# 23-1084(L),

## 23-7409(CON)

IN THE UNITED STATES COURT OF APPEALS FOR THE
SECOND CIRCUIT

VDARE FOUNDATION, INC.,

*Plaintiff-Appellant,*

- v. -

LETITIA JAMES, IN HER OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF NEW YORK,

*Defendant-Appellee.*

On Appeal from the United States District Court for the Northern
District of New York, Case No. 1:22-cv-01337 (FJS/CHF)

**PLAINTIFF-APPELLANT APPENDIX
VOLUME 1 OF 7
(PAGES AA0001– AA0290)**

Jay M. Wolman
RANDAZZA LEGAL GROUP, PLLC.
100 Pearl Street, 14th Floor
Hartford, CT 06103
Tel: 888-887-1776
Email: jmw@randazza.com

Marc J. Randazza
RANDAZZA LEGAL GROUP, PLLC.
30 Western Avenue
Gloucester, MA 01930
Tel: 888-887-1776
Email: ecf@randazza.com

*Counsel for Appellant*

i

# TABLE OF CONTENTS

U.S. District Court for the Northern District of New York
Docket Sheet, Case No. 1:22-cv-01337 (FJS/CHF)…………….. AA0001

Verified Complaint dated Dec. 12, 2022 [Dkt. No. 1]………….. AA0009

    Exhibit A – *Volkov v. James* Complaint [Dkt. No. 1-1]…. AA0027

Motion to Dismiss for Failure to State a Claim
dated Jan. 18, 2023 [Dkt. No. 12]………………………………… AA0075

    Memorandum in Support of Motion [Dkt. No. 12-1]……. AA0076

    Declaration of Fuchs [Dkt. No. 12-2]………………………. AA0103

    Exhibit A – State Court Petition [Dkt. No. 12-3]……….. AA0108

    Exhibit B – 2020 Form 990 [Dkt. No. 12-4]……………… AA0118

    Exhibit C – 2019 Form 990 [Dkt. No. 12-5]……………… AA0160

    Exhibit D – 2018 Form 990 [Dkt. No. 12-6]……………… AA0191

    Exhibit E – Affirmation of E. Frish [Dkt. No. 12-7]…….. AA0220

    Exhibit F – Deed from VDARE to BCF [Dkt. No. 12-8]… AA0234

    Exhibit G – Deed from VDARE to BBB [Dkt. No. 12-9]... AA0237

    Exhibit H – BCF Certificate of Incorporation
    [Dkt. No. 12-10]……………………………………………………. AA0245

    Exhibit I – BBB Certificate of Incorporation
    [Dkt. No. 12-11]……………………………………………………. AA0250

    Exhibit J – Lease to BBB [Dkt. No. 12-12]……………….. AA0255

    Exhibit K – Subpoena [Dkt. No. 12-13]…………………… AA0261

    Exhibit L – Facebook Report [Dkt. No. 12-14]…………… AA0279

    Exhibit M – Facebook Subpoenas [Dkt. No. 12-15]…….. AA0309

Exhibit N – Kelly Letter dated July 20, 2022
[Dkt. No. 12-16]…………………………………………………… AA0336

Exhibit O – Suvari Correspondence [Dkt. No. 12-17]…... AA0342

Exhibit P – Frisch Letter [Dkt. No. 12-18]……………… AA0368

Exhibit Q – Suvari Correspondence [Dkt. No. 12-19]…... AA0371

Exhibit R – Frisch Letter [Dkt. No. 12-20]……………… AA0375

Exhibit S – Frisch Letter [Dkt. No. 12-21]……………… AA0377

Exhibit T – Suvari Letter dated Dec. 2, 2022
[Dkt. No. 12-22] …………………………………………………… AA0379

Notice Re: Decision in Related State Case dated
Jan. 26, 2023 [Dkt. No. 15] ……………………………...……… AA0384

Text Order Treating Dkt. No. 15 as Supplement dated
Jan. 27, 2023 [Dkt. No. 16] ……………………………………… AA0398

Affidavit in Opposition to Motion to Dismiss
dated Feb. 22, 2023 [Dkt. No. 25]………………………………… AA0399

Exhibit A – Affirmation in Support of Order to Show
Cause [Dkt. No. 25-1]…………………………………………… AA0402

Exhibit B – Fuchs Email [Dkt. No. 25-2]………………… AA0415

Exhibit C – Frisch Letter [Dkt. No. 25-3]………………… AA0417

Exhibit D – Frisch Letter [Dkt. No. 25-4]……………….... AA0419

Exhibit E – Frisch Email [Dkt. No. 25-5]………………… AA0422

Exhibit F – Frisch Email [Dkt. No. 25-6]………………… AA0423

Exhibit G – Suvari Letter [Dkt. No. 25-7]……………..… AA0424

Exhibit H – Lease Agreement [Dkt. No. 25-8]…………… AA0428

Exhibit I – 2019 CHAR500 Form [Dkt. No. 25-9]……….. AA0433

Exhibit J – Fuchs Email [Dkt. No. 25-10]..................... AA0437

Exhibit K – Frisch Letter [Dkt. No. 25-11].................... AA0438

Exhibit L – Frisch Email [Dkt. No. 25-12].................... AA0440

Exhibit M – Frisch Letter [Dkt. No. 25-13].................. AA0441

Exhibit N – State Case Memorandum [Dkt. No. 25-14]... AA0442

Exhibit O – *Volokh v. James* Opinion and Order
[Dkt. No. 25-15]........................................................ AA0464

Exhibit P – Operating Agreement [Dkt. No. 25-16]........ AA0485

Exhibit Q – Bylaws of Berkeley Castle Foundation
[Dkt. No. 25-17]........................................................ AA0490

Exhibit R – Order [Dkt. No. 25-18]............................ AA0496

Exhibit S – Affirmation in Support of Application
for Stay [Dkt. No. 25-19]........................................... AA0498

Memorandum in Opposition to Motion to Dismiss dated
Feb. 22, 2023 [Dkt. No. 26] ..................................... AA0521

Response in Support of Motion to Dismiss dated
Mar. 8, 2023 [Dkt. No. 27] ....................................... AA0551

Notice Re: Decision in Related State Case dated
Mar. 14, 2023 [Dkt. No. 28] ..................................... AA0562

Emergency Motion for Temporary Restraining Order and
Preliminary Injunction dated Mar. 21, 2023 [Dkt. No. 29]...... AA0564

Declaration of A. Frisch [Dkt. No. 29-2]........................ AA0568

Corrected Memorandum in Support of Emergency Motion
for Temporary Restraining Order and Preliminary Injunction
dated Mar. 21, 2023 [Dkt. No. 30]...................................... AA0634

iv

Order Denying Motion for Temporary Restraining Order
dated Mar. 27, 2023 [Dkt. No. 32] ...................................... AA0664

Response in Opposition to Motion for a Preliminary
Injunction dated April 10, 2023 [Dkt. No. 34] ....................... AA0666

Affidavit in Opposition to Motion for a Preliminary
Injunction dated April 10, 2023 [Dkt. No. 35] ....................... AA0684

    Exhibit A – Affidavit of Yael Fuchs [Dkt. No. 35-1]........ AA0688

    Exhibit B – Subpoena [Dkt. No. 35-2]..........................  AA0706

    Exhibit C – Frisch Letter [Dkt. No. 35-3]....................  AA0724

    Exhibit D – Frisch Letter [Dkt. No. 35-4]....................  AA0727

    Exhibit E – OAG Letter [Dkt. No. 35-5].......................  AA0729

    Exhibit F – State Court Petition [Dkt. No. 35-6]............  AA0734

    Exhibit G – Oral Argument Transcript [Dkt. No. 35-7]... AA0744

    Exhibit H – State Court Order [Dkt. No. 35-8]..............  AA0780

    Exhibit I – OAG Proposed Protective Order
    [Dkt. No. 35-9]......................................................  AA0792

    Exhibit J – VDARE Motion for Stay [Dkt. No. 35-10]..... AA0802

    Exhibit K – OAG Opposition to Motion for Stay
    [Dkt. No. 35-11]....................................................  AA0980

    Exhibit L – Order Denying Stay [Dkt. No. 35-12]..........  AA1044

    Exhibit M – Frisch Affirmation [Dkt. No. 35-13]...........  AA1046

Reply in Support of Motion for a Preliminary Injunction
dated April 24, 2023 [Dkt. No. 38] ...................................... AA1060

Affidavit in Support of Motion for a Preliminary Injunction
dated April 24, 2023 [Dkt. No. 39] ...................................... AA1076

Exhibit A – OAG Memorandum of Law [Dkt. No. 39-1]... AA1079

Exhibit B – 11 News Article [Dkt. No. 39-2]……………... AA1102

Exhibit C – Washington Post Article [Dkt. No. 39-3]…… AA1106

Exhibit D – VDARE Article [Dkt. No. 39-4]……………… AA1110

Exhibit E – Washington Post Article [Dkt. No. 39-5]…… AA1113

Exhibit F – Declaration of Lydia Brimelow
[Dkt. No. 39-6] …………………………………………….. AA1862

Exhibit G – Affidavit of VDARE Lady Reader
[Dkt. No. 39-7] …………………………………………….. AA1874

Exhibit H – Affidavit of Federale [Dkt. No. 39-8] ………. AA1877

Notice of Motion to Strike Docket Entries dated
April 28, 2023 [Dkt. No. 42]……..………………………………. AA1880

Memorandum in Support of Motion to Strike
[Dkt. No. 42-1]…………………………………………….. AA1881

Notice Supplement in Support of Motion for Preliminary
Injunction dated April 28, 2023 [Dkt. No. 43]………………….. AA1886

Exhibit A – Redacted Affidavit [Dkt. No. 43-1]…………. AA1887

Exhibit B – Redacted Affidavit [Dkt. No. 43-2]…………. AA1890

Text Order on Motion to Strike dated
May 2, 2023 [Dkt. No. 44]……………………………………….. AA1893

Sur-Reply in Opposition to Motion for a Preliminary
Injunction dated May 10, 2023 [Dkt. No. 49] …………………... AA1894

Response in Support of Motion to Dismiss dated
July 27, 2023 [Dkt. No. 51] …………………………….…….…… AA1904

Notice of Appeal dated July 27, 2023 [Dkt. No. 53]……………. AA1907

Response in Opposition to Motion to Dismiss
dated July 27, 2023 [Dkt. No. 54] ……………………………….. AA1909

Motion for Injunction Pending Appeal dated
Aug.24, 2023 [Dkt. No. 56] ……………………………………… AA1914

Memorandum of Law in Support of Motion for Injunction
Pending Appeal dated Aug. 24, 2023 [Dkt. No. 57]…………… AA1917

    Exhibit A – Mendelson Letter [Dkt. No. 57-1]…………. AA1940

    Exhibit B – Kelly Letter [Dkt. No. 57-2]…………………. AA1945

    Exhibit C – Mendelson Letter [Dkt. No. 57-3]…………. AA1948

    Exhibit D – Letter from F. Kelly dated
    Aug. 1, 2023 [Dkt. No. 57-4]…………………..…………….. AA1951

Response in Opposition to Motion for Injunction Pending
Appeal dated Sept. 13, 2023 [Dkt. No. 58]……………………….... AA1971

    Exhibit 1 – Schimmel Letter [Dkt. No. 58-1]……………. AA1982

Notice of Appeal dated Oct. 13, 2023 [Dkt. No. 61] …………… AA1984

APPEAL,CLOSED

# U.S. District Court
# Northern District of New York - Main Office (Syracuse) [NextGen CM/ECF Release 1.7 (Revision 1.7.1.2)] (Albany)
# CIVIL DOCKET FOR CASE #: 1:22-cv-01337-FJS-CFH

| | |
|---|---|
| VDARE Foundation, Inc. v. James | Date Filed: 12/12/2022 |
| Assigned to: Senior Judge Frederick J. Scullin, Jr | Date Terminated: 09/13/2023 |
| Referred to: Magistrate Judge Christian F. Hummel | Jury Demand: Plaintiff |
| Cause: 28:1331 Federal Question: Other Civil Rights | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: Federal Question |

**Plaintiff**

**VDARE Foundation, Inc.**                    represented by **Andrew J Frisch**
Andrew J. Frisch
125 Wickenden Street
Providence, RI 02903
212-285-8000
Email: afrisch@andrewfrisch.com
*TERMINATED: 04/25/2023*
*LEAD ATTORNEY*

**Jay Marshall Wolman**
Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor
Hartford, CT 06103
702-420-2001
Email: jmw@randazza.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Frederick C. Kelly , III**
Frederick C. Kelly, Esq.
One Harriman Square
P.O. Box 60
Goshen, NY 10924
845-295-7945
Email: fckellylaw@protonmail.com
*TERMINATED: 12/21/2022*

**Marc J. Randazza**
Randazza Legal Group, PLLC
4974 S. Rainbow Blvd. - Suite 100
Las Vegas, NV 89118
702-420-2001
Email: mjr@randazza.com
*ATTORNEY TO BE NOTICED*

V.

**AA0001**

**Defendant**

| | |
|---|---|
| **Letitia James**<br>*in her official capacity as Attorney General*<br>*of the State of New York* | represented by **Alexander S. Mendelson**<br>NYS Office of The Attorney General<br>28 Liberty Street<br>New York, NY 10005<br>212-416-8990<br>Email: alexander.mendelson@ag.ny.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Rick Sawyer**
NYS Office of The Attorney General
28 Liberty Street
New York, NY 10005
212-416-6182
Email: richard.sawyer@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Catherine Suvari**
U.S. Attorney's Office- District of
Connecticut
137 Church Street, 24th Floor
New Haven, CT 06510
203-821-3710
Email: Catherine.Suvari@usdoj.gov
*TERMINATED: 04/05/2023*

**Yael Fuchs**
NYS Office of The Attorney General
28 Liberty Street - 19th Floor
New York, NY 10005
212-416-8391
Email: yael.fuchs@ag.ny.gov
*TERMINATED: 05/09/2023*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/12/2022 | 1 | VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF against Letitia James (Filing fee $402 receipt number ANYNDC-6128995) filed by VDARE Foundation, Inc. (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet)(pjh, ) (Entered: 12/13/2022) |
| 12/13/2022 | 2 | Summons Issued as to Letitia James. (pjh, ) (Entered: 12/13/2022) |
| 12/13/2022 | 3 | G.O. 25 FILING ORDER ISSUED: Initial Conference set for 3/13/2023 at 9:00 AM in Albany before Magistrate Judge Christian F. Hummel. Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 3/6/2023. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) (pjh, ) (Entered: 12/13/2022) |
| 12/20/2022 | 4 | NOTICE of Appearance by Frederick C. Kelly, III on behalf of VDARE Foundation, Inc. (Kelly, Frederick) (Entered: 12/20/2022) |

| 12/21/2022 | 5 | NOTICE by VDARE Foundation, Inc. *Withdrawal of Appearance* (Kelly, Frederick) (Entered: 12/21/2022) |
| 12/22/2022 | 6 | NOTICE of Appearance by Yael Fuchs on behalf of Letitia James (Fuchs, Yael) (Entered: 12/22/2022) |
| 12/22/2022 | 7 | First MOTION for Extension of Time to File Answer filed by Letitia James. Response to Motion due by 1/12/2023 Motions referred to Christian F. Hummel. (Fuchs, Yael) (Entered: 12/22/2022) |
| 12/22/2022 | 8 | AFFIDAVIT of Service for Personal served on NYS Attorney General via her authorized representative on December 14, 2022, filed by VDARE Foundation, Inc.. (Frisch, Andrew) (Entered: 12/22/2022) |
| 12/28/2022 | 9 | TEXT ORDER granting 7 First MOTION for Extension of Time to File Answer filed by Letitia James. Letitia James answer due 1/18/2023. Authorized by Magistrate Judge Christian F. Hummel on 12/28/2022. (tab) (Entered: 12/28/2022) |
| 01/03/2023 | 10 | Letter Motion from Andrew J. Frisch for VDARE Foundation, Inc. requesting Rescheduling of Conference submitted to Judge Christian F. Hummel . (Frisch, Andrew) (Entered: 01/03/2023) |
| 01/04/2023 | 11 | TEXT ORDER granting 10 Letter Motion from Andrew J. Frisch for VDARE Foundation, Inc. requesting Rescheduling of Conference : The Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 3/28/2023. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) The Initial Conference is reset for 4/5/2023 @ 10:00 AM. **The conference will be conducted by telephone. The Court will issue a separate notice setting forth the instructions to connect to the conference call in advance of the scheduled date and time** . Authorized by Magistrate Judge Christian F. Hummel on 1/4/2023. (tab) (Entered: 01/04/2023) |
| 01/18/2023 | 12 | MOTION to Dismiss for Failure to State a Claim filed by Letitia James. Motion returnable before Senior District Judge Frederick J. Scullin, Jr.,MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Letitia James. Motion returnable before Senior District Judge Frederick J. Scullin, Jr. Response to Motion due by 2/8/2023. Reply to Response to Motion due by 2/15/2023 (Attachments: # 1 Memorandum of Law, # 2 Declaration of Yael Fuchs, # 3 Exhibit(s) A State Court Petition, # 4 Exhibit(s) B 2020 Form 990, # 5 Exhibit(s) C 2019 Form 990, # 6 Exhibit(s) D 2018 Form 990, # 7 Exhibit(s) E Frisch Affirmation, # 8 Exhibit(s) F Deed from VDARE to BCF, # 9 Exhibit(s) G Deed from VDARE to BBB, # 10 Exhibit(s) H BCF Certificate of Incorporation, # 11 Exhibit(s) I BBB Certificate of Incorporation, # 12 Exhibit(s) J Lease from Lydia Brimelow to BBB, # 13 Exhibit(s) K Subpoena, # 14 Exhibit(s) L Facebook Report, # 15 Exhibit(s) M Facebook Subpoenas, # 16 Exhibit(s) N Letter, # 17 Exhibit(s) O Letter, # 18 Exhibit(s) P Letter, # 19 Exhibit(s) Q Letter, # 20 Exhibit(s) R Letter, # 21 Exhibit(s) S Letter, # 22 Exhibit(s) T Letter) (Fuchs, Yael) Modified on 2/8/2023 to correct name of Judge who will be handling the motion. (rep). (Entered: 01/18/2023) |
| 01/26/2023 | 13 | MOTION for Limited Admission Pro Hac Vice of Catherine Suvari Filing fee $100, receipt number ANYNDC-6175865. Motions referred to Christian F. Hummel. (Fuchs, Yael) (Entered: 01/26/2023) |
| 01/26/2023 | 14 | MOTION for Limited Admission Pro Hac Vice of Richard Sawyer Filing fee $100, receipt number ANYNDC-6175682. (Attachments: # 1 Petition for Admission to Practice, # 2 Certificate of Good Standing, # 3 Declaration of Sponsor, # 4 Attorney Registration Form) Motions referred to Christian F. Hummel. (Fuchs, Yael) (Entered: 01/26/2023) |

**AA0003**

| 01/26/2023 | 15 | NOTICE by Letitia James *re Decision and Order in related state case* (Fuchs, Yael) (Entered: 01/26/2023) |
|---|---|---|
| 01/27/2023 | 16 | TEXT ORDER: The Court will be treating the 15 Notice as a supplement to Defendant's motion to dismiss, Dkt. No 12 , to which Plaintiff should respond to in its opposition to the motion. Plaintiff is permitted an additional 5 pages in its memorandum of law in opposition to Defendant's motion in light of the length of Defendant's supplemental submission. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on January 27, 2023. (rep) Modified on 2/8/2023 to correct hyperlink (rep). (Entered: 01/27/2023) |
| 01/30/2023 | 17 | TEXTORDER granting 13 Motion for Limited Admission Pro Hac Vice of Catherine Suvari, Esq. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Authorized by Magistrate Judge Christian F. Hummel on 1/30/2023. (tab) (Entered: 01/30/2023) |
| 01/30/2023 | 18 | TEXT ORDER granting 14 Motion for Limited Admission Pro Hac Vice of Richard Sawyer, Esq. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Authorized by Magistrate Judge Christian F. Hummel on 1/30/2023. (tab) (Entered: 01/30/2023) |
| 01/31/2023 | 19 | NOTICE of Appearance by Catherine Suvari on behalf of Letitia James (Suvari, Catherine) (Entered: 01/31/2023) |
| 02/06/2023 | 20 | First MOTION for Extension of Time to File Response/Reply *to Defendant's Motion to Dismiss* filed by VDARE Foundation, Inc.. Response to Motion due by 2/27/2023 Motions referred to Christian F. Hummel. (Frisch, Andrew) (Entered: 02/06/2023) |
| 02/07/2023 | 21 | TEXT ORDER granting 20 First MOTION for Extension of Time to File Response/Reply *to Defendant's Motion to Dismiss* filed by VDARE Foundation, Inc. Plaintiff's Response to Motion due by 2/15/2023; The Reply to Response to Motion now due by 3/1/2023. Authorized by Magistrate Judge Christian F. Hummel on 2/7/2023. (tab) (Entered: 02/07/2023) |
| 02/10/2023 | 22 | Second MOTION for Extension of Time to File Response/Reply filed by VDARE Foundation, Inc.. Response to Motion due by 3/3/2023 (Attachments: # 1 Declaration) Motions referred to Christian F. Hummel. (Frisch, Andrew) (Entered: 02/10/2023) |
| 02/13/2023 | 23 | TEXT ORDER granting 22 Motion for Extension of Time to File Response/Reply filed by VDARE Foundation, Inc.: Response to Motion due by 2/22/2023. Reply to Response to Motion due by 3/8/2023. Authorized by Magistrate Judge Christian F. Hummel on 2/13/2023. (tab) (Entered: 02/13/2023) |
| 02/13/2023 | 24 | NOTICE OF APPEARANCE by Rick Sawyer on behalf of Letitia James (Sawyer, Rick) (Entered: 02/13/2023) |
| 02/22/2023 | 25 | AFFIDAVIT in Opposition re 12 MOTION to Dismiss for Failure to State a Claim filed by Letitia James. Motion returnable before Senior Judge Frederick J. Scullin, Jr. MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Letitia James. Motion returnable |

**AA0004**

| | | |
|---|---|---|
| | | before Senior Judge Frederick J. Scullin, Jr. filed by VDARE Foundation, Inc.. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Exhibit(s) C, # 4 Exhibit(s) D, # 5 Exhibit(s) E, # 6 Exhibit(s) F, # 7 Exhibit(s) G, # 8 Exhibit(s) H, # 9 Exhibit(s) I, # 10 Exhibit(s) J, # 11 Exhibit(s) K, # 12 Exhibit(s) L, # 13 Exhibit(s) M, # 14 Exhibit(s) N, # 15 Exhibit(s) O, # 16 Exhibit(s) P, # 17 Exhibit(s) Q, # 18 Exhibit(s) R, # 19 Exhibit(s) S) (Frisch, Andrew) Modified on 2/23/2023 to correct Judge's name. (rep, ). (Entered: 02/22/2023) |
| 02/22/2023 | 26 | MEMORANDUM OF LAW filed by VDARE Foundation, Inc.. (Frisch, Andrew) (Entered: 02/22/2023) |
| 03/08/2023 | 27 | RESPONSE in Support re 12 MOTION to Dismiss for Failure to State a Claim filed by Letitia James. Motion returnable before Judge Christian F. Hummel MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Letitia James. Motion returnable before Judge Christian F. Hummel *REPLY* filed by Letitia James. (Suvari, Catherine) (Entered: 03/08/2023) |
| 03/14/2023 | 28 | NOTICE by Letitia James *re Decision and Order in related State case* (Fuchs, Yael) (Entered: 03/14/2023) |
| 03/21/2023 | 29 | Emergency MOTION for Temporary Restraining Order *and preliminary injunction* by VDARE Foundation, Inc.. (Attachments: # 1 Memorandum of Law, # 2 Declaration) (Frisch, Andrew) Modified on 3/27/2023 - to clarify docket text (rep). (Entered: 03/21/2023) |
| 03/21/2023 | 30 | AMENDED DOCUMENT/CORRECTED MEMORANDUM OF LAW: Re: 29 Emergency TRO, by VDARE Foundation, Inc.. . (Frisch, Andrew) Modified on 3/22/2023 to clarify docket text (rep). (Entered: 03/21/2023) |
| 03/21/2023 | 31 | TEXT NOTICE: The Rule 16 Initial Conference scheduled for April 5, 2023 at 10:00am before Magistrate Judge Christian F. Hummel and the deadline to submit a proposed Civil Case Management Plan and exchange Mandatory Disclosures are ADJOURNED without date pending a decision on the dispositive motion. (tab) (Entered: 03/21/2023) |
| 03/22/2023 | | CLERK'S CORRECTION OF DOCKET ENTRY: The clerk notes that plaintiff filed the 30 Amended Memorandum of Law to remove several blank pages that were found in the original 29 motion. (rep) (Entered: 03/22/2023) |
| 03/27/2023 | 32 | ORDER: The Court hereby ORDERS that Plaintiff's motion for a temporary restraining order, see Dkt. No. 29 , is DENIED; and the Court further ORDERS that Defendant shall file her opposition to Plaintiff's motion for a preliminary injunction, see Dkt. No. 29 , on or before **April 10, 2023**; and the Court further ORDERS that Plaintiff shall file its reply to Defendant's opposition to its motion for a preliminary injunction on or before **April 17, 2023**; and the Court further ORDERS that the Court shall decide the motion based on the parties' submissions. Signed by Senior Judge Frederick J. Scullin, Jr on March 27, 2023. (rep) (Entered: 03/27/2023) |
| 04/05/2023 | 33 | NOTICE by Letitia James *of Withdrawal of Counsel* (Suvari, Catherine) (Entered: 04/05/2023) |
| 04/10/2023 | 34 | RESPONSE in Opposition re 29 Emergency MOTION for Temporary Restraining Order filed by Letitia James. (Sawyer, Rick) (Entered: 04/10/2023) |
| 04/10/2023 | 35 | AFFIDAVIT in Opposition re 29 Emergency MOTION for Temporary Restraining Order *by Yael Fuchs* filed by Letitia James. (Attachments: # 1 Exhibit(s) A (12/16/22 Fuchs Aff.), # 2 Exhibit(s) B (Subpoena), # 3 Exhibit(s) C (9/19/22 Frisch Letter), # 4 Exhibit(s) D (11/28/22 Frisch Letter), # 5 Exhibit(s) E (12/2/22 OAG Letter), # 6 Exhibit(s) F (State Court Petition), # 7 Exhibit(s) G (Oral Argument Tr.), # 8 Exhibit(s) H (State Court Order), |

**AA0005**

| | | |
|---|---|---|
| | | # 9 Exhibit(s) I (OAG's Proposed Protective Order), # 10 Exhibit(s) J (VDARE's Motion for Stay), # 11 Exhibit(s) K (OAG's Opposition), # 12 Exhibit(s) L (Order Denying Stay), # 13 Exhibit(s) M (1/3/22 Frisch Affirmation))(Sawyer, Rick) (Entered: 04/10/2023) |
| 04/17/2023 | 36 | MOTION to Withdraw as Attorney filed by VDARE Foundation, Inc.. Response to Motion due by 5/8/2023 (Attachments: # 1 Declaration) Motions referred to Christian F. Hummel. (Frisch, Andrew) (Entered: 04/17/2023) |
| 04/17/2023 | 37 | TEXT ORDER: The Court is in receipt of Plaintiff's counsel's 36 motion to withdraw as counsel at his client's request. The Court GRANTS the motion. The Court directs Plaintiff that it must have new counsel file a Notice of Appearance and a reply in further support of Plaintiff's motion for a preliminary injunction on or before **April 24, 2023**. Failure to do so will result in DENIAL of Plaintiffs 29 motion for a preliminary injunction. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on April 17, 2023. (rep) Modified on 4/17/2023 to correct bold text. (rep). (Entered: 04/17/2023) |
| 04/24/2023 | 38 | REPLY to Response to Motion re 29 Emergency MOTION for Temporary Restraining Order filed by VDARE Foundation, Inc.. (Wolman, Jay) (Entered: 04/24/2023) |
| 04/24/2023 | 39 | AFFIDAVIT in Support re 29 Emergency MOTION for Temporary Restraining Order filed by VDARE Foundation, Inc.. (Attachments: # 1 Exhibit(s) A - OAG Memorandum of Law, # 2 Exhibit(s) B - 11 News Article, # 3 Exhibit(s) C - Washington Post Article, # 4 Exhibit(s) D - VDARE Article, # 5 Exhibit(s) E - Washington Post Article, # 6 Exhibit(s) F - Declaration of Lydia Brimelow, # 7 Exhibit(s) G - Affidavit of VDARE Lady Reader, # 8 Exhibit(s) H - Affidavit of Federale)(Wolman, Jay) (Entered: 04/24/2023) |
| 04/24/2023 | 40 | NOTICE OF APPEARANCE by Jay Marshall Wolman on behalf of VDARE Foundation, Inc. (Wolman, Jay) (Entered: 04/24/2023) |
| 04/25/2023 | 41 | NOTICE OF ADMISSION REQUIREMENT as to Party Plaintiff; Attorney Marc J. Randazza, Email address is ecf@randazza.com. Phone number is 888-887-1776. Admissions due by 5/9/2023. (khr) Emailed a copy to the Attorney on 4/25/2023. (Entered: 04/25/2023) |
| 04/28/2023 | 42 | MOTION to Strike *docket entries 39-2 through 39-8 and all portions of docket entry 38 relying on those documents* filed by Letitia James. Response to Motion due by 5/19/2023 (Attachments: # 1 Memorandum of Law) Motions referred to Christian F. Hummel. (Sawyer, Rick) (Entered: 04/28/2023) |
| 04/28/2023 | 43 | NOTICE by VDARE Foundation, Inc. re 29 Emergency MOTION for Temporary Restraining Order (Attachments: # 1 Exhibit(s) A - Redacted Affidavit, # 2 Exhibit(s) B - Redacted Affidavit)(Wolman, Jay) (Entered: 04/28/2023) |
| 05/02/2023 | 44 | TEXT ORDER: The Court is in receipt of Defendant's motion to strike certain documents or in the alternative for permission to file a sur-reply 42 and Plaintiff's Notice regarding 2 additional affidavits 43 . The Court denies Defendant's motion to strike certain documents and grants Defendant's motion to file a sur-reply addressing the documents mentioned in her motion to strike the documents mentioned in her 42 motion as well as the documents attached to Plaintiff's 43 Notice as they pertain to Plaintiff's motion for a preliminary injunction. Defendant shall file its sur-reply, not to exceed 10 pages, on or before May 10, 2023. The Court will strike any other documents that the parties attempt to file regarding the pending motion for a preliminary injunction. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on May 2, 2023. (rep) (Entered: 05/02/2023) |
| 05/04/2023 | 45 | NOTICE OF APPEARANCE by Alexander S. Mendelson on behalf of Letitia James (Mendelson, Alexander) (Entered: 05/04/2023) |

**AA0006**

Case 23-1084, Document 33-6, 01/25/2024, 3606094, Page14 of 297

| | | |
|---|---|---|
| 05/09/2023 | 46 | Letter Motion from Alexander Mendelson, Assistant Attorney General for Letitia James requesting that the Court direct the Clerk of Court to remove Assistant Attorney General Yael Fuchs as counsel to Defendant and to remove Ms. Fuchs name and email address from the Court's ECF/CM notification list submitted to Judge Scullin . (Mendelson, Alexander) (Entered: 05/09/2023) |
| 05/09/2023 | 47 | TEXT ORDER granting 46 Letter Motion from Alexander Mendelson, Assistant Attorney General for Letitia James requesting that the Court direct the Clerk of Court to remove Assistant Attorney General Yael Fuchs as counsel to Defendant. Authorized by Magistrate Judge Christian F. Hummel on 5/9/2023. (tab) (Entered: 05/09/2023) |
| 05/09/2023 | 48 | NOTICE by VDARE Foundation, Inc. re 41 Notice of Admission Requirement *of Marc J. Randazza* (Wolman, Jay) (Entered: 05/09/2023) |
| 05/10/2023 | 49 | RESPONSE in Opposition re 29 Emergency MOTION for Temporary Restraining Order *(Sur-Reply as authorized by D.E. 44)* filed by Letitia James. (Sawyer, Rick) (Entered: 05/10/2023) |
| 06/27/2023 | 50 | MEMORANDUM-DECISION AND ORDER: The Court hereby ORDERS that VDARE's motion for a preliminary injunction, see Dkt. No. 29 , is DENIED; and the Court furtherORDERS that each of the parties may supplement their prior submissions supporting or opposing Defendant's motion to dismiss, to address the issue of the effect of res judicata on that motion in a letter brief, not to exceed five pages, within thirty (30) days of the date of this Memorandum-Decision and Order. Signed by Senior Judge Frederick J. Scullin, Jr on June 27, 2023. (rep) (Entered: 06/27/2023) |
| 06/27/2023 | | Set Deadlines: Deadline to file supplement is 7/27/2023. (rep) (Entered: 06/27/2023) |
| 07/27/2023 | 51 | RESPONSE in Support re 12 MOTION to Dismiss for Failure to State a Claim filed by Letitia James. Motion returnable before Judge Frederick J. Scullin, Jr.. MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Letitia James. Motion returnable before Judge Frederick J. Scullin, Jr. filed by Letitia James. (Sawyer, Rick) Modified on 7/29/2023 to correct Judge's name (rep, ). (Entered: 07/27/2023) |
| 07/27/2023 | 52 | NOTICE OF APPEARANCE by Marc J. Randazza on behalf of VDARE Foundation, Inc. (Randazza, Marc) (Entered: 07/27/2023) |
| 07/27/2023 | 53 | NOTICE OF APPEAL as to 50 Order on Motion for TRO,, by VDARE Foundation, Inc.. Filing fee $ 505, receipt number ANYNDC-6387101. (Wolman, Jay) (Entered: 07/27/2023) |
| 07/27/2023 | 54 | RESPONSE in Opposition re 12 MOTION to Dismiss for Failure to State a Claim filed by Letitia James. Motion returnable before Judge Frederick J. Scullin, Jr. MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Letitia James. Motion returnable before Judge Frederick J. Scullin, Jr. filed by VDARE Foundation, Inc.. (Wolman, Jay) Modified on 7/29/2023 to correct Judge's name (rep, ). (Entered: 07/27/2023) |
| 07/28/2023 | 55 | ELECTRONIC NOTICE AND CERTIFICATION sent to US Court of Appeals re 53 Notice of Appeal (khr) (Entered: 07/28/2023) |
| 08/24/2023 | 56 | MOTION Injunction Pending Appeal filed by VDARE Foundation, Inc.. Response to Motion due by 9/14/2023. (Wolman, Jay) Modified on 8/28/2023 to remove motion referral (rep). (Entered: 08/24/2023) |
| 08/24/2023 | 57 | MEMORANDUM OF LAW re 56 Motion for Miscellaneous/Other Relief *Injunction Pending Appeal* filed by VDARE Foundation, Inc.. (Attachments: # 1 Exhibit(s) A - Letter from A. Mendelson dated June 28, 2023, # 2 Exhibit(s) B - Letter from F. Kelly dated July |

| | | |
|---|---|---|
| | | 5, 2023, # 3 Exhibit(s) C - Letter from A. Mendelson dated July 12, 2023, # 4 Exhibit(s) D - Letter from F. Kelly dated August 1, 2023)(Wolman, Jay) (Entered: 08/24/2023) |
| 09/13/2023 | 58 | RESPONSE in Opposition re 56 MOTION Injunction Pending Appeal filed by VDARE Foundation, Inc.. filed by Letitia James. (Attachments: # 1 Exhibit(s) 2023.08.24 Letter from L. Schimmel to F. Kelly re. VDARE)(Mendelson, Alexander) (Entered: 09/13/2023) |
| 09/13/2023 | 59 | MEMORANDUM-DECISION AND ORDER: The Court hereby ORDERS that Defendant's motion to dismiss Plaintiff's complaint, see Dkt. No. 12 , is GRANTED; and the Court further ORDERS that VDARE's motion for an injunction pending appeal, see Dkt. No. 56 , is DENIED as moot; and the Court further ORDERS that the Clerk of the Court shall enter judgment in favor of Defendant and close this case. Signed by Senior Judge Frederick J. Scullin, Jr on September 13, 2023. (rep) (Entered: 09/13/2023) |
| 09/13/2023 | 60 | JUDGMENT: IT IS ORDERED AND ADJUDGED that Defendant's motion to dismiss Plaintiff's complaint, see Dkt. No. 12 , is GRANTED; and the Court further ORDERS that VDARE's motion for an injunction pending appeal, see Dkt. No. 56 , is DENIED as moot; and the Court further ORDERS that the Clerk of the Court shall enter judgment in favor of Defendant and close this case. (rep) (Entered: 09/13/2023) |
| 10/13/2023 | 61 | NOTICE OF APPEAL as to 59 Order on Motion for Miscellaneous Relief,, Order on Motion to Dismiss for Failure to State a Claim,, Order on Motion to Dismiss/Lack of Subject Matter Jurisdiction, 60 Judgment, by VDARE Foundation, Inc.. Filing fee $ 505, receipt number ANYNDC-6476956. (Wolman, Jay) (Entered: 10/13/2023) |
| 10/13/2023 | 62 | ELECTRONIC NOTICE AND CERTIFICATION sent to US Court of Appeals re 61 Notice of Appeal. (khr) (Entered: 10/13/2023) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/24/2024 13:25:45 | | |
| **PACER Login:** | jaywolmawolma | **Client Code:** | Vdare |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-01337-FJS-CFH |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

_____ x

VDARE FOUNDATION, INC.

      *Plaintiff,*

    against

LETITIA JAMES, in her official capacity
as Attorney General of the State of New York,

      *Defendant.*

_____ x

Civil Action No: ____-cv-_____

**1:22-cv-1337 (FJS/CFH)**

---

## VERIFIED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

---

Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@andrewfrisch.com*

*Attorneys for Plaintiff*

**AA0009**

## PARTIES

1.     Plaintiff VDARE Foundation, Inc. ("VDARE") is a non-profit foundation recognized by the IRS as a 501(c)(3) educational organization organized and existing under the laws of the State of New York, but with a principal place of business in Berkeley Springs, West Virginia.

2.     VDARE was founded to support the efforts of VDARE.com, a non-profit web magazine. VDARE is a charity registered in the State of New York. VDARE is literally a mom-and-pop operation, run by Peter and Lydia Brimelow, husband and wife, with limited staff and resources.

3.     Defendant Letitia James has been the Attorney General of the State of New York since she was sworn into office on January 1, 2019. Her office is located in Albany, New York. She is sued here in her official capacity. She was Attorney General at all times relevant to this Complaint and has final policymaking authority with respect to her office and is responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the attorneys under her command. Her name appears as the Attorney General on all the subpoenas at issue in this matter.

## JURISDICTION AND VENUE

4.     Pursuant to 28 U.S.C. § 1331, the Court has subject matter jurisdiction because this action involves claims based on the First and Fourteenth Amendments to the United States Constitution, and because this action seeks to prevent state officials from interfering with federal rights. Further, subject matter jurisdiction is conferred on this Court by 28 U.S.C. § 1343(a)(3) because this action is brought to redress deprivations under color of state law of rights, privileges, and immunities secured by the United States

2

**AA0010**

Constitution. This Court has supplemental jurisdiction over state law claims asserted in this action under 28 U.S.C. § 1367. Venue is proper in this district under 28 U.S.C. § 1391(b) as the Attorney General has a principal office within it.

5.     There is a present and actual controversy between the parties.

6.     The relief requested is authorized pursuant to 28 U.S.C. § 1343(a)(4) (recovery of damages or equitable relief or any other such relief for the protection of civil rights), 28 U.S.C. § 2201 and 2202 (declaratory and other appropriate relief), 42 U.S.C. § 1983 (deprivation of rights, privileges, and immunities secured by the Constitution), and 42 U.S.C. § 1988 (awards of attorneys' fees and costs).

### The Attorney General's Violation of VDARE's First Amendment Rights

7.     VDARE's founder, Peter Brimelow, is a well-known magazine editor, political commentator, columnist and author whose career spans five decades. He has served as an editor and writer at the Wall Street Journal, Financial Post, Macleans, Barron's, Fortune, Forbes, National Review, and MarketWatch. He is a recipient of the Gerald Loeb Award for Distinguished Business and Financial Journalism, was a media fellow at the Hoover Institution, and has been described as "a star of the conservative movement in the 2000s." He is the author of four well-regarded books, including Alien Nation: Common Sense About America's Immigration Disaster (1995), a national bestseller in the United States. He also wrote The Patriot Game: National Dreams and Political Realities (1986), a book on Canadian politics that is credited with spurring the creation of the Reform Party of Canada in 1987; as well as The Wall Street Gurus: How You Can Profit from Investment Newsletters; and The Worm in the Apple: How the Teacher Unions Are Destroying American Education.

**AA0011**

8.     Brimelow with an editorial collective of several other journalists started VDARE.com to publish articles critical of the immigration policy of the United States. Throughout its existence, VDARE has published pieces that criticize current United States immigration policy for various reasons and from a variety of angles and perspectives. VDARE's editorial position in favor of limiting immigration is not based on any sort of aversion to immigrants. Brimelow is himself an immigrant and a naturalized United States citizen. Many of VDARE's editors and contributors, current and former, are immigrants or foreign nationals. Stories originally published in VDARE have been positively cited by the New York Times, the Harvard Journal on Law and Public Policy, and many other publications.

9.     VDARE is not without detractors. VDARE has repeatedly been tarred with pejoratives such as "white nationalist," and "racist. VDARE rejects these labels. Whatever the views of VDARE's detractors, its speech is non-violent and lawful and protected by the First Amendment to the United States Constitution.

10.     Use of pejoratives to describe VDARE has led to significant reputational and professional harm for those associated with it. On occasions when associations with VDARE have been disclosed or become public, people have lost employment, and contractors essential to VDARE's existence have opted to stop providing services. Venues which have agreed to host VDARE's conferences have faced pressure campaigns and threats. Such venues have sometimes cancelled contracts with VDARE.

11.     To protect its rights of speech and association, VDARE is vigilant about maintaining the privacy of those associated with it and does not disclose their identities unless required by law.

4

**AA0012**

## THE ATTORNEY GENERAL HAS EXPRESSED DESIRE
## TO IMPEDE SPEECH SIMILAR TO VDARE'S

12.     The Attorney General, as the State's principal law enforcement officer, should be a stalwart steward of the First Amendment, protecting the right to expression of viewpoints and advocacy of positions about government policy.  It is her obligation to distinguish viewpoints protected by the First Amendment with which she disagrees from calls to violence or other non-protected types of expression.  *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional.").

13.     On January 8, 2020, the Attorney General told reporters that her then newly-created "Hate Crimes Unit" would "focus on social media companies:"  "We are going to strengthen oversight, because we see how much hate is being fueled by content on the internet. We're calling on these companies to regulate hate speech and strengthen their policies. They can do more to fight these things – racism, the spread of disinformation and hate."  *See  https://www.haaretz.com/us-news/2020-01-08/ty-article/.premium/new-york-anti-semitism-crisis-jews-violence-trump/0000017f-e39c-d568-ad7f-f3ff3b320000*

14.     On August 5, 2020, the Attorney General joined in a letter to Facebook demanding that it increase censorship against "hate speech and hate organizations:"

>       *Although Facebook has developed policies against hate speech and organizations that peddle it, we remain concerned that Facebook's policies on Dangerous Individuals and Organizations, including but not limited to its policies on white nationalist and white supremacist content, are not enforced quickly and comprehensively enough.*

15.     The Attorney General's desire to suppress free speech has led to ongoing litigation. In *Volokh v. James*, social media platforms and websites have noted her antipathy towards

5

**AA0013**

free speech - - citing her desire to use the law to prevent what she describes as "dangerous and corrosive ideas to spread." *See* Exhibit A at ¶ 18.

## The Attorney General Targets VDARE

16.     On May 13, 2022, the Attorney General's Special Counsel for Hate Crimes subpoenaed Meta, the parent company of Facebook, for information about VDARE. Specifically, the subpoena demanded:

1. All account opening documents for the Facebook Accounts.

2. Documents sufficient to identify the individuals who opened the Facebook Accounts.

3. All documents concerning the grounds on which the Facebook Accounts were terminated.

4. A true and correct copy of the document entitled "April 2020 Coordinated Inauthentic Behavior Report."

5. All documents relating to the finding that VDARE engaged in "coordinated inauthentic behavior" in its use of Facebook and other Meta platforms.

6. Documents sufficient to identify the Facebook Pages, accounts, and Group used by VDARE in their "coordinated inauthentic behavior" as described by the "April 2020 Coordinated Inauthentic Behavior Report."

7. Documents sufficient to identify the "COVID-19-related conspiracies and hate speech about Asian Americans" shared through the network of fake accounts VDARE created and identified by the "April 2020 Coordinated Inauthentic Behavior Report."

8. All documents indicating that VDARE violated the terms of service of Facebook or other Meta platforms.

9. All complaints made to Facebook or another Meta platform during the Relevant Period concerning any allegations that VDARE violated the platform's terms of service.

**AA0014**

10. All documents from investigations by Meta, its predecessors, or agents into allegations that VDARE violated the terms of service of Facebook or other Meta platforms.

11. Documents sufficient to identify the amount, date, purpose, payor name, and payor address for any payment made to VDARE by Facebook Pay or any other Meta payment platform.

12. All documents reflecting withdrawals by VDARE from Facebook Pay or any other Meta payment platform, including the amount, date, withdrawing person or entity and recipients of each withdrawal.

13. All documents relating to any other transfers by VDARE to or from Facebook Pay or any other Meta payment platform, including the source, recipients, dates, and amounts of such transfers, to the extent not previously described herein.

14. Documents sufficient to identify the final balance(s), if any, in VDARE's Facebook Pay or any other Meta payment account.

15. All account closing documents for VDARE's Facebook Pay or any other Meta payment account.

16. Documents sufficient to identify any advertisements placed by VDARE within the Relevant Period on Facebook or any other Meta platform.

17. Documents sufficient to identify the total cost of advertisements placed by VDARE within the Relevant Period on Facebook or any other Meta platform.

18. Documents sufficient to identify the audiences targeted by VDARE's advertising within the Relevant Period on Facebook or any other Meta platform.

19. Documents sufficient to identify the number of users to whom VDARE's advertising was delivered within the Relevant Period on Facebook or any other Meta platform. Please note that this request does not call for production of the identity of any user who received VDARE's advertising.

17. None of the documents that the Attorney General demanded from Meta appear reasonably related to any unlawful activity by VDARE. Speech characterized by the Attorney General as "hate speech" and "misinformation" does not render it unprotected by the First Amendment. While VDARE disagrees with Facebook that it ever engaged in "coordinated inauthentic behavior," even such purported behavior does not constitute a

**AA0015**

criminal or civil violation.

18.     On June 14, 2022 the same Special Counsel for Hate Crimes issued a subpoena to

Facebook Payments demanding:

>   1. Documents sufficient to identify the amount, date, purpose, payor name, and
>   payor address for any payment made to VDARE by Facebook Payments, Inc., or
>   any other Meta payment platform.
>
>   2. All documents reflecting withdrawals by VDARE from Facebook Payments,
>   Inc., or any other Meta payment platform, including the amount, date, withdrawing
>   person or entity and recipients of each withdrawal.
>
>   3. All documents relating to any other transfers by VDARE to or from Facebook
>   Payments, Inc., or any other Meta payment platform, including the source,
>   recipients, dates, and amounts of such transfers, to the extent not previously
>   described herein.
>
>   4. Documents sufficient to identify the final balance(s), if any, in VDARE's
>   Facebook Payments, Inc., or any other Meta payment account.
>
>   5. All account closing documents for VDARE's Facebook Payments, Inc., or any
>   other Meta payment account.

19.     VDARE was notified of this subpoena by Facebook's counsel, not by the Attorney

General, a violation by the Attorney General of the Stored Communications Act, which

requires "with prior notice from the governmental entity to the subscriber or customer if

the governmental entity" for administrative subpoenas.  18 U.S.C. § 2703(b).

20.     The Facebook Payments and Meta subpoenas collectively asked for information

about payments made to VDARE, which would have inevitably disclosed confidential

information about VDARE's donors.  In addition, asking for information about the names

of those who operated the accounts would have identified the names of those who

anonymously post from the social media accounts.

21.     Had Facebook and Meta supplied the information that the Attorney General

demanded, the rights under the First Amendment of donors and commentators would have

**AA0016**

been violated.

## The Attorney General's Charities Bureau Subpoena

22.     On June 24, 2022, before Meta or Facebook Payments produced documents, the Attorney General's Charities Bureau issued a subpoena to VDARE, identifying 44 categories of demanded documents.

23.     Among many other things, the Attorney General demanded "Copies of the transcripts to each deposition in the litigation between Peter Brimelow and/or VDARE and the New York Times, and all documents produced by VDARE and/or Brimelow in connection with those proceedings." This demand referred to a lawsuit for libel filed by Brimelow against the New York Times for calling him an "open white nationalist," which he is not.

24.     On July 20, 2022, after a meet-and-confer with Assistant Attorneys General on July 18, 2022, an attorney then advising VDARE on responding to the Attorney General's subpoenas, requested in writing that the she withdraw her subpoenas on grounds that they were pretexts aimed at VDARE's rights under the First Amendment of the United States Constitution to express positions critical of governmental officials and policy. The Attorney General declined to withdraw the subpoenas.

25.     In August 2022, before a revised return date, VDARE engaged new counsel and directed him to comply with the Attorney General's subpoena. The Attorney General acknowledged new counsel's need to get up to speed and his competing commitments and requested that VDARE produce "very basic corporate records" to demonstrate VDARE's intent to comply in advance of a "rolling production." Between September 19 and November 21, 2022, VDARE produced about 6,000 pages of documents in response to the

**AA0017**

Attorney General's subpoena to VDARE after completing review of documents maintained by VDARE electronically and in hard copy.

26. While making and before completing the production, VDARE advised the Attorney General of its position that production of the identities of many of its contractors would violate the First Amendment to the United States Constitution. VDARE explained to the Attorney General that some contractors would face retribution if their association with VDARE was revealed, and that VDARE otherwise risked losing services of contractors indispensable to its existence if their identities were disclosed, as has happened in the past. VDARE cited the Attorney General to *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460, 462 (1958) (protecting the right of "advocacy of both public and private points of view, particularly controversial ones" and holding that an order requiring association to produce membership list interfered with First Amendment freedom of association); and *Evergreen Ass'n, Inc. v. Schneiderman*, 153 A.D.3d 87, 100 (2d Dep't 2017) (applying strict scrutiny where anti-abortion advocacy group served with the Attorney General's investigatory subpoena alleged that subpoena compliance would "have a chilling effect on [the group's] associations with its employees and potential clients" as well as at least one hospital). *See also Ronsenblatt v. Baer*, 383 U.S. 75, 85 (1966) ("Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized.")

27. VDARE proposed that the Attorney General identify specific contractors about which she might be concerned; and VDARE could otherwise identify any contractor which might qualify as a "related party" within the meaning of New York law. VDARE

10

**AA0018**

expressed its desire to make as robust a production as possible, proposing that the issue of disclosure of contractors' identities could be revisited if it did not prove to be an adequate solution or if a specific need arose. The Attorney General rejected VDARE's proposals and requested that VDARE further articulate its objection to disclosure of the identities of vendors.

28.     By letter dated October 31, 2022, VDARE again articulated its objection to disclosure of the identities of contractors and requested that the parties meet-and-confer on the issue. VDARE advised the Attorney General that the identities of VDARE's contractors are indispensable to its work, and their identities inextricably intertwined with financial records, including on lists of banking transactions and associated copies of checks. VDARE had otherwise advised the Attorney General that the work of its counsel, a solo practitioner reviewing all of VDARE's documents himself, to provide documents with redactions was labor-intensive, time-consuming, and ongoing. VDARE proposed in its letter of October 31, 2022, that the parties meet-and-confer to determine if they could find at least a temporary resolution of the issue.

29.     VDARE advised the Attorney General that its concerns were heightened by a letter dated October 11, 2022, sent by members of Congress to Attorney General Merrick Garland, requesting investigation of apparently undue disclosure of confidential information provided to or otherwise obtained by the Attorney General in another matter. On August, 26, 2022, Politico published confidential information about donors to a conservative political non-profit, Stand for America, Inc. According to reports, the information came from the Attorney General's office, though the exact leaker is unknown. *https://www.wsj.com/articles/all-about-nikki-haleys-donors-new-york-attorney-general-*

*letitia-james-stand-for-america-11662065044.*

30.     Meanwhile, in early October 2022, the Attorney General requested that VDARE provide a general outline of electronically-stored files (emails) that VDARE would need to collect for review and produce and begin collecting. VDARE did so, advising that the universe of such files amounted to over 40 gigabytes of data, providing a list of email custodians, and otherwise keeping the Attorney General updated as to the status of the review.  The emails, like VDARE's paper documents, contain information about the identities of contractors whose association with VDARE is not required for any legitimate oversight of VDARE by the Attorney General, and the disclosure of which would violate First Amendment protections and risk VDARE's existence.

31.     As for the Attorney General's subpoenas to Facebook Payments and Meta, while VDARE questioned the legitimate purpose of the Attorney General's demands, VDARE withdrew its objection to disclosures provided that no personal identifying information was disclosed and the anonymity of its donors and contributors was protected.

32.     On December 2, 2022, the Attorney General demanded full compliance with its subpoena to VDARE by December 12, 2022, or would deem VDARE to be in non-compliance.  Though VDARE had advised the Attorney General about its concerns about unnecessary disclosure of identifies of contractors, the Attorney General demanded that their identities be disclosed.  Though the Attorney General had encouraged VDARE to make a rolling production as documents were reviewed, resulting in later decisions not to redact some information that had earlier been redacted, the Attorney General questioned the validity of VDARE's concerns.  Though VDARE had advised the Attorney General that redactions of identities of contractors were intertwined with its records and were

12

**AA0020**

otherwise time-consuming and labor intensive to apply, the Attorney General demanded, by December 12, 2022, a log identifying each redaction of each contractor's identify in VDARE's production (and its prospective production of emails) as a precondition to a meet-and-confer about VDARE's constitutional objection to unnecessary disclosure of identities of contractors.

33.     The Attorney General's position threatens VDARE's existence and reveals that her targeting of VDARE is a pretext because she disagrees with its constitutionally-protected speech.

**COUNT ONE**
**Declaratory Relief under the First Amendment**

34.     VDARE repeats and re-alleges every allegation in the preceding paragraphs as though fully set forth herein.

35.     Long established First Amendment precedent establishes the right to associate with a group for "advocacy of both public and *private points of view, particularly controversial ones*." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. at 460 (emphasis added). This right is infringed when the identities of anonymous members of a controversial group are sought through a government subpoena. *See id.* at 462 (order requiring association to produce membership list interfered with First Amendment freedom of association).

**36.**     Imposing on "associational rights" . . . "cannot be justified on the ground that the regime is narrowly tailored to investigating charitable wrongdoing." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2389 (2021).

**37.**     Subpoenas which could have "a chilling effect on its associations with its employees and potential clients" by breaking anonymity are invalid. *See, e.g.*, *Evergreen Ass'n, Inc. v. Schneiderman*, 153 A.D.3d at 100. *See also Brown v. Socialist Workers '74*

13

**AA0021**

*Committee (Ohio)*, 459 U.S. 87, 96 (1982) ("Even individuals who receive disbursements for 'merely' commercial transactions may be deterred by the public enmity attending publicity, and those seeking to harass may disrupt commercial activities on the basis of expenditure information. Because an individual who enters into a transaction with a minor party purely for commercial reasons lacks any ideological commitment to the party, such an individual may well be deterred from providing services by even a small risk of harassment.")

38.     The Attorney General has failed to recognize the rights of speech and association of VDARE and its contractors and has rejected reasonable proposals to accommodate VDARE's concerns, which helps demonstrate the Attorney General's true agenda.

### COUNT TWO

**(Violation of VDARE's First and Fourteenth Amendment Rights
Under 42 U.S.C. § 1983 by Retaliating Against VDARE Based on
Exercise of Its Rights of Freedom of Speech and of Association)**

39.     VDARE repeats and re-alleges every allegation in the preceding paragraphs as though fully set forth herein.

40.     The First Amendment, which applies to the Attorney General by operation of the Fourteenth Amendment, secures VDARE's right to free speech, including its right to express political beliefs about immigration and related polices of the United States, regardless of whether the Attorney General agrees.

41.     The Attorney General has expressed her desire to use her power to limit speech with which she disagrees and has cited the First Amendment as an obstacle to her goal.

42.     The Attorney General's subpoena to VDARE is an offshoot of the Attorney General's targeting of VDARE because of its viewpoints.

43.     Government action in retaliation for the exercise of protected speech violates the First Amendment of the United States Constitution. *See Mozzochi v. Borden*, 959 F.2d 1174, 1179 (2d Cir. 1992).

**AA0022**

44.    "To state a First Amendment retaliation claim sufficient to withstand a motion to dismiss, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015).

45.    VDARE's expressed viewpoints about immigration and related subjects are protected by the First Amendment.

46.    Subpoenas can constitute the basis of adverse action to show retaliation. *See, e.g., Molefi v. Oppenheimer Tr.*, No. 03 CV 5631 FBVVP, 2007 WL 538547, at *4 (E.D.N.Y. Feb. 15, 2007).

47.    The Attorney General has targeted VDARE in retaliation for constitutionally protected speech.

**COUNT THREE**

**(Violation of VDARE's Rights Under Article I, Section 8 of the New York State Constitution by Retaliating Against VDARE Based on Exercise of Its Rights of Freedom of Speech and Association)**

48.    VDARE repeats and re-alleges every allegation in the preceding paragraphs as though fully set forth herein.

49.    Article I, Section 8 of the New York State Constitution secures VDARE's right to free speech, including its right to express political beliefs concerning immigration policy,

50.    "The analysis for a retaliation claim under the First Amendment and under Article I § 8 of the New York State Constitution is the same." *Kuczinski v. City of New York*, 352 F. Supp. 3d 314, 321 (S.D.N.Y. 2019). The Attorney General's targeting of VDARE constitutes retaliation under the United States and New York Constitutions.

**AA0023**

## COUNT FOUR

### (Preliminary and Permanent Injunctions)

51.     VDARE repeats and re-alleges every allegation in the preceding paragraphs as though fully set forth herein.

52.     VDARE seeks and is entitled to a preliminary injunction prior to judgment in this case and a permanent injunction thereafter barring the Attorney General from enforcing her unconstitutional demands.

53.     VDARE will suffer irreparable harm absent such injunctive relief, including disclosure of identities of contractors, which disclosure cannot be undone.

54.     VDARE is likely to prevail on the merits in this litigation.

55.     The balance of equities favors VDARE.

56.     The public interest favors VDARE as the public interest itself lies squarely with the vigorous exercise of First amendment rights.

### DEMAND FOR JURY TRIAL

VDARE hereby demands a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE VDARE respectfully requests judgment:

   i.     On the First Cause of Action, declaring the Subpoenas' attempt to compel First Amendment speech and associational rights unconstitutional

   ii.    On the Second Cause of Action, for compensatory and punitive damages in an amount to be determined at trial;

   iii.   On the Third Cause of Action, for compensatory and punitive damages in an amount to be determined at trial;

16

**AA0024**

iv.    On the Fourth Cause of Action, to enjoin the Defendant from enforcing the subpoena;

v.    For the costs of this action, attorney's fees and such other further and different relief as this court deems just and proper.

Dated:  December 12, 2022


Respectfully submitted,

*/s/ Andrew J. Frisch*
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@andrewfrisch.com*

*Attorneys for Plaintiff*

**AA0025**

## VERIFICATION OF LYDIA BRIMELOW

Pursuant to 28 U.S.C. 1746, Lydia Brimelow declares as follows:

1. I am President of VDARE Foundation, Inc., the Plaintiff herein, and a citizen of the United States.

2. I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief

3. I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on December 12, 2022

Lydia Brimelow

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

EUGENE VOLOKH, RUMBLE CANADA
INC., and LOCALS TECHNOLOGY INC.

        *Plaintiffs*,

    v.

LETITIA JAMES, in her official capacity as
Attorney General of New York,

        *Defendant*.

Civil Action No.: 1:22-cv-10195

---

# VERIFIED COMPLAINT
# FOR DECLARATORY AND INJUNCTIVE RELIEF

---

DARPANA M. SHETH
(New York Bar No. 4287918)
DANIEL M. ORTNER*
(California State Bar No. 329866)
JAMES M. DIAZ*
(Vermont Bar No. 5014)
FOUNDATION FOR INDIVIDUAL RIGHTS AND
    EXPRESSION
510 Walnut St., Suite 1250
Philadelphia, PA 19106
Telephone: (215) 717-3473
daniel.ortner@thefire.org
jay.diaz@thefire.org
darpana.sheth@thefire.org

*Attorneys for Plaintiff*
**Pro Hac Vice* Motions Forthcoming
** S.D.N.Y. Admission Pending

BARRY N. COVERT**
(New York Bar No. 27118)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave., Suite 120
Buffalo, NY 14202
Tel: (716) 849-1333 x 365
bcovert@lglaw.com

## INTRODUCTION

1.      The State of New York has enacted a new law, slated to take effect December 3, 2022, with one goal: to silence disfavored—but constitutionally protected—expression. New York General Business Law Section 394-ccc ostensibly targets "hateful conduct," but in reality, regulates protected online speech that someone, somewhere perceives to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion, or other protected categories (the "Online Hate Speech Law").

2.      New York's Online Hate Speech Law, titled "Social media networks; hateful conduct prohibited," hangs like the Sword of Damocles over a broad swath of online services (such as websites and apps), threatening to drop if they do not properly address speech that expresses certain state-disfavored viewpoints, as the state now mandates they must. In something of a First Amendment "double whammy," the Online Hate Speech Law burdens the publication of disfavored but protected speech through unconstitutionally compelled speech—forcing online services to single out "hate speech" with a dedicated policy, a mandatory report & response mechanism, and obligatory direct replies to each report. If a service refuses, the law threatens New York Attorney General investigations, subpoenas, and daily fines of $1,000 per violation.

3.      There can be no reasonable doubt New York will enforce the Online Hate Speech Law to strong-arm online services into censoring protected speech. The Attorney General's intentions, in fact, could not be clearer; as recited, for example, in an October press release, the Attorney General declared that "[o]nline platforms should be held accountable for allowing hateful and dangerous content to spread on their platforms" because an alleged "lack of oversight, transparency, and accountability of these platforms allows hateful and extremist views to proliferate online." Press Release, Office of the New York State Attorney General, *Attorney*

*General James and Governor Hochul Release Report on the Role of Online Platforms in the Buffalo Shooting* (Oct. 18, 2022), https://ag.ny.gov/press-release/2022/attorney-general-james-and-governor-hochul-release-report-role-online-platforms [https://perma.cc/L5VP-3EMN].

4.      The threat posed by the new Online Hate Speech Law is of critical concern to online services like those operated by the Plaintiffs here.

5.      Plaintiff Eugene Volokh operates The Volokh Conspiracy, a legal blog subject to the Online Hate Speech Law. The Volokh Conspiracy is dedicated to maintaining a free and open marketplace of ideas, and thus generally avoids regulating or removing visitor comments from his site based on viewpoint. Volokh does not believe that speech targeted by the Online Hate Speech Law warrants the now mandated policy, report & response mechanism, or direct replies to reports.

6.      Plaintiffs Rumble Canada Inc. and Locals Technology Inc. own and operate online services subject to the Online Hate Speech Law. The sites compete with market leaders such as YouTube by touting their acceptance of a robust variety of speech, including viewpoints rejected by other platforms. Both sites generally avoid regulating or removing creator content or visitor comments from their sites so long as the content or comments comply with their content policies. Neither Plaintiff has a business reason to create a dedicated policy and report & response mechanism, or to directly reply to reports for the speech targeted by the Online Hate Speech Law.

7.      New York cannot regulate disfavored online speech by compelling online services to "mouth support for views they find objectionable," *Janus v. Am. Fed'n of State, Cnty. and Mun. Emps.*, 138 S. Ct. 2448, 2463 (2018), in hopes of deterring or eliminating hate speech. Plaintiffs bring this lawsuit to vindicate their constitutional and statutory rights because the First Amendment does not tolerate efforts, like those of the State of New York, to "cleanse public debate." *Cohen v. California*, 403 U.S. 15, 25 (1971).

## JURISDICTION

8.     This action arises under the First and Fourteenth Amendments to the United States Constitution and the following federal laws: (a) the Civil Rights Act of 1871, 42 U.S.C. Sections 1983 and 1988; (b) Section 230 of the Communications Decency Act, 47 U.S.C. Section 230; and (c) the Declaratory Judgment Act, 28 U.S.C. Sections 2201–02.

9.     Plaintiffs seek declaratory and injunctive relief declaring that New York General Business Law § 394-ccc is unconstitutional, facially and as-applied, under the First and Fourteenth Amendments, and is also preempted by Section 230 of the Communications Decency Act.

10.     This Court has original jurisdiction over these federal claims under 28 U.S.C. Sections 1331 and 1343.

## VENUE

11.     Venue is proper in this judicial district under 28 U.S.C. Section 1391(b)(1) because Defendant resides in the Southern District of New York. The New York Attorney General maintains an office in this District and conducts a substantial portion of its activity in this District. *Buffalo Tchrs. Fed'n, Inc. v. Helsby*, 426 F. Supp. 828, 830 (S.D.N.Y. 1976).

## THE PARTIES

### *Plaintiffs*

12.     Plaintiff Eugene Volokh, a California resident and constitutional law professor at UCLA School of Law,[*] is co-owner and operator of The Volokh Conspiracy, a legal blog with posts by Volokh, other professors, and various academically minded lawyers from around the country (collectively "Volokh" or "The Volokh Conspiracy"). The site is hosted at reason.com/volokh by Reason magazine, a print and online publication dedicated to "free minds

---

[*] Eugene Volokh is participating in this lawsuit on his own behalf. UCLA has taken no position on the matter.

**AA0030**

and free markets." Volokh and his co-bloggers have final editorial authority on The Volokh Conspiracy, including with regard to content selection. Visitors to the site, after registering, may comment on published blog posts and reply to other commenters. The public can view all comments and replies. New York's Online Hate Speech Law regulates The Volokh Conspiracy as a "social media network" because it is an "internet platform[] . . . designed to enable users to share any content with other users or to make such content available to the public." Volokh objects to the Online Hate Speech Law's requirements as contrary to The Volokh Conspiracy's mission.

13. Plaintiff Rumble Canada Inc., headquartered in Toronto and a wholly owned subsidiary of Rumble Inc. (which is headquartered in Longboat Key, Florida), is the owner and operator of Rumble.com (collectively "Rumble"), an online service similar to YouTube in that it allows independent creators to upload and share video content, and registered users to comment on videos and to reply to other commenters. The public can view all videos, comments, and replies on Rumble. New York's Online Hate Speech Law regulates Rumble as a "social media network" because it is an "internet platform[] . . . designed to enable users to share any content with other users or to make such content available to the public." Rumble objects to the Online Hate Speech Law's requirements as contrary to its pro-free speech purpose and mission "to protect a free and open internet" and to "create technologies that are immune to cancel culture." *About Us*, Rumble Inc., https://corp.rumble.com (last visited Nov. 25, 2022).

14. Plaintiff Locals Technology Inc., headquartered in Longboat Key, Florida, and a wholly owned subsidiary of Rumble Inc., is the owner and operator of Locals.com (collectively "Locals"), an online service that allows creators to communicate and share content directly with unpaid and paid subscribers. Visitors to Locals, after registering, may comment on creator pages or reply to other commenters. New York's Online Hate Speech Law regulates Locals as a "social

media network" because it is an "internet platform[] . . . designed to enable users to share any content with other users or to make such content available to the public." Locals objects to the Online Hate Speech Law's requirements as contrary to its pro-free speech purpose and mission of being "committed to fostering a community that is safe, respectful, and dedicated to the free exchange of ideas." *Community Guidelines*, Locals, https://locals.com/community-guidelines (last visited Nov. 25, 2022).

### *Defendant*

15.     Defendant Letitia James, New York's Attorney General, is responsible for enforcing the Online Hate Speech Law, which provides her office investigative authority, subpoena powers, and the ability to assess civil penalties for violations and carry out this obligation. N.Y. Gen. Bus. Law § 394-ccc(5). At all relevant times, Attorney General James was and is acting under the color of state law. Attorney General James is sued in her official capacity only.

### FACTUAL ALLEGATIONS

16.     Hate speech is generally viewed as "[s]peech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground." *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017). But it is nonetheless protected against viewpoint-based suppression. *Id.*

17.     Since the end of World War II, as other nations across the globe passed laws to prohibit or penalize hate speech, our Supreme Court has repeatedly struck down laws purporting to target hate speech. *See* Roni Cohen, *Regulating Hate Speech: Nothing Customary About It*, 15 Chi. J. Int'l L. 229, 238–48 (2014). "As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v. Phelps*, 562 U.S. 443, 461 (2011). As the Court recently emphasized, limiting speech perceived to be

hateful, insulting, or offensive "strikes at the heart of the First Amendment." *Matal*, 137 S.Ct. at 1764. For the United States, "the interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship." *Reno v. Am. C.L. Union*, 521 U.S. 844, 885 (1997).

18.     Despite its First Amendment protection, after New York's lawmakers spent several years targeting online "hate speech," the State passed a law that singles out and penalizes this speech. Acting in the wake of a racially motivated mass shooting, New York's Legislature fast-tracked the Online Hate Speech Law, passing it with little debate after only nineteen days.  New York Governor Kathy Hochul praised the law, saying it would require "social media networks to monitor and report hateful conduct on their platforms." Governor Kathy Hochul, *Governor Hochul Signs Landmark Legislative Package to Strengthen Gun Laws and Protect New Yorkers* at 12:30–13:07 (June 6, 2022), https://youtu.be/SNrci_ey8L4?t=750. Attorney General James said the law was necessary because "social media platforms provide an unchecked vehicle for [] dangerous and corrosive ideas to spread," and it would allow her office to "expand our work . . . to address this growing threat" from "dangerous and hateful platforms." *Id.* at 35:50–36:35.

19.     Effective December 3, 2022, New York's law requires virtually every online service that is accessed by New Yorkers and allows third parties to share information, to endorse the state's definition of hate speech, mislabeled as "hateful conduct." Specifically, the law compels online services to single out hate speech with a dedicated policy, a report & response mechanism, and mandated direct replies to each report. In doing so, the law targets and burdens protected speech that someone, somewhere believes to "vilify, humiliate, or incite violence against a group or a class of persons" based on race, color, religion, or other protected categories. N.Y. Gen. Bus. Law § 394-ccc(a).

7

**AA0033**

20.     Plaintiffs, owners of online services subject to New York's law, object to the law's impositions. They seek to promote free and open debate on their platforms because they believe in the free marketplace of ideas. They publish all manner of speech and do not believe that the speech targeted by the Online Hate Speech Law should be chilled, prohibited, or removed as a result of a government edict. They do not want to parrot the state's message or be required to reply to every complaint of alleged "hate speech."

21.     Plaintiffs allow a wide range of speech and are concerned that publishing a policy and mechanisms targeting a specific form of speech is likely to chill the protected speech of commenters, and thus implicate their platforms in the chilling of protected speech.

22.     Moreover, as a result of the law's vague terms, Plaintiffs are not even sure how to comply. The law's title "Social media networks; hateful conduct prohibited" suggests Plaintiffs must ban speech that meets state-defined hate speech. The definition's vague terms, "vilify," "humiliate," "incite," and "violence," make it impossible for either Plaintiffs or the public to know exactly what speech constitutes "hateful conduct."

23.     Under New York's expansive hate speech definition, a John Oliver comedy/news segment poking fun at the British monarchy could be categorized as humiliating English people based on their national origin, LastWeekTonight, *The Monarchy: Last Week Tonight with John Oliver (HBO)* (Nov. 14, 2022), https://www.youtube.com/watch?v=KWterDbJKjY; an interview by ReasonTV discussing a satirical tweet by the Babylon Bee calling the Biden Administration's Assistant Secretary for Health Rachel Levine its "man of the year" may be "vilifying" or "humiliating" to transgender people, ReasonTV, *Babylon Bee Won't Back Down Over Trans Joke Twitter Ban* (Aug. 23, 2022), https://rumble.com/v1h339k-babylon-bee-wont-back-down-over-trans-joke-twitter-ban.html [https://perma.cc/3VDG-EDAX]; a video from London's Barbican Art

**AA0034**

Gallery showcasing a photography exhibit on masculinity and patriarchy might humiliate or vilifying men, Barbican Centre, *Curator Tour: Masculinities: Liberation through Photography at the Barbican Art Gallery* (Jul. 20, 2022) https://www.youtube.com/watch?v=AivPz4enrmA; a Wall Street Journal book review article with comments quoting Gandhi's use of a racist term for Black South Africans may be vilifying or humiliating Black South Africans, Indians, or both based on their race or ethnicity, Wm. Roger Louis, *Ghandi The Imperialist*, Wall St. J. (Jan. 8, 2016), https://www.wsj.com/articles/Gandhi-the-imperialist-1452290431; and a black and white historical video of Malcom X discussing white people's guilt could be viewed as vilifying or humiliating white people based on their race, MalcolmShabazz, *Malcolm X On White People's Guilt Complex* (Jan. 30, 2018), https://www.youtube.com/watch?v=q0nNSRuSzx4.

24.     New York cannot justify such a sweeping regulation of protected speech. The Online Hate Speech Law violates the First Amendment because it burdens the publication of speech based on its viewpoint, unconstitutionally compels speech, and is overbroad. It is also vague in violation of the Fourteenth Amendment, *see Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018) ("It is self-evident that an indeterminate prohibition carries with it the opportunity for abuse." (quotation marks and alterations omitted)), and preempted by Section 230 of the Communications Decency Act. Given well-settled Supreme Court precedent, the New York's law must be enjoined and struck down.

***New York Aims to Adopt the Online Hate Speech Law to Control Certain Internet Speech.***

**A.  New York officials have been trying to suppress certain online speech for several years.**

25.     For at least the last several years, New York policymakers have tried to compel online services to chill, prohibit, or remove online speech disfavored by the state.

26. For example, in 2019, New York State Senator David Carlucci introduced Senate Bill S.7275, or the "Social Media Hate Speech Accountability Act." S.B. 7275, 2019–20 Leg. Sess. (N.Y. 2019), https://www.nysenate.gov/legislation/bills /2019/s7275.

27. S.7275 sought to "require social media network platforms to create a process to remove" so-called "hate speech." Sponsor Memo, S.B. 7275, 2019–20 Leg. Sess. (N.Y. 2019), https://www.nysenate.gov/legislation/bills/2019/s7275.

28. S.7275 would have required social media networks to remove or block "hate speech" within 24 hours of receiving a visitor complaint and "immediately" notify the complainant of a decision along with the network's reasoning for the decision. S.B. 7275 § 3(b)(ii)-(iv). Violations of the statute, "including any offense not committed in this state," would have been punishable by a fine of up to one million dollars per violation. S.B. 7275 § 5(a)(ii).

29. In announcing S.7275, Senator Carlucci said, "While social media companies do have policies in place against what content is deemed hate speech or which can be removed, no one but the company is enforcing it. This bill will allow the State to take action and hold social media platforms accountable." Press Release, David Carlucci, Senator, New York State Senate, *Senator David Carlucci Introduces Legislation to Combat Hate Speech on Social Media* (Jan. 21, 2020), https://www.nysenate.gov/newsroom/press-releases/david-carlucci/senator-david-carlucci -introduces-legislation-combat-hate.

30. In May of 2021, New York Assemblywoman Patricia Fahy and State Senator Anna Kaplan announced a package of legislation, including companion bills S.4511 and A7865, aimed at addressing the proliferation of online hate speech (as well as "misinformation"). Press Release, Anna M. Kaplan, Senator, New York State Senate, *Lawmakers Push for Better Enforcement of Social Media Standards Against Hate and Misinformation* (May 5, 2021),

https://www.nysenate.gov/newsroom/press-releases/anna-m-kaplan/lawmakers-push-better-enforcement-social-media-standards.

31.     S.4511 and A7865 drew from Carlucci's S.7275, but included fewer defined terms and removed the enforcement provisions.

32.     In the May 5, 2021, press release, Assemblywoman Fahy decried "[t]he alarming spread of misinformation and hate speech across our online and social media platforms."

33.     Assemblywoman Fahy also expressed concern that online services "self-promulgated guidelines" for online speech were "often ineffective at preventing the spread of hate speech or other misinformation online before its simply too late."

34.     The bills remained in legislative committees for a year.

**B.  In the wake of a racially motivated mass shooting in Buffalo, New York's highest public officials blamed the internet.**

35.     On May 14, 2022, a white supremacist murdered ten Black people and injured three others at a Buffalo supermarket.

36.     The killer livestreamed the mass shooting via online streaming service Twitch for approximately two minutes to 28 viewers before Twitch ended the stream.

37.     New York officials immediately blamed social media for the attack. The following day on national television, Governor Kathy Hochul blamed "evil ideas . . . all induced by the internet" and faulted "platforms . . . willing to share this information, allow it to be posted." *Meet the Press—May 15, 2022*, NBC News (May 15, 2022), https://www.nbcnews.com/news/ncna 1295425.

38.     On May 18, 2022, Governor Hochul directed New York Attorney General Letitia James, pursuant to New York Executive Law Section 63(8), to investigate various online platforms for "civil or criminal liability for their role in promoting, facilitating, or providing a platform to

plan or promote violence." Letter from Kathy Hochul, Governor of New York, to Letitia James, Attorney General of New York, (May 18, 2022), https://www.governor.ny.gov/sites/default /files/2022-05/Executive_Law_63_Referral.pdf.

39.     That same day, Attorney General James launched an investigation into "social media companies and other online resources," alleging that the Buffalo shooting "revealed the depths and danger of the online forums that spread and promote hate." Press Release, Office of the New York State Attorney General, *Attorney General James Launches Investigations Into Social Media Companies for Role in Buffalo Attack* (May 18, 2022), https://ag.ny.gov/press-release/2022/attorney-general-james-launches-investigations-social-media-companies-role.

40.     Contemporaneously, the New York Legislature reacted by hastily amending the Fahy/Kaplan bills to include an enforcement provision, substituting the bills with Assembly Bill A7865A.

41.     A7685A was then passed on June 2, 2022.

42.     In promoting the bill's passage, Assemblywoman Fahy focused her ire on the internet and social media companies, declaring on Facebook: "racist and violent hate speech has been allowed to spread on the internet and social media almost unchecked." Assemblymember Patricia A. Fahy, Facebook (June 1, 2022), https://www.facebook.com/Assemblymember PatriciaFahy/posts/pfbid0svnTeCD5m3zhbGDT6Hzs45mgoMBxCcQfWzfUJqgdtRbKqryve12o b9Rd8BriPvBEl.

43.     And in a press release, Assemblywoman Fahy said "we need social media platforms to put into place clear, concise policies on how to report and address hateful content." Press Release, Carl E. Heastie, Assembly Speaker, New York State Assembly, *Assembly Passes*

*Package of Legislation to Strengthen State's Gun Laws and Protect New York Communities* (June 2, 2022), https://nyassembly.gov/Press/?sec=story&story=102242.

44.     At a June 6, 2022, press conference to sign the bill, among others, Governor Hochul declared that the Online Hate Speech Law required "social media networks to monitor and report hateful conduct on their platforms," noting that "[o]ur great leader, our Attorney General, will be championing this cause with every power her office can bring in at their disposal." Governor Kathy Hochul, *Governor Hochul Signs Landmark Legislative Package to Strengthen Gun Laws and Protect New Yorkers* at 12:30–13:07 (June 6, 2022), https://youtu.be/SNrci_ey8L4?t=750.

45.     At the same press conference, Attorney General James alleged that mass shooters' motives are "enabled by the dark corners of the internet" because "social media platforms provide an unchecked vehicle for [] dangerous and corrosive ideas to spread." The Attorney General noted the Online Hate Speech Law would allow her office to "expand our work to study and to address this growing threat" from "dangerous and hateful platforms." Governor Kathy Hochul, *Governor Hochul Signs Landmark Legislative Package to Strengthen Gun Laws and Protect New Yorkers* at 35:50–36:35 (June 6, 2022), https://youtu.be/SNrci_ey8L4?t=2150.

### C.  Attorney General James's report shows her intent to pressure online services across the internet to chill, prohibit, and remove protected speech New York disfavors.

46.     On October 18, 2022, Attorney General James released her responsive investigative report. Office of New York State Attorney General Letita James, *Investigative Report On The Role Of Online Platforms In The Tragic Mass Shooting in Buffalo on May 14, 2022* (Oct. 18, 2022), https://ag.ny.gov/sites/default/files/buffaloshooting-onlineplatformsreport .pdf (the "Report").

47.     For the report, Attorney General James investigated a variety of online services: video sharing services like Rumble; online messaging boards like Reddit, 4Chan, and 8kun, "and their Derivatives;" Quora, a community-based questions and answers online service; Twitch; Discord; and widely known social network sites such as Facebook and Twitter. Report at 6.

48.     The report squarely blames "[a]nonymous, virtually unmoderated websites and platforms," for a purported correlating rise in mass shootings, alleging that "their refusal to moderate content in any meaningful way ensures that these platforms are and remain breeding grounds for racist hate speech and radicalization." Report at 3.

49.     The report's executive summary, signed by Attorney General James, closes with a dubiously premised rallying cry to pass laws "ensuring online platforms no longer enable horrific mass shootings and hate-based violence." Report at 4.

50.     The report shows that Attorney General James expansively interprets the term "online platform" as everything "from fringe websites to mainstream platforms like Facebook, Instagram, Twitter, and others." Report at 3.

51.     The report also calls for federal and state lawmakers to punish online platforms for not censoring "hate speech" by dramatically limiting Section 230—memorably described as the twenty-six words that created the internet—and imposing civil liability on platforms and individuals for the transmission or distribution of such speech and violent videos or images. *See* Rep. at 41–43; Stephen Engelberg, *Twenty-six Words Created the Internet. What Will It Take to Save it?*, ProPublica (Feb. 9, 2021), https://www.propublica.org/article/nsu-section-230.

52.     In an October 18, 2022, press release promoting the report, Governor Hochul and Attorney General James claimed that a "lack of oversight, transparency, and accountability of these platforms allowed hateful and extremist views to proliferate online." Press Release, Office

of the New York State Attorney General, *Attorney General James and Governor Hochul Release Report on the Role of Online Platforms in the Buffalo Shooting* (Oct. 18, 2022), https://ag.ny.gov/press-release/2022/attorney-general-james-and-governor-hochul-release-report-role-online-platforms.

53.     In the October 18, 2022, press release, Attorney General James called for "online platforms [to] be held accountable for allowing hateful and dangerous content to spread on their platforms." *Id.*

54.     The Attorney General's report and statements demonstrate her office will expansively interpret and zealously enforce the Online Hate Speech Law.

*The Online Hate Speech Law is Designed to Encourage the Removal of Protected Speech*

### A. The Online Hate Speech Law Encourages the Removal of protected speech on a vast array of online services.

55.     The Online Hate Speech Law is titled "Social media networks; hateful conduct prohibited."

56.     The Online Hate Speech Law requires "social media networks" to endorse the state's treatment of disfavored speech, mislabeled as "hateful conduct" and defined as "use of a social media network" that is perceived by someone, somewhere, at some point in time, to "vilify, humiliate, or incite violence against a group or class of persons" based on based on race, color, religion, or other protected categories.

57.     While the Online Hate Speech Law purports to regulate "hateful conduct" on "social media network[s]," the definition of "hateful conduct" only includes speech, because the only way to "use" a "social media network" is to create or share expressive content such as videos or comments.

58.     Most, if not all, internet speech that someone, somewhere might argue serves to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion or other protected category is protected by the First Amendment because restrictions on such "bias-motivated" speech "silenc[e] speech on the basis of its content." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992). The Online Hate Speech Law thus seeks to regulate constitutionally protected internet speech.

59.     The Online Hate Speech Law does not define "vilify," "humiliate," "incite," or "violence."

60.     The law does not suggest that the speaker must intend to "vilify, humiliate, or incite violence," just that the speech can be perceived, by an unspecified *someone*, as doing one of those three things.

61.     Such speech is included in a wide variety of comedy, art, journalism, historical documentation, and commentary on matters of public concern that enjoy First Amendment protection. *See supra* ¶ 23.

62.     "Social media network" is defined as "service providers, which, for profit-making purposes, operate internet platforms that are designed to enable users to share any content with other users or to make such content available to the public." N.Y. Gen. Bus. Law § 394-ccc(1)(a).

63.     The Online Hate Speech Law does not define "service provider," "for profit-making purposes," "user," "internet platform," "share," or "content."

64.     However, New York elsewhere expansively defines "Internet service provider" as "any person, business or organization qualified to do business in this state that provides individuals, corporations, or other entities with the ability to connect to the internet." N.Y. Pub. Serv. Law § 224-c.

16

**AA0042**

65.     The New York statute implies that an entity is organized for "profit-making purposes" so long as it has "net earnings . . . which inure to the benefit of any private shareholder or individual." N.Y. Lab. Law § 190.

66.     "User" is not defined in New York statute.

67.     Based on the term's plain meaning in context, however, a "user" is, at a minimum, anyone who comments on content posted on an online service, as well as those that create and share content.

68.     "Internet platform" is not defined in New York statute.

69.     Based on the term's plain meaning in context, however, an "internet platform" is, at a minimum, an online service including a website or a mobile app.

70.     "Share" is not defined in New York statute.

71.     Based on the term's plain meaning in context, however, "share" is, at a minimum, exchanging information of some kind.

72.     "Content" is not defined in New York statute.

73.     Based on the term's plain meaning in context, however, "content" is, at a minimum, information that is displayed on an online service.

74.     During the New York Assembly's debate on A7865A, Assemblywoman Fahy said that the law would apply to any website that has a "footprint" in New York or is "used by residents here." Transcript of Session Proceedings at 189, New York State Assembly, 2021–22 Sess. (June 1, 2022).

75.     "Social media network" is defined so broadly that it includes any for-profit online service with a comment section that has been visited by at least one person in New York.

76.     The Online Hate Speech Law applies regardless of whether any state-defined hate speech has ever appeared on the "social media network."

**B. The Online Hate Speech Law compels "social media networks" to express New York's disdain for particular protected speech.**

77.     The Online Hate Speech Law requires "social media networks" to take three actions regarding "prohibited" hate speech.

78.     First, "social media network[s]" must develop and publish a policy describing how they "will respond [to] and address" visitor complaints of hate speech (the "Hate Speech Policy").

79.     Second, "social media network[s]" must create a "clear and easily accessible mechanism" for visitors to complain about perceived hate speech on the site and receive responses (the "Report & Response Mechanism").

80.     Third, "social media network[s]" must "provide a direct response" to individual complainants, "informing them of how the matter is being handled" (the "Reply Requirement").

81.     The Online Hate Speech Law does not define "respond," "address," or "handled."

82.     The law's statutory title "Social media networks; hateful conduct *prohibited*," suggests that these undefined terms should be understood as meaning "prohibit" when referring to how online services should treat hate speech on their platforms. (emphasis added).

83.     The New York Attorney General has the authority to enforce the Online Hate Speech Law through assessment of a $1,000 daily fine per violation. N.Y. Gen. Bus. Law § 394-ccc(5).

84.     The law also empowers the New York Attorney General to issue subpoenas and investigate compliance. *Id.*

85.     Once the Online Hate Speech Law goes into effect on December 3, 2022, Attorney General James may begin enforcing Section 394-ccc, under her own interpretation of the statute.

***Eugene Volokh and The Volokh Conspiracy Are Committed to Free Speech and Open Debate.***

86.     Co-founded by Eugene Volokh, The Volokh Conspiracy is a legal blog hosted at the reason.com/volokh page of a website operated by Reason magazine, a print and online publication dedicated to the principles of "free minds and free markets."



87.     Volokh and his co-bloggers post regularly about current legal developments, frequently regarding free expression issues.

88.     While Reason magazine hosts The Volokh Conspiracy website, Eugene Volokh and his co-bloggers retain full editorial control over the blog's content and policies.

89.     The Volokh Conspiracy's co-bloggers reside in or are employed throughout the United States, including in California, Colorado, Georgia, Illinois, Indiana, New Jersey, New York, Ohio, Texas, Utah, Virginia, and Washington, D.C.

90.     The Volokh Conspiracy is organized "for-profit making purposes." It generates revenue through targeted advertisements, including ads targeted to New York visitors.

91.     In 2021, 10% of The Volokh Conspiracy's viewers were people in New York. And according to user internet protocol (IP) locations, around 3.9% of comments were posted by New Yorkers.

92.     While Volokh appreciates the revenue that comes from The Volokh Conspiracy, he considers blogging to be an act of professional and personal passion by which he shares his and others' views on a variety of legal topics.

93.     The Volokh Conspiracy is a "social media network" because it is a "service provider" operating an "internet platform" that is "designed to enable users to share [] content" with each other and the public.

94.     Each Volokh Conspiracy blog post includes a publicly viewable comment section where registered commenters may comment and reply to other commenters.

95.     The Volokh Conspiracy currently employs a comment policy that does not exclude any viewpoints: "We invite comments and request that they be civil and on-topic. We do not moderate or assume any responsibility for comments, which are owned by the readers who post them. Comments do not represent the views of Reason.com or the Reason Foundation. We reserve the right to delete any comment for any reason at any time. Comments may only be edited within 5 minutes of posting."

96.     Volokh and his co-bloggers are the sole decisionmakers as to whether comments warrant deletion; in particular, he is the sole decisionmaker as to whether comments posted responding to his own posts warrant deletion.

97.     The Volokh Conspiracy does not have a Hate Speech Policy because its policy does not address "how [The Volokh Conspiracy] *will* respond and address reports of" hate speech. N.Y. Gen. Bus. Law § 394-ccc(3) (emphasis added). Nor does its comment policy reference speech that may be perceived to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion, or other protected categories. Regardless, the law's vagueness makes it impossible for Volokh to know whether the comment policy satisfies New York's Hate Speech Policy requirement or how it could do so.

98.     The Volokh Conspiracy does not have a Report & Response Mechanism to allow visitors to submit complaints, nor does Volokh feel obligated to reply to complainants.

99.     Volokh and his co-bloggers regularly post blog posts in favor of broad free expression rights under the First Amendment.

100.     Volokh and his co-bloggers frequently post content arguing against the regulation of speech that some may consider vilifying, insulting, humiliating, offensive, or hateful.

101.     Volokh believes that most, if not all, of the speech included in the state's definition of "hateful conduct" is constitutionally protected.

102.     Volokh believes that developing and publishing a Hate Speech Policy, creating a Report & Response Mechanism, and fulfilling the Reply Requirement to single out state-defined hate speech through a designated policy, Report & Response Mechanism, or Reply Requirement is contrary to The Volokh Conspiracy's ethos, purpose, and mission.

103.     Posts on The Volokh Conspiracy often receive dozens to hundreds of comments.

104. Weekly, Volokh hosts an open comment section for commenters to post whatever is on their mind. The weekly comment section routinely receives several hundred comments.

105. Some commenters on The Volokh Conspiracy have accused other commenters of engaging in hate speech because they post controversial views on topics concerning one or more of the protected categories identified in New York's law. Volokh therefore believes that if he created the Report & Response Mechanism, he would receive numerous complaints alleging that some comments qualify as state-defined hate speech, meant to be "prohibited."

106. Reviewing and responding to each of these comments, as per the Reply Requirement, will be time-consuming and burdensome, especially given the fact that Volokh would be individually responsible for handling this process.

***Rumble is Committed to Free Speech and Open Debate.***

107. Rumble is an internet video streaming platform that invites independent creators to upload video content and allows registered users to comment on the videos and communicate with each other.

108. Rumble has a pro-free speech mission and purpose, described on its "about us" page: "We are Rumble[.] We are for people with something to say and something to share, who believe in authentic expression, and want to control the value of their own creations. We create technologies that are immune to cancel culture. Because everyone benefits when we have access to more ideas, diverse opinions, and dialogue. Join us. We are on a mission to protect a free and

open internet."



109.    Rumble Inc. is publicly traded on the NASDAQ, an American Stock Exchange based in New York City.

110.    Rumble Inc. and its subsidiaries are organized "for-profit making purposes," generating revenue through advertisements and other sources, including ads targeted to New York visitors.

111.    Rumble has many content creators based in New York.

112.    In the third quarter of 2022, Rumble had an average of 71 million global monthly active users, 57 million of whom were based in the United States and Canada. Many New Yorkers access Rumble each month and many New Yorkers post comments on Rumble videos.

113.     Rumble is a "social media network" because it is a "service provider" that operates an "internet platform" and is "designed to enable users to share [] content" with each other and the public.

114.     Content creators share video content with the public on Rumble and registered visitors can comment on videos and reply to other commenters.

115.     Rumble is known as a neutral video platform that does not impose arbitrary censorship on its content creators, including creators of controversial content that some may perceive as "hateful." *See supra* ¶ 23.

116.     Rumble's policies prohibit content that, among other things, a) is illegal; b) is pornographic, obscene, or of an adult or sexual nature; c) "is grossly offensive to the online community, including but not limited to, racism, anti-semitism and hatred;" d) supports or incites violence or unlawful acts; e) supports groups that support or incite violence or unlawful acts; or f) promotes terrorist organizations. *Website Terms and Conditions of Use and Agency Agreement, Rumble Content Policies*, Rumble, https://rumble.com/s/terms.

117.     Rumble reserves "the right to . . . remove messages which Rumble in its sole discretion determines to be undesirable, inciting violence, harmful, offensive or otherwise in violation of [its] Terms of Use." *Id.* In other words, Rumble is the sole determinant of whether its criteria are met.

118.     Rumble does not have a Hate Speech Policy as required by the Online Hate Speech Law because it has no policy addressing "how [Rumble] *will* respond and address reports of" hate speech. N.Y. Gen. Bus. Law § 394-ccc(3) (emphasis added). Rumble has a policy against racist or antisemitic content, but it does not prohibit content because it may "vilify" or "humiliate." New York's law would force Rumble to create a policy based around the state's definition of "hate

speech" rather than the lines that Rumble has chosen for itself. Nor does it reference speech that may be perceived to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion, or other protected categories. Further, the law's vagueness makes it impossible for Rumble to know whether its policy satisfies New York's Hate Speech Policy requirement or how it could do so.

119. Some of the videos that content creators post on Rumble's online service may be perceived as "hateful" by some visitors. *See supra* ¶ 23.

120. Rumble does not believe that all Rumble content that may appear to some as "hateful" under the Online Hate Speech Law warrants a designated Hate Speech Policy, Report & Response Mechanism, or Reply Requirement.

121. Rumble does not have a Report & Response Mechanism within the meaning of the Online Hate Speech Law. While Rumble visitors may email complaints to the email address support@rumble.com, and Rumble "attempt[s] to respond to every complaint," "Rumble will take appropriate actions in its sole discretion and has no responsibility to at any time report" to the complainant "the status or outcome of its investigation or any actions Rumble has taken as a result." *Website Terms and Conditions of Use and Agency Agreement, Complaint Procedure*, Rumble, https://rumble.com/s/terms.

122. Furthermore, Rumble cannot be certain that its support@rumble.com email address is a sufficient "mechanism" to "allow [Rumble] to provide a direct response to any individual reporting" hate speech to satisfy the law's Report & Response Mechanism requirement. In addition, even if the email address satisfied the requirement, the law's vagueness makes it impossible to know whether its mechanism is sufficiently "clear and easily accessible" or how it could be so to satisfy the law.

123. Some commenters on Rumble have accused other commenters of engaging in hate speech because they post controversial views on topics concerning one or more of the protected categories identified in New York's law.

124. If Rumble is required to create a "clear and easily accessible" Report & Response Mechanism and fulfill the Reply Requirement, it believes it will be inundated with many more complaints alleging that content and comments on Rumble qualify as state-defined hate speech, meant to be "prohibited" regardless of whether such content and comments fall within the definitions of the Online Hate Speech Law.

125. Reviewing and responding to each of these complaints, as per the Reply Requirement, will be a time-consuming and burdensome process. To avoid assuming this burden Rumble may need to devote additional resources, more aggressively remove content, and/or limit the ability for registered users to participate in Rumble's comment sections.

***Locals is Committed to Free Speech and Open Debate.***

126. Locals is an online community-building site that allows content creators to crowdfund and create engaged communities. Creators can develop exclusive content and ask interested members to pay a monthly fee to join the creator's "community."

127. Locals is organized "for-profit making purposes," generating revenue through the fees that members pay to join a creator's community.

128. Locals has content creators and community members in New York City.

129. Locals has advertised in New York City, including a recent promotion in Times Square:



130.    Locals is a "social media network" because it is a "service provider" which operates an "internet platform" that is "designed to enable users to share [] content" with each other and the public. Locals content creators can share video, audio, and text content with members of their community, and registered members of a creator's community may post comments or respond to other community members' comments.

131.    Locals "is committed to fostering a community that is safe, respectful, and dedicated to the free exchange of ideas."



132.    To further its mission, within its limited guidelines, Locals allows its creators to independently police content in their "communities."

133.    Locals Community Guidelines list just a few categories of content that are wholly prohibited on its platform: a) content that violates the rights of third parties like a copyright violation; b) content that violates a law or regulation; c) content that fits Locals' definition of "sexual activity;" and d) content that threatens violence against an individual or group of people. Locals makes the sole determination of whether speech violates the community guidelines.

134.    Locals does not have a Hate Speech Policy within the meaning of the Online Hate Speech Law because it has no policy addressing "how [Locals] *will* respond and address reports of" hate speech. N.Y. Gen. Bus. Law § 394-ccc(3) (emphasis added). Nor do its community guidelines reference speech that may be perceived to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion, or other protected categories. Regardless, the law's vagueness makes it impossible for Locals to know whether its policy satisfies New York's Hate Speech Policy requirement or how it could do so.

135.    Some of the content on Locals may offend some visitors.

136.    Locals does not believe that all Locals content that may appear to some as "hateful conduct" under the Online Hate Speech Law warrants a designated Hate Speech Policy, Report & Response Mechanism, or Reply Requirement.

137.    Members of Locals communities can email complaints to Locals about content in their communities to support@locals.com, but there is no requirement that complaints will receive a response from Locals.

138.    Furthermore, Locals general email address is not a "mechanism" that will also "allow [Locals] to provide a direct response to any individual reporting" hate speech, and therefore

may not satisfy the law's Report & Response Mechanism requirement. In addition, even if the email address satisfied the requirement, the law's vagueness makes it impossible to know whether the "mechanism" is sufficiently "clear and easily accessible" or how it could be so to satisfy the law.

139.    Some commenters on Locals have accused other commenters of engaging in hate speech because they post controversial views on topics concerning one or more of the protected categories identified in New York's law.

140.    If Locals is required to post a "clear and easily accessible" Report & Response Mechanism and fulfill the Reply Requirement, it believes it will be inundated with many more complaints alleging that content and comments on Locals qualify as state-defined hate speech, meant to be "prohibited."

141.    Reviewing and responding to each of these complaints, as per the Reply Requirement, will be time-consuming and burdensome. To avoid assuming this burden Locals may need to devote additional resources, more aggressively remove content, and/or limit the ability for Locals members to participate in community comment sections.

***The Online Hate Speech Law Deprives Plaintiffs of Their Rights and Their Injury Will Be Ongoing.***

142.    As of December 3, 2022, as a direct and proximate result of New York's Online Hate Speech Law, Plaintiffs will be required to develop and publish a Hate Speech Policy.

143.    The Plaintiffs each disagree with the speech and message that the Online Hate Speech Law will compel them to convey.

144.    As of December 3, 2022, as a direct and proximate result of the Online Hate Speech Law, Plaintiffs will be required to publish a "clear and easily accessible" Report & Response

Mechanism on their online services for visitors to submit complaints about state-defined hate speech on their online services.

145.     Plaintiffs do not want to create and publish the Report & Response Mechanism, nor do they want to communicate to visitors that they endorse the state's definition of hate speech—which differs from their own content policies—or agree with the state's mandated response to it.

146.     As of December 3, 2022, as a direct and proximate result of the Online Hate Speech Law, Plaintiffs will be required to respond to visitor complaints about state-defined hate speech on their online services, and to describe "how the matter is being handled."

147.     Plaintiffs each disagree with the state's message implied by fulfilling the Reply Requirement for visitor complaints about state-defined hate speech and being compelled to describe "how the matter is being handled."

148.     Plaintiffs do not want to communicate, in any way, to visitors that they endorse New York's definition of hate speech or agree with the state's mandated response to it. Being required to do so will harm their reputations as serious advocates of free speech and open debate.

149.     Plaintiffs do not want to be compelled to respond to every visitor complaint about state-defined hate speech, which may or may not align with the content policies of their platforms.

150.     As of December 3, 2022, as a direct and proximate cause of New York's Online Hate Speech Law, Plaintiffs Rumble and Locals will likely be inundated with complaints and either need to hire additional staff to process these complaints, more aggressively remove content, or limit users' ability to participate in their comment sections. Doing so is likely to cause Rumble and Locals to suffer additional financial burdens, and may force them to make significant changes to their platforms and visitor experience.

151.   As of December 3, 2022, Plaintiff Eugene Volokh will be required to respond to each comment personally, a significant new burden, as a direct and proximate cause of New York's Online Hate Speech Law.

152.   As of December 3, 2022, as a direct and proximate cause of New York's Online Hate Speech Law, Plaintiffs will be required to either comply with the terms of the law or risk investigations, subpoenas, and daily fines of $1,000 per violation.

153.   As a result of being pressured to respond in the state's prescribed manner to constitutionally protected expression under the Online Hate Speech Law, Plaintiffs will suffer ongoing irreparable injury to their constitutional and statutory rights. The denial of these constitutional rights is an irreparable injury *per se*. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

154.   As a result of being compelled to speak or having to risk civil penalties under the Online Hate Speech Law, Plaintiffs will suffer ongoing irreparable injury to their constitutional and statutory rights. The denial of these constitutional rights is an irreparable injury *per se*. *Id.*

155.   As a result of the Online Hate Speech Law's overbreadth, Plaintiffs will be both (a) required to develop and enforce a policy dealing with constitutionally protected expression and (b) compelled to speak. Plaintiffs will suffer ongoing irreparable injury to their constitutional and statutory rights. The denial of these constitutional rights is an irreparable injury *per se*. *Id.*

156.   As a result of the Online Hate Speech Law's vagueness, Plaintiffs will be both (a) required to develop and enforce a policy regulating constitutionally protected expression and (b) compelled to speak. Plaintiffs will suffer ongoing irreparable injury to their constitutional and statutory rights. The denial of these constitutional rights is an irreparable injury *per se*. *Id*.

157.   As a result of the Online Hate Speech Law's incompatibility with Section 230, Plaintiffs will be required to assume the risk of liability or civil penalty for their role as publisher

of online content. As result, Plaintiffs' right to publish constitutionally protected expression will be burdened and they will suffer ongoing irreparable injury to their constitutional and statutory rights. *See Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 845 (M.D. Tenn. 2013) (granting a preliminary injunction on both First Amendment and Section 230 preemption grounds); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1273 (W.D. Wash. 2012) (same); *Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097, at *6 (D.N.J. Aug. 20, 2013) (same).

158. Without declaratory and injunctive relief from this Court, New York's unconstitutional law will remain enforceable and Plaintiffs will indefinitely suffer irreparable harm.

159. Plaintiffs have no other adequate legal remedy to prevent their injury other than an injunction from this Court.

### FIRST CAUSE OF ACTION
### Facial and As-Applied First Amendment Challenge to
### New York General Business Law § 394-ccc
### (Content- and Viewpoint-Based Regulation of Speech)

160. Plaintiffs re-allege and incorporate the preceding paragraphs as if repeated here.

161. The First Amendment generally prohibits laws that target speech because of the content or viewpoint expressed. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995).

162. New York's Online Hate Speech Law is content- and viewpoint-based. It is content-based because it singles out speech that is directed at or pertains to groups or classes of persons based on specified protected class statuses. *R.A.V.*, 505 U.S. at 392; *see Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.").

163.    New York's Online Hate Speech Law is viewpoint-based because it applies only to speech perceived to "vilify, humiliate, or incite violence against a group or class of persons" and not to speech that, for instance, is perceived to affirm or uplift. *See Matal*, 137 S. Ct. at 1763 ("Giving offense is a viewpoint."). Viewpoint discrimination is an "egregious form of content discrimination" and is "presumptively unconstitutional." *Rosenberger*, 515 U.S. at 829–30.

164.    New York policymakers, including Governor Hochul and Attorney General James, have threatened that online platforms will be held accountable for publishing state-defined hate speech. The threat is reflected in 1) the Online Hate Speech Law's title—"Social media networks; hateful conduct prohibited"; 2) the Governor's signing statement that the Online Hate Speech Law required "social media networks to monitor and report hateful conduct on their platforms"; and 3) the Attorney General's report calling for sweeping restrictions on online services if they did not take further steps to remove hate speech; among other official statements.

165.    The Online Hate Speech Law places unconstitutional content- and viewpoint-based burdens on protected speech through the ever-present threat to "social media network[s]" of Attorney General investigations or civil penalties for failing to respond to complaints about viewpoints New York deems "hateful." It also places content- and viewpoint-based burdens on speech by requiring "social media network[s]" to bear the cost of developing and publishing the Hate Speech Policy, creating the Report & Response Mechanism, and fulfilling the Reply Requirement.

166.    To avoid these costs, Plaintiffs Rumble and Locals and many other online services are likely to be forced to hire additional staff to conduct moderation, aggressively remove content

that receives a complaint, or limit their comments sections—significantly suppressing speech across their platforms.

167.    The First Amendment prohibits New York from burdening protected speech through "thinly veiled threats" that if "social media network[s]" do not treat the speech in the way the government wishes, they will face consequences from state action. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963) ("People do not lightly disregard public officers' thinly veiled threats to institute . . . proceedings against them if they do not come around."). "The sword of Damocles causes harm because it hangs, not necessarily because it drops." *PSINet v. Chapman*, 167 F. Supp. 2d 878, 888 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004); *see also Backpage.com, LLC v. Dart*, 807 F.3d 229, 237–38 (7th Cir. 2015) (First Amendment is violated when government officials "coupl[e] threats with denunciations of the activity that the official wants stamped out").

168.    New York lacks a compelling government interest for pressuring "social media network[s]" to remove protected speech. Indeed, the law lacks even a legitimate interest. The law has no legislative findings providing a government interest. In fact, the only purported interest, stated in the New York Governor's Section 394-ccc signing statement and the Attorney General's report—silencing protected speech—is constitutionally illegitimate. *United States v. Eichman*, 496 U.S. 310, 315 (1990) (where "the Government's asserted interest is related to the suppression of free expression" it "cannot justify its infringement on First amendment rights." (quotation marks and citation omitted) (emphasis omitted)).

169.    The Online Hate Speech Law is not a narrowly tailored means of achieving New York's interest. To the contrary, there are many less restrictive alternatives such as enforcing

criminal laws and the government engaging in its own anti-hate speech expression rather than restricting or coopting online services.

170.    As a direct and proximate result of the Online Hate Speech Law, New York will burden a vast amount of internet speech and Plaintiffs will suffer ongoing irreparable injuries, including the deprivation of their constitutional right to publish protected speech without the undue burden imposed by an unconstitutional state mandate.

### SECOND CAUSE OF ACTION
### Facial and As-Applied First Amendment Challenge to
### New York General Business Law § 394-ccc
### (Compelled Speech)

171.    Plaintiffs re-allege and incorporate the preceding paragraphs as if repeated here.

172.    The First Amendment prohibits laws that compel speech. Generally, laws that compel speech are subject to strict scrutiny because they "plainly alter [] the content of . . . speech." *Nat'l Ins. of Family and Life Advocates v. Beccera*, 138 S. Ct. 2361, 2371 (2018); *see also W. Va. St. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").

173.    The Volokh Conspiracy, Rumble, and Locals all object to conveying the message that hate speech should be singled out for chilling, prohibition, or removal.

174.    The Online Hate Speech Law compels Volokh, Rumble, Locals, and most other "social media network[s]" to espouse the state's message by requiring them to fulfill three requirements.

175.    First, it compels them to develop and publish a policy for addressing speech on their online services that some may perceive to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion, or other protected category.

176.    Plaintiffs do not have policies that address hate speech in the manner prescribed by the state—speech that some may perceive to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion or other protected category. While Rumble has a policy prohibiting speech that incites violence generally, as well as racist and antisemitic content, it does not extend to speech that may be perceived to vilify or humiliate a wide range of groups. Regardless, the Online Hate Speech Law's vagueness makes it impossible to know whether Rumble's existing policy satisfies New York's law in this regard or how it could do so.

177.    Forcing "social media network[s]" to develop and publish a policy singling out state-defined hate speech compels Plaintiffs to endorse the state's message—in the least, that such speech is particularly worthy of a designated policy.

178.    Plaintiffs disagree with and do not want to convey the state's message as required by the Online Hate Speech Law.

179.    Second, the Online Hate Speech Law requires "social media network[s]" to create a "clear and easily accessible" Report & Response Mechanism for visitors to report state-defined hate speech and receive a direct response "informing them of how the matter is being handled." N.Y. Gen. Bus. Law § 394-ccc(2).

180.    Volokh does not have a Report & Response Mechanism. Rumble and Locals provide an email address for complaints, but not a mechanism specific to reporting and responding to complaints about perceived hate speech (or one that assures a response as to *any* speech). Volokh occasionally gets complaints through his individual e-mail address, but does not have a mechanism

specific to reporting and responding to complaints about perceived hate speech (or one that assures a response as to *any* speech).

181.    Forcing "social media network[s]" to create a "clear and easily accessible" Report & Response Mechanism for state-defined hate speech compels Plaintiffs to speak and to effectively endorse the state's message that, in the least, such speech is particularly worthy of singling out for complaint and direct response.

182.    Plaintiffs disagree with and do not want to create a Report & Response Mechanism because it requires them to constructively endorse the state's message.

183.    Third, the Online Hate Speech Law requires Plaintiffs to "provide a direct response to any individual" complaining about perceived state-defined hate speech, "informing them of how the matter is being handled." *Id*.

184.    Plaintiffs Volokh and Locals do not have a formal practice of providing a direct response to any complaint of state-defined hate speech or otherwise. While Rumble's policy states that it may provide a direct response to complaints, it explicitly states that it has no obligation to do so.

185.    Forcing "social media network[s]" to "provide a direct response" to complaints of state-defined hate speech about "how the matter is being handled" compels them to speak to these complainants. It also requires them to effectively endorse the state's message that complaints about such speech deserve a "direct response" and that state-defined hate speech must be "addressed" and "handled" because it is particularly worthy of direct response.

186.    Plaintiffs do not want to provide a direct response to every individual complaining about state-defined hate speech because it will effectively endorse the state's message with which they disagree.

187.     New York lacks a compelling government interest for compelling "social media network[s]" to speak by posting a Hate Speech Policy, creating a Report & Response Mechanism, or fulfilling the Reply Requirement.

188.     Indeed, the law lacks even a legitimate interest. The law does not include legislative findings, and thus no description of a government interest. In fact, the only purported interest, stated in the New York Governor's section 394-ccc signing statement and the Attorney General's report—silencing protected speech—is constitutionally illegitimate. *Eichman*, 496 U.S. at 315 (where "the Government's asserted interest is related to the suppression of free expression" it "cannot justify its infringement on First amendment rights." (quotation marks omitted)). The Online Hate Speech Law is not a narrowly tailored means of achieving New York's interest. To the contrary, there are many less restrictive alternatives such as enforcing criminal laws and the government engaging in its own anti-hate speech expression rather than restricting or coopting online services.

189.     As a direct and proximate result of the Online Hate Speech Law, Plaintiffs will suffer ongoing irreparable injuries, including being deprived of their constitutional right against being compelled to speak.

**THIRD CAUSE OF ACTION**
**Facial and As-Applied First Amendment Challenge to**
**New York General Business Law § 394-ccc**
**(Overbreadth)**

190.     Plaintiffs re-allege and incorporate the preceding paragraphs as if repeated here.

191.     First Amendment overbreadth doctrine prohibits laws that regulate speech if "a substantial number of [their] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotation marks and citations omitted).

192.    The Online Hate Speech Law is facially overbroad because it pressures online services to chill, prohibit, or remove a substantial amount of constitutionally protected online speech and compels them to voice the state's pro-censorship view. Much speech that may be perceived to "vilify, humiliate, or incite violence against a group or class of persons" is constitutionally protected even when it concerns protected class status. *See, e.g., Snyder v. Phelps*, 562 U.S. 443 (2011) ("God hates fags," "Thank God for 9/11," "Priests Rape Boys," among other signs constitutionally protected); *see also Brandenburg v. Ohio*, 395 U.S. 444, 447–48 (1969) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action . . . . *A statute which fails to draw this distinction* impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments." (emphasis added) (citations omitted)).

193.    The Online Hate Speech Law has no legitimate sweep because it seeks to unlawfully chill protected speech. Assuming *arguendo* that the law has *some* legitimate sweep with regard to speech that incites violence, its unconstitutional applications dwarf that legitimate sweep because the law reaches all manner of comedy, art, journalism, historical documentation, and commentary on important matters of public concern just because someone, somewhere believes it to "vilify" or "humiliate." *See supra* ¶ 23.

194.    Laws or policies attempting to restrict speech using terms similar to "vilify" and "humiliate" have routinely been struck down as either vague or overbroad. *See, e.g., Saxe v. St. Coll. Area Sch. Dist.*, 240 F.3d 200, 210 (3d Cir. 2001) (striking down policy "prohibiting disparaging speech"); *see also Beverly v. Watson*, No. 14 C 4970, 2017 WL 4339795, at *8 (N.D. Ill. Sept. 29, 2017) (collecting cases).

195.    As a direct and proximate result of the Online Hate Speech Law's overbreadth,

Plaintiffs will suffer ongoing irreparable injuries, including being deprived of their constitutional

right to publish protected speech and against being pressured to chill protected speech.

### FOURTH CAUSE OF ACTION
### Facial and As-Applied Fourteenth Amendment Challenge to
### New York General Business Law § 394-ccc
### (Vagueness)

196.    Plaintiffs re-allege and incorporate the preceding paragraphs as if repeated here.

197.    Fourteenth Amendment vagueness doctrine prohibits laws that do not "give the

person of ordinary intelligence a reasonable opportunity to know what is" required, or do not

"provide explicit standards for those who apply them" to prevent arbitrary and discriminatory

enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). And "[w]hen speech is

involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not

chill protected speech." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012).

198.    The Online Hate Speech Law uses broad and ambiguous terms.

199.    The Online Hate Speech Law's most important terms, such as "vilify," "humiliate,"

"incite," "user," "internet platform," "content," "clear and concise," and "clear and easily

accessible," among others, do not have an objective plain meaning.

200.    The terms "vilify" and "humiliate" in particular are incapable of reasoned

application. *See Mansky*, 138 S. Ct. at 1888 (emphasizing that when regulating speech "the State

must be able to articulate some sensible basis for distinguishing what may come in from what must

stay out"). They are subject to "a virtually open-ended interpretation" since any two people can

widely disagree on what vilifies or humiliates. *Id.* at 1891.

201.    The Online Hate Speech Law therefore does not provide a person of ordinary

intelligence a reasonable opportunity to know, for example, 1) what online services are regulated

given the fact that "social media network" is defined so broadly that it includes any for-profit online service with a comment section that has been visited by at least one person in New York; 2) what speech must be addressed by the compelled Hate Speech Policy; 3) whether an online service's Hate Speech Policy and Report & Response Mechanism are "clear," "concise," or "easily accessible"; or 4) whether a site has sufficiently responded to complaints.

202.    The Online Hate Speech Law's lack of explicit standards also unconstitutionally invites arbitrary and discriminatory enforcement in determining, for example, (1) which "social media network[s]" the law applies to; (2) whether an online service's policy provides a sufficiently "clear and concise" description of how the site "will respond [to] and address" state-defined hate speech; (3) whether an online service's Report & Response Mechanism is "clear and easily accessible;" and (4) whether an online service has sufficiently responded to complaints.

203.    In light of the law's formal title, Governor Hochul and Attorney General James's official statements, and the Attorney General's report, and in combination with its vague terms, Plaintiffs reasonably believe that the Online Hate Speech Law will be expansively interpreted and aggressively enforced. At a minimum, the vagueness of the law's operative terms affords the Attorney General unbound discretion to adopt such expansive interpretation, whether the Attorney General ultimately does or not, and online services like Plaintiffs will have no way of knowing whether the law will be taken to that extreme and must operate with the expectation that it will. Thus, the law's vagueness encourages Plaintiffs and those similarly situated "to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked," *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)) (quotation marks and internal citation omitted), and thereby unconstitutionally incentivizing them to chill

speech on their platform and compelling them to parrot the state's message in order to avoid investigation and civil penalties.

204. The Online Hate Speech Law contains a savings clause stating that it is not to be construed as (a) imposing an "obligation" on the social media network "that adversely affects the rights or freedoms of any person" under the First Amendment; or (b) adding to or increasing "liability for anything other than the failure to provide a mechanism for a user to report . . . and to receive a response on such report." N.Y. Gen. Bus. Law § 394-ccc(4).

205. But this vague savings clause does not place "adequate publicly disclosed limits on . . . discretion," *Battle v. City of Seattle*, 89 F. Supp. 3d 1092, 1107 (W.D. Wash. 2015), and therefore cannot save the Online Hate Speech Law. *Stevens*, 559 U.S. at 480 ("The First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige.").

206. As a direct and proximate result of the Online Hate Speech Law's vagueness, Plaintiffs will suffer ongoing irreparable injury, including being deprived of their constitutional right to a reasonable opportunity to know how they can comport with the law's requirements.

**FIFTH CAUSE OF ACTION**
**Statutory Preemption Challenge Under 47 U.S.C. § 230 to**
**New York General Business Law § 394-ccc**

207. Plaintiffs re-allege and incorporate the preceding paragraphs as if repeated here.

208. Congress enacted Section 230 of the Communications Decency Act (47 U.S.C. § 230) to protect providers of "interactive computer services" from liability for decisions to moderate or not moderate user-generated content.

209. Section 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to

a computer server, including specifically a service or system that provides access to the Internet." 47 U.S.C. § 230(f)(2).

210.    The Plaintiffs each qualify as an "interactive computer service" because they offer visitors access to content and the ability to post their own content or comments. In fact, every online service that qualifies as a "social media network" under the Online Hate Speech Law would necessarily qualify as an "interactive computer service" under Section 230.

211.    Section 230(c)(1) provides, in pertinent part, that a "provider" of an "interactive computer service" shall "not be treated as the publisher or speaker of any information provided by" a content creator or commenter for purposes of civil or criminal liability. Section 230(e)(3) preempts inconsistent state laws and prevents the imposition of lability. 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."); *see Cooper*, 939 F. Supp. 2d at 805 (invalidating a Tennessee law that regulated websites due to Section 230 preemption).

212.    Section 230 protects an online service's "exercise of its editorial and self-regulatory functions," *Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000), including the ability to establish third-party content policies free from a duty to scrutinize creator or commenter content. The immunity "extends to . . . website policies and practices," and their "construct and operation." *Jane Doe No. 1 v. Backpage.com*, 817 F.3d 12, 20 (1st Cir. 2016). Decisions not to change online service policies or its "construct and operation" are as much editorial decisions as not deleting any particular third-party post. *Id.* (citing *Universal Commc'n Sys., v. Lycos*, 478 F.3d 413, 422 (1st Cir. 2007).

213.    The Online Hate Speech Law treats "social media network[s]," Plaintiffs included, as publishers, unlawfully holding them liable based on third-party content if they do not fulfill any of three obligations New York has imposed.

214.    First, the Online Hate Speech Law requires "social media network[s]" to develop and publish a Hate Speech Policy describing how they "will respond [to] and address" state-defined hate speech on their platforms, including third-party creator or commenter speech, presupposing that such "response," whatever it may be, is required. Second, the law requires a "clear and easily accessible" Report & Response Mechanism, regulating the "construct and operation" of their sites. Third, the Reply Requirement mandates that online services monitor and screen third-party content in order to "provide a direct response" to visitor complaints.

215.    In these ways the Online Hate Speech Law subjects Plaintiffs to potential investigations, subpoenas, and civil penalties for their decisions as online publishers of third-party content, and it is accordingly preempted by Section 230.

216.    As a direct and proximate result of the Online Hate Speech Law's violation of their protection as publishers under Section 230, Plaintiffs will suffer ongoing irreparable injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Eugene Volokh, Rumble Canada Inc., and Locals Technology Inc. respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendant and issue the following relief:

A.    A declaration that:

1.    New York General Business Law § 394-ccc is unconstitutional on its face and as applied to Plaintiffs under the First Amendment to the Constitution of the United States

because it is a content-based and viewpoint-based regulation of speech that is not narrowly tailored to achieve a compelling government interest.

2.    New York General Business Law § 394-ccc is unconstitutional on its face and as applied to Plaintiffs under the First Amendment to the Constitution of the United States because it compels their speech.

3.    New York General Business Law § 394-ccc is unconstitutional on its face and as applied to Plaintiffs under the First Amendment to the Constitution of the United States because it overbroad.

4.    New York General Business Law § 394-ccc is unconstitutional on its face and as applied to Plaintiffs under the Fourteenth Amendment to the Constitution of the United States because it impermissibly vague.

5.    New York General Business Law § 394-ccc is preempted by Section 230 of the Communications Decency Act.

B.    Preliminary injunctive relief against Defendant, prospectively enjoining enforcement of New York General Business Law § 394-ccc during the pendency of this litigation.

C.    Permanent injunctive relief against Defendant, prospectively enjoining enforcement of New York General Business Law § 394-ccc.

D.    An award of attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law; and

E.    All other further legal and equitable relief as the Court may deem just and proper.


DATED: December 1, 2022

Respectfully submitted,

/s/ Darapana M. Sheth

DARAPANA M. SHETH                          BARRY N. COVERT**
(New York Bar No. 4287918)                 (New York Bar No. 27118)
DANIEL M. ORTNER*                          LIPSITZ GREEN SCIME CAMBRIA LLP
(California State Bar No. 329866)           42 Delaware Ave., Suite 120
JAMES M. DIAZ*                              Buffalo, NY 14202
(Vermont Bar No. 5014)                     Tel: (716) 849-1333 x 365
FOUNDATION FOR INDIVIDUAL RIGHTS AND       bcovert@lglaw.com
    EXPRESSION
510 Walnut St., Suite 1250
Philadelphia, PA 19106
Telephone: (215) 717-3473
daniel.ortner@thefire.org
jay.diaz@thefire.org
darpana.sheth@thefire.org

*Attorneys for Plaintiff*
**Pro Hac Vice* Motions Forthcoming
** S.D.N.Y. Admission Pending

## VERIFICATION OF EUGENE VOLOKH

Pursuant to 28 U.S.C. § 1746, I, EUGENE VOLOKH, declare as follows:

1. I am a Plaintiff in the present case and a citizen of the United States of America.

2. I am the co-founder and owner of the blog The Volokh Conspiracy that was originally located at www.volokh.com and is now hosted at www.reason.com/volokh.

3. I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

4. I have personal knowledge of the factual allegations in paragraphs 5, 12, 86-106, 142-149, 151, 152-159, 176-189, 195, 203, 206, and 215-216 of the Complaint and know them to be true regarding Eugene Volokh and the Volokh Conspiracy.

5. I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on November 30, 2022.

_____

Eugene Volokh

*Plaintiff*

**AA0073**

## VERIFICATION OF MICHAEL ELLIS

Pursuant to 28 U.S.C. § 1746, I, MICHAEL ELLIS, declare as follows:

1. I am an authorized representative of the Plaintiffs, Rumble Canada Inc. and Locals Technology Inc., in the present case and a citizen of the United States of America.

2. I am the General Counsel and Corporate Secretary of Rumble Inc., the parent company of Rumble Canada Inc. and Locals Technology Inc.

3. I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

4. I have personal knowledge of the factual allegations in paragraphs 6, 13, 14, 23 (that the video that is listed as being on Rumble is in fact found on Rumble as of today), 107-125, 126-141, 142-150, 152-159, 176-189, 166, 195, 203, 206, and 215-216 of the Complaint, and know them to be true with regard to Rumble Canada Inc. and Locals Technology Inc.

5. I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on December 1, 2022.

_____

Michael Ellis

Rumble Canada Inc. and Locals Technology Inc.

Plaintiffs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **VDARE FOUNDATION, INC.,** | |
| Plaintiff, | |
| v. | 22-cv-01337 (FJS-CFH) |
| **LETITIA JAMES**, in her official Capacity as Attorney General of New York, | **NOTICE OF MOTION** |
| Defendant. | |

**PLEASE TAKE NOTICE** that State Defendant Attorney General Letitia James, in her official capacity, moves this Court for an Order under Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure dismissing the claims against her as well any further relief this Court may deem just and proper. The basis for this request is set forth in the accompanying memorandum of law and in Defendant's opposition to Plaintiffs' preliminary injunction motion.

No oral argument is requested at this time. If any claims survive this motion, Defendant respectfully requests 30 days to submit an answer. Defendant reserves the right to file reply papers.

Dated: January 18, 2023
   New York, New York

**LETITIA JAMES**

New York State Attorney General
28 Liberty St. New York, NY 10005

By: Yael Fuchs
JAMES SHEEHAN
Assistant Attorney General
YAEL FUCHS
Assistant Attorney General
CATHERINE SUVARI
Assistant Attorney General
RICHARD SAWYER
Special Counsel, Civil Rights Bureau

**AA0075**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

VDARE FOUNDATION, INC.,

                Plaintiff,

      -vs-

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York,

                Defendant.
_____

**22-cv-1337 (FJS/CFH)**

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS

**LETITIA JAMES**
New York State Attorney General
28 Liberty St. New York, NY 10005

By:    JAMES SHEEHAN
        Assistant Attorney General
        NDNY Attorney Bar Roll #516406
        YAEL FUCHS
        Assistant Attorney General
        NDNY Attorney Bar Roll # 702160
        CATHERINE SUVARI*
        Assistant Attorney General
        RICHARD SAWYER*
        Special Counsel, Civil Rights Bureau

        *Pro hac vice applications forthcoming

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 4

    New York law authorizes the Attorney General to investigate apparent unlawful conduct at registered charities like VDARE. ........................................................................................ 4

    Public filings indicate that VDARE used charitable funds to buy a medieval-style castle in West Virginia, permits its directors to live in it, and conveyed it to two corporations established by one of those directors. ........................................................................................ 5

    The Attorney General begins investigating VDARE, issues subpoenas, and VDARE resists compliance. .................................................................................................................................. 8

STANDARD OF REVIEW ............................................................................................ 11

ARGUMENT ................................................................................................................... 12

    I. Sovereign immunity bars the majority of Plaintiff's claims. .................................... 12

    II. Abstention is appropriate given the ongoing state-court litigation concerning VDARE's subpoena compliance. ............................................................................................................. 13

    III. The First Amendment does not prohibit the use of an administrative subpoena to investigate potential unlawful conduct by a New York-regulated charity. ............................. 14

    IV. VDARE has not alleged a plausible First Amendment retaliation claim. .......................... 17

        B.   VDARE has not and cannot plead "but for" causation because no First Amendment claim can arise from an objectively justified investigation. ................................................. 19

        C.   VDARE has failed to plead that illicit animus caused an injury. ................................... 21

    V. Count Four must also be dismissed. ..................................................................................... 22

CONCLUSION ................................................................................................................. 22

AA0077

# TABLE OF AUTHORITIES

## Cases

*Abrams v. N.Y. Found. for the Homeless*, 190 A.D.2d 578 (1st Dep't 1993) ......................... 15, 19

*Alleyne v. N.Y. State Educ. Dep't*, 691 F.Supp.2d 322 (N.D.N.Y. 2010) .................................... 12

*Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273 (E.D.N.Y. 2013) ........................................ 12

*Am. Savings Bank, FSB v. UBS Fin. Servs., Inc.*, 347 F.3d 436 (2d Cir. 2003) ........................... 17

*American Disposal Services, Inc. v. O'Brien*, 839 F.2d 84 (2d Cir.1988) ................................... 14

*Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021) .................................. 3, 15, 16

*Arista Recs., LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ........................................................ 15

*Aron v. Becker*, 48 F. Supp. 3d 347 (N.D.N.Y 2014) ........................................................... 12

*Avery v. DiFiore*, 2019 WL 3564570  (S.D.N.Y. Aug. 6, 2019) ..................................... 12, 19, 21

*Awan v. Ashcroft*, No. 09-cv-1653, 2010 WL 3924849 (E.D.N.Y. Sept. 28, 2010) ................. 5, 20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................... 11

*Bimber's Delwood, Inc. v. James*, 496 F. Supp. 760 (W.D.N.Y. 2020) ....................................... 22

*Brown v. Socialist Workers '74 Comm. (Ohio)*, 459 U.S. 87 (1982) ......................................... 16

*Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) .................................................................... 13

*Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018) ............................................... 15

*Curley v. Village of Suffern*, 268 F.3d 65 (2d Cir. 2001) ............................................. 20, 21, 22

*Dorsett v. Cnty. of Nassau*, 732 F.3d 157 (2d Cir. 2013) ...................................................... 18

*Evergreen Ass'n, Inc. v. Schneiderman*, 153 A.D.3d 87 (2d Dep't 2017) ................................ 3, 16

*Exxon Mobil Corp. v. Schneiderman*, 316 F. Supp. 3d 679 (S.D.N.Y. 2018) ............................ 19

*Finch v. N.Y. State Off. of Children and Family Servs.*, 499 F. Supp. 2d 521 (S.D.N.Y. 2007) .. 12

*Hartman v. Moore*, 547 U.S. 250 (2006) ..................................................................... 18, 19, 20

*Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600 (2003) ........................... 19

iii

*Levy v. Lewis*, 635 F.2d 960 (2d Cir.1980) ................................................................ 14

*Liberty Mut. Ins. Co. v. Hurlbut*, 585 F.3d 639 (2d Cir. 2009) .................................. 14

*Matter of Hogan v. Cuomo*, 67 A.D.3d 1144 (3d Dep't 2009) .................................... 21

*Nat'l Rifle Assoc. v. Vullo*, 49 F.4th 700 (2d Cir. 2022) ............................................ 21

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350 (1989) .............. 14

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019) ..................................................... 18, 19, 21

*Orange Trans. Servs., Inc. v. Volvo Grp. N. Am., LLC*, 450 F. Supp. 3d 311 (W.D.N.Y. 2020) . 11

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) ........................................ 12, 13

*People by James v. Nat'l Rifle Assoc.*, 75 Misc. 3d 1000 (Sup. Ct. N.Y. Cnty. 2022) ........... 18, 21

*People by James v. VDARE Found., Inc.*, Index No. 453196/2022 (Sup. Ct. N.Y. Cnty. Dec. 16, 2022) ................................................................................... 11, 17, 21

*People by Underwood v. Trump*, 62 Misc. 3d 500 (Sup. Ct. N.Y. Cnty. 2018) ........................ 18

*Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110 (2d Cir. 1995) ......................................... 20

*Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406 (2d Cir. 2008) ................................ 5, 20

*Temple of Lost Sheep Inc. v. Abrams*, 930 F.2d 178 (2d Cir. 1991) .................................... 13

*Trump v. James*, 21-cv-1352 (BKS/CFH), 2022 WL 1718951 (N.D.N.Y. May 27, 2022) ......... 13

*United States v. Konstantakakos*, 121 F. App'x 902 (2d Cir. 2005) ................................... 19

*Wayte v. United States*, 470 U.S. 598 (1985) ........................................................ 20

*Zherka v. Amicone*, 634 F.3d 642 (2d Cir. 2011) ................................................... 22

**Statutes**

42 U.S.C. § 1983 .......................................................................... 12, 13

EPTL § 8-1.4(i); ................................................................................. 5

Exec. Law § 175 .............................................................................. 5

**AA0079**

Exec. Law § 63(12)...............................................................................5

N-PCL § 1008(a)(15)............................................................................5

N-PCL § 1101........................................................................................5

N-PCL § 1102........................................................................................5

N-PCL § 1109(b)...................................................................................5

N-PCL § 1115(a)...................................................................................5

N-PCL § 112(b)(6)................................................................................5

N-PCL § 509........................................................................................20

N-PCL § 510........................................................................................20

N-PCL § 511........................................................................................20

N-PCL § 511-a.....................................................................................20

N-PCL § 706..........................................................................................5

N-PCL § 714..........................................................................................5

N-PCL § 715.....................................................................................5, 20

N-PCL § 717..........................................................................................5

N-PCL § 720..........................................................................................5

N-PCL, Art. 5.........................................................................................5

U.S. Constitution, Amendment XI.......................................................12

**Rules**

Fed. R. Civ. P. 12(b)(1).......................................................................12

Fed. R. Evid. 201.............................................................................5, 20

## PRELIMINARY STATEMENT

Plaintiff VDARE Foundation, Inc., a New York-chartered non-profit, has asked the Court to end the Attorney General's lawful investigation into VDARE's apparent pattern of self-dealing and financial misconduct by nullifying a valid state administrative subpoena. But neither the First Amendment nor any other provision of law justifies such a drastic measure, and the Court's intervention would seriously harm New York State's interest in enforcing its non-profit law. The Attorney General has a statutory responsibility to protect charitable property controlled by organizations, like VDARE, under its jurisdiction. Publicly available information fully justifies its investigation here.

The Attorney General began investigating VDARE after its own public filings, statements, and published media reports revealed a possible pattern of self-dealing, misleading donor solicitation, misuse of charitable assets, and false reporting. As one example, VDARE apparently used charitable funds to purchase the $1.4 million medieval-style Berkeley Springs Castle and promptly conveyed the property to two corporations established by one of its directors. That director and her husband, the organization's founder and also a director, admittedly used the castle as a family residence. These transactions, among others, raise serious questions regarding VDARE's governance and use of charitable assets.

In June 2022, the Attorney General served an investigative subpoena on VDARE for records relating to the Berkeley Springs Castle transactions, other related-party transactions, VDARE's corporate structure, record keeping, and relevant governance policies. VDARE did not move to quash or modify the subpoena and partially complied for months. Its counsel repeatedly requested deadline extensions and promised to complete production by December 12, 2022. The Attorney General asked VDARE to provide a redaction log by that date to better

## AA0081

understand the extensive and haphazard redactions in VDARE's document productions. But VDARE did not complete production, as promised, or provide a redaction log on December 12. Instead, it ceased complying with the subpoena and filed this lawsuit.

VDARE's complaint completely ignores the indicia of self-dealing and other regulatory misconduct that drew the Attorney General's scrutiny. Those facts are detailed at length in a pending state-court petition to compel subpoena compliance. *See* Fuchs Aff., Ex. A. VDARE cannot use its status as a publisher of controversial opinions as a pretext for diversion or waste of charitable assets, and it should not be permitted to use this Court's power to circumvent the Attorney General's lawful investigation.

All of VDARE's claims are without merit and should be dismissed.

*First*, VDARE's claims for monetary damages, and its claims under the New York Constitution (Counts 2 and 3) are barred by the Eleventh Amendment and sovereign immunity and should be dismissed for lack of jurisdiction.

*Second*, the state-court proceeding pending before Justice Sabrina B. Kraus is the proper venue for raising the subpoena objections that VDARE wants this Court to consider. Given the comprehensive regulatory scheme governing New York charities and the State's clear interest in investigating potential violations of that law, the Court should abstain from deciding those issues under the *Burford* abstention doctrine.

*Third*, even if this Court considers VDARE's claims, VDARE has failed to plausibly allege that the Attorney General's subpoena violates the First Amendment (Count 1). In this investigation of self-dealing and misuse of charitable assets, the Attorney General's subpoena reasonably seeks the identities of those who have received payments from VDARE. VDARE has not and cannot cite a single example of a federal court granting the extraordinary relief requested

**AA0082**

here—nullifying a lawfully issued subpoena on the basis that financial and governance records must be kept secret from a state agency investigating possible misuse of funds. On the contrary, the Supreme Court recently ratified such investigative tools in the *Americans for Prosperity* decision cited by VDARE. *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021). Unlike the federal cases cited by VDARE, the Attorney General is conducting a targeted investigation, not requiring blanket disclosures, and the information sought by the subpoena will not be made publicly available. Nor does the state-court case VDARE cites, *Evergreen Ass'n, Inc. v. Schneiderman*, 153 A.D.3d 87 (2d Dep't 2017), justify enjoining this investigation. There, in an appeal of a state-court special proceeding (akin to the one pending in this case), the Appellate Division affirmed the Attorney General's subpoena and permitted the investigation to go forward while placing limited restrictions on the subpoena's scope. Nothing in that decision justifies an order under § 1983 declaring the Attorney General's investigation "unconstitutional."

*Fourth*, VDARE's complaint fails to plausibly allege a First Amendment retaliation claim. Illegal conduct, like the possible self-dealing under investigation, is not protected by the First Amendment. And because good cause exists for the Attorney General's subpoena, VDARE cannot show that any improper motive was the but-for cause of the investigation. Nor has VDARE shown any injury from the investigation, despite months of partial compliance and the haphazard disclosure by counsel of many contractors' identities.

*Finally*, because VDARE's other claims must be dismissed, its request for an injunction must also be denied.

For these reasons, the Court should dismiss this action in its entirety.

**AA0083**

# BACKGROUND

**New York law authorizes the Attorney General to investigate apparent unlawful conduct at registered charities like VDARE.**

VDARE incorporated as a not-for-profit charitable corporation under the laws of New York and is registered as a charity under New York law. Compl. ¶¶ 1–2. VDARE does not dispute that it operates subject to the Attorney General's oversight as a New York regulated non-profit entity.

Under New York law, the Attorney General has a duty to protect "the public interest in charitable property." *Schneiderman v. Tierney*, No. 451489/2014, 2015 WL 2378983, at \*2 (Sup. Ct. N.Y. Cnty. May 18, 2015). The law gives the Attorney General "broad supervisory and oversight responsibilities over charitable assets and their fiduciaries." *In re McDonell*, 195 Misc. 2d 277, 278-79 (Sup. Ct. N.Y. Cnty. 2002); *see also Abrams v. Found. for the Homeless*, 190 A.D.2d 578 (1st Dep't 1993); *Spitzer v. Lev*, No. 400989/2002, 2003 WL 21649444, at \*3 (Sup. Ct. N.Y. Cnty. June 5, 2003); *In re McDonnell*, 195 Misc. 2d 277, 278–79 (Sup. Ct. N.Y. Cnty. 2002). This includes "preventing fraud and self-dealing in charities" by launching investigations and enforcement actions. *Citizens United v. Schneiderman*, 882 F.3d 374, 379, 384 (2d Cir. 2018).

As the State's chief law enforcement officer, "there is no doubt that the Attorney-General has a right to conduct investigations to determine if charitable solicitations are free from fraud and whether charitable assets are being used properly for the intended beneficiaries." *Abrams v. Temple of the Lost Sheep*, 148 Misc. 2d 825, 828–29 (Sup. Ct. N.Y. Cnty. 1990); *see also People by James v. Nat'l Rifle Assoc. of Am., Inc.*, 75 Misc. 3d 1000, 1005 (Sup. Ct. N.Y. Cnty. 2022). Under both the Not-For-Profit Corporation Law and the Estates, Powers, and Trusts Law, the Attorney General may pursue such investigations through investigative subpoenas to New York

4

charities, like VDARE, and to any third parties that may have relevant documents or information. *See* EPTL § 8-1.4(i); N-PCL § 112(b)(6); *see also* Exec. Law §§ 63(12) (authorizing subpoenas directed at uncovering fraud and illegality), 175 (authorizing subpoenas for investigations of fraud in charitable solicitations). Issuing such subpoenas is a preliminary step to determine whether cause exists for the Attorney General to take further enforcement action, which could include directing restitution, unwinding transactions, requiring an accounting, removing officers, or dissolving the entity. *See, e.g.,* N-PCL §§ 706, 714, 715, 717, 720, 1008(a)(15), 1101, 1102, 1109(b), and 1115(a); *see also* N-PCL, Art. 5.

**Public filings indicate that VDARE used charitable funds to buy a medieval-style castle in West Virginia, permits its directors to live in it, and conveyed it to two corporations established by one of those directors.**

According to VDARE, it is "a mom-and- pop operation run by Peter and Lydia Brimelow, husband and wife." Compl. ¶ 2. VDARE's 2020 IRS Form 990—the most recent available—confirms that the organization is overseen exclusively by the Brimelow family: Peter Brimelow serves as its chairman, Lydia Brimelow as president, and John Brimelow as a director. Fuchs Aff., Ex. B at 7.[1] On that same form, VDARE lists its only activity as "[c]reate[ing] and manag[ing] internet publication." Fuchs Aff., Ex. B at 1.

Publicly available documents suggest that VDARE has grown significantly in recent

---

[1] On a motion to dismiss, the Court may consider the pleading, information incorporated into the pleading by reference, and any document upon which the pleading relies. *Geron v. Seyfarth Shaw LLP*, 736 F.3d 213, 219 (2d Cir. 2013). Specifically, the Court may consider a document where a complaint "relies heavily upon its terms and effect" or "[w]here the plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint…." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002). The Court may also consider matters that are subject to judicial notice, including properly recorded deeds, *Awan v. Ashcroft*, No. 09-cv-1653, 2010 WL 3924849, at *2 (E.D.N.Y. Sept. 28, 2010), newspaper articles, and regulatory filings, *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). *See* Fed. R. Evid. 201.

years, and the organization now reports millions of dollars in charitable donations and hundreds of thousands of dollars in compensation for Peter Brimelow. In 2019, VDARE reported $4.2 million in donations to the IRS, an eightfold increase over its reported 2018 revenue. *See* Fuchs Aff., Ex. C, D. And Peter Brimelow's reported compensation jumped from $181,675 in 2018 to $345,364 in 2019. *Id.* In 2020, VDARE reported paying more than $300,000 in compensation to Peter and Lydia Brimelow. Fuchs Aff., Ex. B.

On February 14, 2020, VDARE purchased a medieval-style castle in Berkley Springs, West Virginia. Shortly after the purchase, Lydia Brimelow confirmed that VDARE bought the castle with donor funds, writing that "donors stepped forward in an unprecedented way" to enable the purchase. *Lydia Brimelow: We Got the Keys to the Castle!*, VDARE.com, https://vdare.com/articles/lydia-brimelow-we-got-the-keys-to-the-castle (last visited Dec. 12, 2022).. She described the castle as a "meeting space," and wrote that "[h]aving a space where we can meet and share ideas without fear of deplatforming will make a difference so material it is hard to overstate." *Id.*

But statements published on VDARE's website within months of the purchase indicate that Peter and Lydia Brimelow were not using the castle as a meeting space but instead as their family's full-time residence. The Brimelows posted family photos celebrating the Fourth of July and Christmas Eve in the castle. *The Brimelow Family Wishes You a Happy Independence Day*, https://vdare.com/posts/the-brimelow-family-wishes-you-a-happy-independence-day (last visited Dec. 20, 2022); *Merry Christmas from VDARE.com!*, VDARE.com, https://vdare.com/articles/peter-brimelow-merry-christmas-from-vdare-com-f3d0cb33-af41-4d90-93b9-c82cd46c5950 (last visited Dec. 20, 2022). And, describing a visit to the castle, a VDARE contributor wrote that "Peter and Lydia Brimelow have moved in and spend most of

**AA0086**

their time there." *Radio Derb: Castling with VDARE.com*, VDARE.com,

https://vdare.com/radio-derb/castling-with-vdare-com-senate-visa-giveaway-covid-hypocrisy-

and-students-cancel-black-etc (last visited Dec. 20, 2022). In a state-court filing, VDARE's

counsel admitted that Peter and Lydia Brimelow lived in the castle "for a period of months" and

stated that they still live on the castle's grounds. *See* Fuchs Aff., E.

Later in 2020, Lydia Brimelow executed two transfers on behalf of VDARE conveying

the entire castle property—a $1.4 million charitable asset—to two West Virginia corporations

she had founded earlier that year. *See* Fuchs Aff., Exs. F–I. One deed filed with the Morgan

County, West Virginia, Register of Deeds conveyed the castle itself and the land it occupies to

the Berkeley Castle Foundation, Inc., a not-for-profit established by Lydia Brimelow. Fuchs Aff.,

Exs. F, H. A second deed conveyed the remaining eight parcels of surrounding land to BBB,

LLC, a for-profit corporation also established by Lydia Brimelow. Fuchs Aff., Exs. G, I. The

sole signatory for both deeds was Lydia Brimelow. Fuchs Aff., Exs. F, G. Under the tagline

"When nothing but a castle will do," the Berkeley Castle Foundation now advertises the castle as

a for-rent event space. https://www.berkeleyspringscastle.com/contact.html (last visited

December 14, 2022). According to a publicly filed contract signed by Lydia Brimelow (as both

landlord and tenant), the Brimelows now pay monthly "rent" to BBB, the for-profit corporation,

to reside on the castle property. Fuchs Aff., Ex. J. In other words, the Brimelows used charitable

funds to purchase property in which they reside, transferred the grounds to a for-profit

corporation they control, and now pay rent to that company, in essence to themselves.

There is a host of potential violations of New York charities law implicated in this series

of transactions. As an example, transferring or approving a transfer of charitable assets from a

charitable New York not-for-profit corporation to a for-profit entity without fair compensation is

a violation of New York and federal law and a breach of the fundamental fiduciary responsibilities of directors and officers. *See generally* Fuchs Aff., Ex. A (petition to compel subpoena in state court). The castle transactions were not reported on VDARE's 2020 IRS Form 990, as required by federal and New York law, nor were they submitted to the Charities Bureau or the New York Supreme Court for approval, as required by N-PCL §§ 510, 511, and 511a. *See* Fuchs Aff. at B. Even had they been submitted, neither the Charities Bureau nor the Court would have the authority to approve such a transaction because VDARE had no independent directors who could have approved it. *See* N-PCL § 510.

### The Attorney General begins investigating VDARE, issues subpoenas, and VDARE resists compliance.

On June 24, 2022, the Attorney General served VDARE with an investigative subpoena seeking information related to VDARE's purchase and conveyance of the Berkeley Springs Castle and other transactions between VDARE, the Brimelows, and entities they control (the "VDARE Subpoena"). Compl. ¶ 22; Fuchs Aff., Ex. K at 5–9. The VDARE Subpoena also sought information related to VDARE's compliance with New York law governing charities, including VDARE's structure, conflict -of -interest policies, charitable solicitations, and financial operations. Fuchs Aff., Ex. K at 5–9.[2]

The VDARE Subpoena did *not* seek any information regarding the development or

---

[2] The Attorney General also served subpoenas on Meta, Facebook's parent company, for information related to allegations that VDARE had engaged in what Facebook characterized as "coordinated inauthentic behavior," activity that could constitute breaches of fiduciary duty under New York law. Compl. ¶¶ 16, 17. Facebook's "Coordinated Inauthentic Behavior Report" described this misconduct as "us[ing] fake accounts to create fictitious personas, post in Groups, manage Pages, drive traffic to off-platform sites, and evade enforcement." Compl. ¶¶ 16, 17; Fuchs Aff. Ex. L at 16. Contrary to VDARE's assertion, *see* Compl. ¶ 19, the Facebook Subpoenas did *not* call for information protected by 18 U.S.C. § 2703(b), and explicitly said so on their face. *See* Fuchs Aff., Ex. M at 4, ¶ 10.

publication of VDARE's online content. *Id.* Nonetheless, VDARE's counsel initially refused to comply with the subpoena at all, describing it as "incredibly unlawful." Compl. ¶ 24; Fuchs Aff. Ex. N. To address VDARE's expressed concerns, the Attorney General agreed to permit limited redactions omitting names and address information for donors and uncompensated volunteers. *See* Fuchs Aff. Ex. O. But VDARE's counsel continued to refuse compliance.

In August 2022, VDARE retained new counsel and allegedly directed him to comply with the VDARE Subpoena. Compl. ¶ 25. In a letter on September 19, 2022, the new counsel identified "a significant volume of electronically-stored (sic) and hard copy documents that need to be reviewed" for production. Compl. ¶ 25; Fuchs. Aff., Ex. P. The parties also agreed on amending the scope of the Facebook Subpoenas to omit donors' identifying information. Compl. ¶ 31.

On September 19, 2022, nearly two months after the VDARE Subpoena's initial deadline, VDARE's counsel finally produced a mere 27 heavily redacted documents without Bates numbers. *See* Fuchs Aff., Exs. P, Q. VDARE provided no log to identify or explain the redactions. *See* Fuchs Aff., Ex. Q; Compl. ¶¶ 28, 32. By email, the OAG requested a redaction log describing the legal basis for each redaction and the category of information being withheld—information to which it is entitled under law. *Id.* Without such redactions, the email explained, the OAG had no means to "reliably identify what has been deleted…and on what legal basis." Fuchs Aff., Ex. Q..

In the nine weeks between September 19 and November 21, VDARE produced only about 6,000 pages of documents, including many duplicates. Compl. ¶ 25. The productions consisted primarily of documents from VDARE's paper files and did not include the 40 gigabytes of emails or other electronically stored data identified by VDARE's counsel. Compl.

**AA0089**

¶¶ 25, 30. The documents also bore numerous redactions, and VDARE again did not provide a redaction log. Compl. ¶¶ 28, 32. According to VDARE, despite having more than six months to work, completing production and compiling a redaction log had not been possible because redacting documents is "labor-intensive and time-consuming." Compl. ¶¶ 28, 32. VDARE's counsel then missed an agreed November 21, 2022 deadline for electronic file production. On November 28, he wrote that email production would be complete by December 12, 2022. *See* Fuchs Aff., Ex. S.

After several attempts to resolve the dispute regarding redactions and to obtain a complete production, *see* Compl. ¶¶ 26–28, 30–31, on December 2, 2022, the OAG requested a complete production and redaction log by December 12, the date set by VDARE's counsel, Compl. ¶ 32; *see* Fuchs. Aff., Exs. S, T. The OAG's letter identified three areas of deficiencies: "(1) ongoing delay and…repeated failure to abide by deadlines that [VDARE itself] proposed; (2) VDARE's failure to produce certain categories of documents based on unsubstantiated objections; and (3) redactions in the production for which [VDARE has] not provided any legal justification and which appear to be applied haphazardly." Fuchs Aff., Ex. T at 1. The letter identified redactions to, among other things, the "contact information for an architectural firm hired to review potential renovations at the Berkeley Springs Castle property," "bank statements to accounts held by entities *other* that VDARE," including bank accounts for the Brimelows' privately controlled LLC, and "contact information for an individual hired to perform 'VDARE Admin' services." *Id.* at 3. The OAG observed:

> These redactions are accompanied by the unredacted disclosure of numerous other VDARE contractors, vendors, and employees identified in VDARE's records, so that your stated treatment of redaction appears inconsistent, to say the least, and raises serious

10

**AA0090**

concerns about the legal basis for any such redactions.

*Id.*

On December 12, 2022, rather than provide a redaction log or make its required production, VDARE filed the present lawsuit. Despite months of partial compliance with the subpoena and promises to complete production, VDARE now claims that the Attorney General's efforts to compel timely and full compliance "threatens VDARE's existence and reveals that her targeting of VDARE is a pretext because she disagrees with its constitutionally-protected (sic) speech." Compl. ¶ 33.

On December 16, 2022, after VDARE missed its own proposed production deadline of December 12, the OAG began a state-court proceeding to compel compliance. *See People by James v. VDARE Found., Inc.*, Index No. 453196/2022, Dkt. No. 1 (Sup. Ct. N.Y. Cnty. Dec. 16, 2022). Justice Sabrina B. Kraus of the New York County Supreme Court ordered VDARE to show cause and to respond by January 12, 2023; argument is set for January 19. *See People v. VDARE*, Index No. 453196/2022, Dkt. No. 33 (Sup. Ct. N.Y. Cnty. Dec. 21, 2022).

## STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must contain enough facts, accepted as true, to "state a claim to relief that is plausible on its face." *Orange Trans. Servs., Inc. v. Volvo Grp. N. Am., LLC*, 450 F. Supp. 3d 311, 318 (W.D.N.Y. 2020), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint's allegations are generally taken as true, a plaintiff must provide "more than labels and conclusions…. Factual allegations must be enough to raise a right to relief above the speculative level." *Id.*, quoting *Twombly*, 550 U.S. at 555. "A plaintiff must show more than a sheer possibility that a defendant has acted unlawfully." *Avery v.*

11

**AA0091**

*DiFiore*, 2019 WL 3564570, at *2 (S.D.N.Y. Aug. 6, 2019) (cleaned up).

"The standard for reviewing a 12(b)(1) motion to dismiss is essentially identical to the 12(b)(6) standard, except that a plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273, 286 (E.D.N.Y. 2013) (cleaned up).

## ARGUMENT

### I.    Sovereign immunity bars the majority of Plaintiff's claims.

Sovereign immunity bars VDARE's claims seeking compensatory and punitive damages under 42 U.S.C. § 1983 (Count Two) and its claims under the New York Constitution (Count Three). Those claims must be dismissed under Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction.

VDARE sued the Attorney General in her official capacity only, and all of its claims for monetary relief under § 1983 are therefore barred by the Eleventh Amendment and must be dismissed. *See, e.g.*, *Aron v. Becker*, 48 F. Supp. 3d 347, 366 (N.D.N.Y 2014) (holding that the Eleventh Amendment bars § 1983 suits against the State of New York and state officers in their official capacities); *Finch v. N.Y. State Off. of Children and Family Servs.*, 499 F. Supp. 2d 521, 536 (S.D.N.Y. 2007) (holding "a suit against a State official in [her] official capacity is, in effect, a suit against the state itself, which is barred." (cleaned up)).

Sovereign immunity also bars VDARE's claim under the New York Constitution (Count Three). "Sovereign immunity bars state constitutional claims against the state, its agencies, or against its employees in their official capacity, regardless of the relief sought." *Alleyne v. N.Y. State Educ. Dep't*, 691 F.Supp.2d 322, 335 (N.D.N.Y. 2010) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105–106 (1984)). That includes injunctive or declaratory relief

**AA0092**

against a state officer—unlike suits under federal law, such relief is not permitted for claims under state law. *Pennhurst*, 465 U.S. at 106. The Court must therefore dismiss VDARE's state-law claim for lack of jurisdiction.

## II. Abstention is appropriate given the ongoing state-court litigation concerning VDARE's subpoena compliance.

This action is an explicit attempt by VDARE to turn a state-law discovery dispute into a federal case, and, by extension, evade scrutiny for possible violations of New York state law. VDARE's request that this Court enjoin the Attorney General's subpoena constitutes an unwarranted federal intrusion into New York's oversight of charitable entities that raises serious federalism and comity concerns. Given the pending subpoena enforcement action, VDARE's claims here, including the constitutional issues it raises, may be litigated as defenses in the state forum. This is a clear example of an instance where abstention is justified. *See Burford v. Sun Oil Co.*, 319 U.S. 315 (1943); *Temple of Lost Sheep Inc. v. Abrams*, 930 F.2d 178, 185 (2d Cir. 1991);*see also Trump v. James*, 21-cv-1352 (BKS/CFH), 2022 WL 1718951 (N.D.N.Y. May 27, 2022) (dismissing a § 1983 lawsuit brought to nullify a state administrative subpoena and holding "[a] state's interest in enforcing its own laws and investigating their violation cannot seriously be disputed" (cleaned up)).

### A. The Court should abstain under the *Burford* abstention doctrine.

In *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), the Supreme Court held that where "timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings…where the 'exercise of federal review…would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361

**AA0093**

(1989) (internal citation and quotation marks omitted).

*Burford* abstention applies to prevent federal courts from "interfering with state efforts…in an area of comprehensive regulation or administration," even where a federal question may be present. *American Disposal Servs., Inc. v. O'Brien*, 839 F.2d 84, 87 (2d Cir.1988) (noting also that abstention may be appropriate "in deference to parallel state court proceedings….in order to further the interests of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." (cleaned up)). *See also Levy v. Lewis*, 635 F.2d 960, 963–64 (2d Cir.1980). Burford abstention applies when "the subject matter of the litigation is traditionally one of state concern." *Liberty Mut. Ins. Co. v. Hurlbut*, 585 F.3d 639, 650 (2d Cir. 2009), and charities regulation certainly qualifies.

New York has a comprehensive statutory scheme for the oversight of charitable not-for-profits, which empowers the Attorney General to carry out the important state interest of ensuring proper governance and proper use of charitable assets to fulfill a legitimate charitable mission. Following an initial investigation, the Attorney General served a lawful investigative subpoena on VDARE. The ongoing proceeding in New York State Supreme Court is the appropriate place to assess VDARE's assertions that the Attorney General's claims of illegal conduct lack merit or infringe constitutional rights.

In light of the foregoing, the Court should abstain here.

## III. The First Amendment does not prohibit the use of an administrative subpoena to investigate potential unlawful conduct by a New York-regulated charity.

VDARE cannot cite a single case where a federal court has granted the extraordinary relief VDARE seeks under Count One: an order declaring "unconstitutional" a state administrative subpoena investigating a registered charity's self-dealing and diversion of charitable funds, solely on the basis that the subpoena infringes on an asserted First Amendment

14

right to keep contractors' identities a secret. To the contrary, the leading case VDARE cites, *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021), explicitly endorsed the use of such investigative tools. There, the Court found that the state "has an important interest in preventing wrongdoing by charitable organizations," and the Attorney General could use subpoenas and audit letters to combat "misuse, misappropriation, and diversion of charitable assets…false and misleading charitable solicitations [and] other improper activities by charities." *Id.* at 2386 (cleaned up). Anonymity *can* be an important First Amendment right, but when it is used to mask violations of the law, "it is unprotected by the First Amendment." *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010) (affirming decision not to quash *federal* subpoena on First Amendment grounds because it would reveal the identity of alleged copyright violator); *see also Abrams v. N.Y. Found. for the Homeless*, 190 A.D.2d 578, 578 (1st Dep't 1993) ("The mere utterance of First Amendment privileges by a purported eleemosynary [charitable] organization cannot shield defendants from the scrutiny of the Attorney-General.").

Here, in an investigation of potential misuse of charitable assets, complete review of transaction parties, organizational spending, and governance and financial controls is critical. Public records have already disclosed more than a million dollars in transactions between VDARE and two corporations established—and controlled—by VDARE's directors. As described above, such transactions could not have been approved by a disinterested board—because the board consisted entirely of Brimelows—and thus violated New York law. Without review of VDARE's actual financial operation and its control by the Brimelows, the Attorney General cannot fulfill her mandate of "preventing fraud and self-dealing in charities." *Citizens United v. Schneiderman*, 882 F.3d 374, 379, 384 (2d Cir. 2018). No authority has ever held that

15

**AA0095**

the Constitution applies the sort of blanket immunity to such scrutiny that VDARE requests here.

The cases VDARE cites are not to the contrary. *Americans for Prosperity* prohibited only mandated donor disclosures in statewide annual filing requirements, while expressly permitting subpoenas seeking the same information as part of a targeted investigation. 141 S. Ct. 2386–87. Here, that decision is doubly irrelevant because the OAG has issued a valid subpoena (as that case endorsed) and has already agreed to redactions to unrelated donor identifying information (the only category of First Amendment-protected information at issue there). Similarly, *Brown v. Socialist Workers '74 Comm. (Ohio)* invalidated a statutory requirement that a political party report *all* of its donors and contractors for a list that would be "open to public inspection for at least six years." 459 U.S. 87, 89–90 (1982). Like *Americans for Prosperity*, that case did not even address, let alone call into question, a state's authority to issue targeted investigative subpoenas as part of a statutorily authorized, pre-complaint regulatory investigation. And VDARE has not come close to identifying a commensurate harm to that law's six-year public inspection requirement. It has not and cannot allege a *single* instance of the Attorney General publicizing confidential information obtained through a valid subpoena. Finally, despite VDARE's misleading characterization, *see* Compl. ¶ 37, *Evergreen Ass'n, Inc. v. Schneiderman*, 153 A.D.3d 87 (2d Dep't 2017), did *not* hold that the Attorney General's subpoena was "invalid." There, the court upheld the Attorney General's subpoena and enforced compliance but narrowed the scope of some of the subpoena's demands. *Id.* at 101–03. Such fine-tuning is a far cry from what VDARE seeks here—complete invalidation of the VDARE Subpoena.[3]

VDARE's request in Count One for an order declaring the VDARE Subpoena

---

[3] VDARE is free to raise similar arguments in the state-court proceeding if it believes some of the subpoena's requests violate the First Amendment. What it cannot do—and *Evergreen* did not

AA0096

"unconstitutional" should accordingly be dismissed for failure to state a claim.

## IV. VDARE has not alleged a plausible First Amendment retaliation claim.

VDARE's cursory allegation of "pretext" is not supported by any plausible allegation of fact and cannot overcome the presumption of regularity accorded to the Attorney General's review. The Attorney General began investigating VDARE after it became apparent that the organization had used charitable funds to buy a castle for its directors to use as a family residence. Public records further showed that VDARE conveyed the entire castle property to two corporations established by director Lydia Brimelow and that the only signatory to those deeds was Lydia Brimelow herself. Fuchs Aff. Exs. E–H. Those transactions should have been disclosed to the IRS and reviewed by the Attorney General's office but were not. Those facts suggested of self-dealing, misappropriation, and breach of fiduciary duties by VDARE's directors, and false filings by VDARE with the Charities Bureau, in violation of New York law. Other potential violations of law were apparent from the face of documents VDARE submitted to the IRS and the Attorney General's Office. *See generally* Fuchs Aff., Ex. A; *People by James v. VDARE Found., Inc.*, Index No. 453196/2022, Dkt. Nos. 3, 4 (Sup. Ct. N.Y. Cnty. Dec. 16, 2022) (setting forth the Attorney General's basis to investigate).

Under Count Two, VDARE argues that the First Amendment shields it from such scrutiny because of an asserted retaliatory motive. But it is not "within the province of the courts

---

do—is use this Court to invalidate the entire subpoena on a nebulous First Amendment ground. To the extent the Court believes the subpoena requires fine-tuning, the issue is not yet ripe for consideration because the same issue is pending in state court, and this Count should still dismiss on prudential ripeness grounds. *See, e.g.*, *Am. Savings Bank, FSB v. UBS Fin. Servs., Inc.*, 347 F.3d 436, 440 (2d Cir. 2003) (dismissing appeal as unripe, holding the issues it raised were "ill-suited for judicial resolution at this stage" because other remedies were available). Finally, *Evergreen* is fully distinguishable because the investigation at issue in that case did not entail allegations of financial misconduct and self-dealing, like those against VDARE, that require disclosure of financial records, including records of payments made, and governance documents.

to subjectively determine the motivation of a government agency in commencing an enforcement

proceeding, or to dismiss the proceeding because of the political disagreements of the parties."

*People by Underwood v. Trump*, 62 Misc. 3d 500, 509 (Sup. Ct. N.Y. Cnty. 2018). VDARE has

failed to plead, as it must to succeed, that "animus and bias were the *sole* motivating factors for

initiating the investigation." *Id.*; *see also People by James v. Nat'l Rifle Assoc.*, 75 Misc. 3d

1000, 1005 (Sup. Ct. N.Y. Cnty. 2022) (rejecting a First Amendment retaliation claim because

"the 'nonretaliatory grounds' were more than sufficient to justify the Attorney General's

investigation") (emphasis added).

To state a First Amendment retaliation claim, VDARE must adequately plead that "(1)

[it] has a right protected by the First Amendment; (2) the defendant's actions were motivated or

substantially caused by [its] exercise of that right; and (3) the defendant's actions caused [it]

some injury." *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

VDARE fails to plead all three elements. *First*, the alleged wrongdoing at issue in the

Attorney General's investigation is not First Amendment-protected activity and VDARE does

not allege any injury through the Attorney General's subpoena into its protected online speech or

the identities of its readers or donors. *Second*, VDARE has not, and cannot, plead that the

Attorney General's investigation was illegitimate. VDARE's allegations cannot overcome the

"presumption of regularity" afforded the Attorney General's actions. *See Hartman v. Moore*, 547

U.S. 250, 263 (2006). *Third*, VDARE has not pleaded that retaliatory animus was the but-for

cause of any injury. "It is not enough to show that an official acted with a retaliatory motive and

that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a

'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken

absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (emphasis in

original).

**A.    Illegal conduct is not protected by the First Amendment.**

VDARE does not and cannot contend that possible self-dealing, looting of charitable

assets, and false filings are protected by the First Amendment. *See, e.g.*, *Illinois, ex rel. Madigan*

*v. Telemarketing Assocs.*, *Inc.*, 538 U.S. 600, 612 (2003); *Exxon Mobil Corp. v. Schneiderman*,

316 F. Supp. 3d 679, 710 (S.D.N.Y. 2018) ("Ensuring that 'accurate information' reaches the

market and the public is consistent with a *bona fide* investigation—not retaliation."); *see also*

*United States v. Konstantakakos*, 121 F. App'x 902, 905 (2d Cir. 2005) ("[I]t has long been

established that the First Amendment does not shield knowingly false statements made as part of

a scheme to defraud."); *N.Y. Found. for the Homeless*, 190 A.D.2d at 578.

The VDARE Subpoena calls primarily for documents related to VDARE's governance,

financial controls, and financial relationships with VDARE directors and their corporations, and

it is aimed at discovering financial misconduct. The subpoena does not call for documents

related to VDARE's editorial content—its First Amendment-protected activity. VDARE may not

use its status as a publisher of controversial opinion as a pretext for its directors to divert or

waste charitable assets. Allegations of such misconduct are a proper target of an investigation.

**B.    VDARE has not and cannot plead "but for" causation because no First
       Amendment claim can arise from an objectively justified investigation.**

The retaliation claim also fails because VDARE has not, and cannot, plead that the

Attorney General's investigation lacked a legitimate basis. Under settled precedent, a First

Amendment retaliation claim requires proving that the investigation would not have taken place

"but for" a retaliatory motive—in other words, the investigation had no legitimate legal or

factual basis. *Nieves*, 139 S. Ct. at 1722 (citing *Hartman*, 547 U.S. at 259–260); *see also Avery*,

2019 WL 3564570, at *3 (applying *Nieves* on a motion dismiss). Conversely, when an

19

**AA0099**

investigation has a legitimate cause, a retaliation claim necessarily fails. *See Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) ("[B]ecause defendants had probable cause to arrest plaintiff, an inquiry into the underlying motive…need not be undertaken."); *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995) (similar). The requirement of "but for" causation advances the "presumption that a prosecutor has legitimate grounds for the action [she] takes." *Hartman*, 547 U.S. at 263 (citing *Wayte v. United States*, 470 U.S. 598, 607–08 (1985)).

The Court can take judicial notice of public records, public filings, and public statements made by VDARE providing ample justification for the Attorney General's subpoena. Fed. R. Evid. 201; *Awan*, 2010 WL 3924849, at *2; *Staehr*, 547 F.3d at 425. Public records indicate that VDARE purchased a $1.4 million medieval-style castle in West Virginia, and public statements by VDARE suggest that it was bought with donor funds. *Supra*, 2–3. Additional statements by VDARE and published on its website indicate that VDARE's directors, Peter and Lydia Brimelow, use that castle as a family residence. *Id.* Public records show that VDARE conveyed the castle to two corporations owned and controlled by Lydia Brimelow, and the only signatory on both deeds was Lydia Brimelow herself. *Supra*, 3–4. And a document filed publicly by VDARE indicates that the Brimelows pay "rent" to BBB, LLC, the for-profit corporation Lydia Brimelow established, to reside on the castle grounds. *Supra*, 4. Those "related-party" transactions required disinterested board approval, disclosure on VDARE's IRS Form 990, and the submission of a petition by VDARE for review and approval by the Attorney General or N.Y. Supreme Court. *See* N-PCL §§ 509, 510, 511, 511-a, 715; Internal Revenue Service Filing Information, Intermediate Sanctions—Excise Taxes, at https://www.irs.gov/charities-non-profits/charitable-organizations/intermediate-sanctions-excise-taxes (last visited Dec. 15, 2022). Based on public records, none of those steps appears to have been taken. *See generally* Fuchs

20

**AA0100**

Aff., Ex. A; *People by James v. VDARE Found., Inc.*, Index No. 453196/2022, Dkt. Nos. 3, 4

(Sup. Ct. N.Y. Cnty. Dec. 16, 2022) (setting forth the Attorney General's basis to investigate).

Those facts more than justify the Attorney General's investigation. Under New York law,

the factual basis for an investigative subpoena "need not be sufficient to *establish* fraud or

illegality, or even provide probable cause, as long as the futility of the process is not inevitable or

obvious." *Matter of Hogan v. Cuomo*, 67 A.D.3d 1144, 1146 (3d Dep't 2009) (emphasis added).

It is enough, as here, that available information provide a reasonable basis for further

investigation. Because the Attorney General's investigation has a legitimate basis, VDARE's

retaliation claims fail, and it does not matter whether VDARE has pleaded any alternative

motivation, no matter how nefarious. *See Nieves*, 139 S. Ct. at 1722; *Avery,* 2019 WL 3564570,

at *3; *Nat'l Rifle Ass'n*, 75 Misc. 3d at 1005.[4]

### C.    VDARE has failed to plead that illicit animus caused an injury.

Finally, VDARE's claims also fail because it has not plausibly alleged an actionable

injury. *Dorsett*, 732 F.3d at 160. VDARE's only alleged injury is the conclusory assertion that

the OAG's investigation "threatens VDARE's existence." Compl. ¶¶ 30, 33. This is not

adequate—such "cursory" allegations are insufficient to "establish facial plausibility." *Zherka v.*

---

[4] The Court need not reach this question, *see Curley*, 268 F.3d at 73, but VDARE has also failed to plead *any* First Amendment animus. The out-of-context quotes from the Attorney General related to oversight of "social media companies" like Facebook do not establish any animus toward VDARE. *See* Compl. ¶¶ 13, 14; *Nat'l Rifle Assoc. v. Vullo*, 49 F.4th 700, 714–18 (2d Cir. 2022) (holding First Amendment permits a government official to speak about "her preferred course of action…it gives her the freedom to advocate for it"). VDARE has not and cannot plead a single example of the Attorney General abusing her authority by retaliating against an individual or entity based on their speech. The lawsuit VDARE cited—and attached to its complaint—concerns the constitutionality of a duly enacted state law that the Attorney General has yet to enforce. Compl. ¶ 15. The Attorney General has argued that the law is constitutional, but the outcome of that proceeding has no bearing on the serious but unsupported assertion made here—that the Attorney General has launched a baseless investigation to punish VDARE for protected speech.

*Amicone*, 634 F.3d 642, 647 (2d Cir. 2011). Moreover, VDARE has been complying partially

with the VDARE Subpoena for months without any discernable injury to it or its contractors—

despite "the unredacted disclosure of numerous other VDARE contractors, vendors, and

employees identified in VDARE's records." Fuchs Aff., Ex. T at 3. Given the absence of any

First Amendment chill or other injury notwithstanding the investigation already under way,

VDARE cannot show that it has suffered an actionable injury. *See Curley*, 268 F.3d at 73.

    For these reasons, the First Amendment claims fail.

**V.      Count Four must also be dismissed.**

    Because VDARE's substantive claims (Counts One through Three) must be dismissed for

lack of jurisdiction and fail to state a claim, its request for an injunction (Count Four) must also

be denied as moot. VDARE has not moved for a preliminary injunction, and any such motion

would be futile because it has not and cannot meet its burden of showing "a clear or substantial

likelihood of success on the merits and a strong showing of irreparable harm." *Bimber's

Delwood, Inc. v. James*, 496 F. Supp. 760, 761 (W.D.N.Y. 2020) (cleaned up).


                                   **CONCLUSION**

    For the reasons set forth above, the Complaint should be dismissed in its entirety. In the

event any claims survive, the Attorney General respectfully requests 30 days to submit an

answer.


                           Dated: January 18, 2023

                           LETITIA JAMES
                           Attorney General for the State of New York
                           *Attorney for State Defendants*
                           s/ Yael Fuchs
                           Yael Fuchs
                           Co-Chief, Enforcement Section, Charities

**AA0102**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

VDARE FOUNDATION, INC.,

                  Plaintiff,

        -vs-

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York,

                Defendant.
_____

**22-cv-1337 (FJS/CFH)**

**DECLARATION OF
YAEL FUCHS
IN SUPPORT OF
DEFENDANT'S
MOTION TO DISMISS**

YAEL FUCHS, a citizen of the United States and a resident of the State of New York,

affirms under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

     1.     I am an Assistant Attorney General in the Office of Letitia James, Attorney

General of the State of New York, who appears on behalf of the People of the State of New York

in this special proceeding. I serve as a Co-Section Chief of the Enforcement Section of the

Charities Bureau.

     2.     I submit this declaration in support of the Office of the Attorney General's motion

to dismiss the action in the above-captioned case.

     3.     I am familiar with the facts and circumstances set forth in this affirmation, which

are based upon my personal knowledge and information contained in the files of the Office of the

Attorney General ("OAG").

     4.     As set forth in greater detail in the accompanying Memorandum of Law, the

Attorney General is vested with expansive oversight authority of not-for-profit entities, their

representations to donors and potential donors, and their use of charitable assets under the New

York Not-for-Profit Corporation Law, the Estates, Powers and Trusts Law and the Executive Law.

5.       As a charity operating and soliciting in New York, VDARE is required to file annually a CHAR500 Registration Form.  The CHAR500 must be signed by two officers and asks for self-reporting regarding certain basic information, including the organization's contact information, the number and identity of board members, and information relating to fundraising.

6.       The CHAR 500 also requires that organizations file and certify a copy of their annual IRS Form 990.  According to the IRS, the Form 990 "is the IRS' primary tool for gathering information about tax-exempt organizations, educating organizations about tax law requirements and promoting compliance. Organizations also use the Form 990 to share information with the public about their programs."  https://www.irs.gov/charities-non-profits/form-990-resources-and-tools (last visited December 14, 2022).

7.       As of the date of this Affirmation, VDARE has not filed its 2020 or 2021 CHAR500 Forms, which would include the IRS Form 990 as an attachment, and is delinquent in its required annual registration with the Charities Bureau.

8.       A true and correct copy of the petition filed by the Attorney General on the docket of *People of the State of New York v. VDARE*, Index No. 453196/20022, Dkt. No. 1 (Sup. Ct. N.Y. Cnty.) is attached as **Exhibit A**.

9.       A true and correct copy of VDARE's most recent available IRS Form 990, from 2020, is attached as **Exhibit B**.

10.      A true and correct copy of VDARE's 2019 IRS Form 990 is attached as **Exhibit C**.

2

**AA0104**

11.     A true and correct copy of VDARE's 2018 IRS Form 990 is attached as **Exhibit D**.

12.     A true and correct copy of an affirmation by Andrew J. Frisch, counsel for VDARE, filed on the docket of *People of the State of New York v. VDARE*, Index No. 453196/20022, Dkt. No. 37 (Sup. Ct. N.Y. Cnty.) is attached as **Exhibit E**.

13.     A true and correct copy of a deed between VDARE Foundation and Berkeley Castle Foundation, Inc., filed with the Morgan County, West Virginia, Register of Deeds is attached as **Exhibit F**.

14.     A true and correct copy of a deed between VDARE Foundation and BBB, LLC, filed with the Morgan County, West Virginia, Register of Deeds is attached as **Exhibit G**.

15.     A true and correct copy of the certificate of incorporation issued July 21, 2020, by the West Virginia Secretary of State to Berkeley Castle Foundation, Inc., is attached as **Exhibit H**.

16.     A true and correct copy of the certificate of incorporation issued July 21, 2020, by the West Virginia Secretary of State to BBB, LLC, is attached as **Exhibit I**.

17.     A true and correct copy of a lease filed by Andrew J. Frisch, counsel for VDARE, on the docket of *People of the State of New York v. VDARE*, Index No. 453196/20022, Dkt. No. 45 (Sup. Ct. N.Y. Cnty.) is attached as **Exhibit J**. The lease appears to be between BBB, LLC, and Lydia Brimelow, and she signed the document as both landlord and tenant.

18.     A true and correct copy of a subpoena served on VDARE by the Attorney General is attached as **Exhibit K**. This document is incorporated by reference throughout the complaint in this action, including in its Prayer for Relief. Compl. ¶¶ 22–25, 32, 42, 56, Prayer for Relief (i), (iv).

AA0105

19.     A true and correct copy of a document entitled "April 2020 Coordinated Inauthentic Behavior Report" filed by VDARE's counsel in the proceeding *VDARE Foundation, Inc. v. Facebook, Inc.*, 21-cv-3933-ALC, Dkt. No. 5-1 (S.D.N.Y.), is attached as **Exhibit L**. This document is incorporated by reference into the complaint in this action. *See* Compl. ¶¶ 16, 17.

20.     A true and correct copy of a subpoena served on Meta Platforms and a subpoena served on Facebook Payments by the Attorney General is attached as **Exhibit M**. This document is incorporated by reference into the complaint in this action. *See* Compl. ¶¶ 16, 18, 31.

21.     A true and correct copy of a letter sent by Frederick Kelly to Catherine Suvari on July 20, 2022, is attached as **Exhibit N.** This document is incorporated by reference into the complaint in this action. *See* Compl. ¶ 24.

22.     A true and correct copy of an email sent by Catherine Suvari to Frederick Kelly on July 27, 2022, is attached as **Exhibit O.** This document is incorporated by reference into the complaint in this action. *See* Compl. ¶ 24.

23.     A true and correct copy of a letter sent by Andrew Frisch to Yael Fuchs on September 19, 2022, is attached as **Exhibit P.** This document is incorporated by reference into the complaint in this action. *See* Compl. ¶ 25.

24.     A true and correct copy of an email sent by Catherine Suvari to Andrew Frisch on September 30, 2022, is attached as **Exhibit Q.** This document is incorporated by reference into the complaint in this action. *See* Compl. ¶ 27.

25.     A true and correct copy of a letter sent by Andrew Frisch to Yael Fuchs on November 21, 2022, is attached as **Exhibit R.** This document is incorporated by reference into the complaint in this action. *See* Compl. ¶ 32.

26.     A true and correct copy of a letter sent by Andrew Frisch to Yael Fuchs on November 28, 2022, is attached as **Exhibit S**. *See* Compl. ¶ 32.

**27.**     A true and correct copy of a letter sent by Catherine Suvari to Andrew Frisch on December 2, 2022, is attached as **Exhibit T.** This document is incorporated by reference into the complaint in this action. *See* Compl. ¶ 32.

Dated: New York, New York
January 18, 2023

LETITIA JAMES
Attorney General of the State of New York

By:     _____

_____
Yael Fuchs
Assistant Attorney General
28 Liberty Street
New York, New York 10005
(212) 416-8391
yael.fuchs@ag.ny.gov

**AA0107**

# EXHIBIT A

Case 1:22-cv-01837-DJS-DEH Document 24-33 filed 01/18/23 Page 97 of 10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x

PEOPLE OF THE STATE OF NEW YORK, by                    Index No. _____
LETITIA JAMES, Attorney General of the
State of New York,                                     **VERIFIED PETITION**

                                        Petitioner,

            -against-

VDARE FOUNDATION, INC.,

                                        Respondent.

-----------------------------------------------------------------x

Petitioner, the People of the State of New York by Letitia James, Attorney General of the

State of New York, as and for its Petition, respectfully alleges as follows:

### PRELIMINARY STATEMENT

1.      The Office of the Attorney General is presently conducting an investigation of

Respondent VDARE Foundation, Inc. ("VDARE"), a not-for-profit corporation incorporated and

registered to solicit in New York, pursuant to the New York Not for Profit Corporation Law,

Estates, Powers and Trusts Law, Executive Law, and other applicable law governing New York

State charities.

2.      Commencement of the Attorney General's investigation followed public reports

that VDARE had purchased a medieval-style castle in West Virginia and that its founder and his

family were residing in the castle.  The Attorney General then reviewed VDARE's regulatory

filings, including the organization's IRS Form 990 and CHAR 500 official filings, and publicly

available information regarding VDARE and its operation.

3.      On June 24, 2022, in connection with its investigation, the Attorney General

served a subpoena *duces tecum* on VDARE that sought documents and information relating to,

**AA0109**
1 of 9

*inter alia*, VDARE's governance, recent financial transactions, and regulatory disclosures (the "Subpoena"). To date, VDARE has produced only limited material from its hard copy files — heavily redacted without any corresponding log or legal justification — and has produced nothing from what it identifies as 40 gigabytes of potentially responsive electronic files.

4.    The Attorney General's investigation into potential misconduct by VDARE and its officers and directors will be irreparably harmed if VDARE is permitted to defy a lawfully issued subpoena.

5.    The Attorney General has attempted in good faith, unsuccessfully, to clarify the scope of its investigative demands and to address stated concerns from VDARE counsel regarding VDARE supporters and/or unpaid authors who choose to speak anonymously.

6.    The Attorney General now petitions this Court for an order: (i) compelling VDARE to comply without delay with the June 23, 2022 subpoena; (ii) ordering all documents produced to be unredacted (except for agreed upon redactions to donor and volunteer information); and (iii) granting such other and further relief as it deems just, proper, and appropriate.

## PARTIES

7.    The Attorney General is responsible for overseeing the activities of New York not-for-profit corporations and the conduct of their officers and directors, in accordance with the New York Not for Profit Corporation Law, the New York Estates, Powers and Trusts Law, and the New York Executive Law.

8.    Respondent VDARE is a not-for-profit charitable organization organized under the laws of the State of New York and with its principal place of business in Berkeley Springs,

West Virginia.  VDARE has registered with the Attorney General's Office and submitted annual

filings as part of that registration since 2009.

## JURISDICTION, APPLICABLE LAW, AND VENUE

9.      The Attorney General brings this special proceeding on behalf of the People of

the State of New York pursuant to the New York Not for Profit Corporation Law, Estates,

Powers and Trusts Law, Executive Law, and CPLR Article 4.

10.     Pursuant to N-PCL § 112 (b)(6), the Attorney General "may take proof and issue

subpoenas in accordance with the civil practice law and rules" in connection with investigations

of potential misconduct giving rise to the remedies set forth in N-PCL § 112(a).

11.     Pursuant to EPTL § 8-1.4(i), the Attorney General "may investigate transactions

and relationships of trustees for the purpose of determining whether or not property held for

charitable purposes has been and is being properly administered. The attorney general, his or her

assistants, deputies or such other officers as may be designated by him or her, are empowered to

subpoena any trustee, agent, fiduciary, beneficiary, institution, association or corporation or other

witness, examine any such witness under oath and, for this purpose, administer the necessary

oaths, and require the production of any books or papers which they deem relevant to the

inquiry."

12.     Pursuant to Executive Law § 63(12), the Attorney General "is authorized to take

proof and make a determination of the relevant facts and to issue subpoenas in accordance with

the civil practice law and rules" in connection with investigations of potential repeated

fraudulent or illegal acts.

13.     Pursuant to Executive Law § 175, the Attorney General "is authorized to take

proof, issue subpoenas and administer oaths in the manner provided in the civil practice law and

**AA0111**

Case 1:22-cv-01337-PLS-CEH 3Document 124-3 filed 01/18/23 19 Page 97 of 10

rules" in connection with investigations of potential misconduct in violation of Article 7-A of the Executive Law, which concerns the solicitation and collection of funds for charitable purposes.

14.    Venue is properly set in New York County pursuant to CPLR §§ 503, 505, and 509, because Petitioner is resident in New York County and has selected New York County, and because Petitioner is a public authority whose facilities involved in the action are located in New York County.

## **FACTS**

15.    VDARE and its current and past board members are the subject of an ongoing investigation by the Attorney General concerning potential financial improprieties, including unlawful related party transactions between VDARE and affiliated entities, officers and board members, excessive compensation, private inurement, and violations of statutory and common law governance standards.

16.    On June 24, 2022, the Attorney General personally served a subpoena *duces tecum* on VDARE by delivery to VDARE's designated agent for service, the Secretary of State of New York, in compliance with CPLR 311 and N-PCL § 306.  The Subpoena set a return date for production of documents of July 25, 2022.

17.    On June 24, the Attorney General mailed a copy of the Subpoena, by U.S. Mail Certified Return Receipt to the address identified in VDARE's most recent annual filing with the Charities Bureau (276 Cacapon Road, Berkeley Springs, West Virginia 25411), together with a copy of the Affidavit of Service prepared by OAG Investigator Donald C. Anselment and a cover letter confirming the nature of the document.

18. On July 2, VDARE counsel confirmed receipt of the Subpoena, requested that the Subpoena be withdrawn in its entirety, and requested information regarding, *inter alia*, the subject matter of the investigation and the relevance of the documents sought in the Subpoena.

19. On July 18, 2022, counsel from the Attorney General's Office met telephonically with VDARE counsel. During that call, VDARE counsel asked the OAG to provide information regarding the nature of the investigation and expressed concerns regarding certain requests, including requests that he believed were overbroad or called for production of documents protected by the attorney-client privilege. OAG counsel responded to VDARE counsel's questions, with a reservation of rights, and identified concerns regarding: (1) the purchase and use of the castle; (2) benefits conferred upon VDARE principals; (3) whether the VDARE board is properly overseeing the finances of the organization; and (4) whether the organization is using charitable assets in accordance with its mission. The OAG also stated that to the extent counsel believed that production would invade attorney-client privilege, the Subpoena did not seek privileged communications and expressly instructed counsel to withhold such documents and provide a privilege log.

20. On July 20, 2022, VDARE counsel sent a second letter to the OAG, by which VDARE renewed its request that the Subpoena be withdrawn and set forth individual objections to many of the Subpoena's individual requests on the grounds of overbreadth, vagueness, attorney-client privilege, and that its requests sought the identities of VDARE readers, writers, and donors.

21. On July 27, 2022, the Attorney General responded by email to the objections raised in VDARE's July 20 letter. With a reservation of rights, counsel for the OAG attempted to address VDARE's concerns by clarifying individual Subpoena requests and agreeing that the

Case 1:22-cv-01837-JLS-CEH Document 124-3 Filed 01/18/23 Page 7 of 10

names of certain individuals, including VDARE contributors and volunteer supporters, could be redacted from otherwise responsive records.

22.  As of the date of this filing, the Attorney General has consented to extend the Subpoena's deadline for production no fewer than six times — most recently to December 12, 2022 — following requests by VDARE counsel that production be delayed to accommodate vacation, holidays, and other competing work obligations.  In total, the Attorney General's agreed adjournments extended the Subpoena's stated response deadline by approximately twenty weeks.

23.  VDARE began production in September 2022 and has produced approximately 6,000 pages from its hard copy records since.  It has redacted that material without offering any legal basis for individual redactions or any explanation for how material was chosen for redaction.  The redactions are extensive, and they have been applied across almost every category of document produced.

24.  The OAG has met with VDARE counsel, in person and by phone, on multiple occasions to discuss the Subpoena requests.  VDARE counsel has assured the OAG throughout that VDARE was working diligently to comply with the Subpoena.  The OAG has expressed concern over production delay in each of its contacts with VDARE counsel and has objected repeatedly to VDARE's continuing production of redacted material without any identified explanation of or legal basis for redaction.

25.  As of the date of this Petition, VDARE has identified 22 unique email accounts as containing potentially responsive material and has not produced any of those files for the Attorney General's review.

**AA0114**

26.     As of the date of this Petition, VDARE has refused to produce any log identifying the material in its production that it has redacted and the legal basis on which it is withholding the redacted information.

27.     Accordingly, the Attorney General now asks the Court to issue appropriate orders pursuant to CPLR § 2308 to ensure that VDARE will promptly comply with the Attorney General's investigative requests.

**CLAIM FOR RELIEF**
**Compelling Subpoena Compliance – CPLR § 2308**

28.     The Attorney General repeats and re-alleges the preceding paragraphs, as though fully set forth herein.

29.     The Subpoena was issued pursuant to a legally-authorized investigation for which there is a factual basis, and the requests in the Subpoena are reasonably related to that investigation.

30.     VDARE has interposed no cognizable basis for delaying or withholding responsive document productions to the Attorney General.

31.     As a result, VDARE should be ordered to comply with the Subpoena without further delay.

WHEREFORE, Petitioner respectfully requests that a judgment and order be entered:  (i) compelling VDARE to comply without delay with the June 23, 2022 subpoena; (ii) ordering all documents produced to be unredacted (except for agreed upon redactions to donor and volunteer information); and (iii) granting such other and further relief as it deems just, proper, and appropriate.

Dated: New York, New York
December 16, 2022

LETITIA JAMES
Attorney General of the State of New York

By: _____

James G. Sheehan
Yael Fuchs
Catherine Suvari
28 Liberty Street
New York, New York 10005
(212) 416-8490
James.Sheehan@ag.ny.gov

## VERIFICATION

STATE OF NEW YORK          }
                          } ss.:
COUNTY OF NEW YORK         }

JAMES G. SHEEHAN, being duly sworn, deposes and says:

I am an Assistant Attorney General in the office of Letitia James, Attorney General of the State of New York (the "Attorney General"). I am duly authorized to make this Verification.

I have read the foregoing petition and am acquainted with the contents thereof based upon the Office of the Attorney General's review of the facts alleged in the petition and the investigative materials contained in the files of the Attorney General's office. To my knowledge based on such acquaintance with the facts, the petition is true.

The reason this Verification is not made by Plaintiff is that Plaintiff is a body politic and the Attorney General is its duly authorized representative.

JAMES SHEEHAN
Assistant Attorney General

NOTARY PUBLIC

Sworn to before me this
16th day of December, 2022

BELYNDA K. ZIGREST
Notary Public - State of New York
01ZI6349654
Qualified in Albany County
My Comm. Expires October 24, 20_24_

1

EXHIBIT B

| Form **990** | | Return of Organization Exempt From Income Tax | | | OMB No. 1545-0047 |
|---|---|---|---|---|---|

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

► Do not enter social security numbers on this form as it may be made public.

► Go to www.irs.gov/Form990 for instructions and the latest information.

**2020**

Department of the Treasury
Internal Revenue Service

**Open to Public Inspection**

**A** For the 2020 calendar year, or tax year beginning 01-01-2020 , and ending 12-31-2020

| **B** Check if applicable: | **C** Name of organization Vdare Foundation | **D** Employer identification number |
|---|---|---|
| ☐ Address change | | 22-3691487 |
| ☐ Name change | Doing business as | |
| ☐ Initial return | | |
| ☐ Final return/terminated | Number and street (or P.O. box if mail is not delivered to street address) Room/suite 447 South Street | **E** Telephone number (860) 309-8257 |
| ☐ Amended return | | |
| ☐ Application pending | City or town, state or province, country, and ZIP or foreign postal code Litchfield, CT 06759 | **G** Gross receipts $ 652,883 |

| **F** Name and address of principal officer: Peter Brimelow 447 South Street Litchfield, C T 06759 | **H(a)** Is this a group return for subordinates? ☐ Yes ☑ No |
|---|---|
| | **H(b)** Are all subordinates included? ☐ Yes ☐ No |
| **I** Tax-exempt status: ☑ 501(c)(3) ☐ 501(c) ( ) ◀ (insert no.) ☐ 4947(a)(1) or ☐ 527 | If "No," attach a list. (see instructions) |
| **J** Website: ► www.vdare.com | **H(c)** Group exemption number ► |

| **K** Form of organization: ☑ Corporation ☐ Trust ☐ Association ☐ Other ► | **L** Year of formation: 1999 | **M** State of legal domicile: NY |
|---|---|---|

## Part I  Summary

**Activities & Governance**

**1** Briefly describe the organization's mission or most significant activities:
Create and manage internet publication.

**2** Check this box ► ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets.

| | | | |
|---|---|---|---|
| **3** Number of voting members of the governing body (Part VI, line 1a) . . . . | **3** | 3 |
| **4** Number of independent voting members of the governing body (Part VI, line 1b) . . . . | **4** | 2 |
| **5** Total number of individuals employed in calendar year 2020 (Part V, line 2a) . . . . | **5** | 0 |
| **6** Total number of volunteers (estimate if necessary) . . . . | **6** | |
| **7a** Total unrelated business revenue from Part VIII, column (C), line 12 . . . . | **7a** | 0 |
| **b** Net unrelated business taxable income from Form 990-T, line 39 . . . . | **7b** | |

| | | Prior Year | Current Year |
|---|---|---|---|
| **Revenue** | **8** Contributions and grants (Part VIII, line 1h) . . . . | 4,259,309 | 631,559 |
| | **9** Program service revenue (Part VIII, line 2g) . . . . | 43,886 | 19,353 |
| | **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d ) . . . . | 42,448 | 1,971 |
| | **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) . . . . | | 0 |
| | **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) . . . . | 4,345,643 | 652,883 |
| **Expenses** | **13** Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) . . . . | | 0 |
| | **14** Benefits paid to or for members (Part IX, column (A), line 4) . . . . | | 0 |
| | **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) . . . . | 345,364 | 0 |
| | **16a** Professional fundraising fees (Part IX, column (A), line 11e) . . . . | | 2,128 |
| | **b** Total fundraising expenses (Part IX, column (D), line 25) ►6,892 | | |
| | **17** Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) . . . . | 646,151 | 1,065,836 |
| | **18** Total expenses. Add lines 13–17 (must equal Part IX, column (A), line 25) . . . . | 991,515 | 1,067,964 |
| | **19** Revenue less expenses. Subtract line 18 from line 12 . . . . | 3,354,128 | -415,081 |

| **Net Assets or Fund Balances** | | Beginning of Current Year | End of Year |
|---|---|---|---|
| | **20** Total assets (Part X, line 16) . . . . | 3,554,869 | 3,144,683 |
| | **21** Total liabilities (Part X, line 26) . . . . | 10,196 | 15,091 |
| | **22** Net assets or fund balances. Subtract line 21 from line 20 . . . . | 3,544,673 | 3,129,592 |

## Part II  Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

**Sign Here**

| Signature of officer | 2021-10-07 Date |
|---|---|
| Peter Brimelow President Type or print name and title | |

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN P00422960 |
|---|---|---|---|---|
| Firm's name ► GEORGE WEINBAUM CPA | | | Firm's EIN ► 68-0564065 | |
| Firm's address ► 17043 EL CAMINO REAL STE 214 HOUSTON, TX 77058 | | | Phone no. (281) 488-5550 | |

AA0119

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . . . . . ☑ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions. | Cat. No. 11282Y | Form **990** (2020)

Form 990 (2020)
Page **2**

**Part III** Statement of Program Service Accomplishments

Check if Schedule O contains a response or note to any line in this Part III . . . . . . . . . . . . ☐

**1** Briefly describe the organization's mission:

Create and manage internet publication.

**2** Did the organization undertake any significant program services during the year which were not listed on
the prior Form 990 or 990-EZ? . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

If "Yes," describe these new services on Schedule O.

**3** Did the organization cease conducting, or make significant changes in how it conducts, any program
services? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

If "Yes," describe these changes on Schedule O.

**4** Describe the organization's program service accomplishments for each of its three largest program services, as measured by
expenses. Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others,
the total expenses, and revenue, if any, for each program service reported.

**4a** (Code: _____ ) (Expenses $ _____ 791,702 including grants of $ _____ ) (Revenue $ _____ 4,789 )

Managed internet publication.

**4b** (Code: _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

**4c** (Code: _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

**4d** Other program services (Describe in Schedule O.)
(Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

**4e** Total program service expenses ▶ _____ 791,702

Form **990** (2020)

**AA0120**

| Part IV | **Checklist of Required Schedules** | | | |
|---|---|---|---|---|

| | | | **Yes** | **No** |
|---|---|---|---|---|
| **1** | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? *If "Yes," complete Schedule A* 🖼 . . . . . . . . . . . . | **1** | Yes | |
| **2** | Is the organization required to complete *Schedule B, Schedule of Contributors* (see instructions)? . . . | **2** | Yes | |
| **3** | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? *If "Yes," complete Schedule C, Part I* . . . . . . . . . . . | **3** | | No |
| **4** | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? *If "Yes," complete Schedule C, Part II* . . . . . . . | **4** | | No |
| **5** | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Revenue Procedure 98-19? *If "Yes," complete Schedule C, Part III* . . | **5** | | No |
| **6** | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? *If "Yes," complete Schedule D,*Part I 🖼. | **6** | | No |
| **7** | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? *If "Yes," complete Schedule D, Part II* 🖼 | **7** | | No |
| **8** | Did the organization maintain collections of works of art, historical treasures, or other similar assets? *If "Yes," complete Schedule D, Part III* 🖼 | **8** | | No |
| **9** | Did the organization report an amount in Part X, line 21 for escrow or custodial account liability; serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services?  *If "Yes," complete Schedule D, Part IV* 🖼 | **9** | | No |
| **10** | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi endowments? *If "Yes," complete Schedule D, Part V* 🖼 | **10** | | No |
| **11** | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable. | | | |
| **a** | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? *If "Yes," complete Schedule D, Part VI.* 🖼 . . . . . . . . . . . . . | **11a** | Yes | |
| **b** | Did the organization report an amount for investments—other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VII* 🖼 . . . . | **11b** | | No |
| **c** | Did the organization report an amount for investments—program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VIII* 🖼 . . . . | **11c** | | No |
| **d** | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part IX* 🖼 . . . . . | **11d** | | No |
| **e** | Did the organization report an amount for other liabilities in Part X, line 25? *If "Yes," complete Schedule D, Part X* 🖼 | **11e** | | No |
| **f** | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? *If "Yes," complete Schedule D, Part X* 🖼 | **11f** | | No |
| **12a** | Did the organization obtain separate, independent audited financial statements for the tax year? *If "Yes," complete Schedule D, Parts XI and XII* 🖼 | **12a** | | No |
| **b** | Was the organization included in consolidated, independent audited financial statements for the tax year? *If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional* 🖼 | **12b** | | No |
| **13** | Is the organization a school described in section 170(b)(1)(A)(ii)? *If "Yes," complete Schedule E* | **13** | | No |
| **14a** | Did the organization maintain an office, employees, or agents outside of the United States? . . . . . | **14a** | | No |
| **b** | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? *If "Yes," complete Schedule F, Parts I and IV* | **14b** | | No |
| **15** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? *If "Yes," complete Schedule F, Parts II and IV* . . . . . | **15** | | No |
| **16** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? *If "Yes," complete Schedule F, Parts III and IV* . . . . | **16** | | No |
| **17** | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? *If "Yes," complete Schedule G, Part I*(see instructions) . . . . . | **17** | | No |
| **18** | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If "Yes," complete Schedule G, Part II* . . . . . . . . | **18** | | No |
| **19** | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If "Yes," complete Schedule G, Part III* . . . . . . . . . . . . . | **19** | | No |
| **20a** | Did the organization operate one or more hospital facilities? *If "Yes," complete Schedule H* . . . . | **20a** | | No |
| **b** | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? | **20b** | | |
| **21** | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* . . . . . . . | **21** | | No |

AA0121

| Part IV | Checklist of Required Schedules *(continued)* | | | |
|---|---|---|---|---|
| | | | Yes | No |
| 22 | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* | 22 | | No |
| 23 | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* | 23 | Yes | |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K. If "No," go to line 25a* | 24a | | No |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? | 24b | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? | 24c | | |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? | 24d | | |
| 25a | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L, Part I* | 25a | | No |
| b | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L, Part I* | 25b | | No |
| 26 | Did the organization report any amount on Part X, line 5 or 22 for receivables from or payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons? | 26 | | No |
| 27 | Did the organization provide a grant or other assistance to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or employee thereof, a grant selection committee member, or to a 35% controlled entity (including an employee thereof) or family member of any of these persons? *If "Yes," complete Schedule L, Part III* | 27 | | No |
| 28 | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions): | | | |
| a | A current or former officer, director, trustee, key employee, creator or founder, or substantial contributor? *If "Yes," complete Schedule L, Part IV* | 28a | | No |
| b | A family member of any individual described in line 28a? *If "Yes," complete Schedule L, Part IV* | 28b | | No |
| c | A 35% controlled entity of one or more individuals and/or organizations described in lines 28a or 28b? *If "Yes," complete Schedule L, Part IV* | 28c | | No |
| 29 | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* | 29 | | No |
| 30 | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* | 30 | | No |
| 31 | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* | 31 | | No |
| 32 | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* | 32 | | No |
| 33 | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? *If "Yes," complete Schedule R, Part I* | 33 | | No |
| 34 | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* | 34 | | No |
| 35a | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | 35a | | No |
| b | If 'Yes' to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* | 35b | | |
| 36 | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* | 36 | | No |
| 37 | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* | 37 | | No |
| 38 | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O. | 38 | Yes | |

| Part V | Statements Regarding Other IRS Filings and Tax Compliance | | | |
|---|---|---|---|---|
| | Check if Schedule O contains a response or note to any line in this Part V . . . . . . . . . . . . | | | ☐ |
| | | | Yes | No |
| 1a | Enter the number reported in Box 3 of Form 1096. Enter -0- if not applicable | 1a | 0 | |
| b | Enter the number of Forms W-2G included in line 1a. Enter -0- if not applicable . | 1b | 0 | |
| c | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? . . . . . . . . . . . . . . . . . . | 1c | | No |

AA0122

Form 990 (2020)                                                                 Page **5**

| Part V | Statements Regarding Other IRS Filings and Tax Compliance *(continued)* |
|---|---|

| | | | | | |
|---|---|---|---|---|---|
| **2a** | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return . . . . . . . . . . . . . . . | **2a** | 0 | | |
| **b** | If at least one is reported on line 2a, did the organization file all required federal employment tax returns? **Note.** If the sum of lines 1a and 2a is greater than 250, you may be required to e-file (see instructions) | | | **2b** | |
| **3a** | Did the organization have unrelated business gross income of $1,000 or more during the year? . . . | | | **3a** | No |
| **b** | If "Yes," has it filed a Form 990-T for this year? *If "No" to line 3b, provide an explanation in Schedule O* . . . | | | **3b** | |
| **4a** | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? . . . . . . . . . . | | | **4a** | No |
| **b** | If "Yes," enter the name of the foreign country: ▶ | | | | |
| | See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). | | | | |
| **5a** | Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? . . | | | **5a** | No |
| **b** | Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | | | **5b** | No |
| **c** | If "Yes," to line 5a or 5b, did the organization file Form 8886-T? . . . . . . . . . | | | **5c** | |
| **6a** | Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? . . . | | | **6a** | No |
| **b** | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? . . . . . . . . . . . . . . . | | | **6b** | |
| **7** | **Organizations that may receive deductible contributions under section 170(c).** | | | | |
| **a** | Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? . . . . . . . . . . . | | | **7a** | No |
| **b** | If "Yes," did the organization notify the donor of the value of the goods or services provided? . . . | | | **7b** | |
| **c** | Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? . . . . . . . . . . . . . . | | | **7c** | |
| **d** | If "Yes," indicate the number of Forms 8282 filed during the year . . . . . | **7d** | 0 | | |
| **e** | Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | | | **7e** | No |
| **f** | Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? | | | **7f** | No |
| **g** | If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? . . . . . . . . . . . . . . . . | | | **7g** | No |
| **h** | If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? . . . . . . . . . . . . . . . | | | **7h** | No |
| **8** | **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? | | | **8** | |
| **9** | **Sponsoring organizations maintaining donor advised funds.** | | | | |
| **a** | Did the sponsoring organization make any taxable distributions under section 4966? . . . | | | **9a** | |
| **b** | Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? . . . | | | **9b** | |
| **10** | **Section 501(c)(7) organizations.** Enter: | | | | |
| **a** | Initiation fees and capital contributions included on Part VIII, line 12 . . . | **10a** | | | |
| **b** | Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | **10b** | | | |
| **11** | **Section 501(c)(12) organizations.** Enter: | | | | |
| **a** | Gross income from members or shareholders . . . . . . . . | **11a** | | | |
| **b** | Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them.) . . . . . | **11b** | | | |
| **12a** | **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | | | **12a** | |
| **b** | If "Yes," enter the amount of tax-exempt interest received or accrued during the year. | **12b** | | | |
| **13** | **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | | |
| **a** | Is the organization licensed to issue qualified health plans in more than one state? . . . . . . . . . . . . . . . | | | **13a** | |
| | **Note.** See the instructions for additional information the organization must report on Schedule O. | | | | |
| **b** | Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans . . . . | **13b** | | | |
| **c** | Enter the amount of reserves on hand . . . . . . . . | **13c** | | | |
| **14a** | Did the organization receive any payments for indoor tanning services during the tax year? . . . | | | **14a** | No |
| **b** | If "Yes," has it filed a Form 720 to report these payments? *If "No," provide an explanation in Schedule O* . . | | | **14b** | |
| **15** | Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? . . . . . . . . . . . | | | **15** | No |
| | If "Yes," see instructions and file Form 4720, Schedule N. | | | | |
| **16** | Is the organization an educational institution subject to the section 4968 excise tax on net investment income? . | | | **16** | No |
| | If "Yes," complete Form 4720, Schedule O. | | | | |

**AA0123**

Form **990** (2020)

Form 990 (2020)          Page **6**

**Part VI** | **Governance, Management, and Disclosure** *For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.*

Check if Schedule O contains a response or note to any line in this Part VI . . . . . . . . . ☑

### Section A. Governing Body and Management

|  |  |  | Yes | No |
|---|---|---|---|---|
| **1a** Enter the number of voting members of the governing body at the end of the tax year. If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O. | **1a** | 3 | | |
| **b** Enter the number of voting members included in line 1a, above, who are independent | **1b** | 2 | | |
| **2** Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? . . . . . . . | **2** | | Yes | |
| **3** Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? . | **3** | | | No |
| **4** Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? . | **4** | | | No |
| **5** Did the organization become aware during the year of a significant diversion of the organization's assets? . | **5** | | | No |
| **6** Did the organization have members or stockholders? . . . . . . . . . . . . . . | **6** | | | No |
| **7a** Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? . . . . . . . . . . . . | **7a** | | | No |
| **b** Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? . . . . . . . . . . . | **7b** | | | No |
| **8** Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | | |
| **a** The governing body? . . . . . . . . . . . . | **8a** | | Yes | |
| **b** Each committee with authority to act on behalf of the governing body? | **8b** | | Yes | |
| **9** Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* . . . . . . . | **9** | | | No |

### Section B. Policies *(This Section B requests information about policies not required by the Internal Revenue Code.)*

|  |  | Yes | No |
|---|---|---|---|
| **10a** Did the organization have local chapters, branches, or affiliates? . . . . . . . . . . | **10a** | | No |
| **b** If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | **10b** | | |
| **11a** Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? . . . . . . . . . . . . . . . . . . . . | **11a** | Yes | |
| **b** Describe in Schedule O the process, if any, used by the organization to review this Form 990. . . . . . . | | | |
| **12a** Did the organization have a written conflict of interest policy? *If "No," go to line 13* . . . . . . | **12a** | Yes | |
| **b** Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? . . . . . . . . . . . . . . . . . . . . | **12b** | Yes | |
| **c** Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe in Schedule O how this was done* . . . . . . . . . . . . . . | **12c** | Yes | |
| **13** Did the organization have a written whistleblower policy? . . . . . . . . . . . . . | **13** | | No |
| **14** Did the organization have a written document retention and destruction policy? . . . . . . . | **14** | | No |
| **15** Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| **a** The organization's CEO, Executive Director, or top management official . . . . . . . | **15a** | | No |
| **b** Other officers or key employees of the organization . . . . . . . . . . . . . | **15b** | | No |
| If "Yes" to line 15a or 15b, describe the process in Schedule O (see instructions). | | | |
| **16a** Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . . . . . . . . . . . . | **16a** | | No |
| **b** If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . . . . . . . . | **16b** | | |

### Section C. Disclosure

**17** List the states with which a copy of this Form 990 is required to be filed▶ N Y

**18** Section 6104 requires an organization to make its Form 1023 (or 1024-A if applicable), 990, and 990-T (501(c)(3)s only) available for public inspection. Indicate how these were made available. Check all that apply.
☐ Own website ☐ Another's website ☐ Upon request ☐ Other (explain in Schedule O)

**19** Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

**20** State the name, address, and telephone number of the person who possesses the organization's books and records:
▶Michelle Tetrault 447 South Street    Litchfield, C T 06759 (860) 309-8257

Form **990** (2020)

AA0124

                                                    

| **Part VII** | **Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . . . ☐

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

  ● List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

  ● List all of the organization's **current** key employees, if any. See instructions for definition of "key employee."

  ● List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations.

  ● List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

  ● List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See instructions for the order in which to list the persons above.

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A)<br>Name and title | (B)<br>Average hours per week (list any hours for related organizations below dotted line) | (C)<br>Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) Peter Brimelow<br>............................<br>Chairman | 40.00<br>40.00 | X | | X | | | | 0 | 264,700 | 0 |
| (2) Lydia Brimelow<br>............................<br>President | 10.00<br>10.00 | X | | X | | | | 0 | 41,500 | 0 |
| (3) John Brimlelow<br>............................<br>Director | 1.00<br>0.00 | X | | | | | | 0 | 0 | 0 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

AA0125

Form 990 (2020) | Page **8**

**Part VII** | Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)*

| (A)<br>Name and title | (B)<br>Average hours per week (list any hours for related organizations below dotted line) | (C)<br>Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **1b Sub-Total** . . . . . . . . . . ▶ | | | | | | | | | | |
| **c Total from continuation sheets to Part VII, Section A** . . . ▶ | | | | | | | | | | |
| **d Total (add lines 1b and 1c)** . . . . . . ▶ | | | | | | | | | 306,200 | |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶ 0

| | | Yes | No |
|---|---|---|---|
| **3** | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . **3** | | No |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . . . . **4** | Yes | |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* . . . . . . . **5** | | No |

**Section B. Independent Contractors**

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. Report compensation for the calendar year ending with or within the organization's tax year.

| (A)<br>Name and business address | (B)<br>Description of services | (C)<br>Compensation |
|---|---|---|
| Happy Penguins LLC<br><br>447 South Street<br>Litchfield, CT 06759 | Employee Leasing | 335,822 |
| | | |
| | | |
| | | |
| | | |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶ 1

AA0126

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . .

| | | **(A)** Total revenue | **(B)** Related or exempt function revenue | **(C)** Unrelated business revenue | **(D)** Revenue excluded from tax under sections 512 - 514 |
|---|---|---|---|---|---|

**Contributions, Gifts, Grants and Other Similar Amounts**

| | | | | | |
|---|---|---|---|---|---|
| **1a** Federated campaigns . . | 1a | | | | |
| **b** Membership dues . . . | 1b | | | | |
| **c** Fundraising events . . | 1c | | | | |
| **d** Related organizations . | 1d | | | | |
| **e** Government grants (contributions) | 1e | | | | |
| **f** All other contributions, gifts, grants, and similar amounts not included above | 1f | 631,559 | | | |
| **g** Noncash contributions included in lines 1a - 1f:$ | 1g | | | | |
| **h Total.** Add lines 1a-1f . . . . . . ▶ | | 631,559 | | | |

**Program Service Revenue**

| | Business Code | | | | |
|---|---|---|---|---|---|
| **2a** Miscellaneous Sales | 453000 | 19,353 | | | 19,353 |
| **b** | | | | | |
| **c** | | | | | |
| **d** | | | | | |
| **e** | | | | | |
| **f** All other program service revenue. | | | | | |
| **9 Total.** Add lines 2a–2f. . . . ▶ | | 19,353 | | | |

**Other Revenue**

| | | (A) | (B) | (C) | (D) |
|---|---|---|---|---|---|
| **3** Investment income (including dividends, interest, and other similar amounts) . . . . ▶ | | 1,971 | 1,971 | | |
| **4** Income from investment of tax-exempt bond proceeds ▶ | | 0 | | | |
| **5** Royalties . . . . . . . . . . ▶ | | 0 | | | |

| | | (i) Real | (ii) Personal | | |
|---|---|---|---|---|---|
| **6a** Gross rents | 6a | | | | |
| **b** Less: rental expenses | 6b | | | | |
| **c** Rental income or (loss) | 6c | | | | |
| **d** Net rental income or (loss) . . . . . . ▶ | | 0 | | | |

| | | (i) Securities | (ii) Other | | |
|---|---|---|---|---|---|
| **7a** Gross amount from sales of assets other than inventory | 7a | | | | |
| **b** Less: cost or other basis and sales expenses | 7b | | | | |
| **c** Gain or (loss) | 7c | | | | |
| **d** Net gain or (loss) . . . . . . . . ▶ | | 0 | | | |

| | | | | | |
|---|---|---|---|---|---|
| **8a** Gross income from fundraising events (not including $ of contributions reported on line 1c). See Part IV, line 18 . . . . | 8a | | | | |
| **b** Less: direct expenses | 8b | | | | |
| **c** Net income or (loss) from fundraising events . ▶ | | 0 | | | |
| **9a** Gross income from gaming activities. See Part IV, line 19 . . . | 9a | | | | |
| **b** Less: direct expenses | 9b | | | | |
| **c** Net income or (loss) from gaming activities . . ▶ | | 0 | | | |
| **10a** Gross sales of inventory, less returns and allowances . . | 10a | | | | |
| **b** Less: cost of goods sold | 10b | | | | |
| **c** Net income or (loss) from sales of inventory . ▶ | | 0 | | | |

| Miscellaneous Revenue | Business Code | | | | |
|---|---|---|---|---|---|
| **11a** | | | | | |
| **b** | | | | | |
| **c** | | | | | |
| **d** All other revenue . . . . . | | | | | |
| **e Total.** Add lines 11a–11d . . . . . ▶ | | 0 | | | |
| **12 Total revenue.** See instructions . . . . . ▶ | | 652,883 | 1,971 | | 19,353 |

AA0127

Case 1:22-cv-00037-LPS-CJB   Document 124-3   Filed 01/18/23   Page 11 of 42

**Part IX** | **Statement of Functional Expenses**

Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . . ☐

| Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII. | (A) Total expenses | (B) Program service expenses | (C) Management and general expenses | (D) Fundraising expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to domestic organizations and domestic governments. See Part IV, line 21 . . . | 0 | | | |
| **2** Grants and other assistance to domestic individuals. See Part IV, line 22 . . . . . . . . . . | 0 | | | |
| **3** Grants and other assistance to foreign organizations, foreign governments, and foreign individuals. See Part IV, lines 15 and 16. . . . . . . . . . . . . | 0 | | | |
| **4** Benefits paid to or for members . . . . . . | 0 | | | |
| **5** Compensation of current officers, directors, trustees, and key employees . . . | 0 | | | |
| **6** Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) . . . . . . | 0 | | | |
| **7** Other salaries and wages . . . . . . . | 0 | | | |
| **8** Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) | 0 | | | |
| **9** Other employee benefits . . . . . . . . | 0 | | | |
| **10** Payroll taxes . . . . . . . . . . . | 0 | | | |
| **11** Fees for services (non-employees): | | | | |
| **a** Management . . . . . . . . . . . | 0 | | | |
| **b** Legal . . . . . . . . . . . . | 150,145 | | 150,145 | |
| **c** Accounting . . . . . . . . . . . | 23,729 | | 23,729 | |
| **d** Lobbying . . . . . . . . . . . . | 0 | | | |
| **e** Professional fundraising services. See Part IV, line 17 | 2,128 | | | 2,128 |
| **f** Investment management fees . . . . . . | 0 | | | |
| **g** Other (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O) | 0 | | | |
| **12** Advertising and promotion . . . . | 58,882 | 58,882 | | |
| **13** Office expenses . . . . . . . . . | 10,917 | 3,639 | 7,278 | |
| **14** Information technology . . . . . . . | 101,019 | 101,019 | | |
| **15** Royalties . . | 0 | | | |
| **16** Occupancy . . . . . . . . . . . | 7,014 | | 7,014 | |
| **17** Travel . . . . . . . . . . . . | 12,205 | 12,205 | | |
| **18** Payments of travel or entertainment expenses for any federal, state, or local public officials . | 0 | | | |
| **19** Conferences, conventions, and meetings . . . . | 9,527 | | 4,763 | 4,764 |
| **20** Interest . . . . . . . . . . . | 874 | | 874 | |
| **21** Payments to affiliates . . . . . . . | 335,822 | 300,703 | 35,119 | |
| **22** Depreciation, depletion, and amortization . . | 0 | | | |
| **23** Insurance . . . . | 2,330 | | 2,330 | |
| **24** Other expenses. Itemize expenses not covered above (List miscellaneous expenses in line 24e. If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O.) | | | | |
| **a** Editors | 123,898 | 123,898 | | |
| **b** Consultant | 61,241 | 61,241 | | |
| **c** Writers | 42,196 | 42,196 | | |
| **d** Videos | 35,317 | 35,317 | | |
| **e** All other expenses | 90,720 | 52,602 | 38,118 | |
| **25** **Total functional expenses.** Add lines 1 through 24e | 1,067,964 | 791,702 | 269,370 | 6,892 |
| **26** **Joint costs.** Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation. Check here ▶ ☐ if following SOP 98-2 (ASC 958-720). | | | | |

**AA0128**

Form 990 (2020) | Page **11**

| Part X | **Balance Sheet** |

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . ☐

|   |   | (A)<br>Beginning of year |   | (B)<br>End of year |
|---|---|---|---|---|
| **Assets** | 1 Cash—non-interest-bearing . . . . . . . | 389,960 | **1** | 118,181 |
| | 2 Savings and temporary cash investments | | **2** | 0 |
| | 3 Pledges and grants receivable, net | | **3** | 0 |
| | 4 Accounts receivable, net . . . . . . . | | **4** | 2,000 |
| | 5 Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons | | **5** | 0 |
| | 6 Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), and persons described in section 4958(c)(3)(B) | | **6** | 0 |
| | 7 Notes and loans receivable, net . . . . . . . | | **7** | 0 |
| | 8 Inventories for sale or use . . . . . . . | | **8** | 0 |
| | 9 Prepaid expenses and deferred charges . . . . | | **9** | 0 |
| | 10a Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D    **10a**    1,488,428 | | | |
| | b Less: accumulated depreciation    **10b**    28,835 | | **10c** | 1,459,593 |
| | 11 Investments—publicly traded securities . | 3,164,909 | **11** | 1,534,909 |
| | 12 Investments—other securities. See Part IV, line 11 . . . . . | | **12** | 30,000 |
| | 13 Investments—program-related. See Part IV, line 11 . . | | **13** | 0 |
| | 14 Intangible assets . . . . . . . | | **14** | 0 |
| | 15 Other assets. See Part IV, line 11 . . . . . | | **15** | 0 |
| | 16 **Total assets.** Add lines 1 through 15 (must equal line 33) . . . | 3,554,869 | **16** | 3,144,683 |
| **Liabilities** | 17 Accounts payable and accrued expenses . . . . . | 10,196 | **17** | 15,091 |
| | 18 Grants payable . . . | | **18** | |
| | 19 Deferred revenue . . . . . | | **19** | |
| | 20 Tax-exempt bond liabilities . . . . . | | **20** | |
| | 21 Escrow or custodial account liability. Complete Part IV of Schedule D | | **21** | |
| | 22 Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons | | **22** | |
| | 23 Secured mortgages and notes payable to unrelated third parties . . | | **23** | |
| | 24 Unsecured notes and loans payable to unrelated third parties . . | | **24** | |
| | 25 Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17 - 24). Complete Part X of Schedule D | | **25** | |
| | 26 **Total liabilities.** Add lines 17 through 25 . . | 10,196 | **26** | 15,091 |
| **Net Assets or Fund Balances** | **Organizations that follow FASB ASC 958, check here ▶** ☑ **and complete lines 27, 28, 32, and 33.** | | | |
| | 27 Net assets without donor restrictions . . . . . . . | 3,544,673 | **27** | 3,129,592 |
| | 28 Net assets with donor restrictions | | **28** | |
| | **Organizations that do not follow FASB ASC 958, check here ▶** ☐ **and complete lines 29 through 33.** | | | |
| | 29 Capital stock or trust principal, or current funds . . . . . | | **29** | |
| | 30 Paid-in or capital surplus, or land, building or equipment fund . . . | | **30** | |
| | 31 Retained earnings, endowment, accumulated income, or other funds | | **31** | |
| | 32 Total net assets or fund balances . . . . . | 3,544,673 | **32** | 3,129,592 |
| | 33 Total liabilities and net assets/fund balances | 3,554,869 | **33** | 3,144,683 |

Form **990** (2020)

**AA0129**

Form 990 (2020)                                                                                           Page **12**

| Part XI | Reconciliation of Net Assets |
|---|---|

Check if Schedule O contains a response or note to any line in this Part XI . . . . . . . . . . . . □

| | | |
|---|---|---:|
| 1 | Total revenue (must equal Part VIII, column (A), line 12) . . . . . . . . . . . . . . . . | **1** | 652,883 |
| 2 | Total expenses (must equal Part IX, column (A), line 25) . . . . . . . . . . . . . . . | **2** | 1,067,964 |
| 3 | Revenue less expenses. Subtract line 2 from line 1 . . . . . . . . . . . . . . . . . | **3** | -415,081 |
| 4 | Net assets or fund balances at beginning of year (must equal Part X, line 32, column (A)) . . . | **4** | 3,544,673 |
| 5 | Net unrealized gains (losses) on investments . . . . . . . . . . . . . . . . . . | **5** | |
| 6 | Donated services and use of facilities . . . . . . . . . . . . . . . . . . . . | **6** | |
| 7 | Investment expenses . . . . . . . . . . . . . . . . . . . . . . . . . | **7** | |
| 8 | Prior period adjustments . . . . . . . . . . . . . . . . . . . . . . . . | **8** | |
| 9 | Other changes in net assets or fund balances (explain in Schedule O) . . . . . . . . . . | **9** | |
| 10 | Net assets or fund balances at end of year. Combine lines 3 through 9 (must equal Part X, line 32, column | **10** | 3,129,592 |

| Part XII | Financial Statements and Reporting |
|---|---|

Check if Schedule O contains a response or note to any line in this Part XII . . . . . . . . . . . . □

| | | | Yes | No |
|---|---|---|:---:|:---:|
| 1 | Accounting method used to prepare the Form 990: ☑ Cash □ Accrual □ Other _____ | | | |
| | If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O. | | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? | **2a** | | No |
| | If "Yes," check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both: | | | |
| | □ Separate basis   □ Consolidated basis   □ Both consolidated and separate basis | | | |
| b | Were the organization's financial statements audited by an independent accountant? | **2b** | | No |
| | If "Yes," check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both: | | | |
| | □ Separate basis   □ Consolidated basis   □ Both consolidated and separate basis | | | |
| c | If "Yes," to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | **2c** | | |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O. | | | |
| 3a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? | **3a** | | No |
| b | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits. | **3b** | | |

Form **990** (2020)

**AA0130**

Form 990 (2020)

**Additional Data**

Return to Form

**Software ID:** 20011551
**Software Version:** 2020v4.0

**Form 990, Special Condition Description:**

Special Condition Description

**SCHEDULE A**
(Form 990 or
990EZ)

Department of the Treasury
Internal Revenue Service

# Public Charity Status and Public Support

Complete if the organization is a section 501(c)(3) organization or a section
4947(a)(1) nonexempt charitable trust.
▶ **Attach to Form 990 or Form 990-EZ.**
▶ Go to **www.irs.gov/Form990** for instructions and the latest information.

OMB No. 1545-0047

**2020**

**Open to Public
Inspection**

| Name of the organization | Employer identification number |
|---|---|
| Vdare Foundation | 22-3691487 |

**Part I** **Reason for Public Charity Status** (All organizations must complete this part.) See instructions.

The organization is not a private foundation because it is: (For lines 1 through 12, check only one box.)

1. ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

2. ☐ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E (Form 990 or 990-EZ).)

3. ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4. ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state:

5. ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv).** (Complete Part II.)

6. ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7. ☑ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

8. ☐ A community trust described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

9. ☐ An agricultural research organization described in **170(b)(1)(A)(ix)** operated in conjunction with a land-grant college or university or a non-land grant college of agriculture. See instructions. Enter the name, city, and state of the college or university:

10. ☐ An organization that normally receives: (1) more than 33 1/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions—subject to certain exceptions, and (2) no more than 33 1/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See **section 509(a)(2).** (Complete Part III.)

11. ☐ An organization organized and operated exclusively to test for public safety. See **section 509(a)(4).**

12. ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in **section 509(a)(1)** or **section 509(a)(2).** See **section 509(a)(3).** Check the box in lines 12a through 12d that describes the type of supporting organization and complete lines 12e, 12f, and 12g.

a. ☐ **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. **You must complete Part IV, Sections A and B.**

b. ☐ **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s). **You must complete Part IV, Sections A and C.**

c. ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions). **You must complete Part IV, Sections A, D, and E.**

d. ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated. The organization generally must satisfy a distribution requirement and an attentiveness requirement (see instructions). **You must complete Part IV, Sections A and D, and Part V.**

e. ☐ Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization.

f. Enter the number of supported organizations . . . . . . . . . . . . . . . . . . . . . . . . _____

g. Provide the following information about the supported organization(s).

| (i) Name of supported organization | (ii) EIN | (iii) Type of organization (described on lines 1- 10 above (see instructions)) | (iv) Is the organization listed in your governing document? | | (v) Amount of monetary support (see instructions) | (vi) Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| | | | **Yes** | **No** | | |
| | | | | | | |
| | | | | | | |
| **Total** | | | | | | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.**

Cat. No. 11285F

**Schedule A (Form 990 or 990-EZ) 2020**

**AA0132**

| **Part II** | **Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)** |
|---|---|

(Complete only if you checked the box on line 5, 7, or 8 of Part I or if the organization failed to qualify under Part III. If the organization failed to qualify under the tests listed below, please complete Part III.)

### Section A. Public Support

| Calendar year<br>(or fiscal year beginning in) ▶ | (a) 2016 | (b) 2017 | (c) 2018 | (d) 2019 | (e) 2020 | (f) Total |
|---|---|---|---|---|---|---|
| 1   Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grant.") . . | 440,984 | 385,988 | 500,672 | 4,259,309 | 614,769 | 6,201,722 |
| 2   Tax revenues levied for the organization's benefit and either paid to or expended on its behalf . . . . | | | | | | 0 |
| 3   The value of services or facilities furnished by a governmental unit to the organization without charge.. | | | | | | 0 |
| 4   **Total.** Add lines 1 through 3 | 440,984 | 385,988 | 500,672 | 4,259,309 | 614,769 | 6,201,722 |
| 5   The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f). . | | | | | | 0 |
| 6   **Public support.** Subtract line 5 from line 4. | | | | | | 6,201,722 |

### Section B. Total Support

| Calendar year<br>(or fiscal year beginning in) ▶ | (a) 2016 | (b) 2017 | (c) 2018 | (d) 2019 | (e) 2020 | (f) Total |
|---|---|---|---|---|---|---|
| 7   Amounts from line 4. . | 440,984 | 385,988 | 500,672 | 4,259,309 | 614,769 | 6,201,722 |
| 8   Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources . . . | 768 | 1,126 | 205 | 42,448 | 13,971 | 58,518 |
| 9   Net income from unrelated business activities, whether or not the business is regularly carried on. . | | | | | | 0 |
| 10   Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.). . | | 57,988 | 192,405 | 14,400 | 4,789 | 269,582 |
| 11   **Total support.** Add lines 7 through 10 | | | | | | 6,529,822 |

| 12 | Gross receipts from related activities, etc. (see instructions) . . . . . . . . . . . . . . . | **12** | |
|---|---|---|---|

**13**   **First 5 years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

### Section C. Computation of Public Support Percentage

| 14 | Public support percentage for 2020 (line 6, column (f) divided by line 11, column (f)) . . . . . . . . . | **14** | 94.980 % |
|---|---|---|---|
| 15 | Public support percentage for 2019 Schedule A, Part II, line 14 . . . . . . . . . . . . . . . . | **15** | 86.880 % |

**16a**   **33 1/3% support test—2020.** If the organization did not check the box on line 13, and line 14 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . ▶ ☑

   **b**   **33 1/3% support test—2019.** If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . ▶ ☐

**17a**   **10%-facts-and-circumstances test—2020.** If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

   **b**   **10%-facts-and-circumstances test—2019.** If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**18**   **Private foundation.** If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**AA0133**

| |

| **Part III** | **Support Schedule for Organizations Described in Section 509(a)(2)** |
|---|---|

(Complete only if you checked the box on line 10 of Part I or if the organization failed to qualify under Part II. If the organization fails to qualify under the tests listed below, please complete Part II.)

### Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | **(a)** 2016 | **(b)** 2017 | **(c)** 2018 | **(d)** 2019 | **(e)** 2020 | **(f)** Total |
|---|---|---|---|---|---|---|
| 1 Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grants.") . | | | | | | |
| 2 Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose | | | | | | |
| 3 Gross receipts from activities that are not an unrelated trade or business under section 513 . . . . . | | | | | | |
| 4 Tax revenues levied for the organization's benefit and either paid to or expended on its behalf . . . | | | | | | |
| 5 The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| 6 **Total.** Add lines 1 through 5 | | | | | | |
| 7a Amounts included on lines 1, 2, and 3 received from disqualified persons | | | | | | |
| b Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year. | | | | | | |
| c Add lines 7a and 7b. . | | | | | | |
| 8 **Public support.** (Subtract line 7c from line 6.) | | | | | | |

### Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | **(a)** 2016 | **(b)** 2017 | **(c)** 2018 | **(d)** 2019 | **(e)** 2020 | **(f)** Total |
|---|---|---|---|---|---|---|
| 9 Amounts from line 6. . . | | | | | | |
| 10a Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources . . | | | | | | |
| b Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975. | | | | | | |
| c Add lines 10a and 10b. | | | | | | |
| 11 Net income from unrelated business activities not included in line 10b, whether or not the business is regularly carried on. | | | | | | |
| 12 Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.) . . | | | | | | |
| 13 **Total support.** (Add lines 9, 10c, 11, and 12.). | | | | | | |

14 **First 5 years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

### Section C. Computation of Public Support Percentage

| | | | |
|---|---|---|---|
| 15 | Public support percentage for 2020 (line 8, column (f) divided by line 13, column (f)) . . . . . . . . . | **15** | |
| 16 | Public support percentage from 2019 Schedule A, Part III, line 15 . . . . . . . . . . . . . . . . | **16** | |

### Section D. Computation of Investment Income Percentage

| | | | |
|---|---|---|---|
| 17 | Investment income percentage for **2020** (line 10c, column (f) divided by line 13, column (f)) . . . . . . | **17** | |
| 18 | Investment income percentage from **2019** Schedule A, Part III, line 17 . . . . . . . . . . . . . . | **18** | |

19a **331/3% support tests—2020.** If the organization did not check the box on line 14, and line 15 is more than 33 1/3%, and line 17 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . ▶ ☐

b **33 1/3% support tests—2019.** If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3% and line 18 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . ▶ ☐

20 **Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions . . . . . ▶ ☐

# AA0134

| **Part IV** | **Supporting Organizations** |

(Complete only if you checked a box on line 12 of Part I. If you checked box 12a, of Part I, complete Sections A and B. If you checked box 12b, of Part I, complete Sections A and C. If you checked box 12c, of Part I, complete Sections A, D, and E. If you checked box 12d, of Part I, complete Sections A and D, and complete Part V.)

**Section A. All Supporting Organizations**

|  |  | Yes | No |
|---|---|---|---|
| **1** | Are all of the organization's supported organizations listed by name in the organization's governing documents? *If "No," describe in **Part VI** how the supported organizations are designated. If designated by class or purpose, describe the designation. If historic and continuing relationship, explain.* **1** | | |
| **2** | Did the organization have any supported organization that does not have an IRS determination of status under section 509(a)(1) or (2)? *If "Yes," explain in **Part VI** how the organization determined that the supported organization was described in section 509(a)(1) or (2).* **2** | | |
| **3a** | Did the organization have a supported organization described in section 501(c)(4), (5), or (6)? *If "Yes," answer lines 3b and 3c below.* **3a** | | |
| **b** | Did the organization confirm that each supported organization qualified under section 501(c)(4), (5), or (6) and satisfied the public support tests under section 509(a)(2)? *If "Yes," describe in **Part VI** when and how the organization made the determination.* **3b** | | |
| **c** | Did the organization ensure that all support to such organizations was used exclusively for section 170(c)(2)(B) purposes? *If "Yes," explain in **Part VI** what controls the organization put in place to ensure such use.* **3c** | | |
| **4a** | Was any supported organization not organized in the United States ("foreign supported organization")? *If "Yes" and if you checked box 12a or 12b in Part I, answer lines 4b and 4c below.* **4a** | | |
| **b** | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If "Yes," describe in **Part VI** how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations.* **4b** | | |
| **c** | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If "Yes," explain in **Part VI** what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes.* **4c** | | |
| **5a** | Did the organization add, substitute, or remove any supported organizations during the tax year? *If "Yes," answer lines 5b and 5c below (if applicable). Also, provide detail in **Part VI**, including (i) the names and EIN numbers of the supported organizations added, substituted, or removed; (ii) the reasons for each such action; (iii) the authority under the organization's organizing document authorizing such action; and (iv) how the action was accomplished (such as by amendment to the organizing document).* **5a** | | |
| **b** | **Type I or Type II only.** Was any added or substituted supported organization part of a class already designated in the organization's organizing document? **5b** | | |
| **c** | **Substitutions only.** Was the substitution the result of an event beyond the organization's control? **5c** | | |
| **6** | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (i) its supported organizations, (ii) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (iii) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If "Yes," provide detail in **Part VI.*** **6** | | |
| **7** | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (defined in section 4958(c)(3)(C)), a family member of a substantial contributor, or a 35% controlled entity with regard to a substantial contributor? *If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ) .* **7** | | |
| **8** | Did the organization make a loan to a disqualified person (as defined in section 4958) not described in line 7? *If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ).* **8** | | |
| **9a** | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons, as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? *If "Yes," provide detail in **Part VI.*** **9a** | | |
| **b** | Did one or more disqualified persons (as defined in line 9a) hold a controlling interest in any entity in which the supporting organization had an interest? *If "Yes," provide detail in **Part VI.*** **9b** | | |
| **c** | Did a disqualified person (as defined in line 9a) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If "Yes," provide detail in **Part VI.*** **9c** | | |
| **10a** | Was the organization subject to the excess business holdings rules of section 4943 because of section 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If "Yes," answer line 10b below.* **10a** | | |
| **b** | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings).* **10b** | | |

**AA0135**

Schedule A (Form 990 or 990-EZ) 2020                                           Page **5**

**Part IV**    **Supporting Organizations** (continued)

| | | Yes | No |
|---|---|---|---|
| **11** | Has the organization accepted a gift or contribution from any of the following persons? | | |
| **a** | A person who directly or indirectly controls, either alone or together with persons described in lines 11b and 11c below, the governing body of a supported organization? | **11a** | |
| **b** | A family member of a person described in 11a above? | **11b** | |
| **c** | A 35% controlled entity of a person described in line 11a or 11b above? *If "Yes" to 11a, 11b, or 11c, provide detail in Part VI.* | **11c** | |

**Section B. Type I Supporting Organizations**

| | | Yes | No |
|---|---|---|---|
| **1** | Did the officers, directors, trustees, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's directors or trustees at all times during the tax year? *If "No," describe in Part VI how the supported organization(s) effectively operated, supervised, or controlled the organization's activities. If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year.* | **1** | |
| **2** | Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If "Yes," explain in Part VI how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised or controlled the supporting organization.* | **2** | |

**Section C. Type II Supporting Organizations**

| | | Yes | No |
|---|---|---|---|
| **1** | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees of each of the organization's supported organization(s)? *If "No," describe in Part VI how control or management of the supporting organization was vested in the same persons that controlled or managed the supported organization(s).* | **1** | |

**Section D. All Type III Supporting Organizations**

| | | Yes | No |
|---|---|---|---|
| **1** | Did the organization provide to each of its supported organizations, by the last day of the fifth month of the organization's tax year, (i) a written notice describing the type and amount of support provided during the prior tax year, (ii) a copy of the Form 990 that was most recently filed as of the date of notification, and (iii) copies of the organization's governing documents in effect on the date of notification, to the extent not previously provided? | **1** | |
| **2** | Were any of the organization's officers, directors, or trustees either (i) appointed or elected by the supported organization(s) or (ii) serving on the governing body of a supported organization? *If "No," explain in Part VI how the organization maintained a close and continuous working relationship with the supported organization(s).* | **2** | |
| **3** | By reason of the relationship described in line 2 above, did the organization's supported organizations have a significant voice in the organization's investment policies and in directing the use of the organization's income or assets at all times during the tax year? *If "Yes," describe in Part VI the role the organization's supported organizations played in this regard.* | **3** | |

**Section E. Type III Functionally-Integrated Supporting Organizations**

**1**    Check the box next to the method that the organization used to satisfy the Integral Part Test during the year **(see instructions)**:

   **a**   ☐   The organization satisfied the Activities Test. Complete **line 2** below.

   **b**   ☐   The organization is the parent of each of its supported organizations. Complete **line 3** below.

   **c**   ☐   The organization supported a governmental entity. Describe in **Part VI** how you supported a government entity (see instructions)

**2**    Activities Test. **Answer lines 2a and 2b below.**

| | | Yes | No |
|---|---|---|---|
| **a** | Did substantially all of the organization's activities during the tax year directly further the exempt purposes of the supported organization(s) to which the organization was responsive? *If "Yes," then in Part VI identify those supported organizations and explain how these activities directly furthered their exempt purposes, how the organization was responsive to those supported organizations, and how the organization determined that these activities constituted substantially all of its activities.* | **2a** | |
| **b** | Did the activities described in line 2a constitute activities that, but for the organization's involvement, one or more of the organization's supported organization(s) would have been engaged in? *If "Yes," explain in Part VI the reasons for the organization's position that its supported organization(s) would have engaged in these activities but for the organization's involvement.* | **2b** | |
| **3** | Parent of Supported Organizations. **Answer lines 3a and 3b below.** | | |
| **a** | Did the organization have the power to regularly appoint or elect a majority of the officers, directors, or trustees of each of the supported organizations?*If "Yes" or "No" provide details in Part VI.* | **3a** | |
| **b** | Did the organization exercise a substantial degree of direction over the policies, programs and activities of each of its supported organizations? *If "Yes," describe in Part VI. the role played by the organization in this regard.* | **3b** | |

**Schedule A (Form 990 or 990-EZ) 2020**

**Part V** Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations

1 ☐ Check here if the organization satisfied the Integral Part Test as a qualifying trust on Nov. 20, 1970 *(explain in **Part VI**)*. See instructions. All other Type III non-functionally integrated supporting organizations must complete Sections A through E.

### Section A – Adjusted Net Income

| | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 | Net short-term capital gain | 1 | | |
| 2 | Recoveries of prior-year distributions | 2 | | |
| 3 | Other gross income (see instructions) | 3 | | |
| 4 | Add lines 1 through 3 | 4 | | |
| 5 | Depreciation and depletion | 5 | | |
| 6 | Portion of operating expenses paid or incurred for production or collection of gross income or for management, conservation, or maintenance of property held for production of income (see instructions) | 6 | | |
| 7 | Other expenses (see instructions) | 7 | | |
| 8 | **Adjusted Net Income** (subtract lines 5, 6 and 7 from line 4) | 8 | | |

### Section B – Minimum Asset Amount

| | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 | Aggregate fair market value of all non-exempt-use assets (see instructions for short tax year or assets held for part of year): | 1 | | |
| a | Average monthly value of securities | 1a | | |
| b | Average monthly cash balances | 1b | | |
| c | Fair market value of other non-exempt-use assets | 1c | | |
| d | **Total** (add lines 1a, 1b, and 1c) | 1d | | |
| e | **Discount** claimed for blockage or other factors *(explain in detail in **Part VI**):* | | | |
| 2 | Acquisition indebtedness applicable to non-exempt use assets | 2 | | |
| 3 | Subtract line 2 from line 1d | 3 | | |
| 4 | Cash deemed held for exempt use. Enter 0.015 of line 3 (for greater amount, see instructions). | 4 | | |
| 5 | Net value of non-exempt-use assets (subtract line 4 from line 3) | 5 | | |
| 6 | Multiply line 5 by 0.035 | 6 | | |
| 7 | Recoveries of prior-year distributions | 7 | | |
| 8 | **Minimum Asset Amount** (add line 7 to line 6) | 8 | | |

### Section C – Distributable Amount

| | | Current Year |
|---|---|---|
| 1 | Adjusted net income for prior year (from Section A, line 8, Column A) | 1 | |
| 2 | Enter 85% of line 1 | 2 | |
| 3 | Minimum asset amount for prior year (from Section B, line 8, Column A) | 3 | |
| 4 | Enter greater of line 2 or line 3 | 4 | |
| 5 | Income tax imposed in prior year | 5 | |
| 6 | **Distributable Amount.** Subtract line 5 from line 4, unless subject to emergency temporary reduction (see instructions). | 6 | |

7 ☐ Check here if the current year is the organization's first as a non-functionally-integrated Type III supporting organization (see instructions).

AA0137

Schedule A (Form 990 or 990-EZ) 2020 — Page **7**

| **Part V** | **Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations** | | (continued) |
|---|---|---|---|

**Section D - Distributions**

|  |  | | Current Year |
|---|---|---|---|
| **1** | Amounts paid to supported organizations to accomplish exempt purposes | 1 | |
| **2** | Amounts paid to perform activity that directly furthers exempt purposes of supported organizations, in excess of income from activity | 2 | |
| **3** | Administrative expenses paid to accomplish exempt purposes of supported organizations | 3 | |
| **4** | Amounts paid to acquire exempt-use assets | 4 | |
| **5** | Qualified set-aside amounts (*prior IRS approval required - provide details in **Part VI***) | 5 | |
| **6** | Other distributions (*describe in **Part VI***). See instructions | 6 | |
| **7** | **Total annual distributions.** Add lines 1 through 6. | 7 | |
| **8** | Distributions to attentive supported organizations to which the organization is responsive (*provide details in **Part VI***). See instructions | 8 | |
| **9** | Distributable amount for 2020 from Section C, line 6 | 9 | |
| **10** | Line 8 amount divided by Line 9 amount | 10 | |

| **Section E - Distribution Allocations** (see instructions) | **(i) Excess Distributions** | **(ii) Underdistributions Pre-2020** | **(iii) Distributable Amount for 2020** |
|---|---|---|---|
| **1** Distributable amount for 2020 from Section C, line 6 | | | |
| **2** Underdistributions, if any, for years prior to 2020 (reasonable cause required-- *explain in **Part VI***). See instructions. | | | |
| **3** Excess distributions carryover, if any, to 2020: | | | |
| **a** From 2015. . . . . . . | | | |
| **b** From 2016. . . . . . . | | | |
| **c** From 2017. . . . . . . | | | |
| **d** From 2018. . . . . . . | | | |
| **e** From 2019. . . . . . . | | | |
| **f** **Total** of lines 3a through e | | | |
| **g** Applied to underdistributions of prior years | | | |
| **h** Applied to 2020 distributable amount | | | |
| **i** Carryover from 2015 not applied (see instructions) | | | |
| **j** Remainder. Subtract lines 3g, 3h, and 3i from line 3f. | | | |
| **4** Distributions for 2020 from Section D, line 7: $ | | | |
| **a** Applied to underdistributions of prior years | | | |
| **b** Applied to 2020 distributable amount | | | |
| **c** Remainder. Subtract lines 4a and 4b from line 4. | | | |
| **5** Remaining underdistributions for years prior to 2020, if any. Subtract lines 3g and 4a from line 2. If the amount is greater than zero, *explain in **Part VI***. See instructions. | | | |
| **6** Remaining underdistributions for 2020. Subtract lines 3h and 4b from line 1. If the amount is greater than zero, *explain in **Part VI***. See instructions. | | | |
| **7** **Excess distributions carryover to 2021.** Add lines 3j and 4c. | | | |
| **8** Breakdown of line 7: | | | |
| **a** Excess from 2016. . . . . | | | |
| **b** Excess from 2017. . . . . | | | |
| **c** Excess from 2018. . . . . | | | |
| **d** Excess from 2019. . . . . | | | |
| **e** Excess from 2020. . . . . | | | |

Schedule A (Form 990 or 990-EZ) (2020)

AA0138

Schedule A (Form 990 or 990-EZ) 2020

**Part VI** **Supplemental Information.** Provide the explanations required by Part II, line 10; Part II, line 17a or 17b; Part III, line 12; Part IV, Section A, lines 1, 2, 3b, 3c, 4b, 4c, 5a, 6, 9a, 9b, 9c, 11a, 11b, and 11c; Part IV, Section B, lines 1 and 2; Part IV, Section C, line 1; Part IV, Section D, lines 2 and 3; Part IV, Section E, lines 1c, 2a, 2b, 3a and 3b; Part V, line 1; Part V, Section B, line 1e; Part V Section D, lines 5, 6, and 8; and Part V, Section E, lines 2, 5, and 6. Also complete this part for any additional information. (See instructions).

Page **8**

| Return Reference | Explanation |
|---|---|
| | |
| **Facts And Circumstances Test** | |
| | |

Schedule A (Form 990 or 990-EZ) 2020

AA0139

Additional Data

Return to Form

**Software ID:** 20011551
**Software Version:** 2020v4.0

**AA0140**

# Schedule B
**(Form 990, 990-EZ, or 990-PF)**
Department of the Treasury
Internal Revenue Service

## Schedule of Contributors

▶ Attach to Form 990, 990-EZ, or 990-PF.
▶ Go to *www.irs.gov/Form990* for the latest information.

OMB No. 1545-0047

## 2020

Name of the organization
Vdare Foundation

**Employer identification number**

22-3691487

**Organization type** (check one):

| Filers of: | Section: |
|---|---|
| Form 990 or 990-EZ | ☐ 501(c)(　) (enter number) organization |
| | ☐ 4947(a)(1) nonexempt charitable trust **not** treated as a private foundation |
| | ☐ 527 political organization |
| Form 990-PF | ☐ 501(c)(3) exempt private foundation |
| | ☐ 4947(a)(1) nonexempt charitable trust treated as a private foundation |
| | ☐ 501(c)(3) taxable private foundation |

Check if your organization is covered by the **General Rule** or a **Special Rule.**
**Note:** Only a section 501(c)(7), (8), or (10) organization can check boxes for both the General Rule and a Special Rule. See instructions.

**General Rule**

☐ For an organization filing Form 990, 990-EZ, or 990-PF that received, during the year, contributions totaling $5,000 or more (in money or other property) from any one contributor. Complete Parts I and II. See instructions for determining a contributor's total contributions.

**Special Rules**

☐ For an organization described in section 501(c)(3) filing Form 990 or 990-EZ that met the 33$^{1}/_{3}$% support test of the regulations under sections 509(a)(1) and 170(b)(1)(A)(vi), that checked Schedule A (Form 990 or 990-EZ), Part II, line 13, 16a, or 16b, and that received from any one contributor, during the year, total contributions of the greater of **(1)** $5,000 or **(2)** 2% of the amount on (i) Form 990, Part VIII, line 1h, or (ii) Form 990-EZ, line 1. Complete Parts I and II.

☐ For an organization described in section 501(c)(7), (8), or (10) filing Form 990 or 990-EZ that received from any one contributor, during the year, total contributions of more than $1,000 *exclusively* for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals. Complete Parts I, II, and III.

☐ For an organization described in section 501(c)(7), (8), or (10) filing Form 990 or 990-EZ that received from any one contributor, during the year, contributions *exclusively* for religious, charitable, etc., purposes, but no such contributions totaled more than $1,000. If this box is checked, enter here the total contributions that were received during the year for an *exclusively* religious, charitable, etc., purpose. Don't complete any of the parts unless the **General Rule** applies to this organization because it received *nonexclusively* religious, charitable, etc., contributions totaling $5,000 or more during the year . . . . . . . . . . ▶ $ _____

**Caution:** An organization that isn't covered by the General Rule and/or the Special Rules doesn't file Schedule B (Form 990, 990-EZ, or 990-PF), but it **must** answer "No" on Part IV, line 2, of its Form 990; or check the box on line H of its Form 990-EZ or on its Form 990PF, Part I, line 2, to certify that it doesn't meet the filing requirements of Schedule B (Form 990, 990-EZ, or 990-PF).

For Paperwork Reduction Act Notice, see the Instructions for Form 990, 990-EZ, or 990-PF.

Cat. No. 30613X

Schedule B (Form 990, 990-EZ, or 990-PF) (2020)

Schedule B (Form 990, 990-EZ, or 990-PF) (2020) | Page **2**

| Name of organization | Employer identification number |
|---|---|
| Vdare Foundation | 22-3691487 |

**Part I**    **Contributors** (see instructions). Use duplicate copies of Part I if additional space is needed.

Contributors

| (a) No. | (b) Name, address, and ZIP + 4 | (c) Total contributions | (d) Type of contribution |
|---|---|---|---|
| RESTRICTED | | $ RESTRICTED | ☐ Person<br>☐ Payroll<br>☐ Noncash<br><br>(Complete Part II for noncash contributions.) |
| . | | $ | ☐ Person<br>☐ Payroll<br>☐ Noncash<br><br>(Complete Part II for noncash contributions.) |
| . | | $ | ☐ Person<br>☐ Payroll<br>☐ Noncash<br><br>(Complete Part II for noncash contributions.) |
| . | | $ | ☐ Person<br>☐ Payroll<br>☐ Noncash<br><br>(Complete Part II for noncash contributions.) |
| . | | $ | ☐ Person<br>☐ Payroll<br>☐ Noncash<br><br>(Complete Part II for noncash contributions.) |
| . | | $ | ☐ Person<br>☐ Payroll<br>☐ Noncash<br><br>(Complete Part II for noncash contributions.) |

Schedule B (Form 990, 990-EZ, or 990-PF) (2020)

AA0142

Schedule B (Form 990, 990-EZ, or 990-PF) (2020)

Page **3**

| Name of organization | Employer identification number |
|---|---|
| Vdare Foundation | 22-3691487 |

**Part II**    **Noncash Property** (see instructions). Use duplicate copies of Part II if additional space is needed.

| (a) No. from Part I | (b) Description of noncash property given | (c) FMV (or estimate) (See instructions) | (d) Date received |
|---|---|---|---|
| \_\_\_\_ | | $ _____ | _____ |
| \_\_\_\_ | | $ _____ | _____ |
| \_\_\_\_ | | $ _____ | _____ |
| \_\_\_\_ | | $ _____ | _____ |
| \_\_\_\_ | | $ _____ | _____ |
| \_\_\_\_ | | $ _____ | _____ |

Schedule B (Form 990, 990-EZ, or 990-PF) (2020)

AA0143

Schedule B (Form 990, 990-EZ, or 990-PF) (2020)                                                              Page **4**

| Name of organization | Employer identification number |
|---|---|
| Vdare Foundation | 22-3691487 |

**Part III** | *Exclusively* religious, charitable, etc., contributions to organizations described in section 501(c)(7), (8), or (10) that total more than $1,000 for the year from any one contributor. Complete columns (a) through (e) and the following line entry. For organizations completing Part III, enter the total of *exclusively* religious, charitable, etc., contributions of $1,000 or less for the year. (Enter this information once. See instructions.) ▶  $ _____

Use duplicate copies of Part III if additional space is needed.

| (a) No. from Part I | (b) Purpose of gift | (c) Use of gift | (d) Description of how gift is held |
|---|---|---|---|
| . | | | |

**(e) Transfer of gift**

| Transferee's name, address, and ZIP 4 | Relationship of transferor to transferee |
|---|---|
| | |

| (a) No. from Part I | (b) Purpose of gift | (c) Use of gift | (d) Description of how gift is held |
|---|---|---|---|
| . | | | |

**(e) Transfer of gift**

| Transferee's name, address, and ZIP 4 | Relationship of transferor to transferee |
|---|---|
| | |

| (a) No. from Part I | (b) Purpose of gift | (c) Use of gift | (d) Description of how gift is held |
|---|---|---|---|
| . | | | |

**(e) Transfer of gift**

| Transferee's name, address, and ZIP 4 | Relationship of transferor to transferee |
|---|---|
| | |

| (a) No. from Part I | (b) Purpose of gift | (c) Use of gift | (d) Description of how gift is held |
|---|---|---|---|
| . | | | |

**(e) Transfer of gift**

| Transferee's name, address, and ZIP 4 | Relationship of transferor to transferee |
|---|---|
| | |

**Schedule B (Form 990, 990-EZ, or 990-PF) (2020)**

**AA0144**

**Additional Data**

Software ID: 20011551
Software Version: 2020v4.0

Return to Form

| SCHEDULE D | **Supplemental Financial Statements** | OMB No. 1545-0047 |
|---|---|---|
| (Form 990) | | **2020** |

**SCHEDULE D (Form 990)**

**Supplemental Financial Statements**

▶ Complete if the organization answered "Yes," on Form 990,
Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b.
▶ Attach to Form 990.
▶ Go to *www.irs.gov/Form990* for instructions and the latest information.

Department of the Treasury
Internal Revenue Service

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| Vdare Foundation | 22-3691487 |

---

**Part I**    **Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 6.

| | | **(a)** Donor advised funds | **(b)** Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year . . . . . . . . . | | |
| 2 | Aggregate value of contributions to (during year) | | |
| 3 | Aggregate value of grants from (during year) | | |
| 4 | Aggregate value at end of year . . . . . . | | |

5   Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds are
the organization's property, subject to the organization's exclusive legal control? . . . . . . . . . .   ☐ **Yes**   ☐ **No**

6   Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only for
charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring
impermissible private benefit? . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ☐ **Yes**   ☐ **No**

---

**Part II**    **Conservation Easements.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 7.

1   Purpose(s) of conservation easements held by the organization (check all that apply).

☐ Preservation of land for public use (e.g., recreation or education)    ☐ Preservation of an historically important land area

☐ Protection of natural habitat    ☐ Preservation of a certified historic structure

☐ Preservation of open space

2   Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation
easement on the last day of the tax year.

| | | **Held at the End of the Year** |
|---|---|---|
| a | Total number of conservation easements . . . . . . . . . . . . . . . . . .   **2a** | |
| b | Total acreage restricted by conservation easements . . . . . . . . . . . . . . . . . .   **2b** | |
| c | Number of conservation easements on a certified historic structure included in (a) . . . . .   **2c** | |
| d | Number of conservation easements included in (c) acquired after 7/25/06, and not on a historic structure listed in the National Register . . .   **2d** | |

3   Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the
tax year ▶ _____

4   Number of states where property subject to conservation easement is located ▶ _____

5   Does the organization have a written policy regarding the periodic monitoring, inspection, handling of
violations, and enforcement of the conservation easements it holds? . . . . . . . . . . . .   ☐ **Yes**   ☐ **No**

6   Staff and volunteer hours devoted to monitoring, inspecting, handling of violations, and enforcing conservation easements during the
year
▶ _____

7   Amount of expenses incurred in monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
▶ $ _____

8   Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)
(B)(i) and section 170(h)(4)(B)(ii)? . . . . . . . . . . . . . . . . . . . . . . .   ☐ **Yes**   ☐ **No**

9   In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement, and
balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes
the organization's accounting for conservation easements.

---

**Part III**    **Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 8.

1a   If the organization elected, as permitted under FASB ASC 958, not to report in its revenue statement and balance sheet works
of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public
service, provide, in Part XIII, the text of the footnote to its financial statements that describes these items.

b   If the organization elected, as permitted under FASB ASC 958, to report in its revenue statement and balance sheet works of
art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service,
provide the following amounts relating to these items:

   **(i)** Revenue included on Form 990, Part VIII, line 1 . . . . . . . . . . . . . . . . ▶ $ _____

   **(ii)** Assets included in Form 990, Part X . . . . . . . . . . . . . . . . . . . . ▶ $ _____

2   If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the
following amounts required to be reported under FASB ASC 958 relating to these items:

a   Revenue included on Form 990, Part VIII, line 1 . . . . . . . . . . . . . . . . . ▶ $ _____

b   Assets included in Form 990, Part X . . . . . . . . . . . . . . . . . . . . . ▶ $ _____

---

AA0146

Schedule D (Form 990) 2020                                                Page **2**

**Part III**   **Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets** *(continued)*

**3**   Using the organization's acquisition, accession, and other records, check any of the following that are a significant use of its collection items (check all that apply):

**a** ☐ Public exhibition            **d** ☐ Loan or exchange programs

**b** ☐ Scholarly research

**c** ☐ Preservation for future generations            **e** ☐ Other ....................................................

**4**   Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII.

**5**   During the year, did the organization solicit or receive donations of art, historical treasures or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection?. . .   ☐ **Yes**   ☐ **No**

**Part IV**   **Escrow and Custodial Arrangements.**
       Complete if the organization answered "Yes" on Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

**1a**   Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X?. . . . . . . . . . . . . . . . . . . . .   ☐ **Yes**   ☐ **No**

**b**   If "Yes," explain the arrangement in Part XIII and complete the following table:

| | | Amount |
|---|---|---|
| **c** | Beginning balance . . . . . . . . . | **1c** | |
| **d** | Additions during the year . . . . . . . . . | **1d** | |
| **e** | Distributions during the year . . . . . . . . . | **1e** | |
| **f** | Ending balance . . . . . . . . . | **1f** | |

**2a**   Did the organization include an amount on Form 990, Part X, line 21, for escrow or custodial account liability? ☐ **Yes**   ☐ **No** . . .

**b**   If "Yes," explain the arrangement in Part XIII. Check here if the explanation has been provided in Part XIII . . . . ☐

**Part V**   **Endowment Funds.**
       Complete if the organization answered "Yes" on Form 990, Part IV, line 10.

| | **(a)** Current year | **(b)** Prior year | **(c)** Two years back | **(d)** Three years back | **(e)** Four years back |
|---|---|---|---|---|---|
| **1a** Beginning of year balance . . . . | | | | | |
| **b** Contributions . . . | | | | | |
| **c** Net investment earnings, gains, and losses | | | | | |
| **d** Grants or scholarships . . . | | | | | |
| **e** Other expenditures for facilities and programs . . . | | | | | |
| **f** Administrative expenses . . . | | | | | |
| **g** End of year balance . . . . . | | | | | |

**2**   Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as:

**a**   Board designated or quasi-endowment ▶ ............................

**b**   Permanent endowment ▶ ............................

**c**   Term endowment ▶ ............................
      The percentages on lines 2a, 2b, and 2c should equal 100%.

**3a**   Are there endowment funds not in the possession of the organization that are held and administered for the organization by:

| | | Yes | No |
|---|---|---|---|
| **(i)** Unrelated organizations . . . . . . . . . . . . . . . | **3a(i)** | | |
| **(ii)** Related organizations . . . . . . . . . . . . . . . | **3a(ii)** | | |
| **b** If "Yes" on 3a(ii), are the related organizations listed as required on Schedule R? | **3b** | | |

**4**   Describe in Part XIII the intended uses of the organization's endowment funds.

**Part VI**   **Land, Buildings, and Equipment.**
       Complete if the organization answered "Yes" on Form 990, Part IV, line 11a. See Form 990, Part X, line 10.

| Description of property | **(a)** Cost or other basis (investment) | **(b)** Cost or other basis (other) | **(c)** Accumulated depreciation | **(d)** Book value |
|---|---|---|---|---|
| **1a** Land . . . . . . | 278,332 | | | 278,332 |
| **b** Buildings . . . . . | 1,181,261 | | | 1,181,261 |
| **c** Leasehold improvements | | | | |
| **d** Equipment . . . . . | | | | |
| **e** Other . . . . . | 28,835 | | 28,835 | |
| **Total.** Add lines 1a through 1e. *(Column (d) must equal Form 990, Part X, column (B), line 10(c).)* . . . ▶ | | | | 1,459,593 |

Schedule D (Form 990) 2020

**AA0147**

Case 1:23-cv-11195-SHS-OTW   Document 201-4   Filed 01/18/25   Page 297 of 42

| **Part VII** | **Investments—Other Securities.** | | |
|---|---|---|---|

Complete if the organization answered 'Yes' on Form 990, Part IV, line 11b. See Form 990, Part X, line 12.

| **(a)** Description of security or category (including name of security) | **(b)** Book value | **(c)** Method of valuation: Cost or end-of-year market value |
|---|---|---|
| **(1)** Financial derivatives  . . . . . . . . . | | |
| **(2)** Closely-held equity interests  . . . . . . . . | | |
| **(3)** Other | | |
| (B) | | |
| (C) | | |
| (D) | | |
| (E) | | |
| (F) | | |
| (G) | | |
| (H) | | |
| (I) | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col. (B) line 12.)* ▶ | | |

| **Part VIII** | **Investments—Program Related.** | | |
|---|---|---|---|

Complete if the organization answered 'Yes' on Form 990, Part IV, line 11c. See Form 990, Part X, line 13.

| **(a)** Description of investment | **(b)** Book value | **(c)** Method of valuation: Cost or end-of-year market value |
|---|---|---|
| **(2)** | | |
| **(3)** | | |
| **(4)** | | |
| **(5)** | | |
| **(6)** | | |
| **(7)** | | |
| **(8)** | | |
| **(9)** | | |
| **(10)** | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 13.)* ▶ | | |

| **Part IX** | **Other Assets.** | |
|---|---|---|

Complete if the organization answered 'Yes' on Form 990, Part IV, line 11d. See Form 990, Part X, line 15.

| **(a)** Description | **(b)** Book value |
|---|---|
| **(2)** | |
| **(3)** | |
| **(4)** | |
| **(5)** | |
| **(6)** | |
| **(7)** | |
| **(8)** | |
| **(9)** | |
| **(10)** | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 15.)*  . . . . . . . . . . . . ▶ | |

| **Part X** | **Other Liabilities.** | |
|---|---|---|

Complete if the organization answered 'Yes' on Form 990, Part IV, line 11e or 11f. See Form 990, Part X, line 25.

| **1.** | **(a)** Description of liability | **(b)** Book value |
|---|---|---|
| **(1)** Federal income taxes | | |
| **(2)** | | |
| **(3)** | | |
| **(4)** | | |
| **(5)** | | |
| **(6)** | | |
| **(7)** | | |
| **(8)** | | |
| **(9)** | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 25.)* ▶ | | |

**2.** Liability for uncertain tax positions. In Part XIII, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FIN 48 (ASC 740). Check here if the text of the footnote has been provided in Part XIII ☐

**AA0148**

**Part XI** | **Reconciliation of Revenue per Audited Financial Statements With Revenue per Return.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a.

| | | | |
|---|---|---|---|
| **1** | Total revenue, gains, and other support per audited financial statements . . . . . . . | | **1** |
| **2** | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | |
| **a** | Net unrealized gains (losses) on investments . . . . . | **2a** | |
| **b** | Donated services and use of facilities . . . . . | **2b** | |
| **c** | Recoveries of prior year grants . . . . . | **2c** | |
| **d** | Other (Describe in Part XIII.) . . . . . | **2d** | |
| **e** | Add lines **2a** through **2d** . . . . . . . . . . . | | **2e** |
| **3** | Subtract line **2e** from line **1** . . . . . . . . . . . | | **3** |
| **4** | Amounts included on Form 990, Part VIII, line 12, but not on line **1**: | | |
| **a** | Investment expenses not included on Form 990, Part VIII, line 7b . | **4a** | |
| **b** | Other (Describe in Part XIII.) . . . . . | **4b** | |
| **c** | Add lines **4a** and **4b** . . . . . . . . . . . . | | **4c** |
| **5** | Total revenue. Add lines **3** and **4c.** (This must equal Form 990, Part I, line 12.) . . . . . | | **5** |

**Part XII** | **Reconciliation of Expenses per Audited Financial Statements With Expenses per Return.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a.

| | | | |
|---|---|---|---|
| **1** | Total expenses and losses per audited financial statements . . . . . . . . | | **1** |
| **2** | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | |
| **a** | Donated services and use of facilities . . . . . | **2a** | |
| **b** | Prior year adjustments . . . . . | **2b** | |
| **c** | Other losses . . . . . | **2c** | |
| **d** | Other (Describe in Part XIII.) . . . . . | **2d** | |
| **e** | Add lines **2a** through **2d** . . . . . . . . . . . | | **2e** |
| **3** | Subtract line **2e** from line **1** . . . . . . . . . . . | | **3** |
| **4** | Amounts included on Form 990, Part IX, line 25, but not on line **1**: | | |
| **a** | Investment expenses not included on Form 990, Part VIII, line 7b . | **4a** | |
| **b** | Other (Describe in Part XIII.) . . . . . | **4b** | |
| **c** | Add lines **4a** and **4b** . . . . . . . . . . . . | | **4c** |
| **5** | Total expenses. Add lines **3** and **4c.** (This must equal Form 990, Part I, line 18.) . . . . . | | **5** |

**Part XIII** | **Supplemental Information**

Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information.

| Return Reference | Explanation |
|---|---|
| | |

**AA0149**

**Additional Data**

**Software ID:** 20011551
**Software Version:** 2020v4.0

Return to Form

**AA0150**

| Schedule J<br>(Form 990)<br><br>Department of the Treasury<br>Internal Revenue Service | **Compensation Information**<br><br>**For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**<br>▶ **Complete if the organization answered "Yes" on Form 990, Part IV, line 23.**<br>▶ **Attach to Form 990.**<br>▶ **Go to www.irs.gov/Form990 for instructions and the latest information.** | OMB No. 1545-0047<br><br>**2020**<br><br>**Open to Public Inspection** |
|---|---|---|

| Name of the organization<br>Vdare Foundation | Employer identification number<br>22-3691487 |
|---|---|

**Part I**    **Questions Regarding Compensation**

|  | | Yes | No |
|---|---|---|---|

**1a** Check the appropiate box(es) if the organization provided any of the following to or for a person listed on Form 990, Part VII, Section A, line 1a. Complete Part III to provide any relevant information regarding these items.

- ☐ First-class or charter travel
- ☐ Travel for companions
- ☐ Tax idemnification and gross-up payments
- ☐ Discretionary spending account
- ☐ Housing allowance or residence for personal use
- ☐ Payments for business use of personal residence
- ☐ Health or social club dues or initiation fees
- ☐ Personal services (e.g., maid, chauffeur, chef)

**b** If any of the boxes on Line 1a are checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain . . . . . . . . . . . . .      **1b**

**2** Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all directors, trustees, officers, including the CEO/Executive Director, regarding the items checked on Line 1a? . .      **2**

**3** Indicate which, if any, of the following the filing organization used to establish the compensation of the organization's CEO/Executive Director. Check all that apply. Do not check any boxes for methods used by a related organization to establish compensation of the CEO/Executive Director, but explain in Part III.

- ☐ Compensation committee
- ☐ Independent compensation consultant
- ☐ Form 990 of other organizations
- ☐ Written employment contract
- ☐ Compensation survey or study
- ☐ Approval by the board or compensation committee

**4** During the year, did any person listed on Form 990, Part VII, Section A, line 1a, with respect to the filing organization or a related organization:

**a** Receive a severance payment or change-of-control payment? . . . . . . . . .      **4a**    No

**b** Participate in, or receive payment from, a supplemental nonqualified retirement plan? . . . .      **4b**    No

**c** Participate in, or receive payment from, an equity-based compensation arrangement? . . .      **4c**    No

If "Yes" to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III.

**Only 501(c)(3), 501(c)(4), and 501(c)(29) organizations must complete lines 5-9.**

**5** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of:

**a** The organization? . . . . . . . . . . . . . . . . . .      **5a**    No

**b** Any related organization? . . . . . . . . . . . . . . .      **5b**    No

If "Yes," on line 5a or 5b, describe in Part III.

**6** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of:

**a** The organization? . . . . . . . . . . . . . . . . . .      **6a**    No

**b** Any related organization? . . . . . . . . . . . . . . .      **6b**    No

If "Yes," on line 6a or 6b, describe in Part III.

**7** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization provide any nonfixed payments not described in lines 5 and 6? If "Yes," describe in Part III . . . . . . . .      **7**    No

**8** Were any amounts reported on Form 990, Part VII, paid or accured pursuant to a contract that was subject to the initial contract exception described in Regulations section 53.4958-4(a)(3)? If "Yes," describe in Part III . . . . . . . . . . . . . . . . .      **8**    No

**9** If "Yes" on line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53.4958-6(c)? . . . . . . . . . . . . .      **9**

**For Paperwork Reduction Act Notice, see the Instructions for Form 990.**      Cat. No. 50053T      **Schedule J (Form 990) 2020**

**AA0151**

Case 1:22-cv-01337-RJS-OTW Document 124 Filed 01/18/23 Page 295 of 42

**Part II** **Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees.** Use duplicate copies if additional space is needed.

For each individual whose compensation must be reported on Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii). Do not list any individuals that are not listed on Form 990, Part VII.

**Note:** The sum of columns (B)(i)–(iii) for each listed individual must equal the total amount of Form 990, Part VII, Section A, line 1a, applicable column (D) and (E) amounts for that individual.

| (A) Name and Title | | (B) Breakdown of W-2 and/or 1099-MISC compensation | | | (C) Retirement and other deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)–(D) | (F) Compensation in column (B) reported as deferred on prior Form 990 |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base compensation | (ii) Bonus & incentive compensation | (iii) Other reportable compensation | | | | |
| **1** Peter Brimelow | (i) | ----- | ----- | 264,700 | ---- | ----- | 264,700 | ---- |
| Chairman | (ii) | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

AA0152

Schedule J (Form 990) 2020

Page **3**

## Part III  Supplemental Information

Provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 3, 4a, 4b, 4c, 5a, 5b, 6a, 6b, 7, and 8, and for Part II. Also complete this part for any additional information.

| Return Reference | Explanation |
|---|---|

Schedule J (Form 990) 2020

AA0153

Return to Form

**Software ID:** 20011551
**Software Version:** 2020v4.0

**Additional Data**

**AA0154**

| **Schedule L**<br>(Form 990 or 990-EZ) | **Transactions with Interested Persons** | OMB No. 1545-0047 |
|---|---|---|
| | ▶ **Complete if the organization answered "Yes" on Form 990, Part IV, lines 25a, 25b, 26, 27, 28a, 28b, or 28c, or Form 990-EZ, Part V, line 38a or 40b.**<br>▶ **Attach to Form 990 or Form 990-EZ.**<br>▶**Go to** *www.irs.gov/Form990* **for instructions and the latest information.** | **2020** |
| Department of the Treasury<br>Internal Revenue Service | | **Open to Public Inspection** |

| Name of the organization<br>Vdare Foundation | Employer identification number<br>22-3691487 |
|---|---|

**Part I**   **Excess Benefit Transactions** (section 501(c)(3), section 501(c)(4), and section 501(c)(29) organizations only).
Complete if the organization answered "Yes" on Form 990, Part IV, line 25a or 25b, or Form 990-EZ, Part V, line 40b.

| 1 | **(a)** Name of disqualified person | **(b)** Relationship between disqualified person and organization | **(c)** Description of transaction | **(d)** Corrected? | |
|---|---|---|---|---|---|
| | | | | Yes | No |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**2** Enter the amount of tax incurred by the organization managers or disqualified persons during the year under
section 4958.     ▶ $ ▶ _____

**3** Enter the amount of tax, if any, on line 2, above, reimbursed by the organization   .   .   .   . ▶ $  ▶ _____

**Part II**   **Loans to and/or From Interested Persons.**
Complete if the organization answered "Yes" on Form 990-EZ, Part V, line 38a, or Form 990, Part IV, line 26; or if the organization reported an amount on Form 990, Part X, line 5, 6, or 22

| **(a)** Name of interested person | **(b)** Relationship with organization | **(c)** Purpose of loan | **(d)** Loan to or from the organization? | | **(e)** Original principal amount | **(f)** Balance due | **(g)** In default? | | **(h)** Approved by board or committee? | | **(i)** Written agreement? | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | To | From | | | Yes | No | Yes | No | Yes | No |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Total** . . . . . . . . . . . . . . ▶ $ | | | | | | | | | | | | |

**Part III**   **Grants or Assistance Benefiting Interested Persons.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 27.

| **(a)** Name of interested person | **(b)** Relationship between interested person and the organization | **(c)** Amount of assistance | **(d)** Type of assistance | **(e)** Purpose of assistance |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.     Cat. No. 50056A     **Schedule L (Form 990 or 990-EZ) 2020**

**AA0155**

Schedule L (Form 990 or 990-EZ) 2020

Page **2**

**Part IV** Business Transactions Involving Interested Persons.

Complete if the organization answered "Yes" on Form 990, Part IV, line 28a, 28b, or 28c.

| **(a)** Name of interested person | **(b)** Relationship between interested person and the organization | **(c)** Amount of transaction | **(d)** Description of transaction | **(e)** Sharing of organization's revenues? | |
|---|---|---|---|---|---|
| | | | | Yes | No |
| (1) Happy Penguins LLC | Affiliate | 335,822 | Employee Leasing Fee | | No |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Part V** Supplemental Information

Provide additional information for responses to questions on Schedule L (see instructions).

| **Return Reference** | **Explanation** |
|---|---|
| | |

Schedule L (Form 990 or 990-EZ) 2020

**AA0156**

**Additional Data**

**Return to Form**

**Software ID:** 20011551
**Software Version:** 2020v4.0

AA0157

# SCHEDULE O
### (Form 990 or 990-EZ)

Department of the Treasury
Name of the organization

Vdare Foundation

## Supplemental Information to Form 990 or 990-EZ

Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.
▶ Attach to Form 990 or 990-EZ.
▶ Go to *www.irs.gov/Form990* for the latest information.

OMB No. 1545-0047

## 2020

Open to Public
Inspection

Employer identification number

22-3691487

| Return Reference | Explanation |
|---|---|
| Form 990, Part VI, Line 11b: Form 990 Review Process | No review was or will be conducted. |
| Form 990, Part VI, Line 19: Other Organization Documents Publicly Available | No documents available to the public. |
| Form 990, Part IV, Section B, Line 12C | Form 990 is provided to each director before filing. |
| Form 990, Part IV, Section A, Line 2 | Peter Brimelow and John Brimelow, directors, are brothers. |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.        Cat. No. 51056K        Schedule O (Form 990 or 990-EZ) 2020

**Additional Data**

**Return to Form**

**Software ID:** 20011551
**Software Version:** 2020v4.0

**AA0159**

EXHIBIT C

EXTENDED TO NOVEMBER 16, 2020

| Form **990** (Rev. January 2020) | **Return of Organization Exempt From Income Tax** | | OMB No. 1545-0047 |
|---|---|---|---|
| | Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations) | | **2019** |

Department of the Treasury
Internal Revenue Service

▶ Do not enter social security numbers on this form as it may be made public.
▶ Go to www.irs.gov/Form990 for instructions and the latest information.

**Open to Public Inspection**

**A** For the 2019 calendar year, or tax year beginning _____ and ending _____

| **B** Check if applicable: | **C** Name of organization | | **D** Employer identification number |
|---|---|---|---|
| ☐ Address change | VDARE FOUNDATION | | |
| ☐ Name change | Doing business as | | 22-3691487 |
| ☐ Initial return | Number and street (or P.O. box if mail is not delivered to street address) | Room/suite | **E** Telephone number |
| ☐ Final return/terminated | 447 SOUTH STREET | | 860-361-6231 |
| ☐ Amended return | City or town, state or province, country, and ZIP or foreign postal code | | **G** Gross receipts $ 4,345,643. |
| ☐ Application pending | LITCHFIELD, CT 06759 | | **H(a)** Is this a group return |
| | **F** Name and address of principal officer: PETER BRIMELOW | | for subordinates? ☐ Yes ☒ No |
| | SAME AS C ABOVE | | **H(b)** Are all subordinates included? ☐ Yes ☐ No |

**I** Tax-exempt status: ☒ 501(c)(3)  ☐ 501(c) ( ) ◀ (insert no.)  ☐ 4947(a)(1) or  ☐ 527    If "No," attach a list. (see instructions)

**J** Website: ▶ WWW. VDARE.COM    **H(c)** Group exemption number ▶

**K** Form of organization: ☒ Corporation  ☐ Trust  ☐ Association  ☐ Other ▶    **L** Year of formation: 1999  **M** State of legal domicile: NY

## Part I  Summary

| | | | |
|---|---|---|---|
| Activities & Governance | 1 Briefly describe the organization's mission or most significant activities: CREATE AND MANAGE INTERNET PUBLICATION | | |
| | 2 Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets. | | |
| | 3 Number of voting members of the governing body (Part VI, line 1a) | 3 | 3 |
| | 4 Number of independent voting members of the governing body (Part VI, line 1b) | 4 | 2 |
| | 5 Total number of individuals employed in calendar year 2019 (Part V, line 2a) | 5 | 0 |
| | 6 Total number of volunteers (estimate if necessary) | 6 | 0 |
| | 7 a Total unrelated business revenue from Part VIII, column (C), line 12 | 7a | 0. |
| | b Net unrelated business taxable income from Form 990-T, line 39 | 7b | 0. |

| | | Prior Year | Current Year |
|---|---|---|---|
| Revenue | 8 Contributions and grants (Part VIII, line 1h) | 500,672. | 4,259,309. |
| | 9 Program service revenue (Part VIII, line 2g) | 4,875. | 43,886. |
| | 10 Investment income (Part VIII, column (A), lines 3, 4, and 7d) | 205. | 42,448. |
| | 11 Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 192,405. | 0. |
| | 12 Total revenue - add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 698,157. | 4,345,643. |
| Expenses | 13 Grants and similar amounts paid (Part IX, column (A), lines 1-3) | 0. | 0. |
| | 14 Benefits paid to or for members (Part IX, column (A), line 4) | 0. | 0. |
| | 15 Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | 181,675. | 345,364. |
| | 16a Professional fundraising fees (Part IX, column (A), line 11e) | 0. | 0. |
| | b Total fundraising expenses (Part IX, column (D), line 25) ▶ 35,382. | | |
| | 17 Other expenses (Part IX, column (A), lines 11a-11d, 11f-24e) | 499,423. | 646,151. |
| | 18 Total expenses. Add lines 13-17 (must equal Part IX, column (A), line 25) | 681,098. | 991,515. |
| | 19 Revenue less expenses. Subtract line 18 from line 12 | 17,059. | 3,354,128. |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| Net Assets or Fund Balances | 20 Total assets (Part X, line 16) | 187,130. | 3,554,869. |
| | 21 Total liabilities (Part X, line 26) | 7,309. | 10,196. |
| | 22 Net assets or fund balances. Subtract line 21 from line 20 | 179,821. | 3,544,673. |

## Part II  Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| Sign Here | ▶ Signature of officer | | Date |
|---|---|---|---|
| | ▶ PETER BRIMELOW, CHAIRMAN | | |
| | Type or print name and title | | |

| | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
| Paid Preparer Use Only | PAMELA J. MATOCHA | | | | P00572001 |
| | Firm's name ▶ T. M. BYXBEE COMPANY, P.C. | | | Firm's EIN ▶ 06-1386456 | |
| | Firm's address ▶ P. O. BOX 187169 | | | | |
| | HAMDEN, CT 06518 | | | Phone no. (203) 281-4933 | |

May the IRS discuss this return with the preparer shown above? (see instructions) ... ☒ Yes ☐ No

932001 01-20-20    LHA  For Paperwork Reduction Act Notice, see the separate instructions.    Form **990** (2019)

**AA0161**

Form **8879-EO**

Department of the Treasury
Internal Revenue Service

## IRS e-file Signature Authorization
## for an Exempt Organization

For calendar year 2019, or fiscal year beginning _____ , 2019, and ending _____ , 20 ___

▶ Do not send to the IRS. Keep for your records.
▶ Go to www.irs.gov/Form8879EO for the latest information.

OMB No. 1545-1878

**2019**

Name of exempt organization

VDARE FOUNDATION

Employer identification number

22-3691487

Name and title of officer

PETER BRIMELOW
CHAIRMAN

### Part I  Type of Return and Return Information  (Whole Dollars Only)

Check the box for the return for which you are using this Form 8879-EO and enter the applicable amount, if any, from the return. If you check the box on line 1a, 2a, 3a, 4a, or 5a, below, and the amount on that line for the return being filed with this form was blank, then leave line 1b, 2b, 3b, 4b, or 5b, whichever is applicable, blank (do not enter -0-). But, if you entered -0- on the return, then enter -0- on the applicable line below. Do not complete more than one line in Part I.

| | | | |
|---|---|---|---|
| 1a Form 990 check here ▶ [X] | b Total revenue, if any (Form 990, Part VIII, column (A), line 12) | 1b | 4,345,643. |
| 2a Form 990-EZ check here ▶ | b Total revenue, if any (Form 990-EZ, line 9) | 2b | |
| 3a Form 1120-POL check here ▶ | b Total tax (Form 1120-POL, line 22) | 3b | |
| 4a Form 990-PF check here ▶ | b Tax based on investment income (Form 990-PF, Part VI, line 5) | 4b | |
| 5a Form 8868 check here ▶ | b Balance Due (Form 8868, line 3c) | 5b | |

### Part II  Declaration and Signature Authorization of Officer

Under penalties of perjury, I declare that I am an officer of the above organization and that I have examined a copy of the organization's 2019 electronic return and accompanying schedules and statements and to the best of my knowledge and belief, they are true, correct, and complete. I further declare that the amount in Part I above is the amount shown on the copy of the organization's electronic return. I consent to allow my intermediate service provider, transmitter, or electronic return originator (ERO) to send the organization's return to the IRS and to receive from the IRS (a) an acknowledgement of receipt or reason for rejection of the transmission, (b) the reason for any delay in processing the return or refund, and (c) the date of any refund. If applicable, I authorize the U.S. Treasury and its designated Financial Agent to initiate an electronic funds withdrawal (direct debit) entry to the financial institution account indicated in the tax preparation software for payment of the organization's federal taxes owed on this return, and the financial institution to debit the entry to this account. To revoke a payment, I must contact the U.S. Treasury Financial Agent at 1-888-353-4537 no later than 2 business days prior to the payment (settlement) date. I also authorize the financial institutions involved in the processing of the electronic payment of taxes to receive confidential information necessary to answer inquiries and resolve issues related to the payment. I have selected a personal identification number (PIN) as my signature for the organization's electronic return and, if applicable, the organization's consent to electronic funds withdrawal.

Officer's PIN: check one box only

[X] I authorize _T M BYXBEE COMPANY PC_ to enter my PIN | 91487
ERO firm name

Enter five numbers, but do not enter all zeros

as my signature on the organization's tax year 2019 electronically filed return. If I have indicated within this return that a copy of the return is being filed with a state agency(ies) regulating charities as part of the IRS Fed/State program, I also authorize the aforementioned ERO to enter my PIN on the return's disclosure consent screen.

As an officer of the organization, I will enter my PIN as my signature on the organization's tax year 2019 electronically filed return. If I have indicated within this return that a copy of the return is being filed with a state agency(ies) regulating charities as part of the IRS Fed/State program, I will enter my PIN on the return's disclosure consent screen.

Officer's signature ▶ _____  Date ▶ 11/13/2020

### Part III  Certification and Authentication

ERO's EFIN/PIN. Enter your six-digit electronic filing identification number (EFIN) followed by your five-digit self-selected PIN. | 06177023190
Do not enter all zeros

I certify that the above numeric entry is my PIN, which is my signature on the 2019 electronically filed return for the organization indicated above. I confirm that I am submitting this return in accordance with the requirements of Pub. 4163, Modernized e-File (MeF) Information for Authorized IRS e-file Providers for Business Returns.

ERO's signature ▶ _Pamela J. Matocha_  Date ▶ 11/13/2020

### ERO Must Retain This Form - See Instructions
### Do Not Submit This Form to the IRS Unless Requested To Do So

LHA  For Paperwork Reduction Act Notice, see instructions.

923051 10-03-19

Form **8879-EO** (2019)

AA0162

Form 990 (2019)      VDARE FOUNDATION      22-3691487     Page **2**

**Part III** **Statement of Program Service Accomplishments**

Check if Schedule O contains a response or note to any line in this Part III ......................................................... ☐

1   Briefly describe the organization's mission:     NONE

_____

_____

_____

2   Did the organization undertake any significant program services during the year which were not listed on the

    prior Form 990 or 990-EZ? .......................................................................................................... ☐ Yes ☒ No

    If "Yes," describe these new services on Schedule O.

3   Did the organization cease conducting, or make significant changes in how it conducts, any program services? ................. ☐ Yes ☒ No

    If "Yes," describe these changes on Schedule O.

4   Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses.

    Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total expenses, and

    revenue, if any, for each program service reported.

4a   (Code: _____ ) (Expenses $    696,786.   including grants of $ _____ ) (Revenue $     43,886. )

    CREATE AND MANAGE INTERNET PUBLICATION

_____

_____

_____

_____

_____

_____

_____

_____

4b   (Code: _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

_____

_____

_____

_____

_____

_____

_____

_____

4c   (Code: _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

_____

_____

_____

_____

_____

_____

_____

_____

4d   Other program services (Describe on Schedule O.)

    (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

4e   Total program service expenses ▶     696,786.

Form **990** (2019)

932002 01-20-20

## Part IV | Checklist of Required Schedules

|  |  |  | Yes | No |
|---|---|---|---|---|
| 1 | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)?<br>If "Yes," complete Schedule A | **1** | X |  |
| 2 | Is the organization required to complete Schedule B, Schedule of Contributors? | **2** | X |  |
| 3 | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for<br>public office? If "Yes," complete Schedule C, Part I | **3** |  | X |
| 4 | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect<br>during the tax year? If "Yes," complete Schedule C, Part II | **4** |  | X |
| 5 | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or<br>similar amounts as defined in Revenue Procedure 98-19? If "Yes," complete Schedule C, Part III | **5** |  | X |
| 6 | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to<br>provide advice on the distribution or investment of amounts in such funds or accounts? If "Yes," complete Schedule D, Part I | **6** |  | X |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space,<br>the environment, historic land areas, or historic structures? If "Yes," complete Schedule D, Part II | **7** |  | X |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? If "Yes," complete<br>Schedule D, Part III | **8** |  | X |
| 9 | Did the organization report an amount in Part X, line 21, for escrow or custodial account liability, serve as a custodian for<br>amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services?<br>If "Yes," complete Schedule D, Part IV | **9** |  | X |
| 10 | Did the organization, directly or through a related organization, hold assets in donor-restricted endowments<br>or in quasi endowments? If "Yes," complete Schedule D, Part V | **10** |  | X |
| 11 | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X<br>as applicable. |  |  |  |
| a | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? If "Yes," complete Schedule D,<br>Part VI | **11a** | X |  |
| b | Did the organization report an amount for investments - other securities in Part X, line 12, that is 5% or more of its total<br>assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VII | **11b** |  | X |
| c | Did the organization report an amount for investments - program related in Part X, line 13, that is 5% or more of its total<br>assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VIII | **11c** |  | X |
| d | Did the organization report an amount for other assets in Part X, line 15, that is 5% or more of its total assets reported in<br>Part X, line 16? If "Yes," complete Schedule D, Part IX | **11d** |  | X |
| e | Did the organization report an amount for other liabilities in Part X, line 25? If "Yes," complete Schedule D, Part X | **11e** |  | X |
| f | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses<br>the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? If "Yes," complete Schedule D, Part X | **11f** |  | X |
| 12a | Did the organization obtain separate, independent audited financial statements for the tax year? If "Yes," complete<br>Schedule D, Parts XI and XII | **12a** |  | X |
| b | Was the organization included in consolidated, independent audited financial statements for the tax year?<br>If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional | **12b** |  | X |
| 13 | Is the organization a school described in section 170(b)(1)(A)(ii)? If "Yes," complete Schedule E | **13** |  | X |
| 14a | Did the organization maintain an office, employees, or agents outside of the United States? | **14a** |  | X |
| b | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business,<br>investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000<br>or more? If "Yes," complete Schedule F, Parts I and IV | **14b** |  | X |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any<br>foreign organization? If "Yes," complete Schedule F, Parts II and IV | **15** |  | X |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to<br>or for foreign individuals? If "Yes," complete Schedule F, Parts III and IV | **16** |  | X |
| 17 | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX,<br>column (A), lines 6 and 11e? If "Yes," complete Schedule G, Part I | **17** |  | X |
| 18 | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines<br>1c and 8a? If "Yes," complete Schedule G, Part II | **18** |  | X |
| 19 | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? If "Yes,"<br>complete Schedule G, Part III | **19** |  | X |
| 20a | Did the organization operate one or more hospital facilities? If "Yes," complete Schedule H | **20a** |  | X |
| b | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? | **20b** |  |  |
| 21 | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or<br>domestic government on Part IX, column (A), line 1? If "Yes," complete Schedule I, Parts I and II | **21** |  | X |

932003 01-20-20                                                                Form **990** (2019)

Form 990 (2019)     VDARE FOUNDATION     22-3691487     Page **4**

## Part IV   Checklist of Required Schedules *(continued)*

| | | | Yes | No |
|---|---|---|---|---|
| 22 | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* | 22 | | X |
| 23 | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* | 23 | X | |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K. If "No," go to line 25a* | 24a | | X |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? | 24b | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? | 24c | | |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? | 24d | | |
| 25a | Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations. Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L, Part I* | 25a | | X |
| b | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L, Part I* | 25b | | X |
| 26 | Did the organization report any amount on Part X, line 5 or 22, for receivables from or payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part II* | 26 | | X |
| 27 | Did the organization provide a grant or other assistance to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor or employee thereof, a grant selection committee member, or to a 35% controlled entity (including an employee thereof) or family member of any of these persons? *If "Yes," complete Schedule L, Part III* | 27 | | X |
| 28 | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions, for applicable filing thresholds, conditions, and exceptions): | | | |
| a | A current or former officer, director, trustee, key employee, creator or founder, or substantial contributor? *If "Yes," complete Schedule L, Part IV* | 28a | X | |
| b | A family member of any individual described in line 28a? *If "Yes," complete Schedule L, Part IV* | 28b | | X |
| c | A 35% controlled entity of one or more individuals and/or organizations described in lines 28a or 28b? *If "Yes," complete Schedule L, Part IV* | 28c | | X |
| 29 | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* | 29 | | X |
| 30 | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* | 30 | | X |
| 31 | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* | 31 | | X |
| 32 | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* | 32 | | X |
| 33 | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? *If "Yes," complete Schedule R, Part I* | 33 | | X |
| 34 | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* | 34 | | X |
| 35a | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | 35a | | X |
| b | If "Yes" to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* | 35b | | |
| 36 | Section 501(c)(3) organizations. Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* | 36 | | X |
| 37 | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* | 37 | | X |
| 38 | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11b and 19? **Note:** All Form 990 filers are required to complete Schedule O | 38 | X | |

## Part V   Statements Regarding Other IRS Filings and Tax Compliance

Check if Schedule O contains a response or note to any line in this Part V ........................................................ ☐

| | | | | Yes | No |
|---|---|---|---|---|---|
| 1a | Enter the number reported in Box 3 of Form 1096. Enter -0- if not applicable | 1a | 0 | | |
| b | Enter the number of Forms W-2G included in line 1a. Enter -0- if not applicable | 1b | 0 | | |
| c | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? | | | 1c | | |

932004 01-20-20                                                        Form **990** (2019)

Form 990 (2019)      VDARE FOUNDATION                        22-3691487     Page 5

| Part V | Statements Regarding Other IRS Filings and Tax Compliance *(continued)* | | | |
| --- | --- | --- | --- | --- |
| | | | Yes | No |
| **2a** | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return ........................... **2a** | 0 | | |
| **b** | If at least one is reported on line 2a, did the organization file all required federal employment tax returns? .................... **2b** | | | |
| | Note: If the sum of lines 1a and 2a is greater than 250, you may be required to *e-file* (see instructions) .................... | | | |
| **3a** | Did the organization have unrelated business gross income of $1,000 or more during the year? .................... **3a** | | | X |
| **b** | If "Yes," has it filed a Form 990-T for this year? *If "No" to line 3b, provide an explanation on Schedule O* .................... **3b** | | | |
| **4a** | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? .................... **4a** | | | X |
| **b** | If "Yes," enter the name of the foreign country ▶ _____ | | | |
| | See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). | | | |
| **5a** | Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? .................... **5a** | | | X |
| **b** | Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? .................... **5b** | | | X |
| **c** | If "Yes" to line 5a or 5b, did the organization file Form 8886-T? .................... **5c** | | | |
| **6a** | Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? .................... **6a** | | | X |
| **b** | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? .................... **6b** | | | |
| **7** | **Organizations that may receive deductible contributions under section 170(c).** | | | |
| **a** | Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? .................... **7a** | | | X |
| **b** | If "Yes," did the organization notify the donor of the value of the goods or services provided? .................... **7b** | | | |
| **c** | Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? .................... **7c** | | | X |
| **d** | If "Yes," indicate the number of Forms 8282 filed during the year .................... **7d** | | | |
| **e** | Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? .................... **7e** | | | |
| **f** | Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? .................... **7f** | | | |
| **g** | If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? .................... **7g** | | | |
| **h** | If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? .................... **7h** | | | |
| **8** | **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? .................... **8** | | | |
| **9** | **Sponsoring organizations maintaining donor advised funds.** | | | |
| **a** | Did the sponsoring organization make any taxable distributions under section 4966? .................... **9a** | | | |
| **b** | Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? .................... **9b** | | | |
| **10** | **Section 501(c)(7) organizations. Enter:** | | | |
| **a** | Initiation fees and capital contributions included on Part VIII, line 12 .................... **10a** | | | |
| **b** | Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities .................... **10b** | | | |
| **11** | **Section 501(c)(12) organizations. Enter:** | | | |
| **a** | Gross income from members or shareholders .................... **11a** | | | |
| **b** | Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them.) .................... **11b** | | | |
| **12a** | **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? .................... **12a** | | | |
| **b** | If "Yes," enter the amount of tax-exempt interest received or accrued during the year .................... **12b** | | | |
| **13** | **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | |
| **a** | Is the organization licensed to issue qualified health plans in more than one state? .................... **13a** | | | |
| | Note: See the instructions for additional information the organization must report on Schedule O. | | | |
| **b** | Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans .................... **13b** | | | |
| **c** | Enter the amount of reserves on hand .................... **13c** | | | |
| **14a** | Did the organization receive any payments for indoor tanning services during the tax year? .................... **14a** | | | X |
| **b** | If "Yes," has it filed a Form 720 to report these payments? *If "No," provide an explanation on Schedule O* .................... **14b** | | | |
| **15** | Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? .................... **15** | | | X |
| | If "Yes," see instructions and file Form 4720, Schedule N. | | | |
| **16** | Is the organization an educational institution subject to the section 4968 excise tax on net investment income? .................... **16** | | | X |
| | If "Yes," complete Form 4720, Schedule O. | | | |

Form **990** (2019)

932005 01-20-20



Form 990 (2019)   VDARE FOUNDATION   22-3691487   Page **6**

**Part VI** Governance, Management, and Disclosure *For each "Yes" response to lines 2 through 7b below, and for a "No" response to line 8a, 8b, or 10b below, describe the circumstances, processes, or changes on Schedule O. See instructions.*

Check if Schedule O contains a response or note to any line in this Part VI ........................................................... [X]

**Section A. Governing Body and Management**

|  |  | Yes | No |
|---|---|---|---|
| 1a Enter the number of voting members of the governing body at the end of the tax year ........... **1a** 3 |  |  |  |
| If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain on Schedule O. |  |  |  |
| b Enter the number of voting members included in line 1a, above, who are independent ...... **1b** 2 |  |  |  |
| 2 Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? ....... | 2 | X |  |
| 3 Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors, trustees, or key employees to a management company or other person? ......... | 3 |  | X |
| 4 Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? .......... | 4 |  | X |
| 5 Did the organization become aware during the year of a significant diversion of the organization's assets? .......... | 5 |  | X |
| 6 Did the organization have members or stockholders? .......... | 6 |  | X |
| 7a Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? .......... | 7a |  | X |
| b Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? .......... | 7b |  | X |
| 8 Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: |  |  |  |
| a The governing body? .......... | 8a | X |  |
| b Each committee with authority to act on behalf of the governing body? .......... | 8b | X |  |
| 9 Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses on Schedule O* .......... | 9 |  | X |

**Section B. Policies** *(This Section B requests information about policies not required by the Internal Revenue Code.)*

|  |  | Yes | No |
|---|---|---|---|
| 10a Did the organization have local chapters, branches, or affiliates? .......... | 10a |  | X |
| b If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? .......... | 10b |  |  |
| 11a Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? | 11a | X |  |
| b Describe in Schedule O the process, if any, used by the organization to review this Form 990. |  |  |  |
| 12a Did the organization have a written conflict of interest policy? *If "No," go to line 13* .......... | 12a | X |  |
| b Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? .......... | 12b | X |  |
| c Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe in Schedule O how this was done* .......... | 12c | X |  |
| 13 Did the organization have a written whistleblower policy? .......... | 13 |  | X |
| 14 Did the organization have a written document retention and destruction policy? .......... | 14 |  | X |
| 15 Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? |  |  |  |
| a The organization's CEO, Executive Director, or top management official .......... | 15a |  | X |
| b Other officers or key employees of the organization .......... | 15b |  | X |
| If "Yes" to line 15a or 15b, describe the process in Schedule O (see instructions). |  |  |  |
| 16a Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? .......... | 16a |  | X |
| b If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? .......... | 16b |  |  |

**Section C. Disclosure**

17 List the states with which a copy of this Form 990 is required to be filed ▶ NY

18 Section 6104 requires an organization to make its Forms 1023 (1024 or 1024-A, if applicable), 990, and 990-T (Section 501(c)(3)s only) available for public inspection. Indicate how you made these available. Check all that apply.
[ ] Own website   [ ] Another's website   [X] Upon request   [ ] Other *(explain on Schedule O)*

19 Describe on Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

20 State the name, address, and telephone number of the person who possesses the organization's books and records ▶
LYDIA BRIMELOW -- 860-361-6231
447 SOUTH STREET, LITCHFIELD, CT   06759

932006 01-20-20   Form **990** (2019)

Form 990 (2019)  VDARE FOUNDATION  22-3691487  Page **7**

| **Part VII** | Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors |

Check if Schedule O contains a response or note to any line in this Part VII .................................................. ☐

**Section A.**  **Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

• List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

• List all of the organization's **current** key employees, if any. See instructions for definition of "key employee."

• List the organization's five **current** highest compensated employees (other than an officer, director, trustee, or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations.

• List all of the organization's **former** officers, key employees, and highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

• List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See instructions for the order in which to list the persons above.

Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee. ☐

| (A)<br>Name and title | (B)<br>Average<br>hours per<br>week<br>(list any<br>hours for<br>related<br>organizations<br>below<br>line) | (C)<br>Position<br>(do not check more than one<br>box, unless person is both an<br>officer and a director/trustee) | | | | | | (D)<br>Reportable<br>compensation<br>from<br>the<br>organization<br>(W-2/1099-MISC) | (E)<br>Reportable<br>compensation<br>from related<br>organizations<br>(W-2/1099-MISC) | (F)<br>Estimated<br>amount of<br>other<br>compensation<br>from the<br>organization<br>and related<br>organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) JOE FALLON<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (2) JOHN WALL<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (3) JOHN BRIMELOW<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (4) PETER BRIMELOW<br>CHAIRMAN | 90.00 | X | | X | | | | 345,364. | 0. | 0. |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

932007 01-20-20

Form **990** (2019)

AA0168

VDARE FOUNDATION  142255  1

Form 990 (2019)  VDARE FOUNDATION  22-3691487  Page **8**

**Part VII** Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)*

| (A)<br>Name and title | (B)<br>Average<br>hours per<br>week<br>(list any<br>hours for<br>related<br>organizations<br>below<br>line) | (C)<br>Position<br>(do not check more than one<br>box, unless person is both an<br>officer and a director/trustee) | | | | | | (D)<br>Reportable<br>compensation<br>from<br>the<br>organization<br>(W-2/1099-MISC) | (E)<br>Reportable<br>compensation<br>from related<br>organizations<br>(W-2/1099-MISC) | (F)<br>Estimated<br>amount of<br>other<br>compensation<br>from the<br>organization<br>and related<br>organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **1b Subtotal** | | | | | | | ▶ | 345,364. | 0. | 0. |
| **c Total from continuation sheets to Part VII, Section A** | | | | | | | ▶ | 0. | 0. | 0. |
| **d Total (add lines 1b and 1c)** | | | | | | | ▶ | 345,364. | 0. | 0. |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶ 1

| | | | Yes | No |
|---|---|---|---|---|
| **3** | Did the organization list any *former* officer, director, trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* | 3 | | X |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* | 4 | X | |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* | 5 | | X |

**Section B. Independent Contractors**

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. Report compensation for the calendar year ending with or within the organization's tax year.

| (A)<br>Name and business address | (B)<br>Description of services | (C)<br>Compensation |
|---|---|---|
| HAPPY PENGUINS LLC /PETER BRIMELOW<br>447 SOUTH STREET, LITCHFIELD, CT 06759 | LEASED EMPLOYEES | 411,003. |
| | | |
| | | |
| | | |
| | | |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶ 1

932008 01-20-20

Form **990** (2019)

Form 990 (2019)　　　VDARE FOUNDATION　　　22-3691487　　Page **9**

## Part VIII　Statement of Revenue

Check if Schedule O contains a response or note to any line in this Part VIII ☐

| | | | | (A)<br>Total revenue | (B)<br>Related or exempt<br>function revenue | (C)<br>Unrelated<br>business revenue | (D)<br>Revenue excluded<br>from tax under<br>sections 512 - 514 |
|---|---|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | 1 a | Federated campaigns | 1a | | | | |
| | b | Membership dues | 1b | | | | |
| | c | Fundraising events | 1c | | | | |
| | d | Related organizations | 1d | | | | |
| | e | Government grants (contributions) | 1e | | | | |
| | f | All other contributions, gifts, grants, and similar amounts not included above | 11 | 4,259,309. | | | |
| | g | Noncash contributions included in lines 1a-1f | 1g $ | | | | |
| | h | **Total.** Add lines 1a-1f | ▶ | 4,259,309. | | | |
| **Program Service Revenue** | | | Business Code | | | | |
| | 2 a | PUBLICATIONS REVENUE | 519130 | 43,886. | 43,886. | | |
| | b | | | | | | |
| | c | | | | | | |
| | d | | | | | | |
| | e | | | | | | |
| | f | All other program service revenue | | | | | |
| | g | **Total.** Add lines 2a-2f | ▶ | 43,886. | | | |
| **Other Revenue** | 3 | Investment income (including dividends, interest, and other similar amounts) | ▶ | 42,448. | | | 42,448. |
| | 4 | Income from investment of tax-exempt bond proceeds | ▶ | | | | |
| | 5 | Royalties | ▶ | | | | |
| | | | (i) Real　　(ii) Personal | | | | |
| | 6 a | Gross rents | 6a | | | | |
| | b | Less: rental expenses | 6b | | | | |
| | c | Rental income or (loss) | 6c | | | | |
| | d | Net rental income or (loss) | ▶ | | | | |
| | 7 a | Gross amount from sales of assets other than inventory | (i) Securities　(ii) Other<br>7a | | | | |
| | b | Less: cost or other basis and sales expenses | 7b | | | | |
| | c | Gain or (loss) | 7c | | | | |
| | d | Net gain or (loss) | ▶ | | | | |
| | 8 a | Gross income from fundraising events (not including $ _____ of contributions reported on line 1c). See Part IV, line 18 | 8a | | | | |
| | b | Less: direct expenses | 8b | | | | |
| | c | Net income or (loss) from fundraising events | ▶ | | | | |
| | 9 a | Gross income from gaming activities. See Part IV, line 19 | 9a | | | | |
| | b | Less: direct expenses | 9b | | | | |
| | c | Net income or (loss) from gaming activities | ▶ | | | | |
| | 10 a | Gross sales of inventory, less returns and allowances | 10a | | | | |
| | b | Less: cost of goods sold | 10b | | | | |
| | c | Net income or (loss) from sales of inventory | ▶ | | | | |
| **Miscellaneous Revenue** | | | Business Code | | | | |
| | 11 a | | | | | | |
| | b | | | | | | |
| | c | | | | | | |
| | d | All other revenue | | | | | |
| | e | **Total.** Add lines 11a-11d | ▶ | | | | |
| | 12 | **Total revenue.** See instructions | ▶ | 4,345,643. | 43,886. | 0. | 42,448. |

932009 01-20-20　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Form **990** (2019)

17471113　756327　142255　　　　　　**AA0170**　　　VDARE FOUNDATION　　　142255 1

Form 990 (2019)     VDARE FOUNDATION              22-3691487    Page **10**

## Part IX | Statement of Functional Expenses

Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).

Check if Schedule O contains a response or note to any line in this Part IX .................. ☒

| Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII. | (A)<br>Total expenses | (B)<br>Program service<br>expenses | (C)<br>Management and<br>general expenses | (D)<br>Fundraising<br>expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to domestic organizations and domestic governments. See Part IV, line 21 ... | | | | |
| **2** Grants and other assistance to domestic individuals. See Part IV, line 22 .................. | | | | |
| **3** Grants and other assistance to foreign organizations, foreign governments, and foreign individuals. See Part IV, lines 15 and 16 ........ | | | | |
| **4** Benefits paid to or for members .................. | | | | |
| **5** Compensation of current officers, directors, trustees, and key employees .................. | 345,364. | 293,560. | 34,536. | 17,268. |
| **6** Compensation not included above to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) ........ | | | | |
| **7** Other salaries and wages .................. | | | | |
| **8** Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) | | | | |
| **9** Other employee benefits .................. | | | | |
| **10** Payroll taxes .................. | | | | |
| **11** Fees for services (nonemployees): | | | | |
| **a** Management .................. | | | | |
| **b** Legal .................. | 46,376. | | 46,376. | |
| **c** Accounting .................. | 21,681. | | 21,681. | |
| **d** Lobbying .................. | | | | |
| **e** Professional fundraising services. See Part IV, line 17 | | | | |
| **f** Investment management fees .................. | | | | |
| **g** Other. (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Sch O.) | 111,808. | 5,880. | 93,934. | 11,994. |
| **12** Advertising and promotion .................. | 25,643. | 25,643. | | |
| **13** Office expenses .................. | 36,142. | 10,310. | 25,832. | |
| **14** Information technology .................. | 93,945. | 93,945. | | |
| **15** Royalties .................. | | | | |
| **16** Occupancy .................. | 8,664. | | 8,664. | |
| **17** Travel .................. | 31,842. | 31,842. | | |
| **18** Payments of travel or entertainment expenses for any federal, state, or local public officials ... | | | | |
| **19** Conferences, conventions, and meetings ...... | 10,610. | | 4,490. | 6,120. |
| **20** Interest .................. | | | | |
| **21** Payments to affiliates .................. | | | | |
| **22** Depreciation, depletion, and amortization ..... | | | | |
| **23** Insurance .................. | | | | |
| **24** Other expenses. Itemize expenses not covered above (List miscellaneous expenses on line 24e. If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O.) | | | | |
| **a** EDITORS | 113,961. | 113,961. | | |
| **b** WRITERS | 61,680. | 61,680. | | |
| **c** VIDEO | 48,996. | 48,996. | | |
| **d** OTHER | 31,856. | 8,022. | 23,834. | |
| **e** All other expenses | 2,947. | 2,947. | | |
| **25** Total functional expenses. Add lines 1 through 24e | 991,515. | 696,786. | 259,347. | 35,382. |
| **26** Joint costs. Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation. Check here ▶ ☐ if following SOP 98-2 (ASC 958-720) | | | | |

932010 01-20-20                                                        Form **990** (2019)

Form 990 (2019)      VDARE FOUNDATION          22-3691487    Page **11**

| Part X | Balance Sheet |
|---|---|

Check if Schedule O contains a response or note to any line in this Part X ....................................... ☐

| | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|
| **Assets** | 1 | Cash - non-interest-bearing ................................................ | 108,550. | 1 | 389,960. |
| | 2 | Savings and temporary cash investments ................................. | | 2 | |
| | 3 | Pledges and grants receivable, net ....................................... | | 3 | |
| | 4 | Accounts receivable, net ................................................... | | 4 | |
| | 5 | Loans and other receivables from any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons | | 5 | |
| | 6 | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), and persons described in section 4958(c)(3)(B) ..... | | 6 | |
| | 7 | Notes and loans receivable, net ......................................... | | 7 | |
| | 8 | Inventories for sale or use ............................................... | | 8 | |
| | 9 | Prepaid expenses and deferred charges ................................. | | 9 | |
| | 10a | Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D ........ 10a 28,835. | | | |
| | b | Less: accumulated depreciation ................. 10b 28,835. | 0. | 10c | 0. |
| | 11 | Investments - publicly traded securities .................................. | 78,580. | 11 | 3,164,909. |
| | 12 | Investments - other securities. See Part IV, line 11 .................... | | 12 | |
| | 13 | Investments - program-related. See Part IV, line 11 .................... | | 13 | |
| | 14 | Intangible assets ............................................................ | | 14 | |
| | 15 | Other assets. See Part IV, line 11 ....................................... | | 15 | |
| | 16 | **Total assets.** Add lines 1 through 15 (must equal line 33) ........... | 187,130. | 16 | 3,554,869. |
| **Liabilities** | 17 | Accounts payable and accrued expenses ................................ | 7,309. | 17 | 10,196. |
| | 18 | Grants payable ............................................................. | | 18 | |
| | 19 | Deferred revenue .......................................................... | | 19 | |
| | 20 | Tax-exempt bond liabilities .............................................. | | 20 | |
| | 21 | Escrow or custodial account liability. Complete Part IV of Schedule D .......... | | 21 | |
| | 22 | Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons .................... | | 22 | |
| | 23 | Secured mortgages and notes payable to unrelated third parties ............ | | 23 | |
| | 24 | Unsecured notes and loans payable to unrelated third parties ............. | | 24 | |
| | 25 | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17-24). Complete Part X of Schedule D .............................................................. | | 25 | |
| | 26 | **Total liabilities.** Add lines 17 through 25 .............................. | 7,309. | 26 | 10,196. |
| **Net Assets or Fund Balances** | | Organizations that follow FASB ASC 958, check here ▶ ☒ and complete lines 27, 28, 32, and 33. | | | |
| | 27 | Net assets without donor restrictions ................................... | 179,821. | 27 | 3,544,673. |
| | 28 | Net assets with donor restrictions ...................................... | | 28 | |
| | | Organizations that do not follow FASB ASC 958, check here ▶ ☐ and complete lines 29 through 33. | | | |
| | 29 | Capital stock or trust principal, or current funds ....................... | | 29 | |
| | 30 | Paid-in or capital surplus, or land, building, or equipment fund ............ | | 30 | |
| | 31 | Retained earnings, endowment, accumulated income, or other funds ........... | | 31 | |
| | 32 | Total net assets or fund balances ....................................... | 179,821. | 32 | 3,544,673. |
| | 33 | Total liabilities and net assets/fund balances .......................... | 187,130. | 33 | 3,554,869. |

Form **990** (2019)

932011 01-20-20

17471113 756327 142255         VDARE FOUNDATION      142255 1

Form 990 (2019)     VDARE FOUNDATION          22-3691487    Page **12**

## Part XI | Reconciliation of Net Assets

Check if Schedule O contains a response or note to any line in this Part XI ..........................................................................

| | | | |
|---|---|---|---|
| 1 | Total revenue (must equal Part VIII, column (A), line 12) | **1** | 4,345,643. |
| 2 | Total expenses (must equal Part IX, column (A), line 25) | **2** | 991,515. |
| 3 | Revenue less expenses. Subtract line 2 from line 1 | **3** | 3,354,128. |
| 4 | Net assets or fund balances at beginning of year (must equal Part X, line 32, column (A)) | **4** | 179,821. |
| 5 | Net unrealized gains (losses) on investments | **5** | 10,724. |
| 6 | Donated services and use of facilities | **6** | |
| 7 | Investment expenses | **7** | |
| 8 | Prior period adjustments | **8** | |
| 9 | Other changes in net assets or fund balances (explain on Schedule O) | **9** | 0. |
| 10 | Net assets or fund balances at end of year. Combine lines 3 through 9 (must equal Part X, line 32, column (B)) | **10** | 3,544,673. |

## Part XII | Financial Statements and Reporting

Check if Schedule O contains a response or note to any line in this Part XII ..........................................................................

| | | Yes | No |
|---|---|---|---|
| 1 | Accounting method used to prepare the Form 990: ☐ Cash ☒ Accrual ☐ Other _____ | | |
| | If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O. | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? | 2a | X |
| | If "Yes," check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both: | | |
| | ☐ Separate basis ☐ Consolidated basis ☐ Both consolidated and separate basis | | |
| b | Were the organization's financial statements audited by an independent accountant? | 2b | X |
| | If "Yes," check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both: | | |
| | ☐ Separate basis ☐ Consolidated basis ☐ Both consolidated and separate basis | | |
| c | If "Yes" to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | 2c | |
| | If the organization changed either its oversight process or selection process during the tax year, explain on Schedule O. | | |
| 3a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? | 3a | X |
| b | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why on Schedule O and describe any steps taken to undergo such audits | 3b | |

Form **990** (2019)

932012 01-20-20

| SCHEDULE A (Form 990 or 990-EZ) | **Public Charity Status and Public Support** | OMB No. 1545-0047 |
|---|---|---|
| | Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust. | **2019** |
| Department of the Treasury Internal Revenue Service | ▶ Attach to Form 990 or Form 990-EZ.  ▶ Go to www.irs.gov/Form990 for instructions and the latest information. | Open to Public Inspection |

| Name of the organization | Employer identification number |
|---|---|
| VDARE FOUNDATION | 22-3691487 |

**Part I** **Reason for Public Charity Status** (All organizations must complete this part.) See instructions.

The organization is not a private foundation because it is: (For lines 1 through 12, check only one box.)

1 ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

2 ☐ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E (Form 990 or 990-EZ).)

3 ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4 ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state: _____

5 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv).** (Complete Part II.)

6 ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7 ☒ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

8 ☐ A community trust described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

9 ☐ An agricultural research organization described in **section 170(b)(1)(A)(ix)** operated in conjunction with a land-grant college or university or a non-land-grant college of agriculture (see instructions). Enter the name, city, and state of the college or university: _____

10 ☐ An organization that normally receives: (1) more than 33 1/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions - subject to certain exceptions, and (2) no more than 33 1/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See **section 509(a)(2).** (Complete Part III.)

11 ☐ An organization organized and operated exclusively to test for public safety. See **section 509(a)(4).**

12 ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in **section 509(a)(1)** or **section 509(a)(2).** See **section 509(a)(3).** Check the box in lines 12a through 12d that describes the type of supporting organization and complete lines 12e, 12f, and 12g.

a ☐ **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. **You must complete Part IV, Sections A and B.**

b ☐ **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s). **You must complete Part IV, Sections A and C.**

c ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions). **You must complete Part IV, Sections A, D, and E.**

d ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated. The organization generally must satisfy a distribution requirement and an attentiveness requirement (see instructions). **You must complete Part IV, Sections A and D, and Part V.**

e ☐ Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization.

f Enter the number of supported organizations ...................................................................

g Provide the following information about the supported organization(s).

| (i) Name of supported organization | (ii) EIN | (iii) Type of organization (described on lines 1-10 above (see instructions)) | (iv) Is the organization listed in your governing document? | | (v) Amount of monetary support (see instructions) | (vi) Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| | | | Yes | No | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **Total** | | | | | | |

LHA For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ. 932021 09-25-19    Schedule A (Form 990 or 990-EZ) 2019

Schedule A (Form 990 or 990-EZ) 2019  VDARE FOUNDATION                                     22-3691487   Page 2

**Part II** Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)
(Complete only if you checked the box on line 5, 7, or 8 of Part I or if the organization failed to qualify under Part III. If the organization
fails to qualify under the tests listed below, please complete Part III.)

### Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2015 | (b) 2016 | (c) 2017 | (d) 2018 | (e) 2019 | (f) Total |
|---|---|---|---|---|---|---|
| 1 Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grants.") | 267,037. | 440,984. | 385,988. | 500,672. | 4259309. | 5853990. |
| 2 Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| 3 The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| 4 Total. Add lines 1 through 3 | 267,037. | 440,984. | 385,988. | 500,672. | 4259309. | 5853990. |
| 5 The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f) | | | | | | 3453182. |
| 6 Public support. Subtract line 5 from line 4. | | | | | | 2400808. |

### Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2015 | (b) 2016 | (c) 2017 | (d) 2018 | (e) 2019 | (f) Total |
|---|---|---|---|---|---|---|
| 7 Amounts from line 4 | 267,037. | 440,984. | 385,988. | 500,672. | 4259309. | 5853990. |
| 8 Gross income from interest, dividends, payments received on securities loans, rents, royalties, and income from similar sources | 7,110. | 768. | 1,126. | 205. | 42,448. | 51,657. |
| 9 Net income from unrelated business activities, whether or not the business is regularly carried on | | | | | | |
| 10 Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.) | | | 57,988. | 192,405. | 14,400. | 264,793. |
| 11 Total support. Add lines 7 through 10 | | | | | | 6170440. |
| 12 Gross receipts from related activities, etc. (see instructions) | | | | | 12 | 39,087. |

13 First five years. If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3)
organization, check this box and stop here .................................................................................................................. ▶ ☐

### Section C. Computation of Public Support Percentage

| | | |
|---|---|---|
| 14 Public support percentage for 2019 (line 6, column (f) divided by line 11, column (f)) | 14 | 38.91 % |
| 15 Public support percentage from 2018 Schedule A, Part II, line 14 | 15 | 86.88 % |

16a 33 1/3% support test - 2019. If the organization did not check the box on line 13, and line 14 is 33 1/3% or more, check this box and
stop here. The organization qualifies as a publicly supported organization ......................................................................... ▶ ☒

b 33 1/3% support test - 2018. If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3% or more, check this box
and stop here. The organization qualifies as a publicly supported organization ..................................................................... ▶ ☐

17a 10% -facts-and-circumstances test - 2019. If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more,
and if the organization meets the "facts-and-circumstances" test, check this box and stop here. Explain in Part VI how the organization
meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization .................................... ▶ ☐

b 10% -facts-and-circumstances test - 2018. If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or
more, and if the organization meets the "facts-and-circumstances" test, check this box and stop here. Explain in Part VI how the
organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization ...................... ▶ ☐

18 Private foundation. If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see instructions ......... ▶ ☐

Schedule A (Form 990 or 990-EZ) 2019

932022 09-25-19

17471113  756337  142255                       **AA0175**                      VDARE FOUNDATION                      142255 1

Schedule A (Form 990 or 990-EZ) 2019 VDARE FOUNDATION      22-3691487   Page **3**

**Part III** Support Schedule for Organizations Described in Section 509(a)(2)

(Complete only if you checked the box on line 10 of Part I or if the organization failed to qualify under Part II. If the organization fails to qualify under the tests listed below, please complete Part II.)

### Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2015 | (b) 2016 | (c) 2017 | (d) 2018 | (e) 2019 | (f) Total |
|---|---|---|---|---|---|---|
| 1 Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grants.") | | | | | | |
| 2 Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose | | | | | | |
| 3 Gross receipts from activities that are not an unrelated trade or business under section 513 | | | | | | |
| 4 Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| 5 The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| 6 **Total.** Add lines 1 through 5 | | | | | | |
| 7a Amounts included on lines 1, 2, and 3 received from disqualified persons | | | | | | |
| b Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year | | | | | | |
| c Add lines 7a and 7b | | | | | | |
| 8 **Public support.** (Subtract line 7c from line 6.) | | | | | | |

### Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2015 | (b) 2016 | (c) 2017 | (d) 2018 | (e) 2019 | (f) Total |
|---|---|---|---|---|---|---|
| 9 Amounts from line 6 | | | | | | |
| 10a Gross income from interest, dividends, payments received on securities loans, rents, royalties, and income from similar sources | | | | | | |
| b Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975 | | | | | | |
| c Add lines 10a and 10b | | | | | | |
| 11 Net income from unrelated business activities not included in line 10b, whether or not the business is regularly carried on | | | | | | |
| 12 Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.) | | | | | | |
| 13 **Total support.** (Add lines 9, 10c, 11, and 12.) | | | | | | |

14 **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here** ........................................................................................................................ ▶ ☐

### Section C. Computation of Public Support Percentage

| | | |
|---|---|---|
| 15 Public support percentage for 2019 (line 8, column (f), divided by line 13, column (f)) | **15** | % |
| 16 Public support percentage from 2018 Schedule A, Part III, line 15 | **16** | % |

### Section D. Computation of Investment Income Percentage

| | | |
|---|---|---|
| 17 Investment income percentage for 2019 (line 10c, column (f), divided by line 13, column (f)) | **17** | % |
| 18 Investment income percentage from 2018 Schedule A, Part III, line 17 | **18** | % |

19a **33 1/3% support tests - 2019.** If the organization did not check the box on line 14, and line 15 is more than 33 1/3%, and line 17 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization ..................... ▶ ☐

b **33 1/3% support tests - 2018.** If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3%, and line 18 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization ............. ▶ ☐

20 **Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions ............................. ▶ ☐

932023 09-25-19      Schedule A (Form 990 or 990-EZ) 2019

47

Schedule A (Form 990 or 990-EZ) 2019 VDARE FOUNDATION 22-3691487 Page 4

## Part IV Supporting Organizations

(Complete only if you checked a box in line 12 on Part I. If you checked 12a of Part I, complete Sections A and B. If you checked 12b of Part I, complete Sections A and C. If you checked 12c of Part I, complete Sections A, D, and E. If you checked 12d of Part I, complete Sections A and D, and complete Part V.)

### Section A. All Supporting Organizations

|  |  | Yes | No |
|---|---|---|---|
| 1 | Are all of the organization's supported organizations listed by name in the organization's governing documents? If "No," describe in Part VI how the supported organizations are designated. If designated by class or purpose, describe the designation. If historic and continuing relationship, explain. **1** | | |
| 2 | Did the organization have any supported organization that does not have an IRS determination of status under section 509(a)(1) or (2)? If "Yes," explain in Part VI how the organization determined that the supported organization was described in section 509(a)(1) or (2). **2** | | |
| 3a | Did the organization have a supported organization described in section 501(c)(4), (5), or (6)? If "Yes," answer (b) and (c) below. **3a** | | |
| b | Did the organization confirm that each supported organization qualified under section 501(c)(4), (5), or (6) and satisfied the public support tests under section 509(a)(2)? If "Yes," describe in Part VI when and how the organization made the determination. **3b** | | |
| c | Did the organization ensure that all support to such organizations was used exclusively for section 170(c)(2)(B) purposes? If "Yes," explain in Part VI what controls the organization put in place to ensure such use. **3c** | | |
| 4a | Was any supported organization not organized in the United States ("foreign supported organization")? If "Yes," and if you checked 12a or 12b in Part I, answer (b) and (c) below. **4a** | | |
| b | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? If "Yes," describe in Part VI how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations. **4b** | | |
| c | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? If "Yes," explain in Part VI what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes. **4c** | | |
| 5a | Did the organization add, substitute, or remove any supported organizations during the tax year? If "Yes," answer (b) and (c) below (if applicable). Also, provide detail in Part VI, including (i) the names and EIN numbers of the supported organizations added, substituted, or removed; (ii) the reasons for each such action; (iii) the authority under the organization's organizing document authorizing such action; and (iv) how the action was accomplished (such as by amendment to the organizing document). **5a** | | |
| b | Type I or Type II only. Was any added or substituted supported organization part of a class already designated in the organization's organizing document? **5b** | | |
| c | Substitutions only. Was the substitution the result of an event beyond the organization's control? **5c** | | |
| 6 | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (i) its supported organizations, (ii) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (iii) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? If "Yes," provide detail in Part VI. **6** | | |
| 7 | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (as defined in section 4958(c)(3)(C)), a family member of a substantial contributor, or a 35% controlled entity with regard to a substantial contributor? If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ). **7** | | |
| 8 | Did the organization make a loan to a disqualified person (as defined in section 4958) not described in line 7? If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ). **8** | | |
| 9a | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? If "Yes," provide detail in Part VI. **9a** | | |
| b | Did one or more disqualified persons (as defined in line 9a) hold a controlling interest in any entity in which the supporting organization had an interest? If "Yes," provide detail in Part VI. **9b** | | |
| c | Did a disqualified person (as defined in line 9a) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? If "Yes," provide detail in Part VI. **9c** | | |
| 10a | Was the organization subject to the excess business holdings rules of section 4943 because of section 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? If "Yes," answer 10b below. **10a** | | |
| b | Did the organization have any excess business holdings in the tax year? (Use Schedule C, Form 4720, to determine whether the organization had excess business holdings.) **10b** | | |

932024 09-25-19 Schedule A (Form 990 or 990-EZ) 2019

Schedule A (Form 990 or 990-EZ) 2019  VDARE FOUNDATION     22-3691487  Page 5

## Part IV   Supporting Organizations (continued)

| | Yes | No |
|---|---|---|
| **11** Has the organization accepted a gift or contribution from any of the following persons? | | |
| **a** A person who directly or indirectly controls, either alone or together with persons described in (b) and (c) below, the governing body of a supported organization? **11a** | | |
| **b** A family member of a person described in (a) above? **11b** | | |
| **c** A 35% controlled entity of a person described in (a) or (b) above? *If "Yes" to a, b, or c, provide detail in* **Part VI.** **11c** | | |

### Section B. Type I Supporting Organizations

| | Yes | No |
|---|---|---|
| **1** Did the directors, trustees, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's directors or trustees at all times during the tax year? *If "No," describe in* **Part VI** *how the supported organization(s) effectively operated, supervised, or controlled the organization's activities. If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year.* **1** | | |
| **2** Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If "Yes," explain in* **Part VI** *how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised, or controlled the supporting organization.* **2** | | |

### Section C. Type II Supporting Organizations

| | Yes | No |
|---|---|---|
| **1** Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees of each of the organization's supported organization(s)? *If "No," describe in* **Part VI** *how control or management of the supporting organization was vested in the same persons that controlled or managed the supported organization(s).* **1** | | |

### Section D. All Type III Supporting Organizations

| | Yes | No |
|---|---|---|
| **1** Did the organization provide to each of its supported organizations, by the last day of the fifth month of the organization's tax year, (i) a written notice describing the type and amount of support provided during the prior tax year, (ii) a copy of the Form 990 that was most recently filed as of the date of notification, and (iii) copies of the organization's governing documents in effect on the date of notification, to the extent not previously provided? **1** | | |
| **2** Were any of the organization's officers, directors, or trustees either (i) appointed or elected by the supported organization(s) or (ii) serving on the governing body of a supported organization? *If "No," explain in* **Part VI** *how the organization maintained a close and continuous working relationship with the supported organization(s).* **2** | | |
| **3** By reason of the relationship described in (2), did the organization's supported organizations have a significant voice in the organization's investment policies and in directing the use of the organization's income or assets at all times during the tax year? *If "Yes," describe in* **Part VI** *the role the organization's supported organizations played in this regard.* **3** | | |

### Section E. Type III Functionally Integrated Supporting Organizations

**1** Check the box next to the method that the organization used to satisfy the Integral Part Test during the year **(see instructions).**
**a** ☐ The organization satisfied the Activities Test. *Complete* **line 2** *below.*
**b** ☐ The organization is the parent of each of its supported organizations. *Complete* **line 3** *below.*
**c** ☐ The organization supported a governmental entity. *Describe in* **Part VI** *how you supported a government entity (see instructions).*

| | | Yes | No |
|---|---|---|---|
| **2** | Activities Test. **Answer (a) and (b) below.** | | |
| **a** | Did substantially all of the organization's activities during the tax year directly further the exempt purposes of the supported organization(s) to which the organization was responsive? *If "Yes," then in* **Part VI** *identify those supported organizations and explain how these activities directly furthered their exempt purposes, how the organization was responsive to those supported organizations, and how the organization determined that these activities constituted substantially all of its activities.* **2a** | | |
| **b** | Did the activities described in (a) constitute activities that, but for the organization's involvement, one or more of the organization's supported organization(s) would have been engaged in? *If "Yes," explain in* **Part VI** *the reasons for the organization's position that its supported organization(s) would have engaged in these activities but for the organization's involvement.* **2b** | | |
| **3** | Parent of Supported Organizations. **Answer (a) and (b) below.** | | |
| **a** | Did the organization have the power to regularly appoint or elect a majority of the officers, directors, or trustees of each of the supported organizations? *Provide details in* **Part VI.** **3a** | | |
| **b** | Did the organization exercise a substantial degree of direction over the policies, programs, and activities of each of its supported organizations? *If "Yes," describe in* **Part VI** *the role played by the organization in this regard.* **3b** | | |

17471113  756327  142355                    **AA0178**              VDARE FOUNDATION          142355  1

Schedule A (Form 990 or 990-EZ) 2019  VDARE  FOUNDATION                                22-3691487  Page 6

## Part V — Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations

1 ☐ Check here if the organization satisfied the Integral Part Test as a qualifying trust on Nov. 20, 1970 (explain in Part VI). **See instructions.** All other Type III non-functionally integrated supporting organizations must complete Sections A through E.

| Section A - Adjusted Net Income | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 Net short-term capital gain | 1 | | |
| 2 Recoveries of prior-year distributions | 2 | | |
| 3 Other gross income (see instructions) | 3 | | |
| 4 Add lines 1 through 3. | 4 | | |
| 5 Depreciation and depletion | 5 | | |
| 6 Portion of operating expenses paid or incurred for production or collection of gross income or for management, conservation, or maintenance of property held for production of income (see instructions) | 6 | | |
| 7 Other expenses (see instructions) | 7 | | |
| 8 **Adjusted Net Income** (subtract lines 5, 6, and 7 from line 4) | 8 | | |

| Section B - Minimum Asset Amount | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 Aggregate fair market value of all non-exempt-use assets (see instructions for short tax year or assets held for part of year): | | | |
| a Average monthly value of securities | 1a | | |
| b Average monthly cash balances | 1b | | |
| c Fair market value of other non-exempt-use assets | 1c | | |
| d Total (add lines 1a, 1b, and 1c) | 1d | | |
| e **Discount** claimed for blockage or other factors (explain in detail in **Part VI**): | | | |
| 2 Acquisition indebtedness applicable to non-exempt-use assets | 2 | | |
| 3 Subtract line 2 from line 1d. | 3 | | |
| 4 Cash deemed held for exempt use. Enter 1-1/2% of line 3 (for greater amount, see instructions). | 4 | | |
| 5 Net value of non-exempt-use assets (subtract line 4 from line 3) | 5 | | |
| 6 Multiply line 5 by .035. | 6 | | |
| 7 Recoveries of prior-year distributions | 7 | | |
| 8 **Minimum Asset Amount** (add line 7 to line 6) | 8 | | |

| Section C - Distributable Amount | | | Current Year |
|---|---|---|---|
| 1 Adjusted net income for prior year (from Section A, line 8, Column A) | 1 | | |
| 2 Enter 85% of line 1. | 2 | | |
| 3 Minimum asset amount for prior year (from Section B, line 8, Column A) | 3 | | |
| 4 Enter greater of line 2 or line 3. | 4 | | |
| 5 Income tax imposed in prior year | 5 | | |
| 6 **Distributable Amount.** Subtract line 5 from line 4, unless subject to emergency temporary reduction (see instructions). | 6 | | |

7 ☐ Check here if the current year is the organization's first as a non-functionally integrated Type III supporting organization (see instructions).

Schedule A (Form 990 or 990-EZ) 2019

Schedule A (Form 990 or 990-EZ) 2019 VDARE FOUNDATION                                22-3691487  Page 7

| Part V | Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations *(continued)* | | | |

| Section D - Distributions | | | | Current Year |
|---|---|---|---|---|
| 1 | Amounts paid to supported organizations to accomplish exempt purposes | | | |
| 2 | Amounts paid to perform activity that directly furthers exempt purposes of supported organizations, in excess of income from activity | | | |
| 3 | Administrative expenses paid to accomplish exempt purposes of supported organizations | | | |
| 4 | Amounts paid to acquire exempt-use assets | | | |
| 5 | Qualified set-aside amounts (prior IRS approval required) | | | |
| 6 | Other distributions (describe in **Part VI**). See instructions. | | | |
| 7 | **Total annual distributions.** Add lines 1 through 6. | | | |
| 8 | Distributions to attentive supported organizations to which the organization is responsive (provide details in **Part VI**). See instructions. | | | |
| 9 | Distributable amount for 2019 from Section C, line 6 | | | |
| 10 | Line 8 amount divided by line 9 amount | | | |

| Section E - Distribution Allocations  (see instructions) | (i) Excess Distributions | (ii) Underdistributions Pre-2019 | (iii) Distributable Amount for 2019 |
|---|---|---|---|
| 1 | Distributable amount for 2019 from Section C, line 6 | | | |
| 2 | Underdistributions, if any, for years prior to 2019 (reasonable cause required- explain in **Part VI**). See instructions. | | | |
| 3 | Excess distributions carryover, if any, to 2019 | | | |
| a | From 2014 | | | |
| b | From 2015 | | | |
| c | From 2016 | | | |
| d | From 2017 | | | |
| e | From 2018 | | | |
| f | **Total** of lines 3a through e | | | |
| g | Applied to underdistributions of prior years | | | |
| h | Applied to 2019 distributable amount | | | |
| i | Carryover from 2014 not applied (see instructions) | | | |
| j | Remainder. Subtract lines 3g, 3h, and 3i from 3f. | | | |
| 4 | Distributions for 2019 from Section D, line 7:              $ | | | |
| a | Applied to underdistributions of prior years | | | |
| b | Applied to 2019 distributable amount | | | |
| c | Remainder. Subtract lines 4a and 4b from 4. | | | |
| 5 | Remaining underdistributions for years prior to 2019, if any. Subtract lines 3g and 4a from line 2. For result greater than zero, explain in **Part VI**. See instructions. | | | |
| 6 | Remaining underdistributions for 2019. Subtract lines 3h and 4b from line 1. For result greater than zero, explain in **Part VI**. See instructions. | | | |
| 7 | **Excess distributions carryover to 2020.** Add lines 3j and 4c. | | | |
| 8 | Breakdown of line 7: | | | |
| a | Excess from 2015 | | | |
| b | Excess from 2016 | | | |
| c | Excess from 2017 | | | |
| d | Excess from 2018 | | | |
| e | Excess from 2019 | | | |

Schedule A (Form 990 or 990-EZ) 2019

OMB No. 1545-0047

# SCHEDULE D
(Form 990)

Department of the Treasury
Internal Revenue Service

## Supplemental Financial Statements

▶ Complete if the organization answered "Yes" on Form 990,
Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b.
▶ Attach to Form 990.
▶ Go to www.irs.gov/Form990 for instructions and the latest information.

**2019**

Open to Public
Inspection

| Name of the organization | Employer identification number |
|---|---|
| VDARE FOUNDATION | 22-3691487 |

**Part I** Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts. Complete if the organization answered "Yes" on Form 990, Part IV, line 6.

| | | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year | | |
| 2 | Aggregate value of contributions to (during year) | | |
| 3 | Aggregate value of grants from (during year) | | |
| 4 | Aggregate value at end of year | | |

5 Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds
are the organization's property, subject to the organization's exclusive legal control? ......................................... ☐ Yes ☐ No

6 Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only
for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring
impermissible private benefit? ........................................................................................................................ ☐ Yes ☐ No

**Part II** Conservation Easements. Complete if the organization answered "Yes" on Form 990, Part IV, line 7.

1 Purpose(s) of conservation easements held by the organization (check all that apply).
☐ Preservation of land for public use (for example, recreation or education) ☐ Preservation of a historically important land area
☐ Protection of natural habitat ☐ Preservation of a certified historic structure
☐ Preservation of open space

2 Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last
day of the tax year.

| | | Held at the End of the Tax Year |
|---|---|---|
| a | Total number of conservation easements | 2a | |
| b | Total acreage restricted by conservation easements | 2b | |
| c | Number of conservation easements on a certified historic structure included in (a) | 2c | |
| d | Number of conservation easements included in (c) acquired after 7/25/06, and not on a historic structure listed in the National Register | 2d | |

3 Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax
year ▶

4 Number of states where property subject to conservation easement is located ▶

5 Does the organization have a written policy regarding the periodic monitoring, inspection, handling of
violations, and enforcement of the conservation easements it holds? ............................................................. ☐ Yes ☐ No

6 Staff and volunteer hours devoted to monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
▶

7 Amount of expenses incurred in monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
▶ $

8 Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i)
and section 170(h)(4)(B)(ii)? ........................................................................................................................ ☐ Yes ☐ No

9 In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement and
balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes the
organization's accounting for conservation easements.

**Part III** Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.
Complete if the organization answered "Yes" on Form 990, Part IV, line 8.

1a If the organization elected, as permitted under FASB ASC 958, not to report in its revenue statement and balance sheet works
of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public
service, provide in Part XIII the text of the footnote to its financial statements that describes these items.

b If the organization elected, as permitted under FASB ASC 958, to report in its revenue statement and balance sheet works of
art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service,
provide the following amounts relating to these items:
  (i) Revenue included on Form 990, Part VIII, line 1 ............................................................................ ▶ $
  (ii) Assets included in Form 990, Part X .............................................................................................. ▶ $

2 If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide
the following amounts required to be reported under FASB ASC 958 relating to these items:
a Revenue included on Form 990, Part VIII, line 1 ................................................................................ ▶ $
b Assets included in Form 990, Part X .................................................................................................. ▶ $

LHA **For Paperwork Reduction Act Notice, see the Instructions for Form 990.** Schedule D (Form 990) 2019

932051 10-02-19

Schedule D (Form 990) 2019    VDARE FOUNDATION                                22-3691487   Page **2**

## Part III   Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets *(continued)*

**3**   Using the organization's acquisition, accession, and other records, check any of the following that make significant use of its collection items (check all that apply):

**a** ☐ Public exhibition           **d** ☐ Loan or exchange program

**b** ☐ Scholarly research         **e** ☐ Other _____

**c** ☐ Preservation for future generations

**4**   Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII.

**5**   During the year, did the organization solicit or receive donations of art, historical treasures, or other similar assets
    to be sold to raise funds rather than to be maintained as part of the organization's collection? ......................... ☐ Yes    ☐ No

## Part IV   Escrow and Custodial Arrangements. Complete if the organization answered "Yes" on Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

**1a**   Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included
     on Form 990, Part X? .................................................................................................... ☐ Yes    ☐ No

**b**   If "Yes," explain the arrangement in Part XIII and complete the following table:

| | | Amount |
|---|---|---|
| **c** Beginning balance .......................................... | **1c** | |
| **d** Additions during the year ............................... | **1d** | |
| **e** Distributions during the year ......................... | **1e** | |
| **f** Ending balance ............................................. | **1f** | |

**2a**   Did the organization include an amount on Form 990, Part X, line 21, for escrow or custodial account liability? ............ ☐ Yes    ☐ No

**b**   If "Yes," explain the arrangement in Part XIII. Check here if the explanation has been provided on Part XIII ............... ☐

## Part V   Endowment Funds. Complete if the organization answered "Yes" on Form 990, Part IV, line 10.

| | (a) Current year | (b) Prior year | (c) Two years back | (d) Three years back | (e) Four years back |
|---|---|---|---|---|---|
| **1a** Beginning of year balance ............... | | | | | |
| **b** Contributions ................................. | | | | | |
| **c** Net Investment earnings, gains, and losses | | | | | |
| **d** Grants or scholarships ................... | | | | | |
| **e** Other expenditures for facilities and programs .................................... | | | | | |
| **f** Administrative expenses ................ | | | | | |
| **g** End of year balance ...................... | | | | | |

**2**   Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as:

**a**   Board designated or quasi-endowment ▶ _____ %

**b**   Permanent endowment ▶ _____ %

**c**   Term endowment ▶ _____ %

The percentages on lines 2a, 2b, and 2c should equal 100%.

**3a**   Are there endowment funds not in the possession of the organization that are held and administered for the organization
     by:

| | | Yes | No |
|---|---|---|---|
| (i) Unrelated organizations ............................................................................................... | **3a(i)** | | |
| (ii) Related organizations ................................................................................................ | **3a(ii)** | | |
| **b** If "Yes" on line 3a(ii), are the related organizations listed as required on Schedule R? ........................ | **3b** | | |

**4**   Describe in Part XIII the intended uses of the organization's endowment funds.

## Part VI   Land, Buildings, and Equipment.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11a. See Form 990, Part X, line 10.

| Description of property | (a) Cost or other basis (investment) | (b) Cost or other basis (other) | (c) Accumulated depreciation | (d) Book value |
|---|---|---|---|---|
| **1a** Land ............................................. | | | ▨▨▨▨▨▨ | |
| **b** Buildings ...................................... | | | | |
| **c** Leasehold improvements ............... | | | | |
| **d** Equipment .................................... | | 28,835. | 28,835. | 0. |
| **e** Other ........................................... | | | | |
| **Total.** Add lines 1a through 1e. *(Column (d) must equal Form 990, Part X, column (B), line 10c.)* ......................... ▶ | | | | 0. |

Schedule D (Form 990) 2019

932052 10-02-19

17471113   756327   142355            2019.04000   VDARE FOUNDATION        142355_1

Schedule D (Form 990) 2019    VDARE FOUNDATION                               22-3691487   Page **3**

| **Part VII** | **Investments - Other Securities.** | | |
|---|---|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 11b. See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| **(1)** Financial derivatives | | |
| **(2)** Closely held equity interests | | |
| **(3)** Other | | |
| (A) | | |
| (B) | | |
| (C) | | |
| (D) | | |
| (E) | | |
| (F) | | |
| (G) | | |
| (H) | | |
| **Total.** (Col. (b) must equal Form 990, Part X, col. (B) line 12.) ▶ | | |

| **Part VIII** | **Investments - Program Related.** | | |
|---|---|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 11c. See Form 990, Part X, line 13.

| (a) Description of investment | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| **(1)** | | |
| **(2)** | | |
| **(3)** | | |
| **(4)** | | |
| **(5)** | | |
| **(6)** | | |
| **(7)** | | |
| **(8)** | | |
| **(9)** | | |
| **Total.** (Col. (b) must equal Form 990, Part X, col. (B) line 13.) ▶ | | |

| **Part IX** | **Other Assets.** | |
|---|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 11d. See Form 990, Part X, line 15.

| (a) Description | (b) Book value |
|---|---|
| **(1)** | |
| **(2)** | |
| **(3)** | |
| **(4)** | |
| **(5)** | |
| **(6)** | |
| **(7)** | |
| **(8)** | |
| **(9)** | |
| **Total.** (Column (b) must equal Form 990, Part X, col. (B) line 15.) ▶ | |

| **Part X** | **Other Liabilities.** | |
|---|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 11e or 11f. See Form 990, Part X, line 25.

| **1.** | (a) Description of liability | (b) Book value |
|---|---|---|
| **(1)** Federal income taxes | | |
| **(2)** | | |
| **(3)** | | |
| **(4)** | | |
| **(5)** | | |
| **(6)** | | |
| **(7)** | | |
| **(8)** | | |
| **(9)** | | |
| **Total.** (Column (b) must equal Form 990, Part X, col. (B) line 25.) ▶ | | |

**2.** Liability for uncertain tax positions. In Part XIII, provide the text of the footnote to the organization's financial statements that reports the
organization's liability for uncertain tax positions under FASB ASC 740. Check here if the text of the footnote has been provided in Part XIII ☐

Schedule D (Form 990) 2019

932053 10-02-19

17471113  756327  142255                    **AA0183**00  VDARE  FOUNDATION            142255  1

Schedule D (Form 990) 2019     VDARE FOUNDATION                                22-3691487   Page 4

## Part XI | Reconciliation of Revenue per Audited Financial Statements With Revenue per Return.

Complete if the organization answered "Yes" on Form 990, Part IV, line 12a.

| | | | |
|---|---|---|---|
| 1 | Total revenue, gains, and other support per audited financial statements | | **1** | |
| 2 | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | | |
| a | Net unrealized gains (losses) on investments | 2a | | |
| b | Donated services and use of facilities | 2b | | |
| c | Recoveries of prior year grants | 2c | | |
| d | Other (Describe in Part XIII.) | 2d | | |
| e | Add lines 2a through 2d | | **2e** | |
| 3 | Subtract line 2e from line 1 | | **3** | |
| 4 | Amounts included on Form 990, Part VIII, line 12, but not on line 1: | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | | |
| b | Other (Describe in Part XIII.) | 4b | | |
| c | Add lines 4a and 4b | | **4c** | |
| 5 | Total revenue. Add lines 3 and 4c. *(This must equal Form 990, Part I, line 12.)* | | **5** | |

## Part XII | Reconciliation of Expenses per Audited Financial Statements With Expenses per Return.

Complete if the organization answered "Yes" on Form 990, Part IV, line 12a.

| | | | |
|---|---|---|---|
| 1 | Total expenses and losses per audited financial statements | | **1** | |
| 2 | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | | |
| a | Donated services and use of facilities | 2a | | |
| b | Prior year adjustments | 2b | | |
| c | Other losses | 2c | | |
| d | Other (Describe in Part XIII.) | 2d | | |
| e | Add lines 2a through 2d | | **2e** | |
| 3 | Subtract line 2e from line 1 | | **3** | |
| 4 | Amounts included on Form 990, Part IX, line 25, but not on line 1: | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | | |
| b | Other (Describe in Part XIII.) | 4b | | |
| c | Add lines 4a and 4b | | **4c** | |
| 5 | Total expenses. Add lines 3 and 4c. *(This must equal Form 990, Part I, line 18.)* | | **5** | |

## Part XIII | Supplemental Information.

Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information.

17471113  756327  142255                    **AA0184**          VDARE  FOUNDATION            142255  1

| SCHEDULE J | **Compensation Information** | OMB No. 1545-0047 |
|---|---|---|
| **(Form 990)** | For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees | **2019** |
| Department of the Treasury Internal Revenue Service | ► Complete if the organization answered "Yes" on Form 990, Part IV, line 23. ► Attach to Form 990. ► Go to www.irs.gov/Form990 for instructions and the latest information. | Open to Public Inspection |

| Name of the organization | Employer identification number |
|---|---|
| VDARE FOUNDATION | 22-3691487 |

**Part I | Questions Regarding Compensation**

| | | Yes | No |
|---|---|---|---|

**1a** Check the appropriate box(es) if the organization provided any of the following to or for a person listed on Form 990, Part VII, Section A, line 1a. Complete Part III to provide any relevant information regarding these items.

- [ ] First-class or charter travel
- [ ] Travel for companions
- [ ] Tax indemnification and gross-up payments
- [ ] Discretionary spending account
- [ ] Housing allowance or residence for personal use
- [ ] Payments for business use of personal residence
- [ ] Health or social club dues or initiation fees
- [ ] Personal services (such as maid, chauffeur, chef)

**b** If any of the boxes on line 1a are checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain ............ **1b**

**2** Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all directors, trustees, and officers, including the CEO/Executive Director, regarding the items checked on line 1a? ................... **2**

**3** Indicate which, if any, of the following the organization used to establish the compensation of the organization's CEO/Executive Director. Check all that apply. Do not check any boxes for methods used by a related organization to establish compensation of the CEO/Executive Director, but explain in Part III.

- [ ] Compensation committee
- [ ] Independent compensation consultant
- [ ] Form 990 of other organizations
- [ ] Written employment contract
- [ ] Compensation survey or study
- [ ] Approval by the board or compensation committee

**4** During the year, did any person listed on Form 990, Part VII, Section A, line 1a, with respect to the filing organization or a related organization:

| | | | |
|---|---|---|---|
| **a** Receive a severance payment or change-of-control payment? ................................ | **4a** | | X |
| **b** Participate in, or receive payment from, a supplemental nonqualified retirement plan? ............................ | **4b** | | X |
| **c** Participate in, or receive payment from, an equity-based compensation arrangement? ............................ | **4c** | | X |

If "Yes" to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III.

**Only section 501(c)(3), 501(c)(4), and 501(c)(29) organizations must complete lines 5-9.**

**5** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of:

| | | | |
|---|---|---|---|
| **a** The organization? ................................................ | **5a** | | X |
| **b** Any related organization? ............................................ | **5b** | | X |

If "Yes" on line 5a or 5b, describe in Part III.

**6** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of:

| | | | |
|---|---|---|---|
| **a** The organization? ................................................ | **6a** | | X |
| **b** Any related organization? ............................................ | **6b** | | X |

If "Yes" on line 6a or 6b, describe in Part III.

**7** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization provide any nonfixed payments not described on lines 5 and 6? If "Yes," describe in Part III ................................... **7** ......... X

**8** Were any amounts reported on Form 990, Part VII, paid or accrued pursuant to a contract that was subject to the initial contract exception described in Regulations section 53.4958-4(a)(3)? If "Yes," describe in Part III ................... **8** ......... X

**9** If "Yes" on line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53.4958-6(c)? ................................................ **9**

LHA  **For Paperwork Reduction Act Notice, see the Instructions for Form 990.**  Schedule J (Form 990) 2019

932111 10-21-19

17471113 756327 142355

Schedule J (Form 990) 2019    VDARE FOUNDATION      22-3691487      Page 2

**Part II**   **Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees.** Use duplicate copies if additional space is needed.

For each individual whose compensation must be reported on Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii).
Do not list any individuals that aren't listed on Form 990, Part VII.

**Note:** The sum of columns (B)(i)-(iii) for each listed individual must equal the total amount of Form 990, Part VII, Section A, line 1a, applicable column (D) and (E) amounts for that individual.

| (A) Name and Title | | (B) Breakdown of W-2 and/or 1099-MISC compensation | | | (C) Retirement and other deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)-(D) | (F) Compensation in column (B) reported as deferred on prior Form 990 |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base compensation | (ii) Bonus & incentive compensation | (iii) Other reportable compensation | | | | |
| (1) PETER BRIMELOW | (i) | 0. | 0. | 345,364. | 0. | 0. | 345,364. | 0. |
| CHAIRMAN | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |

Schedule J (Form 990) 2019

932112 10-21-19

**AA0186**

**SCHEDULE L**
**(Form 990 or 990-EZ)**

Department of the Treasury
Internal Revenue Service

# Transactions With Interested Persons

▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 25a, 25b, 26, 27, 28a, 28b, or 28c, or Form 990-EZ, Part V, line 38a or 40b.

▶ Attach to Form 990 or Form 990-EZ.

▶ Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No. 1545-0047

**2019**

Open To Public Inspection

Name of the organization

VDARE FOUNDATION

Employer identification number

22-3691487

**Part I** | **Excess Benefit Transactions** (section 501(c)(3), section 501(c)(4), and section 501(c)(29) organizations only).

Complete if the organization answered "Yes" on Form 990, Part IV, line 25a or 25b, or Form 990-EZ, Part V, line 40b.

| 1 (a) Name of disqualified person | (b) Relationship between disqualified person and organization | (c) Description of transaction | (d) Corrected? | |
|---|---|---|---|---|
| | | | Yes | No |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

2 Enter the amount of tax incurred by the organization managers or disqualified persons during the year under section 4958 .................................................................................................................. ▶ $ _____

3 Enter the amount of tax, if any, on line 2, above, reimbursed by the organization ............................... ▶ $ _____

**Part II** | **Loans to and/or From Interested Persons.**

Complete if the organization answered "Yes" on Form 990-EZ, Part V, line 38a or Form 990, Part IV, line 26; or if the organization reported an amount on Form 990, Part X, line 5, 6, or 22.

| (a) Name of interested person | (b) Relationship with organization | (c) Purpose of loan | (d) Loan to or from the organization? | | (e) Original principal amount | (f) Balance due | (g) In default? | | (h) Approved by board or committee? | | (i) Written agreement? | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | To | From | | | Yes | No | Yes | No | Yes | No |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Total** | | | | | ▶ $ | | | | | | | |

**Part III** | **Grants or Assistance Benefiting Interested Persons.**

Complete if the organization answered "Yes" on Form 990, Part IV, line 27.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of assistance | (d) Type of assistance | (e) Purpose of assistance |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

LHA   For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.

Schedule L (Form 990 or 990-EZ) 2019

932131 10-21-19

**AA0187**

Schedule L (Form 990 or 990-EZ) 2019  VDARE FOUNDATION                                   22-3691487  Page **2**

**Part IV**  **Business Transactions Involving Interested Persons.**

Complete if the organization answered "Yes" on Form 990, Part IV, line 28a, 28b, or 28c.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of transaction | (d) Description of transaction | (e) Sharing of organization's revenues? | |
|---|---|---|---|---|---|
| | | | | Yes | No |
| HAPPY PENGUINS LLC | LIMITED LIABILITY C | 0. | ORGANIZATIO | | X |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Part V**  **Supplemental Information.**

Provide additional information for responses to questions on Schedule L (see instructions).

SCH L, PART IV, BUSINESS TRANSACTIONS INVOLVING INTERESTED PERSONS:

(A)  NAME OF PERSON: HAPPY PENGUINS LLC

(B)  RELATIONSHIP BETWEEN INTERESTED PERSON AND ORGANIZATION:

LIMITED LIABILITY COMPANY OWNED PETER BRIMELOW (CHAIRMAN)

(D)  DESCRIPTION OF TRANSACTION: ORGANIZATION LEASES CHAIRMAN, PETER

BRIMELOW, TO VDARE FOUNDATION

Schedule L (Form 990 or 990-EZ) 2019

932132 10-21-19

**AA0188**

Case 1:22-cv-01337-PJS-DFH Document 35 Filed 01/18/23 Page 297 of 31

**SCHEDULE O**
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

**Supplemental Information to Form 990 or 990-EZ**

Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.
▶ Attach to Form 990 or 990-EZ.
▶ Go to www.irs.gov/Form990 for the latest information.

OMB No. 1545-0047

**2019**

**Open to Public Inspection**

Name of the organization

VDARE FOUNDATION

Employer identification number

22-3691487

FORM 990, PART VI, SECTION A, LINE 2:

PETER BRIMELOW, CHAIRMAN, AND JOHN BRIMELOW, DIRECTOR, ARE BROTHERS.


FORM 990, PART VI, SECTION B, LINE 11B:

FORM 990 IS PROVIDED TO EACH DIRECTOR PRIOR TO FILING.


FORM 990, PART VI, SECTION B, LINE 12C:

MONITORS AND COMPLIES ANNUALLY.


FORM 990, PART VI, SECTION C, LINE 19:

DOCUMENTS ARE MADE AVAILABLE UPON REQUEST


FORM 990, PART IX, LINE 11G, OTHER FEES:

FUNDRAISING FEES - PAYPAL & STRIPE:

| | |
|---|---:|
| PROGRAM SERVICE EXPENSES | 0. |
| MANAGEMENT AND GENERAL EXPENSES | 0. |
| FUNDRAISING EXPENSES | 11,994. |
| TOTAL EXPENSES | 11,994. |


VIRTUAL ASSISTANT FEE:

| | |
|---|---:|
| PROGRAM SERVICE EXPENSES | 5,880. |
| MANAGEMENT AND GENERAL EXPENSES | 0. |
| FUNDRAISING EXPENSES | 0. |
| TOTAL EXPENSES | 5,880. |


ADMIN ASSISTANT FEE:

LHA  **For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.**                    Schedule O (Form 990 or 990-EZ) (2019)

932211  09-06-19



Schedule O (Form 990 or 990-EZ) (2019)                                                              Page **2**

| Name of the organization | Employer identification number |
|---|---|
| VDARE FOUNDATION | 22-3691487 |

PROGRAM SERVICE EXPENSES                                                                          0.

MANAGEMENT AND GENERAL EXPENSES                                                            84,334.

FUNDRAISING EXPENSES                                                                              0.

TOTAL EXPENSES                                                                               84,334.


PROFESSIONAL CONSULTANT:

PROGRAM SERVICE EXPENSES                                                                          0.

MANAGEMENT AND GENERAL EXPENSES                                                             9,000.

FUNDRAISING EXPENSES                                                                              0.

TOTAL EXPENSES                                                                                9,000.


BANK FEES:

PROGRAM SERVICE EXPENSES                                                                          0.

MANAGEMENT AND GENERAL EXPENSES                                                               600.

FUNDRAISING EXPENSES                                                                              0.

TOTAL EXPENSES                                                                                  600.

TOTAL OTHER FEES ON FORM 990, PART IX, LINE 11G, COL A                                      111,808.

932212 09-06-19

17471113 756327 142255                   37                        AA0190             142255 1

EXHIBIT D

EXTENDED TO NOVEMBER 15, 2019

Form **990**

Department of the Treasury
Internal Revenue Service

## Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ Do not enter social security numbers on this form as it may be made public.

▶ Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No. 1545-0047

**2018**

Open to Public Inspection

**A** For the 2018 calendar year, or tax year beginning _____ and ending _____

| B Check if applicable: | C Name of organization | | D Employer identification number |
|---|---|---|---|
| ☐ Address change | VDARE FOUNDATION | | |
| ☐ Name change | Doing business as | | 22-3691487 |
| ☐ Initial return | Number and street (or P.O. box if mail is not delivered to street address) | Room/suite | E Telephone number |
| ☐ Final return/terminated | 447 SOUTH STREET | | 860-361-6231 |
| ☐ Amended return | City or town, state or province, country, and ZIP or foreign postal code | | G Gross receipts $ 698,157. |
| ☐ Application pending | LITCHFIELD, CT 06759 | | H(a) Is this a group return |
| | F Name and address of principal officer: PETER BRIMELOW | | for subordinates? ☐ Yes ☒ No |
| | SAME AS C ABOVE | | H(b) Are all subordinates included? ☐ Yes ☐ No |

**I** Tax-exempt status: ☒ 501(c)(3) ☐ 501(c) ( ) ◀ (insert no.) ☐ 4947(a)(1) or ☐ 527   If "No," attach a list. (see instructions)

**J** Website: ▶ WWW.VDARE.COM   H(c) Group exemption number ▶

**K** Form of organization: ☒ Corporation ☐ Trust ☐ Association ☐ Other ▶   **L** Year of formation: 1999   **M** State of legal domicile: NY

### Part I | Summary

| | | | |
|---|---|---|---|
| 1 | Briefly describe the organization's mission or most significant activities: CREATE AND MANAGE INTERNET PUBLICATION | | |
| 2 | Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets. | | |
| 3 | Number of voting members of the governing body (Part VI, line 1a) | 3 | 3 |
| 4 | Number of independent voting members of the governing body (Part VI, line 1b) | 4 | 2 |
| 5 | Total number of individuals employed in calendar year 2018 (Part V, line 2a) | 5 | 0 |
| 6 | Total number of volunteers (estimate if necessary) | 6 | 0 |
| 7 a | Total unrelated business revenue from Part VIII, column (C), line 12 | 7a | 0. |
| b | Net unrelated business taxable income from Form 990-T, line 38 | 7b | 0. |

| | | Prior Year | Current Year |
|---|---|---|---|
| 8 | Contributions and grants (Part VIII, line 1h) | 385,988. | 500,672. |
| 9 | Program service revenue (Part VIII, line 2g) | 4,726. | 4,875. |
| 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d) | -70,778. | 205. |
| 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 57,988. | 192,405. |
| 12 | Total revenue - add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 377,924. | 698,157. |
| 13 | Grants and similar amounts paid (Part IX, column (A), lines 1-3) | 0. | 0. |
| 14 | Benefits paid to or for members (Part IX, column (A), line 4) | 0. | 0. |
| 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | 148,303. | 181,675. |
| 16a | Professional fundraising fees (Part IX, column (A), line 11e) | 0. | 0. |
| b | Total fundraising expenses (Part IX, column (D), line 25) ▶ 15,795. | | |
| 17 | Other expenses (Part IX, column (A), lines 11a-11d, 11f-24e) | 307,088. | 499,423. |
| 18 | Total expenses. Add lines 13-17 (must equal Part IX, column (A), line 25) | 455,391. | 681,098. |
| 19 | Revenue less expenses. Subtract line 18 from line 12 | -77,467. | 17,059. |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| 20 | Total assets (Part X, line 16) | 173,863. | 187,130. |
| 21 | Total liabilities (Part X, line 26) | 9,881. | 7,309. |
| 22 | Net assets or fund balances. Subtract line 21 from line 20 | 163,982. | 179,821. |

### Part II | Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| Sign Here | Signature of officer | | Date |
|---|---|---|---|
| | PETER BRIMELOW, CHAIRMAN | | |
| | Type or print name and title | | |

| Paid Preparer Use Only | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
| | PAMELA J. MATOCHA | | | | P00572001 |
| | Firm's name ▶ T. M. BYXBEE COMPANY, P.C. | | | Firm's EIN ▶ 06-1386456 | |
| | Firm's address ▶ P. O. BOX 187169 | | | | |
| | HAMDEN, CT 06518 | | | Phone no. (203) 281-4933 | |

May the IRS discuss this return with the preparer shown above? (see instructions) ☒ Yes ☐ No

823001 12-31-18   LHA **For Paperwork Reduction Act Notice, see the separate instructions.**   Form **990** (2018)

**AA0192**

Form 990 (2018)      VDARE FOUNDATION                        22-3691487    Page **2**

| Part III | Statement of Program Service Accomplishments |

Check if Schedule O contains a response or note to any line in this Part III ............................................... ☐

1   Briefly describe the organization's mission:    NONE

_____

_____

_____

2   Did the organization undertake any significant program services during the year which were not listed on the
prior Form 990 or 990-EZ? ........................................................................................................... ☐ Yes ☒ No
If "Yes," describe these new services on Schedule O.

3   Did the organization cease conducting, or make significant changes in how it conducts, any program services? ................ ☐ Yes ☒ No
If "Yes," describe these changes on Schedule O.

4   Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses.
Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total expenses, and
revenue, if any, for each program service reported.

4a   (Code: _____ ) (Expenses $      564,898.   including grants of $ _____ ) (Revenue $     197,280. )
    CREATE AND MANAGE INTERNET PUBLICATION

_____

_____

_____

_____

_____

_____

_____

_____

_____

4b   (Code: _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

_____

_____

_____

_____

_____

_____

_____

_____

_____

4c   (Code: _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

_____

_____

_____

_____

_____

_____

_____

_____

4d   Other program services (Describe in Schedule O.)
(Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

4e   Total program service expenses ▶      564,898.

Form **990** (2018)

832002 12-31-18

10040817 756327 142255              2018.06010 VDARE FOUNDATION        142255_1

**AA0193**

Form 990 (2018)     VDARE FOUNDATION     22-3691487     Page **3**

## Part IV | Checklist of Required Schedules

| | | Yes | No |
|---|---|---|---|
| 1 | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? If "Yes," complete Schedule A ................................................................................................... **1** | X | |
| 2 | Is the organization required to complete Schedule B, Schedule of Contributors? ............................ **2** | | X |
| 3 | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? If "Yes," complete Schedule C, Part I ................................................................ **3** | | X |
| 4 | Section 501(c)(3) organizations. Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? If "Yes," complete Schedule C, Part II .................................................. **4** | | X |
| 5 | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Revenue Procedure 98-19? If "Yes," complete Schedule C, Part III .................... **5** | | X |
| 6 | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? If "Yes," complete Schedule D, Part I **6** | | X |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? If "Yes," complete Schedule D, Part II ................... **7** | | X |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? If "Yes," complete Schedule D, Part III .......................................................................................... **8** | | X |
| 9 | Did the organization report an amount in Part X, line 21, for escrow or custodial account liability, serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services? If "Yes," complete Schedule D, Part IV .................................................................................. **9** | | X |
| 10 | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi-endowments? If "Yes," complete Schedule D, Part V ............................................. **10** | | X |
| 11 | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable. | | |
| a | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? If "Yes," complete Schedule D, Part VI ........................................................................................................ **11a** | X | |
| b | Did the organization report an amount for investments - other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VII ........................................... **11b** | | X |
| c | Did the organization report an amount for investments - program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VIII .......................................... **11c** | | X |
| d | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part IX .................................................................. **11d** | | X |
| e | Did the organization report an amount for other liabilities in Part X, line 25? If "Yes," complete Schedule D, Part X .......... **11e** | | X |
| f | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? If "Yes," complete Schedule D, Part X .......... **11f** | | X |
| 12a | Did the organization obtain separate, independent audited financial statements for the tax year? If "Yes," complete Schedule D, Parts XI and XII ............................................................................................... **12a** | | X |
| b | Was the organization included in consolidated, independent audited financial statements for the tax year? If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional ............... **12b** | | X |
| 13 | Is the organization a school described in section 170(b)(1)(A)(ii)? If "Yes," complete Schedule E ............................ **13** | | X |
| 14a | Did the organization maintain an office, employees, or agents outside of the United States? .................................. **14a** | | X |
| b | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? If "Yes," complete Schedule F, Parts I and IV ......................................................... **14b** | | X |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? If "Yes," complete Schedule F, Parts II and IV ............................................. **15** | | X |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? If "Yes," complete Schedule F, Parts III and IV ...................................... **16** | | X |
| 17 | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? If "Yes," complete Schedule G, Part I .......................................... **17** | | X |
| 18 | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? If "Yes," complete Schedule G, Part II ................................................................. **18** | | X |
| 19 | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? If "Yes," complete Schedule G, Part III ......................................................................................... **19** | | X |
| 20a | Did the organization operate one or more hospital facilities? If "Yes," complete Schedule H ............................ **20a** | | X |
| b | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? .................... **20b** | | |
| 21 | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? If "Yes," complete Schedule I, Parts I and II .......................... **21** | | X |

832003 12-31-18

5

Form **990** (2018)

**AA0194**

Form 990 (2018)      VDARE FOUNDATION      22-3691487      Page **4**

**Part IV | Checklist of Required Schedules** *(continued)*

| | | Yes | No |
|---|---|---|---|
| 22 | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III*    **22** | | X |
| 23 | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J*    **23** | X | |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K. If "No," go to line 25a*    **24a** | | X |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception?    **24b** | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds?    **24c** | | |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year?    **24d** | | |
| 25a | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L, Part I*    **25a** | | X |
| b | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L, Part I*    **25b** | | X |
| 26 | Did the organization report any amount on Part X, line 5, 6, or 22 for receivables from or payables to any current or former officers, directors, trustees, key employees, highest compensated employees, or disqualified persons? *If "Yes," complete Schedule L, Part II*    **26** | | X |
| 27 | Did the organization provide a grant or other assistance to an officer, director, trustee, key employee, substantial contributor or employee thereof, a grant selection committee member, or to a 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part III*    **27** | | X |
| 28 | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions): | | |
| a | A current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV*    **28a** | X | |
| b | A family member of a current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV*    **28b** | | X |
| c | An entity of which a current or former officer, director, trustee, or key employee (or a family member thereof) was an officer, director, trustee, or direct or indirect owner? *If "Yes," complete Schedule L, Part IV*    **28c** | | X |
| 29 | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M*    **29** | | X |
| 30 | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M*    **30** | | X |
| 31 | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I*    **31** | | X |
| 32 | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II*    **32** | | X |
| 33 | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? *If "Yes," complete Schedule R, Part I*    **33** | | X |
| 34 | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1*    **34** | | X |
| 35a | Did the organization have a controlled entity within the meaning of section 512(b)(13)?    **35a** | | X |
| b | If "Yes" to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2*    **35b** | | |
| 36 | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2*    **36** | | X |
| 37 | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI*    **37** | | X |
| 38 | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O.    **38** | X | |

**Part V | Statements Regarding Other IRS Filings and Tax Compliance**

Check if Schedule O contains a response or note to any line in this Part V     ☐

| | | | | Yes | No |
|---|---|---|---|---|---|
| 1a | Enter the number reported in Box 3 of Form 1096. Enter -0- if not applicable | **1a** | 0 | | |
| b | Enter the number of Forms W-2G included in line 1a. Enter -0- if not applicable | **1b** | 0 | | |
| c | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners?    **1c** | | | | | |

832004 12-31-18        Form **990** (2018)

10040817 756327 142255      2018.06010 VDARE FOUNDATION      142255_1

**AA0195**

Form 990 (2018)     VDARE FOUNDATION        22-3691487    Page **5**

| Part V | Statements Regarding Other IRS Filings and Tax Compliance *(continued)* |
|---|---|

|  |  |  | Yes | No |
|---|---|---|---|---|
| **2a** | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return | **2a** | 0 |  |  |
| **b** | If at least one is reported on line 2a, did the organization file all required federal employment tax returns? | **2b** |  |  |
|  | **Note.** If the sum of lines 1a and 2a is greater than 250, you may be required to *e-file (see instructions)* |  |  |  |
| **3a** | Did the organization have unrelated business gross income of $1,000 or more during the year? | **3a** |  | X |
| **b** | If "Yes," has it filed a Form 990-T for this year? *If "No" to line 3b, provide an explanation in Schedule O* | **3b** |  |  |
| **4a** | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? | **4a** |  | X |
| **b** | If "Yes," enter the name of the foreign country: ▶ |  |  |  |
|  | See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). |  |  |  |
| **5a** | Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? | **5a** |  | X |
| **b** | Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | **5b** |  | X |
| **c** | If "Yes" to line 5a or 5b, did the organization file Form 8886-T? | **5c** |  |  |
| **6a** | Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? | **6a** |  | X |
| **b** | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? | **6b** |  |  |
| **7** | **Organizations that may receive deductible contributions under section 170(c).** |  |  |  |
| **a** | Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? | **7a** |  | X |
| **b** | If "Yes," did the organization notify the donor of the value of the goods or services provided? | **7b** |  |  |
| **c** | Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? | **7c** |  | X |
| **d** | If "Yes," indicate the number of Forms 8282 filed during the year | **7d** |  |  |  |
| **e** | Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | **7e** |  |  |
| **f** | Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? | **7f** |  |  |
| **g** | If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? | **7g** |  |  |
| **h** | If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? | **7h** |  |  |
| **8** | **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? | **8** |  |  |
| **9** | **Sponsoring organizations maintaining donor advised funds.** |  |  |  |
| **a** | Did the sponsoring organization make any taxable distributions under section 4966? | **9a** |  |  |
| **b** | Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? | **9b** |  |  |
| **10** | **Section 501(c)(7) organizations.** Enter: |  |  |  |
| **a** | Initiation fees and capital contributions included on Part VIII, line 12 | **10a** |  |  |  |
| **b** | Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | **10b** |  |  |  |
| **11** | **Section 501(c)(12) organizations.** Enter: |  |  |  |
| **a** | Gross income from members or shareholders | **11a** |  |  |  |
| **b** | Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them.) | **11b** |  |  |  |
| **12a** | **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | **12a** |  |  |
| **b** | If "Yes," enter the amount of tax-exempt interest received or accrued during the year | **12b** |  |  |  |
| **13** | **Section 501(c)(29) qualified nonprofit health insurance issuers.** |  |  |  |
| **a** | Is the organization licensed to issue qualified health plans in more than one state? | **13a** |  |  |
|  | **Note.** See the instructions for additional information the organization must report on Schedule O. |  |  |  |
| **b** | Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans | **13b** |  |  |  |
| **c** | Enter the amount of reserves on hand | **13c** |  |  |  |
| **14a** | Did the organization receive any payments for indoor tanning services during the tax year? | **14a** |  | X |
| **b** | If "Yes," has it filed a Form 720 to report these payments? *If "No," provide an explanation in Schedule O* | **14b** |  |  |
| **15** | Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? | **15** |  | X |
|  | If "Yes," see instructions and file Form 4720, Schedule N. |  |  |  |
| **16** | Is the organization an educational institution subject to the section 4968 excise tax on net investment income? | **16** |  | X |
|  | If "Yes," complete Form 4720, Schedule O. |  |  |  |

Form **990** (2018)

832005 12-31-18

10040817 756327 142255       2018.06010 VDARE FOUNDATION       142255_1

**AA0196**

Form 990 (2018)     VDARE FOUNDATION            22-3691487     Page **6**

**Part VI** | **Governance, Management, and Disclosure** *For each "Yes" response to lines 2 through 7b below, and for a "No" response to line 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.*

Check if Schedule O contains a response or note to any line in this Part VI ........................................................................ ☒

## Section A. Governing Body and Management

| | | | | Yes | No |
|---|---|---|---|---|---|
| 1a | Enter the number of voting members of the governing body at the end of the tax year ................ | 1a | 3 | | |
| | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O. | | | | |
| b | Enter the number of voting members included in line 1a, above, who are independent .............. | 1b | 2 | | |
| 2 | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? ................................................................................. | | | 2 | X | |
| 3 | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors, or trustees, or key employees to a management company or other person? ...................... | | | 3 | | X |
| 4 | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? .............. | | | 4 | | X |
| 5 | Did the organization become aware during the year of a significant diversion of the organization's assets? ...................... | | | 5 | | X |
| 6 | Did the organization have members or stockholders? ............................................................................. | | | 6 | | X |
| 7a | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? ............................................................................................. | | | 7a | | X |
| b | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? ......................................................................................... | | | 7b | | X |
| 8 | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | | | |
| a | The governing body? ............................................................................................................. | | | 8a | X | |
| b | Each committee with authority to act on behalf of the governing body? .......................................... | | | 8b | X | |
| 9 | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* ................................... | | | 9 | | X |

## Section B. Policies *(This Section B requests information about policies not required by the Internal Revenue Code.)*

| | | | Yes | No |
|---|---|---|---|---|
| 10a | Did the organization have local chapters, branches, or affiliates? ................................................. | 10a | | X |
| b | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? ..................... | 10b | | |
| 11a | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? | 11a | X | |
| b | Describe in Schedule O the process, if any, used by the organization to review this Form 990. | | | |
| 12a | Did the organization have a written conflict of interest policy? *If "No," go to line 13* ............................ | 12a | X | |
| b | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? | 12b | X | |
| c | Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe in Schedule O how this was done* ................................................................................................. | 12c | X | |
| 13 | Did the organization have a written whistleblower policy? ........................................................... | 13 | | X |
| 14 | Did the organization have a written document retention and destruction policy? ...................................... | 14 | | X |
| 15 | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| a | The organization's CEO, Executive Director, or top management official ............................................. | 15a | | X |
| b | Other officers or key employees of the organization ................................................................. | 15b | | X |
| | If "Yes" to line 15a or 15b, describe the process in Schedule O (see instructions). | | | |
| 16a | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? ......................................................................................... | 16a | | X |
| b | If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? ................................................................................ | 16b | | |

## Section C. Disclosure

| | |
|---|---|
| 17 | List the states with which a copy of this Form 990 is required to be filed ▶ NY |
| 18 | Section 6104 requires an organization to make its Forms 1023 (1024 or 1024-A if applicable), 990, and 990-T (Section 501(c)(3)s only) available for public inspection. Indicate how you made these available. Check all that apply.<br>☐ Own website    ☐ Another's website    ☒ Upon request    ☐ Other *(explain in Schedule O)* |
| 19 | Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year. |
| 20 | State the name, address, and telephone number of the person who possesses the organization's books and records ▶<br>LYDIA BRIMELOW - 860-361-6231<br>447 SOUTH STREET, LITCHFIELD, CT    06759 |

832006 12-31-18                                             Form **990** (2018)

10040817 756327 142255            2018.06010 VDARE FOUNDATION           142255_1

**AA0197**

Form 990 (2018)      VDARE FOUNDATION      22-3691487    Page **7**

| **Part VII** | **Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors** |

Check if Schedule O contains a response or note to any line in this Part VII ......................................................... ☐

**Section A.**   Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

• List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

• List all of the organization's **current** key employees, if any. See instructions for definition of "key employee."

• List the organization's five **current** highest compensated employees (other than an officer, director, trustee, or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations.

• List all of the organization's **former** officers, key employees, and highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

• List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

List persons in the following order: individual trustees or directors; institutional trustees; officers; key employees; highest compensated employees; and former such persons.

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A)<br>Name and Title | (B)<br>Average<br>hours per<br>week<br>(list any<br>hours for<br>related<br>organizations<br>below<br>line) | (C)<br>Position<br>(do not check more than one<br>box, unless person is both an<br>officer and a director/trustee) | | | | | | (D)<br>Reportable<br>compensation<br>from<br>the<br>organization<br>(W-2/1099-MISC) | (E)<br>Reportable<br>compensation<br>from related<br>organizations<br>(W-2/1099-MISC) | (F)<br>Estimated<br>amount of<br>other<br>compensation<br>from the<br>organization<br>and related<br>organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) JOE FALLON<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (2) JOHN WALL<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (3) JOHN BRIMELOW<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (4) PETER BRIMELOW<br>CHAIRMAN | 90.00 | X | | X | | | | 181,675. | 0. | 0. |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

832007 12-31-18

Form **990** (2018)

Form 990 (2018)      VDARE FOUNDATION                                    22-3691487      Page **8**

| Part VII | Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)* |
|---|---|

| (A)<br>Name and title | (B)<br>Average<br>hours per<br>week<br>(list any<br>hours for<br>related<br>organizations<br>below<br>line) | (C)<br>Position<br>(do not check more than one<br>box, unless person is both an<br>officer and a director/trustee) | | | | | | (D)<br>Reportable<br>compensation<br>from<br>the<br>organization<br>(W-2/1099-MISC) | (E)<br>Reportable<br>compensation<br>from related<br>organizations<br>(W-2/1099-MISC) | (F)<br>Estimated<br>amount of<br>other<br>compensation<br>from the<br>organization<br>and related<br>organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **1b Sub-total** ............................................. ▶ | | | | | | | | 181,675. | 0. | 0. |
| **c** Total from continuation sheets to Part VII, Section A ......... ▶ | | | | | | | | 0. | 0. | 0. |
| **d** Total (add lines 1b and 1c) .................................. ▶ | | | | | | | | 181,675. | 0. | 0. |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶                                                                  1

| | | Yes | No |
|---|---|---|---|
| **3** Did the organization list any *former* officer, director, or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* ................................................................ | **3** | | X |
| **4** For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* ........................ | **4** | X | |
| **5** Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* ................................................ | **5** | | X |

**Section B. Independent Contractors**

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. Report compensation for the calendar year ending with or within the organization's tax year.

| (A)<br>Name and business address | (B)<br>Description of services | (C)<br>Compensation |
|---|---|---|
| HAPPY PENGUINS LLC /PETER BRIMELOW<br>447 SOUTH STREET, LITCHFIELD, CT 06759 | LEASED EMPLOYEE -<br>CHAIRMAN | 181,675. |
| | | |
| | | |
| | | |
| | | |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶                   1

Form **990** (2018)

832008  12-31-18

Form 990 (2018)    VDARE FOUNDATION    22-3691487    Page **9**

| **Part VIII** | **Statement of Revenue** | | | |
|---|---|---|---|---|

Check if Schedule O contains a response or note to any line in this Part VIII ☐

| | | | | **(A)** Total revenue | **(B)** Related or exempt function revenue | **(C)** Unrelated business revenue | **(D)** Revenue excluded from tax under sections 512 - 514 |
|---|---|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | **1 a** | Federated campaigns | 1a | | | | |
| | **b** | Membership dues | 1b | | | | |
| | **c** | Fundraising events | 1c | | | | |
| | **d** | Related organizations | 1d | | | | |
| | **e** | Government grants (contributions) | 1e | | | | |
| | **f** | All other contributions, gifts, grants, and similar amounts not included above | 1f | 500,672. | | | |
| | **g** | Noncash contributions included in lines 1a-1f: $ | | | | | |
| | **h** | **Total.** Add lines 1a-1f ► | | 500,672. | | | |
| **Program Service Revenue** | | | **Business Code** | | | | |
| | **2 a** | PUBLICATIONS REVENUE | 519130 | 4,875. | 4,875. | | |
| | **b** | | | | | | |
| | **c** | | | | | | |
| | **d** | | | | | | |
| | **e** | | | | | | |
| | **f** | All other program service revenue | | | | | |
| | **g** | **Total.** Add lines 2a-2f ► | | 4,875. | | | |
| **Other Revenue** | **3** | Investment income (including dividends, interest, and other similar amounts) ► | | 205. | | | 205. |
| | **4** | Income from investment of tax-exempt bond proceeds ► | | | | | |
| | **5** | Royalties ► | | | | | |
| | | | **(i) Real** | **(ii) Personal** | | | |
| | **6 a** | Gross rents | | | | | |
| | **b** | Less: rental expenses | | | | | |
| | **c** | Rental income or (loss) | | | | | |
| | **d** | Net rental income or (loss) ► | | | | | |
| | **7 a** | Gross amount from sales of assets other than inventory | **(i) Securities** | **(ii) Other** | | | |
| | **b** | Less: cost or other basis and sales expenses | | | | | |
| | **c** | Gain or (loss) | | | | | |
| | **d** | Net gain or (loss) ► | | | | | |
| | **8 a** | Gross income from fundraising events (not including $ _____ of contributions reported on line 1c). See Part IV, line 18 | a | | | | |
| | **b** | Less: direct expenses | b | | | | |
| | **c** | Net income or (loss) from fundraising events ► | | | | | |
| | **9 a** | Gross income from gaming activities. See Part IV, line 19 | a | | | | |
| | **b** | Less: direct expenses | b | | | | |
| | **c** | Net income or (loss) from gaming activities ► | | | | | |
| | **10 a** | Gross sales of inventory, less returns and allowances | a | | | | |
| | **b** | Less: cost of goods sold | b | | | | |
| | **c** | Net income or (loss) from sales of inventory ► | | | | | |
| | | Miscellaneous Revenue | **Business Code** | | | | |
| | **11 a** | EVENT CANCELLATION SET | 900099 | 192,405. | 192,405. | | |
| | **b** | | | | | | |
| | **c** | | | | | | |
| | **d** | All other revenue | | | | | |
| | **e** | **Total.** Add lines 11a-11d ► | | 192,405. | | | |
| | **12** | **Total revenue.** See instructions ► | | 698,157. | 197,280. | 0. | 205. |

832009 12-31-18    Form **990** (2018)

10040817 756327 142255    2018.06010 VDARE FOUNDATION    142255_1

**AA0200**

Form 990 (2018)     VDARE FOUNDATION        22-3691487    Page **10**

**Part IX | Statement of Functional Expenses**

Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).

Check if Schedule O contains a response or note to any line in this Part IX ......................................... ☐

| *Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII.* | (A)<br>Total expenses | (B)<br>Program service<br>expenses | (C)<br>Management and<br>general expenses | (D)<br>Fundraising<br>expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to domestic organizations and domestic governments. See Part IV, line 21 ... | | | | |
| **2** Grants and other assistance to domestic individuals. See Part IV, line 22 .............. | | | | |
| **3** Grants and other assistance to foreign organizations, foreign governments, and foreign individuals. See Part IV, lines 15 and 16 ........ | | | | |
| **4** Benefits paid to or for members ..................... | | | | |
| **5** Compensation of current officers, directors, trustees, and key employees ...................... | 181,675. | 154,424. | 18,167. | 9,084. |
| **6** Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) ........ | | | | |
| **7** Other salaries and wages ........................... | | | | |
| **8** Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) | | | | |
| **9** Other employee benefits ............................. | | | | |
| **10** Payroll taxes ............................................. | | | | |
| **11** Fees for services (non-employees): | | | | |
| **a** Management ............................................. | | | | |
| **b** Legal ...................................................... | 17,660. | | 17,660. | |
| **c** Accounting ............................................... | 9,242. | | 9,242. | |
| **d** Lobbying .................................................. | | | | |
| **e** Professional fundraising services. See Part IV, line 17 | | | | |
| **f** Investment management fees ........................ | | | | |
| **g** Other. (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Sch O.) | 39,366. | 8,820. | 24,403. | 6,143. |
| **12** Advertising and promotion ........................... | 4,225. | 4,225. | | |
| **13** Office expenses ....................................... | 26,196. | 7,717. | 18,479. | |
| **14** Information technology ............................... | 89,278. | 89,278. | | |
| **15** Royalties ................................................. | | | | |
| **16** Occupancy ............................................... | 6,548. | | 6,548. | |
| **17** Travel ..................................................... | 30,032. | 28,256. | 1,776. | |
| **18** Payments of travel or entertainment expenses for any federal, state, or local public officials ... | | | | |
| **19** Conferences, conventions, and meetings ...... | 4,698. | | 4,130. | 568. |
| **20** Interest ................................................... | | | | |
| **21** Payments to affiliates ................................ | | | | |
| **22** Depreciation, depletion, and amortization ...... | | | | |
| **23** Insurance ................................................ | | | | |
| **24** Other expenses. Itemize expenses not covered above. (List miscellaneous expenses in line 24e. If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O.) | | | | |
| **a** EDITORS | 122,735. | 122,735. | | |
| **b** EVENTS | 82,014. | 82,014. | | |
| **c** WRITERS | 58,670. | 58,670. | | |
| **d** OTHER | 8,759. | 8,759. | | |
| **e** All other expenses | | | | |
| **25** Total functional expenses. Add lines 1 through 24e | 681,098. | 564,898. | 100,405. | 15,795. |
| **26** Joint costs. Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation. Check here ▶ ☐ If following SOP 98-2 (ASC 958-720) | | | | |

832010 12-31-18                                                   Form **990** (2018)

10040817 756327 142255           2018.06010 VDARE FOUNDATION         142255_1

**AA0201**

Form 990 (2018)       VDARE FOUNDATION                            22-3691487   Page **11**

| **Part X** | **Balance Sheet** | | | | | |

Check if Schedule O contains a response or note to any line in this Part X .................................................. ☐

| | | | | **(A)** Beginning of year | | **(B)** End of year |
|---|---|---|---|---|---|---|
| **Assets** | 1 | Cash - non-interest-bearing | | 93,913. | 1 | 108,550. |
| | 2 | Savings and temporary cash investments | | | 2 | |
| | 3 | Pledges and grants receivable, net | | | 3 | |
| | 4 | Accounts receivable, net | | | 4 | |
| | 5 | Loans and other receivables from current and former officers, directors, trustees, key employees, and highest compensated employees. Complete Part II of Schedule L | | | 5 | |
| | 6 | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), persons described in section 4958(c)(3)(B), and contributing employers and sponsoring organizations of section 501(c)(9) voluntary employees' beneficiary organizations (see instr). Complete Part II of Sch L | | | 6 | |
| | 7 | Notes and loans receivable, net | | | 7 | |
| | 8 | Inventories for sale or use | | | 8 | |
| | 9 | Prepaid expenses and deferred charges | | | 9 | |
| | 10a | Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D   **10a**   28,835. | | | | |
| | b | Less: accumulated depreciation   **10b**   28,835. | | 0. | 10c | 0. |
| | 11 | Investments - publicly traded securities | | 79,950. | 11 | 78,580. |
| | 12 | Investments - other securities. See Part IV, line 11 | | | 12 | |
| | 13 | Investments - program-related. See Part IV, line 11 | | | 13 | |
| | 14 | Intangible assets | | | 14 | |
| | 15 | Other assets. See Part IV, line 11 | | | 15 | |
| | 16 | **Total assets.** Add lines 1 through 15 (must equal line 34) | | 173,863. | 16 | 187,130. |
| **Liabilities** | 17 | Accounts payable and accrued expenses | | 9,881. | 17 | 7,309. |
| | 18 | Grants payable | | | 18 | |
| | 19 | Deferred revenue | | | 19 | |
| | 20 | Tax-exempt bond liabilities | | | 20 | |
| | 21 | Escrow or custodial account liability. Complete Part IV of Schedule D | | | 21 | |
| | 22 | Loans and other payables to current and former officers, directors, trustees, key employees, highest compensated employees, and disqualified persons. Complete Part II of Schedule L | | | 22 | |
| | 23 | Secured mortgages and notes payable to unrelated third parties | | | 23 | |
| | 24 | Unsecured notes and loans payable to unrelated third parties | | | 24 | |
| | 25 | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17-24). Complete Part X of Schedule D | | | 25 | |
| | 26 | **Total liabilities.** Add lines 17 through 25 | | 9,881. | 26 | 7,309. |
| **Net Assets or Fund Balances** | | Organizations that follow SFAS 117 (ASC 958), check here ▶ ☒ and complete lines 27 through 29, and lines 33 and 34. | | | | |
| | 27 | Unrestricted net assets | | 163,982. | 27 | 179,821. |
| | 28 | Temporarily restricted net assets | | | 28 | |
| | 29 | Permanently restricted net assets | | | 29 | |
| | | Organizations that do not follow SFAS 117 (ASC 958), check here ▶ ☐ and complete lines 30 through 34. | | | | |
| | 30 | Capital stock or trust principal, or current funds | | | 30 | |
| | 31 | Paid-in or capital surplus, or land, building, or equipment fund | | | 31 | |
| | 32 | Retained earnings, endowment, accumulated income, or other funds | | | 32 | |
| | 33 | Total net assets or fund balances | | 163,982. | 33 | 179,821. |
| | 34 | Total liabilities and net assets/fund balances | | 173,863. | 34 | 187,130. |

Form **990** (2018)

832011 12-31-18

13

10040817 756327 142255           2018.06010 VDARE FOUNDATION          142255_1

**AA0202**

Form 990 (2018)     VDARE FOUNDATION            22-3691487    Page **12**

**Part XI | Reconciliation of Net Assets**

Check if Schedule O contains a response or note to any line in this Part XI .................................................... ☐

| | | | |
|---|---|---|---|
| 1 | Total revenue (must equal Part VIII, column (A), line 12) | 1 | 698,157. |
| 2 | Total expenses (must equal Part IX, column (A), line 25) | 2 | 681,098. |
| 3 | Revenue less expenses. Subtract line 2 from line 1 | 3 | 17,059. |
| 4 | Net assets or fund balances at beginning of year (must equal Part X, line 33, column (A)) | 4 | 163,982. |
| 5 | Net unrealized gains (losses) on investments | 5 | -1,220. |
| 6 | Donated services and use of facilities | 6 | |
| 7 | Investment expenses | 7 | |
| 8 | Prior period adjustments | 8 | |
| 9 | Other changes in net assets or fund balances (explain in Schedule O) | 9 | 0. |
| 10 | Net assets or fund balances at end of year. Combine lines 3 through 9 (must equal Part X, line 33, column (B)) | 10 | 179,821. |

**Part XII | Financial Statements and Reporting**

Check if Schedule O contains a response or note to any line in this Part XII ................................................... ☐

| | | Yes | No |
|---|---|---|---|
| 1 | Accounting method used to prepare the Form 990: ☐ Cash ☒ Accrual ☐ Other _____ | | |
| | If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O. | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? ................... | 2a | X |
| | If "Yes," check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both: | | |
| | ☐ Separate basis    ☐ Consolidated basis    ☐ Both consolidated and separate basis | | |
| b | Were the organization's financial statements audited by an independent accountant? ...................................... | 2b | X |
| | If "Yes," check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both: | | |
| | ☐ Separate basis    ☐ Consolidated basis    ☐ Both consolidated and separate basis | | |
| c | If "Yes" to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? ...................... | 2c | |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O. | | |
| 3a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? ........................................................................................................ | 3a | X |
| b | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits ................................ | 3b | |

Form **990** (2018)

832012 12-31-18

14
10040817 756327 142255         2018.06010 VDARE FOUNDATION        142255_1

**AA0203**

| SCHEDULE A | **Public Charity Status and Public Support** | OMB No. 1545-0047 |
|---|---|---|
| (Form 990 or 990-EZ) | Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust. | **2018** |
| Department of the Treasury Internal Revenue Service | ▶ Attach to Form 990 or Form 990-EZ.<br>▶ Go to www.irs.gov/Form990 for instructions and the latest information. | Open to Public Inspection |

| Name of the organization | Employer identification number |
|---|---|
| VDARE FOUNDATION | 22-3691487 |

**Part I** | **Reason for Public Charity Status** (All organizations must complete this part.) See instructions.

The organization is not a private foundation because it is: (For lines 1 through 12, check only one box.)

1 ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

2 ☐ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E (Form 990 or 990-EZ).)

3 ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4 ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state: _____

5 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv).** (Complete Part II.)

6 ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7 ☒ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

8 ☐ A community trust described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

9 ☐ An agricultural research organization described in **section 170(b)(1)(A)(ix)** operated in conjunction with a land-grant college or university or a non-land-grant college of agriculture (see instructions). Enter the name, city, and state of the college or university: _____

10 ☐ An organization that normally receives: (1) more than 33 1/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions - subject to certain exceptions, and (2) no more than 33 1/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See **section 509(a)(2).** (Complete Part III.)

11 ☐ An organization organized and operated exclusively to test for public safety. See **section 509(a)(4).**

12 ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in **section 509(a)(1)** or **section 509(a)(2).** See **section 509(a)(3).** Check the box in lines 12a through 12d that describes the type of supporting organization and complete lines 12e, 12f, and 12g.

a ☐ **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. **You must complete Part IV, Sections A and B.**

b ☐ **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s). **You must complete Part IV, Sections A and C.**

c ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions). **You must complete Part IV, Sections A, D, and E.**

d ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated. The organization generally must satisfy a distribution requirement and an attentiveness requirement (see instructions). **You must complete Part IV, Sections A and D, and Part V.**

e ☐ Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization.

f Enter the number of supported organizations ................................................................

g Provide the following information about the supported organization(s).

| (i) Name of supported organization | (ii) EIN | (iii) Type of organization (described on lines 1-10 above (see instructions)) | (iv) Is the organization listed in your governing document? Yes | No | (v) Amount of monetary support (see instructions) | (vi) Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **Total** | | | | | | |

LHA **For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.** 832021 10-11-18 Schedule A (Form 990 or 990-EZ) 2018

10040817 756327 142255 2018.06010 VDARE FOUNDATION 142255_1

**AA0204**

Schedule A (Form 990 or 990-EZ) 2018 VDARE FOUNDATION 22-3691487 Page **2**

| Part II | Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi) |

(Complete only if you checked the box on line 5, 7, or 8 of Part I or if the organization failed to qualify under Part III. If the organization fails to qualify under the tests listed below, please complete Part III.)

### Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2014 | (b) 2015 | (c) 2016 | (d) 2017 | (e) 2018 | (f) Total |
|---|---|---|---|---|---|---|
| 1 Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grants.") | 228,626. | 267,037. | 440,984. | 385,988. | 500,672. | 1823307. |
| 2 Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| 3 The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| 4 Total. Add lines 1 through 3 | 228,626. | 267,037. | 440,984. | 385,988. | 500,672. | 1823307. |
| 5 The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f) | | | | | | |
| 6 Public support. Subtract line 5 from line 4. | | | | | | 1823307. |

### Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2014 | (b) 2015 | (c) 2016 | (d) 2017 | (e) 2018 | (f) Total |
|---|---|---|---|---|---|---|
| 7 Amounts from line 4 | 228,626. | 267,037. | 440,984. | 385,988. | 500,672. | 1823307. |
| 8 Gross income from interest, dividends, payments received on securities loans, rents, royalties, and income from similar sources | 15,813. | 7,110. | 768. | 1,126. | 205. | 25,022. |
| 9 Net income from unrelated business activities, whether or not the business is regularly carried on | | | | | | |
| 10 Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.) | | | | | 57,988. | 192,405. | 250,393. |
| 11 Total support. Add lines 7 through 10 | | | | | | 2098722. |
| 12 Gross receipts from related activities, etc. (see instructions) | | | | | 12 | 9,601. |
| 13 First five years. If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and stop here | | | | | | ▶ ☐ |

Note: row 10 values 57,988. and 192,405. are in columns (d) 2017 and (e) 2018.

### Section C. Computation of Public Support Percentage

| | | | |
|---|---|---|---|
| 14 Public support percentage for 2018 (line 6, column (f) divided by line 11, column (f)) | 14 | 86.88 | % |
| 15 Public support percentage from 2017 Schedule A, Part II, line 14 | 15 | 91.93 | % |

**16a 33 1/3% support test - 2018.** If the organization did not check the box on line 13, and line 14 is 33 1/3% or more, check this box and stop here. The organization qualifies as a publicly supported organization ........................ ▶ ☒

**b 33 1/3% support test - 2017.** If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3% or more, check this box and stop here. The organization qualifies as a publicly supported organization ........................ ▶ ☐

**17a 10% -facts-and-circumstances test - 2018.** If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and stop here. Explain in Part VI how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization ........................ ▶ ☐

**b 10% -facts-and-circumstances test - 2017.** If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and stop here. Explain in Part VI how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization ........................ ▶ ☐

**18 Private foundation.** If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see instructions ......... ▶ ☐

Schedule A (Form 990 or 990-EZ) 2018

832022 10-11-18

10040817 756327 142255        2018.06010 VDARE FOUNDATION        142255_1

**AA0205**

Schedule A (Form 990 or 990-EZ) 2018 VDARE FOUNDATION        22-3691487   Page **3**

| Part III | Support Schedule for Organizations Described in Section 509(a)(2) |

(Complete only if you checked the box on line 10 of Part I or if the organization failed to qualify under Part II. If the organization fails to qualify under the tests listed below, please complete Part II.)

### Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2014 | (b) 2015 | (c) 2016 | (d) 2017 | (e) 2018 | (f) Total |
|---|---|---|---|---|---|---|
| 1 Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grants.") | | | | | | |
| 2 Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose | | | | | | |
| 3 Gross receipts from activities that are not an unrelated trade or business under section 513 | | | | | | |
| 4 Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| 5 The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| 6 **Total.** Add lines 1 through 5 | | | | | | |
| 7a Amounts included on lines 1, 2, and 3 received from disqualified persons | | | | | | |
| b Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year | | | | | | |
| c Add lines 7a and 7b | | | | | | |
| 8 **Public support.** (Subtract line 7c from line 6.) | | | | | | |

### Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2014 | (b) 2015 | (c) 2016 | (d) 2017 | (e) 2018 | (f) Total |
|---|---|---|---|---|---|---|
| 9 Amounts from line 6 | | | | | | |
| 10a Gross income from interest, dividends, payments received on securities loans, rents, royalties, and income from similar sources | | | | | | |
| b Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975 | | | | | | |
| c Add lines 10a and 10b | | | | | | |
| 11 Net income from unrelated business activities not included in line 10b, whether or not the business is regularly carried on | | | | | | |
| 12 Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.) | | | | | | |
| 13 **Total support.** (Add lines 9, 10c, 11, and 12.) | | | | | | |

14 **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here** ................................................................................................................................................................ ▶ ☐

### Section C. Computation of Public Support Percentage

| | | | |
|---|---|---|---|
| 15 Public support percentage for 2018 (line 8, column (f), divided by line 13, column (f)) | | 15 | % |
| 16 Public support percentage from 2017 Schedule A, Part III, line 15 | | 16 | % |

### Section D. Computation of Investment Income Percentage

| | | | |
|---|---|---|---|
| 17 Investment income percentage for 2018 (line 10c, column (f), divided by line 13, column (f)) | | 17 | % |
| 18 Investment income percentage from 2017 Schedule A, Part III, line 17 | | 18 | % |

19a **33 1/3% support tests - 2018.** If the organization did not check the box on line 14, and line 15 is more than 33 1/3%, and line 17 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization ................................... ▶ ☐

b **33 1/3% support tests - 2017.** If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3%, and line 18 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization ............ ▶ ☐

20 **Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions ........................ ▶ ☐

832023 10-11-18                                       Schedule A (Form 990 or 990-EZ) 2018

10040817 756327 142255            2018.06010 VDARE FOUNDATION          142255_1

**AA0206**

Schedule A (Form 990 or 990-EZ) 2018 VDARE FOUNDATION                    22-3691487   Page 4

| Part IV | Supporting Organizations |
|---------|--------------------------|

(Complete only if you checked a box in line 12 on Part I. If you checked 12a of Part I, complete Sections A and B. If you checked 12b of Part I, complete Sections A and C. If you checked 12c of Part I, complete Sections A, D, and E. If you checked 12d of Part I, complete Sections A and D, and complete Part V.)

**Section A. All Supporting Organizations**

| | | Yes | No |
|---|---|---|---|
| 1 | Are all of the organization's supported organizations listed by name in the organization's governing documents? *If "No," describe in* Part VI *how the supported organizations are designated. If designated by class or purpose, describe the designation. If historic and continuing relationship, explain.* | **1** | | |
| 2 | Did the organization have any supported organization that does not have an IRS determination of status under section 509(a)(1) or (2)? *If "Yes," explain in* Part VI *how the organization determined that the supported organization was described in section 509(a)(1) or (2).* | **2** | | |
| 3a | Did the organization have a supported organization described in section 501(c)(4), (5), or (6)? *If "Yes," answer (b) and (c) below.* | **3a** | | |
| b | Did the organization confirm that each supported organization qualified under section 501(c)(4), (5), or (6) and satisfied the public support tests under section 509(a)(2)? *If "Yes," describe in* Part VI *when and how the organization made the determination.* | **3b** | | |
| c | Did the organization ensure that all support to such organizations was used exclusively for section 170(c)(2)(B) purposes? *If "Yes," explain in* Part VI *what controls the organization put in place to ensure such use.* | **3c** | | |
| 4a | Was any supported organization not organized in the United States ("foreign supported organization")? *If "Yes," and if you checked 12a or 12b in Part I, answer (b) and (c) below.* | **4a** | | |
| b | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If "Yes," describe in* Part VI *how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations.* | **4b** | | |
| c | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If "Yes," explain in* Part VI *what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes.* | **4c** | | |
| 5a | Did the organization add, substitute, or remove any supported organizations during the tax year? *If "Yes," answer (b) and (c) below (if applicable). Also, provide detail in* Part VI, *including (i) the names and EIN numbers of the supported organizations added, substituted, or removed; (ii) the reasons for each such action; (iii) the authority under the organization's organizing document authorizing such action; and (iv) how the action was accomplished (such as by amendment to the organizing document).* | **5a** | | |
| b | **Type I or Type II only.** Was any added or substituted supported organization part of a class already designated in the organization's organizing document? | **5b** | | |
| c | **Substitutions only.** Was the substitution the result of an event beyond the organization's control? | **5c** | | |
| 6 | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (i) its supported organizations, (ii) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (iii) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If "Yes," provide detail in* Part VI. | **6** | | |
| 7 | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (as defined in section 4958(c)(3)(C)), a family member of a substantial contributor, or a 35% controlled entity with regard to a substantial contributor? *If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ).* | **7** | | |
| 8 | Did the organization make a loan to a disqualified person (as defined in section 4958) not described in line 7? *If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ).* | **8** | | |
| 9a | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? *If "Yes," provide detail in* Part VI. | **9a** | | |
| b | Did one or more disqualified persons (as defined in line 9a) hold a controlling interest in any entity in which the supporting organization had an interest? *If "Yes," provide detail in* Part VI. | **9b** | | |
| c | Did a disqualified person (as defined in line 9a) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If "Yes," provide detail in* Part VI. | **9c** | | |
| 10a | Was the organization subject to the excess business holdings rules of section 4943 because of section 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If "Yes," answer 10b below.* | **10a** | | |
| b | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings.)* | **10b** | | |

832024 10-11-18

Schedule A (Form 990 or 990-EZ) 2018

10040817 756327 142255                    2018.06010 VDARE FOUNDATION                    142255_1

**AA0207**

Schedule A (Form 990 or 990-EZ) 2018 VDARE FOUNDATION       22-3691487   Page 5

## Part IV   Supporting Organizations *(continued)*

|  |  | Yes | No |
|---|---|---|---|
| 11 | Has the organization accepted a gift or contribution from any of the following persons? |  |  |
| a | A person who directly or indirectly controls, either alone or together with persons described in (b) and (c) |  |  |
|  | below, the governing body of a supported organization? **11a** |  |  |
| b | A family member of a person described in (a) above? **11b** |  |  |
| c | A 35% controlled entity of a person described in (a) or (b) above? *If "Yes" to a, b, or c, provide detail in* **Part VI.** **11c** |  |  |

### Section B. Type I Supporting Organizations

|  |  | Yes | No |
|---|---|---|---|
| 1 | Did the directors, trustees, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's directors or trustees at all times during the tax year? *If "No," describe in* **Part VI** *how the supported organization(s) effectively operated, supervised, or controlled the organization's activities. If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year.* **1** |  |  |
| 2 | Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If "Yes," explain in* **Part VI** *how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised, or controlled the supporting organization.* **2** |  |  |

### Section C. Type II Supporting Organizations

|  |  | Yes | No |
|---|---|---|---|
| 1 | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees of each of the organization's supported organization(s)? *If "No," describe in* **Part VI** *how control or management of the supporting organization was vested in the same persons that controlled or managed the supported organization(s).* **1** |  |  |

### Section D. All Type III Supporting Organizations

|  |  | Yes | No |
|---|---|---|---|
| 1 | Did the organization provide to each of its supported organizations, by the last day of the fifth month of the organization's tax year, (i) a written notice describing the type and amount of support provided during the prior tax year, (ii) a copy of the Form 990 that was most recently filed as of the date of notification, and (iii) copies of the organization's governing documents in effect on the date of notification, to the extent not previously provided? **1** |  |  |
| 2 | Were any of the organization's officers, directors, or trustees either (i) appointed or elected by the supported organization(s) or (ii) serving on the governing body of a supported organization? *If "No," explain in* **Part VI** *how the organization maintained a close and continuous working relationship with the supported organization(s).* **2** |  |  |
| 3 | By reason of the relationship described in (2), did the organization's supported organizations have a significant voice in the organization's investment policies and in directing the use of the organization's income or assets at all times during the tax year? *If "Yes," describe in* **Part VI** *the role the organization's supported organizations played in this regard.* **3** |  |  |

### Section E. Type III Functionally Integrated Supporting Organizations

|  |  |  |
|---|---|---|
| 1 | *Check the box next to the method that the organization used to satisfy the Integral Part Test during the year* **(see instructions).** |  |
| a | ☐ The organization satisfied the Activities Test. *Complete* **line 2** *below.* |  |
| b | ☐ The organization is the parent of each of its supported organizations. *Complete* **line 3** *below.* |  |
| c | ☐ The organization supported a governmental entity. *Describe in* **Part VI** *how you supported a government entity (see instructions).* |  |

|  |  | Yes | No |
|---|---|---|---|
| 2 | Activities Test. **Answer (a) and (b) below.** |  |  |
| a | Did substantially all of the organization's activities during the tax year directly further the exempt purposes of the supported organization(s) to which the organization was responsive? *If "Yes," then in* **Part VI** *identify* **those supported organizations and explain** *how these activities directly furthered their exempt purposes, how the organization was responsive to those supported organizations, and how the organization determined that these activities constituted substantially all of its activities.* **2a** |  |  |
| b | Did the activities described in (a) constitute activities that, but for the organization's involvement, one or more of the organization's supported organization(s) would have been engaged in? *If "Yes," explain in* **Part VI** *the reasons for the organization's position that its supported organization(s) would have engaged in these activities but for the organization's involvement.* **2b** |  |  |
| 3 | Parent of Supported Organizations. **Answer (a) and (b) below.** |  |  |
| a | Did the organization have the power to regularly appoint or elect a majority of the officers, directors, or trustees of each of the supported organizations? *Provide details in* **Part VI.** **3a** |  |  |
| b | Did the organization exercise a substantial degree of direction over the policies, programs, and activities of each of its supported organizations? *If "Yes," describe in* **Part VI** *the role played by the organization in this regard.* **3b** |  |  |

832025 10-11-18       Schedule A (Form 990 or 990-EZ) 2018

10040817 756327 142255      2018.06010 VDARE FOUNDATION      142255_1

**AA0208**

Schedule A (Form 990 or 990-EZ) 2018 VDARE FOUNDATION                    22-3691487    Page 6

| Part V | Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations |

1 ☐ Check here if the organization satisfied the Integral Part Test as a qualifying trust on Nov. 20, 1970 (explain in Part VI.)  **See instructions.** All other Type III non-functionally integrated supporting organizations must complete Sections A through E.

| Section A - Adjusted Net Income | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 | Net short-term capital gain | 1 | | |
| 2 | Recoveries of prior-year distributions | 2 | | |
| 3 | Other gross income (see instructions) | 3 | | |
| 4 | Add lines 1 through 3 | 4 | | |
| 5 | Depreciation and depletion | 5 | | |
| 6 | Portion of operating expenses paid or incurred for production or collection of gross income or for management, conservation, or maintenance of property held for production of income (see instructions) | 6 | | |
| 7 | Other expenses (see instructions) | 7 | | |
| 8 | **Adjusted Net Income** (subtract lines 5, 6, and 7 from line 4) | 8 | | |

| Section B - Minimum Asset Amount | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 | Aggregate fair market value of all non-exempt-use assets (see instructions for short tax year or assets held for part of year): | | | |
| a | Average monthly value of securities | 1a | | |
| b | Average monthly cash balances | 1b | | |
| c | Fair market value of other non-exempt-use assets | 1c | | |
| d | **Total** (add lines 1a, 1b, and 1c) | 1d | | |
| e | Discount claimed for blockage or other factors (explain in detail in **Part VI**): | | | |
| 2 | Acquisition indebtedness applicable to non-exempt-use assets | 2 | | |
| 3 | Subtract line 2 from line 1d | 3 | | |
| 4 | Cash deemed held for exempt use. Enter 1-1/2% of line 3 (for greater amount, see instructions) | 4 | | |
| 5 | Net value of non-exempt-use assets (subtract line 4 from line 3) | 5 | | |
| 6 | Multiply line 5 by .035 | 6 | | |
| 7 | Recoveries of prior-year distributions | 7 | | |
| 8 | **Minimum Asset Amount** (add line 7 to line 6) | 8 | | |

| Section C - Distributable Amount | | | Current Year |
|---|---|---|---|
| 1 | Adjusted net income for prior year (from Section A, line 8, Column A) | 1 | | |
| 2 | Enter 85% of line 1 | 2 | | |
| 3 | Minimum asset amount for prior year (from Section B, line 8, Column A) | 3 | | |
| 4 | Enter greater of line 2 or line 3 | 4 | | |
| 5 | Income tax imposed in prior year | 5 | | |
| 6 | **Distributable Amount.** Subtract line 5 from line 4, unless subject to emergency temporary reduction (see instructions) | 6 | | |

7 ☐ Check here if the current year is the organization's first as a non-functionally integrated Type III supporting organization (see instructions).

Schedule A (Form 990 or 990-EZ) 2018

832026 10-11-18

20

10040817 756327 142255          2018.06010 VDARE FOUNDATION          142255_1

**AA0209**

Schedule A (Form 990 or 990-EZ) 2018 VDARE FOUNDATION                    22-3691487  Page 7

| Part V | Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations *(continued)* |
|---|---|

| Section D - Distributions | | | Current Year |
|---|---|---|---|
| 1 | Amounts paid to supported organizations to accomplish exempt purposes | | |
| 2 | Amounts paid to perform activity that directly furthers exempt purposes of supported | | |
|   | organizations, in excess of income from activity | | |
| 3 | Administrative expenses paid to accomplish exempt purposes of supported organizations | | |
| 4 | Amounts paid to acquire exempt-use assets | | |
| 5 | Qualified set-aside amounts (prior IRS approval required) | | |
| 6 | Other distributions (describe in Part VI). See instructions. | | |
| 7 | **Total annual distributions.** Add lines 1 through 6. | | |
| 8 | Distributions to attentive supported organizations to which the organization is responsive | | |
|   | (provide details in Part VI). See instructions. | | |
| 9 | Distributable amount for 2018 from Section C, line 6 | | |
| 10 | Line 8 amount divided by line 9 amount | | |

| Section E - Distribution Allocations (see instructions) | (i) Excess Distributions | (ii) Underdistributions Pre-2018 | (iii) Distributable Amount for 2018 |
|---|---|---|---|
| 1 | Distributable amount for 2018 from Section C, line 6 | | | |
| 2 | Underdistributions, if any, for years prior to 2018 (reason- | | | |
|   | able cause required- explain in Part VI). See instructions. | | | |
| 3 | Excess distributions carryover, if any, to 2018 | | | |
| a | From 2013 | | | |
| b | From 2014 | | | |
| c | From 2015 | | | |
| d | From 2016 | | | |
| e | From 2017 | | | |
| f | Total of lines 3a through e | | | |
| g | Applied to underdistributions of prior years | | | |
| h | Applied to 2018 distributable amount | | | |
| i | Carryover from 2013 not applied (see instructions) | | | |
| j | Remainder. Subtract lines 3g, 3h, and 3i from 3f. | | | |
| 4 | Distributions for 2018 from Section D, | | | |
|   | line 7:                    $ | | | |
| a | Applied to underdistributions of prior years | | | |
| b | Applied to 2018 distributable amount | | | |
| c | Remainder. Subtract lines 4a and 4b from 4. | | | |
| 5 | Remaining underdistributions for years prior to 2018, if | | | |
|   | any. Subtract lines 3g and 4a from line 2. For result greater | | | |
|   | than zero, explain in Part VI. See instructions. | | | |
| 6 | Remaining underdistributions for 2018. Subtract lines 3h | | | |
|   | and 4b from line 1. For result greater than zero, explain in | | | |
|   | Part VI. See instructions. | | | |
| 7 | **Excess distributions carryover to 2019.** Add lines 3j | | | |
|   | and 4c. | | | |
| 8 | Breakdown of line 7: | | | |
| a | Excess from 2014 | | | |
| b | Excess from 2015 | | | |
| c | Excess from 2016 | | | |
| d | Excess from 2017 | | | |
| e | Excess from 2018 | | | |

Schedule A (Form 990 or 990-EZ) 2018

832027  10-11-18

| SCHEDULE D<br>(Form 990)<br><br>Department of the Treasury<br>Internal Revenue Service | **Supplemental Financial Statements**<br>► Complete if the organization answered "Yes" on Form 990,<br>Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b.<br>► Attach to Form 990.<br>►Go to www.irs.gov/Form990 for instructions and the latest information. | OMB No. 1545-0047<br>**2018**<br>Open to Public<br>Inspection |
|---|---|---|

| Name of the organization | Employer identification number |
|---|---|
| VDARE FOUNDATION | 22-3691487 |

**Part I** Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts. Complete if the organization answered "Yes" on Form 990, Part IV, line 6.

| | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|
| 1 Total number at end of year | | |
| 2 Aggregate value of contributions to (during year) | | |
| 3 Aggregate value of grants from (during year) | | |
| 4 Aggregate value at end of year | | |

5 Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds
are the organization's property, subject to the organization's exclusive legal control? ........................ ☐ Yes ☐ No

6 Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only
for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring
impermissible private benefit? ........................................................................ ☐ Yes ☐ No

**Part II** Conservation Easements. Complete if the organization answered "Yes" on Form 990, Part IV, line 7.

1 Purpose(s) of conservation easements held by the organization (check all that apply).
☐ Preservation of land for public use (e.g., recreation or education)   ☐ Preservation of a historically important land area
☐ Protection of natural habitat                                         ☐ Preservation of a certified historic structure
☐ Preservation of open space

2 Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last
day of the tax year.

| | | Held at the End of the Tax Year |
|---|---|---|
| a Total number of conservation easements | 2a | |
| b Total acreage restricted by conservation easements | 2b | |
| c Number of conservation easements on a certified historic structure included in (a) | 2c | |
| d Number of conservation easements included in (c) acquired after 7/25/06, and not on a historic structure listed in the National Register | 2d | |

3 Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax
year ►

4 Number of states where property subject to conservation easement is located ►

5 Does the organization have a written policy regarding the periodic monitoring, inspection, handling of
violations, and enforcement of the conservation easements it holds? ............................................ ☐ Yes ☐ No

6 Staff and volunteer hours devoted to monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
►

7 Amount of expenses incurred in monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
► $

8 Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i)
and section 170(h)(4)(B)(ii)? ...................................................................... ☐ Yes ☐ No

9 In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement, and balance sheet, and
include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for
conservation easements.

**Part III** Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.
Complete if the organization answered "Yes" on Form 990, Part IV, line 8.

1a If the organization elected, as permitted under SFAS 116 (ASC 958), not to report in its revenue statement works of art,
historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide, in Part XIII,
the text of the footnote to its financial statements that describes these items.

b If the organization elected, as permitted under SFAS 116 (ASC 958), to report in its revenue statement and balance sheet works of art, historical
treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts
relating to these items:

(i) Revenue included on Form 990, Part VIII, line 1 ............................................... ► $

(ii) Assets included in Form 990, Part X ........................................................ ► $

2 If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide
the following amounts required to be reported under SFAS 116 (ASC 958) relating to these items:

a Revenue included on Form 990, Part VIII, line 1 ............................................... ► $

b Assets included in Form 990, Part X ......................................................... ► $

LHA  **For Paperwork Reduction Act Notice, see the Instructions for Form 990.**   Schedule D (Form 990) 2018

832051 10-29-18

Schedule D (Form 990) 2018   VDARE FOUNDATION        22-3691487  Page **2**

| Part III | Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets *(continued)* |

3   Using the organization's acquisition, accession, and other records, check any of the following that are a significant use of its collection items (check all that apply):

a ☐ Public exhibition      d ☐ Loan or exchange programs

b ☐ Scholarly research      e ☐ Other _____

c ☐ Preservation for future generations

4   Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII.

5   During the year, did the organization solicit or receive donations of art, historical treasures, or other similar assets
to be sold to raise funds rather than to be maintained as part of the organization's collection? .......................... ☐ Yes   ☐ No

| Part IV | Escrow and Custodial Arrangements. Complete if the organization answered "Yes" on Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21. |

1a Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included
on Form 990, Part X? ................................................................................................................................................. ☐ Yes   ☐ No

b If "Yes," explain the arrangement in Part XIII and complete the following table:

| | | Amount |
|---|---|---|
| c Beginning balance | 1c | |
| d Additions during the year | 1d | |
| e Distributions during the year | 1e | |
| f Ending balance | 1f | |

2a Did the organization include an amount on Form 990, Part X, line 21, for escrow or custodial account liability? ............ ☐ Yes   ☐ No

b If "Yes," explain the arrangement in Part XIII. Check here if the explanation has been provided on Part XIII ....................... ☐

| Part V | Endowment Funds. Complete if the organization answered "Yes" on Form 990, Part IV, line 10. |

| | (a) Current year | (b) Prior year | (c) Two years back | (d) Three years back | (e) Four years back |
|---|---|---|---|---|---|
| 1a Beginning of year balance | | | | | |
| b Contributions | | | | | |
| c Net investment earnings, gains, and losses | | | | | |
| d Grants or scholarships | | | | | |
| e Other expenditures for facilities and programs | | | | | |
| f Administrative expenses | | | | | |
| g End of year balance | | | | | |

2   Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as:

a Board designated or quasi-endowment ▶ _____ %

b Permanent endowment ▶ _____ %

c Temporarily restricted endowment ▶ _____ %

The percentages on lines 2a, 2b, and 2c should equal 100%.

3a Are there endowment funds not in the possession of the organization that are held and administered for the organization
by:                                                            Yes | No

(i) unrelated organizations ............................................................................................................................. | 3a(i) | |

(ii) related organizations .............................................................................................................................. | 3a(ii) | |

b If "Yes" on line 3a(ii), are the related organizations listed as required on Schedule R? ............................................. | 3b | |

4   Describe in Part XIII the intended uses of the organization's endowment funds.

| Part VI | Land, Buildings, and Equipment. |

Complete if the organization answered "Yes" on Form 990, Part IV, line 11a. See Form 990, Part X, line 10.

| Description of property | (a) Cost or other basis (investment) | (b) Cost or other basis (other) | (c) Accumulated depreciation | (d) Book value |
|---|---|---|---|---|
| 1a Land | | | | |
| b Buildings | | | | |
| c Leasehold improvements | | | | |
| d Equipment | | 28,835. | 28,835. | 0. |
| e Other | | | | |

Total. Add lines 1a through 1e. *(Column (d) must equal Form 990, Part X, column (B), line 10c.)* ........................ ▶ | | | | 0. |

Schedule D (Form 990) 2018

Schedule D (Form 990) 2018     VDARE FOUNDATION         22-3691487    Page **3**

### Part VII   Investments - Other Securities.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11b. See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| (1) Financial derivatives | | |
| (2) Closely-held equity interests | | |
| (3) Other | | |
| (A) | | |
| (B) | | |
| (C) | | |
| (D) | | |
| (E) | | |
| (F) | | |
| (G) | | |
| (H) | | |
| Total. (Col. (b) must equal Form 990, Part X, col. (B) line 12.) ▶ | | |

### Part VIII   Investments - Program Related.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11c. See Form 990, Part X, line 13.

| (a) Description of investment | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| (1) | | |
| (2) | | |
| (3) | | |
| (4) | | |
| (5) | | |
| (6) | | |
| (7) | | |
| (8) | | |
| (9) | | |
| Total. (Col. (b) must equal Form 990, Part X, col. (B) line 13.) ▶ | | |

### Part IX   Other Assets.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11d. See Form 990, Part X, line 15.

| (a) Description | (b) Book value |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |
| (6) | |
| (7) | |
| (8) | |
| (9) | |
| Total. (Column (b) must equal Form 990, Part X, col. (B) line 15.) .................................... ▶ | |

### Part X   Other Liabilities.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11e or 11f. See Form 990, Part X, line 25.

| 1. | (a) Description of liability | (b) Book value | |
|---|---|---|---|
| (1) | Federal income taxes | | |
| (2) | | | |
| (3) | | | |
| (4) | | | |
| (5) | | | |
| (6) | | | |
| (7) | | | |
| (8) | | | |
| (9) | | | |
| Total. (Column (b) must equal Form 990, Part X, col. (B) line 25.) ............ ▶ | | | |

2. Liability for uncertain tax positions. In Part XIII, provide the text of the footnote to the organization's financial statements that reports the
organization's liability for uncertain tax positions under FIN 48 (ASC 740). Check here if the text of the footnote has been provided in Part XIII ☐

Schedule D (Form 990) 2018

832053 10-29-18

10040817 756327 142255        2018.06010 VDARE FOUNDATION        142255_1

**AA0213**

Schedule D (Form 990) 2018  VDARE FOUNDATION                           22-3691487  Page 4

**Part XI** | **Reconciliation of Revenue per Audited Financial Statements With Revenue per Return.**

Complete if the organization answered "Yes" on Form 990, Part IV, line 12a.

| | | | |
|---|---|---|---|
| 1 | Total revenue, gains, and other support per audited financial statements | | 1 |
| 2 | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | |
| a | Net unrealized gains (losses) on investments | 2a | |
| b | Donated services and use of facilities | 2b | |
| c | Recoveries of prior year grants | 2c | |
| d | Other (Describe in Part XIII.) | 2d | |
| e | Add lines 2a through 2d | | 2e |
| 3 | Subtract line 2e from line 1 | | 3 |
| 4 | Amounts included on Form 990, Part VIII, line 12, but not on line 1: | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | |
| b | Other (Describe in Part XIII.) | 4b | |
| c | Add lines 4a and 4b | | 4c |
| 5 | Total revenue. Add lines 3 and 4c. *(This must equal Form 990, Part I, line 12.)* | | 5 |

**Part XII** | **Reconciliation of Expenses per Audited Financial Statements With Expenses per Return.**

Complete if the organization answered "Yes" on Form 990, Part IV, line 12a.

| | | | |
|---|---|---|---|
| 1 | Total expenses and losses per audited financial statements | | 1 |
| 2 | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | |
| a | Donated services and use of facilities | 2a | |
| b | Prior year adjustments | 2b | |
| c | Other losses | 2c | |
| d | Other (Describe in Part XIII.) | 2d | |
| e | Add lines 2a through 2d | | 2e |
| 3 | Subtract line 2e from line 1 | | 3 |
| 4 | Amounts included on Form 990, Part IX, line 25, but not on line 1: | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | |
| b | Other (Describe in Part XIII.) | 4b | |
| c | Add lines 4a and 4b | | 4c |
| 5 | Total expenses. Add lines 3 and 4c. *(This must equal Form 990, Part I, line 18.)* | | 5 |

**Part XIII** Supplemental Information.

Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information.

832054 10-29-18                                                        Schedule D (Form 990) 2018

| SCHEDULE J (Form 990) | **Compensation Information** | OMB No. 1545-0047 |
|---|---|---|
| | For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees | **2018** |
| | ▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 23. | |
| Department of the Treasury Internal Revenue Service | ▶ Attach to Form 990. ▶ Go to www.irs.gov/Form990 for instructions and the latest information. | Open to Public Inspection |

| Name of the organization | Employer identification number |
|---|---|
| VDARE FOUNDATION | 22-3691487 |

## Part I | Questions Regarding Compensation

|  |  | Yes | No |
|---|---|---|---|

**1a** Check the appropriate box(es) if the organization provided any of the following to or for a person listed on Form 990, Part VII, Section A, line 1a. Complete Part III to provide any relevant information regarding these items.

☐ First-class or charter travel ☐ Housing allowance or residence for personal use
☐ Travel for companions ☐ Payments for business use of personal residence
☐ Tax indemnification and gross-up payments ☐ Health or social club dues or initiation fees
☐ Discretionary spending account ☐ Personal services (such as maid, chauffeur, chef)

**b** If any of the boxes on line 1a are checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain ............ | **1b** | | |

**2** Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all directors, trustees, and officers, including the CEO/Executive Director, regarding the items checked on line 1a? .................. | **2** | | |

**3** Indicate which, if any, of the following the filing organization used to establish the compensation of the organization's CEO/Executive Director. Check all that apply. Do not check any boxes for methods used by a related organization to establish compensation of the CEO/Executive Director, but explain in Part III.

☐ Compensation committee ☐ Written employment contract
☐ Independent compensation consultant ☐ Compensation survey or study
☐ Form 990 of other organizations ☐ Approval by the board or compensation committee

**4** During the year, did any person listed on Form 990, Part VII, Section A, line 1a, with respect to the filing organization or a related organization:

**a** Receive a severance payment or change-of-control payment? .................................................. | **4a** | | X |
**b** Participate in, or receive payment from, a supplemental nonqualified retirement plan? ......................... | **4b** | | X |
**c** Participate in, or receive payment from, an equity-based compensation arrangement? ......................... | **4c** | | X |
If "Yes" to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III.

Only section 501(c)(3), 501(c)(4), and 501(c)(29) organizations must complete lines 5-9.

**5** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of:

**a** The organization? ....................................................................................... | **5a** | | X |
**b** Any related organization? ............................................................................... | **5b** | | X |
If "Yes" on line 5a or 5b, describe in Part III.

**6** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of:

**a** The organization? ....................................................................................... | **6a** | | X |
**b** Any related organization? ............................................................................... | **6b** | | X |
If "Yes" on line 6a or 6b, describe in Part III.

**7** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization provide any nonfixed payments not described on lines 5 and 6? If "Yes," describe in Part III ............................................. | **7** | | X |

**8** Were any amounts reported on Form 990, Part VII, paid or accrued pursuant to a contract that was subject to the initial contract exception described in Regulations section 53.4958-4(a)(3)? If "Yes," describe in Part III ............ | **8** | | X |

**9** If "Yes" on line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53.4958-6(c)? ........................................................................ | **9** | | |

LHA **For Paperwork Reduction Act Notice, see the Instructions for Form 990.** Schedule J (Form 990) 2018

832111 10-26-18

10040817 756327 142255 2018.06010 VDARE FOUNDATION 142255_1

**AA0215**

Schedule J (Form 990) 2018

VDARE FOUNDATION

22-3691487

Page 2

**Part II** | **Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees.** Use duplicate copies if additional space is needed.

For each individual whose compensation must be reported on Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii).
Do not list any individuals that aren't listed on Form 990, Part VII.

**Note:** The sum of columns (B)(i)-(iii) for each listed individual must equal the total amount of Form 990, Part VII, Section A, line 1a, applicable column (D) and (E) amounts for that individual.

| (A) Name and Title | | (B) Breakdown of W-2 and/or 1099-MISC compensation | | | (C) Retirement and other deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)-(D) | (F) Compensation in column (B) reported as deferred on prior Form 990 |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base compensation | (ii) Bonus & incentive compensation | (iii) Other reportable compensation | | | | |
| (1) PETER BRIMELOW CHAIRMAN | (i) | 0. | 0. | 181,675. | 0. | 0. | 181,675. | 0. |
| | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |

832112 10-26-18

Schedule J (Form 990) 2018

28

**AA0216**

**SCHEDULE L**
(Form 990 or 990-EZ)

# Transactions With Interested Persons

▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 25a, 25b, 26, 27, 28a, 28b, or 28c, or Form 990-EZ, Part V, line 38a or 40b.
▶ Attach to Form 990 or Form 990-EZ.
▶ Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No. 1545-0047

**2018**

Open To Public Inspection

Department of the Treasury
Internal Revenue Service

Name of the organization: **VDARE FOUNDATION**

Employer identification number: **22-3691487**

**Part I** | Excess Benefit Transactions (section 501(c)(3), section 501(c)(4), and 501(c)(29) organizations only).

Complete if the organization answered "Yes" on Form 990, Part IV, line 25a or 25b, or Form 990-EZ, Part V, line 40b.

| 1 (a) Name of disqualified person | (b) Relationship between disqualified person and organization | (c) Description of transaction | (d) Corrected? Yes | No |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

2 Enter the amount of tax incurred by the organization managers or disqualified persons during the year under section 4958 ▶ $ _____

3 Enter the amount of tax, if any, on line 2, above, reimbursed by the organization ▶ $ _____

**Part II** | Loans to and/or From Interested Persons.

Complete if the organization answered "Yes" on Form 990-EZ, Part V, line 38a or Form 990, Part IV, line 26; or if the organization reported an amount on Form 990, Part X, line 5, 6, or 22.

| (a) Name of interested person | (b) Relationship with organization | (c) Purpose of loan | (d) Loan to or from the organization? To | From | (e) Original principal amount | (f) Balance due | (g) In default? Yes | No | (h) Approved by board or committee? Yes | No | (i) Written agreement? Yes | No |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

Total ▶ $

**Part III** | Grants or Assistance Benefiting Interested Persons.

Complete if the organization answered "Yes" on Form 990, Part IV, line 27.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of assistance | (d) Type of assistance | (e) Purpose of assistance |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

LHA **For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.**

Schedule L (Form 990 or 990-EZ) 2018

832131 10-25-18

Schedule L (Form 990 or 990-EZ) 2018 VDARE FOUNDATION                                    22-3691487    Page **2**

| Part IV | Business Transactions Involving Interested Persons. |

Complete if the organization answered "Yes" on Form 990, Part IV, line 28a, 28b, or 28c.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of transaction | (d) Description of transaction | (e) Sharing of organization's revenues? | |
|---|---|---|---|---|---|
| | | | | Yes | No |
| HAPPY PENGUINS LLC | LIMITED LIABILITY C | 181,675. | ORGANIZATIO | | X |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| Part V | Supplemental Information. |

Provide additional information for responses to questions on Schedule L (see instructions).

SCH L, PART IV, BUSINESS TRANSACTIONS INVOLVING INTERESTED PERSONS:

(A) NAME OF PERSON: HAPPY PENGUINS LLC

(B) RELATIONSHIP BETWEEN INTERESTED PERSON AND ORGANIZATION:

LIMITED LIABILITY COMPANY OWNED PETER BRIMELOW (CHAIRMAN)

(D) DESCRIPTION OF TRANSACTION: ORGANIZATION LEASES CHAIRMAN, PETER

BRIMELOW, TO VDARE FOUNDATION

Schedule L (Form 990 or 990-EZ) 2018

832132 10-25-18

**SCHEDULE O**
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

**Supplemental Information to Form 990 or 990-EZ**

Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.
▶ Attach to Form 990 or 990-EZ.
▶ Go to www.irs.gov/Form990 for the latest information.

OMB No. 1545-0047

**2018**

Open to Public
Inspection

Name of the organization
**VDARE FOUNDATION**

Employer identification number
22-3691487

FORM 990, PART VI, SECTION A, LINE 2:

PETER BRIMELOW, CHAIRMAN, AND JOHN BRIMELOW, DIRECTOR, ARE BROTHERS.

FORM 990, PART VI, SECTION B, LINE 11B:

FORM 990 IS PROVIDED TO EACH DIRECTOR PRIOR TO FILING.

FORM 990, PART VI, SECTION B, LINE 12C:

MONITORS AND COMPLIES ANNUALLY.

FORM 990, PART VI, SECTION C, LINE 19:

DOCUMENTS ARE MADE AVAILABLE UPON REQUEST

LHA  For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.        Schedule O (Form 990 or 990-EZ) (2018)
832211 10-10-18

EXHIBIT E

AA0220

Case 1:22-cv-01337-DJS-CFH  Document 24-73  Filed 01/18/23  Page 2 of 14

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------ x

PEOPLE OF THE STATE OF NEW YORK, by
LETITIA JAMES, Attorney General of the State of
New York,                                        Index No. 453196/2022

                            Petitioner,          Motion Sequence No. 2
                                                 (VDARE's motion for dismissal
            - against -                          or, alternatively, a stay)

VDARE FOUNDATION, INC.,

                            Respondent.

------------------------------------------------------------------ x

AFFIRMATION IN SUPPORT OF RESPONDENT'S ORDER TO SHOW CAUSE
TO DISMISS OR, ALTERNATIVELY, STAY THIS PROCEEDING PENDING
RESOLUTION OF THE DUPLICATIVE AND OVERLAPPING FEDERAL CASE

        Andrew J. Frisch, an attorney duly admitted to practice law in the State of New

York since 1985, affirms the following statements to be true under penalties of perjury:

                            Introduction

        1.      I am counsel to VDARE Foundation, Inc. ("VDARE"), a non-profit

foundation organized and existing under the laws of the State of New York with a principal place

of business in Berkeley Springs, West Virginia.  The undersigned was engaged by VDARE in

late August 2022 to comply with and otherwise respond to an investigative subpoena issued to

VDARE by the Attorney General of the State of New York ("OAG") on or about June 24, 2022.

This Affirmation is based on personal knowledge, documents attached as exhibits which are true

and accurate copies of the originals, and otherwise on information and belief as noted.

        2.      On December 12, 2022, VDARE filed an action in United States District

Court for the Northern District of New York against the OAG [*VDARE Foundation, Inc. v.*

**AA0221**
1 of 13

Case 1:22-cv-01337-FJS-CFH Document 24-73 Filed 01/18/23 Page 2 of 14

*James*, 1:22-cv-01337 (FJS)], alleging, among other things, that the OAG's demands for certain disclosures in response to its subpoena (a) threaten VDARE's ability to conduct business; and (b) reveal the OAG's subpoena to be a retaliatory pretext aimed at interfering with VDARE's rights to freedom of speech and association guaranteed by the United States and New York Constitutions. VDARE's federal complaint seeks declaratory and injunctive relief. *See* VDARE's Complaint in United States District Court (the "Federal Complaint"), attached hereto as Exhibit A.

3. On December 16, 2022, less than a week *after* December 12, 2022, when VDARE filed its Federal Complaint against the OAG (and simultaneously emailed a courtesy copy to the OAG in advance of formal service), the OAG commenced this special proceeding against VDARE, seeking to compel the very disclosures identified in VDARE's Federal Complaint that threaten its existence and further demonstrating that the OAG's arguments in support of its investigative subpoena are pretextual.

4. It was not until December 22, 2022, that the OAG first notified VDARE that it had initiated this special proceeding, the day *after* the OAG (on December 21, 2022) requested and secured VDARE's consent to an extension of the OAG's deadline in federal court to respond to VDARE's Federal Complaint. In securing VDARE's consent to an extension of the OAG's deadline in federal court, the OAG did not disclose that it had filed this special proceeding the week before and was apparently awaiting this Court's issuance of an order to show cause, instead claiming: "Because of the holidays and a member of our team who has COVID, we would appreciate an extension until Jan 18 to respond to VDARE's complaint in the NDNY. Can you please confirm your consent?" *See* Email from the OAG to the undersigned,

2

Case 1:22-cv-01337-PJS-CEH Document 24-73 Filed 01/18/23 Page 97 of 14

dated December 21, 2022, attached hereto as Exhibit B.

5.     This affirmation is respectfully submitted in support of VDARE's

application, pursuant to CPLR 3211(a)(4), that this special proceeding be dismissed or,

alternatively, stayed until VDARE's pending federal action is resolved.

I.     *VDARE Sought Relief in United States District Court Only After the*
       *OAG's True Motive for Conducting this Investigation Became Apparent,*
       *And the OAG's Position Threatened VDARE's Ability to Conduct Business*

       *(A) VDARE's proposed middle ground and to meet and confer*

6.     Between September and November 2022, VDARE's undersigned counsel

completed review of records maintained by VDARE electronically and in hard copy and

produced over 6,000 pages to the OAG responsive to its investigative subpoena.  Before

December 2022, VDARE's counsel had provided the OAG with a list of email custodians and was

in the process of completing compliance with the OAG's subpoena by identifying responsive

emails from a universe of 40 gigabytes (the equivalent of millions of pages).

7.     While working towards completing compliance with the OAG's subpoena,

VDARE's counsel advised the OAG that disclosure of the identities of its employees and contractors

would violate constitutional guarantees of free speech and association.  The subject matter of

VDARE's principal activity - - commentary about immigration policy of the United States

disseminated to the public through its website at www.VDARE.com - - is controversial.  VDARE's

lawful speech has led to reputational and professional harm to people and entities associated with it.

In addition, contractors providing services essential to VDARE's survival have refused to continue to

do business with VDARE, including venues which cancelled contracts with VDARE to host

conferences, sometimes because of disagreement with VDARE's views, and sometimes because of

3

fear of protests.  These harms to VDARE have made it increasingly difficult for VDARE to find alternatives to continue to stay in business.  *See* Letter from the undersigned to the OAG, dated September 26, 2022, attached hereto as Exhibit C; Letter from the undersigned to the OAG, dated October 31, 2022, attached hereto as Exhibit D; Email from the undersigned to the OAG, dated October 20, 2022, attached hereto as Exhibit E.

      8.     The OAG knows or should know that VDARE's controversial speech exposes it to reprisals from those who disagree or fear protests from those who disagree.  *See, e.g.*, *"VDARE responds to conference cancellation at Cheyenne Mountain Resort,"* Aug. 15, 2017[1] ("Cheyenne Mountain Resort [in Colorado] will not be hosting the VDARE Foundation in April of next year. We remain committed to respecting the privacy of guests at the resort."); Kristine Phillips, The Washington Post, Jan 26, 2017 ("Tenaya Lodge, a resort on the border of Yosemite National Park, canceled [VDARE's] booking after receiving complaints about the organization's views.")[2]; *"Cancelled Tucson Conference Produces Five-Figure Settlement - - VDARE.com To Announce New Venue Soon!"* Mar. 7, 2018.[3]

      9.     Likewise, multiple businesses providing services essential to VDARE's continued operations have terminated their relationships with VDARE, including Mailchimp and Constant Contact (providers of email marketing services), Paypal, Amazon, Google Ads, and

---

[1] Available at *https://www.kktv.com/content/news/Mayor-Suthers-responds-to-planned-VDARE-conference-in-Colorado-Springs-440537563.html*

[2] Available at *https://www.washingtonpost.com/news/post-nation/wp/2017/01/26/a-resort-canceled-a-white-nationalist-groups-first-ever-conference-because-of-its-views/*

[3] Available at *https://vdare.com/articles/cancelled-tucson-conference-produces-five-figure-settlement-vdare-com-to-announce-new-venue-soon*

4

many smaller businesses.[4]  VDARE created an entity called "Happy Penguins LLC" for the sole

purpose of paying VDARE's employees so that they could identify a non-controversial entity

(Happy Penguins) - - and not VDARE - - as their employer.  *See* VDARE's Internal Revenue

Form 990 for 2019[5] (identifying "Happy Penguins LLC / Peter Brimelow" (VDARE's founder)

as a service providing leased employees).

       10.     While simultaneously working to comply with the OAG's subpoena and

producing documents responsive to the OAG's subpoena, VDARE's counsel provided the OAG

with precedent that established the constitutionally-protected interests.  Exhibit C (citing *NAACP*

*v. Alabama ex rel. Patterson,* 357 U.S. 449, 460, 462 (1958) (protecting the right of "advocacy of

both public and private points of view, particularly controversial ones" and holding that an order

requiring association to produce membership list interfered with First Amendment freedom of

association); and *Evergreen Ass'n, Inc. v. Schneiderman,* 153 A.D.3d 87, 100 (2d Dep't 2017)

(applying strict scrutiny where anti-abortion advocacy group served with the Attorney General's

investigatory subpoena alleged that subpoena compliance would "have a chilling effect on [the

group's] associations with its employees and potential clients" as well as at least one hospital);

*see also Rosenberger v. Rector & Visitors of the Univ. of Va. ,* 515 U.S. 819, 828 (1995)

("Discrimination against speech because of its message is presumed to be unconstitutional.");

---

   [4]  *See https://vdare.com/posts/we-ve-been-purged-from-mail-chimp-vice-gloats-
deplatforming-works-update-we-re-back; https://vdare.com/posts/emergency-message-to-
vdare-com-readers-from-peter-brimelow; see also "Tourist Town Desperate to Reopen Faces
Another Battle" infra.*

   [5]  *Available at https://www.charitiesnys.com/RegistrySearch/getcontent?guid=
{20D3F877-0000-CCBA-A2A6-DE59F92CA6EF}&orgid=41-37-83&title=IRS%20Annual%20R
eturn&project=Charities.*

Case 1:22-cv-01837-JLS-JJM Document 24-73 Filed 01/18/23 Page 7 of 14

*Rosenblatt v. Baer,* 383 U.S. 75, 85 (1966) ("Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized.").

11.     On October 15, 2022, VDARE requested that the OAG explain its purpose in seeking information about contractors in an effort "to narrow issues and move things along." Email from the undersigned to the OAG, dated October 15, 2022, attached hereto as Exhibit F. While the OAG declined to provide any such explanation, VDARE proposed a middle ground to the OAG that addressed the OAG's ostensibly legitimate investigative interest while protecting VDARE's concerns - - with reservation of the OAG's right to revisit the issue at a later date if necessary. VDARE proposed that it identify contractors who are related parties as defined by Article 715 of the New York Not-for-Profit Corporation Law who earn more than $10,000 annually; and would "consider identifying other employees or contractors involved in specific transactions with which your office might be concerned." Email of the undersigned to the OAG, dated October 20, 2022, attached hereto as Exhibit E ("To the extent you continue to have a problem with this protocol for this subset of vendors, we can revisit the issue as your work continues and see if we can resolve it later. I would like to make as robust a production as I can now and deal with this issue later, to the extent that my way forward for now proves not to be a permanent solution.").

12.     The OAG rejected VDARE's proposed middle ground. The OAG invited VDARE to provide objections in writing to specific requests in the OAG's subpoena, giving the impression that the OAG was keeping an open mind about the issue. VDARE provided objections to specific requests by letter dated October 31, 2022, requesting an opportunity to meet and confer toward resolving the issue. *See* Letter of the undersigned to the OAG, dated Oct. 31, 2022, attached

AA0226
6 of 13

Case 1:22-cv-01337-JLS-JJM Document 24-3 Filed 01/18/23 Page 7 of 14

hereto as Exhibit D). Even then, VDARE did not take a blanket approach to its continuing objections, but disclosed the identities of all of its employees as part of its continuing production, the identities of contractors who appeared to be related parties within the meaning of Article 715 of the New York Not for Profit Corporation Law (without regard to amount earned), as well as others whose associations with VDARE were apparently already publicly known.

13. In the undersigned's letter to the OAG dated October 31, 2022 (Exhibit D), VDARE expressed concern to the OAG about its apparent disclosure of constitutionally protected information in another investigation. On October 11, 2022, members of the United States Congress wrote to United States Attorney General Merrick Garland, requesting investigation of apparently undue disclosures provided to or otherwise obtained by the OAG. On August, 26, 2022, Politico had published confidential information about donors to another conservative non-for-profit in the OAG's cross hairs which was reportedly leaked by the OAG.[6]

14. Despite VDARE's completion of its review of records maintained electronically and in hard copy and attendant production of over 6,000 pages of documents, VDARE's continuing analysis of 40 gigabytes of emails, and its request to meet and confer on disclosure of the identifies of contractors, the OAG notified VDARE's counsel on December 2, 2022, that it required VDARE to complete production by December 12, 2022. Exhibit G. On December 12, 2022, as noted above, VDARE commenced a lawsuit in the Northern District of New York against the OAG. Exhibit A.

---

[6] *See https://www.wsj.com/articles/all-about-nikki-haleys-donors-new-york-attorney-general-letitia-james-stand-for-america.*

7

(B)  *The OAG rejected VDARE's offer to immediately address the OAG's purported concern about VDARE's purchase and use of a property*

15.     The purported impetus for the OAG's investigation (as disclosed by the OAG to VDARE's counsel) is VDARE's purchase in 2020 of a castle-styled property in Berkeley Springs, West Virginia, to host conferences in order to eliminate the risk that VDARE's conferences could only be conducted at the whim of independent venue owners.  *See* Rachel Olding, *"Tourist Town Desperate to Reopen Faces Another Battle"* Daily Beast (May 29, 2020)[7] (noting that VDARE's founder, Peter Brimelow, "said they plan to use the castle for meetings and as a studio - - handy considering at least three hotels have canceled conference contracts on VDARE after learning of the group's views.").

16.     After VDARE purchased the castle, a cottage on the castle's grounds in which the Brimelows intended to live was not yet habitable so the Brimelows (Peter and Lydia Brimelow and their three young children) moved from their home in Connecticut and lived in the castle for a period of months until the cottage was ready for them.  Among documents produced to the OAG as part of the 6,000 pages (and separately in undersigned's email to the OAG) is a lease agreement establishing that the Brimelows paid rent to live in the cottage beginning in April 2021. *See* Lease Agreement, attached hereto as Exhibit H.  Upon locating and producing the Brimelows' lease agreement for the cottage to the OAG, the undersigned proposed a meeting with the OAG to begin addressing the OAG's professed concerns about VDARE's purchase of the castle.  The OAG rejected that invitation, expressly deferring even an initial discussion about the castle until after VDARE produced all documents deemed by the OAG to be responsive to its subpoena.

---

[7]  Available at *https://www.thedailybeast.com/berkeley-springs-west-virginia-freaks-out-after-vdare-founder-buys-its-castle.*

Case 1:22-cv-01337-BKS-DJS Document 24-7 Filed 01/18/23 Page 10 of 14

*(C) Additional concerns expressed by the OAG are
pretextual and unfairly insinuate malfeasance*

17.    The OAG has authority to inquire and request documents from charities

registered in New York State, but it may not seek to supercede a previously-filed federal case with

unfair insinuations of malfeasance nor by demanding constitutionally-protected information far

afield from legitimate oversight.

18.    A few examples are illustrative.  The OAG notes in support of its motion that

Lydia Brimelow is identified on filings as VDARE's "Secretary, Treasurer and Publisher," but not

identified as Peter Brimelow's wife on VDARE's Internal Revenue Service Form 990.  AAG Fuchs

Affirmation [NYSCEF Doc. 4] at 19.  Peter and Lydia Brimelow, however, are publicly known to be

married and, on information and belief, file their income tax returns jointly as husband and wife with

the same Internal Revenue Service with which VDARE files Form 990.  The OAG asserts no

connection between this purported misstep in completing an IRS form and the identities of

VDARE's contractors.

19.    Similarly, the OAG insinuates that Peter Brimelow's compensation

reported in from VDARE's 2019 IRS Form 990 was atypically high [AAG Fuchs Affirmation at 9],

but conveniently omits that VDARE's total contributions for 2019 were $4,259,309 [VDARE's

Form CHAR500 for 2019, attached hereto as Exhibit I][8], a far substantially greater amount than in

other years.  Likewise, the OAG insinuates malfeasance from an auction of furnishings from the

castle [AAG Fuchs Affirmation at 8], but, on information and belief, the entirety of *de minimis*

proceeds from the auction went for VDARE's benefit.  None of this innuendo from the OAG

_____

[8]  Available at *https://www.charitiesnys.com/RegistrySearch/getcontent?guid=
{30D3F877-0000-CB55-8F8C-8ED446FA3F08}&orgid=41-37-83&title=Annual%20Filing%20
for%20Charitable%20Organizations&project=Charities*

9

justifies its demand for the identities of contractors and, instead, demonstrates that the OAG's

investigation is pretextual.

### (D) The OAG's complaints about inconsistencies in redactions ignore that the OAG encouraged a rolling production

20.     In the OAG's letter of December 2, 2022, demanding that VDARE complete

its production and identify all contractors without redactions by December 12, 2022, the OAG

complained that VDARE had inconsistently applied redactions, which had not been accompanied by

a log identifying the bases for the redactions.  But the OAG had agreed to "a rolling production"

[Email from the OAG to the undersigned, dated August 23, 2022, attached hereto as Exhibit J],

which permitted VDARE to act in good faith and reassess the need for redactions as its review

continued.  *See, e.g.*, Letter from the undersigned to the OAG, dated September 19, 2022, attached

hereto as Exhibit K ("As to redactions in the documents produced today, I have not had ample time

fully to evaluate bases underlying the reactions . . . I have opted instead to produce an installment of

documents today and will circle back on the redactions once my evaluations are complete."); Exhibit

E ("These issues . . . are not present for every vendor, so I am trying to identify precisely which

vendors present a problem.").

### (v) The OAG faulted VDARE for attempting to meet its own ambitious deadlines despite knowing that VDARE is a mom-and-pop operation represented by a solo practitioner

21.     As of December 2, 2022, when the OAG declined VDARE's proposal that

the parties meet and confer in response to VDARE's letter of October 31, 2022, and, instead,

demanded that production be completed within ten days, all that remained was resolution of

VDARE's objection to disclosure of contractors' identities and production of emails responsive to

the subpoena (and attendant redactions of contractors' identities).  Though the OAG's motion infers

undue delay in VDARE's production, the OAG is fully aware that VDARE "is literally a mom-an-

10

pop operation, with an actual mom who home schools three children, represented by a solo practitioner with no staff," who reviewed all VDARE records himself to determine responsiveness. Email from the undersigned to the OAG, dated September 30, 2022, attached hereto as Exhibit L. VDARE's legitimate efforts to protect its contractors and business interests by redacting identities of contractors was and remains labor-intensive and time-consuming, as VDARE reported to the OAG. Letter from the undersigned to the OAG, dated Oct. 31, 2022, attached hereto as Exhibit D ("The identities of VDARE's donors, content providers, and vendors who provide services to VDARE in its locality or are otherwise indispensable to its work are inextricably intertwined with some of its financial records. For example, some of these entities are identified in bank statements in lists of monthly transactions and associated copies of checks. The work to provide such financial records with redactions is labor-intensive and time-consuming and is ongoing."). Meanwhile, as to the OAG's request for a log of redactions and their bases, the extent of redactions of identities of contractors was significant, favoring one log of redactions after production was complete. Letter from the undersigned to the OAG, dated Nov. 21, 2022, attached hereto as Exhibit M.

22.     The undersigned set ambitious deadlines in a good faith effort to show diligence and compliance and, as of December 2, 2022, had completed review and produced 6,000 pages of VDARE's records maintained electronically and in hard copy. Completion of review of emails was in sight when the OAG, on December 2, 2022, unreasonably demanded that VDARE complete all steps necessary for compliance within ten days, apparently requiring that it either disclose the identities of all contractors without redactions or provide a full list of all such redactions from the 6,000 pages and responsive emails, and thereafter moved to compel compliance without meeting and conferring as requested by the undersigned on October 31, 2022, as required by the Court's local rules - - notwithstanding VDARE's previously filed Federal Complaint.

11

*II*      *Issues Raised by the OAG in this Special Proceeding Duplicate and Overlap*
           *Issues Raised by VDARE's First-filed Federal Complaint Against the OAG*

23.    VDARE sought relief in federal court only after the OAG's approach to its subpoena threatened VDARE's ability to conduct business and revealed that the OAG is using its subpoena power as a pretext. VDARE's Federal Complaint is based on many of the same underlying issues raised by the OAG's subsequent special proceeding in this Court.

24.    Thus, VDARE's Federal Complaint (Exhibit A), among other things that duplicate and overlap with this special proceeding, (a) alleges that the OAG unreasonably demands disclosure of identities of contractors indispensable to VDARE's work without any apparent legitimate investigatory purpose; (b) alleges settled principles of constitutional law cited by VDARE to the OAG in redacting identities of contractors; (c) alleges the OAG's demand on December 2, 2022, that VDARE complete its production without redactions by December 12, 2022, and without the meet-and-confer proposed by VDARE's counsel on October 31, 2022; and (d) alleges VDARE's concern about the OAG's leaking of confidential information in another matter.

25.    As noted above, undersigned counsel consented to the OAG's request for an extension of time for the OAG to respond to VDARE's Federal Complaint, which request did not disclose that the OAG had initiated this special proceeding. As of the date of this filing, the OAG's response to VDARE's federal complaint is due by January 18, 2023.

**AA0232**

26.     I affirm that the relief sought by VDARE in this application has not previously been requested in this Court.

Dated: January 3, 2023

> */s/ Andrew J. Frisch*
> Andrew J. Frisch
> The Law Offices of Andrew J. Frisch, PLLC
> 40 Fulton Street, 17th Floor
> New York, New York 10038
> (212) 285-8000
> *afrisch@andrewfrisch.com*
>
> *Attorneys for Respondent*

13

**EXHIBIT F**

T872940

Morgan County
Kimberly Nickles, Clerk
Instrument 872940
12/30/2020 @ 12:36:53 PM
DEED
279 @ Page 71
Pages Recorded 2
Recording Cost $    26.00

71

**THIS DEED** is made on December 29, 2020, by and between **VDARE FOUNDATION**, a New York not-for-profit corporation, ("Grantor") and **BERKELEY CASTLE FOUNDATION, INC.**, a West Virginia corporation, ("Grantee").

**WITNESSETH**, that for and in consideration of the sum of Ten Dollars ($10.00), cash in hand paid, and for other good and valuable consideration, the receipt and sufficiency is hereby acknowledged, Grantor does hereby **GRANT** and **CONVEY** unto Grantee, with covenants of General Warranty, all of their right, title and interest in and to all that certain lot, tract or parcel of land, together with the improvements thereon and the appurtenances thereunto belonging, situate in the Town of Bath, Bath District, Morgan County, West Virginia, and being more particularly described as follows:

A survey of a tract of land on the west side of West Virginia State Route 9, near the Town of Bath, in Bath District, Morgan County, West Virginia, more particularly described as follows:

Beginning at a 5/8 inch iron rod, set, in the west right-of-way line of West Virginia State Route 9, corner to Ward W. Keesecker II (WB 8, Page 3); thence, with said Keesecker, N 51° 34' 21" W., 212.14 feet to a 5/8 inch iron rod, set, corner to said Keesecker and U.S. Silica (Deed Book 48, at page 207); thence, with said U.S. Silica, N 51° 34' 21" W, 150.00 feet to a 5/8 inch iron rod, set, thence, N 36° 35' 47" E, 483.16 feet to a 5/8 inch iron rod, set in the line of said U.S. Silica at the corner of S. Taylor Suit (Deed Book 15, at page 283); thence, with said Suit, S 51° 53' 52" E, 374.73 feet to a 5/8 inch iron rod, set in the west margin of said Route 9, corner to said Suit; thence, with said west and north margin, the following courses and distances:  S 37° 23' 27" W, 189.38 feet; thence, N 52° 36' 23" W, 10.00 feet; thence, S 37° 23' 37" W, 50.00 feet; thence, S 39° 31' 29" W, 150.00 feet; thence, S 50° 28' 31" E, 10.00 feet; thence, S 37° 35' 17" W, 95.37 feet to the Point of Beginning, and containing 4.058 acres as surveyed by Michael M. Crawford, Licensed Land Surveyor, on August 10, 2000 and as shown on Berkeley Land Surveys Plat No. 2000164, which is recorded in the Office of the Clerk of the County Commission of Morgan County, West Virginia, in Map Book 7, at page 106, and to which plat reference is hereby made for a more particular description of the real estate conveyed herein.

BEING part of the same real estate conveyed unto VDARE Foundation, a New York not-for-profit corporation, by Berkeley Springs Castle, LLC, a West Virginia limited liability company, by deed dated February 14, 2020, of record in the Office of the Clerk of the County Commission of Morgan County, West Virginia in Deed Book No. 274 at page 710.

This conveyance is made subject to all exceptions, restrictions, conditions, covenants, agreements, municipal zoning ordinances, land use regulations, assessments, charges, easements, rights of way, and mineral severances contained in former deeds of record or visible upon inspection.

**DECLARATION OF CONSIDERATION OR VALUE:**  Under penalties of fine and imprisonment as provided by law, Grantor declares that this transfer is exempt from the excise tax on the privilege of transferring real property under W.Va. Code § 11-22-1 as a transfer between like nonprofit corporations having the same or similar purposes.

**WITNESS** the following signature and seal:

VDare Foundation, Inc.

By: _Lydia Brimelow_

President, VDare Foundation, Inc.

Returned 1/4/2021

FLAHERTY
200 CAPITOL STREET
CHARLESTON WV 25301-2206

STATE OF West Virginia
COUNTY OF Morgan , to-wit;

I, Angela Yost , a Notary Public in and for the abovesaid County
and State, do hereby certify that Lydia Brimelow , whose name is signed to the
foregoing deed bearing date the 29th day of December, 2020, as President of
VDARE Foundation, a New York not-for-profit corporation, has this day acknowledged the same
before me in my said County and State to me the act and deed of the not-for-profit corporation,
VDARE Foundation, a New York not-for-profit corporation.

Given under my hand and seal this 29th day of December , 2020

My commission expires   August 19, 2025

_Angela Yost_
Notary Public

(PLACE OF SEAL)

OFFICIAL SEAL
Angela M. Yost
Notary Public
State of West Virginia
My Commission Expires
August 19, 2025
1855 VALLEY ROAD
BERKELEY SPRINGS, WV 25411

Prepared by: Caleb P. Knight 200 Capitol Street, Charleston, WV 25301 (304) 347-4242

County Clerk's Office          DEC 3 0 2020
Morgan County, West Virginia
The foregoing writing, was this day presented
in said office and thereupon admitted to record.
at 12:36. Teste: _Kimberly Clerk_ KKS

**AA0236**

EXHIBIT G


Morgan County
Instrument 872938
12/30/2020 @ 12:29:02 PM
279 @ Page 64
Pages Recorded 7
Recording Cost    $      48.00
Transfer Tax      $    1705.00
Land Tax          $     682.00

**THIS DEED** is made on December 29, 2020, by and between VDARE FOUNDATION, a New York not-for-profit corporation, ("Grantor") and BBB LLC, a West Virginia limited liability company, ("Grantee").

**WITNESSETH**, that for and in consideration of the sum of Ten Dollars ($10.00), cash in hand paid, and for other good and valuable consideration, the receipt and sufficiency is hereby acknowledged, Grantor does hereby **GRANT** and **CONVEY** unto Grantee, with covenants of General Warranty, all of their right, title and interest in and to all those certain lots, tracts or parcels of land, together with the improvements thereon and the appurtenances thereunto belonging, situate in the Town of Bath, Bath District, Morgan County, West Virginia, and being more particularly described as follows:

PARCEL NUMBER ONE

TRACT NUMBER ONE

A tract of land on the east side of Warm Spring Ridge, in Bath District, Morgan County, West Virginia, more particularly described as follows:

"BEGINNING at a 5/8 inch iron rod, found in the line of Berkeley Springs Castle, LLC (D.B. 199 Pg. 496, Tract 1), corner to Berkeley Springs Castle (D.B. 199 Pg. 496, Tract 3); thence, with said Berkeley Springs Castle, (D.B. 199 Pg. 496, Tract 3), S. 35° 19' 56" W. 219.45 feet to a point in the line of said Castle (D.B. 199 Pg. 496, Tract 3) which lies N 35° 19' 56" E, 8.35 feet from a 5/8 inch iron rod, found, being the northwest corner to Brenda VanGosen (D.B. 180 Pg. 159) and corner to U. S. Silica Co., Bridges Tract (D.B. 46, Pg. 326); thence, from said point, with said Bridges Tract, N 57° 10' 04" W, 217.24 feet to a 5/8 inch iron rod, set; thence, N 19° 51' 35" E, 553.56 feet to a 5/8 inch iron rod, set; thence N 31° 31' 18" E, 825.01 feet to a 5/8 inch iron rod, set; thence, N 30° 16' 17" E, 544.47 feet to a hardened nail, set in rock about 20 feet west of a sharp pointed rock on top of Warm Spring Ridge, corner to said U. S. Silica Co, Bridges Tract; thence with same, in part, and finally with U. S. Silica Co. (D.B. 41 Pg. 157), S 54° 03' 00" E, 792.93 feet to a 5/8 inch iron rod, found, corner to said U. S. Silico (D.B. 41 Pg. 157), Sandra L. Matts (D.B. 137 Pg. 433) and Citizen's National Bank (D.B. 193 Pg. 287); thence, with said Citizen's National Bank, in part, Mary T. Lerner (W.B. 9 Pg. 699), in part, and finally with the west end of Union Street, S. 36° 47' 59" W, 199.03 feet to a 5/8 inch iron rod, set, corner to U. S. Silica Co, (D.B. 48 Pg. 207, Parcel No. 3); thence, with said D.B. 48 Pg. 207, Parcel No. 3, S. 36° 47' 59" W, 132.00 feet to a 5/8 inch iron rod, found, corner to Peter H. Moss (D.B. 157 Pg. 217); thence, with said Moss, S. 36° 47' 59" W, 29.30 feet to a 5/8 inch iron rod, found, corner to said Moss and a 10-feet wide alley; thence, with said alley, in part, and finally with Todd E. and Tina A. Byers (D.B. 171 Pg. 553), S 36° 31' 49" W, 89.78 feet to a 5/8 inch iron rod, set, corner to said Byers and the west margin of W. Va. State Route 9, (Project 3198, as constructed); thence with said west margin of Route 9, S 53° 43' 11' W, 58.86 feet; thence, tangent to the last described line along the arc of a curve to the left, which curve has a Central angle of 15° 32' 11", a radius of 311.50 feet, and an arc length of 84.47 feet; thence, tangent to the last described curve, S 39° 06' 12" W, 210.50 feet; thence, tangent to the last described line, along the arc of a curve to the right, which curve has a Central angle of 10° 58' 19", a radius of 452.50 feet, and an arc length of 86.65 feet; thence, tangent to the last described curve, S 49° 01' 11" W, 25.50 feet; thence, tangent to the last described line along the arc of a curve to the left, which curve has a Central angle of 14° 47' 00", a radius of 311.50, and an arc length of 80.37 feet; thence, tangent to the last described curve, S 34° 14' 13" W, 57.94 feet; thence, S 37° 23' 27" W, 42.15 feet to a 5/8 inch iron rod, found, corner to Berkeley Springs Castle, LLC (D.B. 199 Pg. 500); thence, leaving the west limit of said Route 9 and with said Castle (D.B. 199 Pg. 500), N 51° 53' 52" W, 374.73 feet to a 5/8 inch iron rod, found; thence, S 36° 35' 47" W, 100.03 feet to a 5/8 inch iron rod, found, corner to two tracts of said Berkeley Springs Castle, LLC (D.B. 199 Pg. 500 and D.B. 199 Pg. 496); thence, leaving said D.B. 199 Pg. 500 and with said D.B. 199 Pg. 496, S 36° 35' 47" W, 483.16 feet to a 5/8 inch iron rod, found; thence, with said Castle (D.B. 199 Pg. 496, Tract 3), S 51° 34' 21" E, 150.00 feet to the Point of Beginning and containing 21.688 acres as surveyed by Michael M. Crawford, Licensed Land Surveyor, on October 1, 2002 and shown on Berkeley Land Surveys Plat No. 2002184" and shown on Berkeley Land Surveys Plat No. 2002177, which is record in the Office of the Clerk of the County Commission of Morgan County, West Virginia, in Map Book No. 7, at page 149.

The Grantor by this deed expressly grants to the Grantee all of the interest of the Grantor in the minerals, including the sand (includes sand rock), silica sand, and quartzite contained in the above described real estate together with the right to prospect for, mine, lease, convey, or reserve the same, it being understood that the Grantor, its successors or

FLAHERTY
200 CAPITAL STREET
CHARLESTON WV 25301-2206

Returned 1/4/2021

**AA0238**

assigns shall have no right to receive any bonuses, minimum royalties, or production royalties paid under any leases of the said Grantee or the Grantee's successors in interest; reserving, however, to the said Grantor, and to its successors and assigns forever, a non-participating royalty interest at the rate of twenty-five (25%) percent of the gross sale price of the sand (includes sand rock), silica sand, and quartzite mined and removed from the above described real estate, free of any cost to the said Grantor, or to its successors or assigns, of discovery, production, and marketing of the said sand (includes sand rock), silica sand, and quartzite.

### TRACT NUMBER TWO

A tract of land on the west side of W.Va. State Route 9, in Berkeley Springs, Corporation, Morgan County, West Virginia, more particularly described as follows:

"BEGINNING at a 5/8 inch iron rod, set, the southwest corner of the west end of Union Street, and in the line of U. S. Silica Co. (D.B. 48 Pg. 207, Parcel No. 1); thence, with said south limit of Union Street, S 53° 12' 01" E, 38.00 feet to a hardened nail, set in a concrete wall, corner to Close Land Development Co. (D.B. 185 Pg. 533); thence, with said Close Land Development Co., S 36° 47' 59" W, 48.60 feet to a 5/8 inch iron rod, set; thence, with said Close, N 53° 12' 01" W, 18.00 feet to a 5/8 inch iron rod, set, corner to said Close; thence, with said Close, in part, and finally with Peter H. Moss (D.B. 157 Pg. 217), S 36° 47' 59" W, 83.40 feet to a 5/8 inch iron rod, found, corner to said Moss; thence, with said Moss, N 53° 12' 01" W, 20.00 feet to a 5/8 inch iron rod, found, corner to said Moss and in the line of said D.B. 48 Pg. 207, Parcel No. 1; thence, with said Parcel No. 1, N 36° 47' 59" E, 132 feet to the Point of Beginning and containing 3514.8 square feet as surveyed by Michael M. Crawford, Licensed Land Surveyor, on October 1, 2002 and shown on Berkeley Land Surveys Plat No. 2002184" and shown on Berkeley Land Surveys Plat No. 2002177, which is record in the Office of the Clerk of the County Commission of Morgan County, West Virginia, at Map Book No. 7, at page 149.

The Grantor by this deed expressly grants to the Grantee all of the interest of the Grantor in the minerals, including the sand (includes sand rock), silica sand, and quartzite contained in the above described real estate together with the right to prospect for, mine, lease, convey, or reserve the same, it being understood that the Grantor, it successors or assigns, shall have no right to receive any bonuses, minimum royalties, or production royalties paid under any leases of the said minerals made by the said Grantee or the Grantee's successors in interest; reserving, however, to the said Grantor, and to its successors and assigns forever, a non-participating royalty interest at the rate of twenty-five (25%) percent of the gross sale price of the sand (includes sand rock), silica sand, and quartzite mined and removed from the above described real estate, free of any cost to the said Grantor, or to its successors or assigns, of discovery, production, and marketing of the said sand (includes sand rock), silica sand, and quartzite.

BEING the same real estate conveyed unto Berkeley Springs Castle, LLC, a West Virginia limited liability company, by U.S. Silica Company, a Delaware corporation, by deed dated October 29, 2002, of record in the Office of the Clerk of the County Commission of Morgan County, West Virginia in Deed Book No. 201 at page 594.

### PARCEL NUMBER TWO

Situate in Town of Bath District, more particularly described as follows:

All of the portions of Lots C and D (described below) lying on the northwest side of West Virginia State Route 9, as shown on the plat by Michael M. Crawford, Licensed Land Surveyor No. 534 dated October 1, 2002 and shown on Berkeley Land Surveys Plat No. 2002184, which is record in the Office of the Clerk of the County Commission of Morgan County, West Virginia, in Map Book No. 7, at page 149 to which reference is hereby made.

LOTS C AND D as designated on O.E. Widmyer's Plan of Lots surveyed by F. P. Plessinger, C.E., on the 9th day of June, 1943, which plan is of record in the Office of the Clerk of the County Commission of Morgan County, West Virginia in Map Book 1 at page 3, said lots having a depth of 165 feet, said Lot C fronting on Wilkes Street 57 feet and Lot D fronting on Wilkes Street 60.3 feet, both lots running back westerly from Wilkes Street equidistant.

SUBJECT TO the restriction as set forth in the deed of record in Deed Book 85, at page 443.

BEING the same real estate conveyed unto Berkeley Springs Castle, LLC, a West Virginia limited liability company, by Close Land Development Company, a West Virginia corporation, by deed dated December 6, 2002, of record in the Office of the Clerk of the County Commission of Morgan County, West Virginia in Deed Book No. 201 at page 604.

## PARCEL NUMBER THREE

### TRACT NUMBER ONE

**PARCEL A:**

Beginning at (1) a 5/8 inch rebar, set in the east line of the original tract (Ward W. Keesecker and Mary M. Keesecker, (Deed Book 51, Page 123, First Tract) and in the east line of the West Virginia State Route 9 right-of-way, and in the west line of the old Sir John's Run Road right-of-way; thence, extending through the original tract with said east line of the West Virginia State Route 9 right-of-way, N 36° 32' 31" E., 136.91 feet to (2) a 5/8 inch rebar, set in the east line of the original tract, and in the south line of another tract of Ward W. Keesecker's (Deed Book 48, Page 411); thence, with the last mentioned tract (Deed Book 48, Page 411), and with the north line of the original tract, S 54° 00' 00" E., 13.31 feet to (3) a 5/8 inch rebar, set in the west line of the old Sir John's Run Road right-of-way, northeast corner of the original tract; thence, with the east line of the original tract, and the west line of the old Sir John's Run Road right-of-way, S 42° 05' 19" W., 137.69 feet to the Point of Beginning, and containing 911 square feet, as surveyed by Michael M. Crawford, Licensed Land Surveyor, on November 11, 1981, and shown on the plat of record in Deed Book 141, Page 610.

**AN UNDIVIDED TWO-THIRDS (2/3) INTEREST IN THE FOLLOWING PARCEL OF REAL ESTATE**

**PARCEL B:**

Beginning at (1) a 5/8 inch rebar, set in the old Sir John's Road; corner to the Ward W. Keesecker Heirs (Deed Book 51, Page 123) and the original tract (Ward W. Keesecker Heirs, Deed Book 48, Page 411) in the west line of the Berkeley Springs State Park, which is also the west line of Berkeley Springs Corporation; thence, with the original tract and the adjoining tract of the Ward W. Keesecker Heirs (Deed Book 51, Page 123), N. 54° 00' 00" W., 28.31 feet to (2) a 5/8 inch rebar, set in the east line of the West Virginia State Route 9 right-of-way; thence with the said east right-of-way line, N. 37° 35' 17" E., 87.25 feet to (3) a 5/8 inch rebar, set; thence, N. 39° 36' 05" E., 159.10 feet to (4) a 5/8 inch rebar, set; thence, S. 51° 30' 09" E., 5.00 feet to (5) a 5/8 inch rebar, set; thence, N. 37° 23' 37" E., 237.22 feet to (6) a 5/8 inch rebar, set; thence, leaving said east right-of-way line, and with the original tract and the Pennsylvania Glass Sand Corporation (Deed Book 48, Page 207), S 54° 00' 00" E., 10.08 feet to (7) a 5/8 inch rebar, set; corner to said Pennsylvania Glass Sand Corporation and the original tract in the line of the Berkeley Springs State Park; thence, with the original tract and the Berkeley Springs State Park, S. 36° 35' 47" W., 482.96 feet to the Point of Beginning, and containing 0.201 acres, as surveyed by Michael M. Crawford, Licensed Land Surveyor, on July 10, 1981, as shown on the plat of record in Deed Book 141, Page 611.

Excepting, however, any portion of the right-of-way for the old Sir John's Road, now impassable, which encroaches on the herein-conveyed 0.201 acre tract near the Point of Beginning.

### TRACT NUMBER TWO

Situate on the west side of West Virginia State Route 9 and on the south side of "The Castle" in Bath District, Morgan County, West Virginia, more particularly described as follows:

"BEGINNING at (1), a found 5/8 inch rebar on the western limits of West Virginia State Route 9, corner to Associated Investors Group, LLC (DB 192, Pg. 336), thence with the western limits of said Route 9 S 36 deg. 52' 21" W 229.48 feet to (2) a found P-K nail in the second concrete step from the top of a flight of steps, corner to Brenda VanGosen (DB 186, Pg. 159), thence leaving said Route 9 and with said VanGosen N 51 deg. 02' 14" W 206.37 feet to (3), a set 5/8 inch rebar in a found stone pile, in the line of U.S. Silica Company (DB 48, Pg. 207), thence with said U.S. Silica N 35 deg. 19' 56" E 227.80 feet to (4), a found 5/8 inch rebar in the line of the aforesaid Associated Investors Group, LLC, thence with said Group S 51 deg. 34' 21" E 212.44 feet to the BEGINNING, containing 1.10 Acre more or less."

As surveyed on February 6, 2001, by Charles P. Dawson, WVLLS No. 808, and shown on Berkeley Land Surveys Plat No. 2001021.

BEING part of the same real estate conveyed unto Berkeley Springs Castle, LLC, a West Virginia limited liability company, by Associated Investors Group, LLC, a West Virginia limited liability company, by deed dated June 25, 2002, of record in the Office of the Clerk of the County Commission of Morgan County, West Virginia in Deed Book No. 199 at page 496.

### PARCEL NUMBER THREE

Situate on the east side of Warm Springs Mountain in Bath District, more particularly described as follows:

BEGINNING at a stake corner to S. T. Suits lot of 3 acres 1 Rod and 19 perches, 13 3/10 feet bearing S. 57 ½° E., from a marked Oilanthesis tree, and in or near the line of the Bath Square; along said line N. 32 ¼ ° E., 100 feet to a stake 10 links (or 6 6/10 feet) Eastward from a pine and in or near said line, there extending up the mountain N. 57 ½° W., 450 feet to a small round marked stone, fast in rocks, against the east side or foot of a large rock and chestnut tree; thence S. 32 ½° W., 100 feet to a stone pile by some white walnuts, corner to said Suites 2nd lot, then with both his lots S. 57 ½° E., 450 feet to the beginning, containing one acre and five perches more or less.

BEING the same real estate conveyed unto Berkeley Springs Castle, LLC, a West Virginia limited liability company, by Associated Investors Group, LLC, a West Virginia limited liability company, by QUITCLAIM deed dated June 25, 2002, of record in the Office of the Clerk of the County Commission of Morgan County, West Virginia in Deed Book No. 199 at page 500.

### PARCEL NUMBER FOUR

Situate in Town of Bath District, Morgan County, West Virginia, more particularly described as follows:

Beginning at an auto driveshaft, found, on the west side of Cornelius Avenue, being the northeast corner of Gary W. Hofe (DB 84, PG 526); thence, leaving said Avenue, and running with the north line of Hofe, N. 63 03' 30" W, 105.91 feet to a ½ inch rebar, found, on the north side of a power pole and continue same course, 11.09 feet (in all 117.00 feet) to the east side of the Old Sir John's Run Road, being the northwest corner of Hofe; thence, with the east of said road, N. 63 24' 43" E., 53.33 feet; thence, N. 34 06' 31" E., 312.64 feet; to a point at the intersection of said Cornelius Avenue and located 17.4 feet from a 5/8 inch rebar, set, at the west base of a large locust tree; thence, with the west side of Cornelius Avenue, S. 17 44' 32" W., 267.54 feet; thence, S. 24 40' 27" W., 89.06 feet, to the point of beginning, containing 0.414 acre, as surveyed by Wayne G. Stotler, LLS, on December 5, 1985, and shown on Plat No. 85161, attached to that certain deed by and between James Walter Shockey, Jr., et ux and Jack P. Barker, et ux., dated December 19, 1985, and of record in the Clerk of the County Commission of Morgan County, West Virginia, in Deed Book No. 134, at page 614.

This conveyance is made subject to utility easements and rights of way of record.

BEING the same real estate conveyed unto Berkeley Spring Castle, LLC, a West Virginia limited liability company, by Alice M. Barker, by deed dated June 9, 2009, of record in the Office of the Clerk of the County Commission of Morgan County, West Virginia in Deed Book No. 233 at page 31.

### PARCEL NUMBER FIVE

Situate in Bath District, Morgan County, West Virginia, more particularly described as follows:

BEGINNING at (1) a 5/8 inch diameter iron rod, set at the South-West corner to this lot, and located N. 36° 06' 03" E., 81.20 feet from a T-bar (found), at the North corner of Paul D. Lawyers lot (also being the South-West corner to Robert Michael's lot), in the East line of land owned by Pennsylvania Glass Sand Corporation; thence, with the Sand Company's land, N. 36° 06' 03" E" 30.00 feet to (2) a capped Rebar, set, in a stone pile, (Made), at the Southwest corner of the Ward W. Kesecker property; thence, with said Kesecker property, S. 51° 01' 13" E., 202.18 feet to a flush capped rebar, set, in line and continue same course 4.00 feet (in all 206.18 feet) to (3) a PK Nail (set) in the second concrete step from the top of steps, in the West side right-of-way line of West Virginia

State Route #9, 20 feet from its center-line; thence, with the West side right-of-way line, and the arc of a curve to the West (whose chord bears S. 47° 36' 42" W., for 30.31 feet) an arc distance of 30.31 feet to (4) a flush capped Rebar, set (said point is located N. 51° 01' 51" W., 5.39 feet from a 2 inch diameter iron pipe, found): thence, with the North line of Robert Michael lot, N; 51° 01' 13" W., 200.12 feet to the beginning, containing 0.1398 acres, or 6089.7 feet, as surveyed by W. Thomas Biggert (West Virginia Surveyor's License No. 51) on April 10, 1975.

A RIGHT-OF-WAY is reserved for the use of the public leading to the dwelling of Mary K. Dawson from the County Road (now the State Road).

BEING the same real estate conveyed unto Berkeley Springs Castle LLC, a West Virginia limited liability company, by Brenda Cross, by deed dated April 20, 2004, of record in the Office of the Clerk of the County Commission of Morgan County, West Virginia, in Deed Book No. 208 at page 216.

## PARCEL NUMBER SIX

Situate in Bath District, Morgan County, West Virginia, more particularly described as follows:

"BEGINNING at a point on the West side limits of the State Road" in the second line of the entire survey conveyed to Bertha Mann and Anna B. Collins, March 19, 1919, of which this survey is a part; thence N. 53 ¾ W. 206 feet to a planted stone on original corner of the entire survey and extending through the same S. 55 ½ E. 196 feet to the West side of the State Road; thence with the Western boundary line of the State Road N. 42 E. 77.5 feet to the point of beginning, containing .36 acres, more or less.

TOGETHER WITH the right of ingress and egress over a concrete walkway leading from State Route No. 9 northerly to the property herein conveyed.

TOGETHER WITH the northern one-half of the garage and the real estate on which it is located situate on State Route No. 9 on the lot now owned by Albert C. and Mildred Smith, adjoining the above described premises herein conveyed. The whole of said garage fronts eighteen (18) feet and six (6) inches on said State Route 9 and extends to the depth of eighteen (18) feet.

THIS CONVEYANCE IS SUBJECT' TO all public utility easements, rights-of-way, conditions, covenants and restrictions and Deeds of Trust of record or in existence.

BEING the same real estate granted and conveyed unto Berkeley Springs Castle, LLC, by Walter L. Peacemaker, by deed dated July 19, 2006, of record in the Office of the Clerk of the County Commission of Morgan County, West Virginia, in Deed Book No. 221 at Page 260.

## PARCEL NUMBER SEVEN

A tract of land on the west side of Warm Spring Ridge, in Bath District, Morgan County, West Virginia, more particularly described as follows:

"BEGINNING at a 5/8 inch iron rod, found, corner to Robert D. and Ann M. Farris (D.B. 170 Pg. 654), John P. and Mary L. Seimann (D.B. 158 Pg. 497), and Laura K. Mechem (D.B. 178 Pg. 46); thence, with said Farris, N 61° 10' 12" W, 222.32 feet to an 8-inch diameter concrete monument, found, corner to said Parris, Douglas M. and Sonia L. Andrews (D.B. 150 Pg. 418), and the Town of Bath (D.B. 68 Pg. 306, Reservoir Lot); thence, with said Reservoir Lot, N 19° 39' 49" E, 208.97 feet to a 5/8 inch iron rod, set; thence, N 60° 24' 20" W, 204.19 feet to an 8-inch diameter concrete monument, found; thence, S 20° 28' 32" W, 211.46 feet to an 8-inch diameter concrete monument, found, corner to said Reservoir lot and said Andrews; thence, leaving said Reservoir lot and with said Andrews, N 73° 49' 43" W, 254.58 feet (passing a 5/8 inch iron rod, found at 234.34 feet) to a point at the center of W. Va. County Route 3 (Sir John's Run Road), corner to said Andrews and Frances L. Wells (W.B. 11, Pg. 244); thence, with said Wells and with said Sir John's Run Road, N 25° 26' 25" W, 225.16 feet; thence N 01° 38' 49" W, 210.46 feet; thence, crossing said road, N 23° 32' 00" E, 438.49 feet to a 5/8 inch iron rod, found on the east side of said Sir John's Run Road; thence, continuing with said Wells on the east side of said Sir John's Run Road, N 12° 10' 58" E, 64.82 feet to a square concrete monument, found; thence, with said Wells, and crossing said Sir John's Run Road, N 23°

12' 42" W, 229.47 feet to a metal post, found on the west edge of said Sir John's Run Road, corner to said Wells and Stanley Ehlenbach (D.B. 63 Pg. 89); thence, with said Ehlenbach, N 08° 51' 58" E, 125.80 feet to a point in said Road, corner to said Ehlenbach and James M. Ambrose (D.B. 151 Pg. 760); thence, leaving said Ehlenbach and crossing said Sir John's Run road, S 69° 07' 19" E, 43.26 feet to a marked locust, found on the east edge of the old Sir John's Run road, corner to said Ambrose; thence, with said Ambrose and the east edge of said old Sir John's Run Road, S 22° 24' 25" E, 164.49 feet to a 5/8 inch iron rod, found; thence, S 34° 38' 31" E, 114.25 feet to a 5/8 inch iron rod, found; thence, S 20° 20' 10" E, 69.69 feet; thence, S 02° 56' 20" E, 44.38 feet to a square concrete monument, found; thence, continuing with said Ambrose and leaving said east edge of old Sir John's Run road, S 76° 51' 24" E, 231.00 feet to a square concrete monument, found; thence, N 33° 00' 00" E, 581.13 feet,) passing a 5/8 inch iron rod, found at 128.92 feet) to a 5/8 inch iron rod, found, corner to said Ambrose and Craig A. and Anna Marie Chambers (D.B. 164 Pg. 545); thence, with said Chambers, N 33° 00' 00" E, 405.15 feet to a 5/8 inch iron rod, found, corner to said Chambers and Robert L. and Dorothea R. Ford (D.B. 167 Pg. 338); thence, with said Ford (D.B. 167 Pg. 338), in part, and finally another tract of said Ford (D.B. 182 Pg. 617) N 33° 00' 00" E, 201.14 feet to the base of a 20-inch hickory stump, found, corner to said Ford (D.B. 182 Pg. 617); thence with same, N 16° 40' 23" E, 65.38 feet to a 36-inch marked white oak, found, corner to a 23.85-acre tract of the grantors (D.B. 43, Pg. 50, Tract 1); thence, with said 23.85-acre tract, S 54° 03' 00" E, 371.21 feet to a hardened nail, set in rock about 20 feet west of a sharp pointed rock on top of Warm Spring Ridge; in the line of said 23.85-acre tract, and corner to U. S. Silica (D.B. 48 Pg. 207, Parcel No. 1, 18.25-acre tract); thence, with said 18.25-acre tract, S 30° 16'17" W, 544.47 feet to a 5/8 inch iron rod, set about 20 feet west of the top of Warm Spring Ridge; thence, S 31° 31' 18" W, 825.01 feet to a 5/8 inch iron rod, set on the east side of an old road; thence, S 19° 51' 35" W, 553.56 feet to a 5/8 inch iron rod, set at the top of Warm Spring Ridge, 40 feet east of the Town of Bath Reservoir lot; thence, S 57° 10' 04" E, 217.24 feet to a point in the line of Berkeley Springs Castle, LLC (D.B. 199 Pg. 500), corner to said 18.25 acre tract; thence, leaving said 18.25-acre tract of U.S. Silica, and with said Berkeley Springs Castle, S 35° 19' 56" W, 8.35 feet to a 5/8 inch iron rod, found, corner to said Castle lot and Brenda VanGosen (D.B. 180 Pg. 159); thence, with said VanGosen, S 35° 19' 28" W, 29.92 feet to a 5/8 inch iron rod, found, corner to said VanGosen and Lara K. Mechem (D.B. 178 Pg. 159); thence, with said Mechem, S 35° 19' 11" W, 80.44 feet to the Point of Beginning and containing 24.768 acres as surveyed by Michael M. Crawford, Licensed Land Surveyor, on September, 2002" and shown on Berkeley Land Surveys Plat No. 2002177, which is record in the Office of the Clerk of the County Commission of Morgan County, West Virginia, in Map Book No. 7, at page 148.

RESERVING, however, a right of way for ingress and egress over an established driveway leading from West Virginia County Route 3 (Sir John's' Run Road) to the tract now deeded to James M. Ambrose (D.B. 151 Pg. 760) which lies east of said Sir John's Run Road, and west of the Old Sir John's Run Road, as shown on the aforesaid Plat No. 2002177.

The Grantor by this deed expressly grants to the Grantee all of the interest of the Grantor in the minerals, including the sand (includes sand rock), silica sand, and quartzite contained in the above described real estate together with the right to prospect for, mine, lease, convey, or reserve the same, it being understood that the Grantor, it successors or assigns, shall have no right to receive any bonuses, minimum royalties, or production royalties paid under any leases of the said minerals made by the said Grantee or the Grantee's successors in interest; reserving, however, to the said Grantor, and to its successors and assigns forever, a non-participating royalty interest at the rate of twenty-five (25%) percent of the gross sale price of the sand (includes sand rock), silica sand, and quartzite mined and removed from the above-described real estate, free of any cost to the said Grantor, or to its successors and assigns, of discovery, production, and marketing of the said sand (includes sand rock), silica sand, and quartzite.

BEING the same real estate conveyed unto Berkeley Springs Castle, LLC, a West Virginia limited liability company, by U.S. Silica Company, a Delaware corporation, by deed dated October 29, 2002, of record in the Office of the Clerk of the County Commission of Morgan County, West Virginia in Deed Book No. 201 at page 599.

### PARCEL NUMBER EIGHT

Situate in Bath District, Morgan County, West Virginia, and being more particularly described as follows:

"Beginning at (1) an iron pipe at the West side Right-of-Way of State Route #9, this point being the South corner of the adjoining Grove lot; thence with the Grove line North 55-30 West 196.0 feet to (2) a Bathey T-Bar; thence South 33 West 50.8 feet to (3) a Bathey T-Bar; thence South 51-51' 30" East 186.9 feet to (4) a flush, Bathey T-Bar at the North-West limits of State Route #9; thence with the West side of State Route #9 North 42 East 63.5 feet to the beginning, containing 0.25071 acres, (0.251 acres), according to a survey by W. Thomas Biggert, Surveyor, on June 19, 1967."

This conveyance transfers all rights and privileges and is subject to any easements regarding the sidewalk and garage set forth in the deed to Rices dated April 12, 1928, of record in the aforesaid County Clerk's Office in Deed Book 41, page 392, insofar as said privileges and easements affect the parcel transferred herein.

BEING the same real estate conveyed unto Berkeley Springs Castle, LLC, by John P. Siemann, by deed dated November 16, 2012, of record in the Office of the Clerk of the County Commission of Morgan County, West Virginia, in Deed Book No. 243 at page 810.

BEING part of the same real estate conveyed unto VDARE Foundation, a New York not-for-profit corporation, by Berkeley Springs Castle, LLC, a West Virginia limited liability company, by deed dated February 14, 2020, of record in the Office of the Clerk of the County Commission of Morgan County, West Virginia in Deed Book No. 274 at page 710.

This conveyance is made subject to all exceptions, restrictions, conditions, covenants, agreements, municipal zoning ordinances, land use regulations, assessments, charges, easements, rights of way, and mineral severances contained in former deeds of record or visible upon inspection.

**DECLARATION OF CONSIDERATION OR VALUE:** Under penalties of fine and imprisonment as provided by law, Grantor declares that the total consideration paid for the property transferred by this instrument is $310,000.00.

WITNESS the following signature and seal:

VDare Foundation, Inc.

By: _Lydia Brimelow_

President, VDare Foundation, Inc.

STATE OF West Virginia

COUNTY OF Morgan , to-wit;

I, Angela Yost , a Notary Public in and for the abovesaid County and State, do hereby certify that Lydia Brimelow , whose name is signed to the foregoing deed bearing date the 29th day of December 2020, as President of VDARE Foundation, a New York not-for-profit corporation, has this day acknowledged the same before me in my said County and State to me the act and deed of the not-for-profit corporation, VDARE Foundation, a New York not-for-profit corporation.

Given under my hand and seal this 29th day of December , 2020

My commission expires August 19, 2025.

_Angela Yost_

Notary Public

(PLACE OF SEAL)

> OFFICIAL SEAL
> Angela M. Yost
> Notary Public
> State of West Virginia
> My Commission Expires
> August 19, 2025
> 1855 VALLEY ROAD
> BERKELEY SPRINGS, WV 25411

Prepared by: Caleb P. Knight 200 Capitol Street, Charleston, WV 25301 (304) 347-4242

**AA0244**

EXHIBIT H



# State of West Virginia

## Certificate

### I, Mac Warner, Secretary of State of the State of West Virginia, hereby certify that

**BERKELEY CASTLE FOUNDATION, INC.**

**Control number: 9AV94**

has filed its application for "Certificate of Incorporation" in my office according to the provisions of the West Virginia Code. I hereby declare the organization to be registered as a corporation from its effective date of July 21, 2020, until a certificate of dissolution has been filed with Secretary of State.

Therefore, I hereby issue this

# CERTIFICATE OF INCORPORATION



*Given under my hand and the*
*Great Seal of the State of*
*West Virginia on this day of*
*July 21, 2020*

*Mac Warner*

*Secretary of State*
496872

**AA0246**

CONFIDENTIAL

VF 005981



WEST VIRGINIA
ARTICLES OF INCORPORATION
WITH NON-PROFIT IRS ATTACHMENT
Form CD-1NP
Rev. 11/2017

**FILED**

**JUL 2 1 2020**

West Virginia Secretary of State
Business & Licensing Division
Tel: (304)558-8000
Fax: (304)558-8381
Website: www.wvsos.gov

**FILE ONE ORIGINAL**
(Two if you want a filed stamped
copy returned to you.)

IN THE OFFICE OF
WV SECRETARY OF STATE

**FILING FEE: $25 (non-profit)**
 * Fee Waived for Veteran-owned corporation

Control # .................................................

\*\*\* The undersigned, acting as incorporator(s) according to the West Virginia Code §31E-2-202, adopt the following \*\*\*
Articles of Incorporation for a West Virginia **Non-Profit** Domestic Corporation, which shall be perpetual.

1. The name of the West Virginia corporation shall be:
   [The name MUST contain one of the required corporate name endings\*
   per §31D-4-401 of the West Virginia Code (\*see attached instructions for
   the list of required name endings)]. This name is your official name and
   must be used in its entirety when in use unless a Trade Name (DBA) is
   registered with the Office of the Secretary of State, according to
   Chapter 47-8 of the West Virginia Code.]

   Berkeley Castle Foundation, Inc.

☒ CHECK BOX to indicate you've included **one of the REQUIRED CORPORATE NAME ENDINGS** (See instructions for name endings).

2. The **address of the principal office** of the corporation will be:

   Street: 276 Cacapon Road

   City: Berkeley Springs    State: WV    Zip Code: 25411

   Located in the **County of** (required):    County: Morgan

   The **mailing address** of the above location, if different, will be:

   Street:

   City:    State:    Zip Code:

3. The **physical address** (not a PO Box) of the **principal place of business** in West Virginia, if any:

   Street: 276 Cacapon Road

   City: Berkeley Springs    State: WV    Zip Code: 25411

   Located in the **County of:**    County: Morgan

   The **mailing address** of the above location, if different, will be:

   Street:

   City:    State:    Zip Code:

4. The name and address of the **person** (agent) to whom notice of process may be sent, if any, will be:

   Name: Lydia Brimelow

   Street: P.O. Box 211

   City: Ritchfield    State: CT    Zip Code: 06759

RECEIVED

JUL 2 1 2020

530646

**AA0247**

CONFIDENTIAL

VF 005982

WEST VIRGINIA ARTICLES OF INCORPORATION WITH NON-PROFIT IRS ATTACHMENT          Page 2

5. **E-mail address** where business correspondence may be received: lbrimelow@vdare.com

6. **Website address** of the business, if any (*ex: yourdomainname.com*):

7. **Do you own or operate more than one business in West Virginia?**   ☐ Yes *Answer a. and b. below.*   ☐ No   ☒ **Decline to answer**

   If "Yes"... a. How many businesses? _____   b. Located in how many West Virginia counties? _____

8. The corporation is organized as (*check the box below*):

   ☒ **NON-PROFIT, NON-STOCK** (If you plan to apply for 501(c)(3) status with the IRS, you will need to include specific language that is required by the IRS to be included in your Articles of Incorporation. That language is included as an attachment to this application - *see last page of this application.*)

9. a. The **purpose** for which this corporation is formed is as follows:
   (Describe the type(s) of business activity which will be conducted, for example, "agricultural production of grain and poultry", "construction of residential and commercial buildings", "manufacturing of food products", "commercial painting", "retail grocery and sale of beer and wine." Purpose may conclude with words "…including the transaction of any or all lawful business for which corporations may be incorporated in West Virginia.")

   the transaction of any or all lawful business for which corporations may be incorporated in West Virginia

   b. Is the business a **Scrap Metal Dealer?**

   ☐ Yes [If "Yes," you must complete the **Scrap Metal Dealer Registration Form** (Form SMD-1) and proceed to Section 10.]

   ☒ No [Proceed to Section 10.]

10. FOR **NON-PROFIT ONLY** (Check the statement that applies to your entity.):

   ☒ Corporation will have **NO MEMBERS**.

   ☐ Corporation will have **MEMBERS** (See *NOTE* below.)

   *NOTE: If the corporation has one or more classes of members, the designation of a class or classes is to be set forth in the articles of incorporation and the manner of election or appointment and the qualifications and rights of the members of each class is to be set forth in the articles of incorporation or bylaws. If this applies to your entity then you will need to attach a separate sheet listing the above required information, unless it will fit in the space provided below.

11. The **name(s) and address(es) of the incorporator(s)** is (You must list at least ONE incorporator.):

| | Name | Address | City | State | Zip Code |
|---|---|---|---|---|---|
| a) | Lydia Brimelow | P.O. Box 211 | Ritchfield | CT | 06759 |
| b) | | | | | |

**AA0248**

CONFIDENTIAL

VF 005983

**WEST VIRGINIA ARTICLES OF INCORPORATION WITH NON-PROFIT IRS ATTACHMENT**   Page 3

12. Is the organization a "veteran-owned" organization?

Effective **JULY 1, 2015**, to meet the requirements for a **"veteran-owned"** organization, the entity filing the registration must meet the following criteria per West Virginia Code §59-1-2a:

1. A "**veteran**" must be honorably discharged or under honorable conditions, and
2. A "**veteran-owned business**" means a business that meets one of the following criteria:
   o Is at least fifty-one percent (51%) unconditionally owned by one or more veterans; or
   o In the case of a publicly owned business, at least fifty-one percent (51%) of the stock is unconditionally owned by one or more veterans.

[ ] Yes (If "Yes," attach Form DD214) ➡ [ ] CHECK BOX indicating you have <u>attached Veteran Affairs Form DD214</u>

[☒] No

You may obtain a copy of your Veterans Affairs Form DD214 by contacting:

**National Personnel Records Center Military Personnel Records**
1 Archives Drive
St. Louis, MO 63138
Toll free: 1-86-NARA-NARA or 1-866-272-6272
Phone: 314-801-0800
www.archives.gov/veterans/military-service-records

Per WV Code 59-1-2(j) effective <u>July 1, 2015</u>, the **registration fee is waived** for entities that meet the requirements as a "veteran-owned" organization. See attached instructions to determine if the organization qualifies for this waiver. In addition, a "veteran-owned" entity will have **four (4) consecutive years of Annual Report fees waived** AFTER the organization's initial formation [see WV Code 59-1-2a(m)].

13. The number of acres of land it holds or expects to hold in West Virginia is: _____ 55 _____

14. **Contact and Signature Information*** (See below *Important Legal Notice Regarding Signature*):

a. Contact person to reach in case there is a problem with filing: Caleb P. Knight     Phone: +1 (304) 347-4242

b. Print name of person who is signing articles of incorporation: Lydia Brimelow

c. Signature of Incorporator: *[signature]*     Date: *[handwritten] July 15, 2020*

***Important Legal Notice Regarding Signature:*** Per **West Virginia Code §31E-1-129. Penalty for signing false document.** Any person who signs a document he or she knows is false in any material respect and knows that the document is to be delivered to the secretary of state for filing is guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than one thousand dollars or confined in the county or regional jail not more than one year, or both.

**Important Note:** This form is a public document. Please do **NOT** provide any personal identifiable information on this form such as social security number, bank account numbers, credit card numbers, tax identification or driver's license numbers.

[ Reset Form ]     [ Print Form ]

# AA0249

**E**XHIBIT **I**



# State of West Virginia

## Certificate

I, *Mac Warner, Secretary of State of the State of West Virginia, hereby certify that*

**BBB, LLC**

**Control number: 9AV93**

has filed its "Articles of Organization" in my office according to the provisions of West Virginia Code §§31B-2-203 and 206. I hereby declare the organization to be registered as a limited liability company from its effective date of July 21, 2020 until the expiration of the term or termination of the company.

Therefore, I hereby issue this

# CERTIFICATE OF A LIMITED LIABILITY COMPANY



*Given under my hand and the Great Seal of the State of West Virginia on this day of July 21, 2020*

*Mac Warner*

**Secretary of State**

496861

# AA0251



---

| WEST VIRGINIA<br>ARTICLES OF ORGANIZATION<br>OF LIMITED LIABILITY COMPANY<br>Form LLD-1<br>Rev. 6/5/2019 | | West Virginia Secretary of State<br>Business & Licensing Division<br>Tel: (304)558-8000<br>Fax: (304)558-8381<br>Website: www.wvsos.gov |

**FILED**

**JUL 2 1 2020**

**IN THE OFFICE OF
WV SECRETARY OF STATE**

**FILE ONE ORIGINAL**
(Two if you want a filed stamped
copy returned to you.)

**FILING FEE: $100**
    Fee Waived for Veteran-owned organization

Control # ____ ____ ____

\* \* \* \* \* We acting as organizers according to West Virginia Code §31B-2-202, adopt the following \* \* \* \* \*
Articles of Organization for a West Virginia Limited Liability Company.

1. The **name** of the West Virginia limited liability company
shall be: [The name must contain one of the required terms such as "limited
liability company" or abbreviations such as "LLC" or "PLLC" - see instructions
for a list of acceptable terms.]

    BBB, LLC

☑ **CHECK BOX to indicate you've included** one of the **REQUIRED CORPORATE NAME ENDINGS** (*See instructions for name endings*).

2. The **company**
will be a:  ☑ LLC  ☐ **Professional LLC\*** for the profession of:
                           (*See Section 2. of the attached instructions for list of accepted professions.*)

                         ☐ **Professional business organizations:** CHECK BOX indicating you have attached the state licensing board
                           Verification of Eligibility (Form **VOE**) to these Articles if your profession meets the requirements as defined by
                           Chapter 30 of WV Code. **Your application will be rejected if the VOE signed by the board is not attached.**

3. The address of the **principal office**
of the company will be:

    Street: 276 Cacapon Road

    City: Berkeley Springs    State: WV    Zip Code: 25411

Located in the **County** of (required):    County: Morgan

The **mailing address** of the above
location, if different, will be:

    Street:

    City:    State:    Zip Code:

4. The address of the initial **designated
(physical) office** of the company in
West Virginia, if any, will be:

    Street:

RECEIVED

JUL 2 1 2020

    City:    State:    Zip Code:

Located in the **County** of:    County:

The **mailing address** of the above
location, if different, will be:

    Street:

    City:    State:    Zip Code:

5. The name and address of the **person
or company (agent)** to whom notice
of process may be sent, if any, will be:

    Name: Lydia Brimelow

    Street: P.O. Box 211

    City: Ritchfield    State: CT    Zip Code: 06759

530042

**AA0252**

**WEST VIRGINIA ARTICLES OF ORGANIZATION OF LIMITED LIABILITY COMPANY**  Page 2

6. **E-mail address** where business correspondence may be received:  lbrimelow@vdare.com

7. **Website address** of the business, if any (*ex: yourdomainname.com*):

8. Do you **own or operate more than one business in West Virginia?**  ☐ **Yes** *Answer a. and b. below.*  ☐ No  ☑ **Decline to answer**

   If "**Yes**"... a. How many businesses? _____  b.  Located in how many West Virginia counties? _____

9. The **name(s) and address(es) of the organizer(s)** is (You must list at least ONE organizer.):

| Name | No. & Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Lydia Brimelow | P.O. Box 211 | Ritchfield | CT | 06759 |
| | | | | |

10. The company will be -   CHECK ONE (required):
   ☑ an **AT-WILL** company, conducting business for an indefinite period.
   ☐ a **TERM** company, conducting business for the term of _____ years.

11. The company will be -  CHECK ONE (required):
   ☐ **MEMBER**-MANAGED [List the names and addresses of all **MEMBERS** below.]
   ☑ **MANAGER**-MANAGED [List the names and addresses of all **MANAGERS** below.]

List the name(s) and address(es) of the **MEMBER(S)** [if member-managed] or the **MANAGER(S)** [if manager-managed] of the company (required; Note: The application will be rejected if the information is not provided below. Attach additional pages if necessary.):

| Name | No. & Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Lydia Brimelow | P.O. Box 211 | Ritchfield | CT | 06759 |
| | | | | |
| | | | | |
| | | | | |

12. All or specified members of a limited liability company are **liable in their capacity as members** for all or specified debts, obligations or liabilities of the company (**required**):
   ☑ No - All debts, obligations and liabilities are those of the company.
   ☐ Yes - Those persons who are liable in their capacity as members for all debts, obligations or liability of the company have consented in writing to the adoption of the provision or to be bound by the provision.

13. a. The **purpose(s) for which this limited liability company is formed** is as follows (required):
   [Describe the type(s) of business activity which will be conducted, for example, "real estate," "construction of residential and commercial buildings," "commercial painting," "professional practice of law" (see **Section 2.** for acceptable "professional" business activities). Purpose may conclude with words "…including the transaction of any or all lawful business for which corporations may be incorporated in West Virginia."]

   the transaction of any or all lawful business for which companies may be organized in West Virginia

   b. Will the above purpose include any business activity conducted as a **consumer litigation financier** pursuant to WV Code §46A-6N?
   ☐ **Yes** [By checking "Yes," the applicant affirms the above **purpose includes the required statement that the organization shall be designated as a litigation financier** pursuant to WV Code §46A-6N. You are also affirming that you have included with this application an original completed copy of the **required** Application for Registration as a Litigation Financier (Form LF-1) with the associated requisite filing fee.]
   ☑ No [Proceed to 14.]

# AA0253

**WEST VIRGINIA ARTICLES OF ORGANIZATION OF LIMITED LIABILITY COMPANY**          Page 3

14. Is the business a **Scrap Metal Dealer**?

   ☐ Yes [If "**Yes**," you must complete the **Scrap Metal Dealer Registration Form** (Form SMD-1) and proceed to Section 15.]

   ☑ **No** [Proceed to Section 15.]

15. Other provisions which may be set forth in the operating agreement or matters not inconsistent with law:
   [See instructions for further information; use extra pages if necessary.]

16. The number of pages attached and included in these Articles is:

17. The **requested effective date** is          ☑ the date and time of filing in the Secretary of State's Office.
   [Requested date *may not be earlier than filing nor*
   *later than 90 days after filing in our office.*]          ☐ the following date _____ and time _____ .

18. Is the organization a "**veteran-owned**" organization?

   Effective **JULY 1, 2015**, to meet the requirements for a "**veteran-owned**" organization, the entity filing the registration must meet the following criteria per West Virginia Code §59-1-2a;

   1. A "**veteran**" must be honorably discharged or under honorable conditions, and
   2. A "**veteran-owned business**" means a business that meets one of the following criteria:
   o Is at least fifty-one percent (51%) unconditionally owned by one or more veterans; or
   o In the case of a publicly owned business, at least fifty-one percent (51%) of the stock is unconditionally owned by one or more veterans.

   ☐ Yes (If "**Yes**," attach Form DD214)  ➡  ☐ **CHECK BOX** indicating you have attached Veteran Affairs Form DD214

   ☑ No                          You may obtain a copy          **National Personnel Records Center**
                                 of your Veterans Affairs        **Military Personnel Records**
                                 Form DD214 by                   1 Archives Drive
                                 contacting:                     St. Louis, MO 63138
                                                                 Toll free: 1-86-NARA-NARA or 1-866-272-6272
                                                                 Phone: 314-801-0800
                                                                 www.archives.gov/veterans/military-service-records

   Per WV Code 59-1-2(j) effective July 1, 2015, the **registration fee is waived** for entities that meet the requirements as a "**veteran-owned**" organization. See attached instructions to determine if the organization qualifies for this waiver. In addition, a "**veteran-owned**" entity will have **four (4) consecutive years of Annual Report fees waived** AFTER the organization's initial formation [see WV Code 59-1-2a(m)].

19. **Contact and Signature Information**\* (See below *Important Legal Notice Regarding Signature*):

   a. Contact person to reach in case there is a problem with filing: Caleb P. Knight          Phone: +1 (304) 347-4242

   b. Print or type name of signer: Lydia Brimelow          Title/Capacity of signer: Manager

   c. Signature: *Lydia Brimelow*          Date: July 15 2020

   \**Important Legal Notice Regarding Signature:* Per West Virginia Code §31B-2-209. **Liability for false statement in filed record.** If a record authorized or required to be filed under this chapter contains a false statement, one who suffers loss by reliance on the statement may recover damages for the loss from a person who signed the record or caused another to sign it on the person's behalf and knew the statement to be false at the time the record was signed .

   **Important Note:** This form is a public document. Please **do NOT** provide any personal identifiable information on this form such as social security number, bank account numbers, credit card numbers, tax identification or driver's license numbers.

   [ Reset Form ]     [ Print Form ]

**AA0254**

**EXHIBIT J**

# RESIDENTIAL LEASE AGREEMENT

THIS RESIDENTIAL LEASE AGREEMENT (hereinafter referred to as "Agreement") is entered into this _1st__day of ___**April 2021**_____ by and between **_BBB LLC**_of **304 Cacapon Road Berkeley Springs, West Virginia 25411** ("Landlord"), and **Lydia Brimelow_** ("Tenant").

**WITNESSETH**

WHEREAS, Landlord agrees to lease the premises identified as: **300 and 304 Cacapon Rd, Berkeley Springs, West Virginia 25411** ("the Premises") for use as a private residence; and

WHEREAS, Tenant agrees to lease the Premises in accordance with the terms and conditions set forth below.

NOW, THEREFORE, In consideration of the mutual covenants contained herein the parties agree to the following:

1.Term of Lease. Tenant agrees to rent the Premises for a period of 12 months commencing on the **1st day of April, 2021** and terminating on the **30th day of April, 2023** ("Term"), or sooner as provided herein.

2.Rent. Tenant agrees to pay annual rent of **$21,624**, in equal monthly installments of **$1800**, payable in advance on the fifth day of each month for that month's rental. The initial rental payment of **$800**, due and payable upon the signing of this Agreement, shall represent the rent for the first month. All rental payments shall be made to Landlord at the address specified above or at such other place as Landlord may designate from time to time.

3.Late Rental Payments and Returned Checks. If Landlord does not receive a monthly rental payment by the 5th day of the month, Tenant agrees to pay a late charge of **$50**, plus **$10** per day for each day thereafter that the rent payment is not received by the Landlord.

3.1.If a monthly rental payment received after the 9th day of the month does not include all applicable late fees and/or "additional rents" as defined herein, the outstanding monthly rental payment will continue to be considered "unpaid".

3.2.Payments received by Landlord will be applied first towards late fees and/or other additional charges, then towards outstanding rent.

3.3.If any check given by Tenant to Landlord for the payment of rent or for any other sum due under this Agreement is returned for insufficient funds, a "stop payment" order, or any other reason, Tenant shall pay Landlord a returned check charge of **$100** and Landlord shall have the right to demand that all future payment obligations be made in cash or by money order.

4.Security Deposit. Upon the signing of this Agreement, Tenant shall deposit **$1000** with Landlord assecurity that Tenant will comply with all of the terms and conditions of this Agreement. THE SECURITY DEPOSIT MAY NOT BE USED TO PAY RENT UNDER ANY CIRCUMSTANCES. Landlord's obligation to release Tenant's security deposit is subject to applicable provisions of law and Tenant's full compliance with the terms and conditions of this Agreement, including but not limited to the following:

4.1.Performance of Tenant's obligations through the full term of the Agreement;

4.2.Confirmation that Tenant has not damaged the Premises, buildings, or grounds;

4.3.Confirmation that the entire dwelling, appliances, closets, and cupboards are clean and free from insects, all debris and rubbish have been removed from the property, carpets are vacuumed and shampooed and left clean and odorless;

4.4.Payment of all unpaid charges including late charges, visitor charges, pet charges, delinquent rents, etc.;

4.5. Return of all keys; and

4.6.Landlord's receipt of Tenant's forwarding address.

5.Use of the Security Deposit. Landlord may use as much of the security deposit as necessary to pay for damages resulting from Tenant's occupancy and use of the Premise or other violations or breaches of the Agreement. If such events occur prior to the termination of the Term, Landlord may demand that Tenant replace the amount of the security deposit used by Landlord. If Landlord sells the Premises, Landlord may transfer the deposit to the new owner for Tenant's benefit. Landlord will notify Tenant of any sale and transfer of the deposit. Landlord will then be released of all liability to return the security deposit to Tenant.

6.Possession of the Premises. Any failure to take possession of the Premises shall not relieve Tenant's obligation to pay rent. If Landlord is unable to deliver possession of the Premises for any reason not within Landlord's control, this Agreement shall remain in full force and effect and Landlord shall not be liable for any resulting damages. Tenant shall not be liable for any rental payment until possession of the Premises is delivered. If Landlord is unable to deliver possession within thirty (30) calendar days after the commencement date identified herein, Tenant may terminate this Agreement by giving written notice to Landlord and shall receive a refund of all rent and security deposits paid.

7.Use of Property. Tenant shall use the Premises exclusively as a private residence with no more than 7 ("Household Members"). Occupancy by guests for more than ten days in any six-month period is prohibited and shall constitute a breach of this Agreement without Landlord's advanced written consent. Tenant shall make no other use of the Premises without Landlord's prior written approval.

8.Alterations by Tenant. Tenant shall not make any alterations, additions, or modifications to the Premises without first obtaining Landlord's express written consent. Any alterations, additions, and /or improvements made to the Premises shall become Landlord's property.

9.No Transfer, Assignment or Subletting. Tenant shall not transfer, assign, or attempt to sublet this Agreement, or any part thereof. Any attempt to assign, transfer, or sublet shall be VOID and, at the election of Landlord, be an irremediable breach of this Agreement and cause for immediate termination.

10.Condition of the Premises. Tenant acknowledges that he or she has examined the entire interior and exterior of the Premises, including plumbing, heating and electrical appliances, smoke detector(s), fixtures, carpets, drapes and paint, and has found them to be in good, safe and clean condition and repair. Tenant further acknowledges that the premises are leased without air conditioning other than one (1) window unit provided by Landlord. Tenant agrees to:

a.Properly use, operate and safeguard the Premises and all furniture and furnishings, appliances and fixtures within the Premises;

b.Maintain the Premises in clean and sanitary condition, and upon termination of the tenancy, to surrender the Premises to Landlord in the same condition as when Tenant first took occupancy, except for ordinary wear and tear,

c.Maintain the surrounding grounds in a clean and safe manner, keeping the grounds clear of rubbish and weeds, and trimming all grass as necessary to effect a neat and orderly appearance to the property,

d.Notify Landlord in writing upon discovery of any damages, defects or dangerous conditions in and about the Premises; and

e.Reimburse Landlord for the cost of any repairs to the Premises of damages caused by misuse or negligence of Tenant or his or her guests or invitees.

11. Premises are Leased Unfurnished. Tenant acknowledges that Premises are leased unfurnished and without appliances except heating device or devices, stove/oven, refrigerator, hot water heater, and one air conditioning window unit. Tenant may freely use any other furniture or appliances as may be present in the Premises. Tenant acknowledges that Landlord may remove, add to, or change any such furniture and appliances at any time at Landlord's sole option.

12.Damage to Personal Property. Landlord shall not be responsible for any loss of or damage to property of Tenant or of others placed, located, or moved into the Premises. Tenant hereby agrees to make no claim for any such damages or loss against Landlord. Tenant shall purchase renter's insurance on all personal property if such coverage is desired.

13.Compliance with Laws. Tenant shall comply with all statutes, ordinances, rules, orders, regulations and requirements of all municipal, state and federal authorities now in force, or which may hereafter be in force, pertaining to the Premises, or Tenant's use of the Premises.

14.Destruction of Premises. Subject to the exception below, if the Premises are damaged or destroyed as to render them uninhabitable, either Landlord or Tenant shall have the right to terminate this Agreement as of the date on which such damage occurs. Written notice of the intention to terminate the Agreement shall be provided to the other party within fifteen days of when the damage occurred.

a.If any damage results from the conduct or negligence of Tenant or Tenant's guests or invitees, Landlord shall have the sole right to terminate this Agreement. Regardless of whether Landlord exercises its right to terminate the Agreement, Tenant shall remain responsible for all losses associated from the property damage, including, but not limited to, damages and repair costs, replacement value of furnishings, as well as loss of rental income.

15.Default by Tenant. Landlord's acceptance of this Agreement is conditioned upon Tenant's prompt rental payments and full compliance with the terms and conditions of this Agreement. Any failure by Tenant to comply with the terms of this Agreement shall constitute a breach of this Agreement. Upon Tenant's default or breach of this Agreement, Landlord, his agents or attorneys, shall have the right to enter the Premises, and remove all persons from the Premises forcibly or otherwise. Tenant expressly waives any and all notice required by law to terminate tenancy, and waives any and all legal proceedings to recover possession of the Premises. The failure to pay rent when due shall immediately constitute a material breach. Tenant shall remain obligated to pay the rent for the remainder of the Lease Term. Tenant shall also be obligated to pay all costs, including reasonable attorney fees, related to the breach and the collection of any monies owed the Landlord, along with the cost of re-entering, re-renting, cleaning, and repairing the Premises.

16.Abandonment by Tenant. If Tenant abandons or vacates the Premises before the end of the Lease Term, or causes the rent to be in arrears, Landlord may, without any liability to Tenant, cancel this Agreement, enter the Premises, and relet the Premises with or without any furniture that may be therein. Any prior payments made by Tenant to Landlord shall be forfeited. If Landlord is required to remove Tenant's personal property from the Premises after Tenant vacates or abandons the Premises, Tenant hereby waives, releases, quitclaims, and discharges Landlord from any damage for loss of any article of personal property.

17.Utilities. All applications and connection for necessary utility services for the Premises shall be made in the name of the Tenant only. Tenant shall be solely liable for all utility charges as they become due, including but not limited to, those for telephone, cable/satellite service (costs associated with services beyond "Basic"), and Internet service. It shall be a material breach of this Agreement for Tenant to allow any lien or encumbrance against the Premises without Landlord's prior written approval. Tenant specifically authorizes Landlord to deduct amounts of any unpaid bills from the security deposit upon termination of this Agreement. Landlord shall be responsible for real property taxes and assessments.

18.Hazardous Use. Tenant shall not bring or maintain anything within the Premises that could be dangerous, flammable, explosive, or increase the danger of fire or any other hazard.

19.No Indoor Smoking. Tenant will not smoke and will not permit guests or invitees to smoke tobacco or any other substance within any structure in the premises. Smoking on open porches and under overhangs is permitted.

**AA0258**

20.Renewal and Changes in Lease. The Landlord may offer the Tenant a new lease to take effect at the end of the Lease Term. The new lease agreement may include reasonable changes. Landlord shall notify Tenant of any proposed new lease provisions at least 60 days before the end of the present lease term. If no changes to the lease are made, Tenant may continue to rent the Premises on a month-to-month basis with the rest of the lease provisions remaining the same. In either case, Tenant shall notify Landlord at least 30 days before the end of the present lease term.

21.Pets. No dogs, cats, or other animals shall be permitted to reside in the Premises without Landlord's prior written consent and right to require an additional security deposit.

22.Landlord's Right of Entry and Inspection. Landlord, or any of his agents, shall have the right to enter the Premises to examine the property, make repairs, additions or alterations as deemed necessary for the safety, comfort, or preservation of the Premises.

a.Except in case of emergency, Landlord shall give Tenant reasonable notice of intent to enter. For these purposes, twenty-four (24) hour written notice shall be deemed reasonable.

b.To facilitate Landlord's right of access, Tenant shall not, without Landlord's prior written consent, add, alter or re-key any locks to the Premises. At all times Landlord shall be provided with a key or keys capable of unlocking all such locks and gaining entry. Tenant further agrees to notify Landlord in writing if Tenant installs any burglar alarm system, including instructions on how to disarm it in case of emergency entry.

c.Landlord shall have the right to exhibit the Premises, and to place notices "For Rent" of "For Sale" at any time within sixty (60) days before the expiration of this Agreement.

23.Individual Tenant Liability. Each tenant who signs this Agreement, regardless of possession or occupancy of the Premises, shall be jointly and severally liable for the full performance of each and every obligation of this Agreement, including, but not limited to, payment of all outstanding rental payments, and any and all costs to remedy damages to the Premises regardless of whether such damages were caused by a Tenant or invitee of a Tenant.

24.Care and Maintenance of Premises. Tenant accepts the Premises in the condition they are in at the beginning of this Lease Term. Tenant shall maintain the Premises in the same condition, order, and repair as found at the commencement of the Lease Term. Tenant shall immediately replace or repair any damage to water apparatus, electric lights, or any fixture, appliances or appurtenances within the Premises caused by any act or neglect of Tenant, or of any guests, visitors, or persons under the control of the Tenant.

25.Smoke Detectors. The Premises are equipped with smoke detection device(s). Tenant shall be responsible for reporting any problems, maintenance or repairs to Landlord. Replacement of batteries is the responsibility of Tenant.

26.Indemnification of Landlord. The parties expressly understand and agree that Landlord shall not be liable for any damage or injury to Tenant, any other person, or to any property, occurring on any part of the Premises. Tenants expressly release Landlord from any and all liability for any damages or injury to Tenants, or any other person, or to any property, occurring on the Premises unless such damage is the direct result of the negligence or unlawful act of Landlord or Landlord's agents. Tenant shall indemnify, defend, and hold harmless Landlord and his agents, from any and all claims for such injury and/or damage, no matter how caused.

27.Remedies. Landlord's rights and remedies provided herein shall be cumulative.

28.Insurance. Tenant assumes full responsibility for all personal property placed, stored, or located on or about the Premises. Landlord does not insure tenant's personal property. Landlord recommends that Tenants obtain insurance to protect against risk of loss from harm to Tenant's personal property. Landlord shall not be responsible for any harm to Tenant's property resulting from fire, theft, burglary, strikes, riots, orders or acts of public authorities, acts of nature or any other circumstance or event beyond Landlord's control.

29.Subordination. This Agreement is subordinate and inferior to any mortgage(s) encumbering the Premises whether currently existing or subsequently executed.

**AA0259**

30.Entire Agreement. This Agreement constitutes the entire understanding of the parties. This Agreement supersedes and terminates all prior representations, warranties, and agreements, written or oral, regarding the subject matter of this Agreement. Any modification to this Agreement must be in a writing signed by both parties.

31.Notice. Written notice mailed and delivered to the Premises shall constitute sufficient notice to Tenant and written notice mailed and delivered to the address provided above shall constitute sufficient notice to Landlord.

32.Severability. Should any provision of this Agreement be held invalid, illegal, or unenforceable in any respect by any court of competent jurisdiction, such holding shall not impair the validity, legality, or enforceability of the remaining provisions of this Agreement.

33.No Waiver. Failure or delay on the part of either party to exercise any right, remedy, power, or privilege hereunder shall not operate as a waiver. Any waiver must be in writing and signed by the party granting such waiver in order to be effective.

34.Governing Law. This Agreement, and the rights and duties of the parties hereunder, shall be construed in accordance with, and governed by, the substantive laws of the State of West Virginia.

IN WITNESS WHEREOF, the parties have executed this Residential Lease Agreement for the purposes herein expressed the day and year above written.

Landlord –                                        Tenant –

E<sub>XHIBIT</sub> K



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
28 LIBERTY STREET
NEW YORK, NEW YORK 10005

*SUBPOENA DUCES TECUM*
**THE PEOPLE OF THE STATE OF NEW YORK**

To:     Custodian of Records
        VDARE Foundation, Inc.
        447 South Street
        Litchfield, CT 06759

**YOU ARE HEREBY COMMANDED**, pursuant to the laws of the State of New York and all business and excuses being laid aside, to produce to the Office of the Attorney General of the State of New York, Letitia James, 28 Liberty Street, New York, New York 10005, in accordance with the Instructions and Definitions below, any and all documents requested in the attached Schedule that are in Your possession, custody or control, including documents in the possession, custody and control of entities that You own or control in whole or in part. Your production of documents in response to this subpoena should be addressed to the attention of Catherine Suvari, Assistant Attorney General, Charities Bureau, and may be submitted by mail or electronic mail provided it is received by **July 25, 2022**, or any agreed upon adjourned date thereafter.

**PLEASE TAKE NOTICE** that the Attorney General deems the documents and testimony requested by this subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest.

**PLEASE TAKE FURTHER NOTICE** that disobedience of this subpoena by failing to deliver the documents and information requested in the attached schedule on the date, time and place stated above or any agreed adjourned date and time may subject VDARE Foundation, Inc. ("VDARE") to prosecution under New York law.

**PLEASE TAKE FURTHER NOTICE** that VDARE shall immediately implement a litigation hold preserving all documents relating to the subject matter of this subpoena, including all documents concerning the specific documents demanded herein. VDARE shall also issue document preservation letters for all documents relating to the subject matter of this subpoena to the following individuals: Peter Brimelow, Lydia Brimelow, John Brimelow, Scott McConnell, John O'Sullivan, Joseph (Joe) Fallon, John Wall, T.M. Byxbee Company, P.C., and Labyrinth, Inc. (Additional subpoenas may follow.)

**AA0262**

**WITNESS, the Honorable Letitia James**, Attorney General of the State of New York, this 23rd day of June, 2022.

By: /s/ *Catherine Suvari*

Catherine Suvari
Assistant Attorney General, Charities Bureau
Catherine.Suvari@ag.ny.gov
(212) 416-6172

**AA0263**

## SCHEDULE

### A. Instructions

1. Please produce the Documents described in Section C of this schedule, in the accordance with the Instructions (Section A), Definitions (Section B) and Format (Section D) described below.

2. <u>Time Frame.</u>  Except as otherwise noted, this subpoena applies to all Documents in effect, created, recorded, compiled, transmitted or received from **January 1, 2016 through the present** (the "Relevant Period").

3. <u>Continuing Obligation.</u> The obligation to produce Documents pursuant to this Subpoena is a continuing one.  Responsive Documents located any time after a response is due or submitted shall be promptly produced at the place and in the manner specified herein.

4. All Documents shall be produced either as kept in the ordinary course of business or with an accompanying cover letter that includes a description of the Documents being produced and their contents, the source from which the Documents have been produced, and the number(s) of the request(s) in Section C to which each Document produced is responsive.

5. <u>Documents No Longer in Your Possession.</u> If any Document requested was formerly in Your possession, custody or control but is no longer available or no longer exists, submit a statement in writing and under oath that: (i) describes in detail the nature of the Document and its contents; (ii) identifies the person who prepared the Document; (iii) identifies all persons who have seen or had possession of the Document; (iv) specifies the date on which the Document was prepared, transmitted or received; (v) specifies the date on which the Document became unavailable; (vi) specifies the reason why the Document is unavailable, including whether it has been misplaced, lost, destroyed or transferred, and, if it has been destroyed or transferred, specifies the conditions of and reasons for such destruction or transfer and the persons who requested and performed the destruction or transfer; and (vii) identifies all persons with knowledge of any portion of the contents of the Document.

6. <u>Privilege.</u> If any Document requested is withheld on the ground of privilege or other legal doctrine, submit with the production a statement in writing and under oath (e.g., a privilege log) that provides, for each Document withheld: (i) a description of the nature of the Document and its contents; (ii) the date of the Document; (iii) the Document's authors and recipients; and (iv) the legal ground for withholding it from production.  If the legal ground is attorney-client privilege, please also indicate the names of the attorneys involved in the Document and the nature of their involvement (e.g., as authors). Such statement (or log) shall accompany each production.  Further, for each Document withheld pursuant to this paragraph, the relevant production shall include placeholder pages equivalent in number to the page-length of the withheld Document.

7. <u>Format for Production.</u> Unless otherwise specified and agreed to by the Office of the Attorney General, responsive Documents shall be produced in electronic form in

**AA0264**

accordance with the instructions and criteria set forth in Section D and Attachment 1 below.

8. <u>Certification.</u> In order for Your response to this subpoena to be complete, it must include a completed version of the attached Certification. In accordance with CPLR 3122-a, the Certification must be sworn in the form of an affidavit and subscribed by a qualified witness charged with the responsibility for maintaining the records, stating in substance that (a) s/he is the duly authorized custodian or other qualified witness and has the authority to make the certification; (b) to the best of his/her knowledge, after reasonable inquiry, the records or copies thereof are accurate versions of the documents described in this subpoena that are in Your possession, custody, or control; (c) to the best of his/her knowledge, after reasonable inquiry, the records or copies produced represent all the documents described in this subpoena, or if they do not represent a complete set of the documents subpoenaed, an explanation of which documents are missing and a reason for their absence is provided; and (d) the records or copies produced were made by the personnel or staff of the business, or persons acting under their control, in the regular course of business, at the time of the act, transaction, occurrence or event recorded therein, or within a reasonable time thereafter, and that it was the regular course of business to make such records.

## B. Definitions

1. "All" shall mean "each and every."

2. "And" and "or" shall be construed disjunctively or conjunctively, as necessary to bring within the scope of a request all responses and Documents that might otherwise be deemed outside the scope of that request.

3. "Any" shall mean "any and all."

4. "Communications" shall refer to any oral, written, in person, or any other form of relay, transmission, or transference of information by any means whatsoever including but not limited to by way of mail, computer, telephone, cellular or mobile phone, voice mail, electronic mail, radio, video, sound recordings, television, telefax, telex, social media, or any other medium, and shall include any Document that abstracts, digests, transcribes, records, or reflects any of the foregoing.

5. "Concerning" or "relating to" shall mean concerning, relating to, referring to, referencing, describing, evidencing, or constituting, either directly or indirectly and in whole or in part.

6. "Documents" is used in the broadest sense of the term and shall mean all records and other tangible media of expression of any nature, including: originals, drafts or finished versions; annotated or nonconforming or other copies, however created, produced or stored (manually, mechanically, electronically or otherwise); electronic mail ("email"), instant messages, Blackberry or other wireless device messages; voicemail; books, papers, files, notes, correspondence, memoranda, reports, records, journals, summaries, registers, account statements, analyses, plans, manuals, policies, telegrams, faxes, wires,

4

**AA0265**

telephone logs, telephone messages, or message slips; minutes, notes, records or transcriptions of conversations, communications or meetings; video and audio tapes; disks and other electronic media; microfilm, microfiche; storage devices; press releases; contracts, agreements; calendars, date books, appointment books and diaries; notices and confirmations.  A draft or non-identical copy is a separate Document. Documents existing in electronic form shall include all items that may have been removed from the email accounts, directories or other locations in which they are ordinarily stored to any other servers, folders, files, archives, or backup devices, whether or not deleted.

7. "VDARE", "You", or "Your" shall mean VDARE Foundation, Inc. and (i) any of its directors, officers, agents, employees, consultants, representatives, attorneys, and other persons acting on its behalf, (ii) any predecessors, successors, parent corporations, subsidiaries, divisions, assigns, "d/b/a" names, and affiliates, including Lexington Research Institute, and (iii) any entities that, directly or indirectly, control, are controlled by, or are under common control with VDARE Foundation, Inc., including by possessing, directly or indirectly, the power to direct or cause the direction of VDARE Foundation, Inc.'s management and policies, whether through membership, the ownership of voting securities, by contract, or otherwise.

8. The singular form of any word shall include the plural and vice versa.

9. Any word used but not defined in this Schedule shall be construed consistently with its common meaning.

**C. Documents to be Produced**

1. Copies of VDARE's certificates of incorporation, certificates of amendment, by-laws, any Documents related to all "d/b/a" names, and any annual reports, <u>from 1999 through the present</u>.

2. Copies of the two most recent IRS Form 990s filed by VDARE with the Internal Revenue Service.

3. Copies of the transcripts to each deposition taken in the litigations between Peter Brimelow and/or VDARE and the New York Times, and all documents produced by VDARE and/or Brimelow in connection with those proceedings.

4. Documents sufficient to Identify (i) the names and addresses of VDARE's current and former employees, their titles, and their dates of employment; (ii) VDARE's current and former volunteers, their titles, and their dates of service; (iii) VDARE's current and former independent contractors and their dates of service; and (iv) VDARE's current and former officers and directors, their titles, and the period during which they held their positions.

5. All minutes of any meetings convened by the full VDARE Board of Directors or any committee thereof <u>from 1999 through the present</u>.

6. All Documents circulated for Board consideration or review.

7. All Documents concerning (i) compensation, including salary, wages, expense reimbursements, royalties, fees, bonuses, deferred compensation, pension and retirement

funds paid to any Officers and/or Directors; (ii) reimbursements or payments made to any Officer and/or Directors of or for travel-related expenses (e.g., automobile purchases or leases, fuel, tolls, parking, and non-automobile transportation such as air and subway fare); (iii) insurance benefits (e.g., medical, dental, automobile, life, malpractice and disability) paid to any Officers and/or Directors; (iv) vacation pay, and/or vacation, sick, and personal leave time or payment therefor paid to any Officers and/or Directors; (v) severance pay or benefits paid to any Officers and/or Directors; (vi) any other payment or reimbursement paid to any Officers and/or Directors for services performed by them on behalf of VDARE, including any solicitation of funds; and (vii) all forms W-2 and 1099 issued to any Officers and/or Directors.

8. Documents reflecting any solicitation of funds on VDARE's behalf, in any format, e.g., hard copy mailers or solicitations or online fundraising such as GoFundMe or Kickstarter.

9. All VDARE written policies, manuals, and/or procedures, including all policies related to conflicts of interest.

10. All Documents concerning or relating to setting, directing, paying, or adjusting any Officer's compensation.

11. All Documents concerning or relating to setting, directing, paying, or adjusting the compensation for Peter Brimelow, or any other employee, officer, director, consultant or vendor of VDARE.

12. All Documents concerning or reporting conflicts of interest "required to be disclosed annually" as set forth in responses to Question 12(b) on Part VI of VDARE's 2019 Form 990.

13. All Documents concerning or reflecting any effort by VDARE to "regularly and consistently monitor and enforce compliance with" the conflicts of interest policy as set forth in response to Question 12(c) on Part VI of VDARE's 2019 Form 990.

14. All Documents concerning or reflecting the purchase of 276 Cacapon Road, Berkeley Springs, West Virginia by or on behalf of VDARE.

15. All Documents concerning or reflecting any representation to the State of West Virginia, the Town of Bath, West Virginia, or the County of Morgan, West Virginia regarding the taxation and/or use of 276 Cacapon Road, Berkeley Springs, West Virginia for charitable purposes.

16. All Documents concerning VDARE events (recorded or live) conducted at or broadcast from the 276 Cacapon Road, Berkeley Springs, West Virginia property, including all Communications (including emails and text messages), all records of any sales made during the event(s), and Documents sufficient to account for all funds received and disbursed because of such events.

17. All Documents concerning VDARE events (recorded or live) scheduled to be conducted at or broadcast from the 276 Cacapon Road, Berkeley Springs, West Virginia property, including all Communications (including emails and text messages) and Documents sufficient to account for all funds received and disbursed because of such scheduled events.

18. All Documents recording, reporting, considering or addressing conflicts of interest as reported on Schedule O of any IRS 990 form.

19. All director and officer insurance policies and any Documents relating to claims made on such policies.

20. Any claims for indemnification or defense by officers or directors upon VDARE.

21. All financial records of VDARE, including its books and records, general ledger, bank statements, credit card statements, debit card statements and receipts, copies of checks (front and back), canceled checks, account opening Documents, and Communications.

22. Documents sufficient to identify VDARE's bank accounts, credit card accounts, website accounts, and accounts with credit card processing.

23. Documents sufficient to identify all persons who have or had access to and/or control of VDARE's bank accounts, credit card accounts, website accounts, and accounts with credit card processing.

24. All audits, reports, reviews, corrective action plans or correspondence (including emails and text messages) issued to VDARE by any accounting firm or auditor, administrator, monitor, or any local, state, or federal agency or governmental or administrative entity.

25. Copies of any orders, judgments, cease and desist letters, or other Documents issued by any governmental entity or court regarding any alleged or confirmed wrongdoing, and any written settlement agreements executed in connection with the same.

26. Documents sufficient to identify any personal or business relationship between any current or former officer, director, or employee of VDARE, on the one hand, and any officer, director, employee, or contractor of VDARE, on the other hand.

27. All Communications between VDARE and the IRS, or between VDARE and any other local or state taxation authority.

28. All Communications between VDARE and any state or federal agency.

29. All Communications between VDARE and any of its accountants or auditors.

30. All Communications by VDARE or any of its agents regarding the Berkeley Castle Foundation, including all emails and text messages exchanged by VDARE, its principals, or agents, and any copies of any documents filed with any state or federal agency by VDARE or its agent on behalf of Berkeley Castle Foundation, Inc.

31. All Communications by VDARE or any of its agents regarding the BBB, LLC, including all emails and text messages exchanged by VDARE, its principals, or agents, and any copies of any documents filed with any state or federal agency by VDARE or its agent on behalf of BBB, LLC.

32. All records of transactions between BBB LLC and VDARE including books and records, general ledger, bank statements, credit card statements, copies of checks (front and back), canceled checks, and Communications.

33. All records of transactions between Berkeley Castle Foundation, Inc. and VDARE including its books and records, general ledger, bank statements, credit card statements, copies of checks (front and back), canceled checks, and Communications.

7

**AA0268**

34. Copies of BBB LLC's certificates of incorporation, certificates of amendment, by-laws, any Documents related to all "d/b/a" names, and any annual reports from BBB's incorporation to the present, in the custody and control of VDARE, its principals, or its agents.

35. Copies of Berkeley Castle Foundation, Inc. certificates of incorporation, certificates of amendment, by-laws, any Documents related to all "d/b/a" names, and any annual reports, from Berkeley Castle Foundation's incorporation to the present, in the custody and control of VDARE, its principals, or its agents.

36. All records relating to real estate transactions between VDARE and Berkeley Castle Foundation, including all contracts, agreements, promissory notes, mortgages, loan documents, deeds, deeds of trust, property value assessments, title searches, title insurance, other insurance agreements, inspections, and Communications.

37. All records relating to real estate transactions between VDARE and Berkeley Springs Castle, LLC, including all contracts, agreements, promissory notes, mortgages, loan documents, deeds, deeds of trust, property value assessments, title searches, title insurance, other insurance agreements, inspections, and Communications.

38. All records relating to real estate transactions between VDARE and BBB, LLC, including all contracts, agreements, promissory notes, mortgages, loan documents, deeds, deeds of trust, property value assessments, title searches, title insurance, other insurance agreements, inspections, and Communications.

39. All records of renovations, improvements, construction, landscaping, or any other work done since February 14, 2020, on the real property described in the February 14, 2020 deed between Berkeley Springs Castle, LLC, and VDARE. Such records shall include without limitation all invoices, contracts, estimates, bids, requests for bids, copies of checks (front and back), and Communications.

40. All records concerning the October 16, 2021 "Castle Auction," including all Communications (including emails and text messages), all records of sales made, copies of checks (front and back), valuations of auction items, and Documents sufficient to account for all funds received and disbursed because of the Auction.

41. All records of and Communications concerning any loans VDARE made to Berkeley Castle Foundation, including promissory notes, mortgages, deeds of trust, agreements, records of repayment, copies of checks (front and back), bank statements, email, and text correspondence.

42. All records of and correspondence concerning any loans VDARE made to BBB, LLC, including promissory notes, mortgages, deeds of trust, agreements, records of repayment, copies of checks (front and back), bank statements, email, and text Communications.

43. All records of and Communications concerning any loans Peter or Lydia Brimelow (individually or collectively) made to VDARE, including promissory notes, mortgages, deeds of trust, agreements, records of repayment, copies of checks (front and back), bank statements, email, and text correspondence.

44. All records of and correspondence concerning any loans VDARE made to Peter or Lydia Brimelow (individually or collectively), including promissory notes, mortgages, deeds of

**AA0269**

trust, agreements, records of repayment, copies of checks (front and back), bank statements, email, and text Communications.

**AA0270**

**D. Format for Production**

Unless otherwise specified and agreed to by the Office of the Attorney General, all responsive documents must be produced in Concordance format in accordance with the following instructions.

1. <u>Concordance Production Components</u>. A Concordance production consists of the following component files, which must be produced in accordance with the specifications set forth below in Section 2:

   - *Metadata Load File*
   - *Extracted or OCR Text Files*
   - *Single-Page Image Files*
   - *Opticon Load File*
   - *Native Files*.

2. <u>Production File Requirements</u>.

   A. ***Metadata Load File***

      - Required file format:

         - UTF-8
         - .dat file extension
         - Field delimiter: (ASCII decimal character 20)
         - Text Qualifier: þ (ASCII decimal character 254). Multiple value field delimiter: ; (ASCII decimal character 59)

      - The first line of the metadata load file must list all included fields. All required fields are listed in Attachment 1.

      - Fields with no values must be represented by empty columns maintaining delimiters and qualifiers.

      - ***Note:*** All documents must have page-level Bates numbering (except documents produced only in native format, which must be assigned a document-level Bates number). The metadata load file must list the beginning and ending Bates numbers (BEGDOC and ENDDOC) for each document.

      - Accepted date formats:

         - mm/dd/yyyy
         - yyyy/mm/dd
         - yyyymmdd

      - Accepted time formats:

    ▪  hh:mm:ss (if not in 24-hour format, You must indicate am/pm)
    ▪  hh:mm:ss:mmm

### B. *Extracted or OCR Text Files*

- You must produce individual document-level text files containing the full extracted text for each produced document.

- When extracted text is not available (for instance, for image-only documents) You must provide individual document-level text files containing the document's full OCR text.

- The filename for each text file must match the document's beginning Bates number (BEGDOC) listed in the metadata load file.

- Text files must be divided into subfolders containing no more than 5000 files.

### C. *Single-Page Image Files (Petrified Page Images)*

- Where possible, all produced documents must be converted into single-page tagged image format ("TIF") files. See Section 7.E below for instructions on producing native versions of documents You are unable to convert.

- Image documents that exist only in non-TIF formats must be converted into TIF files. The original image format must be produced as a native file as described in Section 7.E below.

- For documents produced only in native format, You must provide a TIF placeholder that states "Document produced only in native format."

- Each single-page TIF file must be endorsed with a unique Bates number.

- The filename for each single-page TIF file must match the unique page-level Bates number (or document-level Bates number for documents produced only in native format).

- Required image file format:
  - CCITT Group 4 compression
  - 2-Bit black and white
  - 300 dpi
  - Either .tif or .tiff file extension.

- TIF files must be divided into subfolders containing no more than 5000 files. Documents should not span multiple subfolders, a document with more than 5000 pages should be kept in a single folder.

**AA0272**

D. *Opticon Load File*

- Required file format:
  - Field delimiter: , (ASCII decimal character 44)
  - No Text Qualifier
  - .opt file extension

- The comma-delimited Opticon load file must contain the following seven fields (as indicated below, values for certain fields may be left blank):

  - ALIAS or IMAGEKEY – the unique Bates number assigned to each page of the production.
  - VOLUME – this value is optional and may be left blank.
  - RELATIVE PATH – the filepath to each single-page image file on the production media.
  - DOCUMENT BREAK – defines the first page of a document. The only possible values for this field are "Y" or blank.
  - FOLDER BREAK – defines the first page of a folder. The only possible values for this field are "Y" or blank.
  - BOX BREAK – defines the first page of a box. The only possible values for this field are "Y" or blank.
  - PAGE COUNT – this value is optional and may be left blank.

- *Example*:

  ABC00001,,IMAGES\0001\ABC00001.tif,Y,,,2
  ABC00002,,IMAGES\0001\ABC00002.tif,,,,
  ABC00003,,IMAGES\0002\ABC00003.tif,Y,,,1
  ABC00004,,IMAGES\0002\ABC00004.tif,Y,,,1

E. *Native Files*

- Non-printable or non–print friendly documents (including but not limited to spreadsheets, audio files, video files and documents for which color has significance to document fidelity) must be produced in their native format.

- The filename of each native file must match the document's beginning Bates number (BEGDOC) in the metadata load file and the original file extension.

- For documents produced only in native format, You must assign a single document-level Bates number and provide an image file placeholder that states "Document produced only in native format."

- The relative paths to all native files on the production media must be listed in the NATIVEFILE field of the metadata load file.

12

**AA0273**

- Native files that are password-protected must be decrypted prior to conversion and produced in decrypted form.

- You may be required to supply a software license for proprietary documents produced only in native format.

3. <u>Production Folder Structure</u>. The production must be organized according to the following standard folder structure:

- data\ (contains production load files)
- images\ (contains single-page TIF files, with subfolder organization)
    - \0001, \0002, \0003…
- natives\ (contains native files, with subfolder organization)
    - \0001, \0002, \0003…
- text\ (contains text files, with subfolder organization)
    \0001, \0002, \0003…

4. <u>De-Duplication</u>. You must perform global de-duplication of stand-alone documents and email families.

5. <u>Paper or Scanned Documents</u>. Documents that exist only in paper format must be scanned to single-page TIF files and OCR'd. The resulting electronic files should be produced in Concordance format pursuant to these instructions. You must contact the Assistant Attorney General whose telephone number appears on the Notice to discuss (i) any documents that cannot be scanned, and (ii) how information for scanned documents should be represented in the metadata load file.

6. <u>Structured Data</u>. Structured data includes but is not limited to relational databases, transactional data, and xml pages. Spreadsheets are not considered structured data. You must first speak to the Assistant Attorney General whose telephone number appears on the Notice.

<u>Relational Databases</u>

- Database tables should be provided in d or other machine-readable, non-proprietary format, with each table in a separate data file. Each data file must have an accompanying data dictionary that explains the meaning of each column name and explains the values of any codes used.

- Dates and numbers must be clearly and consistently formatted and, where relevant, units of measure should be explained in the data dictionary.

- Records must contain clear, unique identifiers, and the data dictionary must include explanations of how the files and records relate to one another.

**AA0274**

7. <u>Media and Encryption</u>. All document sets over 2 GB must be produced on CD, DVD, or hard-drive media. All production media must be encrypted with a strong password, which must be delivered independently from the production media. Document sets under 2 GB may be delivered electronically. The OAG offers a secure cloud storage option that can be set up to receive media on a one-time basis, or the OAG will download media from the providing parties' server.

**AA0275**

## ATTACHMENT 1
## Required Fields for Metadata Load File

| FIELD NAME | FIELD DESCRIPTION | FIELD VALUE EXAMPLE[1] |
|---|---|---|
| BEGDOC | Bates number assigned to the first page of the document. | ABC0001 |
| ENDDOC | Bates number assigned to the last page of the document. | ABC0002 |
| BEGATTACH | Bates number assigned to the first page of the parent document in a document family (*i.e.*, should be the same as BEGDOC of the parent document, or PARENTDOC). | ABC0001 |
| ENDATTACH | Bates number assigned to the last page of the last child document in a family (*i.e.*, should be the same as ENDDOC of the last child document). | ABC0008 |
| PARENTDOC | BEGDOC of parent document. | ABC0001 |
| CHILDDOCS | List of BEGDOCs of all child documents, delimited by ";" when field has multiple values. | ABC0002; ABC0003; ABC0004… |
| COMMENTS | Additional document comments, such as passwords for encrypted files. | |
| NATIVEFILE | Relative file path of the native file on the production media. | .\Native_File\Folder\...\BEGDOC.ext |
| TEXTFILE | Relative file path of the plain text file on the production media. | .\Text_Folder\Folder\...\BEGDOC.txt |
| SOURCE | For scanned paper records this should be a description of the physical location of the original paper record. For loose electronic files this should be the name of the file server or workstation where the files were gathered. | Company Name, Department Name, Location, Box Number… |
| CUSTODIAN | Owner of the document or file. | Firstname Lastname, Lastname, Firstname, User Name; Company Name, Department Name... |
| FROM | Sender of the email. | Firstname Lastname < FLastname @domain > |
| TO | All to: members or recipients, delimited by ";" when field has multiple values. | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; … |
| CC | All cc: members, delimited by ";" when field has multiple values. | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; … |
| BCC | All bcc: members, delimited by ";" when field has multiple values | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; … |

**AA0276**

| SUBJECT | Subject line of the email. | |
|---|---|---|
| DATERCVD | Date and time that an email was received. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| DATESENT | Date and time that an email was sent. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| CALBEGDATE | Date that a meeting begins. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| CALENDDATE | Date that a meeting ends. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| ATTACHMENTS | List of filenames of all attachments, delimited by ";" when field has multiple values. | AttachmentFileName.; AttachmentFileName.docx; AttachmentFileName.pdf;… |
| NUMATTACH | Number of attachments. | |
| RECORDTYPE | General type of record. | IMAGE; LOOSE E-MAIL; E-MAIL; E-DOC IMAGE ATTACHMENT; LOOSE E-MAIL ATTACHMENT; E-MAIL ATTACHMENT; E-DOC ATTACHMENT |
| FOLDERLOC | Original folder path of the produced document. | Drive:\Folder\...\...\ |
| FILENAME | Original filename of the produced document. | Filename.ext |
| DOCEXT | Original file extension. | html, xls, pdf |
| DOCTYPE | Name of the program that created the produced document. | Adobe Acrobat, Microsoft Word, Microsoft Excel, Corel WordPerfect… |
| TITLE | Document title (if entered). | |
| AUTHOR | Name of the document author. | |
| REVISION | Number of revisions to a document. | 18 |
| DATECREATED | Date and time that a document was created. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| DATEMOD | Date and time that a document was last modified. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| FILESIZE | Original file size in bytes. | |
| PGCOUNT | Number of pages per document. | |
| IMPORTANCE | Email priority level if set. | Low, Normal, High |
| MD5HASH | MD5 hash value computed from native file (a/k/a file fingerprint). | |
| SHA1HASH | SHA1 hash value | |
| MSGINDEX | Email message ID | |
| CONVERSATIONINDEX | Email Conversation Index | |

**Certification of Business Records**

State of _____ )
                    ) ss.:
County of _____ )

_____, being duly sworn, deposes and says:

1. I am the duly authorized custodian or other qualified witness of the business records of _____.

   I am familiar with the business practices and procedures of _____ and have the authority to make this certification.

2. To the best of my knowledge, after reasonable inquiry, the records produced in response to the subpoena are accurate versions of the documents described in the subpoena that are in my possession, custody or control.

3. To the best of my knowledge, after reasonable inquiry, the records represent all the documents described in the subpoena duces tecum except that the following documents are missing for the reason stated:

   _____

4. The records produced were made by the personnel or staff of the business, or persons acting under their control, in the regular course of business, at the time of the act, transaction, occurrence or event recorded therein, or within a reasonable time thereafter, and it was the regular course of business to make such records.

Sworn to before me this ____

day of _____, 2022

_____
Notary Public

**AA0278**

E<small>XHIBIT</small> L

AA0279

DETAILED REPORT

# April 2020 Coordinated Inauthentic Behavior Report

FACEBOOK

AA0280



We're constantly working to find and stop coordinated campaigns that seek to manipulate public debate across our apps. In 2019 alone, we took down over 50 networks worldwide for engaging in coordinated inauthentic behavior (CIB), including ahead of major democratic elections.

These efforts are led by a cross-disciplinary team focused on finding and disrupting both the most sophisticated influence operations aimed to manipulate public debate as well as high volume inauthentic behaviors like spam and fake engagement. Over the past several years, our team has grown to over 200 people with expertise ranging from open source research, to threat investigations, cyber security, law enforcement and national security, investigative journalism, engineering, product development, data science and academic studies in disinformation.

You can find more information about our previous enforcement actions here.

PURPOSE OF THIS REPORT

Over the past three years, we've shared our findings about coordinated inauthentic behavior we detect and remove from our platforms. As part of regular CIB reports, we're sharing information about all networks we take down over the course of a month to make it easier for people to see progress we're making in one place.

WHAT IS CIB?

While we investigate and enforce against any type of inauthentic behavior — including fake engagement, spam and artificial amplification — we approach enforcement against these mostly financially-motivated activities differently from how we counter foreign interference or domestic influence operations. We routinely take down less sophisticated, high-volume inauthentic behaviors like spam and we do not announce these enforcement actions when we take them.

AA0281

We view influence operations as coordinated efforts to manipulate public debate for a strategic goal where fake accounts are central to the operation. There are two tiers of these activities that we work to stop: 1) coordinated inauthentic behavior in the context of domestic, non-state campaigns (CIB) and 2) coordinated inauthentic behavior on behalf of a foreign or government actor (FGI).

## COORDINATED INAUTHENTIC BEHAVIOR (CIB)

When we find domestic, non-government campaigns that include groups of accounts and Pages seeking to mislead people about who they are and what they are doing while relying on fake accounts, we remove both inauthentic and authentic accounts, Pages and Groups directly involved in this activity.

## FOREIGN OR GOVERNMENT INTERFERENCE (FGI)

If we find any instances of CIB conducted on behalf of a government entity or by a foreign actor, we apply the broadest enforcement measures including the removal of every on-platform property connected to the operation itself and the people and organizations behind it.

## CONTINUOUS ENFORCEMENT

We keep to monitor for efforts to re-establish a presence on Facebook by networks we previously removed for CIB. Using both automated and manual detection, we continuously remove accounts and Pages connected to networks we took down in the past.

## SUMMARY OF APRIL 2020 FINDINGS

This month, we removed eight networks of accounts, Pages and Groups. Two of them — from Russia and Iran — focused internationally (FGI), and the remaining six — in the US, Georgia, Myanmar and Mauritania — targeted domestic audiences in their respective countries (CIB). We have shared information about our findings with law enforcement, policymakers and industry partners.

We know that people looking to mislead others — whether through phishing, scams, or influence operations — try to leverage crises to advance their goals, and the coronavirus pandemic is no different. All of the networks we took down for CIB in April were created before

**AA0282**

the COVID-19 pandemic began, however, we've seen people behind these campaigns opportunistically use coronavirus-related posts among many other topics to build an audience and drive people to their Pages or off-platform sites. The majority of the networks we took down this month were still trying to grow their audience or had a large portion of engagement on their Pages generated by their own accounts.

- **Total number of Facebook accounts removed:** 732
- **Total number of Instagram accounts removed:** 162
- **Total number of Pages removed:** 793
- **Total number of Groups removed:** 200

## NETWORKS REMOVED IN APRIL, 2020:

1. **Russia:** We removed 46 Pages, 91 Facebook accounts, 2 Groups, and 1 Instagram account. This network posted in Russian, English, German, Spanish, French, Hungarian, Serbian, Georgian, Indonesian and Farsi, focusing on a wide range of regions around the world. Our investigation linked this activity to individuals in Russia, the Donbass region in Ukraine and two media organizations in Crimea — NewsFront and SouthFront. We found this network as part of our internal investigation into suspected coordinated inauthentic behavior in the region.

2. **Iran:** We removed 118 Pages, 389 Facebook accounts, 27 Groups, and 6 Instagram accounts. This activity originated in Iran and focused on a wide range of countries globally including Algeria, Bangladesh, Bosnia, Egypt, Ghana, Libya, Mauritania, Morocco, Nigeria, Senegal, Sierra Leone, Somalia, Sudan, Tanzania, Tunisia, the US, UK and Zimbabwe. Our investigation linked this activity to the Islamic Republic of Iran Broadcasting Corporation. We found this network as part of our internal investigations into suspected coordinated inauthentic behavior, based in part on some links to our past takedowns.

3. **US:** We removed 5 Pages, 20 Facebook accounts, and 6 Groups that originated in the US and focused domestically. Our investigation linked this activity to individuals associated with the QAnon network known to spread fringe conspiracy theories. We found this activity as part of our internal investigations into suspected coordinated inauthentic behavior ahead of the 2020 election in the US.

APRIL 2020 COORDINATED INAUTHENTIC BEHAVIOR REPORT

**AA0283**

4. **US:** We removed 19 Pages, 15 Facebook accounts, and 1 Group that originated in the US and focused domestically. Our investigation linked this network to VDARE, a website known for posting anti-immigration content, and individuals associated with a similar website The Unz Review. We found this activity as part of our internal investigations into suspected coordinated inauthentic behavior ahead of the 2020 election in the US.

5. **Mauritania:** We removed 11 Pages, 75 Facebook accounts, and 90 Instagram accounts. This network originated in Mauritania and focused on domestic audiences. We detected this operation as a result of our internal investigation into suspected coordinated inauthentic behavior linked to our past takedowns.

6. **Myanmar:** We removed 3 Pages, 18 Facebook accounts, and 1 Group. This domestic-focused network originated in Myanmar. Our investigation linked this activity to members of the Myanmar Police Force. We found this network as part of our internal investigation into suspected coordinated inauthentic behavior in the region.

7. **Georgia:** We removed 511 Pages, 101 Facebook accounts, and 122 Groups, and 56 Instagram accounts. This domestic-focused activity originated in Georgia. Our investigation linked this network to Espersona, a media firm in Georgia. This organization is now banned from our platforms. We found this activity as part of our investigation into suspected coordinated inauthentic behavior publicly reported by a local fact-checking organization in Georgia with some links to our past takedown.

8. **Georgia:** Finally, we removed 23 Facebook accounts, 80 Pages, 41 Groups, and 9 Instagram accounts. This domestic-focused activity originated in Georgia. Our investigation linked this network to individuals associated with United National Movement, a political party. We found this activity as part of our investigation into suspected coordinated inauthentic behavior in the region. Our assessment benefited from local public reporting in Georgia.

We are making progress rooting out this abuse, but as we've said before, it's an ongoing effort. We're committed to continually improving to stay ahead. That means building better technology, hiring more people and working more closely with law enforcement, security experts and other companies.

# 01

**We removed 46 Pages, 91 Facebook accounts, 2 Groups, and 1 Instagram account for violating our policy against foreign interference which is coordinated inauthentic behavior on behalf of a foreign entity. This activity originated in Russia, the Donbass region in Ukraine and the Crimean Peninsula. The people behind it posted in Russian, English, German, Spanish, French, Hungarian, Serbian, Georgian, Indonesian and Farsi, focusing on a wide range of regions around the world.**

The individuals behind this activity relied on a combination of authentic, duplicate and fake accounts — many of which had been previously detected and disabled by our automated systems. They used fake accounts to post their content and manage Groups and Pages posing as independent news entities in the regions they targeted. This network posted about geopolitical and local news including topics such as the military conflict in Ukraine, the Syrian civil war, the annexation of Crimea, NATO, US elections, and more recently the coronavirus pandemic. Our investigation linked this activity to individuals in Russia and Donbass, and two media organizations in Crimea — NewsFront and SouthFront.

We found this network as part of our internal investigation into suspected coordinated inauthentic behavior in the region.

- *Presence on Facebook and Instagram:* 46 Pages, 91 accounts, 2 Groups, and 1 Instagram account
- *Followers:* About 267,300 accounts followed one or more of these Pages, about 2,100 accounts joined one or more of these Groups, and around 800 people followed this Instagram account

**AA0285**

- *Advertising:* About $3,150 in spending for ads on Facebook and Instagram paid for primarily in US dollars, Russian rubles, and Euros.

AA0286

Below is a sample of the content posted by some of these Pages:





**AA0287**



От Советского Информбюро/Oficina de la Información Soviética

December 18, 2019 ·

La agresividad del Gobierno de Trump atenta contra las relaciones EE.UU.-Cuba

La agresividad del actual gobierno de Estados Unidos amenaza con revertir el proceso de acercamiento con Cuba, iniciado hace hoy cinco años con el restablecimiento de las relaciones diplomáticas entre los dos países.

Incluso, dentro del propio Estados Unidos, los sondeos de opinión reflejan que gran parte de su población se muestra favorable a la existencia de las relaciones diplomáticas y a la eliminación del bloqueo.

https://es.news-front.info/.../la-agresividad-del-gobierno-d.../

See Translation



ES.NEWS-FRONT.INFO
La agresividad del Gobierno de Trump atenta contra las relaciones EE.UU.-Cuba

**Page name:** Office of Soviet Information
**Post:** Trump Government's aggression violates US-Cuban relations.

The aggression of the current US government threatens to reverse the process of rapprochement with Cuba, which began five years ago today with the restoration of diplomatic relations between the two countries.

Even within the United States itself, opinion polls reflect that much of its population favors the existence of diplomatic relations and the removal of the blockade."

AA0288

# 02

**We also removed 118 Pages, 389 Facebook accounts, 27 Groups, and 6 Instagram accounts that were involved in foreign interference which is coordinated inauthentic behavior on behalf of a foreign entity. This activity originated in Iran and focused on a wide range of countries globally including Algeria, Bangladesh, Bosnia, Egypt, Ghana, Libya, Mauritania, Morocco, Nigeria, Senegal, Sierra Leone, Somalia, Sudan, Tanzania, Tunisia, the United States, United Kingdom, and Zimbabwe.**

The individuals behind this network relied on a combination of authentic and fake accounts — some of which had been previously detected and disabled by our automated systems — to post in Groups, manage Pages, and drive people to off-platform sites. These accounts typically had fake names common in the region they targeted. Some of these Pages merged with one another over time and posed as local NGOs and independent news entities located in the country they focused on. They sometimes repurposed Iranian state media content and posted primarily in Arabic, Bengali, Bosnian, and English about geopolitical and local news relevant to each region including topics like the civil war in Syria, the Arab Spring protests, the tensions between Libya and Turkey, criticism of Saudi involvement in the Middle East and Africa, Al Qaeda's actions in Africa, the Occupy movement in the US, criticism of US policies in the Middle East and the 2012 US elections.

Although the people behind this activity attempted to conceal their identities and coordination, our investigation found links to the Islamic Republic of Iran Broadcasting Corporation. We found this activity as part of our internal investigations into Iran-linked, suspected coordinated inauthentic behavior, which exhibited some links to the networks we had removed in August 2018, January 2019, and March 2019.

- *Presence on Facebook and Instagram:* 118 Pages, 389 Facebook accounts, 27 Groups, and 6 Instagram accounts

**AA0289**

- *Followers:* About 318,000 accounts followed one or more of these Pages, around 67,000 accounts joined one or more of these Groups, and about 135,000 people followed one of more of these Instagram accounts
- *Advertising:* Around $1,600 in spending for ads on Facebook paid for primarily in US dollars, Euros and Canadian dollars.

**AA0290**