# 23-1084(L),

## 23-7409(CON)

IN THE UNITED STATES COURT OF APPEALS FOR THE
SECOND CIRCUIT

VDARE FOUNDATION, INC.,

*Plaintiff-Appellant,*

- v. -

LETITIA JAMES, IN HER OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF NEW YORK,

*Defendant-Appellee.*

On Appeal from the United States District Court for the Northern
District of New York, Case No. 1:22-cv-01337 (FJS/CHF)

**PLAINTIFF-APPELLANT APPENDIX
VOLUME 2 OF 7
(PAGES AA0291– AA0580)**

Jay M. Wolman
RANDAZZA LEGAL GROUP, PLLC.
100 Pearl Street, 14th Floor
Hartford, CT 06103
Tel: 888-887-1776
Email: jmw@randazza.com

Marc J. Randazza
RANDAZZA LEGAL GROUP, PLLC.
30 Western Avenue
Gloucester, MA 01930
Tel: 888-887-1776
Email: ecf@randazza.com

*Counsel for Appellant*

i

# TABLE OF CONTENTS

U.S. District Court for the Northern District of New York
Docket Sheet, Case No. 1:22-cv-01337 (FJS/CHF)…………….. AA0001

Verified Complaint dated Dec. 12, 2022 [Dkt. No. 1]………….. AA0009

    Exhibit A – *Volkov v. James* Complaint [Dkt. No. 1-1]…. AA0027

Motion to Dismiss for Failure to State a Claim
dated Jan. 18, 2023 [Dkt. No. 12]…………………………………… AA0075

    Memorandum in Support of Motion [Dkt. No. 12-1]……. AA0076

    Declaration of Fuchs [Dkt. No. 12-2]……………………… AA0103

    Exhibit A – State Court Petition [Dkt. No. 12-3]……….. AA0108

    Exhibit B – 2020 Form 990 [Dkt. No. 12-4]……………… AA0118

    Exhibit C – 2019 Form 990 [Dkt. No. 12-5]……………… AA0160

    Exhibit D – 2018 Form 990 [Dkt. No. 12-6]……………… AA0191

    Exhibit E – Affirmation of E. Frish [Dkt. No. 12-7]…….. AA0220

    Exhibit F – Deed from VDARE to BCF [Dkt. No. 12-8]… AA0234

    Exhibit G – Deed from VDARE to BBB [Dkt. No. 12-9]... AA0237

    Exhibit H – BCF Certificate of Incorporation
    [Dkt. No. 12-10]…………………………………………………… AA0245

    Exhibit I – BBB Certificate of Incorporation
    [Dkt. No. 12-11]…………………………………………………… AA0250

    Exhibit J – Lease to BBB [Dkt. No. 12-12]……………….. AA0255

    Exhibit K – Subpoena [Dkt. No. 12-13]……………………. AA0261

    Exhibit L – Facebook Report [Dkt. No. 12-14]…………… AA0279

    Exhibit M – Facebook Subpoenas [Dkt. No. 12-15]…….. AA0309

ii

Exhibit N – Kelly Letter dated July 20, 2022
[Dkt. No. 12-16]…............................................................ AA0336

Exhibit O – Suvari Correspondence [Dkt. No. 12-17]…... AA0342

Exhibit P – Frisch Letter [Dkt. No. 12-18]….................. AA0368

Exhibit Q – Suvari Correspondence [Dkt. No. 12-19]…... AA0371

Exhibit R – Frisch Letter [Dkt. No. 12-20]….................. AA0375

Exhibit S – Frisch Letter [Dkt. No. 12-21]….................. AA0377

Exhibit T – Suvari Letter dated Dec. 2, 2022
[Dkt. No. 12-22] …........................................................... AA0379

Notice Re: Decision in Related State Case dated
Jan. 26, 2023 [Dkt. No. 15] …...............................…........ AA0384

Text Order Treating Dkt. No. 15 as Supplement dated
Jan. 27, 2023 [Dkt. No. 16] …............................................ AA0398

Affidavit in Opposition to Motion to Dismiss
dated Feb. 22, 2023 [Dkt. No. 25]….................................. AA0399

Exhibit A – Affirmation in Support of Order to Show
Cause [Dkt. No. 25-1]…................................................... AA0402

Exhibit B – Fuchs Email [Dkt. No. 25-2]….................... AA0415

Exhibit C – Frisch Letter [Dkt. No. 25-3]….................... AA0417

Exhibit D – Frisch Letter [Dkt. No. 25-4]….................... AA0419

Exhibit E – Frisch Email [Dkt. No. 25-5]….................... AA0422

Exhibit F – Frisch Email [Dkt. No. 25-6]…..................... AA0423

Exhibit G – Suvari Letter [Dkt. No. 25-7]…................... AA0424

Exhibit H – Lease Agreement [Dkt. No. 25-8]…............. AA0428

Exhibit I – 2019 CHAR500 Form [Dkt. No. 25-9]…........ AA0433

iii

Exhibit J – Fuchs Email [Dkt. No. 25-10]...................... AA0437

Exhibit K – Frisch Letter [Dkt. No. 25-11]................... AA0438

Exhibit L – Frisch Email [Dkt. No. 25-12].................. AA0440

Exhibit M – Frisch Letter [Dkt. No. 25-13].................. AA0441

Exhibit N – State Case Memorandum [Dkt. No. 25-14]... AA0442

Exhibit O – *Volokh v. James* Opinion and Order
[Dkt. No. 25-15]............................................... AA0464

Exhibit P – Operating Agreement [Dkt. No. 25-16]........ AA0485

Exhibit Q – Bylaws of Berkeley Castle Foundation
[Dkt. No. 25-17].............................................. AA0490

Exhibit R – Order [Dkt. No. 25-18]............................ AA0496

Exhibit S – Affirmation in Support of Application
for Stay [Dkt. No. 25-19]..................................... AA0498

Memorandum in Opposition to Motion to Dismiss dated
Feb. 22, 2023 [Dkt. No. 26] ................................. AA0521

Response in Support of Motion to Dismiss dated
Mar. 8, 2023 [Dkt. No. 27] .................................. AA0551

Notice Re: Decision in Related State Case dated
Mar. 14, 2023 [Dkt. No. 28] ................................. AA0562

Emergency Motion for Temporary Restraining Order and
Preliminary Injunction dated Mar. 21, 2023 [Dkt. No. 29]...... AA0564

Declaration of A. Frisch [Dkt. No. 29-2]...................... AA0568

Corrected Memorandum in Support of Emergency Motion
for Temporary Restraining Order and Preliminary Injunction
dated Mar. 21, 2023 [Dkt. No. 30].................................... AA0634

iv

Order Denying Motion for Temporary Restraining Order
dated Mar. 27, 2023 [Dkt. No. 32] ...................................... AA0664

Response in Opposition to Motion for a Preliminary
Injunction dated April 10, 2023 [Dkt. No. 34] ....................... AA0666

Affidavit in Opposition to Motion for a Preliminary
Injunction dated April 10, 2023 [Dkt. No. 35] ....................... AA0684

    Exhibit A – Affidavit of Yael Fuchs [Dkt. No. 35-1]........ AA0688

    Exhibit B – Subpoena [Dkt. No. 35-2].......................... AA0706

    Exhibit C – Frisch Letter [Dkt. No. 35-3].................... AA0724

    Exhibit D – Frisch Letter [Dkt. No. 35-4].................... AA0727

    Exhibit E – OAG Letter [Dkt. No. 35-5]....................... AA0729

    Exhibit F – State Court Petition [Dkt. No. 35-6]........... AA0734

    Exhibit G – Oral Argument Transcript [Dkt. No. 35-7]... AA0744

    Exhibit H – State Court Order [Dkt. No. 35-8].............. AA0780

    Exhibit I – OAG Proposed Protective Order
    [Dkt. No. 35-9]...................................................... AA0792

    Exhibit J – VDARE Motion for Stay [Dkt. No. 35-10]..... AA0802

    Exhibit K – OAG Opposition to Motion for Stay
    [Dkt. No. 35-11]..................................................... AA0980

    Exhibit L – Order Denying Stay [Dkt. No. 35-12].......... AA1044

    Exhibit M – Frisch Affirmation [Dkt. No. 35-13]........... AA1046

Reply in Support of Motion for a Preliminary Injunction
dated April 24, 2023 [Dkt. No. 38] ...................................... AA1060

Affidavit in Support of Motion for a Preliminary Injunction
dated April 24, 2023 [Dkt. No. 39] ...................................... AA1076

Exhibit A – OAG Memorandum of Law [Dkt. No. 39-1]... AA1079

Exhibit B – 11 News Article [Dkt. No. 39-2]……………... AA1102

Exhibit C – Washington Post Article [Dkt. No. 39-3]…… AA1106

Exhibit D – VDARE Article [Dkt. No. 39-4]……………… AA1110

Exhibit E – Washington Post Article [Dkt. No. 39-5]…… AA1113

Exhibit F – Declaration of Lydia Brimelow
[Dkt. No. 39-6] …………………………………………….. AA1862

Exhibit G – Affidavit of VDARE Lady Reader
[Dkt. No. 39-7] …………………………………………….. AA1874

Exhibit H – Affidavit of Federale [Dkt. No. 39-8] ………. AA1877

Notice of Motion to Strike Docket Entries dated
April 28, 2023 [Dkt. No. 42]…….…………………………… AA1880

Memorandum in Support of Motion to Strike
[Dkt. No. 42-1]……………………………………………….. AA1881

Notice Supplement in Support of Motion for Preliminary
Injunction dated April 28, 2023 [Dkt. No. 43]………………….. AA1886

Exhibit A – Redacted Affidavit [Dkt. No. 43-1]………….. AA1887

Exhibit B – Redacted Affidavit [Dkt. No. 43-2]………….. AA1890

Text Order on Motion to Strike dated
May 2, 2023 [Dkt. No. 44]……..……………………………… AA1893

Sur-Reply in Opposition to Motion for a Preliminary
Injunction dated May 10, 2023 [Dkt. No. 49] …………………... AA1894

Response in Support of Motion to Dismiss dated
July 27, 2023 [Dkt. No. 51] ………………………………...…….. AA1904

Notice of Appeal dated July 27, 2023 [Dkt. No. 53]……………. AA1907

Response in Opposition to Motion to Dismiss
dated July 27, 2023 [Dkt. No. 54] ……………………………….. AA1909

Motion for Injunction Pending Appeal dated
Aug.24, 2023 [Dkt. No. 56] ……………………………………….. AA1914

Memorandum of Law in Support of Motion for Injunction
Pending Appeal dated Aug. 24, 2023 [Dkt. No. 57]……………. AA1917

    Exhibit A – Mendelson Letter [Dkt. No. 57-1]…………. AA1940

    Exhibit B – Kelly Letter [Dkt. No. 57-2]…………………. AA1945

    Exhibit C – Mendelson Letter [Dkt. No. 57-3]…………. AA1948

    Exhibit D – Letter from F. Kelly dated
    Aug. 1, 2023 [Dkt. No. 57-4]…………………..…………... AA1951

Response in Opposition to Motion for Injunction Pending
Appeal dated Sept. 13, 2023 [Dkt. No. 58]………………….... AA1971

    Exhibit 1 – Schimmel Letter [Dkt. No. 58-1]…………. AA1982

Notice of Appeal dated Oct. 13, 2023 [Dkt. No. 61] …………… AA1984

Below is a sample of the content posted by some of these Pages:



**Page name:** Middle East

**Post:** For the 3rd Friday in a row, men below the age of 50 were not allowed to enter Al Aqsa Mosque. For the 3rd Friday in a row, the Israeli Forces prevented thousands of religion practitioners below the age of 50 years from arriving to perform Friday prayers at Al Aqsa Mosque. Israeli Forces consisting of cavalry, special units, border guards and police were placed across streets of Jerusalem, with barricades on the entry points for the old city and the holy mosque. The forces checked IDs of all men to confirm their age, sending home those who were below the age of 50. The community around pointed out that the Israeli forces also prevented youngsters below the age of 50 from performing Al Fajer prayers in Al Aqsa Mosque.



**AA0291**



**Balkan Anti-imperialist Movement**
April 9 at 12:58 AM · 🌐

Dva francuska znanstvenika predložila su testiranje cjepiva protiv koronavirusa SARS-CoV-2 u Africi, što je izazvalo veliki skandal.

See Translation

LOGICNO.COM
**Francuski stručnjaci predložili testiranje cjepiva za Covid u Africi: „Pa to smo već radili s AIDS-om"**

**AA0292**

# 03

**We removed 5 Pages, 20 Facebook accounts, and 6 Groups for coordinated inauthentic behavior as part of a small domestic-focused network in the United States.**

The people behind this activity used fake accounts — some of which had already been detected and disabled by our automated systems — to create fictitious personas, like and comment on their own content making it appear more popular than it is, manage Pages and Groups, and evade detection and enforcement. They frequently posted about news and topics including the upcoming presidential election and candidates, the current US administration, anti-Semitic and anti-Asian conspiracies, and COVID-19. While it did not appear to be the focus of this campaign, some of the individuals behind this effort attempted to monetize their clickbait content by selling t-shirts and other merchandise.

We found this activity as part of our proactive investigations into suspected coordinated inauthentic behavior in the US ahead of the 2020 election. Although the people behind this operation attempted to conceal their identities and coordination, our investigation found links to individuals associated with QAnon, a network known to spread fringe conspiracy theories. We continue to monitor and will take additional action if we see other violations of our Community Standards.

- *Presence on Facebook:* 5 Pages, 20 accounts, and 6 Groups
- *Followers:* About 133,000 accounts followed one or more of these Pages and about 30,000 accounts joined one of more of these Groups
- *Advertising:* Less than $1 in spending for ads on Facebook paid for in US dollars.

**AA0293**

Below is a sample of the content posted by some of these Pages:







**AA0294**

# 04

**We removed 19 Pages, 15 Facebook accounts, and 1 Group engaged in coordinated inauthentic behavior on our platform. This domestic-focused activity originated in the United States.**

The people behind this network used fake accounts to create fictitious personas, post in Groups, manage Pages, drive traffic to off-platform sites, and evade enforcement. They frequently posted about US news and topics including the US President, ideologies recognized as far-right, and anti-immigration content. Most recently, this network shared COVID-19-related conspiracies and hate speech about Asian Americans.

We found this activity as part of our proactive investigations into suspected coordinated inauthentic behavior in the US ahead of the 2020 election. Although the people behind this operation attempted to conceal their coordination, our investigation linked this network to VDARE, a website known for posting anti-immigration content, and to individuals associated with a similar website The Unz Review. We continue to monitor and will take additional action if we see other violations of our Community Standards.

- *Presence on Facebook:* 19 Pages, 15 Facebook accounts, and 1 Group
- *Followers:* About 207,700 accounts followed one or more of these Pages and about 20 accounts joined this Group.
- *Advertising:* Around $114,000 in spending for ads on Facebook paid for in US dollars.

AA0295

Below is a sample of the content posted by some of these Pages:





**AA0296**

# 05

**We removed 11 Pages, 75 Facebook accounts, and 90 Instagram accounts for engaging in coordinated inauthentic behavior. This network originated in Mauritania and focused largely on domestic audiences.**

The people behind this network used a combination of authentic, compromised and fake accounts — some of which had gone through name changes and already been disabled by our automated systems — to amplify their own content, manage Pages and post in Groups. The majority of engagement on these Pages was generated by this network itself. They posted primarily in Arabic and some in English and French about domestic and regional news and topics including the civil wars in Libya and Yemen, criticism of Qatar, Turkey and Iran, Qatar's treatment of migrant workers, as well as support for the president of Mauritania and the United Arab Emirates. Most recently, this network also posted about COVID-19 and various countries' response to the pandemic.

We detected this operation as a result of our internal investigation into suspected coordinated inauthentic behavior linked to the activity we had removed in August 2019 and March 2020.

- *Presence on Facebook and Instagram:* 11 Pages, 75 accounts, and 90 Instagram accounts
- *Followers:* About 62,500 accounts followed one or more of these Pages and less than 25,000 people followed one or more of these Instagram accounts
- *Advertising:* Less than $190 in spending for ads on Facebook and Instagram paid for in US dollars.

AA0297

Below is a sample of the content posted by some of these Pages:



**Post**: Thank you to the generous Emirates for this valuable aid: 18 tons of medical and food supplies to help us fight against the coronavirus



**Post:** Mining company Snim, at the direction of President Ghazouani, dedicates 813 million for local development in Nouadhibou #Accomplishments_of_the_Mauritanian_ nation

AA0298



**Page name:** Mauritania Events

**Post:** Under directives from President of the Republic Mohammed Ould Al-Sheikh Al-Ghazouani to fight the novel #coronavirus, a program has started to distribute aid to poor prisoners in #Nouakchott #Mauritania_Fights_Coronavirus #Mauritania_Events

**Text over photo:** Government measures to distribute aid to poor prisoners in Nouakchott.

**AA0299**

# 06

**We removed 3 Pages, 18 Facebook accounts, and 1 Group for violating our policy against [coordinated inauthentic behavior](). This domestic-focused activity originated in Myanmar.**

The individuals behind this network used fake and duplicate accounts to post in Groups and manage Pages posing as news entities. The Page admins and account owners shared content primarily in Burmese about local news and events such as the successes of the national police and military, stories about police officers providing assistance to local families, arrests and police raids, criticism of the Arakan Army and anti-Rohingya content. Most recently, some of these Pages posted about COVID-19. Although the people behind this activity attempted to conceal their identities and coordination, our investigation found links to members of the Myanmar Police Force. We found this activity as part of our internal investigation into suspected coordinated inauthentic behavior in the region.

- *Presence on Facebook:* 3 Pages, 18 accounts, and 1 Group.
- *Followers:* About 19,000 accounts followed one or more of these Pages and around 30 accounts followed this Group.
- *Advertising:* Around $20 in spending for ads on Facebook paid for in US dollars.

**AA0300**

Below is a sample of the content posted by some of these Pages:



**Post:** 19060 ecstasy pills and 6 grams of ICE, worth of 481.3 Lakh seized at Tamwe

At 3:50 am on February 19, in front of No.5, Basic Education High School, Natmauk Ward, Tamwe Township, Yangon Division, the inspection was conducted on Honda Accord vehicle, driven by Aung Myint Myat (aka) Aung Lay from 10 Ward and Mazda Demio vehicle, driven by Nay Hein Lat (aka) Villa. Altogether, a total of 19060 ecstasy pills (worth of 476.5 Lakh) were seized, in break down, from the vehicle driven by Aung Myint Myat (aka) Aung Lay, there were 2 swords which at the length of 2 by 8 inch and 1 inch respectively, 6 g of ICE under white bag under the back seat (worth 4.8 lakh), 19000 WY ecstasy pills, 44 plastic pipce, 1 phone; from the vehicle driven by Nay Hein Lat (aka) Villa, 60 WY ecstasy pills in plastic bags. From investigation on Aung Myint Myat (aka) Aung Lay regarding the drugs, it is stated that 10 days ago, he bought from Saw Naung who he met near 44th mile at Yangon-Mandalay highway. For Hein Lat (aka) Villa, he bought from Aung Myint Myat (aka) Aunglay to consume and sell.

Two of them have been charged under the Narcotics and Psychotropic Stances Act at Tamwe police station and are trying to surface and arrest their links.

AA0301





# 07

**We removed 511 Pages, 101 Facebook accounts, and 122 Groups and 56 Instagram accounts for violating our policy against [coordinated inauthentic behavior](#). This domestic-focused activity originated in Georgia.**

The individuals behind this activity used fake accounts — some of which had been previously detected and disabled by our automated systems — to create fictitious personas, impersonate opposition leaders and local health officials, manage Groups and Pages, and make their content appear more popular that it is. Some of these Groups went through name and admin changes over time and appear to have been purchased. The people behind this network also ran Pages designed to look like user profiles — using false names and stock profile images — to post and amplify their content, as well as to avoid detection and removal. Some of these Pages posed as independent news outlets. The Page admins and account owners typically posted about domestic news and political issues such as elections, government policies and officials, as well as criticism of the opposition, journalists and local activists. Most recently, this network shared some content about COVID-19, including posts which was removed for violating our policies against harmful health misinformation.

Although the people behind this operation attempted to conceal their identities, our investigation linked them to Espersona, a media firm in Georgia. This organization is now banned from our platforms. We found this activity as part of our investigation into suspected coordinated inauthentic behavior publicly reported by a local fact-checking organization in Georgia with some links to the network we took down in [December 2019](#).

- *Presence on Facebook:* 511 Pages, 101 Facebook accounts, and 122 Groups and 56 Instagram accounts
- *Followers:* About 973,000 accounts followed one or more of these Pages, around 1,508, 000 accounts followed one or more of these Groups, and about 26,000 people followed one or more of these Instagram accounts.
- *Advertising:* Around $30,000 in spending for ads on Facebook paid for in US dollars.

**AA0303**

Below is a sample of the content posted by some of these Pages:



**Post:** I go crazy about Gakharia's facial expressions

**Text over image:** Do you like Gakharia: Yes/No



**Post:** We are one team



**Post:** He is killing Corona

**AA0305**

# 08

**Finally we removed 23 Facebook accounts, 80 Pages, 41 Groups, and 9 Instagram accounts for engaging in [coordinated inauthentic behavior](). This domestic-focused activity originated in Georgia.**

The individuals behind this activity used a combination of authentic and fake accounts to comment on content, evade detection and removal, and manage Groups and Pages — some of which posed as news entities. They frequently posted about local news and political topics like the 2018 Georgian elections and candidates, Georgian Orthodox Church, criticism of the ruling party and the government's handling of the coronavirus pandemic. Many of these Pages have not been active since 2018.

Although the people behind this campaign attempted to conceal their identities, our investigation linked this network to individuals associated with United National Movement, a political party in Georgia. We found this activity as part of our investigation into suspected coordinated inauthentic behavior in the region. Our assessment benefited from local public reporting in Georgia.

- *Presence on Facebook:* 23 Facebook accounts, 80 Pages, 41 Groups, and 9 Instagram accounts
- *Followers:* About 785,000 accounts followed one or more of these Pages, around 6,300 accounts followed one or more of these Groups, and around 6,400 people followed one of more of these Instagram accounts
- *Advertising:* Around $23,800 in spending for ads on Facebook paid for primarily in US dollars
- *Events:* 22 events were hosted by these accounts and Pages. Up to 11,600 people expressed interest in at least one of these events. We cannot confirm whether any of these events actually occurred.

**AA0306**

Below is a sample of the content posted by some of these Pages:



Translation:

**Page name:** Official agency of making fun of Georgian dreamers

**Post:** Is it possible that angry people attacked these murderers and Russian agents?



**Page name:** Patriarchate's gang of black hundreds

**Text in image:** What I requested / What arrived

AA0307



**Page name:** Stop Bidzina

**Text in image:** Profane cursing at the member of Georgian dream

**AA0308**

EXHIBIT M



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
28 LIBERTY STREET
NEW YORK, NEW YORK 10005

*SUBPOENA DUCES TECUM*
**THE PEOPLE OF THE STATE OF NEW YORK**

To:     Meta Platforms, Inc.
        1601 Willow Road
        Menlo Park, CA 94025

**YOU ARE HEREBY COMMANDED**, under the laws of the State of New York and all business and excuses being laid aside, to produce to the Office of the Attorney General of the State of New York, Letitia James, 28 Liberty Street, New York, New York 10005, in accordance with the Instructions and Definitions below, any and all documents requested in the attached Schedule that are in Your possession, custody or control, including documents in the possession, custody and control of entities that You own or control in whole or in part. Your production of Documents in response to this subpoena should be addressed to the attention of Rick Sawyer, Special Counsel for Hate Crimes, and may be submitted by mail or electronic mail provided it is received by **June 10, 2022**, or any agreed upon adjourned date thereafter.

**PLEASE TAKE NOTICE** that the Attorney General deems the Documents and testimony requested by this subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest.

**PLEASE TAKE FURTHER NOTICE** that disobedience of this subpoena by failing to deliver the documents and information requested in the attached schedule on the date, time and place stated above or any agreed adjourned date and time may subject Meta Platforms, Inc., to prosecution under New York law.

**PLEASE TAKE FURTHER NOTICE** that Meta Platforms, Inc., shall immediately implement a litigation hold preserving all documents relating to the subject matter of this subpoena, including all documents concerning the specific documents demanded herein. (Additional subpoenas may follow.)

**AA0310**

**WITNESS, the Honorable Letitia James**, Attorney General of the State of New York, May 13, 2022.

LETITIA JAMES
Attorney General of New York

By: /s/ Rick Sawyer

RICK SAWYER
*Special Counsel for Hate Crimes*
28 Liberty Street
New York, New York 10005
Tel. 212.416.6182
richard.sawyer@ag.ny.gov

2

**AA0311**

# SCHEDULE

**A.  Instructions**

1.  Please produce the Documents described in Section C of this schedule, in the accordance with these Instructions (Section A) and the Definitions (Section B) and Format (Section D) described below.

2.  Time Frame.  Except as otherwise noted, this subpoena applies to all Documents in effect, created, recorded, compiled, transmitted or received from **January 1, 2015 through the present** (the "Relevant Period").

3.  Continuing Obligation. The obligation to produce Documents pursuant to this subpoena is a continuing one.  Responsive Documents located any time after a response is due or submitted shall be promptly produced at the place and in the manner specified herein.

4.  No Documents Responsive to Requests.  If there are no Documents responsive to a particular request, please so state in writing, identifying the paragraph number(s) of the request concerned.

5.  All Documents shall be produced with an accompanying cover letter that includes a description of the Documents being produced and their contents, the source from which the Documents have been produced, and the number(s) of the request(s) in Section C to which each Document produced is responsive.

6.  In order for the response to this subpoena to be complete, it must include a completed version of the attached Certification. In accordance with CPLR 3120 and 3122-a, the Certification must be sworn in the form of an affidavit and subscribed by a qualified witness charged with the responsibility for maintaining the records, stating in substance that (a) s/he is the duly authorized custodian or other qualified witness and has the authority to make the certification; (b) to the best of his/her knowledge, after reasonable inquiry, the records or copies thereof are accurate versions of the documents described in this subpoena that are in your possession, custody, or control; (c) to the best of his/her knowledge, after reasonable inquiry, the records or copies produced represent all the documents described in this subpoena, or if they do not represent a complete set of the documents subpoenaed, an explanation of which documents are missing and a reason for their absence is provided; and (d) the records or copies produced were made by the personnel or staff of the business, or persons acting under their control, in the regular course of business, at the time of the act, transaction, occurrence or event recorded therein, or within a reasonable time thereafter, and that it was the regular course of business to make such records.

7.  Documents No Longer in Your Possession. If any Document requested was formerly in your possession, custody or control but is no longer available or no longer exists, submit a statement in writing and under oath that: (i) describes in detail the nature of the Document and its contents; (ii) identifies the person who prepared the Document; (iii) identifies all persons who have seen or had possession of the Document; (iv) specifies the dates on which the Document was prepared, transmitted or received; (v) specifies the date

3

**AA0312**

on which the Document became unavailable; (vi) specifies the reason why the Document is unavailable, including whether it has been misplaced, lost, destroyed or transferred, and, if it has been destroyed or transferred, specifies the conditions of and reasons for such destruction or transfer and the persons who requested and performed the destruction or transfer; and (vii) identifies all persons with knowledge of any portion of the contents of the Document.

8. <u>Privilege.</u> If any Document requested is withheld on ground of privilege or other legal doctrine, submit with the production a statement in writing and under oath (e.g., a privilege log) that provides, for each Document withheld: (i) a description of the nature of the Document and its contents; (ii) the date of the Document; (iii) the Document's authors and recipients; and (iv) the legal ground for withholding it from production. If the legal ground is attorney-client privilege, please also indicate the names of the attorneys involved in the Document and the nature of their involvement (e.g., as authors). Such statement (or log) shall accompany each production. Further, for each Document withheld pursuant to this paragraph, the relevant production shall include placeholder pages equivalent in number to the page-length of the withheld Document.

9. <u>Format for Production.</u> Unless otherwise specified and agreed to by the Office of the Attorney General, responsive Documents shall be produced in their original format, whether hard copy or electronic.

10. <u>Stored Communications Act.</u> If You are a service which provides (a) the ability to send or receive wire or electronic communication to users; or (b) computer storage or processing services by means of an electronic communications system available to the public, the Stored Communications Act ("SCA"), 18 U.S.C. § 2703, may protect certain customer/subscriber communications, records, and other information pertaining to customers/subscribers that You maintain, other than the (a) name; (b) address; (c) local and long distance telephone connection records, or records of session times and durations; (d) length of service (including start date) and types of service utilized; (e) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and (f) means and source of payment for such service (including any credit card or bank account number), of a subscriber to or customer of such service. 18 U.S.C. § 2703(c)(2). This Subpoena should not be interpreted to request information protected by the SCA. Such protected information need not be produced in response to this Subpoena. If You have any questions regarding whether certain information is protected by the SCA, You should contact an attorney.

## B.   Definitions

1. "All" shall mean "each and every."

2. "And" and "or" shall be construed disjunctively or conjunctively, as necessary to bring within the scope of a request all responses and Documents that might otherwise be deemed outside the scope of that request.

3. "Any" shall mean "any and all."

4

4. "Communications" shall refer to any oral, written, in person, or any other form of relay, transmission, or transference of information by any means whatsoever including but not limited to by way of mail, computer, telephone, cellular or mobile phone, voice mail, electronic mail, radio, video, sound recordings, television, telefax, telex, social media, or any other medium, and shall include any Document that abstracts, digests, transcribes, records, or reflects any of the foregoing.

5. "Concerning" or "relating to" shall mean concerning, relating to, referring to, referencing, describing, evidencing, or constituting, either directly or indirectly and in whole or in part.

6. "Documents" is used in the broadest sense of the term and shall mean all records and other tangible media of expression of any nature, including: originals, drafts or finished versions; annotated or nonconforming or other copies, however created, produced or stored (manually, mechanically, electronically or otherwise); electronic mail ("email"), instant messages, Blackberry or other wireless device messages; voicemail; books, papers, files, notes, correspondence, memoranda, reports, records, journals, summaries, registers, account statements, analyses, plans, manuals, policies, telegrams, faxes, wires, telephone logs, telephone messages, or message slips; minutes, notes, records or transcriptions of conversations, communications or meetings; video and audio tapes; disks and other electronic media; microfilm, microfiche; storage devices; press releases; contracts, agreements; calendars, date books, appointment books and diaries; notices and confirmations. A draft or non-identical copy is a separate Document. Documents existing in electronic form shall include all items that may have been removed from the email accounts, directories or other locations in which they are ordinarily stored to any other servers, folders, files, archives, or backup devices, whether or not deleted.

7. The singular form of any word shall include the plural and vice versa.

8. Any word used but not defined in this Schedule shall be construed consistently with its common meaning.

9. "VDARE" shall mean VDARE Foundation, Inc. and (i) any of its directors, officers, agents, employees, consultants, representatives, attorneys, and other persons acting on its behalf including but not limited to Peter Brimelow, Lydia Brimelow, John Brimelow, Scott McConnell, John O'Sullivan, Joseph (Joe) Fallon, and John Wall, (ii) any predecessors, successors, parent corporations, subsidiaries, divisions, assigns, "d/b/a" names, and affiliates, including Lexington Research Institute, and (iii) any entities that, directly or indirectly, control, are controlled by, or are under common control with VDARE Foundation, Inc., including by possessing, directly or indirectly, the power to direct or cause the direction of VDARE Foundation, Inc.'s management and policies, whether through membership, the ownership of voting securities, by contract, or otherwise.

5

**AA0314**

**C.**     **Documents to Be Produced**

For the **Relevant Time Period**, please produce the following documents relating to any Facebook account established by, held in the name or on behalf of, and/or linked to:

    a.  VDARE Foundation, Inc. (VDARE)
    b.  EIN 22-3691487
    c.  www.vdare.com
    d.  pbrimelow@vdare.com; lbrimelow@vdare.com
    e.  Peter Brimelow, VDARE Chairman;
    f.  Lydia Brimelow, VDARE Treasurer

(collectively the "Facebook Accounts"):

1. All account opening documents for the Facebook Accounts.

2. Documents sufficient to identify the individuals who opened the Facebook Accounts.

3. All documents concerning the grounds on which the Facebook Accounts were terminated.

4. A true and correct copy of the document entitled "April 2020 Coordinated Inauthentic Behavior Report."

5. All documents relating to the finding that VDARE engaged in "coordinated inauthentic behavior" in its use of Facebook and other Meta platforms.

6. Documents sufficient to identify the Facebook Pages, accounts, and Group used by VDARE in their "coordinated inauthentic behavior" as described by the "April 2020 Coordinated Inauthentic Behavior Report."

7. Documents sufficient to identify the "COVID-19-related conspiracies and hate speech about Asian Americans" shared through the network of fake accounts VDARE created and identified by the "April 2020 Coordinated Inauthentic Behavior Report."

8. All documents indicating that VDARE violated the terms of service of Facebook or other Meta platforms.

9. All complaints made to Facebook or another Meta platform during the Relevant Period concerning any allegations that VDARE violated the platform's terms of service.

10. All documents from investigations by Meta, its predecessors, or agents into allegations that VDARE violated the terms of service of Facebook or other Meta platforms.

11. Documents sufficient to identify the amount, date, purpose, payor name, and payor address for any payment made to VDARE by Facebook Pay or any other Meta payment platform.

6

**AA0315**

12. All documents reflecting withdrawals by VDARE from Facebook Pay or any other Meta payment platform, including the amount, date, withdrawing person or entity and recipients of each withdrawal.

13. All documents relating to any other transfers by VDARE to or from Facebook Pay or any other Meta payment platform, including the source, recipients, dates, and amounts of such transfers, to the extent not previously described herein.

14. Documents sufficient to identify the final balance(s), if any, in VDARE's Facebook Pay or any other Meta payment account.

15. All account closing documents for VDARE's Facebook Pay or any other Meta payment account.

16. Documents sufficient to identify any advertisements placed by VDARE within the Relevant Period on Facebook or any other Meta platform.

17. Documents sufficient to identify the total cost of advertisements placed by VDARE within the Relevant Period on Facebook or any other Meta platform.

18. Documents sufficient to identify the audiences targeted by VDARE's advertising within the Relevant Period on Facebook or any other Meta platform.

19. Documents sufficient to identify the number of users to whom VDARE's advertising was delivered within the Relevant Period on Facebook or any other Meta platform. Please note that this request does not call for production of the identity of any user who received VDARE's advertising.

**AA0316**

**D.    Format for Production**

Unless otherwise specified and agreed to by the Office of the Attorney General, all responsive documents must be produced in Concordance format in accordance with the following instructions.

1.   Concordance Production Components. A Concordance production consists of the following component files, which must be produced in accordance with the specifications set forth below in Section 2:

   - *Metadata Load File*
   - *Extracted or OCR Text Files*
   - *Single-Page Image Files*
   - *Opticon Load File*
   - *Native Files.*

2.   Production File Requirements.

   A.   ***Metadata Load File***

   - Required file format:
      - UTF-8
      - .dat file extension
      - Field delimiter: (ASCII decimal character 20)
      - Text Qualifier: þ (ASCII decimal character 254). Multiple value field delimiter: ; (ASCII decimal character 59)

   - The first line of the metadata load file must list all included fields. All required fields are listed in Attachment 1.

   - Fields with no values must be represented by empty columns maintaining delimiters and qualifiers.

   - ***Note:*** All documents must have page-level Bates numbering (except documents produced only in native format, which must be assigned a document-level Bates number). The metadata load file must list the beginning and ending Bates numbers (BEGDOC and ENDDOC) for each document.

   - Accepted date formats:
      - mm/dd/yyyy
      - yyyy/mm/dd
      - yyyymmdd

   - Accepted time formats:

**AA0317**

- hh:mm:ss (if not in 24-hour format, You must indicate am/pm)
- hh:mm:ss:mmm

## B. *Extracted or OCR Text Files*

- You must produce individual document-level text files containing the full extracted text for each produced document.

- When extracted text is not available (for instance, for image-only documents) You must provide individual document-level text files containing the document's full OCR text.

- The filename for each text file must match the document's beginning Bates number (BEGDOC) listed in the metadata load file.

- Text files must be divided into subfolders containing no more than 5000 files.

## C. *Single-Page Image Files (Petrified Page Images)*

- Where possible, all produced documents must be converted into single-page tagged image format ("TIF") files. See Section 7.E below for instructions on producing native versions of documents You are unable to convert.

- Image documents that exist only in non-TIF formats must be converted into TIF files. The original image format must be produced as a native file as described in Section 7.E below.

- For documents produced only in native format, You must provide a TIF placeholder that states "Document produced only in native format."

- Each single-page TIF file must be endorsed with a unique Bates number.

- The filename for each single-page TIF file must match the unique page-level Bates number (or document-level Bates number for documents produced only in native format).

- Required image file format:
  - CCITT Group 4 compression
  - 2-Bit black and white
  - 300 dpi
  - Either .tif or .tiff file extension.

- TIF files must be divided into subfolders containing no more than 5000 files. Documents should not span multiple subfolders, a document with more than 5000 pages should be kept in a single folder.

9

**AA0318**

D. ***Opticon Load File***

- Required file format:

    - Field delimiter: , (ASCII decimal character 44)
    - No Text Qualifier
    - .opt file extension

- The comma-delimited Opticon load file must contain the following seven fields (as indicated below, values for certain fields may be left blank):

    - ALIAS or IMAGEKEY – the unique Bates number assigned to each page of the production.
    - VOLUME – this value is optional and may be left blank.
    - RELATIVE PATH – the filepath to each single-page image file on the production media.
    - DOCUMENT BREAK – defines the first page of a document. The only possible values for this field are "Y" or blank.
    - FOLDER BREAK – defines the first page of a folder. The only possible values for this field are "Y" or blank.
    - BOX BREAK – defines the first page of a box. The only possible values for this field are "Y" or blank.
    - PAGE COUNT – this value is optional and may be left blank.

- ***Example***:

    ABC00001,,IMAGES\0001\ABC00001.tif,Y,,,2
    ABC00002,,IMAGES\0001\ABC00002.tif,,,,
    ABC00003,,IMAGES\0002\ABC00003.tif,Y,,,1
    ABC00004,,IMAGES\0002\ABC00004.tif,Y,,,1

E. ***Native Files***

- Non-printable or non–print friendly documents (including but not limited to spreadsheets, audio files, video files and documents for which color has significance to document fidelity) must be produced in their native format.

- The filename of each native file must match the document's beginning Bates number (BEGDOC) in the metadata load file and the original file extension.

- For documents produced only in native format, You must assign a single document-level Bates number and provide an image file placeholder that states "Document produced only in native format."

- The relative paths to all native files on the production media must be listed in the NATIVEFILE field of the metadata load file.

**AA0319**

- Native files that are password-protected must be decrypted prior to conversion and produced in decrypted form.

- You may be required to supply a software license for proprietary documents produced only in native format.

3. <u>Production Folder Structure</u>. The production must be organized according to the following standard folder structure:

  - data\ (contains production load files)
  - images\ (contains single-page TIF files, with subfolder organization)
    - \0001, \0002, \0003…
  - natives\ (contains native files, with subfolder organization)
    - \0001, \0002, \0003…
  - text\ (contains text files, with subfolder organization)
    - \0001, \0002, \0003…

4. <u>De-Duplication</u>. You must perform global de-duplication of stand-alone documents and email families.

5. <u>Paper or Scanned Documents</u>. Documents that exist only in paper format must be scanned to single-page TIF files and OCR'd. The resulting electronic files should be produced in Concordance format pursuant to these instructions. You must contact the Assistant Attorney General whose telephone number appears on the Notice to discuss (i) any documents that cannot be scanned, and (ii) how information for scanned documents should be represented in the metadata load file.

6. <u>Structured Data</u>. Structured data includes but is not limited to relational databases, transactional data, and xml pages. Spreadsheets are not considered structured data. You must first speak to the Assistant Attorney General whose telephone number appears on the Notice.

   <u>Relational Databases</u>

   - Database tables should be provided in d or other machine-readable, non-proprietary format, with each table in a separate data file. Each data file must have an accompanying data dictionary that explains the meaning of each column name and explains the values of any codes used.

   - Dates and numbers must be clearly and consistently formatted and, where relevant, units of measure should be explained in the data dictionary.

   - Records must contain clear, unique identifiers, and the data dictionary must include explanations of how the files and records relate to one another.

11

**AA0320**

7. <u>Media and Encryption</u>. All document sets over 2 GB must be produced on CD, DVD, or hard-drive media. All production media must be encrypted with a strong password, which must be delivered independently from the production media. Document sets under 2 GB may be delivered electronically. The OAG offers a secure cloud storage option that can be set up to receive media on a one-time basis, or the OAG will download media from the providing parties' server.

12

**AA0321**

## ATTACHMENT 1
### Required Fields for Metadata Load File

| FIELD NAME | FIELD DESCRIPTION | FIELD VALUE EXAMPLE[1] |
|---|---|---|
| BEGDOC | Bates number assigned to the first page of the document. | ABC0001 |
| ENDDOC | Bates number assigned to the last page of the document. | ABC0002 |
| BEGATTACH | Bates number assigned to the first page of the parent document in a document family (*i.e.*, should be the same as BEGDOC of the parent document, or PARENTDOC). | ABC0001 |
| ENDATTACH | Bates number assigned to the last page of the last child document in a family (*i.e.*, should be the same as ENDDOC of the last child document). | ABC0008 |
| PARENTDOC | BEGDOC of parent document. | ABC0001 |
| CHILDDOCS | List of BEGDOCs of all child documents, delimited by ";" when field has multiple values. | ABC0002; ABC0003; ABC0004… |
| COMMENTS | Additional document comments, such as passwords for encrypted files. | |
| NATIVEFILE | Relative file path of the native file on the production media. | \Native_File\Folder\...\BEGDOC.ext |
| TEXTFILE | Relative file path of the plain text file on the production media. | \Text_Folder\Folder\...\BEGDOC.txt |
| SOURCE | For scanned paper records this should be a description of the physical location of the original paper record. For loose electronic files this should be the name of the file server or workstation where the files were gathered. | Company Name, Department Name, Location, Box Number… |
| CUSTODIAN | Owner of the document or file. | Firstname Lastname, Lastname, Firstname, User Name; Company Name, Department Name... |
| FROM | Sender of the email. | Firstname Lastname < FLastname @domain > |
| TO | All to: members or recipients, delimited by ";" when field has multiple values. | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; … |
| CC | All cc: members, delimited by ";" when field has multiple values. | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; … |
| BCC | All bcc: members, delimited by ";" when field has multiple values | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; … |

AA0322

| | | |
|---|---|---|
| SUBJECT | Subject line of the email. | |
| DATERCVD | Date and time that an email was received. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| DATESENT | Date and time that an email was sent. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| CALBEGDATE | Date that a meeting begins. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| CALENDDATE | Date that a meeting ends. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| ATTACHMENTS | List of filenames of all attachments, delimited by ";" when field has multiple values. | AttachmentFileName.; AttachmentFileName.docx; AttachmentFileName.pdf;… |
| NUMATTACH | Number of attachments. | |
| RECORDTYPE | General type of record. | IMAGE; LOOSE E-MAIL; E-MAIL; E-DOC IMAGE ATTACHMENT; LOOSE E-MAIL ATTACHMENT; E-MAIL ATTACHMENT; E-DOC ATTACHMENT |
| FOLDERLOC | Original folder path of the produced document. | Drive:\Folder\...\...\ |
| FILENAME | Original filename of the produced document. | Filename.ext |
| DOCEXT | Original file extension. | html, xls, pdf |
| DOCTYPE | Name of the program that created the produced document. | Adobe Acrobat, Microsoft Word, Microsoft Excel, Corel WordPerfect… |
| TITLE | Document title (if entered). | |
| AUTHOR | Name of the document author. | |
| REVISION | Number of revisions to a document. | 18 |
| DATECREATED | Date and time that a document was created. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| DATEMOD | Date and time that a document was last modified. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| FILESIZE | Original file size in bytes. | |
| PGCOUNT | Number of pages per document. | |
| IMPORTANCE | Email priority level if set. | Low, Normal, High |
| MD5HASH | MD5 hash value computed from native file (a/k/a file fingerprint). | |
| SHA1HASH | SHA1 hash value | |
| MSGINDEX | Email message ID | |
| CONVERSATIONINDEX | Email Conversation Index | |

**AA0323**

**Certification of Business Records**

State of _____)
) ss.:
County of _____)

_____, being duly sworn, deposes and says:

1. I am the duly authorized custodian or other qualified witness of the business records of _____.

   I am familiar with the business practices and procedures of _____ and have the authority to make this certification.

2. To the best of my knowledge, after reasonable inquiry, the records produced in response to the subpoena are accurate versions of the documents described in the subpoena that are in my possession, custody or control.

3. To the best of my knowledge, after reasonable inquiry, the records represent all the documents described in the subpoena duces tecum except that the following documents are missing for the reason stated:

   _____

4. The records produced were made by the personnel or staff of the business, or persons acting under their control, in the regular course of business, at the time of the act, transaction, occurrence or event recorded therein, or within a reasonable time thereafter, and it was the regular course of business to make such records.

Sworn to before me this ____

day of _____, 2022

_____
Notary Public

15

**AA0324**



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
28 LIBERTY STREET
NEW YORK, NEW YORK 10005

*SUBPOENA DUCES TECUM*
**THE PEOPLE OF THE STATE OF NEW YORK**

To:    Facebook Payments, Inc.
       1601 Willow Road
       Menlo Park, CA 94025

**YOU ARE HEREBY COMMANDED**, under the laws of the State of New York and all business and excuses being laid aside, to produce to the Office of the Attorney General of the State of New York, Letitia James, 28 Liberty Street, New York, New York 10005, in accordance with the Instructions and Definitions below, any and all documents requested in the attached Schedule that are in Your possession, custody or control, including documents in the possession, custody and control of entities that You own or control in whole or in part. Your production of Documents in response to this subpoena should be addressed to the attention of Rick Sawyer, Special Counsel for Hate Crimes, and may be submitted by mail or electronic mail provided it is received by **June 29, 2022**, or any agreed upon adjourned date thereafter.

**PLEASE TAKE NOTICE** that the Attorney General deems the Documents and testimony requested by this subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest.

**PLEASE TAKE FURTHER NOTICE** that disobedience of this subpoena by failing to deliver the documents and information requested in the attached schedule on the date, time and place stated above or any agreed adjourned date and time may subject Facebook Payments, Inc. to prosecution under New York law.

**PLEASE TAKE FURTHER NOTICE** that Facebook Payments, Inc., shall immediately implement a litigation hold preserving all documents relating to the subject matter of this subpoena, including all documents concerning the specific documents demanded herein. (Additional subpoenas may follow.)

1

**AA0325**

      **WITNESS, the Honorable Letitia James**, Attorney General of the State of New York, June 14, 2022.

                                                 **LETITIA JAMES**
                                               Attorney General of New York

By:  /s/ Rick Sawyer

                                               RICK SAWYER
                                             *Special Counsel for Hate Crimes*
                                             28 Liberty Street
                                             New York, New York 10005
                                             Tel. 212.416.6182
                                           richard.sawyer@ag.ny.gov

# SCHEDULE

## A. Instructions

1.  Please produce the Documents described in Section C of this schedule, in the accordance with these Instructions (Section A) and the Definitions (Section B) and Format (Section D) described below.

2.  <u>Time Frame.</u>  Except as otherwise noted, this subpoena applies to all Documents in effect, created, recorded, compiled, transmitted or received from **January 1, 2015 through the present** (the "Relevant Period").

3.  <u>Continuing Obligation.</u> The obligation to produce Documents pursuant to this subpoena is a continuing one.  Responsive Documents located any time after a response is due or submitted shall be promptly produced at the place and in the manner specified herein.

4.  <u>No Documents Responsive to Requests.</u>  If there are no Documents responsive to a particular request, please so state in writing, identifying the paragraph number(s) of the request concerned.

5.  All Documents shall be produced with an accompanying cover letter that includes a description of the Documents being produced and their contents, the source from which the Documents have been produced, and the number(s) of the request(s) in Section C to which each Document produced is responsive.

6.  In order for the response to this subpoena to be complete, it must include a completed version of the attached Certification. In accordance with CPLR 3120 and 3122-a, the Certification must be sworn in the form of an affidavit and subscribed by a qualified witness charged with the responsibility for maintaining the records, stating in substance that (a) s/he is the duly authorized custodian or other qualified witness and has the authority to make the certification; (b) to the best of his/her knowledge, after reasonable inquiry, the records or copies thereof are accurate versions of the documents described in this subpoena that are in your possession, custody, or control; (c) to the best of his/her knowledge, after reasonable inquiry, the records or copies produced represent all the documents described in this subpoena, or if they do not represent a complete set of the documents subpoenaed, an explanation of which documents are missing and a reason for their absence is provided; and (d) the records or copies produced were made by the personnel or staff of the business, or persons acting under their control, in the regular course of business, at the time of the act, transaction, occurrence or event recorded therein, or within a reasonable time thereafter, and that it was the regular course of business to make such records.

7.  <u>Documents No Longer in Your Possession.</u> If any Document requested was formerly your possession, custody or control but is no longer available or no longer exists, submit a statement in writing and under oath that: (i) describes in detail the nature of the Document and its contents; (ii) identifies the person who prepared the Document; (iii) identifies all persons who have seen or had possession of the Document; (iv) specifies the dates on which the Document was prepared, transmitted or received; (v) specifies the date

on which the Document became unavailable; (vi) specifies the reason why the Document is unavailable, including whether it has been misplaced, lost, destroyed or transferred, and, if it has been destroyed or transferred, specifies the conditions of and reasons for such destruction or transfer and the persons who requested and performed the destruction or transfer; and (vii) identifies all persons with knowledge of any portion of the contents of the Document.

8. <u>Privilege.</u> If any Document requested is withheld on ground of privilege or other legal doctrine, submit with the production a statement in writing and under oath (e.g., a privilege log) that provides, for each Document withheld: (i) a description of the nature of the Document and its contents; (ii) the date of the Document; (iii) the Document's authors and recipients; and (iv) the legal ground for withholding it from production. If the legal ground is attorney-client privilege, please also indicate the names of the attorneys involved in the Document and the nature of their involvement (e.g., as authors). Such statement (or log) shall accompany each production. Further, for each Document withheld pursuant to this paragraph, the relevant production shall include placeholder pages equivalent in number to the page-length of the withheld Document.

9. <u>Format for Production.</u> Unless otherwise specified and agreed to by the Office of the Attorney General, responsive Documents shall be produced in their original format, whether hard copy or electronic.

10. <u>Stored Communications Act.</u> If You are a service which provides (a) the ability to send or receive wire or electronic communication to users; or (b) computer storage or processing services by means of an electronic communications system available to the public, the Stored Communications Act ("SCA"), 18 U.S.C. § 2703, may protect certain customer/subscriber communications, records, and other information pertaining to customers/subscribers that You maintain, other than the (a) name; (b) address; (c) local and long distance telephone connection records, or records of session times and durations; (d) length of service (including start date) and types of service utilized; (e) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and (f) means and source of payment for such service (including any credit card or bank account number), of a subscriber to or customer of such service. 18 U.S.C. § 2703(c)(2). This Subpoena should not be interpreted to request information protected by the SCA. Such protected information need not be produced in response to this Subpoena. If You have any questions regarding whether certain information is protected by the SCA, You should contact an attorney.

## B. Definitions

1. "All" shall mean "each and every."

2. "And" and "or" shall be construed disjunctively or conjunctively, as necessary to bring within the scope of a request all responses and Documents that might otherwise be deemed outside the scope of that request.

3. "Any" shall mean "any and all."

4

4. "Communications" shall refer to any oral, written, in person, or any other form of relay, transmission, or transference of information by any means whatsoever including but not limited to by way of mail, computer, telephone, cellular or mobile phone, voice mail, electronic mail, radio, video, sound recordings, television, telefax, telex, social media, or any other medium, and shall include any Document that abstracts, digests, transcribes, records, or reflects any of the foregoing.

5. "Concerning" or "relating to" shall mean concerning, relating to, referring to, referencing, describing, evidencing, or constituting, either directly or indirectly and in whole or in part.

6. "Documents" is used in the broadest sense of the term and shall mean all records and other tangible media of expression of any nature, including:  originals, drafts or finished versions; annotated or nonconforming or other copies, however created, produced or stored (manually, mechanically, electronically or otherwise); electronic mail ("email"), instant messages, Blackberry or other wireless device messages; voicemail; books, papers, files, notes, correspondence, memoranda, reports, records, journals, summaries, registers, account statements, analyses, plans, manuals, policies, telegrams, faxes, wires, telephone logs, telephone messages, or message slips; minutes, notes, records or transcriptions of conversations, communications or meetings; video and audio tapes; disks and other electronic media; microfilm, microfiche; storage devices; press releases; contracts, agreements; calendars, date books, appointment books and diaries; notices and confirmations.  A draft or non-identical copy is a separate Document. Documents existing in electronic form shall include all items that may have been removed from the email accounts, directories or other locations in which they are ordinarily stored to any other servers, folders, files, archives, or backup devices, whether or not deleted.

7. The singular form of any word shall include the plural and vice versa.

8. Any word used but not defined in this Schedule shall be construed consistently with its common meaning.

9. "VDARE" shall mean VDARE Foundation, Inc. and (i) any of its directors, officers, agents, employees, consultants, representatives, attorneys, and other persons acting on its behalf including but not limited to Peter Brimelow, Lydia Brimelow, John Brimelow, Scott McConnell, John O'Sullivan, Joseph (Joe) Fallon, and John Wall, (ii) any predecessors, successors, parent corporations, subsidiaries, divisions, assigns, "d/b/a" names, and affiliates, including Lexington Research Institute, and (iii) any entities that, directly or indirectly, control, are controlled by, or are under common control with VDARE Foundation, Inc., including by possessing, directly or indirectly, the power to direct or cause the direction of VDARE Foundation, Inc.'s management and policies, whether through membership, the ownership of voting securities, by contract, or otherwise.

5

**AA0329**

**C.      Documents to Be Produced**

For the **Relevant Time Period**, please produce the following documents relating to any Facebook account established by, held in the name or on behalf of, and/or linked to:

      a.   VDARE Foundation, Inc. (VDARE)
      b.   EIN 22-3691487
      c.   www.vdare.com
      d.   pbrimelow@vdare.com; lbrimelow@vdare.com
      e.   Peter Brimelow, VDARE Chairman;
      f.   Lydia Brimelow, VDARE Treasurer

(collectively the "Facebook Accounts"):

1.  Documents sufficient to identify the amount, date, purpose, payor name, and payor address for any payment made to VDARE by Facebook Payments, Inc., or any other Meta payment platform.

2.  All documents reflecting withdrawals by VDARE from Facebook Payments, Inc., or any other Meta payment platform, including the amount, date, withdrawing person or entity and recipients of each withdrawal.

3.  All documents relating to any other transfers by VDARE to or from Facebook Payments, Inc., or any other Meta payment platform, including the source, recipients, dates, and amounts of such transfers, to the extent not previously described herein.

4.  Documents sufficient to identify the final balance(s), if any, in VDARE's Facebook Payments, Inc., or any other Meta payment account.

5.  All account closing documents for VDARE's Facebook Payments, Inc., or any other Meta payment account.

6

**D.** **Format for Production**

Unless otherwise specified and agreed to by the Office of the Attorney General, all responsive documents must be produced in Concordance format in accordance with the following instructions.

1. <u>Concordance Production Components</u>. A Concordance production consists of the following component files, which must be produced in accordance with the specifications set forth below in Section 2:

    - *Metadata Load File*

    - *Extracted or OCR Text Files*

    - *Single-Page Image Files*

    - *Opticon Load File*

    - *Native Files*.

2. <u>Production File Requirements</u>.

    A. ***Metadata Load File***

    - Required file format:

        ▪ UTF-8
        ▪ .dat file extension
        ▪ Field delimiter: (ASCII decimal character 20)
        ▪ Text Qualifier: þ (ASCII decimal character 254). Multiple value field delimiter: ; (ASCII decimal character 59)

    - The first line of the metadata load file must list all included fields. All required fields are listed in Attachment 1.

    - Fields with no values must be represented by empty columns maintaining delimiters and qualifiers.

    - ***Note:*** All documents must have page-level Bates numbering (except documents produced only in native format, which must be assigned a document-level Bates number). The metadata load file must list the beginning and ending Bates numbers (BEGDOC and ENDDOC) for each document.

    - Accepted date formats:

        ▪ mm/dd/yyyy
        ▪ yyyy/mm/dd
        ▪ yyyymmdd

    - Accepted time formats:

7

**AA0331**

- hh:mm:ss (if not in 24-hour format, You must indicate am/pm)
- hh:mm:ss:mmm

## B. *Extracted or OCR Text Files*

- You must produce individual document-level text files containing the full extracted text for each produced document.

- When extracted text is not available (for instance, for image-only documents) You must provide individual document-level text files containing the document's full OCR text.

- The filename for each text file must match the document's beginning Bates number (BEGDOC) listed in the metadata load file.

- Text files must be divided into subfolders containing no more than 5000 files.

## C. *Single-Page Image Files (Petrified Page Images)*

- Where possible, all produced documents must be converted into single-page tagged image format ("TIF") files. See Section 7.E below for instructions on producing native versions of documents You are unable to convert.

- Image documents that exist only in non-TIF formats must be converted into TIF files. The original image format must be produced as a native file as described in Section 7.E below.

- For documents produced only in native format, You must provide a TIF placeholder that states "Document produced only in native format."

- Each single-page TIF file must be endorsed with a unique Bates number.

- The filename for each single-page TIF file must match the unique page-level Bates number (or document-level Bates number for documents produced only in native format).

- Required image file format:
  - CCITT Group 4 compression
  - 2-Bit black and white
  - 300 dpi
  - Either .tif or .tiff file extension.

- TIF files must be divided into subfolders containing no more than 5000 files. Documents should not span multiple subfolders, a document with more than 5000 pages should be kept in a single folder.

8

**AA0332**

D. *Opticon Load File*

- Required file format:

    - Field delimiter: , (ASCII decimal character 44)
    - No Text Qualifier
    - .opt file extension

- The comma-delimited Opticon load file must contain the following seven fields (as indicated below, values for certain fields may be left blank):

    - ALIAS or IMAGEKEY – the unique Bates number assigned to each page of the production.
    - VOLUME – this value is optional and may be left blank.
    - RELATIVE PATH – the filepath to each single-page image file on the production media.
    - DOCUMENT BREAK – defines the first page of a document. The only possible values for this field are "Y" or blank.
    - FOLDER BREAK – defines the first page of a folder. The only possible values for this field are "Y" or blank.
    - BOX BREAK – defines the first page of a box. The only possible values for this field are "Y" or blank.
    - PAGE COUNT – this value is optional and may be left blank.

- *Example*:

    ABC00001,,IMAGES\0001\ABC00001.tif,Y,,,2
    ABC00002,,IMAGES\0001\ABC00002.tif,,,,
    ABC00003,,IMAGES\0002\ABC00003.tif,Y,,,1
    ABC00004,,IMAGES\0002\ABC00004.tif,Y,,,1

E. *Native Files*

- Non-printable or non–print friendly documents (including but not limited to spreadsheets, audio files, video files and documents for which color has significance to document fidelity) must be produced in their native format.

- The filename of each native file must match the document's beginning Bates number (BEGDOC) in the metadata load file and the original file extension.

- For documents produced only in native format, You must assign a single document-level Bates number and provide an image file placeholder that states "Document produced only in native format."

- The relative paths to all native files on the production media must be listed in the NATIVEFILE field of the metadata load file.

9

**AA0333**

- Native files that are password-protected must be decrypted prior to conversion and produced in decrypted form.

- You may be required to supply a software license for proprietary documents produced only in native format.

3. <u>Production Folder Structure</u>. The production must be organized according to the following standard folder structure:

- data\ (contains production load files)
- images\ (contains single-page TIF files, with subfolder organization)
  - \0001, \0002, \0003…
- natives\ (contains native files, with subfolder organization)
  - \0001, \0002, \0003…
- text\ (contains text files, with subfolder organization)
  - \0001, \0002, \0003…

4. <u>De-Duplication</u>. You must perform global de-duplication of stand-alone documents and email families.

5. <u>Paper or Scanned Documents</u>. Documents that exist only in paper format must be scanned to single-page TIF files and OCR'd. The resulting electronic files should be produced in Concordance format pursuant to these instructions. You must contact the Assistant Attorney General whose telephone number appears on the Notice to discuss (i) any documents that cannot be scanned, and (ii) how information for scanned documents should be represented in the metadata load file.

6. <u>Structured Data</u>. Structured data includes but is not limited to relational databases, transactional data, and xml pages. Spreadsheets are not considered structured data. You must first speak to the Assistant Attorney General whose telephone number appears on the Notice.

<u>Relational Databases</u>

- Database tables should be provided in d or other machine-readable, non-proprietary format, with each table in a separate data file. Each data file must have an accompanying data dictionary that explains the meaning of each column name and explains the values of any codes used.

- Dates and numbers must be clearly and consistently formatted and, where relevant, units of measure should be explained in the data dictionary.

- Records must contain clear, unique identifiers, and the data dictionary must include explanations of how the files and records relate to one another.

10

**AA0334**

7. <u>Media and Encryption</u>. All document sets over 2 GB must be produced on CD, DVD, or hard-drive media. All production media must be encrypted with a strong password, which must be delivered independently from the production media. Document sets under 2 GB may be delivered electronically. The OAG offers a secure cloud storage option that can be set up to receive media on a one-time basis, or the OAG will download media from the providing parties' server.

11

EXHIBIT N

*Frederick C. Kelly*

*Attorney at Law*
*One Harriman Square*
*Goshen, New York 10924*
*845 294-7945* ◆ *Fax 845 294-7889*
*fckellylaw@protonmail.com*
*Service by electronic means is not accepted.*

Mr. Rick Sawyer, Esq.
Special Counsel for Hate Crimes
28 Liberty Street
New York, NY 10005

Ms. Catherine Suvari, Esq.
Assistant Attorney General
General Charities Bureau
28 Liberty Street
New York, NY 10005

July 20, 2022          *Via Email*

Re:     New York Attorney General Subpoena to Meta Platforms, Inc. dated May 13, 2022
        New York Attorney General Subpoena to Facebook Payments, Inc. dated June 14, 2022
        New York Attorney General Subpoena to VDARE Foundation, Inc. dated June 23, 2022

Dear Mr. Sawyer and Ms. Suvari:

This email is in follow up to the meet and confer held on Monday, July 18, 2022.

Upon further examination, your subpoenae are incredibly unlawful, such that their very service brings into question the good faith of the New York Attorney General.

Let us start with obvious facts: VDARE publishes speech which is highly critical of current governmental policy. This is speech at the very heart of our First Amendment, *e.g.* "Criticism of government is at the very center of the constitutionally protected area of free discussion. *Rosenblatt v. Baer*, 383 US 75, 85 [1966]; "A more invidious classification than that between persons who support government officials and their policies and those who are critical of them is difficult to imagine." *Glasson v. City of Louisville*, 518 F2d 899, 912 [6th Cir. 1975].

Page 1 of 5

**AA0337**

Furthermore, VDARE's speech is not only critical of governmental policy, but controversial in its own right.

Precisely because of its controversial character, many of VDARE's writers, readers, and donors prefer to remain anonymous. Their ability to do so is well settled law that you have blatantly disregarded with your subpoenae.

A writer's anonymity was recognized, among other places, in *Talley v California*, 362 US 60 [1960]: "There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression... "Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all... Even the Federalist Papers, written in favor of the adoption of our Constitution, were published under fictitious names. It is plain that anonymity has sometimes been assumed for the most constructive purposes." *Id*. at 64-65.

Turning to a reader's anonymity, it too, has been given constitutional recognition. Among other places, you are referred to the eloquent concurrence by Justice Douglas in *US v. Rumely*, 345 US 41 [1953]: "Once the government can demand of a publisher the names of the purchasers of his publications, the free press as we know it disappears. Then the spectre of a government agent will look over the shoulder of everyone who reads. The purchase of a book or pamphlet today **may result in a subpoena tomorrow**. Fear of criticism goes with every person into the bookstall. The subtle, imponderable pressures of the orthodox lay hold. Some will fear to read what is unpopular, what the powers-that-be dislike. When the light of publicity may reach any student, any teacher, inquiry will be discouraged. The books and pamphlets that are critical of the administration, that preach an unpopular policy in domestic or foreign affairs, that are in disrepute in the orthodox school of thought will be suspect and subject to investigation. The press and its readers will pay a heavy price in harassment. But that will be minor in comparison with the menace of the shadow which government will cast over literature that does not follow the dominant party line. If the lady from Toledo can be required to disclose what she read yesterday and what she will read tomorrow, fear will take the place of freedom in the libraries, book stores, and homes of the land. Through the harassment of hearings, investigations, reports, **and subpoenas** government will hold a club over speech and over the press. Congress could not do this by law. The power of investigation is also limited." *Id*. at 57-58.

And just recently, the Supreme Court reiterated its commitment to protecting donor anonymity. *Ams for Prosperity Found v Bonta*, 141 S Ct. 2373, 2388 [2021]

Despite the law, and the Attorney General's office as an alleged upholder of law, you have managed to serve three subpoenae which not only disregard the First Amendment, but practically bludgeon it, repeatedly, often along all three protected categories above.

Regarding Mr. Sawyer's Meta Subpoena of May 14, 2022:
•        Item 1 sweeps up any anonymous writers for VDARE. It is also incredibly overbroad

**AA0338**

insofar as is seeks any account even "linked" to VDARE or its writers.
- Item 2 again sweeps up any anonymous writers for VDARE and suffers from overbreadth.
- Item 11 sweeps up anonymous donors, as well as any anonymous writers for VDARE; then too it suffers from incredible overbreadth.
- Item 12 again sweeps up anonymous writers and suffers from incredible overbreadth.
- Item 13 sweeps up anonymous writers and donors, and suffers from incredible overbreadth.
- Item 14 again sweeps up anonymous writers and suffers from incredible overbreadth.
- Item 15 again sweeps up anonymous writers and suffers from incredible overbreadth.
- Item 16 violates publisher anonymity, sweeps up anonymous writers and suffers from incredible overbreadth.
- Item 17 again sweeps up anonymous writers and suffers from incredible overbreadth.
- Item 18 again sweeps up anonymous writers and suffers from incredible overbreadth, and could disclose anonymous readers, as well.
- Item 19 again sweeps up anonymous writers and suffers from incredible overbreadth, and could disclose anonymous readers, as well.


Regarding Mr. Sawyer's Facebook Subpoena of June 14, 2022:
- Item 1 sweeps up anonymous donors, as well as any anonymous writers for VDARE, as well as suffering from incredible overbreadth.
- Item 2 again sweeps up anonymous writers and suffers from incredible overbreadth.
- Item 3 sweeps up anonymous writers and donors, and suffers from incredible overbreadth.
- Item 4 again sweeps up anonymous writers and suffers from incredible overbreadth.
- Item 5 again sweeps up anonymous writers and suffers from incredible overbreadth.

Regarding Miss Suvari's VDARE Subpoena of June 23, 2022:
- Item 3 invades attorney-client privilege and is patently offensive.
- Item 4 violates the First Amendment rights of VDARE's anonymous writers, suffers from incredible overbreadth, is harassing, and patently offensive.
- Item 5 suffers from overbreadth.
- Item 6 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, invades attorney-client privilege and is patently offensive.
- Item 7 violates the First Amendment rights of VDARE's anonymous writers and suffers from overbreadth.
- Item 8 violates the First Amendment rights of VDARE's anonymous writers, readers and donors.
- Item 9 violates the First Amendment rights of VDARE's anonymous writers and suffers from overbreadth.
- Item 11 violates the First Amendment rights of VDARE's anonymous writers.
- Item 12 suffers from overbreadth and is vague.
- Item 13  suffers from overbreadth and is vague.
- Item 14  violates the First Amendment rights of VDARE's anonymous writers, readers

**AA0339**

and donors, invades attorney-client privilege and is patently offensive.
- Item 15 suffers from overbreadth and is vague, and invades attorney-client privilege.
- Item 16 violates the First Amendment rights of VDARE's anonymous writers, readers and donors.
- Item 17 violates the First Amendment rights of VDARE's anonymous writers, readers and donors.
- Item 21 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, and suffers from incredible overbreadth.
- Item 22 violates the First Amendment rights of VDARE's anonymous writers and suffers from incredible overbreadth.
- Item 23 violates the First Amendment rights of VDARE's anonymous writers and suffers from incredible overbreadth.
- Item 24 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, and is patently offensive.
- Item 25 suffers from overbreadth and is vague.
- Item 26 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, is vague, and appears to violate attorney-client privilege, too.
- Item 27 violates the First Amendment rights of VDARE's anonymous writers and suffers from incredible overbreadth.
- Item 28 violates the First Amendment rights of VDARE's anonymous writers and suffers from incredible overbreadth.
- Item 29  violates the First Amendment rights of VDARE's anonymous writers and suffers from incredible overbreadth.
- Item 30 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, is vague, and appears to violate attorney-client privilege, too.
- Item 31 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, is vague, and appears to violate attorney-client privilege, too.
- Item 32 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, is vague, and appears to violate attorney-client privilege, too.
- Item 33 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, is vague, and appears to violate attorney-client privilege, too.
- Item 34 suffers from overbreadth and is vague, and appears to violate attorney-client privilege, too.
- Item 35 suffers from overbreadth and is vague, and appears to violate attorney-client privilege, too.
- Item 36 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, is vague, and appears to violate attorney-client privilege, too.
- Item 37 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, is vague, and appears to violate attorney-

client privilege, too.
- Item 38 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, is vague, and appears to violate attorney-client privilege, too.
- Item 40 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth.
- Item 41 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth.
- Item 42 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth.
- Item 43 violates the First Amendment rights of VDARE's anonymous writers and suffers from incredible overbreadth.
- Item 44 violates the First Amendment rights of VDARE's anonymous writers and suffers from incredible overbreadth.

Looking over the demands of all three subpoenae, it appears that of 68 separate demands, fully 53 are improper, with most violations landing squarely on First Amendment grounds. That fail rate is not the record of a party proceeding in good faith. Whatever statutory presumption the Attorney General is accorded, it is rebutted by the above pattern.

This is an unlawful and oppressive fishing expedition, the very furthest thing from a narrowly tailored inquiry sensitive to the constitutional rights of the party subpoenaed. Under the circumstances, we must respectfully ask you to withdraw your subpoenae in their entirety.

Please advise on your stance at your earliest convenience.

I thank you for your time and attention herein, and remain

Very truly yours,

/s/
Frederick C. Kelly, Esq.

cc:     Lydia Brimelow          *Via Email*
        Perkins Coie LLP        *Via Email at CdelFierro@perkinscoie.com*

Page 5 of  5

**AA0341**

EXHIBIT O

| | |
|---|---|
| **From:** | Suvari, Catherine |
| **To:** | Frederick C. Kelly, Esq. |
| **Cc:** | Fuchs, Yael |
| **Bcc:** | Suvari, Catherine |
| **Subject:** | OAG Subpoena duces tecum to VDARE Foundation, Inc. |
| **Date:** | Wednesday, July 27, 2022 5:08:00 PM |
| **Attachments:** | 2022.06.23 Subpoena duces tecum to VDARE Foundation, Inc..pdf |
| | 2022.07.20 Kelly Letter to OAG.pdf |

Mr. Kelly,

We have considered your July 20 letter objections to the subpoena recently served by our office on the Custodian of Records for VDARE Foundation, Inc.  We are prepared to make the following clarifications and revisions:

<u>(Section B. Definitions)</u>

- The definition of "VDARE" is clarified to specify that the OAG includes the entities in part (i) of the definition only to the extent they are acting as representatives for VDARE.  As such, the complete definition shall now be (new language highlighted below):

> 7. "VDARE", "You", or "Your" shall mean VDARE Foundation, Inc. and (i) any of its directors, officers, agents, employees, consultants, representatives, attorneys, and other persons ==when== acting on its behalf, (ii) any predecessors, successors, parent corporations, subsidiaries, divisions, assigns, "d/b/a" names, and affiliates, including Lexington Research Institute, and (iii) any entities that, directly or indirectly, control, are controlled by, or are under common control with VDARE Foundation, Inc., including by possessing, directly or indirectly, the power to direct or cause the direction of VDARE Foundation, Inc.'s management and policies, whether through membership, the ownership of voting securities, by contract, or otherwise.

<u>(Section C. Documents to Be Produced)</u>

- Request No. 1:  This request shall be modified to limit the request for annual reports to the relevant time period.  As revised, the request shall now call for:

> 1. Copies of VDARE's certificates of incorporation, certificates of amendment, by-laws, any Documents related to all "d/b/a" names (for all years).  Copies of any annual reports prepared during the Relevant Period.

- Request No. 4:  This request shall be modified to (i) exclude employee address information and volunteer information <u>but</u> (ii) include the names of all parties residing in the VDARE Foundation property at 276 Capacon Road, Berkeley Springs, West Virginia. As revised, the request shall now call for:

> 4. Documents sufficient to Identify (i) the names of VDARE's current and former employees, their titles, and their dates of employment; (ii) VDARE's current and

**AA0343**

former independent contractors and their dates of service; (iii) VDARE's current and former officers and directors, their titles, and the period during which they held their positions; and (iv) the names of all individuals residing at 276 Cacapon Road, Berkeley Springs, West Virginia.

- Request No. 5:  This request shall be modified to limit the request for meeting minutes to minutes prepared during the Relevant Period.  As revised, the request shall now call for:

    5. All minutes of any meetings convened by the full VDARE Board of Directors or any committee thereof.

- Request Nos. 16 and 17:  These requests shall be modified to permit redaction of the names for non-VDARE attendees at any past or scheduled events.  As modified, the requests shall now read as follows:

    16. All Documents concerning VDARE events (recorded or live) conducted at or broadcast from the 276 Cacapon Road, Berkeley Springs, West Virginia property, including all Communications (including emails and text messages), all records of any sales made during the event(s), and Documents sufficient to account for all funds received and disbursed because of such events.  The names of all non-VDARE event attendees may be redacted from responsive documents; the names of (i) VDARE employees and (ii) any individuals who received payment or some other form of financial benefit in connection with their attendance at the events may not be redacted.

    17. All Documents concerning VDARE events (recorded or live) scheduled to be conducted at or broadcast from the 276 Cacapon Road, Berkeley Springs, West Virginia property, including all Communications (including emails and text messages) and Documents sufficient to account for all funds received and disbursed because of such scheduled events. The names of anticipated non-VDARE event attendees may be redacted from responsive documents; the names of (i) VDARE employees and (ii) any individuals who are anticipated to receive payment or some other form of financial benefit in connection with their attendance at a future scheduled event may not be redacted.

- Request No. 20:  the text of this request will not be modified, but is revised by operation of the clarification to the definition of VDARE at Section B of the subpoena.

- Request No. 25:  This request shall be modified to exclude documents that are not addressed to VDARE and do not concern VDARE's conduct.  As revised, the request shall now call for:

    25. Copies of any orders, judgments, cease and desist letters, or other Documents issued by any governmental entity or court to VDARE or its Officers or Directors regarding any alleged or confirmed wrongdoing by VDARE or its Officers or Directors (in their capacity as representatives of the organization), and any written settlement

**AA0344**

agreements executed in connection with the same.

- Request No. 40:  This request shall be modified to capture only those communications initiated by VDARE and to permit redaction of buyer contact information from responsive sale records.  As revised, the request shall now read:

  40. All records concerning the October 16, 2021 "Castle Auction," including all Communications by VDARE (including emails and text messages), all records of sales made (with buyer contact information redacted), and Documents sufficient to account for all funds received and disbursed because of the Auction.

Copies of (i) the original subpoena as served on VDARE Foundation, Inc., and (ii) your June 20 letter objections are attached above for reference.  Please note the instruction at page 1 of the subpoena, which states that the subpoena calls only for production of documents that are in VDARE's possession, custody or control.

All other subpoena terms not addressed in this email remain unchanged.

As previously agreed, the current return date (as adjourned) for the subpoena is **August 17, 2022**. Please let us know your availability to meet and confer once you have had an opportunity to review the clarifications outlined above.

**Catherine Suvari | Assistant Attorney General**
New York State Office of the Attorney General
28 Liberty Street, 19th Floor  |  New York, New York 10005
Tel: (212) 416-6172  |  Catherine.Suvari@ag.ny.gov



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
28 LIBERTY STREET
NEW YORK, NEW YORK 10005

*SUBPOENA DUCES TECUM*
**THE PEOPLE OF THE STATE OF NEW YORK**

To:     Custodian of Records
        VDARE Foundation, Inc.
        447 South Street
        Litchfield, CT 06759

 **YOU ARE HEREBY COMMANDED**, pursuant to the laws of the State of New York and all business and excuses being laid aside, to produce to the Office of the Attorney General of the State of New York, Letitia James, 28 Liberty Street, New York, New York 10005, in accordance with the Instructions and Definitions below, any and all documents requested in the attached Schedule that are in Your possession, custody or control, including documents in the possession, custody and control of entities that You own or control in whole or in part. Your production of documents in response to this subpoena should be addressed to the attention of Catherine Suvari, Assistant Attorney General, Charities Bureau, and may be submitted by mail or electronic mail provided it is received by **July 25, 2022**, or any agreed upon adjourned date thereafter.

 **PLEASE TAKE NOTICE** that the Attorney General deems the documents and testimony requested by this subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest.

 **PLEASE TAKE FURTHER NOTICE** that disobedience of this subpoena by failing to deliver the documents and information requested in the attached schedule on the date, time and place stated above or any agreed adjourned date and time may subject VDARE Foundation, Inc. ("VDARE") to prosecution under New York law.

 **PLEASE TAKE FURTHER NOTICE** that VDARE shall immediately implement a litigation hold preserving all documents relating to the subject matter of this subpoena, including all documents concerning the specific documents demanded herein. VDARE shall also issue document preservation letters for all documents relating to the subject matter of this subpoena to the following individuals: Peter Brimelow, Lydia Brimelow, John Brimelow, Scott McConnell, John O'Sullivan, Joseph (Joe) Fallon, John Wall, T.M. Byxbee Company, P.C., and Labyrinth, Inc. (Additional subpoenas may follow.)

**WITNESS, the Honorable Letitia James**, Attorney General of the State of New York, this 23rd day of June, 2022.

By: _/s/ Catherine Suvari_

Catherine Suvari
Assistant Attorney General, Charities Bureau
Catherine.Suvari@ag.ny.gov
(212) 416-6172

**AA0347**

# SCHEDULE

## A. Instructions

1. Please produce the Documents described in Section C of this schedule, in the accordance with the Instructions (Section A), Definitions (Section B) and Format (Section D) described below.

2. Time Frame.  Except as otherwise noted, this subpoena applies to all Documents in effect, created, recorded, compiled, transmitted or received from **January 1, 2016 through the present** (the "Relevant Period").

3. Continuing Obligation. The obligation to produce Documents pursuant to this Subpoena is a continuing one.  Responsive Documents located any time after a response is due or submitted shall be promptly produced at the place and in the manner specified herein.

4. All Documents shall be produced either as kept in the ordinary course of business or with an accompanying cover letter that includes a description of the Documents being produced and their contents, the source from which the Documents have been produced, and the number(s) of the request(s) in Section C to which each Document produced is responsive.

5. Documents No Longer in Your Possession. If any Document requested was formerly in Your possession, custody or control but is no longer available or no longer exists, submit a statement in writing and under oath that: (i) describes in detail the nature of the Document and its contents; (ii) identifies the person who prepared the Document; (iii) identifies all persons who have seen or had possession of the Document; (iv) specifies the date on which the Document was prepared, transmitted or received; (v) specifies the date on which the Document became unavailable; (vi) specifies the reason why the Document is unavailable, including whether it has been misplaced, lost, destroyed or transferred, and, if it has been destroyed or transferred, specifies the conditions of and reasons for such destruction or transfer and the persons who requested and performed the destruction or transfer; and (vii) identifies all persons with knowledge of any portion of the contents of the Document.

6. Privilege. If any Document requested is withheld on the ground of privilege or other legal doctrine, submit with the production a statement in writing and under oath (e.g., a privilege log) that provides, for each Document withheld: (i) a description of the nature of the Document and its contents; (ii) the date of the Document; (iii) the Document's authors and recipients; and (iv) the legal ground for withholding it from production.  If the legal ground is attorney-client privilege, please also indicate the names of the attorneys involved in the Document and the nature of their involvement (e.g., as authors). Such statement (or log) shall accompany each production.  Further, for each Document withheld pursuant to this paragraph, the relevant production shall include placeholder pages equivalent in number to the page-length of the withheld Document.

7. Format for Production. Unless otherwise specified and agreed to by the Office of the Attorney General, responsive Documents shall be produced in electronic form in

AA0348

accordance with the instructions and criteria set forth in Section D and Attachment 1 below.

8. <u>Certification.</u> In order for Your response to this subpoena to be complete, it must include a completed version of the attached Certification. In accordance with CPLR 3122-a, the Certification must be sworn in the form of an affidavit and subscribed by a qualified witness charged with the responsibility for maintaining the records, stating in substance that (a) s/he is the duly authorized custodian or other qualified witness and has the authority to make the certification; (b) to the best of his/her knowledge, after reasonable inquiry, the records or copies thereof are accurate versions of the documents described in this subpoena that are in Your possession, custody, or control; (c) to the best of his/her knowledge, after reasonable inquiry, the records or copies produced represent all the documents described in this subpoena, or if they do not represent a complete set of the documents subpoenaed, an explanation of which documents are missing and a reason for their absence is provided; and (d) the records or copies produced were made by the personnel or staff of the business, or persons acting under their control, in the regular course of business, at the time of the act, transaction, occurrence or event recorded therein, or within a reasonable time thereafter, and that it was the regular course of business to make such records.

## B. Definitions

1. "All" shall mean "each and every."

2. "And" and "or" shall be construed disjunctively or conjunctively, as necessary to bring within the scope of a request all responses and Documents that might otherwise be deemed outside the scope of that request.

3. "Any" shall mean "any and all."

4. "Communications" shall refer to any oral, written, in person, or any other form of relay, transmission, or transference of information by any means whatsoever including but not limited to by way of mail, computer, telephone, cellular or mobile phone, voice mail, electronic mail, radio, video, sound recordings, television, telefax, telex, social media, or any other medium, and shall include any Document that abstracts, digests, transcribes, records, or reflects any of the foregoing.

5. "Concerning" or "relating to" shall mean concerning, relating to, referring to, referencing, describing, evidencing, or constituting, either directly or indirectly and in whole or in part.

6. "Documents" is used in the broadest sense of the term and shall mean all records and other tangible media of expression of any nature, including: originals, drafts or finished versions; annotated or nonconforming or other copies, however created, produced or stored (manually, mechanically, electronically or otherwise); electronic mail ("email"), instant messages, Blackberry or other wireless device messages; voicemail; books, papers, files, notes, correspondence, memoranda, reports, records, journals, summaries, registers, account statements, analyses, plans, manuals, policies, telegrams, faxes, wires,

**AA0349**

telephone logs, telephone messages, or message slips; minutes, notes, records or transcriptions of conversations, communications or meetings; video and audio tapes; disks and other electronic media; microfilm, microfiche; storage devices; press releases; contracts, agreements; calendars, date books, appointment books and diaries; notices and confirmations. A draft or non-identical copy is a separate Document. Documents existing in electronic form shall include all items that may have been removed from the email accounts, directories or other locations in which they are ordinarily stored to any other servers, folders, files, archives, or backup devices, whether or not deleted.

7. "VDARE", "You," or "Your" shall mean VDARE Foundation, Inc. and (i) any of its directors, officers, agents, employees, consultants, representatives, attorneys, and other persons acting on its behalf, (ii) any predecessors, successors, parent corporations, subsidiaries, divisions, assigns, "d/b/a" names, and affiliates, including Lexington Research Institute, and (iii) any entities that, directly or indirectly, control, are controlled by, or are under common control with VDARE Foundation, Inc., including by possessing, directly or indirectly, the power to direct or cause the direction of VDARE Foundation, Inc.'s management and policies, whether through membership, the ownership of voting securities, by contract, or otherwise.

8. The singular form of any word shall include the plural and vice versa.

9. Any word used but not defined in this Schedule shall be construed consistently with its common meaning.

## C. Documents to be Produced

1. Copies of VDARE's certificates of incorporation, certificates of amendment, by-laws, any Documents related to all "d/b/a" names, and any annual reports, <u>from 1999 through the present</u>.

2. Copies of the two most recent IRS Form 990s filed by VDARE with the Internal Revenue Service.

3. Copies of the transcripts to each deposition taken in the litigations between Peter Brimelow and/or VDARE and the New York Times, and all documents produced by VDARE and/or Brimelow in connection with those proceedings.

4. Documents sufficient to Identify (i) the names and addresses of VDARE's current and former employees, their titles, and their dates of employment; (ii) VDARE's current and former volunteers, their titles, and their dates of service; (iii) VDARE's current and former independent contractors and their dates of service; and (iv) VDARE's current and former officers and directors, their titles, and the period during which they held their positions.

5. All minutes of any meetings convened by the full VDARE Board of Directors or any committee thereof <u>from 1999 through the present</u>.

6. All Documents circulated for Board consideration or review.

7. All Documents concerning (i) compensation, including salary, wages, expense reimbursements, royalties, fees, bonuses, deferred compensation, pension and retirement

funds paid to any Officers and/or Directors; (ii) reimbursements or payments made to any Officer and/or Directors of or for travel-related expenses (e.g., automobile purchases or leases, fuel, tolls, parking, and non-automobile transportation such as air and subway fare); (iii) insurance benefits (e.g., medical, dental, automobile, life, malpractice and disability) paid to any Officers and/or Directors; (iv) vacation pay, and/or vacation, sick, and personal leave time or payment therefor paid to any Officers and/or Directors; (v) severance pay or benefits paid to any Officers and/or Directors; (vi) any other payment or reimbursement paid to any Officers and/or Directors for services performed by them on behalf of VDARE, including any solicitation of funds; and (vii) all forms W-2 and 1099 issued to any Officers and/or Directors.

8. Documents reflecting any solicitation of funds on VDARE's behalf, in any format, e.g., hard copy mailers or solicitations or online fundraising such as GoFundMe or Kickstarter.

9. All VDARE written policies, manuals, and/or procedures, including all policies related to conflicts of interest.

10. All Documents concerning or relating to setting, directing, paying, or adjusting any Officer's compensation.

11. All Documents concerning or relating to setting, directing, paying, or adjusting the compensation for Peter Brimelow, or any other employee, officer, director, consultant or vendor of VDARE.

12. All Documents concerning or reporting conflicts of interest "required to be disclosed annually" as set forth in responses to Question 12(b) on Part VI of VDARE's 2019 Form 990.

13. All Documents concerning or reflecting any effort by VDARE to "regularly and consistently monitor and enforce compliance with" the conflicts of interest policy as set forth in response to Question 12(c) on Part VI of VDARE's 2019 Form 990.

14. All Documents concerning or reflecting the purchase of 276 Cacapon Road, Berkeley Springs, West Virginia by or on behalf of VDARE.

15. All Documents concerning or reflecting any representation to the State of West Virginia, the Town of Bath, West Virginia, or the County of Morgan, West Virginia regarding the taxation and/or use of 276 Cacapon Road, Berkeley Springs, West Virginia for charitable purposes.

16. All Documents concerning VDARE events (recorded or live) conducted at or broadcast from the 276 Cacapon Road, Berkeley Springs, West Virginia property, including all Communications (including emails and text messages), all records of any sales made during the event(s), and Documents sufficient to account for all funds received and disbursed because of such events.

17. All Documents concerning VDARE events (recorded or live) scheduled to be conducted at or broadcast from the 276 Cacapon Road, Berkeley Springs, West Virginia property, including all Communications (including emails and text messages) and Documents sufficient to account for all funds received and disbursed because of such scheduled events.

**AA0351**

18. All Documents recording, reporting, considering or addressing conflicts of interest as reported on Schedule O of any IRS 990 form.

19. All director and officer insurance policies and any Documents relating to claims made on such policies.

20. Any claims for indemnification or defense by officers or directors upon VDARE.

21. All financial records of VDARE, including its books and records, general ledger, bank statements, credit card statements, debit card statements and receipts, copies of checks (front and back), canceled checks, account opening Documents, and Communications.

22. Documents sufficient to identify VDARE's bank accounts, credit card accounts, website accounts, and accounts with credit card processing.

23. Documents sufficient to identify all persons who have or had access to and/or control of VDARE's bank accounts, credit card accounts, website accounts, and accounts with credit card processing.

24. All audits, reports, reviews, corrective action plans or correspondence (including emails and text messages) issued to VDARE by any accounting firm or auditor, administrator, monitor, or any local, state, or federal agency or governmental or administrative entity.

25. Copies of any orders, judgments, cease and desist letters, or other Documents issued by any governmental entity or court regarding any alleged or confirmed wrongdoing, and any written settlement agreements executed in connection with the same.

26. Documents sufficient to identify any personal or business relationship between any current or former officer, director, or employee of VDARE, on the one hand, and any officer, director, employee, or contractor of VDARE, on the other hand.

27. All Communications between VDARE and the IRS, or between VDARE and any other local or state taxation authority.

28. All Communications between VDARE and any state or federal agency.

29. All Communications between VDARE and any of its accountants or auditors.

30. All Communications by VDARE or any of its agents regarding the Berkeley Castle Foundation, including all emails and text messages exchanged by VDARE, its principals, or agents, and any copies of any documents filed with any state or federal agency by VDARE or its agent on behalf of Berkeley Castle Foundation, Inc.

31. All Communications by VDARE or any of its agents regarding the BBB, LLC, including all emails and text messages exchanged by VDARE, its principals, or agents, and any copies of any documents filed with any state or federal agency by VDARE or its agent on behalf of BBB, LLC.

32. All records of transactions between BBB LLC and VDARE including books and records, general ledger, bank statements, credit card statements, copies of checks (front and back), canceled checks, and Communications.

33. All records of transactions between Berkeley Castle Foundation, Inc. and VDARE including its books and records, general ledger, bank statements, credit card statements, copies of checks (front and back), canceled checks, and Communications.

34. Copies of BBB LLC's certificates of incorporation, certificates of amendment, by-laws, any Documents related to all "d/b/a" names, and any annual reports from BBB's incorporation to the present, in the custody and control of VDARE, its principals, or its agents.

35. Copies of Berkeley Castle Foundation, Inc. certificates of incorporation, certificates of amendment, by-laws, any Documents related to all "d/b/a" names, and any annual reports, from Berkeley Castle Foundation's incorporation to the present, in the custody and control of VDARE, its principals, or its agents.

36. All records relating to real estate transactions between VDARE and Berkeley Castle Foundation, including all contracts, agreements, promissory notes, mortgages, loan documents, deeds, deeds of trust, property value assessments, title searches, title insurance, other insurance agreements, inspections, and Communications.

37. All records relating to real estate transactions between VDARE and Berkeley Springs Castle, LLC, including all contracts, agreements, promissory notes, mortgages, loan documents, deeds, deeds of trust, property value assessments, title searches, title insurance, other insurance agreements, inspections, and Communications.

38. All records relating to real estate transactions between VDARE and BBB, LLC, including all contracts, agreements, promissory notes, mortgages, loan documents, deeds, deeds of trust, property value assessments, title searches, title insurance, other insurance agreements, inspections, and Communications.

39. All records of renovations, improvements, construction, landscaping, or any other work done since February 14, 2020, on the real property described in the February 14, 2020 deed between Berkeley Springs Castle, LLC, and VDARE. Such records shall include without limitation all invoices, contracts, estimates, bids, requests for bids, copies of checks (front and back), and Communications.

40. All records concerning the October 16, 2021 "Castle Auction," including all Communications (including emails and text messages), all records of sales made, copies of checks (front and back), valuations of auction items, and Documents sufficient to account for all funds received and disbursed because of the Auction.

41. All records of and Communications concerning any loans VDARE made to Berkeley Castle Foundation, including promissory notes, mortgages, deeds of trust, agreements, records of repayment, copies of checks (front and back), bank statements, email, and text correspondence.

42. All records of and correspondence concerning any loans VDARE made to BBB, LLC, including promissory notes, mortgages, deeds of trust, agreements, records of repayment, copies of checks (front and back), bank statements, email, and text Communications.

43. All records of and Communications concerning any loans Peter or Lydia Brimelow (individually or collectively) made to VDARE, including promissory notes, mortgages, deeds of trust, agreements, records of repayment, copies of checks (front and back), bank statements, email, and text correspondence.

44. All records of and correspondence concerning any loans VDARE made to Peter or Lydia Brimelow (individually or collectively), including promissory notes, mortgages, deeds of

**AA0353**

trust, agreements, records of repayment, copies of checks (front and back), bank statements, email, and text Communications.

**D. Format for Production**

Unless otherwise specified and agreed to by the Office of the Attorney General, all responsive documents must be produced in Concordance format in accordance with the following instructions.

1. <u>Concordance Production Components</u>. A Concordance production consists of the following component files, which must be produced in accordance with the specifications set forth below in Section 2:

   - *Metadata Load File*

   - *Extracted or OCR Text Files*

   - *Single-Page Image Files*

   - *Opticon Load File*

   - *Native Files*.

2. <u>Production File Requirements</u>.

   A. ***Metadata Load File***

   - Required file format:

     ▪ UTF-8
     ▪ .dat file extension
     ▪ Field delimiter: (ASCII decimal character 20)
     ▪ Text Qualifier: þ (ASCII decimal character 254). Multiple value field delimiter: ; (ASCII decimal character 59)

   - The first line of the metadata load file must list all included fields. All required fields are listed in Attachment 1.

   - Fields with no values must be represented by empty columns maintaining delimiters and qualifiers.

   - ***Note:*** All documents must have page-level Bates numbering (except documents produced only in native format, which must be assigned a document-level Bates number). The metadata load file must list the beginning and ending Bates numbers (BEGDOC and ENDDOC) for each document.

   - Accepted date formats:

     ▪ mm/dd/yyyy
     ▪ yyyy/mm/dd
     ▪ yyyymmdd

   - Accepted time formats:

**AA0355**

- hh:mm:ss (if not in 24-hour format, You must indicate am/pm)
- hh:mm:ss:mmm

## B. *Extracted or OCR Text Files*

- You must produce individual document-level text files containing the full extracted text for each produced document.

- When extracted text is not available (for instance, for image-only documents) You must provide individual document-level text files containing the document's full OCR text.

- The filename for each text file must match the document's beginning Bates number (BEGDOC) listed in the metadata load file.

- Text files must be divided into subfolders containing no more than 5000 files.

## C. *Single-Page Image Files (Petrified Page Images)*

- Where possible, all produced documents must be converted into single-page tagged image format ("TIF") files. See Section 7.E below for instructions on producing native versions of documents You are unable to convert.

- Image documents that exist only in non-TIF formats must be converted into TIF files. The original image format must be produced as a native file as described in Section 7.E below.

- For documents produced only in native format, You must provide a TIF placeholder that states "Document produced only in native format."

- Each single-page TIF file must be endorsed with a unique Bates number.

- The filename for each single-page TIF file must match the unique page-level Bates number (or document-level Bates number for documents produced only in native format).

- Required image file format:
  - CCITT Group 4 compression
  - 2-Bit black and white
  - 300 dpi
  - Either .tif or .tiff file extension.

- TIF files must be divided into subfolders containing no more than 5000 files. Documents should not span multiple subfolders, a document with more than 5000 pages should be kept in a single folder.

**AA0356**

D. ***Opticon Load File***

- Required file format:
  - Field delimiter: , (ASCII decimal character 44)
  - No Text Qualifier
  - .opt file extension

- The comma-delimited Opticon load file must contain the following seven fields (as indicated below, values for certain fields may be left blank):

  - ALIAS or IMAGEKEY – the unique Bates number assigned to each page of the production.
  - VOLUME – this value is optional and may be left blank.
  - RELATIVE PATH – the filepath to each single-page image file on the production media.
  - DOCUMENT BREAK – defines the first page of a document. The only possible values for this field are "Y" or blank.
  - FOLDER BREAK – defines the first page of a folder. The only possible values for this field are "Y" or blank.
  - BOX BREAK – defines the first page of a box. The only possible values for this field are "Y" or blank.
  - PAGE COUNT – this value is optional and may be left blank.

- ***Example***:

  ABC00001,,IMAGES\0001\ABC00001.tif,Y,,,2
  ABC00002,,IMAGES\0001\ABC00002.tif,,,,
  ABC00003,,IMAGES\0002\ABC00003.tif,Y,,,1
  ABC00004,,IMAGES\0002\ABC00004.tif,Y,,,1

E. ***Native Files***

- Non-printable or non–print friendly documents (including but not limited to spreadsheets, audio files, video files and documents for which color has significance to document fidelity) must be produced in their native format.

- The filename of each native file must match the document's beginning Bates number (BEGDOC) in the metadata load file and the original file extension.

- For documents produced only in native format, You must assign a single document-level Bates number and provide an image file placeholder that states "Document produced only in native format."

- The relative paths to all native files on the production media must be listed in the NATIVEFILE field of the metadata load file.

**AA0357**

- Native files that are password-protected must be decrypted prior to conversion and produced in decrypted form.

- You may be required to supply a software license for proprietary documents produced only in native format.

3. <u>Production Folder Structure</u>. The production must be organized according to the following standard folder structure:

- data\ (contains production load files)
- images\ (contains single-page TIF files, with subfolder organization)
    - \0001, \0002, \0003…
- natives\ (contains native files, with subfolder organization)
    - \0001, \0002, \0003…
- text\ (contains text files, with subfolder organization)
    - \0001, \0002, \0003…

4. <u>De-Duplication</u>. You must perform global de-duplication of stand-alone documents and email families.

5. <u>Paper or Scanned Documents</u>. Documents that exist only in paper format must be scanned to single-page TIF files and OCR'd. The resulting electronic files should be produced in Concordance format pursuant to these instructions. You must contact the Assistant Attorney General whose telephone number appears on the Notice to discuss (i) any documents that cannot be scanned, and (ii) how information for scanned documents should be represented in the metadata load file.

6. <u>Structured Data</u>. Structured data includes but is not limited to relational databases, transactional data, and xml pages. Spreadsheets are not considered structured data. You must first speak to the Assistant Attorney General whose telephone number appears on the Notice.

   <u>Relational Databases</u>

   - Database tables should be provided in d or other machine-readable, non-proprietary format, with each table in a separate data file. Each data file must have an accompanying data dictionary that explains the meaning of each column name and explains the values of any codes used.

   - Dates and numbers must be clearly and consistently formatted and, where relevant, units of measure should be explained in the data dictionary.

   - Records must contain clear, unique identifiers, and the data dictionary must include explanations of how the files and records relate to one another.

13

**AA0358**

7. <u>Media and Encryption</u>. All document sets over 2 GB must be produced on CD, DVD, or hard-drive media. All production media must be encrypted with a strong password, which must be delivered independently from the production media. Document sets under 2 GB may be delivered electronically. The OAG offers a secure cloud storage option that can be set up to receive media on a one-time basis, or the OAG will download media from the providing parties' server.

**AA0359**

**ATTACHMENT 1**
**Required Fields for Metadata Load File**

| FIELD NAME | FIELD DESCRIPTION | FIELD VALUE EXAMPLE[1] |
|---|---|---|
| BEGDOC | Bates number assigned to the first page of the document. | ABC0001 |
| ENDDOC | Bates number assigned to the last page of the document. | ABC0002 |
| BEGATTACH | Bates number assigned to the first page of the parent document in a document family (*i.e.*, should be the same as BEGDOC of the parent document, or PARENTDOC). | ABC0001 |
| ENDATTACH | Bates number assigned to the last page of the last child document in a family (*i.e.*, should be the same as ENDDOC of the last child document). | ABC0008 |
| PARENTDOC | BEGDOC of parent document. | ABC0001 |
| CHILDDOCS | List of BEGDOCs of all child documents, delimited by ";" when field has multiple values. | ABC0002; ABC0003; ABC0004… |
| COMMENTS | Additional document comments, such as passwords for encrypted files. | |
| NATIVEFILE | Relative file path of the native file on the production media. | .\Native_File\Folder\...\BEGDOC.ext |
| TEXTFILE | Relative file path of the plain text file on the production media. | .\Text_Folder\Folder\...\BEGDOC.txt |
| SOURCE | For scanned paper records this should be a description of the physical location of the original paper record. For loose electronic files this should be the name of the file server or workstation where the files were gathered. | Company Name, Department Name, Location, Box Number… |
| CUSTODIAN | Owner of the document or file. | Firstname Lastname, Lastname, Firstname, User Name; Company Name, Department Name... |
| FROM | Sender of the email. | Firstname Lastname < FLastname @domain > |
| TO | All to: members or recipients, delimited by ";" when field has multiple values. | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; … |
| CC | All cc: members, delimited by ";" when field has multiple values. | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; … |
| BCC | All bcc: members, delimited by ";" when field has multiple values | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; … |

15

**AA0360**

| SUBJECT | Subject line of the email. | |
|---|---|---|
| DATERCVD | Date and time that an email was received. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| DATESENT | Date and time that an email was sent. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| CALBEGDATE | Date that a meeting begins. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| CALENDDATE | Date that a meeting ends. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| ATTACHMENTS | List of filenames of all attachments, delimited by ";" when field has multiple values. | AttachmentFileName.; AttachmentFileName.docx; AttachmentFileName.pdf;… |
| NUMATTACH | Number of attachments. | |
| RECORDTYPE | General type of record. | IMAGE; LOOSE E-MAIL; E-MAIL; E-DOC IMAGE ATTACHMENT; LOOSE E-MAIL ATTACHMENT; E-MAIL ATTACHMENT; E-DOC ATTACHMENT |
| FOLDERLOC | Original folder path of the produced document. | Drive:\Folder\...\...\ |
| FILENAME | Original filename of the produced document. | Filename.ext |
| DOCEXT | Original file extension. | html, xls, pdf |
| DOCTYPE | Name of the program that created the produced document. | Adobe Acrobat, Microsoft Word, Microsoft Excel, Corel WordPerfect… |
| TITLE | Document title (if entered). | |
| AUTHOR | Name of the document author. | |
| REVISION | Number of revisions to a document. | 18 |
| DATECREATED | Date and time that a document was created. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| DATEMOD | Date and time that a document was last modified. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| FILESIZE | Original file size in bytes. | |
| PGCOUNT | Number of pages per document. | |
| IMPORTANCE | Email priority level if set. | Low, Normal, High |
| MD5HASH | MD5 hash value computed from native file (a/k/a file fingerprint). | |
| SHA1HASH | SHA1 hash value | |
| MSGINDEX | Email message ID | |
| CONVERSATIONINDEX | Email Conversation Index | |

**AA0361**

**Certification of Business Records**

State of _____ )
                          ) ss.:
County of _____ )


_____, being duly sworn, deposes and says:


1.  I am the duly authorized custodian or other qualified witness of the business records of
    _____.

    I am familiar with the business practices and procedures of _____
    and have the authority to make this certification.

2.  To the best of my knowledge, after reasonable inquiry, the records produced in response
    to the subpoena are accurate versions of the documents described in the subpoena that are
    in my possession, custody or control.

3.  To the best of my knowledge, after reasonable inquiry, the records represent all the
    documents described in the subpoena duces tecum except that the following documents
    are missing for the reason stated:

    _____


4.  The records produced were made by the personnel or staff of the business, or persons
    acting under their control, in the regular course of business, at the time of the act,
    transaction, occurrence or event recorded therein, or within a reasonable time thereafter,
    and it was the regular course of business to make such records.


Sworn to before me this ____

day of _____, 2022

                                            _____
                                            Notary Public

**AA0362**

*Frederick C. Kelly*

*Attorney at Law*
*One Harriman Square*
*Goshen, New York 10924*
*845 294-7945* ◆ *Fax 845 294-7889*
*fckellylaw@protonmail.com*
*Service by electronic means is not accepted.*


Mr. Rick Sawyer, Esq.
Special Counsel for Hate Crimes
28 Liberty Street
New York, NY 10005

Ms. Catherine Suvari, Esq.
Assistant Attorney General
General Charities Bureau
28 Liberty Street
New York, NY 10005


July 20, 2022          *Via Email*


Re:    New York Attorney General Subpoena to Meta Platforms, Inc. dated May 13, 2022
       New York Attorney General Subpoena to Facebook Payments, Inc. dated June 14, 2022
       New York Attorney General Subpoena to VDARE Foundation, Inc. dated June 23, 2022


Dear Mr. Sawyer and Ms. Suvari:

This email is in follow up to the meet and confer held on Monday, July 18, 2022.

Upon further examination, your subpoenae are incredibly unlawful, such that their very service brings into question the good faith of the New York Attorney General.

Let us start with obvious facts: VDARE publishes speech which is highly critical of current governmental policy.  This is speech at the very heart of our First Amendment, *e.g.* "Criticism of government is at the very center of the constitutionally protected area of free discussion. *Rosenblatt v. Baer*, 383 US 75, 85 [1966]; "A more invidious classification than that between persons who support government officials and their policies and those who are critical of them is difficult to imagine." *Glasson v. City of Louisville*, 518 F2d 899, 912 [6th Cir. 1975].


Page 1 of  5


**AA0363**

Furthermore, VDARE's speech is not only critical of governmental policy, but controversial in its own right.

Precisely because of its controversial character, many of VDARE's writers, readers, and donors prefer to remain anonymous. Their ability to do so is well settled law that you have blatantly disregarded with your subpoenae.

A writer's anonymity was recognized, among other places, in *Talley v California*, 362 US 60 [1960]: "There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression...
"Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all... Even the Federalist Papers, written in favor of the adoption of our Constitution, were published under fictitious names. It is plain that anonymity has sometimes been assumed for the most constructive purposes." *Id*. at 64-65.

Turning to a reader's anonymity, it too, has been given constitutional recognition. Among other places, you are referred to the eloquent concurrence by Justice Douglas in *US v. Rumely*, 345 US 41 [1953]: "Once the government can demand of a publisher the names of the purchasers of his publications, the free press as we know it disappears. Then the spectre of a government agent will look over the shoulder of everyone who reads. The purchase of a book or pamphlet today **may result in a subpoena tomorrow**. Fear of criticism goes with every person into the bookstall. The subtle, imponderable pressures of the orthodox lay hold. Some will fear to read what is unpopular, what the powers-that-be dislike. When the light of publicity may reach any student, any teacher, inquiry will be discouraged. The books and pamphlets that are critical of the administration, that preach an unpopular policy in domestic or foreign affairs, that are in disrepute in the orthodox school of thought will be suspect and subject to investigation. The press and its readers will pay a heavy price in harassment. But that will be minor in comparison with the menace of the shadow which government will cast over literature that does not follow the dominant party line. If the lady from Toledo can be required to disclose what she read yesterday and what she will read tomorrow, fear will take the place of freedom in the libraries, book stores, and homes of the land. Through the harassment of hearings, investigations, reports, **and subpoenas** government will hold a club over speech and over the press. Congress could not do this by law. The power of investigation is also limited." *Id*. at 57-58.

And just recently, the Supreme Court reiterated its commitment to protecting donor anonymity. *Ams for Prosperity Found v Bonta*, 141 S Ct. 2373, 2388 [2021]

Despite the law, and the Attorney General's office as an alleged upholder of law, you have managed to serve three subpoenae which not only disregard the First Amendment, but practically bludgeon it, repeatedly, often along all three protected categories above.

Regarding Mr. Sawyer's Meta Subpoena of May 14, 2022:
•      Item 1 sweeps up any anonymous writers for VDARE. It is also incredibly overbroad

**AA0364**

insofar as is seeks any account even "linked" to VDARE or its writers.
- Item 2 again sweeps up any anonymous writers for VDARE and suffers from overbreadth.
- Item 11 sweeps up anonymous donors, as well as any anonymous writers for VDARE; then too it suffers from incredible overbreadth.
- Item 12 again sweeps up anonymous writers and suffers from incredible overbreadth.
- Item 13 sweeps up anonymous writers and donors, and suffers from incredible overbreadth.
- Item 14 again sweeps up anonymous writers and suffers from incredible overbreadth.
- Item 15 again sweeps up anonymous writers and suffers from incredible overbreadth.
- Item 16 violates publisher anonymity, sweeps up anonymous writers and suffers from incredible overbreadth.
- Item 17 again sweeps up anonymous writers and suffers from incredible overbreadth.
- Item 18 again sweeps up anonymous writers and suffers from incredible overbreadth, and could disclose anonymous readers, as well.
- Item 19 again sweeps up anonymous writers and suffers from incredible overbreadth, and could disclose anonymous readers, as well.


Regarding Mr. Sawyer's Facebook Subpoena of June 14, 2022:
- Item 1 sweeps up anonymous donors, as well as any anonymous writers for VDARE, as well as suffering from incredible overbreadth.
- Item 2 again sweeps up anonymous writers and suffers from incredible overbreadth.
- Item 3 sweeps up anonymous writers and donors, and suffers from incredible overbreadth.
- Item 4 again sweeps up anonymous writers and suffers from incredible overbreadth.
- Item 5 again sweeps up anonymous writers and suffers from incredible overbreadth.

Regarding Miss Suvari's VDARE Subpoena of June 23, 2022:
- Item 3 invades attorney-client privilege and is patently offensive.
- Item 4 violates the First Amendment rights of VDARE's anonymous writers, suffers from incredible overbreadth, is harassing, and patently offensive.
- Item 5 suffers from overbreadth.
- Item 6 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, invades attorney-client privilege and is patently offensive.
- Item 7 violates the First Amendment rights of VDARE's anonymous writers and suffers from overbreadth.
- Item 8 violates the First Amendment rights of VDARE's anonymous writers, readers and donors.
- Item 9 violates the First Amendment rights of VDARE's anonymous writers and suffers from overbreadth.
- Item 11 violates the First Amendment rights of VDARE's anonymous writers.
- Item 12 suffers from overbreadth and is vague.
- Item 13  suffers from overbreadth and is vague.
- Item 14  violates the First Amendment rights of VDARE's anonymous writers, readers

AA0365

and donors, invades attorney-client privilege and is patently offensive.

- Item 15 suffers from overbreadth and is vague, and invades attorney-client privilege.
- Item 16 violates the First Amendment rights of VDARE's anonymous writers, readers and donors.
- Item 17 violates the First Amendment rights of VDARE's anonymous writers, readers and donors.
- Item 21 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, and suffers from incredible overbreadth.
- Item 22 violates the First Amendment rights of VDARE's anonymous writers and suffers from incredible overbreadth.
- Item 23 violates the First Amendment rights of VDARE's anonymous writers and suffers from incredible overbreadth.
- Item 24 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, and is patently offensive.
- Item 25 suffers from overbreadth and is vague.
- Item 26 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, is vague, and appears to violate attorney-client privilege, too.
- Item 27 violates the First Amendment rights of VDARE's anonymous writers and suffers from incredible overbreadth.
- Item 28 violates the First Amendment rights of VDARE's anonymous writers and suffers from incredible overbreadth.
- Item 29  violates the First Amendment rights of VDARE's anonymous writers and suffers from incredible overbreadth.
- Item 30 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, is vague, and appears to violate attorney-client privilege, too.
- Item 31 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, is vague, and appears to violate attorney-client privilege, too.
- Item 32 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, is vague, and appears to violate attorney-client privilege, too.
- Item 33 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, is vague, and appears to violate attorney-client privilege, too.
- Item 34 suffers from overbreadth and is vague, and appears to violate attorney-client privilege, too.
- Item 35 suffers from overbreadth and is vague, and appears to violate attorney-client privilege, too.
- Item 36 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, is vague, and appears to violate attorney-client privilege, too.
- Item 37 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, is vague, and appears to violate attorney-

**AA0366**

client privilege, too.
- Item 38 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth, is vague, and appears to violate attorney-client privilege, too.
- Item 40 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth.
- Item 41 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth.
- Item 42 violates the First Amendment rights of VDARE's anonymous writers, readers and donors, suffers from incredible overbreadth.
- Item 43 violates the First Amendment rights of VDARE's anonymous writers and suffers from incredible overbreadth.
- Item 44 violates the First Amendment rights of VDARE's anonymous writers and suffers from incredible overbreadth.

Looking over the demands of all three subpoenae, it appears that of 68 separate demands, fully 53 are improper, with most violations landing squarely on First Amendment grounds. That fail rate is not the record of a party proceeding in good faith. Whatever statutory presumption the Attorney General is accorded, it is rebutted by the above pattern.

This is an unlawful and oppressive fishing expedition, the very furthest thing from a narrowly tailored inquiry sensitive to the constitutional rights of the party subpoenaed. Under the circumstances, we must respectfully ask you to withdraw your subpoenae in their entirety.

Please advise on your stance at your earliest convenience.

I thank you for your time and attention herein, and remain

Very truly yours,

/s/
Frederick C. Kelly, Esq.

cc:     Lydia Brimelow          *Via Email*
        Perkins Coie LLP        *Via Email at CdelFierro@perkinscoie.com*

Page 5 of 5

**AA0367**

**EXHIBIT P**

The Law Offices of
## ANDREW J. FRISCH, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
212-285-8000

September 19, 2022

*Via email (Yael.Fuchs@ag.ny.gov; Catherine.Suvari@ag.ny.gov)*

Yael Fuchs, Assistant Attorney General
Catherine Suvari, Assistant Attorney General
Office of the Attorney General
28 Liberty Street
New York, New York 10005

     *Re: Subpoena to VDare Foundation, Inc.*

Dear Counsel:

     As I advised you via telephone on August 23, 2022, VDare Foundation, Inc. ("VDare") has engaged me as new counsel to respond to your Subpoena, dated June 24, 2022 (the "Subpoena"). VDare formally retained me within a week of our call. I appreciate your courtesies in accommodate my pre-existing commitments in other matters. As I continue to get up to speed and review documents, my hope is that we can meet and confer to address and attempt to resolve any areas of dispute.

     While I stand by VDare's objections to the Subpoena set forth by predecessor counsel that Subpoena requests are overbroad, vague, and require disclosures protected by the First Amendment, I do not stand by predecessor counsel's position that the Subpoena be withdrawn. With reliance on VDare's full reservation of all rights and any and all objections, I have today forwarded documents to a discovery vendor. My understanding is that the vendor cannot format the documents as specified in the Subpoena by today, but I expect that I can more readily arrange for production in another form, so please let me know your preference.

     I have been able to confer with the client meaningfully and begun to review documents only within the last ten or so days. My review of documents continues so that I can identify and produce any additional documents responsive to your Subpoena. Thus, I expect that the documents produced today will constitute the first installment of a rolling production. There is a significant volume of electronically-stored and hard copy documents that need to be reviewed so that any additional documents responsive to the Subpoena can be identified. I expect to be able to tell you by this week's end when another installment can be made. As to redactions in the documents produced today, I have not had ample time fully to evaluate bases underlying the redactions, including attorney-client privilege and First Amendment concerns. I

**AA0369**

have opted instead to produce an installment of documents today and will circle back on the redactions once my evaluations are complete. I expect that I can report back on this issue by next Monday.

In the course of marshaling documents responsive to the Subpoena, an additional objection has come to light. Some of the requested documents relate to the Berkeley Springs Castle Foundation ("BSCF"), a distinct entity apparently domiciled in West Virginia, which is not the named target of the Subpoena and has not itself been served. In the ordinary course, VDare has no blanket legal right or practical ability to access BSCF's records -- and no possession, custody, or control of BSCF's records. VDare has transacted with BSCF, and so some documents relating to BSCF reside within VDare. VDare is willing to endeavor to procure and produce other responsive documents from BSCF, provided that your Office acknowledges and agrees that such efforts by VDare: (I) prejudice none of VDare's rights and waive none of VDare's objections; (ii) will not be construed by your Office to negate the corporate distinction between VDare and BSCF; and (iii) similarly do not waive or prejudice any objection that BSCF might itself assert in the future if your Office purports to serve BSCF with process.

VDare hereby requests, pursuant to New York Public Officers Law Sections 87(2)(d) and 89(5)(a), and for reasons of business confidentiality, that this communication and the accompanying materials, which are all designated "Confidential," be maintained in confidence by you and your Office and not be disclosed publicly whether in response to a request under Article 6 of the New York Public Officers Law or otherwise. If this communication or the accompanying documents are the subject of such a request, please so advise me before making any such disclosure at 212-285-8000.

Very truly yours,

/s/ *Andrew J. Frisch*
Andrew J. Frisch

Enclosures
(under separate cover)

**AA0370**

EXHIBIT Q

| | |
|---|---|
| **From:** | Suvari, Catherine |
| **To:** | afrisch@andrewfrisch.com |
| **Cc:** | Fuchs, Yael |
| **Bcc:** | Suvari, Catherine |
| **Subject:** | RE: VDARE |
| **Date:** | Friday, September 30, 2022 1:06:00 PM |

Andy,

We are available to meet next <u>Thursday, Oct 6</u> in any of the following windows: 9:00a-10a, 11:00a-1p, and 3:00p – 5p. Please let us know whether there is an hour in any of those blocks that will work for you and we will circulate a WebEx invite.

In anticipation of our meeting, there are several aspects of your recent letters and initial production that we would like to specifically flag for discussion:

- First, it has now been two weeks since your September 15 email assurance that document review in response to the June subpoena had begun in earnest and we have received a total of 27 documents, in almost exclusively hard copy and unnumbered form, and with unmarked redactions on individual documents. Earlier this week you provided a single .pdf as a second production delivery and even that single file contained several pages duplicative of your first paper production. We see in your email earlier this morning that you anticipate being able to provide a properly formatted electronic re-production later today- please confirm that we will receive replacement copies of the material provided in paper form on September 19, in the format specified by the subpoena, and that it will include marked redactions (where appropriate), accompanied by a log identifying the Bates range for any pages on which redactions appear, the legal basis for those redaction, and a general description of the category of information being withheld. At present, there is no way for us to reliably identify what has been deleted from the material you are producing and on what legal basis.

- Second, we do not agree with the proposal in your Monday letter that VDARE make its own determination of which individuals – including outside vendors and contractors-- it will or will not identify in any materials that are otherwise responsive to the subpoena's demands. If VDARE intends to take the position that a particular, identified request in the subpoena is unlawful, VDARE of course bears the burden of identifying the request to which it is objecting, the category of material covered by that request that it believes cannot be lawfully demanded by a regulatory investigative subpoena, and – if the stated concern is an associational chilling effect – some specific substantive explanation of how the disclosure being sought would operate to chill VDARE's protected associational or speech rights. General assertions that there exists a certain community of authors writing anonymously who fall within the subpoena's definition of paid agents and would be generally discouraged from writing by some part of VDARE's production are not enough.

- Finally, your email this morning refers in general terms to outstanding boxes of documents slated for review and the timing of future productions. In light of the more than three months that have now passed with only minimal actual disclosure, please plan to provide

**AA0372**

firm dates and estimates of production volume during our discussion next week so that we can understand exactly what remains to be reviewed and when VDARE will substantially complete its subpoena response.

Kate

**Catherine Suvari | Assistant Attorney General**
New York State Office of the Attorney General
28 Liberty Street, 19th Floor  |  New York, New York 10005
Tel: (212) 416-6172  |  Catherine.Suvari@ag.ny.gov

---

**From:** Andrew Frisch <afrisch@andrewfrisch.com>
**Sent:** Friday, September 30, 2022 11:04 AM
**To:** Fuchs, Yael <Yael.Fuchs@ag.ny.gov>
**Cc:** Suvari, Catherine <Catherine.Suvari@ag.ny.gov>
**Subject:** VDARE

[EXTERNAL]

Yael,

Please let me know if you are free to meet on Monday or otherwise next week (other than the holiday).  Perhaps you would prefer a zoom or a call.

My discovery vendor, which I chose because of its proximity to your office, advises me that it expects to provide you with previously-provided documents in your requested format today (I will check in with them shortly).  Meanwhile, I have in hand the Brimelows' residential lease agreement for the cottages at 300 and 304 Capacon Road, Berkeley Springs, West Virginia, and an office lease agreement and am awaiting two Federal Express deliveries of a total of about two boxes of documents from WV, one delivery which is to be delivered to my office today and another expected early next week.  There may be as many as four or more additional boxes in storage in WV that may contain documents responsive to your subpoena which I hope to have located and delivered to me for review as soon as it can be done.

The good news, it seems to me, is that my client identified replacement counsel in my space who can address compliance with your subpoena and attempt to narrow any areas of dispute.  I believe I have, at the very least, provided the indication of intent of compliance that you requested.  VDARE, of course, is literally a mom-and-pop operation, with an actual mom who homeschools three little kids; its new lawyer (me) is a solo practitioner with no staff.   We are doing our very best to make up for lost time, and I appreciate your continuing professionalism.

Best regards,

*Andrew J. Frisch*

*The Law Offices of Andrew J. Frisch, PLLC*

*40 Fulton Street, 17th Floor*
*New York, New York 10038*
*212-285-8000*
*646-304-0352 (fax)*
*afrisch@andrewfrisch.com*
*www.andrewfrisch.com*

**AA0374**

**EXHIBIT R**

The Law Offices of
ANDREW J. FRISCH, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
212-285-8000

November 21, 2022

*Via email (Yael.Fuchs@ag.ny.gov; Catherine.Suvari@ag.ny.gov)*

Yael Fuchs, Assistant Attorney General
Catherine Suvari, Assistant Attorney General
Office of the Attorney General
28 Liberty Street
New York, New York 10005

  Re: *Subpoena to VDare Foundation, Inc.*

Dear Counsel:

   On behalf of VDARE Foundation, Inc. ("VDARE"), I expect a vendor today to deliver to your office media containing supplemental documents in response to a subpoena issued by your office to VDARE, dated June 23, 2022, as modified by your office on July 27, 2022 (the "Subpoena"). I incorporate as if fully set forth herein my letter to you of October 31, 2022, containing VDARE's continuing objections.

   Response to your subpoena involving emails is taking longer than anticipated. I am continuing to work to complete that portion of my review. My time to continue the review this week is limited in part because of this week's holiday. If the review is not complete by November 28, 2022, I will be in a better position by then to estimate its completion. Also, an audit of VDARE was supposed to have been provided to VDARE by now, but it has not yet been received by VDARE, though I expect it shortly. I will identify redactions in the production once the project is complete.

   Very truly yours,

   /s/ *Andrew J. Frisch*
   Andrew J. Frisch

**AA0376**

# EXHIBIT S

The Law Offices of
ANDREW J. FRISCH, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
212-285-8000

November 28, 2022

*Via email (Yael.Fuchs@ag.ny.gov; Catherine.Suvari@ag.ny.gov)*

Yael Fuchs, Assistant Attorney General
Catherine Suvari, Assistant Attorney General
Office of the Attorney General
28 Liberty Street
New York, New York 10005

 *Re: Subpoena to VDare Foundation, Inc.*

Dear Counsel:

  As I reported in my letter to you of November 21, 2022, response to your Office's subpoena to VDARE involving emails is taking longer than anticipated. I am aiming to complete that part of the response to the subpoena by December 12, 2022.

  Very truly yours,

  /s/ *Andrew J. Frisch*
  Andrew J. Frisch

**AA0378**

**EXHIBIT T**



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
  ATTORNEY GENERAL

DIVISION OF SOCIAL JUSTICE
CHARITIES BUREAU

212.416.6172
Catherine.Suvari@ag.ny.gov

December 2, 2022

**Via Email To: afrisch@andrewfrisch.com**

Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038

Re: *Subpoena to VDARE Foundation dated June 23, 2022*

Andy:

I write to address significant deficiencies in VDARE's production response to the above-referenced subpoena. As explained below, we have serious concerns regarding: (1) ongoing delay and your repeated failure to abide by deadlines that you yourself proposed; (2) VDARE's failure to produce certain categories of documents based on unsubstantiated objections; and (3) redactions in the production for which you have not provided any legal justification and which appear to be applied haphazardly. VDARE is also delinquent in its required annual filings with this office: annual submissions for both 2020 and 2021, including the audited financials that you acknowledged in your November 21, 2022 cover letter, are all overdue.

Pursuant to Rule 4.4(b) of the Rules of Professional Conduct, we are also notifying you that you have produced material in your November 21 delivery that may be protected by an attorney-client privilege. *See* VF 4777-4780.

Continuing Production Delay

You have noted throughout your reports this Fall that you were first retained for this matter in August 2022 and that we agreed to extend the subpoena's stated deadline in response to your requests for more time to collect and review material. You now appear to be setting — and moving — your own chosen deadlines for VDARE's subpoena compliance: on October 25, you even remarked by email that our reference to previously-agreed deadlines was "not productive" and "divert[ed]" you from "subpoena-related tasks" on which you were working.

We are now more than three months into your representation of VDARE and more than five months since the date VDARE was served with the subpoena. In the past eight weeks alone, we have had the following assurances from you, none of which proved true: (i) that you would substantially complete hard copy production by October 31 (Oct. 6); (ii) that you would provide, on or before October 31, a privilege/ redaction log that identified each marked redaction in the production and the legal basis for those redactions (Oct. 6); (iii) that the "lion's share of documents" had been reviewed and sent to the vendor for a substantially complete production by October 31 (Oct. 20); (iv) that "95% or so" of VDARE's hard copy documents were in process at the vendor and "well underway aiming for substantial compliance on October 31 or before" (Oct. 21); (v) that

40 gigabytes of potentially responsive email records, as well as "more documents potentially responsive to the subpoena" could be reviewed and produced on or before November 21, including on a rolling basis (Oct. 31). In the last ten days, you have announced instead that email review is suddenly taking "longer than anticipated" and that you will "aim[ ] to complete that part of the response to the subpoena by December 12, 2022."

As of the date of this letter, you have produced a total of roughly 6,000 pages of Bates-stamped material, the first section of which you have produced three separate times and all of which bears extensive unlabeled redactions to which we have repeatedly objected. The material produced to date does not appear to include any significant volume of email from the VDARE accounts that you first identified to us on October 31 and does not identify which of the subpoena's requests each document responds to. Please complete the production of both hard copy and ESI documents, in the form called for by the subpoena, by **December 12, 2022**.

VDARE's Unsubstantiated Objections to Certain Subpoena Requests

In July 2022, we took steps to clarify several of the subpoena's requests in response to VDARE's stated privacy concern for donors and volunteers, but we have consistently objected to a generalized assertion of sensitivity and have emphasized that we do not agree to the withholding of documents and information on that basis.

Your production cover letter on October 31 stated that "VDARE is concerned that disclosures risk further impairment to freedoms of speech and association of itself and others." We note that the requests you identified in your October 31 letter as intrusive on fundamental liberties included the request for VDARE Board meeting minutes (Req. No 5), the request for *outgoing* solicitation materials sent on VDARE's behalf (Req. No. 8), the request for documents identifying the individual(s) who control VDARE financial accounts (Req. No. 23), and the request for documents concerning physical renovation of VDARE's West Virginia castle property (Req. No. 39). You have not articulated how — and we do not agree that — these requests implicate any constitutional speech or associational concern for VDARE donors or content providers. To the extent any of these documents have been withheld from your productions to date, we demand complete delivery by December 12, 2022.

VDARE's Failure to Provide a Privilege/Redaction Log

We have asked several times that you provide a privilege/ redaction log to identify the legal basis on which VDARE is redacting or withholding particular material, and we asked specifically in our conference on October 6 that you provide such a log on or before October 31. Such a log is necessary for us to understand and evaluate VDARE's basis for redacting or withholding information. Your October 31 letter offered only the assurance that you expected to complete your redactions to responsive financial records by November 21 and that you would be in the best position to explain those redactions after you had completed them. On November 21, you stated without explanation that you would identify redactions in the production "once the project is complete." We still have not received a log.

We have explained in several exchanges with you that we will not agree in advance to special treatment for a subset of vendor information that you and/or VDARE independently identify as sensitive: VDARE must articulate particular categories of material covered by any individual request that it believes cannot be lawfully demanded and provide substantive explanation of how the disclosure being sought would operate to chill VDARE's protected associational or speech rights. We will meet and confer on this issue again only after production of a written privilege-redaction log to serve as the basis for meaningful review. Please produce such a log by **December 12, 2022**.

We also note that, in your letter of September 26, 2022, you asserted that subpoena requests for employee, vendor, and contract information violate First Amendment rights held by those

**AA0381**

entities because "[m]ost of [VDARE's] employees and contractors are writers and editors for the site." The documents that you have produced to date have been redacted far beyond the limits of any editorial content: you have redacted, among other things, (i) contact information for an architectural firm hired to review potential renovations at the Berkely Springs Castle property (VF 4427-4428; VF 4766-4767), (ii) the contact name, but not address, of a Switzerland-based firm hired to perform, according to its own invoice, "standard software development and server administration," (VF 3980-3981), (iii) the name of VDARE's bookkeeper, which appears to be separately disclosed in your production on a publicly-filed IRS Form I-9 prepared to confirm Lydia Brimelow's eligibility as an employee of Happy Penguins LLC (ex. VF 4280, VF 4282); (iv) contact information contained in a public magazine subscription renewal form sent to Peter Brimelow (VF 4187) (also marked as Confidential); (v) bank statements to accounts held by entities *other* than VDARE, including Happy Penguins LLC and Peter and Lydia Brimelow, as individuals (VF 4346-4348, VF 4338-4343); and the contact information for an individual or company hired to perform "VDARE Admin" services (VF 4017, VF 4274). These redactions are accompanied by the unredacted disclosure of numerous other VDARE contractors, vendors, and employees identified in VDARE's records, so that your stated treatment of redaction appears inconsistent, to say the least, and raises serious concerns about the legal basis for any such redactions.

<u>VDARE's Failure to Provide Mandatory Filings</u>

As we have previously noted, VDARE is delinquent in its filing of its 2020 Char500 and schedules, including the IRS Form 990. That filing was due in November 2021. VDARE's filing for 2021 was due on November 29, 2022 and has not been received. Attached to this letter is a notice of delinquency from our Registration Section.

We have discussed each of the above issues with you on several occasions and have agreed to significant deadline extensions to accommodate your requests for additional time to review. We reserve all rights regarding our position on your client's non-compliance with the subpoena and will seek judicial intervention to obtain compliance if the documents and information listed here are not produced by December 12, 2022.

Sincerely,

*/s/ Kate Suvari*

Kate Suvari
Assistant Attorney General

Encl.

cc:     Assistant Attorney General Yael Fuchs

**AA0382**



STATE OF NEW YORK

OFFICE OF THE ATTORNEY GENERAL

Letitia James
Attorney General

Division of Social Justice
Charities Bureau

December 2, 2022

Vdare Foundation
PO Box 211
Litchfield, CT 06759

**Re:**   **Vdare Foundation**
      **Delinquent Filing – Action Requested**
      **Registration Number: 41-37-83**

Dear Sir or Madam:

This letter is to notify you that the above organization is delinquent in filing its annual financial reports with the New York Attorney General's Charities Bureau. New York law requires registered organizations to file annually Form CHAR500, IRS Form 990 and, if applicable, an independent certified public accountant's audit or review report and pay an annual filing fee.

In order to resolve the delinquency, the organization must submit its delinquent filings, with a copy of this letter, to the Charities Bureau within **thirty (30) days** of the above date.  According to our records, the following filings are delinquent:

- **Fiscal Year Ended 12/31/2020: CHAR500 Annual Filing – complete online.**
- **Fiscal Year Ended 12/31/2021: CHAR500 Annual Filing – complete online.**

 A portal for electronic filing is posted on our webpage www.charitiesnys.com – online filing is required. Please be advised that Article 7-A of the Executive Law prohibits a delinquent organization from raising funds in New York, including through government grants. In addition, failure to submit all required filings may subject the organization to cancellation of its registration.

If you believe that the organization has already submitted its required filings or if it is no longer conducting activities or soliciting contributions in New York, please notify this office in writing upon receipt of this letter and include a copy of this letter with your response.  Please mail your response to the attention of Stephenie Brathwaite. If you have any questions concerning this request, please contact the Charities Bureau by phone at (212) 416-8401 or by email at Stephenie.Brathwaite@ag.ny.gov.

Sincerely,

Hanna Rubin
Director-Registration Section
Charities Bureau

**AA0383**

This is page 101 of 297.



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF SOCIAL JUSTICE
CHARITIES BUREAU

212.416.8391
Yael.Fuchs@ag.ny.gov

January 26, 2023

**Via Electronic Filing**

Hon. Frederick J. Scullin, Jr.
United States District Court
Federal Building and U.S. Courthouse
P.O. Box 7255
Syracuse, NY 13261-7255

Re:     *VDARE Foundation, Inc.* v. *James*, No. 22-cv-1337

Dear Judge Scullin:

The Attorney General has moved to dismiss this action on several grounds, including that (i) VDARE has not alleged a plausible First Amendment retaliation claim and that (ii) the lawfulness of the subpoena that VDARE seeks to challenge has already been presented through a motion to compel subpoena compliance filed in New York State Supreme Court on December 16, 2023.[1]

I write to inform this Court that the Supreme Court issued a Decision and Order fully resolving the state action this week. *See* Decision and Order dated January 23, 2023, *New York* v. *VDARE Foundation, Inc.*, Index No. 453196/2022 (Sup. Ct. N.Y. Cty.) (the "Enforcement Order"). The Supreme Court (i) denied VDARE's request to dismiss the state action or for a stay pending resolution of its claims here, and (ii) directed VDARE to complete production of all outstanding material called for by the Attorney General's subpoena on or before February 24, 2023. The Supreme Court's analysis reviewed many of the same issues raised by the Attorney General's pending motion in this action and I enclose a copy of the decision as new, binding authority for this Court's consideration.

VDARE asserts here, as it did in the state action, that the Attorney General issued subpoena demands unrelated to any valid investigative interest and that the Attorney General's investigation intrudes on VDARE's protected speech and associational rights. Presented with

---

[1]     The Attorney General filed her opening brief in support of dismissal on January 18, 2023 (Dkt. Nos. 12 and 12-1 through 12-22). The New York Supreme Court heard oral argument of the Attorney General's motion to compel subpoena compliance in the state action the following day, on January 19, 2023.

## AA0384

the same arguments and documentary record now before this Court, the Supreme Court addressed these concerns directly and concluded that:

- New York State has a public policy interest in ensuring the robust regulation of tax-exempt entities like VDARE, and the Attorney General has authority to supervise and investigate such entities when misconduct is suspected. Enforcement Order, at 6.

- The Attorney General has broad and well-established authority to issue subpoenas in connection with a civil investigation of a non-profit's conduct to determine whether to bring an enforcement proceeding. *Id.* at 5.

- The critical facts and events that triggered the Attorney General's review of VDARE are not in dispute, and VDARE's own filings admit many of those facts and underscore both the reasonableness of the Attorney General's subpoena and the relevance of complete financial and transaction records to OAG review. *Id.* at 7, 8.

- As the party seeking to challenge a subpoena on constitutional grounds, VDARE bears the initial threshold burden of demonstrating that production of the information sought by the subpoena would impair its constitutional rights. VDARE has not established why, after months of partial compliance, providing a redaction log of its already-produced documents and completing its production now raises a First Amendment concern and/or poses a threat to its existence. *Id.* at 7-8.

The Supreme Court also specifically examined two of the cases that VDARE highlights in its Complaint to urge its exemption from regulatory review. First, the Court determined that the subpoena is sufficiently focused on subject matter areas that fall with the Attorney General's statutory oversight authority to meet the standards for lawful investigative demands outlined in *Evergreen Ass'n, Inc.* v. *Schneiderman*, 153 A.D.3d 87 (2d Dep't 2017). *Id.* at 5-6. The Court also considered and distinguished the U.S. Supreme Court's analysis of donor anonymity in *Americans for Prosperity* v. *Bonta*, 141 S. Ct. 2373 (2021), noting that that decision concerned donor disclosures in a statewide annual filing requirement and expressly endorsed the use of subpoenas like the one at issue to obtain information for targeted investigative review. *Id.* at 8-9.

The Supreme Court's decision, reviewing the same factual record and constitutional claims that VDARE alleges in this action, represents a final judgment that is entitled to preclusive effect and requires dismissal of VDARE's Complaint. Pursuant to 28 U.S.C. § 1738, federal courts "must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra* v. *Warren City School Dist. Bd. of Education*, 465 U.S. 75, 81 (1984); *see Conopco, Inc.* v. *Roll Int'l*, 231 F.3d 82, 87 (2d Cir. 2000). Under New York law, the doctrine of *res judicata*, or claim preclusion, applies where: (1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action. *See Monahan* v.

*N.Y.C. Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000). Each of the requirements for preclusive effect are met here: the parties in this action are identical to those in the state proceeding, and VDARE had, and availed itself of, the opportunity to fully litigate the propriety of the Attorney General's investigation in that forum. VDARE argued in the state action, exactly as it does here, that the Attorney General's true motive for investigation was pretextual and that insistence on additional disclosures "threatened VDARE's ability to conduct business." Frisch Aff. at 3 (filed in this action as Exhibit E to the Decl. of Yael Fuchs, at Dkt. No. 12-7). Urging the state court to stay or dismiss review in favor of this action, VDARE itself highlighted the overlap between its federal claims and the issues raised by the Attorney General's motion to compel compliance: "VDARE's Federal Complaint is based," it explained, "on many of the same underlying issues raised by the OAG's subsequent special proceeding in this Court," including allegations that the Attorney General's investigative demands were "unreasonable," "without any apparent legitimate investigatory purpose," and violated "settled principles of constitutional law." *See id.* at 12. The Supreme Court has now issued a decision that expressly considers and rejects each of those arguments and fully resolves the state enforcement proceeding, and this Court must dismiss VDARE's federal claims on that ground. *See Trump* v. *James*, No. 21-cv-1352, 2022 WL 1718951, at *16 (N.D.N.Y May 27, 2022) (BKS, C.J.) (order in New York subpoena enforcement proceeding that granted motion to compel was final judgment on the merits which brought parties' claim regarding compliance with subpoena "to a final conclusion" and was entitled to preclusive effect in Section 1983 action seeking to enjoin further investigation). *See also Gherardi* v. *State of New York*, 161 Fed. Appx. 60 (2d Cir. 2005) (affirming dismissal of constitutional challenge to property use legislation in federal court on *res judicata* grounds where prior state action asserting identical challenge had been dismissed on the merits).

For all of the reasons highlighted in the Enforcement Order and in the Attorney General's briefing in support of its motion to dismiss, this Court should dismiss VDARE's claims in their entirety.

Respectfully submitted,

*/s/ Yael Fuchs*

Assistant Attorney General

Encl.

cc:     Counsel of Record (via ECF)

Case 1:22-cv-01337-BJS-GWH Document 12-5 Filed 01/26/23 Page 2 of 14

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

| | | |
|---|---|---|
| PRESENT: | **HON. SABRINA KRAUS** | PART 57TR |
| | *Justice* | |

------------------------------------------------------------------X

PEOPLE OF THE STATE OF NEW YORK, BY LETITIA
JAMES, ATTORNEY GENERAL OF THE STATE OF NEW
YORK

                              Plaintiff,

                 - v -

VDARE FOUNDATION, INC.,

                           Defendant.

------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 453196/2022 |
| MOTION DATE | 1/19/2023 |
| MOTION SEQ. NO. | 001 002 |

**DECISION + ORDER ON
MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 001) 2, 33, 53, 56, 57, 59,
60, 61

were read on this motion to/for                          ENFORCEMENT             .

The following e-filed documents, listed by NYSCEF document number (Motion 002) 36, 37, 38, 39, 40,
41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 54, 55, 58

were read on this motion to/for                          DISMISSAL              .

## BACKGROUND

      Petitioner commenced this special proceeding to compel compliance with a subpoena

duces tecum dated June 23, 2022 (the "Subpoena") issued in conjunction with an investigation

into the activities of Respondent, a not-for-profit corporation.

## ALLEGED FACTS

      Respondent is a New York charitable not-for-profit corporation that incorporated in New

York in 1999. In 2000, Respondent, then known as, the Lexington Research Institute, Limited,

applied for and received recognition of its tax-exempt status from the IRS as a 501(c)(3)

charitable entity. Respondent did not register with the Attorney General's office until 2009.

453196/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. VDARE FOUNDATION, INC.
Motion No.  001 002

Page 1 of 11

**AA0387**

1 of 11

Case 1:22-cv-01337-DLC-GHH54 Document 72-3 Filed 01/26/23 Page 25 of 14

In its application for federal tax-exempt status, Respondent stated its plan to operate from offices in New York and listed two of its four directors at addresses in New York City. Respondent described its primary purpose as creating a publication web page and magazine, with editorial content focusing on foreign and domestic policy issues.

In 2019, Respondent reported a six-fold increase in revenue, from $700,000 in 2018 to approximately $4.3 million in 2019 and including a $1.5 million lump donation from a donor-advised fund. In early 2020, Respondent spent $1.4 million of these newly received funds on the purchase of the Berkeley Springs Castle, a medieval-style castle located in West Virginia.

Public postings by Respondent Chairman Peter Brimelow and others indicate that he and his family have used the castle as their primary residence since at least March 2020. During this same period, Respondent also substantially increased payments to Brimelow and to third-party, for-profit companies he controls.  In 2019, Brimelow's reported salary more than doubled and comprised roughly one third of Respondent's operating expenditures. Respondent separately reported spending tens of thousands of dollars on office expenses in 2019, as well as paying hundreds of thousands of dollars to a third-party LLC controlled by Brimelow that was based at Brimelow's residential home address.

In December 2020, Respondent conveyed the entirety of the Berkeley Springs Castle property to two West Virginia corporations incorporated by Lydia Brimelow, Peter's wife and a Respondent director, five months earlier. Respondent conveyed the castle itself and the land that it sits on to the Berkeley Castle Foundation (BCF), a non-profit corporation.  Respondent conveyed the remaining land, consisting of eight parcels, to BBB, LLC, a for-profit corporation.

Based on the information it had obtained, the Attorney General began an investigation of Respondent and its leadership for potential violations of the New York law applicable to

453196/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY          Page 2 of 11
GENERAL OF THE STATE OF NEW YORK vs. VDARE FOUNDATION, INC.
Motion No.  001 002

AA0388
2 of 11

charities. The Subpoena seeks: documents concerning Respondent's organizational structure; compliance conflict-of-interest policy requirements under New York law, and financial operations; its purchase and conveyance of the Berkeley Springs Castle; and transactions between Respondent and entities controlled by the Brimelows.

Respondent originally took the position that the Subpoena was unlawful and should be withdrawn. On September 19, 2022, new counsel for Respondent agreed to comply with the Subpoena but asserted that a significant volume of electronically-stored and hard copy documents needed to be reviewed. Respondent made its first production that day consisting of 27 documents produced without Bates numbers and bearing unmarked redactions. No log was provided to identify or explain the redactions.

In the twelve weeks since its first September delivery, Respondent has produced approximately 6,000 pages from its hard copy records. It has redacted that material without any explanation for how material was chosen for redaction. Petitioner assets that the redactions are extensive and have been applied across almost every category of document produced, including board meeting minutes, bank statements, internal accounting ledgers, credit card statements, invoices, financial records for the limited liability company (Happy Penguins LLC) from which Respondent has historically leased Peter Brimelow's services, and bank statements to accounts held personally by Peter and Lydia Brimelow.

On October 31, 2022, Lydia Brimelow represented that, with limited exceptions, Respondent's hard copy production was complete, and identified 22 unique email accounts containing approximately 40 gigabytes of potentially responsive electronically stored information. Respondent's counsel stated that review of that material would be completed by

453196/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. VDARE FOUNDATION, INC.        Page 3 of 11
Motion No. 001 002

AA0389
3 of 11

Case 1:22-cv-01337-BDS-CFH  Document 15  Filed 01/26/23  Page 27 of 14

November 21, 2022. Respondent subsequently proposed December 12, 2022, as a new deadline for completing email production.

On December 2, 2022, Petitioner wrote to Respondent, summarizing its concerns with the pace and scope of the production, including its extensive redactions, and demanded that Respondent complete its subpoena compliance and produce a redaction log by December 12, 2022.

On December 12, 2022, Respondent filed an action in United States District Court for the Northern District of New York against Petitioner [*VDARE Foundation, Inc. v. James*, 1:22-cv-01337 (FJS)], alleging, among other things, that Petitioner's demands for certain disclosures threaten Respondent's ability to conduct business; and that Petitioner's subpoena is a retaliatory pretext aimed at interfering with Respondent's rights to freedom of speech and association. The federal complaint seeks a declaration that Subpoena violates Respondent's first amendment rights, an injunction preventing Petitioner's enforcement of the Subpoena and damages.

On December 16, 2022, Petitioner commenced this special proceeding.

## PENDING APPLICATIONS FOR RELIEF

Petitioner seeks an order compelling Respondent to comply with the investigative Subpoena duces tecum dated June 23, 2022.

Respondent has moved for an order dismissing this proceeding, or alternatively staying the proceeding pending resolution of the Federal Action.[1]

On January 19, 2023, the court heard oral argument on the motions and reserved decision.  For the reasons stated below, Petitioner's motion to compel is granted and Respondent's motion for a stay or dismissal is denied.

---

[1]  At argument Respondent withdrew its request for dismissal and limited its request to a stay pending the Federal Court litigation.

453196/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY          Page 4 of 11
GENERAL OF THE STATE OF NEW YORK vs. VDARE FOUNDATION, INC.
Motion No.  001 002

AA0390
4 of 11

## DISCUSSION

The requirements for the issuance of an investigatory subpoena duces tecum are "(1) that the issuing agency has authority to engage in the investigation and issue the subpoena, (2) that there is an authentic factual basis to warrant the investigation, and (3) that the evidence sought is reasonably related to the subject of the inquiry" (*Matter of Abrams v. Thruway Food Market & Shopping Center, Inc.,* 147 A.D.2d 143, 147, 541 N.Y.S.2d 856; citing *Matter of Levin v. Murawski,* 59 N.Y.2d 35, 462 N.Y.S.2d 836, 449 N.E.2d 730, and *Matter of A'Hearn v. Committee on Unlawful Practice of Law of N.Y. County Lawyers' Assn.,* 23 N.Y.2d 916, 298 N.Y.S.2d 315, 246 N.E.2d 166).

*Evergreen Ass'n, Inc. v. Schneiderman*, 153 A.D.3d 87, 96 (2017).

The Attorney General has broad and well-established authority to issue subpoenas in connection with a civil investigation of a non-profit's conduct to determine whether to bring an enforcement proceeding. Exec. Law §§ 63(12), 175; N-PCL § 112; EPTL § 8-1.4(m). *See also Temple of the Lost Sheep*, 148 Misc. 2d at 828–29. "Moreover, in evaluating the Attorney General's justification for the issuance of a subpoena, there is a presumption that (s)he is acting in good faith" (*Matter of Dental Coop. v. Attorney–General of State of N.Y.,* 127 A.D.2d 274, 280; *see Matter of Abrams v. Thruway Food Market & Shopping Center, Inc.,* 147 A.D.2d at 147). The party challenging a subpoena issued by the Attorney General bears the burden of establishing the subpoena's invalidity. *Id.* at 828

CPLR §2308(b) provides "… if a person fails to comply with a subpoena which is not returnable in a court, the issuer or the person on whose behalf the subpoena was issued may move in the supreme court to compel compliance. If the court finds that the subpoena was authorized, it shall order compliance and may impose costs not exceeding fifty dollars."

In evaluating the propriety of an investigative subpoena, New York courts apply a deferential standard of review: it is presumed that the Attorney General acts in good faith. *Ryan*

453196/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY    Page 5 of 11
GENERAL OF THE STATE OF NEW YORK vs. VDARE FOUNDATION, INC.
Motion No. 001 002

AA0391
5 of 11

*v. Lefkowitz*, 18 N.Y.2d 977, 979 (1966); *Hogan v. Cuomo*, 67 A.D.3d 1144, 1145 (3d Dep't

2009); *Anheuser-Busch. Inc. v. Abrams*, 71 N.Y.2d 327, 332 (1988)), aff'd 205 A.D.3d 625

(2022).

Petitioner's subpoena request must demonstrate a "reasonable relationship to the subject

matter under investigation and the public interest to be served." *Giardina v. James*, 185 A.D.3d

451 (1st Dep't 2020).  A party must respond to an investigative subpoena unless the information

sought is "utterly irrelevant to any proper inquiry." *Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d

327, 331–32 (1988).

New York State has a public policy interest in ensuring the robust regulation of tax-

exempt charitable entities like Respondent and Petitioner has authority to supervise and

investigate such entities when misconduct is suspected.

Petitioner's Subpoena is focused on subject matter areas which fall within the statutory

provisions that govern not-for-profit corporations. The Not-for-Profit Corporation Law, for

example, provides that entities like Respondent may be formed only for charitable purposes, *see*,

*e.g.*, N-PCL §§ 202, 204, 205, and that charitable assets may not be distributed to members,

directors or officers, N-PCL § 515(a). Charitable entities are also subject to express requirements

under the N-PCL for lawful operation, including requirements for a process by which

compensation is set (N-PCL § 515(b)); processes for acquisition and "sale or other disposition"

of property (N-PCL §§ 509, 510, 511 and 511-a); creating and presenting complete and accurate

financial reports (N-PCL §§ 519, 520); a process for considering related party transactions (N-

PCL § 715); and a process for managing conflicts of interest. (N-PCL § 715-a).

The Subpoena's requests demand the type of material that will permit Petitioner to

determine whether Respondent has complied with these requirements, including complete copies

453196/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY          Page 6 of 11
GENERAL OF THE STATE OF NEW YORK vs. VDARE FOUNDATION, INC.
Motion No.  001 002

AA0392
6 of 11

Case 1:22-cv-01337-FJS-CFH Document 15-1 Filed 01/26/23 Page 197 of 14

of Respondent's annual regulatory filings, financial transaction records, compensation records, and records of Board meetings and review. The documents called for will permit Petitioner to determine whether there has been any diversion of charitable assets—for example through unlawful payments to for-profit corporations held by the Brimelows or other VDARE fiduciaries. Article 7-A of the Executive Law authorizes the Attorney General to supervise charitable organizations that solicit in New York, and Article 7-A requires the Attorney General to monitor such organizations to ensure that, inter alia, a charity does not solicit contributions under false pretenses or use the contributions it receives in a manner that is not "substantially consistent" with the charity's stated purposes. See generally Executive Law § 172-d.

Respondent has raised constitutional objections related to the First Amendment and therefore had the initial threshold burden to make a showing that production of the information sought would impair its First Amendment rights (*see Matter of Full Gospel Tabernacle v. Attorney–General of State of N.Y.,* 142 A.D.2d 489, 493, 536 N.Y.S.2d 201; *St. German of Alaska E. Orthodox Catholic Church v. United States,* 653 F.Supp. 1342, 1346–1347 [S.D.N.Y.]; *see also Matter of Grand Jury Subpoenas for Locals 17, 135, 257 & 608 of United Bhd. of Carpenters & Joiners of Am., AFL–CIO,* 72 N.Y.2d 307, 532 N.Y.S.2d 722, 528 N.E.2d 1195). However, Respondent makes this argument on behalf of its donors and Petitioner has agreed, initially to redact donors' and volunteers' identities. Respondent has not established that the Subpoena would impair Respondent's own First Amendment rights.

Additionally, Respondent's filings themselves underscore the reasonableness of the Subpoena. Respondent admits the critical facts that first triggered Petitioner's scrutiny— Peter Brimelow, Respondent's founder and director, and his wife, Lydia Brimelow, also a director,

453196/2022 PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. VDARE FOUNDATION, INC. Motion No. 001 002

Page 7 of 11

AA0393

7 of 11

used and continue to use a $1.4 million charitable asset as their personal residence. See Frisch Aff. (Doc. No. 37).

Respondent argues that the Brimelows paid rent to live in the cottage beginning in April 2021, however the lease is between Lydia Brimelow and BBB, LLC, a West-Virginia for-profit corporation she manages, and Lydia Brimelow signed the document as both landlord and tenant. Frisch Aff. Ex. H (Doc. No. 45); Fuchs Aff. Ex. L (BBB, LLC registration showing Lydia Brimelow as manager).

Respondent's motion and accompanying papers fail to meet its burden of establishing the Subpoena's invalidity. Respondent, which has partially complied with the subpoena for months, has not established why providing a redaction log for its already-produced documents raises any First Amendment concerns or why continuing production would pose a threat to its existence.

Although Respondent argues that redactions are required to protect the identities of contractors—including writers who contribute to the website—these are precisely the records the Petitioner seeks to examine in its investigation of Respondent's alleged organizational misconduct. To the extent anonymity is used to mask violations of the law, "it is unprotected by the First Amendment." *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010).

For example, the only board member among four who is not a Brimelow family member is a known contributor. The Attorney General may probe this contributor's compensation as part of its investigation of conflicts of interest and board independence. And the Attorney General may seek the identities of other contributors to determine whether further conflicts of interest may exist.

Respondent's reliance on *Americans for Prosperity v. Bonta*, 141 S.Ct. 2373 (2021), is equally unavailing. That decision concerned only donor disclosures in statewide annual filing

453196/2022 PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. VDARE FOUNDATION, INC. Motion No. 001 002

Page 8 of 11

AA0394
8 of 11

Case 1:22-cv-01337-ERS-OHR 3Documents, Filed 05/26/23 1Page 127of 14

requirements, while expressly permitting subpoenas seeking the same information as part of a

targeted investigation. *See Ams. for Prosperity Found.*, 141 S. Ct. at 2386–87.   Moreover,

Petitioner has indicated a willingness to enter into a stipulation /order of confidentiality to further

address any of Respondent's concerns.

Finally, Respondent presents no compelling basis for a stay of this proceeding in its

moving papers, and acknowledged at oral argument it has not sought a stay of this proceeding

from the Federal District Court.

Based on the foregoing, Respondent's motion for a stay is denied and Petitioner's motion

to compel is granted.

WHEREFORE it is hereby:

ORDERED Respondent VDARE Foundation, Inc. ("VDARE") shall comply with the

Subpoena, subject to the agreement of July 27, 2022, memorialized in Exhibit R to the

Affirmation of Yael Fuchs at Dkt. No. 22, that VDARE may redact the following from

otherwise responsive material: (i) the names of any actual or anticipated private (nonVDARE)

attendees present at VDARE events conducted at or broadcast from the 276

Cacapon Road, Berkley Springs, West Virginia Property; and (ii) donor-identifying

information in any responsive record of private contributions to the organization and/or

purchases from the October 16, 2021 "Castle Auction" (transaction amounts, dates, and

other details must be disclosed); and it is further

ORDERED that such redactions are without prejudice to Petitioner's right to seek

modification of these agreed redaction terms by written application to the Court on notice to

VDARE; and it is further

453196/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY                Page 9 of 11
GENERAL OF THE STATE OF NEW YORK vs. VDARE FOUNDATION, INC.
Motion No.  001 002

AA0395
9 of 11

Case 1:22-cv-01337-ELH-GHH 30 Document 15-1 Filed 05/26/23 Page 237 of 14

ORDERED that on or before February 10, 2023, VDARE shall re-produce all hard copy documents previously produced to Petitioner, in a revised form that bears only those redactions outlined in the preceding paragraph or any additional redaction identified by VDARE in a written log that complies with the requirements of CPLR 3122(b); this production shall be accompanied by simultaneous delivery of the corresponding CPLR 3122(b) log; and it is further

ORDERED that on or before February 24, 2023, VDARE shall complete production of all responsive material contained in the universe of electronic files identified by its October 31, 2022 letter (Dkt. No. 26); on or before February 24, 2023, VDARE shall provide a written log that complies with the requirements of CPLR 3122(b) to identify the redactions, if any, applied to such production; and it is further

ORDERED that the parties, if so advised, may forthwith enter into a Stipulation for the Production of Confidential Information pursuant to this order and submit said stipulation to be so-ordered by the court; and it is further

ORDERED that, within 20 days from entry of this order, Petitioner shall serve a copy of this order with notice of entry on the Clerk of the General Clerk's Office (60 Centre Street, Room 119); and it is further

ORDERED that such service upon the Clerk shall be made in accordance with the procedures set forth in the *Protocol on Courthouse and County Clerk Procedures for Electronically Filed Cases* (accessible at the "E-Filing" page on the court's website at the address www.nycourts.gov/supctmanh);]; and it is further

ORDERED that any relief not expressly addressed has nonetheless been considered and is hereby denied; and it is further

**453196/2022  PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. VDARE FOUNDATION, INC.  Motion No. 001 002**                                            **Page 10 of 11**

**AA0396**
10 of 11

Case 1:22-cv-01337-ERS-OEH 3 Document 15-1 Filed 05/26/23 Page 147 of 14

ORDERED that this constitutes the decision and order of this court.

20230123145412958KRADSE27B502CD5844BFE88AF03FF4E118495

| 1/23/2023 | | SABRINA KRAUS, J.S.C. |
| DATE | | |

CHECK ONE:              [X] CASE DISPOSED              [ ] NON-FINAL DISPOSITION

                        [X] GRANTED        [ ] DENIED   [ ] GRANTED IN PART          [ ] OTHER

APPLICATION:            [ ] SETTLE ORDER                [ ] SUBMIT ORDER

CHECK IF APPROPRIATE:   [ ] INCLUDES TRANSFER/REASSIGN  [ ] FIDUCIARY APPOINTMENT    [ ] REFERENCE

| 01/27/2023 | 16 | TEXT ORDER: The Court will be treating the 15 Notice as a supplement to Defendant's motion to dismiss, Dkt. No 12 , to which Plaintiff should respond to in its opposition to the motion. Plaintiff is permitted an additional 5 pages in its memorandum of law in opposition to Defendant's motion in light of the length of Defendant's supplemental submission. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on January 27, 2023. (rep) Modified on 2/8/2023 to correct hyperlink (rep). (Entered: 01/27/2023) |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

VDARE FOUNDATION, INC.

                *Plaintiff,*

         - against -                  Civil Action No. 22-cv-1337 (FJS/CFH)

LETITIA JAMES, in her official capacity        **DECLARATION**
as Attorney General of the State of New York,

                *Defendant.*

------------------------------------------------------------x

        Andrew J. Frisch hereby declares the following pursuant to 28 U.S.C. § 1746:

        1.      I am counsel of record in this case for VDARE FOUNDATION, INC.

("VDARE") and submit this Declaration in support of VDARE's opposition to the motion of the

Attorney General of the State of New York (the "Attorney General" or the "OAG") to dismiss

this case. I am also counsel of record for VDARE in *James v. VDARE Foundation, Inc.*, N.Y.

County Index No. 453196/2022, a special proceeding initiated by the Attorney General in the

Supreme Court of the State of New York, County of New York ("state court"), after VDARE

initiated this federal case.

        2.      The documents identified below are true and accurate copies as described.

To maintain consistency, for documents filed by VDARE in state court in its motion to stay the

state court proceeding pending this federal case, this Declaration uses the same exhibit letters,

except for one inconsistency: Exhibit A hereto is my Affirmation submitted in state court in

support of VDARE's application for a stay; Exhibit A to my Affirmation in state court was

VDARE's complaint filed in this Court.

**AA0399**

3.      The documents are as follows:

Exhibit A      My affirmation submitted in state court (NYSCEF Docket No. 37);

Exhibit B      An email from the OAG to VDARE's counsel (NYSCEF Docket No. 39);

Exhibit C      A letter from VDARE's counsel to the OAG (NYSCEF Docket No. 40);

Exhibit D      A letter from VDARE's counsel to the OAG (NYSCEF Docket No. 41);

Exhibit E      An email from VDARE's counsel to the OAG (NYSCEF Docket No. 42);

Exhibit F      An email from VDARE's counsel to the OAG (NYSCEF Docket No. 43);

Exhibit G      A letter from the OAG to VDARE's counsel (NYSCEF Docket No. 44);

Exhibit H      A residential lease agreement produced by VDARE to the OAG (NYSCEF Docket No. 45);

Exhibit I      VDARE's CHAR 500 for 2019 (NYSCEF Docket No. 46);

Exhibit J      An email from the OAG to VDARE's counsel (NYSCEF Docket No. 47);

Exhibit K      A letter from VDARE's counsel to the OAG (NYSCEF Docket No. 48);

Exhibit L      An email from VDARE's counsel to the OAG (NYSCEF Docket No. 49);

Exhibit M      A letter from VDARE's counsel to the OAG (NYSCEF Docket No. 50);

Exhibit N      A memorandum of law submitted by the OAG in state court (NYSCEF Docket No. 3);

Exhibit O      A preliminary injunction issued in *Volokh v. James*, 1:22-cv-10195 (S.D.N.Y.);

Exhibit P      The operating agreement for BBB, LLC, which was produced by VDARE to the OAG pursuant to its investigative subpoena;

Exhibit Q      Bylaws for Berkeley Castle Foundation, which was produced by VDARE to the OAG pursuant to its investigative subpoena;

Exhibit R      An order of the Appellate Division, First Department, dated February 8, 2023, staying an order of the Supreme Court of the State of New York, County of New York, pending further briefing;

Exhibit S    My affirmation submitted to the Appellate Division, First Department, in support of a stay of the state court's order.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

*/s/ Andrew J. Frisch*
Andrew J. Frisch

Executed on February 22, 2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------ x

PEOPLE OF THE STATE OF NEW YORK, by
LETITIA JAMES, Attorney General of the State of
New York,                                            Index No. 453196/2022

                           Petitioner,      Motion Sequence No. 2
                                             (VDARE's motion for dismissal
       - against -                                  or, alternatively, a stay)

VDARE FOUNDATION, INC.,

                           Respondent.

------------------------------------------------------------------ x

AFFIRMATION IN SUPPORT OF RESPONDENT'S ORDER TO SHOW CAUSE
TO DISMISS OR, ALTERNATIVELY, STAY THIS PROCEEDING PENDING
RESOLUTION OF THE DUPLICATIVE AND OVERLAPPING FEDERAL CASE

         Andrew J. Frisch, an attorney duly admitted to practice law in the State of New

York since 1985, affirms the following statements to be true under penalties of perjury:

Introduction

         1.     I am counsel to VDARE Foundation, Inc. ("VDARE"), a non-profit

foundation organized and existing under the laws of the State of New York with a principal place

of business in Berkeley Springs, West Virginia.  The undersigned was engaged by VDARE in

late August 2022 to comply with and otherwise respond to an investigative subpoena issued to

VDARE by the Attorney General of the State of New York ("OAG") on or about June 24, 2022.

This Affirmation is based on personal knowledge, documents attached as exhibits which are true

and accurate copies of the originals, and otherwise on information and belief as noted.

         2.     On December 12, 2022, VDARE filed an action in United States District

Court for the Northern District of New York against the OAG [*VDARE Foundation, Inc. v.*

Case 1:22-cv-01337-FJS-CFH Document 23-1 Filed 02/22/23 Page 7 of 13

*James*, 1:22-cv-01337 (FJS)], alleging, among other things, that the OAG's demands for certain

disclosures in response to its subpoena (a) threaten VDARE's ability to conduct business; and

(b) reveal the OAG's subpoena to be a retaliatory pretext aimed at interfering with VDARE's

rights to freedom of speech and association guaranteed by the United States and New York

Constitutions. VDARE's federal complaint seeks declaratory and injunctive relief. *See*

VDARE's Complaint in United States District Court (the "Federal Complaint"), attached hereto

as Exhibit A.

3.    On December 16, 2022, less than a week *after* December 12, 2022, when

VDARE filed its Federal Complaint against the OAG (and simultaneously emailed a courtesy

copy to the OAG in advance of formal service), the OAG commenced this special proceeding

against VDARE, seeking to compel the very disclosures identified in VDARE's Federal

Complaint that threaten its existence and further demonstrating that the OAG's arguments in

support of its investigative subpoena are pretextual.

4.    It was not until December 22, 2022, that the OAG first notified VDARE

that it had initiated this special proceeding, the day *after* the OAG (on December 21, 2022)

requested and secured VDARE's consent to an extension of the OAG's deadline in federal court

to respond to VDARE's Federal Complaint. In securing VDARE's consent to an extension of

the OAG's deadline in federal court, the OAG did not disclose that it had filed this special

proceeding the week before and was apparently awaiting this Court's issuance of an order to

show cause, instead claiming: "Because of the holidays and a member of our team who has

COVID, we would appreciate an extension until Jan 18 to respond to VDARE's complaint in the

NDNY. Can you please confirm your consent?" *See* Email from the OAG to the undersigned,

Case 1:22-cv-01337-JLS-DEH Document 23-13 Filed 02/22/23 Page 7 of 13

dated December 21, 2022, attached hereto as Exhibit B.

5.    This affirmation is respectfully submitted in support of VDARE's application, pursuant to CPLR 3211(a)(4), that this special proceeding be dismissed or, alternatively, stayed until VDARE's pending federal action is resolved.

I.    *VDARE Sought Relief in United States District Court Only After the OAG's True Motive for Conducting this Investigation Became Apparent, And the OAG's Position Threatened VDARE's Ability to Conduct Business*

   *(A)  VDARE's proposed middle ground and to meet and confer*

6.    Between September and November 2022, VDARE's undersigned counsel completed review of records maintained by VDARE electronically and in hard copy and produced over 6,000 pages to the OAG responsive to its investigative subpoena.  Before December 2022, VDARE's counsel had provided the OAG with a list of email custodians and was in the process of completing compliance with the OAG's subpoena by identifying responsive emails from a universe of 40 gigabytes (the equivalent of millions of pages).

7.    While working towards completing compliance with the OAG's subpoena, VDARE's counsel advised the OAG that disclosure of the identities of its employees and contractors would violate constitutional guarantees of free speech and association.  The subject matter of VDARE's principal activity - - commentary about immigration policy of the United States disseminated to the public through its website at www.VDARE.com - - is controversial.  VDARE's lawful speech has led to reputational and professional harm to people and entities associated with it. In addition, contractors providing services essential to VDARE's survival have refused to continue to do business with VDARE, including venues which cancelled contracts with VDARE to host conferences, sometimes because of disagreement with VDARE's views, and sometimes because of

fear of protests. These harms to VDARE have made it increasingly difficult for VDARE to find

alternatives to continue to stay in business. *See* Letter from the undersigned to the OAG, dated

September 26, 2022, attached hereto as Exhibit C; Letter from the undersigned to the OAG, dated

October 31, 2022, attached hereto as Exhibit D; Email from the undersigned to the OAG, dated

October 20, 2022, attached hereto as Exhibit E.

        8.      The OAG knows or should know that VDARE's controversial speech

exposes it to reprisals from those who disagree or fear protests from those who disagree. *See,*

*e.g.*, *"VDARE responds to conference cancellation at Cheyenne Mountain Resort,"* Aug. 15,

2017[1] ("Cheyenne Mountain Resort [in Colorado] will not be hosting the VDARE Foundation in

April of next year. We remain committed to respecting the privacy of guests at the resort.");

Kristine Phillips, The Washington Post, Jan 26, 2017 ("Tenaya Lodge, a resort on the border of

Yosemite National Park, canceled [VDARE's] booking after receiving complaints about the

organization's views.")[2]; *"Cancelled Tucson Conference Produces Five-Figure Settlement - -*

*VDARE.com To Announce New Venue Soon!"* Mar. 7, 2018.[3]

        9.      Likewise, multiple businesses providing services essential to VDARE's

continued operations have terminated their relationships with VDARE, including Mailchimp and

Constant Contact (providers of email marketing services), Paypal, Amazon, Google Ads, and

---

[1] Available at *https://www.kktv.com/content/news/Mayor-Suthers-responds-to-planned-VDARE-conference-in-Colorado-Springs-440537563.html*

[2] Available at *https://www.washingtonpost.com/news/post-nation/wp/2017/01/26/a-resort-canceled-a-white-nationalist-groups-first-ever-conference-because-of-its-views/*

[3] Available at *https://vdare.com/articles/cancelled-tucson-conference-produces-five-figure-settlement-vdare-com-to-announce-new-venue-soon*

Case 1:22-cv-01857-JLS-JJM Document 23-13 Filed 02/22/23 Page 5 of 13

many smaller businesses.[4]  VDARE created an entity called "Happy Penguins LLC" for the sole

purpose of paying VDARE's employees so that they could identify a non-controversial entity

(Happy Penguins) - - and not VDARE - - as their employer.  *See* VDARE's Internal Revenue

Form 990 for 2019[5] (identifying "Happy Penguins LLC / Peter Brimelow" (VDARE's founder)

as a service providing leased employees).

      10.    While simultaneously working to comply with the OAG's subpoena and

producing documents responsive to the OAG's subpoena, VDARE's counsel provided the OAG

with precedent that established the constitutionally-protected interests.  Exhibit C (citing *NAACP*

*v. Alabama ex rel. Patterson,* 357 U.S. 449, 460, 462 (1958) (protecting the right of "advocacy of

both public and private points of view, particularly controversial ones" and holding that an order

requiring association to produce membership list interfered with First Amendment freedom of

association); and *Evergreen Ass'n, Inc. v. Schneiderman,* 153 A.D.3d 87, 100 (2d Dep't 2017)

(applying strict scrutiny where anti-abortion advocacy group served with the Attorney General's

investigatory subpoena alleged that subpoena compliance would "have a chilling effect on [the

group's] associations with its employees and potential clients" as well as at least one hospital);

*see also Rosenberger v. Rector & Visitors of the Univ. of Va. ,* 515 U.S. 819, 828 (1995)

("Discrimination against speech because of its message is presumed to be unconstitutional.");

---

    [4]  *See https://vdare.com/posts/we-ve-been-purged-from-mail-chimp-vice-gloats-deplatforming-works-update-we-re-back; https://vdare.com/posts/emergency-message-to-vdare-com-readers-from-peter-brimelow; see also "Tourist Town Desperate to Reopen Faces Another Battle" infra.*

    [5]  *Available at https://www.charitiesnys.com/RegistrySearch/getcontent?guid= {20D3F877-0000-CCBA-A2A6-DE59F92CA6EF}&orgid=41-37-83&title=IRS%20Annual%20R eturn&project=Charities.*

*Rosenblatt v. Baer,* 383 U.S. 75, 85 (1966) ("Criticism of government is at the very center of the

constitutionally protected area of free discussion. Criticism of those responsible for government

operations must be free, lest criticism of government itself be penalized.").

      11.    On October 15, 2022, VDARE requested that the OAG explain its purpose in

seeking information about contractors in an effort "to narrow issues and move things along." Email

from the undersigned to the OAG, dated October 15, 2022, attached hereto as Exhibit F. While the

OAG declined to provide any such explanation, VDARE proposed a middle ground to the OAG that

addressed the OAG's ostensibly legitimate investigative interest while protecting VDARE's

concerns - - with reservation of the OAG's right to revisit the issue at a later date if necessary.

VDARE proposed that it identify contractors who are related parties as defined by Article 715 of

the New York Not-for-Profit Corporation Law who earn more than $10,000 annually; and would

"consider identifying other employees or contractors involved in specific transactions with which

your office might be concerned." Email of the undersigned to the OAG, dated October 20, 2022,

attached hereto as Exhibit E ("To the extent you continue to have a problem with this protocol

for this subset of vendors, we can revisit the issue as your work continues and see if we can

resolve it later. I would like to make as robust a production as I can now and deal with this issue

later, to the extent that my way forward for now proves not to be a permanent solution.").

      12.    The OAG rejected VDARE's proposed middle ground. The OAG invited

VDARE to provide objections in writing to specific requests in the OAG's subpoena, giving the

impression that the OAG was keeping an open mind about the issue. VDARE provided objections to

specific requests by letter dated October 31, 2022, requesting an opportunity to meet and confer

toward resolving the issue. *See* Letter of the undersigned to the OAG, dated Oct. 31, 2022, attached

Case 1:22-cv-01337-BJS-CFH Document 25-1 Filed 02/22/23 Page 7 of 13

hereto as Exhibit D).  Even then, VDARE did not take a blanket approach to its continuing

objections, but disclosed the identities of all of its employees as part of its continuing production, the

identities of contractors who appeared to be related parties within the meaning of Article 715 of the

New York Not for Profit Corporation Law (without regard to amount earned), as well as others

whose associations with VDARE were apparently already publicly known.

13.     In the undersigned's letter to the OAG dated October 31, 2022 (Exhibit

D), VDARE expressed concern to the OAG about its apparent disclosure of constitutionally

protected information in another investigation.  On October 11, 2022, members of the United States

Congress wrote to United States Attorney General Merrick Garland, requesting investigation of

apparently undue disclosures provided to or otherwise obtained by the OAG.  On August, 26, 2022,

Politico had published confidential information about donors to another conservative non-for-profit

in the OAG's cross hairs which was reportedly leaked by the OAG.[6]

14.     Despite VDARE's completion of its review of records maintained

electronically and in hard copy and attendant production of over 6,000 pages of documents,

VDARE's continuing analysis of 40 gigabytes of emails, and its request to meet and confer on

disclosure of the identifies of contractors, the OAG notified VDARE's counsel on December 2,

2022, that it required VDARE to complete production by December 12, 2022.  Exhibit G.  On

December 12, 2022, as noted above, VDARE commenced a lawsuit in the Northern District of New

York against the OAG.  Exhibit A.

---

[6] *See* https://www.wsj.com/articles/all-about-nikki-haleys-donors-new-york-attorney-general-letitia-james-stand-for-america.

7

Case 1:22-cv-01857-JLS-JJM Document 23-13 filed 02/22/23 Page 8 of 13

*(B)  The OAG rejected VDARE's offer to immediately address the OAG's
purported concern about VDARE's purchase and use of a property*

15.    The purported impetus for the OAG's investigation (as disclosed by the OAG
to VDARE's counsel) is VDARE's purchase in 2020 of a castle-styled property in Berkeley Springs,
West Virginia, to host conferences in order to eliminate the risk that VDARE's conferences could
only be conducted at the whim of independent venue owners.  *See* Rachel Olding, *"Tourist Town
Desperate to Reopen Faces Another Battle"* Daily Beast (May 29, 2020)[7] (noting that VDARE's
founder, Peter Brimelow, "said they plan to use the castle for meetings and as a studio - - handy
considering at least three hotels have canceled conference contracts on VDARE after learning of
the group's views.").

16.    After VDARE purchased the castle, a cottage on the castle's grounds in
which the Brimelows intended to live was not yet habitable so the Brimelows (Peter and Lydia
Brimelow and their three young children) moved from their home in Connecticut and lived in the
castle for a period of months until the cottage was ready for them.  Among documents produced to
the OAG as part of the 6,000 pages (and separately in undersigned's email to the OAG) is a lease
agreement establishing that the Brimelows paid rent to live in the cottage beginning in April 2021.
*See* Lease Agreement, attached hereto as Exhibit H.  Upon locating and producing the Brimelows'
lease agreement for the cottage to the OAG, the undersigned proposed a meeting with the OAG to
begin addressing the OAG's professed concerns about VDARE's purchase of the castle.  The OAG
rejected that invitation, expressly deferring even an initial discussion about the castle until after
VDARE produced all documents deemed by the OAG to be responsive to its subpoena.

---

[7]  Available at *https://www.thedailybeast.com/berkeley-springs-west-virginia-freaks-out-
after-vdare-founder-buys-its-castle.*

8

Case 1:22-cv-01837-JLS-JJM Document 23-13 Filed 02/22/23 Page 97 of 13

*(C) Additional concerns expressed by the OAG are*
*pretextual and unfairly insinuate malfeasance*

17.     The OAG has authority to inquire and request documents from charities registered in New York State, but it may not seek to supercede a previously-filed federal case with unfair insinuations of malfeasance nor by demanding constitutionally-protected information far afield from legitimate oversight.

18.     A few examples are illustrative.  The OAG notes in support of its motion that Lydia Brimelow is identified on filings as VDARE's "Secretary, Treasurer and Publisher," but not identified as Peter Brimelow's wife on VDARE's Internal Revenue Service Form 990.  AAG Fuchs Affirmation [NYSCEF Doc. 4] at 19.  Peter and Lydia Brimelow, however, are publicly known to be married and, on information and belief, file their income tax returns jointly as husband and wife with the same Internal Revenue Service with which VDARE files Form 990.  The OAG asserts no connection between this purported misstep in completing an IRS form and the identities of VDARE's contractors.

19.     Similarly, the OAG insinuates that Peter Brimelow's compensation reported in from VDARE's 2019 IRS Form 990 was atypically high [AAG Fuchs Affirmation at 9], but conveniently omits that VDARE's total contributions for 2019 were $4,259,309 [VDARE's Form CHAR500 for 2019, attached hereto as Exhibit I][8], a far substantially greater amount than in other years.  Likewise, the OAG insinuates malfeasance from an auction of furnishings from the castle [AAG Fuchs Affirmation at 8], but, on information and belief, the entirety of *de minimis* proceeds from the auction went for VDARE's benefit.  None of this innuendo from the OAG

---

[8]  Available at *https://www.charitiesnys.com/RegistrySearch/getcontent?guid=*
*{30D3F877-0000-CB55-8F8C-8ED446FA3F08}&orgid=41-37-83&title=Annual%20Filing%20*
*for%20Charitable%20Organizations&project=Charities*

AA0410
9 of 13

Case 1:23-cv-01537-PGG-OTW Document 25-1 Filed 02/22/23 Page 210 of 13

justifies its demand for the identities of contractors and, instead, demonstrates that the OAG's

investigation is pretextual.

### (D) The OAG's complaints about inconsistencies in redactions ignore that the OAG encouraged a rolling production

20. In the OAG's letter of December 2, 2022, demanding that VDARE complete

its production and identify all contractors without redactions by December 12, 2022, the OAG

complained that VDARE had inconsistently applied redactions, which had not been accompanied by

a log identifying the bases for the redactions. But the OAG had agreed to "a rolling production"

[Email from the OAG to the undersigned, dated August 23, 2022, attached hereto as Exhibit J],

which permitted VDARE to act in good faith and reassess the need for redactions as its review

continued. *See, e.g.*, Letter from the undersigned to the OAG, dated September 19, 2022, attached

hereto as Exhibit K ("As to redactions in the documents produced today, I have not had ample time

fully to evaluate bases underlying the reactions . . . I have opted instead to produce an installment of

documents today and will circle back on the redactions once my evaluations are complete."); Exhibit

E ("These issues . . . are not present for every vendor, so I am trying to identify precisely which

vendors present a problem.").

### (v) The OAG faulted VDARE for attempting to meet its own ambitious deadlines despite knowing that VDARE is a mom-and-pop operation represented by a solo practitioner

21. As of December 2, 2022, when the OAG declined VDARE's proposal that

the parties meet and confer in response to VDARE's letter of October 31, 2022, and, instead,

demanded that production be completed within ten days, all that remained was resolution of

VDARE's objection to disclosure of contractors' identities and production of emails responsive to

the subpoena (and attendant redactions of contractors' identities). Though the OAG's motion infers

undue delay in VDARE's production, the OAG is fully aware that VDARE "is literally a mom-an-

10

pop operation, with an actual mom who home schools three children, represented by a solo
practitioner with no staff," who reviewed all VDARE records himself to determine responsiveness.
Email from the undersigned to the OAG, dated September 30, 2022, attached hereto as Exhibit L.
VDARE's legitimate efforts to protect its contractors and business interests by redacting identities of
contractors was and remains labor-intensive and time-consuming, as VDARE reported to the OAG.
Letter from the undersigned to the OAG, dated Oct. 31, 2022, attached hereto as Exhibit D ("The
identities of VDARE's donors, content providers, and vendors who provide services to VDARE
in its locality or are otherwise indispensable to its work are inextricably intertwined with some of
its financial records. For example, some of these entities are identified in bank statements in lists
of monthly transactions and associated copies of checks. The work to provide such financial
records with redactions is labor-intensive and time-consuming and is ongoing."). Meanwhile, as
to the OAG's request for a log of redactions and their bases, the extent of redactions of identities
of contractors was significant, favoring one log of redactions after production was complete.
Letter from the undersigned to the OAG, dated Nov. 21, 2022, attached hereto as Exhibit M.

22.    The undersigned set ambitious deadlines in a good faith effort to show
diligence and compliance and, as of December 2, 2022, had completed review and produced 6,000
pages of VDARE's records maintained electronically and in hard copy. Completion of review of
emails was in sight when the OAG, on December 2, 2022, unreasonably demanded that VDARE
complete all steps necessary for compliance within ten days, apparently requiring that it either
disclose the identities of all contractors without redactions or provide a full list of all such redactions
from the 6,000 pages and responsive emails, and thereafter moved to compel compliance without
meeting and conferring as requested by the undersigned on October 31, 2022, as required by the
Court's local rules - - notwithstanding VDARE's previously filed Federal Complaint.

<center>11</center>

Case 1:22-cv-01337-DLC Document 54-1 Filed 02/22/23 Page 247 of 13

*II*     *Issues Raised by the OAG in this Special Proceeding Duplicate and Overlap*
        *Issues Raised by VDARE's First-filed Federal Complaint Against the OAG*

23.     VDARE sought relief in federal court only after the OAG's approach to its subpoena threatened VDARE's ability to conduct business and revealed that the OAG is using its subpoena power as a pretext.  VDARE's Federal Complaint is based on many of the same underlying issues raised by the OAG's subsequent special proceeding in this Court.

24.     Thus, VDARE's Federal Complaint (Exhibit A), among other things that duplicate and overlap with this special proceeding, (a) alleges that the OAG unreasonably demands disclosure of identities of contractors indispensable to VDARE's work without any apparent legitimate investigatory purpose; (b) alleges settled principles of constitutional law cited by VDARE to the OAG in redacting identities of contractors; (c) alleges the OAG's demand on December 2, 2022, that VDARE complete its production without redactions by December 12, 2022, and without the meet-and-confer proposed by VDARE's counsel on October 31, 2022; and (d) alleges VDARE's concern about the OAG's leaking of confidential information in another matter.

25.     As noted above, undersigned counsel consented to the OAG's request for an extension of time for the OAG to respond to VDARE's Federal Complaint, which request did not disclose that the OAG had initiated this special proceeding.  As of the date of this filing, the OAG's response to VDARE's federal complaint is due by January 18, 2023.

12

Case 1:23-cv-01337-JSR Document 23-1 Filed 02/22/23 Page 213 of 13

26.     I affirm that the relief sought by VDARE in this application has not

previously been requested in this Court.

Dated: January 3, 2023

<div style="margin-left:40%">

*/s/ Andrew J. Frisch*
Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@andrewfrisch.com*

*Attorneys for Respondent*

</div>

13

**AA0414**

## Andrew Frisch

| | |
|---|---|
| **From:** | Fuchs, Yael <Yael.Fuchs@ag.ny.gov> |
| **Sent:** | Wednesday, December 21, 2022 10:35 AM |
| **To:** | Andrew Frisch; Suvari, Catherine |
| **Subject:** | RE: VDARE |

Andy,

Because of the holidays and a member of our team who has COVID, we would appreciate an extension until Jan 18 to respond to VDARE's complaint in the NDNY. Can you please confirm your consent? Feel free to call me if you have any questions.

Thank you, and happy holidays,
Yael

**Yael Fuchs | Assistant Attorney General**
Co-Chief, Enforcement Section, Charities Bureau
New York State Office of the Attorney General
28 Liberty Street, New York, NY 10005
Tel: (212) 416-8391 | yael.fuchs@ag.ny.gov

**From:** Andrew Frisch <afrisch@andrewfrisch.com>
**Sent:** Monday, December 12, 2022 4:24 PM
**To:** Fuchs, Yael <Yael.Fuchs@ag.ny.gov>; Suvari, Catherine <Catherine.Suvari@ag.ny.gov>
**Subject:** VDARE

**[EXTERNAL]**
Counsel,

Attached is a courtesy copy of a complaint filed today in United States District Court for the Northern District of New York. Please let me know when you can if the Attorney General will accept this email as service.

I will be providing a supplement to VDARE's production consisting of an audit report.

Best regards.

*Andrew J. Frisch*
*The Law Offices of Andrew J. Frisch, PLLC*
*40 Fulton Street, 17th Floor*
*New York, New York 10038*
*212-285-8000*
*646-304-0352 (fax)*
*afrisch@andrewfrisch.com*
*www.andrewfrisch.com*

**IMPORTANT NOTICE:** This e-mail, including any attachments, may be confidential, privileged or otherwise legally

1

**AA0415**

Case 1:22-cv-01837-JS-ARL Document 25-26 Filed 02/22/23 Page 2 of 2

protected. It is intended only for the addressee. If you received this e-mail in error or from someone who was not
authorized to send it to you, do not disseminate, copy or otherwise use this e-mail or its attachments. Please notify the
sender immediately by reply e-mail and delete the e-mail from your system.

2

**AA0416**

Case 1:22-cv-01337-ELS-GRJ-34 Document 25-36 Filed 02/22/2334 Page 1 of 2

The Law Offices of
ANDREW J. FRISCH, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
212-285-8000

September 26, 2022

*Via email (Yael.Fuchs@ag.ny.gov; Catherine.Suvari@ag.ny.gov)*

Yael Fuchs, Assistant Attorney General
Catherine Suvari, Assistant Attorney General
Office of the Attorney General
28 Liberty Street
New York, New York 10005

Re: Subpoena to VDare Foundation, Inc.

Dear Counsel:

On behalf of VDARE Foundation, Inc. ("VDARE"), attached are pages of board minutes that will be incorporated in a forthcoming formatted production. I also write to clarify our position on identifying contractors, vendors, and employees. VDARE is willing to identify contractors, vendors, and employees who are related parties as defined by the New York Not-for-Profit Corporation Law, as well as those listed in its Form 990s as among its top paid employees and vendors. We will consider identifying other employees or contractors involved in specific transactions with which your office might be concerned. A blanket request for all employees, vendors, and contractors, however, violates the First Amendment rights to anonymity and free association of these people and entities.

Most of the employees and contractors are writers and editors for the site. "[A]n author's decision to remain anonymous, like other decisions concerning omissions or additions to the contents of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 342 (1995). *See also Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (holding that the "exercise of editorial control and judgment" is protected by the First Amendment.) "The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism." *McIntyre*, 514 U.S. at, 341-42. VDARE is a controversial organization, risking

Case 1:22-cv-01337-EGS-GMH Document 28-36 Filed 02/22/2835 Page 297 of 2

social and professional consequences for those affiliated with it.  For example, just last year, a private school teacher was fired after he was outed as an anonymous VDARE writer.[1]

        The First Amendment right to anonymity extends beyond writing and editing to associational rights.  *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460, 462 (1958) (protecting the right of "advocacy of both public and private points of view, particularly controversial ones" and holding that an order requiring association to produce membership list interfered with First Amendment freedom of association).  The Appellate Division has held that these rights apply where lists of employees of controversial organizations are compelled. *Evergreen Ass'n, Inc. v. Schneiderman*, 153 A.D.3d 87, 100 (2d Dep't 2017) (applying strict scrutiny where anti-abortion advocacy group served with OAG investigatory subpoena alleged that subpoena compliance would "have a chilling effect on [the group's] associations with its employees and potential clients" as well as at least one hospital).  Other than information that could create such a chilling effect, the produced board minutes redact material covered by the attorney-client privilege, none of which is related to any related-party transaction or any other apparent subject of your inquiry.

        As I continue to review documents, I propose that we meet and confer to discuss the above and continue to seek to narrow any areas of dispute.  My schedule is completely open on October 3, 2022, so please let me know if that date is convenient.  I know that entry of replacement counsel into a matter can cause delay, and I appreciate your professional courtesies as my client and I endeavor to respond to your subpoena and attend to its requested formalities.

        Very truly yours,

        /s/ *Andrew J. Frisch*
        Andrew J. Frisch

Enclosures

---

[1] *See* Christopher Mathias, An Elementary School Teacher's Secret Life as a White Nationalist Writer, Huffpost.com (May 16, 2021) *https://www.huppost.com/entry/benjamin-welton-white-nationalist-elementary-school-teacher-writer_n_60ae5e89e4b0d45b753140fb*

The Law Offices of
**ANDREW J. FRISCH, PLLC**
40 Fulton Street, 17th Floor
New York, New York 10038
212-285-8000

October 31, 2022

*Via email (Yael.Fuchs@ag.ny.gov; Catherine.Suvari@ag.ny.gov)*

Yael Fuchs, Assistant Attorney General
Catherine Suvari, Assistant Attorney General
Office of the Attorney General
28 Liberty Street
New York, New York 10005

      *Re: Subpoena to VDare Foundation, Inc.*

Dear Counsel:

      On behalf of VDARE Foundation, Inc. ("VDARE"), I expect a vendor today to deliver to your office media containing documents in response to a subpoena issued by your office to VDARE, dated June 23, 2022, as modified by your office on July 27, 2022 (the "Subpoena"). Enclosed herewith is an associated Certification of Business Records with itemized responses.

A.    *VDARE's continuing objections to the Subpoena*

      VDARE objects generally to the Subpoena as overbroad, unduly onerous, and insufficiently tailored to serve any compelling investigative purpose. To the extent that the Subpoena seeks disclosure of the identity of VDARE donors, content providers, or vendors who provide VDARE with services in its locality or are otherwise indispensable to its work, VDARE objects specifically to Requests 4, 5, 8, 16, 17, 21, 23, and 39. I incorporate by reference my letter to you dated September 26, 2022, as if fully set forth herein. *See Evergreen v. Schneiderman*, 153 A.D.3d 87 (2d Dep't 2017) (requiring that government action be narrowly tailored to serve a compelling state interest without impairing fundamental liberties). VDARE is concerned that disclosures risk further impairment to freedoms of speech and association of itself and others. The castle was acquired precisely to address cancellations and hostility from venues

**AA0419**

Case 1:22-cv-01337-JGLS-RFH-34 Document 26-46 Filed 02/22/2837 Page 7 of 3

because of adverse media attention.  Threats to the anonymity of certain vendors, for example, risks impairing associations and jeopardizing relationships unrelated to your investigation's purported purpose.[1]  I propose that we meet and confer on this issue to see if we can reach agreement.

The identities of VDARE's donors, content providers, and vendors who provide services to VDARE in its locality or are otherwise indispensable to its work are inextricably intertwined with some of its financial records.  For example, some of these entities are identified in bank statements in lists of monthly transactions and associated copies of checks.  The work to provide such financial records with redactions is labor-intensive and time-consuming and is ongoing.  Our current expectation is that we can complete that work no later than the estimated time necessary to complete review of electronically stored information as discussed below.  I will be in the best position to identify the bases for all redactions in VDARE's discovery when it is complete.

B.    *The confidentiality of VDARE's information must be maintained*

By letter dated September 19, 2022, VDARE requested, pursuant to New York Public Officers Law Sections 87(2)(d) and 89(5)(a), and for reasons of business confidentiality, that materials provided pursuant to the Subpoena be considered confidential and be maintained in confidence by you and your Office and not be disclosed publicly whether in response to a request under Article 6 of the New York Public Officers Law or otherwise.  VDARE also requested that you advise undersigned counsel if counsel's communications with your Office or documents provided pursuant to the Subpoena are the subject of such a request before making any disclosure.  I reiterate that request here and am producing all records responsive to the Subpoena expressly designated as "Confidential."   VDARE's concerns about confidentiality are heightened by a letter dated October 11, 2022, sent by members of Congress to Attorney General Merrick Garland requesting investigation of apparently undue disclosure of confidential information provided to or otherwise obtained by your Office in another matter.

C.    *VDARE's email accounts*

VDARE maintains email accounts as identified in Exhibit A hereto.  The total volume of material is about 40 gigabytes.  In addition, more documents potentially responsive to the Subpoena arrived for counsel's review last week and others are *en route*.  My best estimate is

---

[1]  *See* Rachel Olding, *"Tourist Town Desperate to Reopen Faces Another Battle,"* Daily Beast (May 29, 2020), *https://www.thedailybeast.com/berkeley-springs-west-virginia-freaks-out-after-vdare-founder-buys-its-castle* (noting that Peter Brimelow "said they plan to use the castle for meetings and as a studio - - handy considering at least three hotels have canceled conference contracts on VDARE after learning of the group's views.").

Case 1:22-cv-01387-JGK-GH Document 25-36 Filed 02/22/23 Page 97 of 3

that I can review the emails and these additional documents and make any additional production on or before November 21, 2022, and can do so on a rolling basis as is feasible.

Very truly yours,

/s/ *Andrew J. Frisch*
Andrew J. Frisch

Attachment

**AA0421**

## Andrew Frisch

| | |
|---|---|
| **From:** | Andrew Frisch |
| **Sent:** | Thursday, October 20, 2022 5:49 AM |
| **To:** | Yael Fuchs; Catherine Suvari |
| **Subject:** | VDARE |
| **Attachments:** | Scan2022-10-19_045452.pdf |

Counsel,

I write to provide a status of where I am and also to propose a solution for one issue at least for now.
The lion's share of documents have been reviewed and are at my vendor for processing/formatting. I expect the remaining documents to be at my vendor either tomorrow when I return from my current work trip or Monday at the latest. I believe I am on track to make a substantially complete production by October 31. I will have a better sense when I get home where things stand for October 24. I have been working on ESI and bases for redactions, so rest assured those things are also my focus and I will report back.

On the issue of vendors, there are some where producing their names is a substantial problem: either they fear retribution because of the political viewpoints of the client and/or the client fears losing the services of vendors. These issues, however, are not present for every vendor, so I am trying to identify precisely which vendors present a problem in this regard. What I propose for now is that, with regard to vendors with which there are these concerns after my continuing review, for those that are paid in excess of an estimated $10,000 per year, to certify that they are not related entities, identify the service they provide and estimated annual payments. To the extent you continue to have a problem with this protocol for this subset of vendors, we can revisit the issue as your work continues and see if we can resolve it later. I would like to make as robust a production as I can now and deal with this issue later, to the extent that my way forward for now proves not to be a permanent solution.

One of the reasons I make this suggestion is that, as I become more familiar with the landscape, I become more convinced that you will conclude after review that there is no issue with the client of any real and significant concern. With that in mind, I attach a document that I mentioned to you previously as a preview of and which will be part of the production.

Again, I appreciate your patience and professional courtesies as I try to make up for lost time. I will be out of pocket today on another matter, scheduled to return to New York (actually Newark) on a flight late tonight.

Best regards,

**AA0422**

Case 1:22-cv-01837-RJS-OTW Document 25-6 Filed 02/22/23 Page 1 of 1

## Andrew Frisch

| | |
|---|---|
| **From:** | Andrew Frisch |
| **Sent:** | Saturday, October 15, 2022 9:06 AM |
| **To:** | Fuchs, Yael |
| **Cc:** | Suvari, Catherine |
| **Subject:** | RE: VDARE |

Yael,

Please forgive the Saturday email; I don't know whether or not you observe.

Please take a look at your email to me of October 6, 2022. It was a week since we spoke, not several weeks. Please review your notes of that conference and see if you can see clear to answer my questions. I am not seeing the ruling in the NRA case on Pacer about vendors to which you made reference. And please let me know for what purpose you seek information about vendors as opposed to, for example, relying on the vendors identified in the forms 990 or of which the OAG is otherwise aware. I am just trying to narrow issues and move things along.

Many thanks,

**From:** Fuchs, Yael <Yael.Fuchs@ag.ny.gov>
**Sent:** Friday, October 14, 2022 4:41 PM
**To:** Andrew Frisch <afrisch@andrewfrisch.com>
**Cc:** Suvari, Catherine <Catherine.Suvari@ag.ny.gov>
**Subject:** Re: VDARE

Andrew, it's been several weeks since we spoke. I'm in transit so don't have notes of our last call. My recollection is that you represented that you were working on production. Can you please explain what you are objecting to and on what grounds? I will then do my best to address it.

Get Outlook for iOS

---

**From:** Andrew Frisch <afrisch@andrewfrisch.com>
**Sent:** Friday, October 14, 2022 12:54:46 PM
**To:** Fuchs, Yael <Yael.Fuchs@ag.ny.gov>
**Cc:** Suvari, Catherine <Catherine.Suvari@ag.ny.gov>
**Subject:** VDARE

**[EXTERNAL]**
Yael,

Can you please point me to the order or motion practice in the NRA lawsuit to which you made reference in our recent call about vendors? I have looked through the case on Pacer and am not seeing it. Also, can you tell me for what purpose you seek this information as opposed, for example, to relying on vendors identified in the forms 990 or of which the OAG is otherwise aware. I am working on this issue now, and your answers to these question would help me formulate my position.

Regards,

**AA0423**



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
  ATTORNEY GENERAL

DIVISION OF SOCIAL JUSTICE
CHARITIES BUREAU

212.416.6172
Catherine.Suvari@ag.ny.gov

December 2, 2022

**Via Email To:** **afrisch@andrewfrisch.com**

Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038

Re: *Subpoena to VDARE Foundation dated June 23, 2022*

Andy:

I write to address significant deficiencies in VDARE's production response to the above-referenced subpoena. As explained below, we have serious concerns regarding: (1) ongoing delay and your repeated failure to abide by deadlines that you yourself proposed; (2) VDARE's failure to produce certain categories of documents based on unsubstantiated objections; and (3) redactions in the production for which you have not provided any legal justification and which appear to be applied haphazardly. VDARE is also delinquent in its required annual filings with this office: annual submissions for both 2020 and 2021, including the audited financials that you acknowledged in your November 21, 2022 cover letter, are all overdue.

Pursuant to Rule 4.4(b) of the Rules of Professional Conduct, we are also notifying you that you have produced material in your November 21 delivery that may be protected by an attorney-client privilege. *See* VF 4777-4780.

Continuing Production Delay

You have noted throughout your reports this Fall that you were first retained for this matter in August 2022 and that we agreed to extend the subpoena's stated deadline in response to your requests for more time to collect and review material. You now appear to be setting — and moving — your own chosen deadlines for VDARE's subpoena compliance: on October 25, you even remarked by email that our reference to previously-agreed deadlines was "not productive" and "divert[ed]" you from "subpoena-related tasks" on which you were working.

We are now more than three months into your representation of VDARE and more than five months since the date VDARE was served with the subpoena. In the past eight weeks alone, we have had the following assurances from you, none of which proved true: (i) that you would substantially complete hard copy production by October 31 (Oct. 6); (ii) that you would provide, on or before October 31, a privilege/ redaction log that identified each marked redaction in the production and the legal basis for those redactions (Oct. 6); (iii) that the "lion's share of documents" had been reviewed and sent to the vendor for a substantially complete production by October 31 (Oct. 20); (iv) that "95% or so" of VDARE's hard copy documents were in process at the vendor and "well underway aiming for substantial compliance on October 31 or before" (Oct. 21); (v) that

Case 1:21-cv-01387-JLS-HKS Document 28-2 Filed 02/29/24 Page 2 of 4

40 gigabytes of potentially responsive email records, as well as "more documents potentially responsive to the subpoena" could be reviewed and produced on or before November 21, including on a rolling basis (Oct. 31). In the last ten days, you have announced instead that email review is suddenly taking "longer than anticipated" and that you will "aim[ ] to complete that part of the response to the subpoena by December 12, 2022."

As of the date of this letter, you have produced a total of roughly 6,000 pages of Bates-stamped material, the first section of which you have produced three separate times and all of which bears extensive unlabeled redactions to which we have repeatedly objected. The material produced to date does not appear to include any significant volume of email from the VDARE accounts that you first identified to us on October 31 and does not identify which of the subpoena's requests each document responds to. Please complete the production of both hard copy and ESI documents, in the form called for by the subpoena, by **December 12, 2022**.

<u>VDARE's Unsubstantiated Objections to Certain Subpoena Requests</u>

In July 2022, we took steps to clarify several of the subpoena's requests in response to VDARE's stated privacy concern for donors and volunteers, but we have consistently objected to a generalized assertion of sensitivity and have emphasized that we do not agree to the withholding of documents and information on that basis.

Your production cover letter on October 31 stated that "VDARE is concerned that disclosures risk further impairment to freedoms of speech and association of itself and others." We note that the requests you identified in your October 31 letter as intrusive on fundamental liberties included the request for VDARE Board meeting minutes (Req. No. 5), the request for *outgoing* solicitation materials sent on VDARE's behalf (Req. No. 8), the request for documents identifying the individual(s) who control VDARE financial accounts (Req. No. 23), and the request for documents concerning physical renovation of VDARE's West Virginia castle property (Req. No. 39). You have not articulated how — and we do not agree that — these requests implicate any constitutional speech or associational concern for VDARE donors or content providers. To the extent any of these documents have been withheld from your productions to date, we demand complete delivery by December 12, 2022.

<u>VDARE's Failure to Provide a Privilege/Redaction Log</u>

We have asked several times that you provide a privilege/ redaction log to identify the legal basis on which VDARE is redacting or withholding particular material, and we asked specifically in our conference on October 6 that you provide such a log on or before October 31. Such a log is necessary for us to understand and evaluate VDARE's basis for redacting or withholding information. Your October 31 letter offered only the assurance that you expected to complete your redactions to responsive financial records by November 21 and that you would be in the best position to explain those redactions after you had completed them. On November 21, you stated without explanation that you would identify redactions in the production "once the project is complete." We still have not received a log.

We have explained in several exchanges with you that we will not agree in advance to special treatment for a subset of vendor information that you and/or VDARE independently identify as sensitive: VDARE must articulate particular categories of material covered by any individual request that it believes cannot be lawfully demanded and provide substantive explanation of how the disclosure being sought would operate to chill VDARE's protected associational or speech rights. We will meet and confer on this issue again only after production of a written privilege-redaction log to serve as the basis for meaningful review. Please produce such a log by **December 12, 2022**.

We also note that, in your letter of September 26, 2022, you asserted that subpoena requests for employee, vendor, and contract information violate First Amendment rights held by those

2

AA0425

entities because "[m]ost of [VDARE's] employees and contractors are writers and editors for the site." The documents that you have produced to date have been redacted far beyond the limits of any editorial content: you have redacted, among other things, (i) contact information for an architectural firm hired to review potential renovations at the Berkely Springs Castle property (VF 4427-4428; VF 4766-4767), (ii) the contact name, but not address, of a Switzerland-based firm hired to perform, according to its own invoice, "standard software development and server administration," (VF 3980-3981), (iii) the name of VDARE's bookkeeper, which appears to be separately disclosed in your production on a publicly-filed IRS Form I-9 prepared to confirm Lydia Brimelow's eligibility as an employee of Happy Penguins LLC (ex. VF 4280, VF 4282); (iv) contact information contained in a public magazine subscription renewal form sent to Peter Brimelow (VF 4187) (also marked as Confidential); (v) bank statements to accounts held by entities *other* than VDARE, including Happy Penguins LLC and Peter and Lydia Brimelow, as individuals (VF 4346-4348, VF 4338-4343); and the contact information for an individual or company hired to perform "VDARE Admin" services (VF 4017, VF 4274). These redactions are accompanied by the unredacted disclosure of numerous other VDARE contractors, vendors, and employees identified in VDARE's records, so that your stated treatment of redaction appears inconsistent, to say the least, and raises serious concerns about the legal basis for any such redactions.

<u>VDARE's Failure to Provide Mandatory Filings</u>

As we have previously noted, VDARE is delinquent in its filing of its 2020 Char500 and schedules, including the IRS Form 990. That filing was due in November 2021. VDARE's filing for 2021 was due on November 29, 2022 and has not been received. Attached to this letter is a notice of delinquency from our Registration Section.

We have discussed each of the above issues with you on several occasions and have agreed to significant deadline extensions to accommodate your requests for additional time to review. We reserve all rights regarding our position on your client's non-compliance with the subpoena and will seek judicial intervention to obtain compliance if the documents and information listed here are not produced by December 12, 2022.

Sincerely,

*/s/ Kate Suvari*

Kate Suvari
Assistant Attorney General

Encl.

cc:     Assistant Attorney General Yael Fuchs

3

**AA0426**



STATE OF NEW YORK

OFFICE OF THE ATTORNEY GENERAL

Letitia James                                              Division of Social Justice
Attorney General                                           Charities Bureau

                                                           December 2, 2022

Vdare Foundation
PO Box 211
Litchfield, CT 06759

**Re:     Vdare Foundation**
          **Delinquent Filing – Action Requested**
          **Registration Number: 41-37-83**

Dear Sir or Madam:

        This letter is to notify you that the above organization is delinquent in filing its annual financial
reports with the New York Attorney General's Charities Bureau. New York law requires registered
organizations to file annually Form CHAR500, IRS Form 990 and, if applicable, an independent certified
public accountant's audit or review report and pay an annual filing fee.

        In order to resolve the delinquency, the organization must submit its delinquent filings, with a
copy of this letter, to the Charities Bureau within **thirty (30) days** of the above date.  According to our
records, the following filings are delinquent:

- **Fiscal Year Ended 12/31/2020: CHAR500 Annual Filing – complete online.**
- **Fiscal Year Ended 12/31/2021: CHAR500 Annual Filing – complete online.**

        A portal for electronic filing is posted on our webpage www.charitiesnys.com – online filing is
required. Please be advised that Article 7-A of the Executive Law prohibits a delinquent organization
from raising funds in New York, including through government grants. In addition, failure to submit all
required filings may subject the organization to cancellation of its registration.

        If you believe that the organization has already submitted its required filings or if it is no longer
conducting activities or soliciting contributions in New York, please notify this office in writing upon
receipt of this letter and include a copy of this letter with your response.  Please mail your response to the
attention of Stephenie Brathwaite. If you have any questions concerning this request, please contact the
Charities Bureau by phone at (212) 416-8401 or by email to Stephenie.Brathwaite@ag.ny.gov.

                                              Sincerely,

                                              Hanna Rubin
                                              Director-Registration Section
                                              Charities Bureau

Case 1:22-cv-01837-LJS-OHH 3 Document 25-86 Filed 02/22/23 5 Page 1 of 5

# RESIDENTIAL LEASE AGREEMENT

THIS RESIDENTIAL LEASE AGREEMENT (hereinafter referred to as "Agreement") is entered into this _1st_ day of ___**April 2021**_____ by and between _**BBB LLC**_ of **304 Cacapon Road Berkeley Springs, West Virginia 25411** ("Landlord"), and **Lydia Brimelow**_ ("Tenant").

## WITNESSETH

WHEREAS, Landlord agrees to lease the premises identified as: **300 and 304 Cacapon Rd, Berkeley Springs, West Virginia 25411** ("the Premises") for use as a private residence; and

WHEREAS, Tenant agrees to lease the Premises in accordance with the terms and conditions set forth below.

NOW, THEREFORE, In consideration of the mutual covenants contained herein the parties agree to the following:

1.Term of Lease. Tenant agrees to rent the Premises for a period of 12 months commencing on the **1st day of April, 2021** and terminating on the **30th day of April, 2023** ("Term"), or sooner as provided herein.

2.Rent. Tenant agrees to pay annual rent of **$21,624**, in equal monthly installments of **$1800**, payable in advance on the fifth day of each month for that month's rental. The initial rental payment of **$800**, due and payable upon the signing of this Agreement, shall represent the rent for the first month. All rental payments shall be made to Landlord at the address specified above or at such other place as Landlord may designate from time to time.

3.Late Rental Payments and Returned Checks. If Landlord does not receive a monthly rental payment by the 5th day of the month, Tenant agrees to pay a late charge of **$50**, plus **$10** per day for each day thereafter that the rent payment is not received by the Landlord.

3.1.If a monthly rental payment received after the 9th day of the month does not include all applicable late fees and/or "additional rents" as defined herein, the outstanding monthly rental payment will continue to be considered "unpaid".

3.2.Payments received by Landlord will be applied first towards late fees and/or other additional charges, then towards outstanding rent.

3.3.If any check given by Tenant to Landlord for the payment of rent or for any other sum due under this Agreement is returned for insufficient funds, a "stop payment" order, or any other reason, Tenant shall pay Landlord a returned check charge of **$100** and Landlord shall have the right to demand that all future payment obligations be made in cash or by money order.

4.Security Deposit. Upon the signing of this Agreement, Tenant shall deposit **$1000** with Landlord assecurity that Tenant will comply with all of the terms and conditions of this Agreement. THE SECURITY DEPOSIT MAY NOT BE USED TO PAY RENT UNDER ANY CIRCUMSTANCES. Landlord's obligation to release Tenant's security deposit is subject to applicable provisions of law and Tenant's full compliance with the terms and conditions of this Agreement, including but not limited to the following:

4.1.Performance of Tenant's obligations through the full term of the Agreement;

4.2.Confirmation that Tenant has not damaged the Premises, buildings, or grounds;

4.3.Confirmation that the entire dwelling, appliances, closets, and cupboards are clean and free from insects, all debris and rubbish have been removed from the property, carpets are vacuumed and shampooed and left clean and odorless;

4.4.Payment of all unpaid charges including late charges, visitor charges, pet charges, delinquent rents, etc.;

4.5. Return of all keys; and

**AA0428**

Case 1:22-cv-01837-RJS-OTW Document 25-86 Filed 02/22/236 Page 2 of 5

4.6.Landlord's receipt of Tenant's forwarding address.

5.Use of the Security Deposit. Landlord may use as much of the security deposit as necessary to pay for damages resulting from Tenant's occupancy and use of the Premise or other violations or breaches of the Agreement. If such events occur prior to the termination of the Term, Landlord may demand that Tenant replace the amount of the security deposit used by Landlord. If Landlord sells the Premises, Landlord may transfer the deposit to the new owner for Tenant's benefit. Landlord will notify Tenant of any sale and transfer of the deposit. Landlord will then be released of all liability to return the security deposit to Tenant.

6.Possession of the Premises. Any failure to take possession of the Premises shall not relieve Tenant's obligation to pay rent. If Landlord is unable to deliver possession of the Premises for any reason not within Landlord's control, this Agreement shall remain in full force and effect and Landlord shall not be liable for any resulting damages. Tenant shall not be liable for any rental payment until possession of the Premises is delivered. If Landlord is unable to deliver possession within thirty (30) calendar days after the commencement date identified herein, Tenant may terminate this Agreement by giving written notice to Landlord and shall receive a refund of all rent and security deposits paid.

7.Use of Property. Tenant shall use the Premises exclusively as a private residence with no more than 7 ("Household Members"). Occupancy by guests for more than ten days in any six-month period is prohibited and shall constitute a breach of this Agreement without Landlord's advanced written consent. Tenant shall make no other use of the Premises without Landlord's prior written approval.

8.Alterations by Tenant. Tenant shall not make any alterations, additions, or modifications to the Premises without first obtaining Landlord's express written consent. Any alterations, additions, and /or improvements made to the Premises shall become Landlord's property.

9.No Transfer, Assignment or Subletting. Tenant shall not transfer, assign, or attempt to sublet this Agreement, or any part thereof. Any attempt to assign, transfer, or sublet shall be VOID and, at the election of Landlord, be an irremediable breach of this Agreement and cause for immediate termination.

10.Condition of the Premises. Tenant acknowledges that he or she has examined the entire interior and exterior of the Premises, including plumbing, heating and electrical appliances, smoke detector(s), fixtures, carpets, drapes and paint, and has found them to be in good, safe and clean condition and repair. Tenant further acknowledges that the premises are leased without air conditioning other than one (1) window unit provided by Landlord. Tenant agrees to:

a.Properly use, operate and safeguard the Premises and all furniture and furnishings, appliances and fixtures within the Premises;

b.Maintain the Premises in clean and sanitary condition, and upon termination of the tenancy, to surrender the Premises to Landlord in the same condition as when Tenant first took occupancy, except for ordinary wear and tear,

c.Maintain the surrounding grounds in a clean and safe manner, keeping the grounds clear of rubbish and weeds, and trimming all grass as necessary to effect a neat and orderly appearance to the property,

d.Notify Landlord in writing upon discovery of any damages, defects or dangerous conditions in and about the Premises; and

e.Reimburse Landlord for the cost of any repairs to the Premises of damages caused by misuse or negligence of Tenant or his or her guests or invitees.

11. Premises are Leased Unfurnished. Tenant acknowledges that Premises are leased unfurnished and without appliances except heating device or devices, stove/oven, refrigerator, hot water heater, and one air conditioning window unit. Tenant may freely use any other furniture or appliances as may be present in the Premises. Tenant acknowledges that Landlord may remove, add to, or change any such furniture and appliances at any time at Landlord's sole option.

Case 1:22-cv-01837-RJS-OTW Document 25-36 Filed 02/22/23 Page 3 of 5

12.Damage to Personal Property. Landlord shall not be responsible for any loss of or damage to property of Tenant or of others placed, located, or moved into the Premises. Tenant hereby agrees to make no claim for any such damages or loss against Landlord. Tenant shall purchase renter's insurance on all personal property if such coverage is desired.

13.Compliance with Laws. Tenant shall comply with all statutes, ordinances, rules, orders, regulations and requirements of all municipal, state and federal authorities now in force, or which may hereafter be in force, pertaining to the Premises, or Tenant's use of the Premises.

14.Destruction of Premises. Subject to the exception below, if the Premises are damaged or destroyed as to render them uninhabitable, either Landlord or Tenant shall have the right to terminate this Agreement as of the date on which such damage occurs. Written notice of the intention to terminate the Agreement shall be provided to the other party within fifteen days of when the damage occurred.

a.If any damage results from the conduct or negligence of Tenant or Tenant's guests or invitees, Landlord shall have the sole right to terminate this Agreement. Regardless of whether Landlord exercises its right to terminate the Agreement, Tenant shall remain responsible for all losses associated from the property damage, including, but not limited to, damages and repair costs, replacement value of furnishings, as well as loss of rental income.

15.Default by Tenant. Landlord's acceptance of this Agreement is conditioned upon Tenant's prompt rental payments and full compliance with the terms and conditions of this Agreement. Any failure by Tenant to comply with the terms of this Agreement shall constitute a breach of this Agreement. Upon Tenant's default or breach of this Agreement, Landlord, his agents or attorneys, shall have the right to enter the Premises, and remove all persons from the Premises forcibly or otherwise. Tenant expressly waives any and all notice required by law to terminate tenancy, and waives any and all legal proceedings to recover possession of the Premises. The failure to pay rent when due shall immediately constitute a material breach. Tenant shall remain obligated to pay the rent for the remainder of the Lease Term. Tenant shall also be obligated to pay all costs, including reasonable attorney fees, related to the breach and the collection of any monies owed the Landlord, along with the cost of re-entering, re-renting, cleaning, and repairing the Premises.

16.Abandonment by Tenant. If Tenant abandons or vacates the Premises before the end of the Lease Term,
or causes the rent to be in arrears, Landlord may, without any liability to Tenant, cancel this Agreement, enter the Premises, and relet the Premises with or without any furniture that may be therein. Any prior payments made by Tenant to Landlord shall be forfeited. If Landlord is required to remove Tenant's personal property from the Premises after Tenant vacates or abandons the Premises, Tenant hereby waives, releases, quitclaims, and discharges Landlord from any damage for loss of any article of personal property.

17.Utilities. All applications and connection for necessary utility services for the Premises shall be made in
the name of the Tenant only. Tenant shall be solely liable for all utility charges as they become due, including but not limited to, those for telephone, cable/satellite service (costs associated with services beyond "Basic"), and Internet service. It shall be a material breach of this Agreement for Tenant to allow any lien or encumbrance against the Premises without Landlord's prior written approval. Tenant specifically authorizes Landlord to deduct amounts of any unpaid bills from the security deposit upon termination of this Agreement. Landlord shall be responsible for real property taxes and assessments.

18.Hazardous Use. Tenant shall not bring or maintain anything within the Premises that could be dangerous, flammable, explosive, or increase the danger of fire or any other hazard.

19.No Indoor Smoking. Tenant will not smoke and will not permit guests or invitees to smoke tobacco or any other substance within any structure in the premises. Smoking on open porches and under overhangs is permitted.

**AA0430**

Case 1:22-cv-01837-RJS-OTW Document 25-86 Filed 02/22/23 Page 4 of 5

20.Renewal and Changes in Lease. The Landlord may offer the Tenant a new lease to take effect at the end of the Lease Term. The new lease agreement may include reasonable changes. Landlord shall notify Tenant of any proposed new lease provisions at least 60 days before the end of the present lease term. If no changes to the lease are made, Tenant may continue to rent the Premises on a month-to-month basis with the rest of the lease provisions remaining the same. In either case, Tenant shall notify Landlord at least 30 days before the end of the present lease term.

21.Pets. No dogs, cats, or other animals shall be permitted to reside in the Premises without Landlord's prior written consent and right to require an additional security deposit.

22.Landlord's Right of Entry and Inspection. Landlord, or any of his agents, shall have the right to enter the Premises to examine the property, make repairs, additions or alterations as deemed necessary for the safety, comfort, or preservation of the Premises.

a.Except in case of emergency, Landlord shall give Tenant reasonable notice of intent to enter. For these purposes, twenty-four (24) hour written notice shall be deemed reasonable.

b.To facilitate Landlord's right of access, Tenant shall not, without Landlord's prior written consent, add, alter or re-key any locks to the Premises. At all times Landlord shall be provided with a key or keys capable of unlocking all such locks and gaining entry. Tenant further agrees to notify Landlord in writing if Tenant installs any burglar alarm system, including instructions on how to disarm it in case of emergency entry.

c.Landlord shall have the right to exhibit the Premises, and to place notices "For Rent" of "For Sale" at any time within sixty (60) days before the expiration of this Agreement.

23.Individual Tenant Liability. Each tenant who signs this Agreement, regardless of possession or occupancy of the Premises, shall be jointly and severally liable for the full performance of each and every obligation of this Agreement, including, but not limited to, payment of all outstanding rental payments, and any and all costs to remedy damages to the Premises regardless of whether such damages were caused by a Tenant or invitee of a Tenant.

24.Care and Maintenance of Premises. Tenant accepts the Premises in the condition they are in at the beginning of this Lease Term. Tenant shall maintain the Premises in the same condition, order, and repair as found at the commencement of the Lease Term. Tenant shall immediately replace or repair any damage to water apparatus, electric lights, or any fixture, appliances or appurtenances within the Premises caused by any act or neglect of Tenant, or of any guests, visitors, or persons under the control of the Tenant.

25.Smoke Detectors. The Premises are equipped with smoke detection device(s). Tenant shall be responsible for reporting any problems, maintenance or repairs to Landlord. Replacement of batteries is the responsibility of Tenant.

26.Indemnification of Landlord. The parties expressly understand and agree that Landlord shall not be liable for any damage or injury to Tenant, any other person, or to any property, occurring on any part of the Premises. Tenants expressly release Landlord from any and all liability for any damages or injury to Tenants, or any other person, or to any property, occurring on the Premises unless such damage is the direct result of the negligence or unlawful act of Landlord or Landlord's agents. Tenant shall indemnify, defend, and hold harmless Landlord and his agents, from any and all claims for such injury and/or damage, no matter how caused.

27.Remedies. Landlord's rights and remedies provided herein shall be cumulative.

28.Insurance. Tenant assumes full responsibility for all personal property placed, stored, or located on or about the Premises. Landlord does not insure tenant's personal property. Landlord recommends that Tenants obtain insurance to protect against risk of loss from harm to Tenant's personal property. Landlord shall not be responsible for any harm to Tenant's property resulting from fire, theft, burglary, strikes, riots, orders or acts of public authorities, acts of nature or any other circumstance or event beyond Landlord's control.

29.Subordination. This Agreement is subordinate and inferior to any mortgage(s) encumbering the Premises whether currently existing or subsequently executed.

Case 1:22-cv-01837-RJS-OTW 3 Document 25-86 Filed 02/22/239 Page 5 of 5

30.Entire Agreement. This Agreement constitutes the entire understanding of the parties. This Agreement supersedes and terminates all prior representations, warranties, and agreements, written or oral, regarding the subject matter of this Agreement. Any modification to this Agreement must be in a writing signed by both parties.

31.Notice. Written notice mailed and delivered to the Premises shall constitute sufficient notice to Tenant and written notice mailed and delivered to the address provided above shall constitute sufficient notice to Landlord.

32.Severability. Should any provision of this Agreement be held invalid, illegal, or unenforceable in any respect by any court of competent jurisdiction, such holding shall not impair the validity, legality, or enforceability of the remaining provisions of this Agreement.

33.No Waiver. Failure or delay on the part of either party to exercise any right, remedy, power, or privilege hereunder shall not operate as a waiver. Any waiver must be in writing and signed by the party granting such waiver in order to be effective.

34.Governing Law. This Agreement, and the rights and duties of the parties hereunder, shall be construed in accordance with, and governed by, the substantive laws of the State of West Virginia.

IN WITNESS WHEREOF, the parties have executed this Residential Lease Agreement for the purposes herein expressed the day and year above written.

Landlord –                              Tenant –

| **CHAR500 Online**<br><br>For new annual filings, and amendments | **Annual Filing for Charitable Organizations**<br>New York State Office of the Attorney General<br>Charities Bureau - Registration Section<br>28 Liberty Street<br>New York, NY 10005<br>charitiesnys.com | **Open to Public Inspection** |
|---|---|---|

Filing Type:   ◉ New Filing   ○ Amendment        Filing Year: **2019**

## General Information

| | | | |
|---|---|---|---|
| Current Organization Name: | Vdare Foundation | Updated Name: | N/A |
| NY Registration Number: | 41-37-83 | Registration Category: | Dual |
| Organization Type: | Corporation | EIN: | 223691487 |
| Current Fiscal Year End: | 12/31 | Updated Fiscal Year End: | N/A |
| Organization Email: | lbrimelow@vdare.com | Organization's Phone: | 860-361-6231 |
| Tax Exempt Status: | 501(c)(3) | Website: | www.vdare.com |

**Organization Address**

| Mailing Address | Principal Address | NY State Address |
|---|---|---|
| PO Box 211<br>Litchfield<br>CT<br>06759<br>United States | 447 South Street<br>Litchfield<br>CT<br>06759<br>United States | NA |

**Primary Contact Information**

First Name:  Lydia        Last Name: Brimelow        Title: Secretary, Treasurer and Publisher

Phone:  860-631-6231        Email: lbrimelow@vdare.com

## Third Party Preparer Information

First Name:  Lakesha        Last Name: Lynn        Title: Registration Specialist

Firm Name:  Labyrinth, Inc.        Phone: 760-931-2620        Email: lakesha@labyrinthinc.com

**Third Party Address**

Street:  1959 Palomar Oaks Way

City:  Carlsbad        State: CA

Zip:  92011        Country: United States

**AA0433**

DocuSign Envelope ID: 1CBA55BU-UF5F-4BU5-Ab/E-A5F5WBURf352
Case 1:22-cv-01837-JSR-OTW 3 Document 25-96 Filed 02/22/231 Page 2 of 4

## Registration Category

1. Does the organization conduct activity in New York State (other than soliciting) ? This may include, but is not limited to, maintaining an office, having employees or running a program.
   ⦿ Yes  ○ No
2. Does the organization have assets in New York State?
   ⦿ Yes  ○ No
3. Is the organization incorporated or formed in New York State?
   ○ Yes  ○ No  N/A
4. Does the organization solicit or receive more than $25,000 annually in total contributions from New York State residents, foundations, corporations, or government agencies?
   ⦿ Yes  ○ No
5. Does the organization use a professional fundraiser or fundraising counsel?
   ○ Yes  ⦿ No

*Based on your responses to the above questions, this organization's registration category remains as*  DUAL

## Annual Exemptions

1. Were the total contributions from New York State, including residents, foundations, government agencies, etc. under $25,000 during the fiscal year?
   ⦿ Yes  ○ No
2. Did the organization use a professional fundraiser or fundraising counsel during the fiscal year?
   ○ Yes  ⦿ No
3. Were the organization's gross receipts under $25,000 and the market value of its assets under $25,000 during the fiscal year?
   ○ Yes  ⦿ No

*Based on your responses to annual exemption questions, this organization is required to file under* ___EPTL___ *during this fiscal year.*

## Financial Information

Which IRS form does your organization use?  IRS990

Organization's total revenue: $4,345,643.00

Organization's total contributions:  $4,259,309.00

Organization's total assets:  N/A

Organization's net assets:  $3,544,673.00

Organization's total revenue and contributions:  N/A

Organization's total liabilities:  N/A

Organization's total assets/ worth:  N/A

Organization's total income:  N/A

Is the organization required to file form Schedule B - Schedule of contributors - with the IRS?
⦿ Yes  ○ No

For the current filing year, does your organization plan to do any of the following with its Charities Bureau Registration?
☐ Closing  ☐ Withdrawing  ☐ Dissolving  ☒ None

Is this your final filing with New York State?  ○ Yes  ○ No  N/A

**AA0434**

## Filing Information

Did the organization use a professional fundraiser or fundraising counsel to solicit contributions in New York State?

○ Yes    ◉ No

| General Information | Description of Services | Description of Compensation |
|---|---|---|
| Name of Firm: N/A<br>Type: N/A    Registration ID: N/A<br>Contract Start: N/A    Contract End: N/A<br>Amount Paid: N/A    Phone: N/A<br>Mailing Address: N/A | N/A | N/A |
| Name of Firm: N/A<br>Type: N/A    Registration ID: N/A<br>Contract Start: N/A    Contract End: N/A<br>Amount Paid: N/A    Phone: N/A<br>Mailing Address: N/A | N/A | N/A |
| Name of Firm: N/A<br>Type: N/A    Registration ID: N/A<br>Contract Start: N/A    Contract End: N/A<br>Amount Paid: N/A    Phone: N/A<br>Mailing Address: N/A | N/A | N/A |

Did the organization receive government grants during this fiscal year?

○ Yes    ◉ No

| Government Grant Agency | Grant Amount |
|---|---|
| N/A | N/A |
| N/A | N/A |
| N/A | N/A |
| N/A | N/A |
| N/A | N/A |

**AA0435**

Case 1:22-cv-01837-FJS-CFH 3 Document 25-96 Filed 02/22/23 Page 4 of 4

## Documents

Attached organization's required documents:

- ☒ IRS document

- ☐ Certified Public Accountant's Audit Report

- ☐ Certified Public Accountant's Review Report

- ☐ Complete Certificate of Amendment or other document amending the name

- ☐ Schedule B

- ☒ Other  documents

## Signatures

*We certify under penalties of perjury that we reviewed this report, including all attachments, and to the best of our knowledge and belief, they are true, correct and complete in accordance with the laws of the State of New York applicable to this report.*

| Role | First Name | Last Name | Email |
|------|-----------|-----------|-------|
| Chairman | Peter | Brimelow | pbrimelow@vdare.com |
| Treasurer | Lydia | Brimelow | lbrimelow@vdare.com |

| | | | |
|---|---|---|---|
| Signature of Chairman | *Peter Brimelow*<br>DocuSigned by:<br>D018F9CE6DDD400... | Date: | 3/2/2021 |
| Signature of Treasurer | *Lydia*<br>DocuSigned by:<br>2730AFAD3DFF43E... | Date: | 3/2/2021 |

**AA0436**

Case 1:23-cv-01837-PGG-OTW Document 23-16 Filed 02/22/234 Page 1 of 1

From: Fuchs, Yael Yael.Fuchs@ag.ny.gov
Subject: VDARE
Date: Aug 23, 2022 at 2:18:30 PM
To: Andrew Frisch afrisch@andrewfrisch.com
Cc: Suvari, Catherine Catherine.Suvari@ag.ny.gov, Sawyer, Richard
Richard.Sawyer@ag.ny.gov, Frederick C. Kelly, Esq.
fckellylaw@protonmail.com

Andy,

It was nice meeting you by phone today.  As we discussed, you have been recently retained
to represent VDARE, along with Mr. Kelly.  In light of your representations regarding your
schedule and commitments in other matters, and as a courtesy to give you time to get up to
speed in this matter, the OAG agrees to push the meet and confer regarding the subpoena
served on VDARE dated June 23, 2022 from tomorrow Aug 24 to **Tuesday 9/6**, and to
adjourn the return date of the subpoena and the subpoenas served on Meta and FB
Payments to Friday **September 9**.  For the 9/6 meeting, I am available before 2.  Please let
me know a time that works.

As we discussed and as you seemed to be aware, there have been several adjournments of
the return date.  We are not inclined to further adjourn the return date, although we are open
to discussing a rolling production beginning on September 9, depending on the results of our
meet and confer and with a full reservation of rights.

Regards,
Yael

**Yael Fuchs | Assistant Attorney General**
Co-Chief, Enforcement Section, Charities Bureau
New York State Office of the Attorney General
28 Liberty Street, New York, NY 10005
Tel: (212) 416-8391 | yael.fuchs@ag.ny.gov

**IMPORTANT NOTICE:** This e-mail, including any attachments, may be
confidential, privileged or otherwise legally protected. It is intended only for the
addressee. If you received this e-mail in error or from someone who was not
authorized to send it to you, do not disseminate, copy or otherwise use this e-
mail or its attachments. Please notify the sender immediately by reply e-mail and
delete the e-mail from your system.

Case 1:22-cv-01837-JLS-HKS Document 23-116 Filed 02/23/25 Page 1 of 2

The Law Offices of
ANDREW J. FRISCH, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
212-285-8000

September 19, 2022

*Via email (Yael.Fuchs@ag.ny.gov; Catherine.Suvari@ag.ny.gov)*

Yael Fuchs, Assistant Attorney General
Catherine Suvari, Assistant Attorney General
Office of the Attorney General
28 Liberty Street
New York, New York 10005

 Re: *Subpoena to VDare Foundation, Inc.*

Dear Counsel:

 As I advised you via telephone on August 23, 2022, VDare Foundation, Inc. ("VDare") has engaged me as new counsel to respond to your Subpoena, dated June 24, 2022 (the "Subpoena"). VDare formally retained me within a week of our call. I appreciate your courtesies in accommodate my pre-existing commitments in other matters. As I continue to get up to speed and review documents, my hope is that we can meet and confer to address and attempt to resolve any areas of dispute.

 While I stand by VDare's objections to the Subpoena set forth by predecessor counsel that Subpoena requests are overbroad, vague, and require disclosures protected by the First Amendment, I do not stand by predecessor counsel's position that the Subpoena be withdrawn. With reliance on VDare's full reservation of all rights and any and all objections, I have today forwarded documents to a discovery vendor. My understanding is that the vendor cannot format the documents as specified in the Subpoena by today, but I expect that I can more readily arrange for production in another form, so please let me know your preference.

 I have been able to confer with the client meaningfully and begun to review documents only within the last ten or so days. My review of documents continues so that I can identify and produce any additional documents responsive to your Subpoena. Thus, I expect that the documents produced today will constitute the first installment of a rolling production. There is a significant volume of electronically-stored and hard copy documents that need to be reviewed so that any additional documents responsive to the Subpoena can be identified. I expect to be able to tell you by this week's end when another installment can be made. As to redactions in the documents produced today, I have not had ample time fully to evaluate bases underlying the redactions, including attorney-client privilege and First Amendment concerns. I

**AA0438**

Case 1:22-cv-01837-JLS-JJM Document 23-11 Filed 02/23/24 Page 2 of 2

have opted instead to produce an installment of documents today and will circle back on the redactions once my evaluations are complete. I expect that I can report back on this issue by next Monday.

In the course of marshaling documents responsive to the Subpoena, an additional objection has come to light. Some of the requested documents relate to the Berkeley Springs Castle Foundation ("BSCF"), a distinct entity apparently domiciled in West Virginia, which is not the named target of the Subpoena and has not itself been served. In the ordinary course, VDare has no blanket legal right or practical ability to access BSCF's records -- and no possession, custody, or control of BSCF's records. VDare has transacted with BSCF, and so some documents relating to BSCF reside within VDare. VDare is willing to endeavor to procure and produce other responsive documents from BSCF, provided that your Office acknowledges and agrees that such efforts by VDare: (I) prejudice none of VDare's rights and waive none of VDare's objections; (ii) will not be construed by your Office to negate the corporate distinction between VDare and BSCF; and (iii) similarly do not waive or prejudice any objection that BSCF might itself assert in the future if your Office purports to serve BSCF with process.

VDare hereby requests, pursuant to New York Public Officers Law Sections 87(2)(d) and 89(5)(a), and for reasons of business confidentiality, that this communication and the accompanying materials, which are all designated "Confidential," be maintained in confidence by you and your Office and not be disclosed publicly whether in response to a request under Article 6 of the New York Public Officers Law or otherwise. If this communication or the accompanying documents are the subject of such a request, please so advise me before making any such disclosure at 212-285-8000.

Very truly yours,

/s/ *Andrew J. Frisch*
Andrew J. Frisch

Enclosures
(under separate cover)

**AA0439**

## Andrew Frisch

| | |
|---|---|
| **From:** | Andrew Frisch |
| **Sent:** | Friday, September 30, 2022 11:04 AM |
| **To:** | Fuchs, Yael |
| **Cc:** | Suvari, Catherine |
| **Subject:** | VDARE |

Yael,

Please let me know if you are free to meet on Monday or otherwise next week (other than the holiday). Perhaps you would prefer a zoom or a call.

My discovery vendor, which I chose because of its proximity to your office, advises me that it expects to provide you with previously-provided documents in your requested format today (I will check in with them shortly). Meanwhile, I have in hand the Brimelows' residential lease agreement for the cottages at 300 and 304 Capacon Road, Berkeley Springs, West Virginia, and an office lease agreement and am awaiting two Federal Express deliveries of a total of about two boxes of documents from WV, one delivery which is to be delivered to my office today and another expected early next week. There may be as many as four or more additional boxes in storage in WV that may contain documents responsive to your subpoena which I hope to have located and delivered to me for review as soon as it can be done.

The good news, it seems to me, is that my client identified replacement counsel in my space who can address compliance with your subpoena and attempt to narrow any areas of dispute. I believe I have, at the very least, provided the indication of intent of compliance that you requested. VDARE, of course, is literally a mom-and-pop operation, with an actual mom who homeschools three little kids; its new lawyer (me) is a solo practitioner with no staff. We are doing our very best to make up for lost time, and I appreciate your continuing professionalism.

Best regards,

*Andrew J. Frisch*
*The Law Offices of Andrew J. Frisch, PLLC*
*40 Fulton Street, 17th Floor*
*New York, New York 10038*
*212-285-8000*
*646-304-0352 (fax)*
*afrisch@andrewfrisch.com*
*www.andrewfrisch.com*

The Law Offices of
ANDREW J. FRISCH, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
212-285-8000

November 21, 2022

*Via email (Yael.Fuchs@ag.ny.gov; Catherine.Suvari@ag.ny.gov)*

Yael Fuchs, Assistant Attorney General
Catherine Suvari, Assistant Attorney General
Office of the Attorney General
28 Liberty Street
New York, New York 10005

    *Re: Subpoena to VDare Foundation, Inc.*

Dear Counsel:

    On behalf of VDARE Foundation, Inc. ("VDARE"), I expect a vendor today to deliver to your office media containing supplemental documents in response to a subpoena issued by your office to VDARE, dated June 23, 2022, as modified by your office on July 27, 2022 (the "Subpoena"). I incorporate as if fully set forth herein my letter to you of October 31, 2022, containing VDARE's continuing objections.

    Response to your subpoena involving emails is taking longer than anticipated. I am continuing to work to complete that portion of my review. My time to continue the review this week is limited in part because of this week's holiday. If the review is not complete by November 28, 2022, I will be in a better position by then to estimate its completion. Also, an audit of VDARE was supposed to have been provided to VDARE by now, but it has not yet been received by VDARE, though I expect it shortly. I will identify redactions in the production once the project is complete.

    Very truly yours,

    */s/ Andrew J. Frisch*
    Andrew J. Frisch

Case 1:22-cv-01337-BJR-JMC   Document 54-16   Filed 02/22/23   Page 97 of 22

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------x

PEOPLE OF THE STATE OF NEW YORK, by                 Index No. _____
LETITIA JAMES, Attorney General of the
State of New York,

                                         Petitioner,

              -against-

VDARE FOUNDATION, INC.,

                                         Respondent.

------------------------------------------------------------------x

### Memorandum of Law in Support of the
### Attorney General's Special Proceeding and Application to
### Compel Respondent VDARE Foundation, Inc. to
### Comply with an Investigatory Subpoena

LETITIA JAMES
Attorney General of the
State of New York
28 Liberty Street
New York, NY 10005

James Sheehan
Yael Fuchs
Catherine Suvari
Assistant Attorneys General
 *of Counsel*

i

AA0442

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

PRELIMINARY STATEMENT ................................................................. 1

RELEVANT STATUTORY BACKGROUND ........................................... 3

BRIEF STATEMENT OF FACTS ............................................................. 5

    A.    The Attorney General Commenced an Investigation into VDARE's
        Operation and Subpoenaed VDARE Records in Relation to
        that Investigation. ............................................................................ 5

    B.    VDARE Insists that the OAG Must Withdraw the Subpoena and
        Fails to Produce. ............................................................................ 8

ARGUMENT .............................................................................................. 11

    A.    Standard of Review ........................................................................ 11

    B.    The Attorney General's Subpoena Seeks Documents and
        Information Directly Related to a Lawful Regulatory Review. ........... 13

    C.    The Subpoena Poses No Risk of Constitutional Harm. ...................... 14

CONCLUSION........................................................................................... 17

# TABLE OF AUTHORITIES

**CASES**                                                                          **Page(s)**

*Abrams* v. *New York Found. for the Homeless*,
    190 A.D.2d 578 (1st Dep't 1993) ...............................................................3, 15, 16

*Abrams* v. *Temple of the Lost Sheep, Inc.*,
    148 Misc. 2d 825 (Sup. Ct. N.Y. Cty. 1990) .............................................3, 5, 11

*Ams. for Prosperity Found.* v. *Bonta*,
    141 S. Ct. 2373 (2021) ...............................................................................17

*Anheuser-Busch, Inc.* v. *Abrams*,
    71 N.Y.2d 327 (1988) ................................................................................12

*Arista Recs., LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010) .....................................................................16

*Citizens United* v. *Schneiderman*,
    882 F.3d 374 (2d Cir. 2018)........................................................................3

*Condon* v. *Inter-Religious Found. for Community Org.*,
    51 A.D.3d 465 (1st Dep't 2008) ...............................................................15

*Giardina* v. *James*,
    185 A.D.3d 451 (1st Dep't 2020) .............................................................12

*Hogan* v. *Cuomo*,
    67 A.D.3d 1144 (3d Dep't 2009) ........................................................12, 14

*In re McDonell*,
    195 Misc. 2d 277 (Sup. Ct. N.Y. Cty. 2002) .............................................3

*Libre by Nexus, Inc.* v. *Underwood*,
    181 A.D.3d 488 (1st Dep't 2020) .............................................................12

*Matter of Cuomo* v. *Dreamland Amusements Inc.*,
    22 Misc. 3d 1107 (A), 2009 WL 81139 (Sup. Ct. N.Y. Cty. 2009)...........12

*Matter of Evergreen Assn., Inc.* v. *Schneiderman*,
    153 A.D.3d 87 (2d Dep't 2017) ...............................................................16

*Matter of La Belle Creole Int'l, S.A.* v. *Attorney-General of the State of N.Y.*,
    10 N.Y.2d 192, 196 (1961) .......................................................................12

*Mountain View Coach Lines, Inc.* v. *Storms*,
    102 A.D.2d 663 (2d Dep't 1984) ..............................................................16

iii

**AA0444**

Case 1:22-cv-01537-BJR Document 254-16 Filed 02/22/2362 Page 4 of 22

*New York* v. *Trump Org.*,
    No. 451685/2020, 2022 WL 489625 (Sup. Ct. N.Y. Cty. Feb. 17, 2022) ..............................12

*Roemer* v. *Cuomo*,
    67 A.D.3d 1169 (3rd Dep't 2009) ...........................................................................................12

*Ryan* v. *Lefkowitz*,
    18 N.Y.2d 977 (1966) ........................................................................................................11–12

*Schneiderman* v. *Tierney*,
    No. 451489/2014, 2015 WL 2378983 (Sup. Ct. N.Y. Cty. May 18, 2015).......................... 3-5

*Spitzer v. Lev*,
    No. 400989/2002, 2003 WL 21649444 (Sup. Ct. N.Y. Cty. June 5, 2003)..............................3

**STATE STATUTES**

CPLR
    § 2308.................................................................................................................................1, 11

Estates, Powers and Trusts Law
    Article 7-A .........................................................................................................................4, 14
    Article 8 ..................................................................................................................................13
    § 8-1.1 *et. seq.*.................................................................................................................. *passim*

Executive Law
    § 63(12)..............................................................................................................................4, 11
    § 172-d ...................................................................................................................................14
    § 175..................................................................................................................................4, 11

Not for Profit Corporation Law (N-PCL)
    § 112..................................................................................................................................4, 11
    §§ 202, 204, 205....................................................................................................................13
    §§ 509, 510, 511, 511-a .....................................................................................................6, 13
    § 515.......................................................................................................................................13
    § 519.......................................................................................................................................13
    § 520.......................................................................................................................................13
    §§ 715, 715-a .........................................................................................................................13

AA0445
4 of 22

Attorney General Letitia James, on behalf of the People of the State of New York,
submits this memorandum of law, along with the accompanying Order to Show Cause, Verified
Petition dated December 16, 2022, and Affirmation of Yael Fuchs in Support of Order to Show
Cause dated December 16, 2022 ("Fuchs Aff."), together with all exhibits thereto, in support of
this special proceeding and her application for a motion to compel and such other relief as the
Court deems just, proper, and appropriate under CPLR § 2308.

## PRELIMINARY STATEMENT

The VDARE Foundation, Inc., is a New York not-for-profit charitable corporation
registered with the Charities Bureau of the New York Attorney General's Office (OAG).  As a
New York charitable corporation, its governance must comply with the New York Not-for-Profit
Corporation Law; its management of charitable assets must comply with the New York Estates,
Powers and Trusts Law; and it must file timely, complete and accurate financial and other
disclosures pursuant to the Executive Law.  Based on a preliminary investigation, the OAG has
reason to believe VDARE has violated each of those requirements.

In 2020, public reporting indicated that VDARE purchased a medieval-style castle that its
Chairman and Director Peter Brimelow now uses as a personal residence with his wife (also a
director) and family.  Following a review of VDARE's public filings and other public material,
the Attorney General began investigating VDARE and its leadership concerning misuse of
charitable assets, unlawful related-party transactions, unauthorized transfer of charitable assets to
for-profit entities (apparently controlled by the Brimelows), and inaccurate filings with the
Charities Bureau.  Such conduct, if confirmed, would constitute serious violations of New York
law.

1

Case 1:22-cv-01337-FJS-CFH Document 54-16 Filed 02/22/2364 Page 6 of 22

As part of its investigation, the Attorney General served VDARE with a subpoena *duces tecum* dated June 23, 2022 (the "Subpoena"). Since then, VDARE has engaged in a series of delaying tactics and obfuscation. Despite several negotiated extensions, VDARE has produced only a fraction of the responsive documents in its possession. Of the documents produced, the majority are redacted beyond comprehension, and VDARE has refused to produce a redaction log justifying those redactions. VDARE has redacted its own board meeting minutes, bank statements, accounting ledgers, and even financial records for Brimelow's privately held company that has received tens of thousands of dollars in unexplained payments from VDARE. And VDARE has yet to review gigabytes of other documents, let alone prepare them for production. When confronted about this delay and given a promised date certain of December 12, 2022, to comply—nearly six months after the Subpoena's issuance—VDARE on that date opted instead to bring a frivolous lawsuit in federal court. *See VDARE Foundation, Inc. v. James*, No. 22-cv-1337 (FJS/CFH) (N.D.N.Y.).

The OAG now seeks judicial supervision to compel compliance with its lawfully issued subpoena. New York law vests the OAG with broad authority to oversee not-for-profit entities and their fiduciaries, and there is no question that VDARE is subject to the OAG's oversight. The delays and gaps in document production have prejudiced the OAG's ability to conduct a timely investigation of VDARE's compliance, and VDARE's extensive redactions have made it impossible for the OAG to confirm or deny its suspicions that VDARE and its fiduciaries have repeatedly violated the law. As set forth below, in light of the OAG's well-established authority to investigate unlawful activity by New York non-profit organizations and because VDARE's objections are unsupported by any showing of actual or likely harm, the OAG is entitled to an order compelling VDARE to comply with the Subpoena.

2

Case 1:23-cv-01337-BCM Document 34-1 Filed 07/22/23 Page 97 of 22

## RELEVANT STATUTORY BACKGROUND

Not-for-profit and charitable organizations do not have shareholders or owners to whom they are accountable:  the Attorney General is the primary law enforcement officer in the State vested with broad discretion to oversee such entities, to enforce compliance with the law, to protect the public trust, to ensure that donations and property held for charitable purposes are being properly used for their intended beneficiaries, and to prevent waste and fraud.  *See Abrams* v. *Found for the Homeless*, 190 A.D.2d 578 (1st Dep't 1993); *Schneiderman* v. *Tierney*, No. 451489/2014, 2015 WL 2378983, at *2 (Sup. Ct. N.Y. Cty. May 18, 2015); *Abrams* v. *Temple of the Lost Sheep, Inc.*, 148 Misc. 2d 825, 828–29 (Sup. Ct. N.Y. Cty. 1990); *Spitzer* v. *Lev*, No. 400989/2002, 2003 WL 21649444, at *3 (Sup. Ct. N.Y. Cty. June 5, 2003).  Under New York law, the Attorney General is responsible for ensuring that entities like VDARE are not misused and for protecting "the public interest in charitable property." *See Tierney*, 2015 WL 2378983, at *3.  She safeguards that public interest through investigations and enforcement actions to prevent, among other things, fraud and misconduct by not-for-profit charitable organizations. *See In re McDonell*, 195 Misc. 2d 277, 278-79 (Sup. Ct. N.Y. Cty. 2002) ("The State Legislature has given the Attorney General broad supervisory and oversight responsibilities over charitable assets and their fiduciaries, as enumerated in the Not-For-Profit Corporation Law, the EPTL and the Executive Law."); *Citizens United* v. *Schneiderman*, 882 F.3d 374, 379, 384 (2d Cir. 2018) (outlining New York's regulatory regime for non-profits and recognizing the "important government interests at stake" in OAG regulation of New York's non-profit sector, including "preventing fraud and self-dealing in charities").

The Attorney General's statutory oversight mandate is expansive: the Not-for-Profit Corporation Law assigns the OAG responsibility for the supervision of not-for-profit

AA0448

corporations and grants the OAG broad investigatory powers in furtherance of that authority.
*See Tierney*, 2015 WL 2378983, at *2–3. Under the Estates, Powers and Trusts Law, the
Attorney General "may investigate transactions and relationships of trustees for the purpose of
determining whether or not property held for charitable purposes has been and is being properly
administered" and may take such steps as the OAG deems "relevant to the inquiry." EPTL §
8-1.4(i). The Attorney General also has the authority to subpoena both the subject of an
investigation and any independent entities or persons that may have documents and information
relevant to her review. *See, e.g.*, EPTL § 8-1.4(i) ("The attorney general… [is] empowered to
subpoena any trustee, agent, fiduciary, beneficiary, institution, association or corporation *or
other witness*, examine any such witness under oath and, for this purpose, administer the
necessary oaths, and require the production of any books or papers which they deem relevant to
the inquiry." (emphasis added)); N-PCL § 112(b)(6) (the Attorney General "may take proof and
issue subpoenas in accordance with the civil practice law and rules" in connection with
investigations of potential misconduct giving rise to the remedies set forth in Not-for-Profit
Corporation Law § 112(a)); *Tierney*, 2015 WL 2378983, at *3. Executive Law section 63(12)
similarly authorizes the Attorney General to take proof and make a determination of relevant
facts through the issuance of subpoenas in accordance with the civil practice law and rules
during an investigation of potential repeated fraudulent or illegal acts. *See also* Exec. L. § 175
(authorizing the Attorney General to "take proof, issue subpoenas and administer oaths" in
connection with investigations of potential misconduct in violation of Article 7-A of the
Executive Law, which concerns the solicitation and collection of funds for charitable purposes.).
These standards make clear that the Attorney General has a right to conduct investigations to
determine whether charitable assets are being used properly for the benefit of intended

Case 1:23-cv-01337-BJR Document 25-4 Filed 02/28/23 Page 9 of 22

beneficiaries. *Temple of the Lost Sheep, Inc.*, 148 Misc 2d at 828–29; *Tierney*, 2015 WL 2378983, at *2–3. A subpoena issued by the Attorney General in that context is presumptively valid and, to challenge the subpoena, a challenging party "has the burden of proof to establish" its invalidity. *Tierney*, 2015 WL 2378983, at *3.

<u>**BRIEF STATEMENT OF FACTS**</u>

**A. The Attorney General Commenced an Investigation into VDARE's Operation and Subpoenaed VDARE Records in Relation to that Investigation.**

VDARE is a New York charitable not-for-profit corporation that incorporated in New York in 1999. Fuchs Aff. ¶ 6. In 2000, VDARE, then known by its previous name, the Lexington Research Institute, Limited, applied for and received recognition of its tax-exempt status from the IRS as a 501(c)(3) charitable entity. *Id*. ¶¶ 8, 9. VDARE did not register with the Attorney General's office (as required by New York law) until 2009. *Id*. ¶¶ 10, 11.

In its application for federal tax-exempt status, VDARE stated its plan to operate from offices in New York and listed two of its four directors at addresses in New York City. *Id*. ¶ 8. VDARE described its "primary purpose" as "creating a publication web page and magazine," with editorial content focusing on "both foreign and domestic policy issues." *Id*. VDARE failed to register with the Attorney General until 2009, nine years after its incorporation. In its initial filing, VDARE described its purpose as "creat[ing] and manag[ing] internet publications." *Id*. ¶ 12.

In 2019, VDARE reported a six-fold increase in revenue, from $700,000 in 2018 to approximately $4.3 million in 2019 and including a $1.5 million lump donation from a donor-advised fund. *See id.* at Exs. E and F. In early 2020, VDARE spent $1.4 million of these newly received funds on the purchase of the Berkeley Springs Castle, a medieval-style castle located in West Virginia. *Id*. ¶¶ 20, 22. Public postings by VDARE Chairman Peter Brimelow and others

5

AA0450

indicate that he and his family have used the castle as their primary residence since at least March 2020: Brimelow and his wife have posted photos of the family celebrating 4th of July and Christmas Eve holidays at the castle, and a VDARE website contributor reported in December 2020 that "Peter and Lydia Brimelow have moved in and spend most of their time [in the castle]…." *Id.* ¶¶ 25-27.

During this same period, VDARE also substantially increased payments to Brimelow and to third-party, for-profit companies he controls: in 2019, Brimelow's reported salary more than doubled and comprised roughly one third of VDARE's operating expenditures. *Id.* at Ex. F. VDARE separately reported spending tens of thousands of dollars on "office expenses" and "office occupancy" in 2019 as well as paying hundreds of thousands of dollars to a third-party LLC controlled by Brimelow that was based (like VDARE) at Brimelow's residential home address. *Id.*

In December 2020, VDARE conveyed the entirety of the Berkeley Springs Castle property—bought with charitable funds—to two West Virginia corporations incorporated by Lydia Brimelow, Peter's wife and a VDARE director, five months earlier. VDARE conveyed the castle itself and the land that it sits on to the Berkeley Castle Foundation (BCF), a putative non-profit corporation. And it conveyed the remaining land, consisting of eight parcels, to BBB, LLC, a for-profit corporation. *Id.* ¶ 28. These transactions by a New York charitable not-for-profit require submission of a petition by VDARE for review and approval by the Attorney General or the Supreme Court under Sections 510, 511, or 511-a of the Not-for-Profit Corporation Law. Each transaction also would require, under Section 509 of the N-PCL, approval by disinterested members of the VDARE Board of Directors. Because the Brimelows were together two of VDARE's three directors according to VDARE's 2020 Form 990 (the third

being Peter Brimelow's brother), no approval by disinterested directors could possibly have been granted.

Each of the castle and compensation transactions is also a "related-party transaction" under Section 715 of the Not-For-Profit Corporation Law that requires review by disinterested board members to ensure fair consideration and examination of alternatives, contemporaneous record-keeping, and proper disclosure on Schedule L of the IRS 990. To the extent that the payments to Brimelow or to his related entities constitute "private inurement," or an excess benefit disclosable on VDARE's IRS 990 return for 2019, and Brimelow could be required to pay a significant excise tax. *See* Internal Revenue Service Filing Information, Intermediate Sanctions - Excise Taxes, *at* https://www.irs.gov/charities-non-profits/charitable-organizations/intermediate-sanctions-excise-taxes (last visited Dec. 15, 2022).

These transactions also raise serious concerns about whether VDARE's board is fulfilling its fiduciary duties under New York law to oversee VDARE's finances, the implementation of its conflict-of-interest policy, and Brimelow's actions as a director, officer and chief manager of the organization, as well as the board's independence from Brimelow. As of November 2020, according to VDARE's Form 990, VDARE's reported board consisted of four people—and three of them were Brimelows. A review of VDARE's Form 990s and other publicly available documents support these concerns and raise questions regarding the truth and accuracy of those filings.

Based on the information it had obtained, the Attorney General began an investigation of VDARE and its leadership for potential violations of the New York law applicable to charities. The Subpoena seeks documents relating to the misconduct described above—documents, for example, concerning VDARE's organizational structure, compliance conflict-of-interest policy

Case 1:22-cv-01884-FJS-CFH Document 25-43 Filed 02/22/23 Page 92 of 22

requirements under New York law, and financial operations; its purchase and conveyance of the

Berkeley Springs Castle, including whether its use as the Brimelows' private residence violates

the law; and transactions between VDARE and entities controlled by the Brimelows.

The Subpoena does *not* seek any information regarding the development or publication of

VDARE's online opinion or analytical content.  In response to concerns expressed by VDARE

counsel, the Attorney General has also clarified that any responsive material produced pursuant

to particular requests that address VDARE fundraising may be redacted in the first instance to

omit identifying name and address information for donor-supporters and uncompensated

volunteers.  Fuchs Aff. ¶ 42.

### B. VDARE Insists that the OAG Must Withdraw the Subpoena and Fails to Produce.

VDARE does not dispute that it is a New York-incorporated entity subject to the

Attorney General's regulatory oversight.  VDARE nonetheless refused to comply with the

Subpoena immediately upon receipt:  in a letter dated July 2, 2022, VDARE asked the Attorney

General to withdraw the Subpoena in its entirety without any reference to individual categories

of requested information or material.  *Id*. ¶ 39.  On July 20, 2022, following a telephonic meet

and confer with the Attorney General's Office, VDARE asserted that the Subpoena was

"incredibly unlawful" and repeated its request that the Subpoena be withdrawn.  *Id*. ¶ 41.

VDARE argued in its July 20 letter that because it operates as an online publisher of

"controversial" speech by anonymous writers and for anonymous readers, the First Amendment

entirely prohibits thirty-two of the forty-four individual requests in the Attorney General's

investigative demand.

The parties have met and discussed VDARE's position on multiple occasions since July.

The OAG responded by email on July 27 to the objections raised in VDARE's July 20 letter and

Case 1:22-cv-01384-FJS-CFH Document 25-43 Filed 02/22/23 Page 13 of 22

attempted to address VDARE's concerns by clarifying certain individual terms and requests that

VDARE had identified as potentially including protected agent or donor information. *Id*. ¶ 42.

The OAG also consented to extensions of the Subpoena's deadline to accommodate vacation,

holidays, and other unrelated work obligations for VDARE counsel. *Id*. ¶ 43. Beginning in late

July, the OAG also repeatedly offered to meet and confer to confirm whether any remaining

objections existed – these proposed meetings, once scheduled, were themselves adjourned on

multiple occasions at VDARE's request.

On September 19, 2022, new counsel for VDARE wrote to the OAG, "I do not stand by

my predecessor counsel's position that the Subpoena be withdrawn" and noted in his letter "a

significant volume of electronically-stored and hard copy documents that need to be reviewed."

*Id.* ¶ 43. VDARE made its first production that day, nearly two months after the Subpoena's

original deadline for production. The September 19 production contained 27 documents

produced without Bates numbers and bearing unmarked redactions. No log was provided to

identify or explain the redactions. The OAG immediately demanded a redaction log and repeated

that demand for the ensuing three months without any compliance. *Id.* ¶¶ 44-45.

In the twelve weeks since its first September delivery, VDARE has produced

approximately 6,000 pages from its hard copy records. *Id.* ¶ 46. It has redacted that material

without offering any legal basis for individual redactions or any explanation for how material

was chosen for redaction. *Id.* The redactions are extensive, and they have been applied across

almost every category of document produced, including VDARE board meeting minutes,

VDARE bank statements, internal VDARE accounting ledgers, VDARE credit card statements,

invoices sent to VDARE, financial records for the limited liability company (Happy Penguins

LLC) from which VDARE has historically leased Peter Brimelow's services, and bank

9

**AA0454**

Case 1:22-cv-01884-FJS-CFH Document 25-43 Filed 02/22/23 Page 14 of 22

statements to accounts held personally by Peter and Lydia Brimelow. *Id.* In one instance, VDARE appears to have redacted a magazine subscription renewal form addressed to Peter Brimelow. *Id.*

On October 31, 2022, Lydia Brimelow represented that, with limited exceptions, VDARE's hard copy production was complete. *Id.* ¶ 47. On that date, VDARE identified 22 unique email accounts containing approximately 40 gigabytes of potentially responsive electronically stored information. *Id.* ¶ 48. VDARE's counsel stated that review of that material would be completed by November 21, 2022. *Id.*

VDARE did not produce any material from its electronic files as promised on November 21. *Id.* ¶ 49. Instead, VDARE counsel unilaterally established December 12, 2022, as a new deadline for completing email production. *Id.* On December 2, the OAG wrote to VDARE, summarizing its concerns with the pace and scope of VDARE's production, including its extensive redactions, and demanded that VDARE complete its subpoena compliance and produce a redaction log by December 12, 2022. *Id.* ¶ 51. VDARE did not comply, instead filing a frivolous lawsuit in federal court.

Despite twenty weeks of extensions, to date, VDARE has failed to produce responsive material from the following categories of records called for by the Subpoena: (i) solicitation materials sent by VDARE to potential contributors; (ii) documents related to the setting or adjusting VDARE's officer compensation; (iii) documents concerning past or future VDARE events located at the Berkeley Springs Castle property; (iv) documents concerning Director and Officer liability insurance held by VDARE for the benefit of its Board; and (v) documents sufficient to demonstrate who controls VDARE's financial accounts. The documents it has produced contain heavy redactions unexplained and unjustified by any redaction log.

10

**AA0455**

## ARGUMENT

The Attorney General has broad and well-established authority to issue subpoenas in connection with a civil investigation of a non-profit's conduct to determine whether to bring an enforcement proceeding. Exec. Law §§ 63(12), 175; N-PCL § 112; EPTL § 8-1.4(m). *See also Temple of the Lost Sheep*, 148 Misc. 2d at 828–29 ("There is no doubt that the Attorney General has a right to conduct investigations to determine if charitable solicitations are free from fraud and whether charitable assets are being properly used for the benefit of intended beneficiaries. This authority is granted to the Attorney General pursuant to the various articles of the Not-For-Profit Corporation Law and the Estates, Powers and Trusts Law identified in the challenged subpoena here."). VDARE has not articulated any plausible basis for refusing to comply with the Subpoena and the Attorney General now asks the Court to issue an order pursuant to CPLR § 2308 to ensure that VDARE promptly responds to the Attorney General's investigative requests without further limitation or delay.

### A. Standard of Review

The party challenging a subpoena issued by the Attorney General bears the burden of establishing the subpoena's invalidity. *Id.* at 828 ("It is well settled that one who challenges a subpoena issued by the Attorney General, which is presumptively valid, has the burden of proof to establish the invalidity of the subpoena[.]"); CPLR § 2308(b)(1) (where a subpoenaed party has failed to comply with a non-judicial subpoena, the issuer of the subpoena may seek a court order to compel a response and the court must order compliance if it finds that the subpoena was authorized.).

In evaluating the propriety of an investigative subpoena, New York courts apply a deferential standard of review: it is presumed that the Attorney General acts in good faith. *See*

11

*Ryan* v. *Lefkowitz*, 18 N.Y.2d 977, 979 (1966); *Hogan* v. *Cuomo*, 67 A.D.3d 1144, 1145 (3d

Dep't 2009); *New York* v. *Trump Org.*, No. 451685/2020, 2022 WL 489625, at *5 (Sup. Ct. N.Y.

Cty. Feb. 17, 2022) (quoting *Anheuser-Busch. Inc.* v. *Abrams*, 71 N.Y.2d 327, 332 (1988)), *aff'd*

205 A.D.3d 625 (2022)) ("In defending his inquiry, the Attorney-General enjoys a presumption

that he is acting in good faith"). The Attorney General's subpoena requests must demonstrate a

"reasonable relationship to the subject matter under investigation and the public interest to be

served." *Giardina* v. *James*, 185 A.D.3d 451 (1st Dep't 2020) (affirming denial of petition to

quash and grant of motion to compel compliance with investigative subpoenas). *See also Matter*

*of La Belle Creole Int'l, S.A.* v. *Attorney-General of the State of N.Y.*, 10 N.Y.2d 192, 196

(1961); *Roemer* v. *Cuomo*, 67 A.D.3d 1169, 1171 (3rd Dep't 2009) ("[The Attorney General]

enjoys a presumption that [s]he is proceeding in good faith. A motion to quash…raises only the

issues of the authority of the investigating body and whether the inquiry falls within the scope of

that authority and, to be sustained, [the Attorney General] need only make a preliminary showing

that the information sought is reasonably related to a proper subject of inquiry.") (internal

quotations and citations omitted); *Matter of Cuomo* v. *Dreamland Amusements Inc.*, 22 Misc. 3d

1107 (A), 2009 WL 81139, at *6 (Sup. Ct. N.Y. Cty. 2009). A party must respond to an

investigative subpoena unless the information sought is "utterly irrelevant to any proper inquiry."

*Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 331–32 (1988).

VDARE has not demonstrated, as it must to lawfully defy the Subpoena's demands, that

"the futility of the process to uncover anything legitimate is inevitable or obvious" or that any

"information sought is utterly irrelevant to any proper inquiry." *Libre by Nexus, Inc.* v.

*Underwood*, 181 A.D.3d 488 (1st Dep't 2020) (citing *Matter of Kapon* v. *Koch*, 23 N.Y.3d 32,

38 (2014), and affirming denial of motion to quash investigative subpoena *duces tecum*).

**B. The Attorney General's Subpoena Seeks Documents and Information Directly Related to a Lawful Regulatory Review.**

New York State's public policy interest in ensuring the robust regulation of tax-exempt charitable entities like VDARE is beyond question, as is the Attorney General's authority to supervise and investigate such entities when misconduct is suspected. The Attorney General's investigation and Subpoena are narrowly focused on well-established principles within this regime: the subject matter areas identified by the Subpoena fall squarely within the statutory provisions that govern not-for-profit corporations like VDARE. The Not-for-Profit Corporation Law, for example, provides that entities like VDARE may be formed only for charitable purposes, *see, e.g.*, N-PCL §§ 202, 204, 205, and that charitable assets may not be distributed to members, directors or officers, N-PCL § 515(a). Charitable entities are also subject to express requirements under the N-PCL for lawful operation, including requirements for a process by which compensation is set (N-PCL § 515(b)); processes for acquisition and "sale or other disposition" of property (N-PCL §§ 509, 510, 511 and 511-a); creating and presenting complete and accurate financial reports (N-PCL §§ 519, 520); a process for considering related party transactions (N-PCL § 715); and a process for managing conflicts of interest. (N-PCL § 715-a). The Subpoena's requests demand exactly the type of material that will permit the Attorney General to determine whether VDARE has complied with these requirements, including, for example, complete copies of VDARE annual regulatory filings, financial transaction records, compensation records, and records of Board meetings and review.

Article 8 of the Estates Powers and Trusts Law similarly authorizes the Attorney General to supervise the operation and administration of entities, trusts and persons holding and administering charitable assets, and VDARE qualifies as exactly such an entity. EPTL §§ 8-1.4, 8-1.9. The EPTL vests the Attorney General with express authority to "represent the

13

**AA0458**

beneficiaries of such [charitable] dispositions," to "enforce the rights of such beneficiaries by appropriate proceedings in the courts," to supervise and to "institute appropriate proceedings . . . to secure the proper administration of any [charitable] trust." *See generally id.* § 8-1.1 *et. seq.* The Subpoena's requests call for documents that will permit the Attorney General to determine whether there has been any diversion of charitable assets—for example through unlawful payments to for-profit corporations held by the Brimelows or other VDARE fiduciaries.

Article 7-A of the Executive Law authorizes the Attorney General to supervise charitable organizations that solicit in New York, and Article 7-A requires the Attorney General to monitor such organizations to ensure that, *inter alia*, a charity does not solicit contributions under false pretenses or use the contributions it receives in a manner that is not "substantially consistent" with the charity's stated purposes. *See generally* Executive Law § 172-d. Review of VDARE's public statements demonstrates that VDARE has sought funding to fund alleged programmatic use of the castle, and the Subpoena demands information related to that use.

Given these standards, and the conduct already identified through review of publicly available information regarding VDARE's spending and operation, there is no question that the Attorney General's regulatory mandate and preliminary investigation establish a reasonable basis for the document and information demands in her investigative subpoena. *Hogan*, 67 A.D.3d at 1146 ("Respondent had more than an adequate basis to issue the subpoenas here. The information forming the factual basis need not be sufficient to establish fraud or illegality, or even provide probable cause, as long as the futility of the process is not inevitable or obvious."). VDARE has not identified any facts or circumstances that demonstrate otherwise.

### C. The Subpoena Poses No Risk of Constitutional Harm.

In response to the OAG's investigatory subpoena for documents related to VDARE's corporate conduct, VDARE has raised constitutional objections related to its *donors'* First

14

AA0459

Amendment rights. But merely invoking the First Amendment does not shield a non-profit from investigative review. Because the OAG has agreed, in the first instance, to redact donors' and volunteers' identities, VDARE must show how this Subpoena will cause the organization itself any First Amendment injury.[1] *See New York Found. For the Homeless*, 190 A.D.2d at 578 (affirming finding of contempt for "persistent and willful defiance of Supreme Court subpoena") ("The mere utterance of First Amendment privileges…cannot shield defendants from the scrutiny of the Attorney General…and to enjoin them from soliciting funds improperly (EPTL 8-1.4)."). *See also Condon* v. *Inter-Religious Found. for Community Org.*, 51 A.D.3d 465, 466 (1st Dep't 2008) (affirming grant of petition to compel compliance with DOE investigative subpoenas that did not seek "membership lists" and did not "on their face implicate core First Amendment concerns of freedom of association that would require some heightened showing to warrant disclosure").

VDARE has not, and cannot, show that the subpoena would impair its own First Amendment rights. Despite the parties' agreement to redact *donor* information, VDARE has redacted much more, including its own board meeting minutes, bank statements, accounting ledgers, credit card statements, invoices it received from third parties, and even financial records for the Brimelows' own for-profit businesses (that have received thousands of dollars in unexplained payments from VDARE). None of these redactions are remotely proper or related to protected First Amendment interests.

But even if VDARE could show a potential First Amendment injury, it would still find no help from *Matter of Evergreen Assn., Inc.* v. *Schneiderman*, 153 A.D.3d 87 (2d Dep't 2017), a case it cited in support of its position. There, the court upheld an investigative subpoena

---

[1] The OAG reserves the right to seek donor identities when and if those identities become relevant to its lawful investigation.

Case 1:22-cv-01884-FJS-CFH Document 25-43 Filed 02/22/23 Page 20 of 22

examining a crisis pregnancy center's unlawful practice of medicine despite the possibility of

First Amendment chill, compelling compliance with demands tailored to its investigation.  The

Attorney General maintains that *Evergreen*'s recognition of a First Amendment harm was

wrongly decided as a matter of law and reserves the right to challenge it on appeal, while

recognizing that this Court is bound by its holding.  *See, e.g.*, *Mountain View Coach Lines, Inc.*

v. *Storms*, 102 A.D.2d 663, 664–65 (2d Dep't 1984).  But even under *Evergreen*'s reasoning, the

Subpoena survives review.  The Subpoena's requests are narrowly tailored to investigate

VDARE's financial and governance misconduct and have been clarified to eliminate the

possibility of First Amendment concerns from anonymous VDARE donors or volunteers.

Although VDARE may claim that redactions are required to protect the identities of

contractors—including writers who contribute to the website—these are precisely the records the

OAG must examine in its investigation of VDARE's organizational misconduct.  To the extent

anonymity is used to mask violations of the law, "it is unprotected by the First Amendment."

*Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010) (affirming decision not to quash a

subpoena on First Amendment grounds because it would reveal the identity of alleged copyright

violator).  Given the web of transactions among VDARE and Brimelow-controlled entities

*already* discovered by the OAG, the identities of contractors are central to the OAG's

investigation.  VDARE, and the Brimelows, cannot hide behind the First Amendment to shield

self-interested transactions from regulatory scrutiny.  *See New York Found. for the Homeless*,

190 A.D.2d at 578.  As another example, the only board member among four who is not a

Brimelow family member is a known VDARE contributor.  The Attorney General may probe

this contributor's compensation as part of its investigation of conflicts of interest and board

independence.  And the Attorney General may seek the identities of other contributors to

16

Case 1:22-cv-01884-FJS-CFH   Document 25-4   Filed 02/22/23   Page 21 of 22

determine whether further conflicts of interest may exist.

      VDARE's reliance on *Americans for Prosperity v. Bonta*, 141 S.Ct. 2373 (2021), is equally unavailing. That decision concerned only donor disclosures in statewide annual filing requirements, while expressly permitting subpoenas seeking the same information as part of a targeted investigation. *See Ams. for Prosperity Found.*, 141 S. Ct. at 2386–87 (noting the obvious, and "substantial," governmental interest in protecting the public from the harms caused by fraud, misuse, misappropriation, and diversion of charitable assets and observing, "Such offenses cause serious social harms. And the Attorney General is the primary law enforcement officer charged with combating them under California law."). Here, that decision is doubly irrelevant because the OAG seeks to compel subpoena compliance (as that case permits) and has already agreed to redactions to unrelated donor identifying information (the only category of First Amendment-protected information at issue there).

## **CONCLUSION**

      For all the foregoing reasons, the Attorney General respectfully requests that the Court issue an order: (i) compelling VDARE to comply without delay with the June 23, 2022 subpoena; (ii) ordering all documents produced to be unredacted (except for agreed-upon redactions to donor and volunteer information); and (iii) granting such other and further relief as it deems just, proper, and appropriate.

AA0462

Case 1:22-cv-01884-EJS-GHent Document 25-43 Filed 02/22/23 80 Page 22 of 22

Dated:  New York, New York
       December 16, 2022

                  LETITIA JAMES
                  Attorney General of the State of New York

              By:   _/s/ James G. Sheehan_
                    James G. Sheehan
                    Yael Fuchs
                    Catherine Suvari
                    Assistant Attorneys General
                    28 Liberty Street
                    New York, New York 10005
                    (212) 416-8490
                    James.Sheehan@ag.ny.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **EUGENE VOLOKH, LOCALS TECHNOLOGY INC. and RUMBLE CANADA INC.,**<br><br>                  **Plaintiffs,**<br><br>      **-against-**<br><br>**LETITIA JAMES,** *in her official capacity as New York Attorney General*,<br><br>              **Defendant.** | **22-CV-10195 (ALC)**<br><br><br>**OPINION AND ORDER** |

**ANDREW L. CARTER, JR., United States District Judge:**

"Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017) (citations omitted).

With the well-intentioned goal of providing the public with clear policies and mechanisms to facilitate reporting hate speech on social media, the New York State legislature enacted N.Y. Gen. Bus. Law § 394-ccc ("the Hateful Conduct Law" or "the law"). Yet, the First Amendment protects from state regulation speech that may be deemed "hateful" and generally disfavors regulation of speech based on its content unless it is narrowly tailored to serve a compelling governmental interest. The Hateful Conduct Law both compels social media networks to speak about the contours of hate speech and chills the constitutionally protected speech of social media users, without articulating a compelling governmental interest or ensuring that the law is narrowly tailored to that goal. In the face of our national commitment to the free expression of speech, even

1

**AA0464**

where that speech is offensive or repugnant, Plaintiffs' motion for preliminary injunction, prohibiting enforcement of the law, is **GRANTED**.

## BACKGROUND

### I. Factual Background

The following facts are drawn from the Complaint, Plaintiffs' declaration in support of their motion for preliminary injunction, and Defendant's declaration in opposition to the motion, and the documents relied upon therein.

#### A. The Plaintiffs

Plaintiffs Eugene Volokh ("Volokh"), Rumble Canada Inc. ("Rumble") and Locals Technology Inc. ("Locals") operate online platforms that they believe are subject to the law as a "social medial network" as defined by the law. Plaintiff Volokh is a California resident and the co-owner and operator of the Volokh Conspiracy, a legal blog. (Compl., ECF No. 1 ¶ 12.) Plaintiff Rumble, headquartered in Toronto, Canada, operates a website "similar to YouTube" which "allows independent creators to upload and share video content". (*Id.* ¶ 13.) Rumble has a "pro-free speech purpose" and its "mission [is] 'to protect a free and open internet' and to 'create technologies that are immune to cancel culture.'" (*Id.*) Plaintiff Locals is a subsidiary of Rumble Inc. and operates a website that allows "creators to communicate and share content directly with unpaid and paid subscribers." (*Id.* ¶ 14.) Locals also has a stated "pro-free speech purpose" and a "mission of being 'committed to fostering a community that is safe, respectful, and dedicated to the free exchange of ideas.'" (*Id.*)

#### B. The Buffalo Mass Shooting

On May 14, 2022, an avowed white supremacist used Twitch, a social media platform, to livestream himself perpetrating a racially motivated mass shooting on Black shoppers at a grocery

AA0465

store in Buffalo, New York. (Sawyer Decl., ECF No. 20 ¶ 4; *id.*, Ex. A, ECF No. 20-1 at 34.) The attack left ten people dead and three wounded. (*Id.*) Shortly thereafter, a recording of the mass shooting "went viral" and was re-posted on several websites, including 4chan and Reddit. (*Id.*) A manifesto expressing the shooter's racist ideology was also shared on social media. (*Id.* at 15–16, 34.)

In response to the mass shooting, Governor Kathy Hochul issued a referral letter to the Office of the Attorney General ("OAG"), directing it to investigate the events surrounding the shooting, focusing on "the specific online platforms that were used to broadcast and amplify the acts and intentions of the mass shooting[.]" (*Id.* at 6; Compl., ECF No. 1 ¶ 38.) Governor Hochul also directed the OAG to "investigate various online platforms for 'civil or criminal liability for their role in promoting, facilitating, or providing a platform to plan or promote violence." (*Id.*)

On October 18, 2022, the OAG released a report detailing its findings. (Sawyer Decl., ECF No. 20 ¶ 3.) In the associated press release, Defendant stated that "[o]nline platforms should be held accountable for allowing hateful and dangerous content to spread on their platforms" because an alleged "lack of oversight, transparency, and accountability of these platforms allows hateful and extremist views to proliferate online." (Compl., ECF No. 1 ¶ 3.)

### C.  The Hateful Conduct Law

The Hateful Conduct Law, entitled "Social media networks; hateful conduct prohibited" went into effect on December 3, 2022. The law applies to "Social media network(s)"[1], and defines "Hateful conduct" as:

---

[1]"Social media network" is defined as "service providers, which, for profit-making purposes, operate internet platforms that are designed to enable users to share any content with other users or to make such content available to the public." N.Y. Gen. Bus. Law § 394-ccc(1)(b). Defendant does not challenge Plaintiffs' assertion that they have standing to sue, but Defendant reserves the right to do so in the future. (Def.'s Opp'n, ECF No. 21 at 6, n.3.)

"[T]he use of a social media network to vilify, humiliate, or incite violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression."

N.Y. Gen. Bus. Law § 394-ccc(1)(a). Thus, the Hateful Conduct Law requires that social media networks create a complaint mechanism for three types of "conduct": (1) conduct that vilifies; (2) conduct that humiliates; and (3) conduct that incites violence. (*Id.*) This "conduct" falls within the law's definition if it is aimed at an individual or group based on their "race", "color", "religion", "ethnicity", "national origin", "disability", "sex", "sexual" orientation", "gender identity" or "gender expression". *Id.*

The Hateful Conduct Law has two main requirements: (1) a mechanism for social media users to file complaints about instances of "hateful conduct" and (2) disclosure of the social media network's policy for how it will respond to any such complaints. First, the law requires a social media network to "provide and maintain a clear and easily accessible mechanism for individual users to report incidents of hateful conduct." This mechanism must "be clearly accessible to users of such network and easily accessed from both a social media networks' application and website. . . ." and must "allow the social media network to provide a direct response to any individual reporting hateful conduct informing them of how the matter is being handled." N.Y. Gen. Bus. Law § 394-ccc(2).

Second, a social media network must "have a clear and concise policy readily available and accessible on their website and application. . . " N.Y. Gen. Bus. Law § 394-ccc(3). This policy must "include[] how such social media network will respond and address the reports of incidents of hateful conduct on their platform." N.Y. Gen. Bus. Law § 394-ccc(3).

4

**AA0467**

The law also empowers the Attorney General to investigate violations of the law and provides for civil penalties for social media networks which "knowingly fail[] to comply" with the requirements. N.Y. Gen. Bus. Law § 394-ccc(5).

## II. Procedural History

This action was commenced by Plaintiffs on December 1, 2022. (Compl., ECF No. 1.) The Complaint alleges both facial and as-applied challenges to the Hateful Conduct Law, arguing that it violates the First Amendment because it: (1) is a content and viewpoint-based regulation of speech; (2) is overbroad; and (3) is void for vagueness. (*See generally id.*) Plaintiffs also allege that the law is preempted by the Communications Decency Act, 47 U.S.C. § 230. (*Id.*)

Plaintiffs filed their motion for preliminary injunction on December 6, 2022, arguing that (1) Plaintiffs have a well-founded fear that the law will be enforced against their online platforms and (2) they are likely to prevail on the merits because the law burdens and compels speech, is overbroad, void for vagueness, and preempted by the Communications Decency Act. (Mot., ECF No. 8; *see generally* Pl.'s Mem., ECF No. 9.) Defendant filed a memorandum in opposition on December 13, 2022, arguing that Plaintiffs are unlikely to succeed on the merits of their claims because, *inter alia*, the law does not target protected expression based on content or viewpoint, is not substantially overbroad or vague, and is not preempted. (*See generally* Def.'s Opp'n, ECF No. 21.)

The Court heard oral argument on the motion on December 19, 2022. (*See* Dec. 19, 2022 "Tr.", ECF No. 27.)

## LEGAL STANDARD

To obtain a preliminary injunction, the movant must show "a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of

equities tips in the party's favor, and that an injunction is in the public interest." *ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) (citing *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). However, "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007); *see also Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 462, 472 (S.D.N.Y. 2010) ("Temporary restraining orders and preliminary injunctions are among the most drastic tools in the arsenal of judicial remedies, and must be used with great care.") (internal citations omitted).

## DISCUSSION

### I. Irreparable Harm

Although a showing of irreparable harm is typically the "single most important prerequisite for the issuance of a preliminary injunction," *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted), "[c]onsideration of the merits is virtually indispensable in the First Amendment context, where the likelihood of success on the merits is the dominant, if not the dispositive, factor." *N.Y. Progress and Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Accordingly, the Court's analysis will focus on the second prong of the preliminary injunction analysis.

### II. Likelihood of Success on the Merits

Where, as is the case here, the injunction being sought will provide the plaintiff with substantially all the relief sought in the complaint, the plaintiff must demonstrate a "clear or substantial likelihood of success on the merits." *Yang v. Kosinski*, 960 F.3d 119, 127–28 (2d Cir. 2020) (internal citations and quotations omitted).

6

For the reasons set out more fully below, the Court finds that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their First Amendment claims, but not on their preemption claim.

A. Plaintiffs' As-Applied First Amendment Challenge

i. *The Legal Framework for the First Amendment*

"The First Amendment generally prevents government from proscribing speech…or even expressive conduct…because of disapproval of the ideas expressed. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) (internal citations and quotations omitted). "The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). Thus, as is relevant to the current facts, "[a]s a Nation we have chosen . . . to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Id.* at 461. This protection extends to speech which the government may seek to limit because it is offensive or insulting. *See R.A.V*, 505 U.S. at 391 ("The First Amendment does not permit [the government] to impose special prohibitions on those speakers who express views on disfavored subjects.") Even regulations that seek to regulate speech "that insult[s], or provoke[s] violence, on the basis of race, color, creed, religion, or gender" have been found to run afoul of the First Amendment because they constitute content and viewpoint-based regulation of protected speech. *Id.* at 391–92.

In evaluating whether a regulation violates the First Amendment, courts "distinguish between content-based and content-neutral regulations of speech." *Id.* "Content-based laws— those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

7

**AA0470**

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* Additionally, when "a state compels an individual to speak a particular message, the state alters the content of their speech, and engages in content-based regulation." *CompassCare v. Cuomo*, 465 F. Supp. 3d 122, 155 (N.D.N.Y. 2020) (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("*NIFLA*") (internal quotations and alterations omitted)).

<p style="text-align:center"><em>ii.      Whether the Hateful Conduct Law Compels Speech</em></p>

Plaintiffs argue that the law regulates the content of their speech by compelling them to speak on an issue on which they would otherwise remain silent. (Pl.'s Mem., ECF No. 9 at 12; Tr., ECF No. 27 at 47:5–13.) Defendant argues that the law regulates conduct, as opposed to speech, because there is no requirement for *how* a social media network must respond to any complaints and because the law does not even require the network to specifically respond to a complaint of hateful content. (Def.'s Opp'n, ECF No. 21 at 9.) Instead, the law merely requires that the complaint mechanism *allows* the network to respond, if that is the social media network's policy. (Tr., ECF No. 27 at 11:25–1212:4.)

Defendant likens the Hateful Conduct Law to the regulation upheld in *Restaurant Law Ctr. v. City of New York*, which required fast-food employers to set up a mechanism for their employees to donate a portion of their paychecks to a non-profit of that employee's choosing. 360 F. Supp. 3d 192 (S.D.N.Y. 2019). The court found that this did not constitute "speech"—nor did it constitute "compelled speech"—noting that the "ministerial act" of administering payroll deductions on behalf of their employees did not constitute speech for the employers. *Id.* at 214. As such, the court applied rational basis review and found that the regulation passed muster. *Id.* at 221.

<p style="text-align:center">8</p>

<p style="text-align:center">**AA0471**</p>

However, those facts are not applicable here. The Hateful Conduct Law does not merely require that a social media network provide its users with a mechanism to complain about instances of "hateful conduct". The law also requires that a social media network must make a "policy" available on its website which details how the network will respond to a complaint of hateful content. In other words, the law requires that social media networks devise and implement a written policy—*i.e.*, speech.

For this reason, the Hateful Conduct Law is analogous to the state mandated notices that were found not to withstand constitutional muster by the Supreme Court and the Second Circuit: *NIFLA* and *Evergreen*. In *NIFLA*, the Supreme Court found that plaintiffs—crisis pregnancy centers opposing abortion—were likely to succeed on the merits of their First Amendment claim challenging a California law requiring them to disseminate notices stating the existence of family-planning services (including abortions and contraception). *NIFLA*, 138 S. Ct. at 2371. The Court emphasized that "[b]y compelling individuals to speak a particular message, such notices 'alte[r] the content of [their] speech.'" *Id.* (quoting *Riley v. National Federation of Blind of N. C., Inc.*, 487 U.S. 781, 795 (1988)). Likewise, in *Evergreen*, the Second Circuit held that a state-mandated disclosure requirement for crisis pregnancy centers impermissibly burdened the plaintiffs' First Amendment rights because it required them to "affirmatively espouse the government's position on a contested public issue…." *Ass'n, Inc. v. City of New York*, 740 F.3d 233, 250 (2d Cir. 2014) (quoting *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 236 (2d Cir. 2011), *aff'd*, 570 U.S. 205 (2013)).

Similarly, the Hateful Conduct Law requires a social media network to endorse the state's message about "hateful conduct". To be in compliance with the law's requirements, a social media network must make a "concise policy readily available and accessible on their website and

AA0472

application" detailing how the network will "respond and address the reports of incidents of hateful conduct on their platform." N.Y. Gen. Bus. Law § 394-ccc(3). Implicit in this language is that each social media network's definition of "hateful conduct" must be at least as inclusive as the definition set forth in the law itself. In other words, the social media network's policy must define "hateful conduct" as conduct which tends to "vilify, humiliate, or incite violence" "on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression." N.Y. Gen. Bus. Law § 394-ccc(1)(a). A social media network that devises its own definition of "hateful conduct" would risk being in violation of the law and thus subject to its enforcement provision.

The gap between the state's definition of "hateful conduct" and other potential definitions is illustrated by Plaintiffs' own current content moderation policies. For instance, Rumble reserves the right to unilaterally remove any content that it deems is:

> "a) is illegal; b) is pornographic, obscene, or of an adult or sexual nature; c) is grossly offensive to the online community, including but not limited to, racism, anti-semitism and hatred; d) supports or incites violence or unlawful acts; e) supports groups that support or incite violence or unlawful acts; or f) promotes terrorist organizations."

(Compl., ECF No. 1 ¶ 116 (internal quotations omitted).) The policy does not explicitly pertain to content that vilifies or humiliates, as is defined in the law, and does not explicitly apply to content aimed at a person or group's "religion", "disability", "sexual orientation" or "gender expression", as is expressly enumerated in the Hateful Conduct Law. For Rumble to be in compliance with the law, it would need to publish a policy expressly indicating that its users have a mechanism to complain about the "hateful conduct" as defined by the Hateful Conduct Law, not removable content as defined by Rumble.

10

**AA0473**

Likewise, Locals' website identifies a few categories of content that it may remove from its website, including content that "threatens violence against an individual or group of people." (*Id.* ¶ 133.) However, this policy also does not encapsulate the classes of groups or persons to whom "hateful conduct" may be directed as is defined by the New York legislature, and it would need to be modified to be brought into compliance with the law by including speech that potentially vilifies or humiliates a group or individual. To be in compliance with the law, Locals would need to publish a policy detailing the types of content its users are entitled to complain about through the new mechanism—*i.e.,* "hateful conduct" as defined by the law—thus compelling Locals to endorse the state's definition of that term.

Clearly, the law, at a minimum, compels Plaintiffs to speak about "hateful conduct". As Plaintiffs note, this compulsion is particularly onerous for Plaintiffs, whose websites have dedicated "pro-free speech purpose[s]" (Compl., ECF No. 1 ¶¶ 13, 14), which likely attract users who are "opposed to censorship" (Pl.'s Mem., ECF No. 9 at 24). Requiring Plaintiffs to endorse the state's definition of "hateful conduct", forces them to weigh in on the debate about the contours of hate speech when they may otherwise choose not to speak. In other words, the law, "deprives Plaintiffs of their right to communicate freely on matters of public concern" without state coercion. *Evergreen,* 740 F.3d at 250.

Additionally, Plaintiffs have an editorial right to keep certain information off their websites and to make decisions as to the sort of community they would like to foster on their platforms. It is well-established that a private entity has an ability to make "choices about whether, to what extent, and in what manner it will disseminate speech…" *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1210 (11th Cir. 2022). These choices constitute "editorial judgments" which are protected by the First Amendment. *Id.* (collecting cases). In *Pacific Gas & Electric Co. v. Public*

*Utilities Commission of California*, the Supreme Court struck down a regulation that would have forced a utility company to include information about a third party in its billing envelopes because the regulation "require[d] appellant to use its property as a vehicle for spreading a message with which it disagrees." 475 U.S. 1, 17 (1986).

Here, the Hateful Conduct Law requires social media networks to disseminate a message about the definition of "hateful conduct" or hate speech—a fraught and heavily debated topic today. Even though the Hateful Conduct Law ostensibly does not dictate what a social media website's response to a complaint must be and does not even require that the networks respond to any complaints or take down offensive material, the dissemination of a policy about "hateful conduct" forces Plaintiffs to publish a message with which they disagree. Thus, the Hateful Conduct Law places Plaintiffs in the incongruous position of stating that they promote an explicit "pro-free speech" ethos, but also requires them to enact a policy allowing users to complain about "hateful conduct" as defined by the state.

       iii.    *Whether the Hateful Conduct Law Compels Commercial Speech*

In the alternative, Defendant argues that even if the law is found to regulate speech, it only regulates commercial speech and should thus be subject to a lesser standard of review. (Def.'s Opp'n, ECF No. 21 at 9, 12–13.) Defendant characterizes the law's requirement that social media networks publish a policy as "a truthful disclosure of fact" that is only subject to rational basis review. (Tr., ECF No. 27 at 44:7–8.) Defendant likens the Hateful Conduct Law's policy requirement to other regulations upheld by the Second Circuit requiring (1) chain restaurants to post calorie content information for their menu items, *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 137 (2d Cir. 2009), and (2) lightbulb manufacturers to disclose the

**AA0475**

mercury content in their products, *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 116 (2d Cir. 2001).

In general, laws regulating commercial speech are subject to a lesser standard of scrutiny. *N.Y. State Rest. Ass'n v. New York City Bd. of Health*, No. 08-CV-1000(RJH), 2008 WL 1752455, at *6 (S.D.N.Y. Apr. 16, 2008), *aff'd*, 556 F.3d 114 (2d Cir. 2009) (citing *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113 (2d Cir. 2001)). The Supreme Court has articulated two definitions of what constitutes commercial speech. First, speech is considered to be commercial when it "'does no more than propose a commercial transaction.'" *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 93 (2d Cir. 2010) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)). Second, "commercial speech [constitutes] 'expression related solely to the economic interests of the speaker and its audience.'" *Conn. Bar Ass'n*, 620 F.3d at 94 (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980)). Commercial speech is generally subject to intermediate scrutiny, *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 261 (2d Cir. 2014); however, where the commercial speech conveys "purely factual and uncontroversial" information, courts apply rational basis review. *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 132 (2d Cir. 2009) (*citing Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 114–15).

The policy disclosure at issue here does not constitute commercial speech and conveys more than a "purely factual and uncontroversial" message. The law's requirement that Plaintiffs publish their policies explaining how they intend to respond to hateful content on their websites does not simply "propose a commercial transaction". Nor is the policy requirement "related solely to the economic interests of the speaker and its audience." Rather, the policy requirement compels a social media network to speak about the range of protected speech it will allow its users to engage (or not engage) in. Plaintiffs operate websites that are directly engaged in the proliferation of

13

speech—Volokh operates a legal blog, whereas Rumble and Locals operate platforms where users post video content and comment on other users' videos.

The "lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988). Where speech is "inextricably intertwined with otherwise fully protected speech", it does not retain any of its potential commercial character. *Id.* Here, the law clearly implicates protected speech—namely hate speech—by requiring a disclosure of the Plaintiffs' policy for responding to complaints of hateful content. This is different in character and kind from commercial speech and amounts to more than mere disclosure of factual information, such as caloric information or mercury content, as Defendant tries to equate.

iv.    *Whether the Hateful Conduct Law Survives Strict Scrutiny*

Because the Hateful Conduct Law regulates speech based on its content, the appropriate level of review is strict scrutiny. *See Evergreen*, 740 F.3d at 244. To satisfy strict scrutiny, a law must be "narrowly tailored to serve a compelling governmental interest." *Amidon v. Student Ass'n of State Univ. of New York at Albany*, 508 F.3d 94, 96 (2d Cir. 2007). A statute is not narrowly tailored if "a less restrictive alternative would serve the Government's purpose." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813, (2000).

Plaintiffs argue that limiting the free expression of protected speech is not a compelling state interest and that the law is not narrowly tailored. While Defendant concedes that the Hateful Conduct Law may not be able to withstand strict scrutiny, she maintains that the state has a compelling interest in preventing mass shootings, such as the one that took place in Buffalo. (Tr., ECF No. 27 at 45:1–15.)

14

**AA0477**

Although preventing and reducing the instances of hate-fueled mass shootings is certainly a compelling governmental interest, the law is not narrowly tailored toward that end.[2] Banning conduct that incites violence is not protected by the First Amendment[3], but this law goes far beyond that.

While the OAG Investigative Report does make a link between misinformation on the internet and the radicalization of the Buffalo mass shooter (Sawyer, Decl., Ex. A, ECF No. 20-1 at 23–26), even if the law was truly aimed at reducing the instances of hate-fueled mass shootings, the law is not narrowly tailored toward reaching that goal. It is unclear what, if any, effect a mechanism that allows users to report hateful conduct on social media networks would have on reducing mass shootings, especially when the law does not even require that social media networks affirmatively respond to any complaints of "hateful conduct". In other words, it is hard to see how the law really changes the status quo—where some social media networks choose to identify and remove hateful content and others do not.

---

[2] The memorandum in support of the legislation that was presented to the New York State Assembly ahead of the floor debate lists the justification for the law as "concerns about misinformation that is spread on social media networks." (Sawyer Decl., Ex. C, ECF No. 20-3.) While the law was enacted in the wake of the Buffalo mass shooting, the original iteration of the bill was drafted in the wake of the events of January 6, 2021 (Compl., ECF No. 1 ¶ 30; Sawyer Decl., Ex. D, ECF No. 20-4 at 182–183), further suggesting that the law is really aimed at misinformation on the internet. However, the First Amendment's shielding of hate speech from regulation means that a state's desire to reduce this type of speech from the public discourse cannot be a compelling governmental interest

[3] The Supreme Court has held that speech that consists of "fighting words" and speech that incites violence or lawlessness are not protected by the First Amendment. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942); *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). For speech to incite violence, "there must be 'evidence or rational inference from the import of the language, that [the words in question] were intended to produce, and likely to produce, imminent' lawless action." *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 70 F. Supp. 3d 572, 581 (S.D.N.Y. 2015), *vacated on other grounds*, 109 F. Supp. 3d 626 (S.D.N.Y. 2015) (citations omitted). The Hateful Conduct law's ban on speech that incites violence is not limited to speech that is likely to produce *imminent* lawless action.

15

Accordingly, for the reasons stated above, the Court finds that Plaintiffs have demonstrated a substantial likelihood of success on their as applied First Amendment challenges to the Hateful Conduct Law.

### B. Plaintiffs' Facial First Amendment Challenges

Plaintiffs argue that the Hateful Conduct Law "is overbroad because it applies to a substantial amount of protected speech, especially compared to its nonexistent or minimal lawful application" and is unconstitutionally vague. (Pls.' Mem., ECF No. 9 at 17–20.) In response, Defendant argues that Plaintiffs have not demonstrated that the law would chill protected speech and that the operative terms of the law are clear and defined. (Def.'s Opp'n., ECF No. 21 at 18–23.)

Both the Supreme Court and the Second Circuit have recognized that "[a]lthough facial challenges are generally disfavored, they are more readily accepted in the First Amendment context." *Picard v. Magliano*, 42 F.4th 89, 101 (2d Cir. 2022) (quoting *Beal v. Stern*, 184 F.3d 117, 125 (2d Cir. 1999)). Although facial invalidation of a statute is a "strong medicine" that should be applied "sparingly and only as a last resort", *Hobbs v. Cnty. of Westchester*, 397 F.3d 133, 155 (2d Cir. 2005) (quoting *FCC v. Pacifica Foundation*, 438 U.S. 726, 743 (1978)); *see also Am. Booksellers Found. v. Dean*, 342 F.3d 96, 105 (2d Cir. 2003), a court may consider a facial overbreadth claim where a plaintiff has established that there are no set of circumstances under which the challenged statute could be valid or that the challenged statute "lacks any plainly legitimate sweep." *Picard*, 42 F.4th at 101 (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)).

"It is established that the courts may, as an exception to ordinary standing requirements, entertain a claim that a law, even if constitutional as applied to the claimant, is so broad that it

"may inhibit the constitutionally protected speech of third parties[.]" *Hobbs*, 397 F.3d at 155. "The purpose of an overbreadth challenge is to prevent the chilling of constitutionally protected conduct, as prudent citizens will avoid behavior that may fall within the scope of a prohibition, even if they are not entirely sure whether it does." *Farrell v. Burke*, 449 F.3d 470, 499 (2d Cir. 2006). "[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). "When a court finds that a statute suffers from such substantial overbreadth, all enforcement of the statute is generally precluded." *Am. Booksellers Found.*, 342 F.3d at 104.

As the Court has already discussed, the law is clearly aimed at regulating speech. Social media websites are publishers and curators of speech, and their users are engaged in speech by writing, posting, and creating content. Although the law ostensibly is aimed at social media networks, it fundamentally implicates the speech of the networks' users by mandating a policy and mechanism by which users can complain about other users' protected speech.

Moreover, the Hateful Conduct law is a content based regulation. The law requires that social media networks develop policies and procedures with respect to hate speech (or "hateful conduct" as it is recharacterized by Defendant). As discussed, the First Amendment protects individuals' right to engage in hate speech, and the state cannot try to inhibit that right, no matter how unseemly or offensive that speech may be to the general public or the state. *See Matal*, 137 S. Ct. at 1764; *see also R.A.V.*, 505 U.S. at 391. Thus, the Hateful Conduct Law's targeting of speech that "vilifi[es]" or "humili[ates]" a group or individual based on their "race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression" N.Y. Gen. Bus. Law § 394-ccc(1)(a), clearly implicates the protected speech of social media users.

This could have a profound chilling effect on social media users and their protected freedom of expression. Even though the law does not require social media networks to remove "hateful conduct" from their websites and does not impose liability on users for engaging in "hateful conduct", the state's targeting and singling out of this type of speech for special measures certainly could make social media users wary about the types of speech they feel free to engage in without facing consequences from the state. This potential wariness is bolstered by the actual title of the law— "Social media networks; hateful conduct prohibited" —which strongly suggests that the law is really aimed at reducing, or perhaps even penalizing people who engage in, hate speech online. As Plaintiffs noted during oral argument, one can easily imagine the concern that would arise if the government required social media networks to maintain policies and complaint mechanisms for anti-American or pro-American speech. (Tr., ECF No. 27 at 29:2.) Moreover, social media users often gravitate to certain websites based on the kind of community and content that is fostered on that particular website. Some social media websites—including Plaintiffs'— intentionally foster a "pro-free speech" community and ethos that may become less appealing to users who intentionally seek out spaces where they feel like they can express themselves freely.

The potential chilling effect to social media users is exacerbated by the indefiniteness of some of the Hateful Conduct Law's key terms. It is not clear what the terms like "vilify" and "humiliate" mean for the purposes of the law. While it is true that there are readily accessible dictionary definitions of those words, the law does not define what type of "conduct" or "speech" could be encapsulated by them. For example, could a post using the hashtag "BlackLivesMatter" or "BlueLivesMatter" be considered "hateful conduct" under the law? Likewise, could social media posts expressing anti-American views be considered conduct that humiliates or vilifies a group based on national origin? It is not clear from the face of the text, and thus the law does not

AA0481

put social media users on notice of what kinds of speech or content is now the target of government regulation.

Accordingly, because the Hateful Conduct Law appears to "reach[…] a substantial amount of constitutionally protected conduct", *Farrell*, 449 F.3d at 496 (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983)), the Court finds that Plaintiffs have demonstrated a likelihood of success on their facial challenges under the First Amendment.[4]

### C. Preemption Under Section 230 of the Communications Decency Act

Lastly, Plaintiffs allege that the Hateful Conduct Law is preempted by Section 230 of the Communications Decency Act because it imposes liability on websites by treating them as publishers. (Pl.'s Mem., ECF No. 9 at 20–21.)

The Communications Decency Act provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1); *see also Ricci v. Teamsters Union Loc. 456*, 781 F.3d 25, 27 (2d Cir. 2015). The Act has an express preemption provision which states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

---

[4] The Court also finds that severing parts of the law would not serve to save the entire statute. As stated in footnote four, while speech that incites violence is not protected by the First Amendment, whether speech does in fact incite violence is a fact-based inquiry. *See Am. Freedom Def. Initiative*, 70 F. Supp. 3d at 581 (For speech to incite violence, "there must be 'evidence or rational inference from the import of the language, that [the words in question] were intended to produce, and likely to produce, imminent' lawless action."). The Supreme Court has rarely applied this standard, "and never explicitly found speech to be on the proscribable side of the standard." *Id.* Thus, it is not clear that limiting the Hateful Conduct Law only to speech that incites violence would necessarily pass constitutional muster. In addition, at oral argument, Plaintiffs argued that the law was not severable. (Tr., ECF No. 27 at 62:8–63:7.)

A plain reading of the Hateful Conduct Law shows that Plaintiffs' argument is without merit. The law imposes liability on social media networks for failing to provide a mechanism for users to complain of "hateful conduct" and for failure to disclose their policy on how they will respond to complaints. N.Y. Gen. Bus. Law § 394-ccc(5). The law does not impose liability on social media networks for failing to respond to an incident of "hateful conduct", nor does it impose liability on the network for its users own "hateful conduct". The law does not even require that social media networks remove instances of "hateful conduct" from their websites. Therefore, the Hateful Conduct Law does not impose liability on Plaintiffs as publishers in contravention of the Communications Decency Act.

## III. Balance of the Equities

Finally, given that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their First Amendment claims, the Court must consider whether "the balance of the equities tips in [Plaintiffs'] favor, and [whether an] injunction is in the public interest." *ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).

Given that "enjoining enforcement of a statute that potentially violates citizens' constitutional rights is in the public interest", and that Defendant can show no harm as a result of being prevented from enforcing an unconstitutional statute, the Court finds that the balance of the equities tips in favor of granting the preliminary injunction. *See CompassCare*, 465 F. Supp. 3d at 159.

## <u>CONCLUSION</u>

Accordingly, for the aforementioned reasons, the Court finds that Plaintiffs are entitled to a preliminary injunction prohibiting the enforcement of N.Y. Gen. Bus. Law § 394-ccc. The Clerk of Court is respectfully requested to terminate the pending motion at ECF No. 8.

**AA0483**

Dated:  **February 14, 2023**
           **New York, New York**

_____
                     **ANDREW L. CARTER, JR.**
                     **United States District Judge**

21

**AA0484**

# OPERATING AGREEMENT

**THIS OPERATING AGREEMENT** ("Agreement") of BBB, LLC, a limited liability company duly organized and existing pursuant to the West Virginia Uniform Limited Liability Act, codified in Chapter 31B of the West Virginia Code, is hereby adopted by the Company to be effective as of July 21, 2020.

1. **Definitions.** The following definitions, when used with an initial capital letter shall apply throughout this Agreement:

   a. **"Act"** shall mean the West Virginia Uniform Liability Act, codified in Chapter 31B of the West Virginia Code, as amended from time to time.

   b. **"Capital Account"** means the Member account to be maintained under the Code.

   c. **"Code"** means the Internal Revenue Code of 1986, as amended, the applicable Treasury Regulations thereunder, and any comparable laws and regulations enacted or promulgated in place thereof.

   d. **"Company"** means BBB, LLC, the West Virginia limited liability company which is the subject of this Agreement.

   e. **"Distributable Cash"** means all cash from all sources, held by the Company as of such date less any amounts reasonably deemed necessary by the Manager to be reserved for normal working capital requirements, contingent liabilities, and such other purposes as the Manager determines to be necessary or advisable for the conduct of the Company's business.

   f. **"Manager"** means Lydia Brimelow or her replacement.

   g. **"Member"** means either the present member.

   h. **"Membership Interest"** means the Member's interest in the Company stated as a percentage as set forth in Section 6 hereof.

   i. **"Officer"** means the appointed position, not the individual occupying the position and otherwise has the meaning set forth in Section 8.

   j. **"Simple Majority"** means more than fifty percent (50%) of the Membership Interests.

2. **Formation.**

   a. **Organization.** The Member formed the Company as a limited liability company pursuant to the Act in accordance with the Articles of Organization filed with the West Virginia Secretary of State's Office on or about July 21, 2021.

1

**AA0485**

b. **Operating Agreement.** This Agreement, including any provisions of the Code incorporated herein by reference, shall be the sole agreement of the Member with respect to the Company's operation. By owning Membership Interest, the Member *de facto* consents and agrees to be bound by this Agreement. No oral agreements may modify this Agreement. This Agreement supersedes all prior agreements.

3. **The Company.**

   a. **Principal Office.** The principal office of the Company shall be located at 276 Cacapon Road, Berkeley Springs, West Virginia, 25411.

   b. **Purpose.** The purpose of the Company is to provide real estate leasing and related services. The Company may also conduct any lawful business activities for which a limited liability company may engage.

4. **Term.** The Company shall continue in existence until terminated under the terms of Agreement.

5. **Capital.**

   a. **Capital Contributions.** The Member has contributed cash to the capital of the Company in the amounts and when called for by the Manager.

   b. **Other Additional Contributions.** Except as provided in Section 5(a), or as agreed in writing by the Member, no Member shall have any obligation or liability to the Company to make any contributions to the capital of the Company.

6. **Membership Interests.**

   a. Vdare Corporation, Inc. – 100%.

7. **Distributions to Members.**

   a. The Company shall distribute Distributable Cash to the Member at such times as the Manager determines; provided, however, that to the extent Distributable Cash is available therefor, the Company shall distribute proportionally to the Member sufficient Distributable Cash to pay taxes associated with Company income.

   b. A Member is solely liable for the "pass through" taxes on that Member's distributions.

8. **Management.**

   a. **Manager-Managed.** The Manager shall manage all aspects of Company operations, including decisions to delegate revocable powers to Company

2

**AA0486**

appointed officers ("Officers"), unless that revocable power has been delegated to an Officer.

b. **Agency.** The Manager has the authority to bind the Company in any transaction unless that authority has been delegated to an Officer.

c. **Officers.** The Members may elect such Officers as the Manager determines to be appropriate. Officers may be appointed from within or outside the company and therefore are not required to be members. All Officers serve at the pleasure of the Member and may be removed by the Manager at any time with or without cause.

   i. An individual can hold several offices concurrently unless otherwise

   ii. Officer appointment or removal shall be directed by a Simple Majority of Membership Interests.

   iii. The appointment of an Officer must be by written agreement between the Company and Officer.

   iv. Any voting rights granted to an Officer must be explicit and approved by all Members, including the right to break ties.

   v. Officer appointment and the rights granted under said appointment shall immediately terminate upon:

      1. the Officer's death,
      2. the Officer's material breach of the agreement between the Company and Officer,
      3. the Officer is charged or convicted of embezzlement, fraud, misappropriation, theft, felony, or gross negligence,
      4. the Officer is adjudicated incompetent,
      5. the Officer assigns its responsibilities to any third party without the required Member approval,
      6. the Officer materially breaches the Officer's fiduciary duty, or
      7. the Officer engages in self-dealing without prior disclosure to all Members.

d. **Meetings.** Meetings shall occur from time to time as called by the Manager or any Member, with reasonable notice actually delivered to the other Members or their designated agent of process. A simple quorum is required at all voting meetings and established by a Simple Majority of Membership Interests. A Member may attend meetings by telephone or other remote methods.

e. **Voting.** Votes shall be cast by the Member or a Member's proxy. A proxy must be appointed by written agreement. Proxies shall be appointed for a reasonable term, not to exceed twelve (11) months. All proxy appointments shall be revocable.

3

**AA0487**

f. **Records.** The Company may appoint an individual to take custody and maintain the Company's records. Each Member shall have access to said records at any time upon reasonable notice and within the ordinary course of business.

9. **Limited Liability.** No Member or Officer of the Company shall be personally liable or responsible to the Company, its Member, or a third-party for any action or omission taken by said Member or Officer on behalf of the Company within the scope of authority of the Member or Officer, or reasonably believed by such Member or Officer to be within the scope of his authority.

10. **Company Termination.** The Company may only terminate by:

    a. A written agreement by the Member to dissolve, wind up, and liquidate the Company; or

    b. An occurrence of any other event that, under the Act, causes the dissolution of a limited liability company unless, within 90 days of the occurrence of the event, the Member executes a statement of intent to continue in full force and effect and continue to carry on the Company's business.

11. **Amendments.** This Operating Agreement may be altered or amended through a written amendment hereto approved by the Member.

12. **Insurance.** The Company shall maintain insurance policies as directed by the Company or required by law. Insurance shall be paid by the Company unless otherwise agreed. The Manager may pay outstanding insurance premiums or related costs to keep insurance policies in affect.

13. **Indemnity.** The Company shall indemnify, defend, and hold the Member harmless from and against any costs and all liabilities and expenses (including reasonable attorneys' fees) arising out of or in any way connected to acts incident to the management and operation of the Company, except such liabilities that are proximately caused by acts of gross negligence or willful misconduct by the Member.

14. **Notice.** Notice shall be sent to the Member's identified address on file. In the event of doubt surrounding said representative, notice shall be delivered to both the representative and the Member's elected address on file.

15. **Governing Law.** This Agreement is to be governed by the applicable laws of the State of West Virginia.

16. **Rules of Construction.** As used herein, unless the context clearly indicates the contrary, the singular number includes the plural, the plural the singular, and the use of any gender is to be applicable to all genders.

4

**AA0488**

17. **Titles and Subtitles.** Titles of the sections and sub-sections are placed herein for convenient reference only and are not to any extent have the effect of modifying, amending, or changing the express terms and provisions of this Agreement.

18. **Waiver.** No waiver of any provisions of this Agreement is to be valid unless in writing and signed by the person or party against whom charged. The waiver of any Agreement obligation does not amend this agreement or prevent subsequent or simultaneous obligation enforcement.

19. **Severability.** Every provision of this Agreement is severable. If any Agreement term is illegal, invalid, or unenforceable for any reason, such illegal, invalid, or unenforceable term shall not affect the validity, legality or enforceability of the remainder of this Agreement.

IN WITNESS WHEREOF, this Agreement has been executed by the Member as of the date first above written.

VDARE Corporation, *Member*

5

**AA0489**

# BYLAWS
## OF
### BERKELEY CASTLE FOUNDATION

The name of the organization is Berkeley Castle Foundation. The purpose of the organization is to support VDARE Foundation, a "supported organization" within the meaning of section 509(a)(3) of the Internal Revenue Code, and to maintain on its behalf the historic Berkeley Castle in Berkeley Springs, West Virginia. The organization is organized in accordance with the West Virginia Nonprofit Corporation Act, as amended, and shall have all the powers and authorities as set forth in section 31E-3-302 of the West Virginia Code, as amended

The organization has not been formed for the making of any profit or personal financial gain. The assets and income of the organization shall not be distributable to or otherwise benefit the trustees, directors, and officers of the organization or any other individual. The assets and income of the organization shall only be used to promote the corporate purposes described below. Nothing contained herein, however, shall be deemed to prohibit the payment of reasonable compensation to employees and independent contractors for services provided for the benefit of the organization.

The organization is organized exclusively for purposes specified in section 501(c)(3) of the Internal Revenue Code. The organization shall not carry on any activities not permitted to be carried on by an organization exempt from federal income tax. The organization shall not endorse, contribute to, work for, or otherwise support (or oppose) a candidate for public office.

The organization is organized exclusively for charitable, religious, educational and scientific purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt organizations described under Section 501c3 of the Internal Revenue Code, or corresponding section of any future federal tax code.

## ARTICLE I
## DIRECTORS

**Section 1. <u>Number of Directors</u>.** The organization shall be managed by a Board of Directors, consisting initially of 3 directors. The Board of Directors may vote to increase the number of Directors to an odd number not exceeding 7 directors.

**Section 2. <u>Election and Term of Office</u>.** Directors shall be elected at the annual meeting of the Board of Directors. Each director shall serve a term of 1 year or until a successor has been elected and qualified.

**Section 3. <u>Removal/Vacancies</u>.** A director may be removed by a majority of the Board of Directors, with or without cause, at a meeting called for that purpose. Any vacancy that occurs on the Board of Directors, whether by death, resignation, removal, or any other cause, may be filled by the remaining directors. A director elected to fill a vacancy shall serve the remaining term of his or her predecessor and shall continue serving until a successor has been elected and qualified.

**Section 4. <u>Chairman</u>.** The Board of Directors shall elect a Chairman, who shall chair all meetings of the Board.

**Section 5.  Regular Meetings.**  The Board of Directors shall meet promptly after the organization is duly registered for the purposes of electing a Chairman and officers, organizing committees and

appointing their chairpersons, and transacting such other business as may properly come before the meeting. The Board of Directors shall thereafter hold a regular meeting for the same purposes not less than annually and may provide, by resolution, for additional regular meetings without notice other than the notice provided by the resolution. Regular meetings shall be held at the time and place designated by the Board of Directors.

**Section 6. <u>Special Meetings</u>.** Special meetings of the Board of Directors may be requested by the Chairman, the President, or any two directors by providing five days' written notice to all directors by overnight United States mail, effective when mailed. A special meeting of members is not required to be held at a geographic location if the meeting is held by means of electronic communications technology in a manner pursuant to which the members have the opportunity to read or hear the proceedings substantially concurrent with the proceedings, note on matters submitted to the members, pose questions, and make comments.

**Section 7. <u>Informal Action</u>.** Any action that may be taken at a meeting of directors or of a committee of directors may be taken without a meeting if a consent in writing setting forth the action so taken, is signed by all of the directors or by all of the members of the committee of directors, as the case may be.

**Section 8. <u>Quorums</u>.** A majority of directors shall constitute at quorum at a meeting of directors, and a majority of committee members shall constitute a quorum at a committee meeting. In the absence of a quorum, a majority of the directors or committee members, as the case may be, may adjourn the meeting to another time without further notice. If a quorum is represented at an adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally scheduled. The directors or committee members present at a meeting represented by a quorum may continue to transact business until adjournment, even if the withdrawal of one or more directors or members results in representation of less than a quorum. In the determination of a quorum of the directors or committee members, or in voting, the disclosed adverse interest of a director or member shall not disqualify the director or member or invalidate his or her vote.

**Section 9. <u>Meeting Places</u>.** Meetings shall be held at the organization's principal place of business unless otherwise stated in the notice. Unless the articles of incorporation or bylaws provide otherwise, the board of directors may permit any or all directors to participate in a regular or special meeting by, or conduct the meeting through the use of, any means of communication by which all directors participating may simultaneously hear each other during this meeting. A director participating in a meeting by this means shall be deemed to be present in person at the meeting.

**Section 10. <u>Meeting Procedures</u>.** The vote of a majority of the directors present at a properly called meeting at which a quorum is present shall be the act of the Board of Directors, unless the vote of a greater number is required by law or by these by-laws for a particular resolution. A director of the organization who is present at a meeting of the Board of Directors at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless their dissent shall be entered in the minutes of the meeting. The Board shall keep written minutes of its proceedings in its permanent records.

**AA0492**

**Section 11. <u>Meeting Minutes</u>.** Minutes of any Regular or Special Meeting shall be kept and signed by the Secretary and shall be sent to all directors within two weeks after the meeting.

**Section 12. <u>Committees</u>.** To the extent permitted by law, the Board of Directors may appoint from its members a committee or committees, temporary or permanent, appoint a chairman of each such committee, and designate the duties, powers, and authorities of each such committee. Each such committee shall meet at a time and place specified by the Chairman of the Board and at such other times and places as the Committee Chairman may determine. Each such committee shall be subject to the same rules governing meeting quorums, meeting places, meeting procedures, and meeting minutes as the Board of Directors.

## ARTICLE II
## OFFICERS

**Section 1. <u>Number of Officers</u>.** The officers of the organization shall be a President, a Secretary, and a Treasurer, and such other officers, such as Vice President, as may be created by the Board of Directors. Each officer shall be elected by the Board of Directors. Two or more offices may be held by one person, except that the President may not serve concurrently as a Vice President.

> **President.** The President shall be the chief executive officer of the organization.

> **Secretary.** The Secretary shall give notice of all meetings of the Board of Directors and any of its Committees, shall keep an accurate list of the directors and committee members, and shall have the authority to certify any records, or copies of records, as the official records of the organization. The Secretary shall keep and maintain the minutes of all meetings of the Board of Directors and of any of its committees.

> **Treasurer.** The Treasurer shall be responsible for conducting the financial affairs of the organization as directed and authorized by the Board of Directors and shall make reports of corporate finances at each meeting of the Board of Directors and as otherwise required by the President or the Chairman of the Board.

**Section 2. <u>Election and Term of Office</u>.** Each officer shall be elected by the Board of Directors at its first meeting. Additional or replacement officers may be elected at any subsequent meeting of the Board of Directors. Each officer shall serve a term ending on the later of the date one year following the officer's election or the date as of which a successor has been elected and qualified.

**Section 3. <u>Removal or Vacancy</u>.** The Board of Directors shall have the power to remove any officer or agent of the organization. Any vacancy that occurs for any reason may be filled by the Board of Directors.

### ARTICLE III
### CORPORATE SEAL & EXECUTION OF INSTRUMENTS

The organization shall not have a corporate seal. All instruments that are executed on behalf of the organization that affect an interest in real estate shall be executed by the President or any Vice-President and by the Secretary or the Treasurer. All other instruments executed by the organization may be executed by the President or any Vice-President. Notwithstanding the preceding provisions of this section, any written instrument may be executed by any officer(s) or agent(s) that are specifically designated by resolution of the Board of Directors.

### ARTICLE IV
### AMENDMENT TO BYLAWS

These bylaws may be amended, altered, or repealed by the Board of Directors at any regular or special meeting, provided that the text of any proposed changes have been distributed to all board members at least ten (10) days before the meeting.

### ARTICLE V
### INDEMNIFICATION

Any director or officer who is involved in litigation by reason of his or her position as a director or officer of this organization shall be indemnified and held harmless by the organization to the fullest extent authorized by law as it now exists or may subsequently be amended (but, in the case of any such amendment, only to the extent that such amendment permits the organization to provide broader indemnification rights).

### ARTICLE VI
### DISSOLUTION

The organization may be dissolved only with authorization of its Board of Directors given at a special meeting called for that purpose, and with the subsequent approval by no less than two-thirds (2/3) vote of the members. In the event of the dissolution of the organization, the assets shall be applied and distributed as follows:

All liabilities and obligations shall be paid, satisfied, and discharged, or adequate provision shall be made therefore. Assets not held upon a condition requiring return, transfer, or conveyance to any other organization or individual shall be distributed, transferred, or conveyed, in trust or otherwise, to charitable and educational organization, organized under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, of a similar or like nature to this organization, as determined by the Board of Directors.

Upon the dissolution of the organization, assets shall be distributed for one or more exempt purposes within the meaning of Section 501c3 of the Internal Revenue Code or corresponding section of any future federal tax code, or shall be distributed to the federal government, or to a state or local government, for a public purpose.

**AA0494**

**Certification**

Lydia Brimelow, President of Berkeley Springs Castle Foundation, and Peter Brimelow, Secretary of Berkeley Springs Castle Foundation, hereby certify that the foregoing is a true and correct copy of the bylaws of the above-named organization, duly adopted by the initial Board of Directors on October 1, 2020.

By: _____     Date: _____

Lydia Brimelow, President

By: _____     Date: _____

Peter Brimelow, Secretary

**AA0495**

FILED: APPELLATE DIVISION - 1ST DEPT 02/08/2023 04:32 PM
NYSCEF DOC. NO. 1
FILED: APPELLATE DIVISION 1ST DEPT 02/07/2023 01:38 PM
NYSCEF DOC. NO. 3
2023-00672
2023-00672
RECEIVED NYSCEF: 02/08/2023
RECEIVED NYSCEF: 02/07/2023

## EXPEDITED SERVICE AND/OR INTERIM RELIEF
(SUBMITTED BY MOVING PARTY)

Date: February 6, 2023                    Case # 2023-00672

Title of Matter: Attorney General of the State of New York, Petitioner,      Index/Indict/Docket # 453196/2022

v. VDARE Foundation, Inc., Respondent

Appeal by **Respondent** from:  Order ☑  Judgment ☐  Decree ☐  of  Supreme ☑  Surrogate's ☐  Family ☐      County **New York**      Court entered on **Jan 23**, 20 **23**

Name of Judge Sabrina Kraus      Notice of Appeal filed on **Feb 6**, 20 **23**

If from administrative determination, state agency _____

Nature of action or proceeding: Special proceeding to compel subpoenaed disclosures

Provisions of  ☑ order  ☐ judgment  ☐ decree  appealed from _____

(1) denial of respondent's application to stay matter pending respondent's first-filed federal case; and (2) grant of petitioner's motion to compel

This application by ~~appellant~~ respondent is for stay of Order (1) denying stay of proceeding pending resolution of respondent's first-filed federal case and (2) granting motion to compel and ordering disclosures on February 10 and 24, 2023.

If applying for a stay, state reason why requested The court below declined to stay this matter pending resolution of respondent's first-filed federal claim against the Attorney General and compelled constitutionally protected disclosures

Has any undertaking been posted **No**      If "yes", state amount and type _____

Has application been made to court below for this relief **No**      If "yes", state Disposition _____

Has there been any prior application here in this court **No**      If "yes", state dates and nature _____

Has adversary been advised of this application **Yes**      Does he/she consent **No**

**AA0496**

| Attorney for Movant | Attorney for Opposition |
|---|---|
| Name Andrew J. Frisch, The Law Offices of Andrew J. Frisch, PLLC | Yael Fuchs, Office of Attorney General |
| Address 40 Fulton Street, 17th Floor | 28 Liberty Plaza |
| New York, New York 10038 | New York, New York 10005 |
| | |
| Tel. No. 212-285-8000 (cell 917-826-4668) | 212-416-8391 |
| | |
| Appearing by Andrew J. Frisch | AAG Yael Fuchs |
| afrisch@andrewfrisch.com | yael.fuchs@ag.ny.gov |

---

**(Do not write below this line)**

DISPOSITION

application for interim stay granted pending expedited resolution of this motion by a full bench.

MJM
_Justice_

02/08/2023
_Date_

Motion Date 2/27/23 ____ Opposition 2/22 ____ Reply 2/27 10 am ____

EXPEDITE _____ PHONE ATTORNEYS _____ DECISION BY _____

ALL PAPERS TO BE SERVED PERSONALLY.

EtH
_Court Attorney_

"Revised 10/19"

**AA0497**

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST DEPARTMENT

--------------------------------------------------------------------- x

People of the State of New York, by LETITIA JAMES,
ATTORNEY GENERAL OF THE STATE OF NEW YORK,

                         Petitioner-Appellee,

                  - against -

VDARE FOUNDATION, INC.

                     Respondent-Appellant.

--------------------------------------------------------------------- x

**Appellate Division
Docket No. 2023-00672**

**New York County
Index No. 453196/2022**

## AFFIRMATION IN SUPPORT OF APPLICATION
## FOR A STAY AND INTERIM RELIEF PENDING APPEAL

Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@andrewfrisch.com*

*Attorney for Respondent-Appellant*

## Table of Contents

Introduction . . . . . . . . . . . . . . . . . . 4

A.  The OAG's Demand for Immediate Disclosure of Constitutionally Protected
    Information Extraneous to Any Legitimate Investigative Need Warrants the
    Inference that the OAG's Pursuit of VDARE is Retaliation for
    VDARE's Exercise of its Constitutional Rights . . . . . . . . . . . . 5

B.  The OAG's Erroneous Challenge to New York's First-Filed Rule . . . . . 12

C.  The Court Below Unduly Deferred to the OAG at the Expense of VDARE's
    Right to Seek Redress in Federal Court for the State's Unconstitutional
    Retaliation and Demand for Disclosures of Constitutionally Protected
    Information Extraneous to Any Truly Overriding Investigative Need . . . 15

Conclusion . . . . . . . . . . . . . . . . . . . 22

2

**AA0499**

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST DEPARTMENT
----------------------------------------------------------------- x

People of the State of New York, by LETITIA JAMES,
ATTORNEY GENERAL OF THE STATE OF NEW YORK,

                   Petitioner-Appellee,

         - against -

VDARE FOUNDATION, INC.

               Respondent-Appellant.

----------------------------------------------------------------- x

**Appellate Division
Docket No.**

**New York County
Index No. 453196/2022**

## AFFIRMATION IN SUPPORT OF APPLICATION
## FOR A STAY AND INTERIM RELIEF PENDING APPEAL

**ANDREW J. FRISCH**, an attorney duly admitted to practice in the courts of

the

State of New York since 1985, affirms the following statements to be true under penalty of

perjury:

        1.       I am the principal of The Law Offices of Andrew J. Frisch, PLLC, counsel

to Respondent-Appellant VDARE Foundation, Inc. ("VDARE"). I make this affirmation in

support of VDARE's motion for an order pursuant to CPLR 5519(c), as well as this Court's

inherent power in aid of its appellate jurisdiction [*see Pokoik v. Dep't of Health & Human Servs.

of County of Suffolk*, 220 A.D.2d 13, 16 (2d Dep't 1996) (citing *Matter of Schneider v. Aulisi*, 307

N.Y.2d 376 (1954)], staying enforcement of an order of the Supreme Court, New York County

(Kraus, J.), dated January 23, 2023 (the "Order," attached hereto as **Exhibit A**). The court

**AA0500**

below erred in that it:

(a) denied VDARE's application to stay the proceeding pending resolution of VDARE's first-filed action against the Attorney General of the State of New York (the "OAG") in *VDARE Foundation, Inc. v. Letitia James*, 1:22-cv-01337 (N.D.N.Y.) (Scullin, U.S.D.J.) (*see* complaint in which is attached hereto as **Exhibit B**); and

(b) compelled VDARE, on ***February 10 and 24, 2023***, to produce materials to the OAG protected by the rights to speech and association guaranteed by the federal and state constitutions.

2.   This Affirmation is based on personal knowledge, true and correct copies of documents attached hereto as exhibits, the record of this matter below, and on information and belief as noted herein.

3.   On January 25, 2023, the OAG filed Notice of Entry of the Order. **Exhibit**

**C**.  On February 6, 2023, VDARE filed a Notice of Appeal.  **Exhibit D**.  On February 6, 2023, I advised the OAG that this application would be made to the Court.  **Exhibit E.**

### Introduction

4.   VDARE is a non-profit foundation organized and existing under the laws of the State of New York with a principal place of business in Berkeley Springs, West Virginia. Undersigned counsel was engaged by VDARE in late August 2022 to comply with and otherwise respond to an investigative subpoena issued to VDARE by the OAG on or about June 24, 2022 (the "Subpoena," attached hereto as **Exhibit F**).

5.   On December 12, 2022, VDARE initiated its action against the OAG in federal court [**Exhibit B**] to protect its ability to continue to do business and its rights of speech and association guaranteed by the federal and state constitutions.  The OAG responded to VDARE's federal action with a motion to dismiss, which is not yet fully briefed.  **On December**

4

**AA0501**

16, 2022, less than a week after VDARE initiated its federal action, the OAG commenced the proceeding below against VDARE, seeking to compel the very disclosures identified in VDARE's federal complaint as threatening its existence.

6.    The OAG's conduct and the court's Order support VDARE's view that a federal court should hear and resolve VDARE's claims of unconstitutional retaliation before VDARE is compelled to produce constitutionally-protected information to the OAG.  VDARE should not be required to produce such material even if its claim of retaliation is rejected absent an adequate justification for such information and the OAG's narrow tailoring of its demands to fit legitimate investigative need.

7.    For these reasons, and as further detailed below, this Court should stay the Order pending resolution of VDARE's appeal to this Court.  At the very least, this Court should stay so much of the Order that compels disclosures of the information at issue.  If the Court is unable to rule on this application for a stay until on or after **February 9, 2023**, the day before the first disclosures must be made pursuant to the Order, the Court should stay the Order at least until 72 hours after this application is resolved.

A.    The OAG's Demand for Immediate Disclosure of Constitutionally Protected Information Extraneous to Any Legitimate Investigative Need Warrants the Inference that the OAG's Pursuit of VDARE is Retaliation for VDARE's Exercise of its Constitutional Rights

8.    While VDARE was briefly represented by an attorney who challenged the validity of the Subpoena, undersigned counsel upon entering the matter as replacement counsel assured the OAG of VDARE's intended compliance.  Recognizing the OAG's broad discretion to exercise regulatory oversight of charities registered in New York and issue investigative subpoenas, between September and November 2022 VDARE produced over 6,000 pages of

5

**AA0502**

documents to the OAG after completing review of documents maintained in hard copy and electronically - - the universe of responsive documents so maintained. By December 2022, VDARE had engaged a vendor to secure its 40 gigabytes of emails (the equivalent of millions of pages) for undersigned counsel's review; had identified email custodians to the OAG; and undersigned counsel's review for responsive emails was well under way.

9.      On December 2, 2022, however, the OAG took unduly heavy-handed positions that demanded disclosures of constitutionally-protected information, threatened VDARE's ability to conduct business, and unfairly inferred VDARE's bad faith from the mechanics of VDARE's then-ongoing compliance. *See* Letter from the OAG to VDARE's counsel, NYSCEF Docket No. 44, attached hereto as **Exhibit G**. The OAG's letter demanded that VDARE, within ten days, disclose its constitutionally protected information, reveal previously-redacted information in the first 6,000 pages of production, complete review of the 40 gigabytes of emails, and produce a complete redaction log for the entirety of its production. *Id.*

10.      Only then, on December 12, 2022, when it appeared that the OAG was targeting VDARE for reasons other than regulatory compliance, VDARE initiated a federal action against the OAG to protect itself and its rights of speech and association guaranteed by the federal and state constitutions.

11.      In otherwise complying with the OAG's Subpoena, VDARE disputed the Subpoena's demand for the identities of contractors who did business with VDARE. The subject matter of VDARE's principal activity - - commentary about immigration policy of the United States disseminated to the public through its website at www.VDARE.com - - is controversial. As VDARE demonstrated below without dispute, VDARE's lawful speech has led to and

6

**AA0503**

continues to cause reputational and professional harm to people and entities associated with it. Contractors providing services essential to VDARE's very existence have refused to continue to do business with VDARE, including venues which have cancelled contracts with VDARE to host conferences, sometimes because of disagreement with VDARE's views, but typically because of their aversion to public protests. These harms to VDARE have made it increasingly difficult for VDARE to find alternative contractors to stay in business. *See* NYSCEF Docket No. 37 (Affirmation of VDARE's Counsel) at 4, attached hereto as **Exhibit H** (citing *"VDARE responds to conference cancellation at Cheyenne Mountain Resort,"* Aug. 15, 2017 ("Cheyenne Mountain Resort [in Colorado] will not be hosting the VDARE Foundation in April of next year. We remain committed to respecting the privacy of guests at the resort."); Kristine Phillips, The Washington Post, Jan 26, 2017 ("Tenaya Lodge, a resort on the border of Yosemite National Park, canceled [VDARE's] booking after receiving complaints about the organization's views."); *"Cancelled Tucson Conference Produces Five-Figure Settlement - - VDARE.com To Announce New Venue Soon!"* Mar. 7, 2018).

12.     Likewise, multiple businesses providing services essential to VDARE's continued operations have terminated their relationships with VDARE, including Mailchimp and Constant Contact (providers of email marketing services), Paypal, Amazon, Google Ads, and other lesser known businesses. **Exhibit H** at 4-5. VDARE created an entity called "Happy Penguins LLC" for the sole purpose of paying VDARE's employees so that they could identify a non-controversial entity (Happy Penguins) - - and not VDARE - - as their employer. *See* VDARE's Internal Revenue Form 990 for 2019 (identifying "Happy Penguins LLC / Peter Brimelow" (VDARE's founder) as a service providing leased employees). See **Exhibit H** at 4-5.

7

13.     VDARE demonstrated below that the threat to its rights to free speech and association is ongoing and constitutes a genuine risk of irreparable harm.  As recently as January 4, 2023, the Washington Post published an article entitled, *"A 'hate castle' or welcome neighbor? VDare divides a West Virginia town.  In Berkeley Springs, the purchase of an iconic castle by VDare, which some consider a hate group, has led to angst and ugliness,"* Washington Post, Jan. 4, 2023. *See* NYSCEF Docket No. 58 (Reply Affirmation of VDARE's Counsel) at 6-7, attached hereto as **Exhibit I**).  Comments to the article posted at *www.washingtonpost.com* contain multiple instances of public abuse of and threats to VDARE's neighbors in West Virginia solely because their favorable opinions of VDARE or its principals were quoted in the article.  Some comments identify those quoted in the article by name; claim that those with favorable opinions of VDARE's principals must necessarily be white supremacists; and threatened them with commercial retaliation and not to "spend money in their town."  One especially vile public comment called out an elderly proprietor of a local business as a "filthy racist" because she was quoted in the article as defending VDARE's principals.  **Exhibit I** at 7.

14.     As discussed *infra*, the court below granted the OAG's motion to compel identities of unrelated contractors and  VDARE's content providers - - writers and contributors who provide content for VDARE's website.  The court below did so despite the OAG's explicit concession in federal court that disclosure of the identities of content providers is beyond the Subpoena's scope.  As part of the OAG's submissions below in support of its motion to compel, the OAG emailed the court a copy of its papers in federal court in support of its [currently pending] motion to dismiss VDARE's federal case.  The OAG therein confirmed that its "VDARE Subpoena did *not* seek any information regarding the development or publication of

8

**AA0505**

VDARE's online content." *See VDARE v. James*, 22-cv-1337 (N.D.N.Y.), Docket No. 12-1

(attached hereto as **Exhibit J**) at 8-9 (OAG's emphasis in original). Just as the court below

ignored VDARE's genuine constitutional concerns about its continued ability to do business if

compelled to disclose identities of unrelated contractors to the OAG, the court below also

ignored the OAG's own concession that the Subpoena did not demand disclosure of information

about publication of VDARE's online content. The court below compelled the disclosures

anyhow.

      15.    Further, the OAG made no genuine effort below and refused VDARE's

repeated requests to show why its request for these identities could not be narrowly tailored. *See*

*Matter of Evergreen Assn., Inc. v. Schneiderman*, 153 A.D.3d 87 (2d Dep't 2017) (citing *Shelton*

*v. Tucker*, 364 U.S. 478, 488 (1960)) (the Attorney General's legitimate investigative purpose

"cannot be pursued by means that broadly stifle fundamental personal liberties when the end can

be more narrowly achieved," and applying strict scrutiny where compliance with the OAG's

subpoena would "have a chilling effect on [the group's] associations with its employees and

potential clients" as well as at least one hospital); *New York State Senate Republican Campaign*

*Comm. v. Sugarman*, 165 A.D.3d 1536, 1540–41 (3d Dep't 2018) (the subpoena's demands

capture materials that are "extraneous to the central purposes of [respondent's] inquiry . . . and/or

unnecessarily infringe on petitioners' First Amendment rights of political expression and

association") (citing *Matter of Evergreen* and quoting *Matter of Kalkstein v. DiNapoli*, 228

A.D.2d 28, 30 (3d Dep't 1997) (quotation marks omitted)). *See also NAACP v. Alabama ex rel.*

*Patterson,* 357 U.S. 449, 460, 462 (1958) (protecting the right of "advocacy of both public and

private points of view, particularly controversial ones" and requiring association to produce

membership list interfered with First Amendment freedom of association).

16.     The OAG - - and the court below - - failed to address VDARE's concern about the OAG's apparent disclosure of constitutionally-protected information in another investigation.  On August, 26, 2022, Politico published confidential information about donors to another conservative not-for-profit entity in the OAG's cross hairs.  Thereafter, on October 11, 2022, members of the United States Congress wrote to United States Attorney General Merrick Garland, requesting investigation of apparently undue disclosures provided to or otherwise obtained by the OAG.  *See* **Exhibit H** at 7.

17.     VDARE attempted to accommodate the OAG by proposing two middle grounds below, both of which were summarily rejected.  *First*, VDARE proposed that it disclose the identities of all contractors who might qualify as "related" within the meaning of Section 715 of New York's Not-for-Profit Corporation Law and otherwise produce all information for all contractors about services provided and the amounts paid to each, without prejudice to the OAG's right to revisit the issue.  The OAG would presumably have no investigative need for the identities of unrelated contractors near VDARE's headquarters in West Virginia (or elsewhere) earning *de minimis* compensation, or unrelated providers of general services such as website hosting, among other unrelated contractors.  While the OAG rejected this middle ground, VDARE nonetheless provided the OAG with an independent auditor's report which identified contractors which might qualify as related.

18.     *Second*, VDARE alternatively proposed that it produce a fully unredacted list of contractors to the court below *in camera* (a protocol used in *Matter of Evergreen)*, subject to the OAG's request for disclosure of the identities of any particular unrelated contractor upon a

10

**AA0507**

showing of a narrowly-tailored investigative need. **Exhibit K.** The court below summarily rejected this proposal without explanation.

19. VDARE initiated its federal case only after the OAG's demand for constitutionally-protected information and its other unduly aggressive positions warranted the inference that the OAG was using its investigative authority in whole or in part as retaliatory state action for VDARE's exercise of its rights to speech and association. For example, the OAG claimed VDARE's non-compliance with the OAG's investigative subpoena on December 2, 2022 [*see* **Exhibit G**], just *one day* before December 3, 2022, the effective date of New York State's new law - - General Business Law ("G.B.L.") Section 394-ccc - - aimed at "hateful conduct," defined as the use of social media to vilify, humiliate, or incite violence. VDARE does not use social media (or any outlet) to vilify, humiliate, nor incite violence against anyone.

20. The OAG's claim of noncompliance on December 2, 2022, the day before the effective date of New York's new law, December 3, 2022, was not the first temporal connection between the OAG's professed regulatory oversight of VDARE while signaling another agenda. As alleged in VDARE's federal complaint, the OAG issued the Subpoena to VDARE in June 2022 just after the OAG's newly created "Hate Crimes Unit" issued separate subpoenas to both Facebook and Facebook's parent company, seeking information about VDARE with specific reference to purported hate speech. **Exhibit B** at ¶¶ 16-18.

21. As alleged in VDARE's federal complaint, the Attorney General in 2020 joined in a letter to Facebook demanding that it increase censorship against "hate speech and hate organizations." **Exhibit B** at ¶ 14. The Attorney General in 2020 also proclaimed - - expressly - - that she created her Hate Crimes Unit "*to strengthen oversight,* because we see how

11

**AA0508**

much hate is being fueled by content on the internet. We're calling on these companies to regulate hate speech and strengthen their policies. They can do more to fight these things - racism, the spread of disinformation and hate." **Exhibit B** at ¶ 13 (emphasis added).

22.     In fact, the Subpoena itself requests documents far afield from any legitimate regulatory oversight. For example, the OAG demanded "Copies of the transcripts to each deposition in the litigation between VDARE founder Peter Brimelow and/or VDARE and the New York Times, and all documents produced by VDARE and/or Brimelow in connection with those proceedings." This demand refers to a lawsuit for libel filed by Brimelow against the New York Times for unjustifiably branding him an "open white nationalist." **Exhibit B** at ¶ 23.

23.     The undue deference afforded the OAG by the court below notwithstanding the inference of the OAG's unconstitutional retaliation - - and the court's rush to grant the OAG's motion to compel in its entirety in the face of genuine constitutional concerns - - underscore why VDARE chose federal court to seek constitutional relief.

B.     The OAG's Erroneous Challenge to New York's First-Filed Rule

24.     In opposing a stay of this proceeding pending resolution of VDARE's federal case against the OAG (or at least pending decision on the OAG's motion to dismiss VDARE's federal case), the OAG did not dispute that VDARE initiated its federal case before the OAG initiated its special proceeding below. New York's well-settled "first-filed" rule requires that the "court which has first taken jurisdiction" - - in this case, United States District Court for the Northern District of New York - - "is the one in which the matter should be determined and it is a violation of the rules of comity to interfere." *Ace Prop. & Cas. Ins. Co. v.*

12

**AA0509**

*Fed.-Mogul Corp.*, 55 A.D.3d 479, 480 (1st Dep't 2008); *accord L-3 Commc'ns Corp. v. SafeNet, Inc.*, 45 A.D.3d 1, 7 (1st Dep't 2007) (same); *accord Syncora Guarantee Inc. v. J.P. Morgan Sec. LLC*, 110 A.D.3d 87, 95 (1st Dep't 2013) (same); C.P.L.R. 3211(a)(4).

25.    Instead of acknowledging that VDARE had a right to choose its forum under settled law in New York, or otherwise consenting to a stay at least to accommodate decision on the OAG's [currently pending] motion to dismiss VDARE's federal case, the OAG analogized VDARE to a commercial plaintiff precipitously seeking tactical advantage by choosing a forum inconvenient to an aggrieved commercial opponent [*see* NYSCEF Docket No. 57, OAG's Memorandum of Law, Jan. 18, 2023 at 2 (citing *White Light Prods. v. On the Scene Prods.*, 231 A.D. 2d 90, 100 (1st Dep't 1997)], and argued that it was improper for VDARE to seek federal relief after the OAG threatened enforcement on December 2, 2022. *See* NYSCEF Docket No. 57 at 1. The analogy pressed by the OAG was misplaced for at least three independent reasons.

26.    *First*, unlike a commercial plaintiff who rushes to an inconvenient forum as soon as its opponent signals an intent to litigate, the OAG's resort to litigation is inherent in virtually every subpoena it issues. *See* **Exhibit F** at 1 (the Subpoena issued to VDARE in June 2022 included the OAG's standard warning that it can seek enforcement for disobedience). The OAG's analogy to commercial litigation would serve to bar every person issued a subpoena by the OAG from ever seeking federal redress in every case no matter how irreparable the federal constitutional harm threatened by the OAG.

27.    *Second*, apart from the Subpoena's inclusion of the OAG's standard warning of its right to seek enforcement, the OAG began expressly threatening VDARE with a

13

motion to compel as early as September 8, 2022, before undersigned counsel had even begun to undertake VDARE's compliance with the OAG's subpoena - - three months before December 10, 2022, when VDARE filed its federal case. *See* Email from the OAG to undersigned counsel, September 8, 2022, attached as **Exhibit K** ("We are prepared to offer reasonable extensions of time reflecting your obligations, but without any production, we are not prepared to continue to extending the deadline and will seek judicial relief ourselves to move this process forward.").

28.     *Third*, unlike a commercial litigant who chooses a geographically inconvenient forum to vindicate its interests in a financial transaction, VDARE chose federal court to vindicate its federal constitutional rights - - and did so in Albany where the OAG maintains an executive office. *See https://ag.ny.gov/contact-attorney-general-letitia-james.*

29.     Likewise misplaced was the OAG's reliance below on *Trump v. James*, 2022 WL 1718951 (N.D.N.Y. May 27, 2022) [*see* NYSCEF Docket No. 57 at 2], in which the former president sought redress in federal court only *after* he had defied multiple orders for contempt and a state action was already ongoing.  No such actions preceded VDARE's federal case.  As *Trump v. James* itself makes clear, "the obligation of federal courts to hear cases within their jurisdiction is 'virtually unflagging'" absent pre-existing state litigation. *Id.* at \*23 (quoting *Cavanaugh v. Geballe*, 28 F.4th 428, 430, 432 (2d Cir. 2022).

30.     Especially revealing was the OAG's subterfuge in delaying the federal case while secretly rushing to state court.  VDARE filed its federal case on December 12, 2022, simultaneously emailing a courtesy copy of its papers to the OAG in advance of formal service, which provided the OAG with three weeks (until January 4, 2023) to respond. *See* F. R. C. P. 12(a)(1)(A)(I).  On December 21, 2022, a full two weeks before the OAG's response was due

14

on January 4, 2023, the OAG requested and secured VDARE's consent to an extension of the OAG's deadline to respond in federal court, from January 4 to 18, 2023. In so doing, the OAG claimed (in an email) that the extension was necessary because of the holidays and an attorney who had taken ill: "Because of the holidays and a member of our team who has COVID, we would appreciate an extension until Jan 18 to respond to VDARE's complaint in the NDNY. Can you please confirm your consent?" *See* **Exhibit H** at 2-3.

31.     Unbeknownst to VDARE when it consented to the extension on December 21 2022, however, the OAG had already initiated this special proceeding the week before (on December 16, 2022) with a proposed order to show cause. The court below issued the OAG's order to show cause on December 22, 2022, scheduling oral argument on the OAG's state motion to compel on January 19, 2023, two business days before the court below denied VDARE's application for a stay based on its first-filed federal action and compelled the disclosures.

32.     It is the OAG, not VDARE, which forum-shopped for undue tactical advantage - - further warranting the inference that more is afoot here than a small charity's regulatory compliance.

C.     The Court Below Unduly Deferred to the OAG at the Expense of VDARE's Right to Seek Redress in Federal Court for the State's Unconstitutional Retaliation and Demand for Disclosures of Constitutionally Protected Information Extraneous to Any Truly Overriding Investigative Need

33.     Despite judicial deference afforded the OAG, nothing about the OAG's professed concerns in its letter to VDARE of December 2, 2022, nor its subsequent motion to compel in the court below demonstrated either a legitimate investigative need for the constitutionally-protected information nor any true attempt at narrow tailoring. To the contrary,

15

**AA0512**

the OAG took the constitutionally offensive position that "the identities of contractors - - including writers who contribute to the website - - these are precisely the records the OAG must examine in its investigation of VDARE's organizational misconduct." NYSCEF Docket No. 3 at 16. The OAG's conclusion does not fit its rationale: a vendor's provision of services to VDARE or a writer's provision of content to its website has no automatic connection to any legitimate investigative need. The OAG took the Orwellian position that its demands were narrowly tailored [NYSCEF Docket No. 3 at 16] when it made no effort at all to narrowly tailor them and rejected VDARE's proposed middle grounds out of hand.

34. Likewise constitutionally offensive - - and irrational - - was the OAG's analogy below of VDARE's vendors and content providers to the copyright violator in *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010), who declined to reveal his name after the copyright holder tracked him via his computer's IP address. The OAG relied on *Arista's* principle that anonymity may not be used to mask violations of the law [*see* NYSCEF Docket No. 3 at 16], but none of VDARE's vendors nor content providers are alleged to have violated the law nor to have helped VDARE to do so. The OAG's demand that VDARE reveal their identities is more than an overreach: it warrants the inference that the Attorney General may be after VDARE *because* of its speech and is demanding that it reveal identities of its vendors and content providers because either she intends to put it out of business or is otherwise hostile to the rights of those with whom she disagrees.

35. Before constitutionally-protected disclosures may be compelled, more is required than a general claim of investigative need. Instead, anonymous Internet speech is protected by the First Amendment unless a party seeking enforcement of a subpoena first

16

**AA0513**

establishes "a real evidentiary basis for believing that the defendant has engaged in wrongful conduct that has caused real harm to the interests of the plaintiff" so that a court may then "assess and compare the magnitude of the harms that would be caused" to freedom of speech and the defendant's commercial interests." *See Mirz v. Yelp, Inc.*, 2021 U.S. Dist. LEXIS 160961 (S.D.N.Y. Aug. 25, 2021); *"Anonymous criticism helped make America great: Trump's critic is utilizing a practice employed by many of the Founding Fathers to protect truth from power,"* The Washington Post, Sept. 8, 2018[1] ("anonymous publication has been an essential feature of American democracy since its beginning. It has long allowed vulnerable voices to participate in public politics and speak truth to power. Indeed, anonymous debate was at the center of the revolutionary politics that led to American independence, the U.S. Constitution and the Bill of Rights, which enshrined the press freedoms that continue to protect anonymous speech today.").

36. The state of the record did not permit the court below to rule on the merit of the OAG's professed regulatory concerns about VDARE, but nor did it warrant unfettered judicial deference to every inference pressed by the OAG. For example, a purported impetus for the OAG's investigation (as first disclosed by the OAG to VDARE shortly after issuance of the Subpoena) was VDARE's purchase in 2020 of a castle-styled property in West Virginia. VDARE did not dispute the OAG's discretion to conduct oversight of a charity's purchase of such a property and instead addressed the issues in its disclosures and offered to meet immediately with the OAG to discuss it. VDARE explained, as otherwise publicly reported, that

---

[1] Available at *https://www.washingtonpost.com/outlook/2018/09/08/anonymous-criticism-helped-make-america-great/*

17

VDARE acquired the castle to host conferences and thereby eliminate the risk that VDARE's events could only be conducted at the whim of independent venue owners. *See* **Exhibit H** at 8 (citing Rachel Olding, *"Tourist Town Desperate to Reopen Faces Another Battle"* Daily Beast (May 29, 2020)[2] (noting that VDARE's founder, Peter Brimelow, "said they plan to use the castle for meetings and as a studio - - handy considering at least three hotels have canceled conference contracts on VDARE after learning of the group's views."); *see also* NYSCEF Docket No. 4 (Affirmation of the OAG in support of its motion to compel) at 5 (citing public reports of purchase of castle for use as a meeting place "without fear of deplatforming").

37. The OAG questioned the use of the castle itself as housing for the Brimelows and their three children. Among documents produced by VDARE to the OAG is a lease agreement establishing that the Brimelows paid rent to live in a cottage on the castle grounds beginning in April 2021. Before the cottage was habitable, the Brimelows and their three children paid rent to live in the castle for a period of months after moving to West Virginia from Connecticut. *See* **Exhibit H** at 8-9. Upon locating and producing the Brimelows' lease agreement for the cottage, the undersigned proposed a meeting with the OAG to begin addressing the OAG's concerns [*see* NYSCEF Docket No. 4 at 6] that the Brimelows used the castle as a residence even after their cottage was made hospitable for lease or that the Brimelows *ever* derived any financial gain from the castle.

38. Nothing about the castle, however, warranted the OAG's demand for identities of contractors and content providers absent narrow tailoring and a true showing of

---

[2] Available at *https://www.thedailybeast.com/berkeley-springs-west-virginia-freaks-out-after-vdare-founder-buys-its-castle*.

investigative need, especially while the OAG is simultaneously representing to a federal judge that VDARE was not required to provide information regarding the "publication of VDARE's online content." *See* **Exhibit J** at 8-9.

39.    Even with judicial deference afforded the OAG, other professed concerns about VDARE failed to demonstrate any connection between the constitutionally-protected information and any true investigative need. At least some of the OAG's claims of malfeasance were either transparently pretextual or seemed designed to cast VDARE in the worst possible light whether or not truly warranted. For example, the OAG argued in support of its motion to compel that Lydia Brimelow is identified on filings as VDARE's "Secretary, Treasurer and Publisher," but not identified as Peter Brimelow's wife on VDARE's Internal Revenue Service Form 990. *See* NYSCEF Doc. 4 at 4-5. Peter and Lydia Brimelow, however, share the same last name, holding themselves out as husband and wife on the same VDARE website which the OAG reviewed to find information supporting its investigation, and, on information and belief, file their income tax returns jointly as husband and wife with the same Internal Revenue Service with which VDARE files Form 990. *See* **Exhibit H** at 9. Once again, the OAG asserted no connection between this purported misstep in completing an IRS form and the identities of VDARE's vendors or content providers.

40.    Similarly, the OAG insinuated that Peter Brimelow's compensation reported in from VDARE's 2019 IRS Form 990 was atypically high [NYSCEF Docket No. 3 at 9], but conveniently omitted that VDARE's total contributions for 2019 were $4,259,309 [see **Exhibit H** at 9-10], a far substantially greater amount than in other years. The OAG also insinuated malfeasance from an auction of furnishings from the castle [NYSCEF Docket No, 4 at

8], but, on information and belief, the entirety of *de minimis* proceeds from the auction inured to VDARE's benefit. **Exhibit H** at 9-10. None of this innuendo from the OAG justified its demand for the identities of vendors and content providers.

41. Nor did the mechanics of VDARE's compliance warrant the OAG's demand for constitutionally-protected information. In demanding on December 2, 2022, that VDARE complete its production and identify all contractors without redactions by December 12, 2022, the OAG complained that VDARE had inconsistently applied redactions without a log identifying the bases for the redactions. But the OAG had itself agreed to "a rolling production" [*see* **Exhibit H** at 10], which enabled VDARE - - acting in good faith - - to reassess the need for redactions as its review continued. VDARE's counsel expressly told the OAG that it had redacted some information in earlier installments of the rolling production which upon later review had been unnecessary. *Id.*

42. Despite the OAG's innuendo that VDARE is acting in bad faith and has deliberately withheld responsive documents [*see* NYSCEF Docket No. 4 at 15], VDARE's counsel has represented in affirmations that the only redactions are to the information discussed herein plus a handful based on attorney-client privilege (and the identity of donors, to which the OAG has agreed) - - and that review of the 40 gigabytes of emails is the only remaining task to complete compliance. While the OAG alleged with rhetorical flourish that redactions had been made to almost every category of document produced [NYSCEF Docket No. 3 at 9], the vendors, content providers, and donors whose identities were redacted are inextricable parts of VDARE's business - - as VDARE's counsel had expressly advised the OAG. *See* **Exhibit H** at 11 (VDARE's counsel emailing the OAG that "the identities of VDARE's donors, content

20

**AA0517**

providers, and vendors who provide services to VDARE in its locality or are otherwise indispensable to its work are inextricably intertwined with some of its financial records. For example, some of these entities are identified in bank statements in lists of monthly transactions and associated copies of checks. The work to provide such financial records with redactions is labor-intensive and time-consuming and is ongoing."). Even if a redaction log after the final installment of the rolling production does not the satisfy the OAG's indiscriminate preferred timing, it did not justify the OAG's immediate demand for constitutionally-protected disclosures far afield from any true investigative need.

43. Nor did the OAG's complaint about delays in VDARE's production warrant its demand for constitutionally protected information or any inference of bad faith. By the time of the OAG's letter of December 2, 2022, VDARE had completed production of documents maintained in hard copy and electronically and review of 40 gigabytes of emails was well under way. VDARE is literally a mom-and-pop operation, run by parents of three home-schooled children, represented by a solo practitioner with no legal or administrative staff. *See* **Exhibit H** at 10-11. The types of mechanical issues of compliance about which the OAG complained are typically solvable, especially where the respondent is close to completing compliance.

44. While the OAG had not proffered a confidentiality agreement to govern VDARE's production presumably because constitutionally-protected information need not be provided to the state under any circumstance absent narrow tailoring and a compelling state interest in the specific information, the court below *sua sponte* invited the parties to enter into such an agreement. The OAG's subsequently proposed agreement [attached hereto as **Exhibit**

21

**AA0518**

L] does not protect the identities of VDARE's contractors nor bar the OAG from issuing subpoenas to them - - precisely the type of state action which is unconstitutional unless preceded by narrow tailoring and a showing of legitimate investigative need. The OAG's proposed agreement explicitly permits the OAG to use constitutionally protected disclosures to contact and interview witnesses without seeking VDARE's permission or prior judicial approval.

45. In denying to stay the proceeding initiated by the OAG pending VDARE's first-filed federal action, the court below neither addressed New York's first-filed rule nor VDARE's federal claim against the OAG for retaliation for exercise of its constitutional rights. In granting the OAG's motion to compel, the court below did not address VDARE's concerns about irreparable harm to its ability to conduct business and constitutional rights to speech and association and, instead, accepted the OAG's misplaced analogy to the identity of the copyright violator in *Arista*.

## Conclusion

46. This Court has the "inherent power to grant a stay" of proceedings pending appeal "in aid of its appellate jurisdiction." *Pokoik v. Dep't of Health & Human Servs. of County of Suffolk*, 220 A.D.2d at 16; *see also Schwartz v. New York City Housing Authority*, 219 A.D.2d 47, 48 (2d Dep't 1996) (an appellate court has "inherent power to grant a stay of acts
or proceedings" that "will disturb the status quo and tend to defeat or impair [the court's] appellate jurisdiction").

47. This Court may also "stay all proceedings to enforce the judgment or
order

22

**AA0519**

appealed from pending an appeal" under C.P.L.R. 5519(c). "[T]he granting of stays pending appeal in such cases is, for the most part, a matter of discretion." *Grisi v. Shainswit*, 119 A.D.2d 418, 421 (1st Dep't 1986). The Court's discretion "will be influenced by any relevant factor, including the presumptive merits of the appeal and any exigency or hardship confronting any party." Practice Commentaries, C.P.L.R. C5519:4; *see also Town of Orangetown v. Magee*, 218 17 A.D.2d 733, 734 (2d Dep't 1995) (staying enforcement of judgment pending appeal under § 5519(c)).

48.     For these reasons, this Court should stay the Order pending resolution of VDARE's appeal to this Court. At the very least, this Court should stay so much of the Order that compels disclosure of the information at issue. If the Court is unable to rule on this application for a stay until on or after **February 9, 2023**, the day before the first disclosures must be made pursuant to the Order, the Court should stay the Order at least until 72 hours after this application is resolved.

Dated: February 6, 2023

Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@andrewfrisch.com*

*Attorneys for Respondent*

23

**AA0520**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

VDARE FOUNDATION, INC.

*Plaintiff,*

- against -                          Civil Action No. 22-cv-1337 (FJS/CFH)

LETITIA JAMES, in her official capacity
as Attorney General of the State of New York,

*Defendant.*

-----------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS

Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@andrewfrisch.com*

*Attorneys for Plaintiff*

**AA0521**

**TABLE OF CONTENTS**

Introduction . . . . . . . . . . . 3

A.    New Developments in State Court Show the . . . . . . . . 4
       Merit and Validity of VDARE's Complaint

B.    The Inference of State Retaliation for VDARE's Exercise . . . . . . 8
       of its Constitutional Rights of Speech and Association

    1.  The Attorney General's Targeting of VDARE as Part of What . . . . 8
        She Expressly Describes as Her "Oversight" of Speech

    2.  VDARE Turned to this Court for Relief While Complying with the . . . 11
        OAG's Subpoena Only After the OAG took Positions that Risked
        Irreparable Constitutional Harm and VDARE's Ability to Conduct Business

    3.  The OAG Rejected VDARE's Proposed Middle Grounds . . . . . 15

    4.  The OAG on December 2, 2022, Demanded that VDARE Disclose . . . 16
        Protected Information, One Day Before a New Law Targeting
        "Hateful Conduct" Became Effective

    5.  The OAG's Pretextual Claims of "Organizational Misconduct" . . . . 17

Argument

The OAG May Not Defeat this Court's Jurisdiction By Initiating . . . . . . 22
A State Proceeding After an Aggrieved Litigant Seeks Federal Relief

    1.  Abstention Does Not Apply . . . . . . . . . . 22

    2.  A Litigant May Not Press New York's Law on Res Judicata . . . . 24
        While Violating New York's First-Filed Rule

    3.  Sovereign Immunity Does Not Bar Relief . . . . . . . 27

    4.  Standard of Review . . . . . . . . . . 29

Conclusion       . . . . . . . . . . . 30

**AA0522**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

VDARE FOUNDATION, INC.

                    *Plaintiff*,                    Civil Action No: 11-cv-1337 (FJS/CFH)

          - against -

LETITIA JAMES, in her official capacity
as Attorney General of the State of New York,

                    *Defendant*.

------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS

On December 12, 2022, Plaintiff VDARE FOUNDATION, INC. ("VDARE")

initiated this action against the Attorney General of the State of New York (the "Attorney

General" or the "OAG") for declaratory and injunctive relief to protect its ability to continue to

do business and its rights of free speech and association guaranteed by the federal and state

constitutions.  On January 18, 2023, the OAG moved to dismiss this action.  This Memorandum

of Law and the accompanying declaration of VDARE's counsel and exhibits thereto are

submitted in opposition to the OAG's motion to dismiss.

<u>Introduction</u>

The circumstances of this case are unprecedented because a state law enforcement

3

**AA0523**

officer has expressly proclaimed her right and intent to conduct "oversight" of the content of speech of organizations like VDARE while advancing a professed need for regulatory oversight of charities. Precisely because VDARE respects the OAG's broad authority to conduct regulatory oversight as the OAG sees fit, it was complying with its investigative subpoena and was near completing its compliance when it demanded disclosures which implicate VDARE's federal and state constitutional rights to speech and association. Though VDARE had no objection to disclosing identities of related contractors within the meaning Section 715 of New York's Not-for-Profit Corporation Law nor the amounts paid to and services rendered by other contractors, the OAG demanded disclosure of the identities of VDARE's content providers and other contractors which would put them at risk and threaten VDARE's ability to continue to conduct business.

The OAG could have agreed with one of the middle grounds proposed by VDARE described below without prejudice to its right to revisit the issue or propose one of its own. Its steadfast refusal to do so coupled with an unjustifiable claim to need constitutionally-protected information without narrow tailoring or any showing of specific investigative need shows that far more is afoot than a small charity's governance. The OAG's conduct of this matter, described in VDARE's complaint and herein, proves precisely what the OAG denies: it seeks disclosure of the identities of its content providers and other contractors exclusively or substantially so that VDARE will be unable to continue to express a viewpoint with which it disagrees. The parties are before this Court because the OAG refuses to separate its regulatory oversight of a charity with a professed right of oversight of the content of speech.

A.    *New Developments in State Court Show the Merit and Validity of VDARE's Complaint*

4

Since VDARE initiated this action, related developments in the Supreme Court of the State of New York, County of New York (the "state court") underscore the merit and validity of VDARE's complaint. On December 14, 2022, two days *after* VDARE initiated this action, the OAG initiated a special proceeding in state court to compel VDARE's compliance with the OAG's investigative subpoena (the OAG's petition in state court is attached as Exhibit C to its motion to dismiss, Docket No. 12-3; the OAG's subpoena is attached as Exhibit K to its motion to dismiss, Docket No. 12-13). *See James v. VDARE Foundation, Inc.*, N.Y. County Index No. 453196/2022. VDARE responded to the OAG's petition in state court by moving to stay the newly-filed proceeding [Frisch Declaration,[1] Exhibit A] based on New York's "first-filed" rule pending resolution of this federal action or at least until decision on the OAG's motion to dismiss this action. *See Ace Prop. & Cas. Ins. Co. v. Fed.-Mogul Corp.*, 55 A.D.3d 479, 480 (1st Dep't 2008) (New York's well-settled "first-filed" rule requires that the "court which has first taken jurisdiction . . . . is the one in which the matter should be determined and it is a violation of the rules of comity to interfere."). VDARE otherwise opposed the OAG's demand that it disclose information protected by the constitutional rights to free speech and association. Frisch Declaration, Exhibit A.

On January 23, 2023, the state court denied VDARE's motion for a stay and granted the OAG's motion to compel. Docket No. 15 (the OAG's filing in this Court of the state court's order). On February 8, 2023, on application by VDARE, the Appellate Division, First Department, stayed the state court's order of January 23, 2023, pending further briefing and decision. Frisch Declaration, Exhibit R. The OAG's opposition is to be filed by February 22,

---

[1] "Frisch Declaration" refers to the Declaration of VDARE's counsel filed herewith.

2023, and VDARE's reply by February 27, 2023.

The proceedings in state court demonstrate the sufficiency of VDARE's claim of unconstitutional retaliation and the irreparable constitutional harm VDARE will suffer if it is denied federal redress. Federal deference to state investigative authority does not extend to state retaliation for exercise of constitutionally-protected speech and association. Nor does such deference leave federal courts powerless to protect federal constitutional rights. As demonstrated in VDARE's complaint [Docket No. 1] and herein, VDARE has established that the OAG is targeting VDARE because of its aversion to the content of its protected speech.

No reasonable inference other than unconstitutional retaliation is warranted by the OAG's conduct of this matter. For example, the OAG represented to this Court in its motion to dismiss this case that its subpoena to VDARE does "*not* seek any information regarding the development or publication of VDARE's online content." Docket No. 12-1 at 8-9 (emphasis in original). Simultaneously, the OAG took the contrary and constitutionally offensive position in state court that "the identities of contractors - - including writers who contribute to the website - - these are precisely the records the OAG must examine in its investigation of VDARE's organizational misconduct." Frisch Declaration, Exhibit N at 16. Apart from taking contradictory positions in two different courts, the OAG's purported rationale for the demanded disclosure does not fit its rationale: a vendor's provision of services to VDARE and a writer's provision of content to VDARE's website have no automatic connection to any legitimate investigative need.

Also troubling is the OAG's claim that this Court is bound by an order in a state court proceeding, which it initiated only *after* VDARE sought constitutional protection in this

**AA0526**

Court.  Especially revealing is the OAG's unseemly subterfuge in secretly rushing to state court to secure a favorable order before this Court hears and rules on its motion to dismiss.  VDARE filed its complaint in this Court on December 12, 2022, simultaneously emailing a courtesy copy of its papers to the OAG in advance of formal service, which provided the OAG with three weeks (until January 4, 2023) to respond.  *See* F. R. C. P. 12(a)(1)(A)(I).  Frisch Declaration, Exhibit A at 2.  On December 21, 2022, a full two weeks before the OAG's response was due on January 4, 2023, the OAG requested and secured VDARE's consent to an extension of its deadline to respond in federal court, from January 4 to 18, 2023.  In so doing, the OAG claimed (in an email) that the extension was necessary because of the holidays and an attorney who had taken ill:  "Because of the holidays and a member of our team who has COVID, we would appreciate an extension until Jan 18 to respond to VDARE's complaint in the NDNY.  Can you please confirm your consent?"  *See* Frisch Declaration, Exhibit A at 2, Exhibit B.

    Unbeknownst to VDARE when it consented to the extension on December 21 2022, however, the OAG had already initiated its special proceeding in state court the week before (on December 16, 2022) with a proposed order to show cause.  Frisch Declaration, Exhibit A at 2.  The state court issued the OAG's order to show cause on December 22, 2022, scheduling and conducting oral argument on its motion to compel on January 19, 2023, just two business days before the state court quickly granted the OAG's motion to compel and denying VDARE's application for a stay of the state proceeding based on this first-filed federal action.  Docket No. 15.

    The OAG cites no case rewarding a litigant's "race to res judicata" [*see Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003)], or permitting a litigant to

cherry-pick from a state's protocols for dueling lawsuits by pressing the state's law on res judicata after violating the state's first-filed rule. *See Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 97 (2d Cir. 2023) (courts should ask "whether the proposed remedy is being used merely for procedural fencing or a race to res judicata"); *F.T.C. v. Garvey*, 383 F.3d 891, 900 (9th Cir. 2004) ("applying res judicata here would likely reward gamesmanship"). Res judicata is designed "to prevent serial forum-shopping" [*Hardison v. Alexander*, 655 F.2d 1281, 1288 (D.C. Cir. 1981)], not reward it. The OAG would not have rushed to state court to attempt an end-run around this Court's jurisdiction if VDARE's claim of unconstitutional retaliation was truly unfounded.

B.  *The Inference of State Retaliation for VDARE's Exercise
     of its Constitutional Rights of Speech and Association*

   1. *The Attorney General's Targeting of VDARE as Part of What
       She Expressly Describes as Her "Oversight" of Speech*

   "To state a First Amendment retaliation claim sufficient to withstand a motion to dismiss, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015). "The analysis for a retaliation claim under the First Amendment and under Article I § 8 of the New York State Constitution is the same." *Kuczinski v. City of New York*, 352 F. Supp. 3d 314, 321 (S.D.N.Y. 2019).

   Imposing on "associational rights . . . . cannot be justified on the ground that the regime is narrowly tailored to investigating charitable wrongdoing." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2389 (2021). Subpoenas which could have "a chilling effect

8

**AA0528**

on its associations with its employees and potential clients" by breaking anonymity are invalid. *See, e.g.*, *Brown v. Socialist Workers '74 Committee* (Ohio), 459 U.S. 87, 96 (1982) ("Even individuals who receive disbursements for 'merely' commercial transactions may be deterred by the public enmity attending publicity, and those seeking to harass may disrupt commercial activities on the basis of expenditure information. Because an individual who enters into a transaction with a minor party purely for commercial reasons lacks any ideological commitment to the party, such an individual may well be deterred from providing services by even a small risk of harassment."); *New York State Senate Republican Campaign Comm. v. Sugarman*, 165 A.D.3d 1536, 1540–41 (3d Dep't 2018) (the subpoena's demands capture materials that are "extraneous to the central purposes of [respondent's] inquiry . . . and/or unnecessarily infringe on petitioners' First Amendment rights of political expression and association") (*quoting Matter of Kalkstein v. DiNapoli*, 228 A.D.2d 28, 30 (3d Dep't 1997) (quotation marks omitted); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460, 462 (1958) (protecting the right of "advocacy of both public and private points of view, particularly controversial ones" and holding that an order requiring an association to produce a membership list interfered with the First Amendment freedom of association); *Evergreen Ass'n, Inc. v. Schneiderman,* 153 A.D.3d 87, 100 (2d Dep't 2017) (applying strict scrutiny where anti-abortion advocacy group served with the Attorney General's investigatory subpoena alleged that subpoena compliance would "have a chilling effect on [the group's] associations with its employees and potential clients" as well as at least one hospital). *See also Ronsenblatt v. Baer,* 383 U.S. 75, 85 (1966) ("Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized.")

9

**AA0529**

VDARE's Verified Complaint sufficiently states a claim against the OAG for unconstitutional retaliation.  The OAG's targeting of VDARE follows the Attorney General's creation of a "Hate Crimes Unit," which she claimed would "strengthen *oversigh*t, because we see how much hate is being fueled by content on the internet."  Complaint at ¶13 (emphasis added).  She joined in a letter to Facebook demanding that it increase censorship against "hate speech and hate organizations," resulting in at least one other case in federal court apart from this case challenging her pursuit of speech with which she disagrees.  Complaint at ¶14 (attaching complaint in *Volokh v. James*, 1:22-cv-10195 (S.D.N.Y.)).  Just last week, the OAG was enjoined in *Volokh* from enforcing a new law aimed at speech.  *See* Frisch Declaration, Exhibit O at 1 ("Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'") (quoting *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017)).

Just before the OAG issued its subpoena to VDARE, the OAG's Special Counsel for Hate Crimes issued separate subpoenas to Meta, the parent company of Facebook, and Facebook Payments.  Complaint at ¶¶16-18.  The OAG thereafter issued a subpoena to VDARE through its Charities Bureau, including a demand for "Copies of the transcripts to each deposition in the litigation between [VDARE founder] Peter Brimelow and/or VDARE and the New York Times, and all documents produced by VDARE and/or Brimelow in connection with those proceedings."  This demand refers to a lawsuit for libel filed by Brimelow against the New York Times for calling him an "open white nationalist."  Complaint ¶23.

These expressed statements and actions of the OAG, which it does not and cannot

10

**AA0530**

deny, preceded and are attendant its demand that VDARE produce "the identities of contractors - - including writers who contribute to the website," which it claims, without any legitimate basis, "are precisely the records the OAG must examine in its investigation of VDARE's organizational misconduct." Frisch Declaration, Exhibit N at 16. Unless the Appellate Division reverses the state court's stayed order, and absent relief in this Court, an order compelling VDARE to produce this constitutionally protected information will stand.

2. *VDARE Turned to this Court for Relief While Complying with the OAG's Subpoena Only After the OAG took Positions that Risked Irreparable Constitutional Harm and VDARE's Ability to Conduct Business*

Notwithstanding concerns of VDARE's predecessor counsel that the OAG's subpoena was a pretext aimed at VDARE's right to express positions critical of governmental officials and policy, VDARE's new counsel pledged compliance. Recognizing the OAG's broad discretion to exercise regulatory oversight of charities registered in New York and issue investigative subpoenas, between September and November 2022 VDARE produced over 6,000 pages of documents to the OAG as part of a rolling production after completing review of documents maintained in hard copy and electronically [Complaint at ¶25] - - the universe of responsive documents so maintained. Frisch Declaration, Exhibit S at 6. By December 2022, VDARE had engaged a vendor to secure its 40 gigabytes of emails (the equivalent of millions of pages) for its counsel's review; had identified email custodians to the OAG; and counsel's review for responsive emails was well under way. Frisch Declaration, Exhibit A at 6, Exhibit S at 6.

In otherwise complying with the OAG's subpoena, VDARE disputed the subpoena's demand for the identities of contractors who did business with VDARE. The

subject matter of VDARE's principal activity - - commentary about immigration policy of the United States disseminated to the public through its website at www.VDARE.com - - is controversial.  As VDARE demonstrated in state court without dispute, VDARE's lawful speech has led to and continues to cause retaliation against people and entities associated with it and attendant reputational and professional harm.  Contractors providing services essential to VDARE's very existence have refused to continue to do business with VDARE, including venues which have cancelled contracts with VDARE to host conferences, sometimes because of disagreement with VDARE's views, but typically because of their aversion to public protests. These harms to VDARE have made it increasingly difficult for VDARE to find alternative contractors to stay in business.  *See* Frisch Declaration, Exhibit A at 4 (citing *"VDARE responds to conference cancellation at Cheyenne Mountain Resort,"* www.kktv.com, Aug. 15, 2017 ("Cheyenne Mountain Resort [in Colorado] will not be hosting the VDARE Foundation in April of next year. We remain committed to respecting the privacy of guests at the resort."); Kristine Phillips, The Washington Post, Jan 26, 2017 ("Tenaya Lodge, a resort on the border of Yosemite National Park, canceled [VDARE's] booking after receiving complaints about the organization's views."); *"Cancelled Tucson Conference Produces Five-Figure Settlement - - VDARE.com To Announce New Venue Soon!"* www.vdare.com, Mar. 7, 2018.

Likewise, multiple businesses providing services essential to VDARE's continued operations have terminated their relationships with VDARE, including Mailchimp and Constant Contact (providers of email marketing services), Paypal, Amazon, Google Ads, and other lesser-known businesses.  VDARE created an entity called "Happy Penguins LLC" for the sole purpose of paying VDARE's employees so that they could identify a non-controversial

12

**AA0532**

entity (Happy Penguins) - - and not VDARE - - as their employer. *See* Frisch Decl, Exhibit __ (attached VDARE's Internal Revenue Form 990 for 2019 (identifying "Happy Penguins LLC / Peter Brimelow" (VDARE's founder) as a service providing leased employees). Frisch Declaration, Exhibit A at 4-5.

The threat to VDARE's rights to free speech and association is ongoing and presents a genuine risk of irreparable harm. As recently as January 4, 2023, the Washington Post published an article entitled, *"A 'hate castle' or welcome neighbor? VDare divides a West Virginia town. In Berkeley Springs, the purchase of an iconic castle by VDare, which some consider a hate group, has led to angst and ugliness,"* Washington Post, Jan. 4, 2023. Comments to the article posted at *www.washingtonpost.com* contain multiple instances of public abuse of and threats to VDARE's neighbors in West Virginia solely because their favorable opinions of VDARE or its principals were quoted in the article. Some comments identify those quoted in the article by name; claim that those with favorable opinions of VDARE's principals must necessarily be white supremacists; and threatened them with commercial retaliation and not to "spend money in their town." One especially vile public comment called out an elderly proprietor of a local business as a "filthy racist" because she was quoted in the article as defending VDARE's principals. Frisch Declaration, Exhibit S at 8.

The OAG made no genuine effort in state court and refused VDARE's repeated requests to show why its request for these identities could not be narrowly tailored. *See Evergreen Assn.,* 153 A.D.3d at 87 (citing *Shelton v. Tucker,* 364 U.S. 478, 488 (1960)) (the Attorney General's legitimate investigative purpose "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved," and applying

13

**AA0533**

strict scrutiny where compliance with the OAG's subpoena would "have a chilling effect on [the group's] associations with its employees and potential clients" as well as at least one hospital); *Sugarman*, 165 A.D.3d at 1540–41 (the subpoena's demands capture materials that are "extraneous to the central purposes of [respondent's] inquiry . . . and/or unnecessarily infringe on petitioners' First Amendment rights of political expression and association") (citing *Evergreen* and quoting *Matter of Kalkstein v. DiNapoli,* 228 A.D.2d 28, 30 (3d Dep't 1997) (quotation marks omitted)). *See also NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460, 462 (1958) (protecting the right of "advocacy of both public and private points of view, particularly controversial ones" and requiring association to produce membership list interfered with First Amendment freedom of association).

Likewise constitutionally offensive - - and irrational - - is the OAG's analogy of VDARE's vendors and content providers to the copyright violator in *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010), who declined to reveal his name after the copyright holder tracked him via his computer's IP address. *See* OAG Memo at 15. The OAG relies on *Arista's* principle that anonymity may not be used to mask violations of the law [*see* Frisch Declaration, Exhibit S at 16], but none of VDARE's vendors nor content providers are alleged to have violated the law nor to have helped VDARE to do so. The OAG's demand that VDARE reveal their identities is more than an overreach: it warrants the inference that the OAG is after VDARE *because* of its speech and is demanding that it reveal identities of its vendors and content providers because either it intends to put it out of business or is otherwise hostile to the rights of those with whom it disagrees.

Before constitutionally-protected disclosures may be compelled, more is

14

**AA0534**

required than a general claim of investigative need. Instead, **anonymous Internet speech is**

**protected by the First Amendment unless a party seeking enforcement of a subpoena first**

**establishes** "a real evidentiary basis for believing that the defendant has engaged in wrongful

conduct that has caused real harm to the interests of the plaintiff" so that a court may then "assess

and compare the magnitude of the harms that would be caused" to freedom of speech and the

defendant's commercial interests." *See Mirz v. Yelp, Inc.*, 2021 U.S. Dist. LEXIS 160961

(S.D.N.Y. Aug. 25, 2021); *"Anonymous criticism helped make America great: Trump's critic is*

*utilizing a practice employed by many of the Founding Fathers to protect truth from power,"* The

Washington Post, Sept. 8, 2018 ("anonymous publication has been an essential feature of

American democracy since its beginning. It has long allowed vulnerable voices to participate in

public politics and speak truth to power. Indeed, anonymous debate was at the center of the

revolutionary politics that led to American independence, the U.S. Constitution and the Bill of

Rights, which enshrined the press freedoms that continue to protect anonymous speech today.").

Frisch Declaration, Exhibit S at 16-17.

   The OAG - - and the state court - - also elected not to address or even mention

VDARE's concern about the OAG's apparent disclosure of constitutionally-protected

information in another investigation of a conservative not-for-profit entity. On August, 26, 2022,

Politico published confidential information about donors to this other entity in the OAG's cross

hairs. Thereafter, on October 11, 2022, members of the United States Congress wrote to United

States Attorney General Merrick Garland, requesting investigation of apparently undue

disclosures provided to or otherwise obtained by the OAG. Frisch Declaration, Exhibit A at 7.

  *3. The OAG Rejected VDARE's Proposed Middle Grounds*

<center>15</center>

<center>**AA0535**</center>

Before seeking relief in this Court, VDARE attempted to accommodate the OAG by proposing two middle grounds, both of which were summarily rejected. *First*, VDARE proposed that it disclose the identities of all contractors who might qualify as "related" within the meaning of Section 715 of New York's Not-for-Profit Corporation Law and otherwise produce all information for all contractors about services provided and the amounts paid to each, without prejudice to the OAG's right to revisit the issue. The OAG would presumably have no investigative need for the identities of unrelated contractors near VDARE's headquarters in West Virginia (or elsewhere) earning *de minimis* compensation, or unrelated providers of general services such as website hosting, among other unrelated contractors. While the OAG rejected this middle ground, VDARE nonetheless provided it with an independent auditor's report which identified contractors which might qualify as related. Frisch Declaration, Exhibit A at 5-6, Exhibit S at 10.

*Second*, after the OAG initiated the state court action in response to VDARE's complaint in this Court, VDARE alternatively proposed that it produce a fully unredacted list of contractors to the state court *in camera* (a protocol used in *Matter of Evergreen*, 153 A.D.3d at 87), subject to the OAG's request for disclosure of the identities of any particular unrelated contractor upon a showing of a narrowly-tailored investigative need. This proposed middle ground was also rejected. Frisch Declaration, Exhibit S at 10-11.

4. *The OAG on December 2, 2022, Demanded that VDARE Disclose Protected Information, One Day Before a New Law Targeting "Hateful Conduct" Became Effective*

On December 2, 2022, the OAG demanded that VDARE, within ten days, disclose constitutionally-protected information, reveal previously-redacted information in the

**AA0536**

first 6,000 pages of production, complete review of its 40 gigabytes of emails, and produce a complete redaction log for the entirety of its production. Frisch Declaration, Exhibit G. The OAG made her demand *one day before* December 3, 2022, the effective date of New York State's new law - - General Business Law ("G.B.L.") Section 394-ccc - - aimed at "hateful conduct," defined as the use of social media to vilify, humiliate, or incite violence. VDARE does not use social media (or any outlet) to vilify, humiliate, nor incite violence against anyone.

The OAG's demand on December 2, 2022, and its attendant claim of non-compliance despite VDARE's production of all responsive documents maintained in hard copy and electronically and its ongoing review of its emails, was not the first temporal connection between the OAG's professed regulatory oversight of VDARE while signaling another agenda. As described above, the OAG's subpoena to VDARE came on the heels of its subpoenas to Facebook Payments and Meta, which followed the Attorney General's public statements of her resolve to "strengthen oversight" of certain non-violent speech.

It was not until December 12, 2022, when the inference of the OAG's targeting of VDARE for reasons other than regulatory compliance was inescapable, did VDARE initiate this action to protect itself and its rights of speech and association guaranteed by the federal and state constitutions.

5. *The OAG's Pretextual Claims of "Organizational Misconduct"*

The OAG's claim of "organizational misconduct" is palpably pretextual. For example, a purported impetus for the OAG's investigation was VDARE's purchase in 2020 of a castle-styled property in West Virginia. VDARE did not dispute the OAG's discretion to conduct oversight of a charity's purchase of such a property and instead addressed the issues in

17

**AA0537**

its disclosures and offered to meet immediately with the OAG to discuss it. Frisch Declaration, Exhibit A at 15, Exhibit S at 17. The OAG's rejection of VDARE's offer to begin meeting immediately with VDARE's counsel about the castle undermines its claim that its overriding concern is ongoing misuse or dissipation of charitable assets.

   VDARE explained, as otherwise publicly reported, that VDARE acquired the castle to host conferences and thereby eliminate the risk that VDARE's events could only be conducted at the whim of independent venue owners. *See* Frisch Declaration, Exhibit A at 8 (citing Rachel Olding, *"Tourist Town Desperate to Reopen Faces Another Battle"* Daily Beast (May 29, 2020) (noting that VDARE's founder, Peter Brimelow, "said they plan to use the castle for meetings and as a studio - - handy considering at least three hotels have canceled conference contracts on VDARE after learning of the group's views."); *see also* NYSCEF Docket No. 4 (Affirmation of the OAG in support of its motion to compel) at 5 (citing VDARE's public report of purchase of castle for use as a meeting place "without fear of deplatforming").

   The OAG questioned the use of the castle itself as housing for the Brimelows and their three children. Among documents produced by VDARE is a lease agreement establishing that the Brimelows paid rent to live in a cottage on the castle grounds beginning in April 2021. Frisch Declaration, Exhibit A at 8, Exhibit H. Before the cottage was habitable, the Brimelows paid rent for them and their three children to live in the castle for a period of months after moving to West Virginia from Connecticut. *See* Frisch Declaration, Exhibit A at 8, Exhibit S at 18. VDARE's counsel proposed a meeting with the OAG as part of a presentation to show that the Brimelows paid rent to live in the castle, used the castle as a residence only until their cottage was made habitable for lease, and that the Brimelows *never*

derived any financial gain from the castle.  Frisch Declaration, Exhibit S at 18.  The OAG rejected VDARE's proposal.

Similarly, the OAG has insinuated that the Brimelows incorporated two entities, the Berkeley Castle Foundation and BBB, LLC, to camouflage misuse or dissipation of charitable assets, but VDARE produced the bylaws for the Berkeley Castle Foundation and an operating agreement for BBB, LLC, both of which identify VDARE as fully supporting or owning both entities.  Frisch Declaration, Exhibits P and Q.  The OAG in her submission to state court made no reference to either document.  As noted above, the OAG rejected VDARE's invitation to begin meeting with its counsel about the castle immediately, instead pressing her demands for disclosures of VDARE's contractors.  The OAG's selective presentation of facts supports VDARE's claim of the OAG's use of regulatory oversight to camouflage the Attorney General's expressed intent to target speech.

Other professed concerns about VDARE also fail to demonstrate any connection between the constitutionally-protected information and any true investigative need.  For example, the OAG argued in state court in support of its motion to compel that Lydia Brimelow is identified on filings as VDARE's "Secretary, Treasurer and Publisher," but not identified as Peter Brimelow's wife on VDARE's Internal Revenue Service Form 990.  Peter and Lydia Brimelow, however, share the same last name, holding themselves out as husband and wife on the same VDARE website which the OAG reviewed to find information supporting its investigation, and, on information and belief, file their income tax returns jointly as husband and wife with the same Internal Revenue Service with which VDARE files Form 990.  Frisch Declaration, Exhibit A at 9, Exhibit S at 19.  The OAG asserted no connection between this

19

**AA0539**

purported misstep in completing an IRS form and the identities of VDARE's vendors or content providers.

Similarly, the OAG insinuated that Peter Brimelow's compensation reported in VDARE's 2019 IRS Form 990 was atypically high [NYSCEF Docket No. 3 at 9], but omitted that VDARE's total contributions for 2019 were $4,259,309 [see Frisch Declaration, Exhibit A at 9-10, Exhibit S at 19], a far substantially greater amount than in other years.  The OAG also insinuated malfeasance from an auction of furnishings from the castle [NYSCEF Docket No, 4 at 8], but, on information and belief, the entirety of *de minimis* proceeds from the auction inured to VDARE's benefit.  Frisch Declaration, Exhibit S at 19-20.  None of this innuendo from the OAG justified its demand for the identities of vendors and content providers.

Nor did the mechanics of VDARE's compliance warrant the OAG's demand for constitutionally-protected information.  In demanding on December 2, 2022, that  VDARE complete its production and identify all contractors without redactions by December 12, 2022, the OAG complained that VDARE had inconsistently applied redactions without a log identifying the bases for the redactions.  But the OAG had itself agreed to "a rolling production," which enabled VDARE - - acting in good faith - - to reassess the need for redactions as its review continued.  VDARE's counsel expressly told the OAG that it had redacted some information in earlier installments of the rolling production which upon later review had been unnecessary.  Frisch Declaration, Exhibit A at 10.

Nor did the OAG's complaint about delays in VDARE's production warrant its demand for constitutionally protected information or any inference of bad faith.  By the time of the OAG's letter of December 2, 2022, VDARE had completed production of documents

20

**AA0540**

maintained in hard copy and electronically and review of 40 gigabytes of emails was well under way. VDARE is literally a mom-and-pop operation, run by parents of three home-schooled children, represented by a solo practitioner with no legal or administrative staff. *See* Frisch Declaration, Exhibit A at 10-11. The types of mechanical issues of compliance about which the OAG complained are typically solvable, especially where the respondent is close to completing compliance.

While the OAG alleged with rhetorical flourish that redactions had been made to almost every category of document produced [NYSCEF Docket No. 3 at 9], the vendors, content providers, and donors whose identities were redacted are inextricable parts of VDARE's business - - as VDARE's counsel had expressly advised the OAG. *See* Frisch Declaration, Exhibit A at 11, Exhibit S at 20-21 (VDARE's counsel emailing the OAG that "the identities of VDARE's donors, content providers, and vendors who provide services to VDARE in its locality or are otherwise indispensable to its work are inextricably intertwined with some of its financial records. For example, some of these entities are identified in bank statements in lists of monthly transactions and associated copies of checks. The work to provide such financial records with redactions is labor-intensive and time-consuming and is ongoing."). Even if a redaction log after the final installment of the rolling production did not the satisfy the OAG's indiscriminate preferred timing, it did not justify the OAG's immediate demand for constitutionally-protected disclosures far afield from any true investigative need.

21

**AA0541**

<u>Argument</u>

<u>The OAG May Not Defeat this Court's Jurisdiction By Initiating
A State Proceeding After an Aggrieved Litigant Seeks Federal Relief</u>

"[T]he obligation of federal courts to hear cases within their jurisdiction is 'virtually unflagging.'" *Trump v. James*, 2022 WL 1718951 at *23 (N.D.N.Y. May 27, 2022) (quoting *Cavanaugh v. Geballe*, 28 F.4th 428, 430, 432 (2d Cir. 2022). VDARE chose this federal forum to seek redress for its constitutional grievances - - the first-filed judicial proceeding arising from the OAG's targeting of VDARE. None of the OAG's proffered roadblocks prevent this Court from hearing VDARE's constitutional grievances.

In addition, VDARE is not claiming that the First Amendment prohibits the use of an administrative subpoena as an investigative tool [*see* OAG Memo at 14], but that the OAG's conduct constitutes unconstitutional retaliation; in fact, VDARE was complying with the subpoena before the OAG demanded protected information. If the OAG's position is correct, state actors could unconstitutionally retaliate with impunity. VDARE initiated this case precisely because the OAG's conduct rebutted the presumption of regularity.

1.    *Abstention Does Not Apply*

The OAG argues that VDARE seeks "to turn a state-law discovery dispute into a federal case," which interferes with "ongoing state-court litigation." But the OAG initiated the state court proceeding *after* VDARE filed its complaint in violation of the state's first-filed rule and created the purported interference of which it now complains.

Abstention applies to certain pre-existing *proceedings*, not the issuance of a "non-self executing" state attorney general's investigative subpoena, nor an attorney general's

22

**AA0542**

administrative proceeding to enforce one. *See New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 US 350, 370 (1989). In *Smith & Wesson Brands, Inc. v. Attorney General of New Jersey*, 27 F.4th 886 (3d Cir. 2022), the Third Circuit rejected abstention where the plaintiff alleged that a subpoena was retaliation for Smith & Wesson's exercise of its constitutional rights. The state attorney general was only "investigating possible violations" of the Consumer Fraud Act, had not alleged any substantive wrongdoing, and only alleged violation of a procedural rule related to the production of documents. The court ruled that abstention was not proper because the "production order was not 'uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Id* (citing *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 81-82 (2013); *see also Google, Inc. v. Hood*, 822 F.3d 212, 223 (5th Cir. 2016) (rejecting abstention of state attorney general's administrative subpoena because "we cannot agree . . . that an executive official's service of a non-self-executing subpoena creates an ongoing state judicial proceeding.").

The Supreme Court's most recent guidance in *Sprint Commc'ns* explains that abstention "extends . . . no further" than three "exceptional circumstances": (1) "state criminal prosecutions"; (2) "civil enforcement proceedings"; and (3) "civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. at 73. None of these circumstances is present here.

In fact, the holding of *Smith and Wesson* was favorably cited by this Court in *Trump v. James.*2022 WL 1718951 (N.D.N.Y. May 27, 2022). This Court in *Trump v. James* agreed that, like *Smith and Wesson*, "the New York proceeding is not a civil enforcement

AA0543

proceeding akin to a criminal prosecution," and implied it would have rejected abstention over the subpoena itself.  It only abstained based "in light of the . . . order holding Mr. Trump in contempt," because civil contempt order fall into the category of "powers, and functions that allow the state courts to adjudicate the matters before them and enforce their judgments."

"[T]he weight of the First Amendment issues involved counsels against abstaining." *Hartford Courant Co. v. Pellegrino*, 380 F. 3d 83, 100 (2d Cir. 2004).  "Abstention would serve no purpose because a state cannot have a legitimate interest in discouraging the exercise of constitutional rights." *Cullen v. Fliegner*, 18 F.3d 96, 104 (2d Cir. 1994). *See also Felmeister v. Office of Attorney Ethics*, 856 F. 2d 529, 534 (3d Cir. 1988) ("[W]e have serious doubts as to whether Burford abstention ever would be appropriate where substantial first amendment issues are raised.").

Abstention would serve no purpose because a state cannot have a legitimate interest in discouraging the exercise of constitutional rights.*" Cullen v. Fliegner*, 18 F.3d 96, 104 (2d Cir. 1994); see also *Felmeister v. Office of Attorney Ethics*, 856 F. 2d 529, 534 (3d Cir. 1988) ("[W]e have serious doubts as to whether Burford abstention ever would be appropriate where substantial first amendment issues are raised."); *Hartford Courant Co. v. Pellegrino*, 380 F. 3d 83, 100 (2d Cir. 2004)  ("the weight of the First Amendment issues involved counsels against abstaining.").

2.  *A Litigant May Not Press New York's Law on Res Judicata While Violating New York's First-Filed Rule*

In opposing a stay of the state court proceeding pending resolution of VDARE's federal case against the OAG or at least pending decision on its motion to dismiss this case), the

24

**AA0544**

OAG did not dispute that VDARE initiated this case before the OAG initiated its special proceeding in state court. New York's well-settled "first-filed" rule requires that the "court which has first taken jurisdiction" - - this Court - - "is the one in which the matter should be determined and it is a violation of the rules of comity to interfere." *Ace Prop. & Cas. Ins. Co. v. Fed.-Mogul Corp.*, 55 A.D.3d at 480; *accord L-3 Commc'ns Corp. v. SafeNet, Inc.*, 45 A.D.3d 1, 7 (1st Dep't 2007) (same); *accord Syncora Guarantee Inc. v. J.P. Morgan Sec. LLC*, 110 A.D.3d 87, 95 (1st Dep't 2013) (same); C.P.L.R. 3211(a)(4).

New York's first-filed rule and res judicata exist in tandem. They are both part of New York's protocols for dueling lawsuits between the same parties. "The rule favoring the right of the first litigant to choose the forum, absent countervailing interests of justice or convenience, is supported by reasons just as valid when applies to the situation where one suit *precedes the other by a day* as they are in a case where a year intervenes between the suits." *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 938 (Fed. Cir. 1993), abrogated on unrelated grounds *by Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) (internal citations and quotations omitted) (emphasis added).

Instead of acknowledging that VDARE had a right to choose its forum under settled law in New York, or otherwise consenting to a stay at least to accommodate a decision by this Court on the OAG's motion to dismiss this case, the OAG analogized VDARE to a commercial plaintiff precipitously seeking tactical advantage by choosing a forum inconvenient to an aggrieved commercial opponent and argued that it was improper for VDARE to seek federal relief after the OAG threatened enforcement on December 2, 2022. Frisch Declaration, Exhibit S at 13. The analogy pressed by the OAG General was misplaced for at

25

**AA0545**

least three independent reasons.

*First*, unlike a commercial plaintiff who rushes to an inconvenient forum as soon as its opponent signals an intent to litigate, the OAG's resort to litigation is inherent in virtually every subpoena she issues. *See* Docket 12-13 (the Subpoena issued to VDARE in June 2022 included the standard warning that the OAG General can seek enforcement for disobedience). The OAG's analogy to commercial litigation would serve to bar every person to whom it issues a subpoena from ever seeking federal redress in every case no matter how irreparable the federal constitutional harm.

*Second*, apart from the subpoena's inclusion of the standard warning of its right to seek enforcement, the OAG began expressly threatening VDARE with a motion to compel as early as September 8, 2022, before its new counsel had even begun to undertake VDARE's compliance with the subpoena - - three months before December 10, 2022, when VDARE filed its federal case. *See* Frisch Declaration, Exhibit S at 13-14, Exhibit K ("We are prepared to offer reasonable extensions of time reflecting your obligations, but without any production, we are not prepared to continue to extending the deadline and will seek judicial relief ourselves to move this process forward.").

*Third*, unlike a commercial litigant who chooses a geographically inconvenient forum to vindicate its interests in a financial transaction, VDARE chose federal court to vindicate its federal constitutional rights - - and did so here in Albany where the OAG maintains an executive office.

In urging application of res judicata, the OAG glosses over the doctrine's application to "previous" actions [*see, e.g., Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 285

(2d Cir. 2000)] and the effect of "prior" actions [*Gherardi v. State of New York*, 161 Fed. Appx. 60, 61 (2d Cir. 2005)] in the cases which it cites.  Docket 15 at 2-3.  The OAG does so because VDARE's action came first, and the use of the words "previous" and "prior" to describe actions in New York must be interpreted in the context of New York's first-filed rule.  The OAG interprets the standard as if it means to encourage litigants to race to initiate new litigation to quickly obtain the first ruling.  The OAG cites no case condoning this type of gamesmanship.

But even if New York's first-filed rule can be so readily evaded, a judgment first in time does not control where the policy favoring preclusion of the second action is clearly and convincingly overcome, as here, where it fails "to yield a coherent disposition of the controversy" or sustains the apparent invalidity of a personal liberty.  Restatement (Second) of Judgments § 26 (1982).  So here.  The state court barely mentioned the substantial claim of unconstitutional retaliation made here nor require the OAG to show what legitimate investigative need could conceivably justify constitutionally-protected disclosures without at least some narrow tailoring or specific articulated need.  The state court inexplicably concluded that VDARE raised constitutional objections only on behalf of its donors [Docket 15 at page 10 of 14], but VDARE repeatedly raised objections to disclosure of contractors and content providers as violations of the constitutional rights of speech and association [*see, e.g.*, Frisch Declaration, Exhibits C and D], which the state court failed to address in any adequate, coherent, or reasoned way.

3.      *Sovereign Immunity Does Not Bar Relief*

Sovereign immunity is inapplicable here because VDARE seeks prospective relief for an ongoing violation of federal law.  See *Verizon Maryland Inc. v. Public Serv. Comm. of Maryland,* 535 U.S. 635 (2002) (*quoting Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261,

27

**AA0547**

296 (1997) (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in

judgment); *Clark v. DiNapoli,* 510 Fed. Appx. 49, 51 (2d Cir. 2013).

              An exception to immunity allows a federal court to issue an injunction against a

state official in her official capacity who is acting contrary to federal law. *Ex parte Young,* 209

U.S. 123 (1908); *New York Health and Hospitals Corporation et al. v. Perales,* 50 F.3d 129

 (2d Cir.1995). This exception is utilized "when there is a specific conflict between the federal

mandate and the state plan or practice that a federal right is implicated," *Doe v. Pfrommer,* 148

F.3d 73, 80-81 (2d Cir.1998), and is authorized to "vindicate the supremacy of [federal]

law." *Ward v. Thomas,* 207 F.3d 114, 119 (2d Cir.2000). Under the doctrine of *Ex parte*

*Young,* a "plaintiff may avoid the Eleventh Amendment bar to suit and proceed against

individual state officers, as opposed to the state, in their official capacities, provided that [her]

complaint[:] (a) alleges an ongoing violation of federal law[;] and (b) seeks relief properly

characterized as prospective." *Clark v. DiNapoli,* 510 Fed. Appx. at 51 (2d Cir.2013) (internal

quotation marks and citation omitted). The Supreme Court has held that "[i]n determining

whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need

only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation

of federal law and seeks relief properly characterized as prospective.' " *Verizon Maryland Inc. v.*

*Public Serv. Comm. of Maryland,* 535 U.S. at 635. "[D]eclaratory relief, while equitable in

nature, is barred by the Eleventh Amendment 'when it would serve to declare only past actions in

violation of federal law; retroactive declaratory relief cannot be properly characterized as

prospective.' " *Neroni v. Coccoma,* 2014 WL 2532482 at *9 (N.D.N.Y. June 5, 2014)

(quoting *Kent v. New York,* 2012 WL 6024998 at *7 (N.D.N.Y. Dec. 4, 2012) (internal quotation

**AA0548**

marks and citation omitted)).

    4.    *Standard of Review*

    "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted). The Court may also "refer to evidence outside the pleadings" and "take judicial notice of documents in the public record, including state court filings." *Krajisnik Soccer Club, Inc. v. Krajisnik Football Club, Inc.*, No. 20-cv-1140, 2021 WL 2142924, at *2, 2021 U.S. Dist. LEXIS 99456, at *5 (N.D.N.Y. May 26, 2021) (citations omitted).

    To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face,'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. See *EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

    VDARE has amply satisfied these standards.

<u>CONCLUSION</u>

For these reasons, the Attorney General's motion to dismiss should be denied.

Dated:  February 22, 2023

<u>/s/ Andrew J. Frisch</u>
Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
afrisch@andrewfrisch.com

*Attorney for Plaintiff*

30

**AA0550**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

VDARE FOUNDATION, INC.,

              Plaintiff,

     -vs-

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York,

              Defendant.

                                  **22-cv-1337 (FJS/CFH)**

---

**REPLY IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS**

**LETITIA JAMES**
New York State Attorney General
28 Liberty St. New York, NY 10005

By:

     JAMES SHEEHAN
     Assistant Attorney General
     NDNY Attorney Bar Roll # 516406
     YAEL FUCHS
     Assistant Attorney General
     NDNY Attorney Bar Roll # 702160
     CATHERINE SUVARI*
     Assistant Attorney General
     RICHARD SAWYER*
     Special Counsel, Civil Rights Bureau

     *Appearing pro hac vice

<u>**TABLE OF CONTENTS**</u>

Page

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

I.    The OAG obtained a final state-court order compelling subpoena compliance. ........... 2

II.    The state court's rulings bind this Court under the law of res judicata. ........................ 3

III.    VDARE's First Amendment retaliation claims must be dismissed. ............................ 6

A.  The state court ruled that VDARE has not established a First Amendment injury and that the OAG's investigation was justified. ........................................... 7

1.  VDARE did not establish a First Amendment injury. ...................................... 7

2.  The OAG's investigation is Justified. .............................................................. 8

B.  VDARE's own admissions defeat its retaliation claim ........................................... 8

IV.    All claims under state law and all claims for money damages must be dismissed for lack of jurisdiction. ........................................................................................... 9

CONCLUSION ................................................................................................... 9

## INTRODUCTION

This lawsuit was Plaintiff VDARE's attempt to divest the New York State Supreme Court of its statutory authority to supervise an investigative subpoena lawfully issued by the New York State Attorney General (OAG). That gambit failed. VDARE filed its complaint in this action on the very day it had promised to complete an ongoing production. Four days later, the OAG made good on its express warning, stated weeks earlier, that it would move to compel VDARE's compliance in state court if VDARE missed its self-imposed deadline. *See* D.E. 12-1 at 10-11. Since then, the New York Supreme Court has ordered full compliance with the subpoena and, in so doing, resolved every dispositive issue before this Court in the OAG's favor. It found that the OAG's subpoena was validly issued and "focused on subject matter areas which fall within the statutory provisions that govern not-for-profit corporations." D.E. 15 at 9. It rejected VDARE's First Amendment challenges, finding that VDARE "has not established that the Subpoena would impair [VDARE's] First Amendment rights." *Id.* at 10. And it found that VDARE's admissions "underscore the reasonableness of the Subpoena." *Id.* Just months ago, when presented with a similar order compelling compliance with an OAG subpoena, the Court dismissed a nearly identical First Amendment retaliation claim on res judicata grounds. *Trump v. James*, 2022 WL 1718951, at *16–20 (N.D.N.Y. May 27, 2022). The Court should reach the same result here.

Independent of the state court's binding review, the concessions in VDARE's opposition brief also require dismissal. To prevail on its only claim, First Amendment retaliation, VDARE must show that the OAG's investigation had no legitimate basis. But VDARE concedes the OAG's "broad authority" to conduct this investigation, D.E. 26 (Opp. Br.) at 4, and its "discretion" to investigate the possible misuse of charitable funds in VDARE's acquisition of a

1

**AA0553**

$1.4 million castle, *id.* at 17. These admissions echo the state court's ruling: the OAG's investigation has a legitimate basis that defeats any retaliation claim as a matter of law.

## ARGUMENT

**I.    The OAG obtained a final state-court order compelling subpoena compliance.**

On January 23, 2023, the New York Supreme Court issued a detailed order directing VDARE to comply with the OAG's subpoena and rejecting VDARE's First Amendment challenges to the subpoena's validity. Reviewing the factual record of VDARE's response to the subpoena, including documentary evidence—a task beyond this Court's authority on a motion to dismiss—the court specifically determined that the OAG's subpoena was justified and that VDARE had not established *any* First Amendment injury.

First, the court applied well-settled standards to examine the lawfulness of OAG's subpoena demands and ruled that the subpoena demonstrated "a reasonable relationship to the subject matter under investigation and the public interest to be served." D.E. 15 at 9 (quoting *Giardina v. James*, 185 A.D.3d 451 (1st Dep't 2020)). It determined that the subpoena "is focused on the subject matter areas which fall within the statutory provisions that govern not-for-profit corporations" and that the requests themselves "demand the type of material that will permit [the OAG] to determine whether [VDARE] has complied" with the law. *Id.* The court specifically found that the requests would allow the OAG "to determine whether there has been any diversion of charitable assets—for example through unlawful payments to for-profit corporations held by the Brimelows or other VDARE fiduciaries." *Id.* at 10.

Next, the state court ruled that VDARE did not meet its burden of showing any First Amendment injury from the subpoena. *Id.*  To the contrary, VDARE's own submissions "underscore[d] the reasonableness of the Subpoena" because they confirmed the OAG's

2

**AA0554**

suspicions about the misuse of charitable assets in buying the $1.4 million castle. *Id.* at 10-11. Reviewing VDARE's concerns about disclosing contractor's identities, the court found "these are precisely the records" the OAG must examine in its investigation into alleged self-dealing. *Id.* at 11. The identities of contractors, including site contributors, must be disclosed to "determine whether further conflicts of interest may exist." *Id.* The court noted that VDARE did not establish "why providing a redaction log for [ ] already-produced documents raises any First Amendment concerns or why continuing production would pose a threat to its existence." *Id.* The court denied VDARE's request to stay the state proceeding pending resolution of this action and ordered production by a date certain. VDARE noticed its intent to appeal and filed a stay request pending appellate review; that request is now before the Appellate Division, First Department.

## II.   The state court's rulings bind this Court under the law of res judicata.

VDARE does not dispute that the state court order meets all three requirements for res judicata effect under New York law: "(1) a final judgment on the merits; (2) identity or privity of parties, and (3) identity of claims in the two actions."[1] Finality is clear—a state-court order resolving a special proceeding by compelling subpoena production is a final adjudication on the merits under New York law. *Trump*, 2022 WL 1718951, at *16–17; *see also In re 381 Search Warrants Directed to Facebook, Inc.*, 29 N.Y.3d 231, 243 (2017) (holding an order denying a motion to quash a subpoena "is a final and appealable order in a special proceeding"). The fact that the state-court order is currently on appeal does not affect its finality for res judicata. *See, e.g.*, *Plaza PH2001 LLC v. Plaza Residential Owner LP*, 98 A.D.3d 89, 98 (1st Dep't 2012) (holding "the pending appeal did not alter the applicability of the doctrine of res judicata").

---

[1] *Divito v. Glennon*, 193 A.D.3d 1326, 1328 (4th Dep't 2021). This Court looks to New York law to determine the res judicata effect of New York rulings. *See Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 87 (2d Cir. 2000).

There is no dispute concerning the identity of the parties in the two actions, and VDARE has also admitted that the issues raised in both actions overlap almost completely. *See, e.g.*, D.E. 12-7 (Frisch Aff.) at 12 ("VDARE's Federal Complaint is based on many of the same underlying issues raised by OAG's special proceeding in [state court]."). Indeed, the state court reviewed and rejected the central argument in VDARE's lawsuit here—that the subpoena was unlawful retaliation that damaged VDARE's First Amendment rights. *See* D.E. 15 at 10-11.

VDARE's only response to the applicability of res judicata is that it was somehow unfair for the state court to decide this matter first.  The law is clear that it does not matter which proceeding was filed first—the first final order controls. *See, e.g., Forte v. Kaneka Am. Corp.*, 110 A.D.2d 81, 86 (2d Dep't 1985) (holding that for the purposes of res judicata, "the effective date of a final judgment is the date of its rendition, without regard to the date of the commencement of the action in which it is rendered or the action in which it is to be given effect"); Restatement (Second) Judgments § 14, Cmt. a (holding that a judgment has res judicata effect even when "the action in which it is rendered was commenced later than the pending action"). It is equally clear that state courts are competent to adjudicate constitutional rights, like those asserted here, "and the potential for preclusion is a necessary consequence of that." *Exxon Mobil Corp. v. Schneiderman*, 316 F. Supp. 3d 679, 703 (S.D.N.Y. 2018) (dismissing a First Amendment retaliation claim because the constitutional issues had been decided in a prior state-court enforcement proceeding); *see also Temple of the Lost Sheep, Inc. v. Abrams*, 930 F.2d 178, 185 (2d Cir. 1991) (affirming dismissal of § 1983 claim as precluded by state-court judgment in prior proceeding to quash subpoena).

Nor was it procedurally improper for the OAG to seek relief in state court. As this Court has recognized, state court is the "proper" forum for litigating the validity of a state subpoena.

4

**AA0556**

*Trump*, 2002 WL 1718951, at *18. When VDARE complained in state court that the special proceeding should be dismissed under New York's "first-filed" rule, the state court summarily rejected the argument. D.E. 15 at 7, 12. New York's "first-filed" rule does not apply where, as here, "one party files the first action preemptively, after learning of the opposing party's intent to commence litigation." *L-3 Comms. Corp. v. SafeNet, Inc.*, 45 A.D.3d 1, 9 (1st Dep't 2007). That ruling, too, is res judicata in this Court. *Trump*, 2002 WL 1718951, at *18.[2]

VDARE cites the Second Restatement of Judgments for limited exceptions to res judicata in cases concerning "a continuing restraint or condition having a vital relation to personal liberty" or "the failure of the prior litigation to yield a coherent disposition of the controversy." *See* D.E. 26 at 27 (citing Restatement (Second) of Judgments § 26(1)(f)). The Restatement's comments make clear that neither exception would be applicable here. The "personal liberty" exception applies only to "civil actions attacking penal custody" and other habeas-like proceedings, including "cases involving civil commitment of the mentally ill, or the custody of a child." Restatement (Second) of Judgments § 26, Cmt. i. Similarly, the exception for "failure…to yield a coherent disposition" applies only to the "extremely rare" cases where "the disposition of the claim and counterclaim in a prior action has left the parties with inconsistent interests in disputed property." *Id.* That's obviously not the case here—no property is under dispute, and the order to complete production by a date certain can easily be followed.

---

[2] VDARE's continuing suggestion that OAG's December 21 request for a two-week extension due to the holidays and an attorney's illness was gamesmanship is a red herring. D.E. 26 at 7. The OAG filed its special proceeding on New York's electronic docket on December 16, but service on VDARE was not procedurally proper until after the Supreme Court entered an order to show cause. *See* CPLR 2214(d). The OAG promptly served VDARE when the Supreme Court entered the order on December 22. VDARE then had the opportunity to withdraw its courtesy and oppose our extension motion here, but it did not. The Court granted our request on December 28. D.E. 9.

5

VDARE's reference to a "race to res judicata," D.E. 26 at 7-8, simply underscores why dismissal is warranted. The phrase comes from cases concerning when a district court may decline to hear a declaratory judgment claim—like Count One of this lawsuit. In the very decision VDARE cites, issued only last month, the Second Circuit warned that a district court should not exercise discretionary federal jurisdiction where its decision to conduct a declaratory review would undermine a state court's jurisdiction over its own domain. In the Second Circuit's words, the district court should determine whether a declaratory judgment action "is being used merely for procedural fencing or a race to res judicata; [and] whether the use of declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court." *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 97 (2d Cir. 2023). Here, the state court has spoken, and VDARE's declaratory judgment claim seeks to create just the sort of needless friction the Second Circuit warned against.

## III.   VDARE's First Amendment retaliation claims must be dismissed.

VDARE concedes that the First Amendment does not "prohibit[] the use of an administrative subpoena as an investigative tool" and that it sues only for First Amendment retaliation. D.E. 26 at 22. The parties agree on the standard for evaluating such a claim—VDARE must show that "(1) the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *See* D.E. 26 at 8 (quoting *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015)). VDARE does not dispute that establishing causation requires showing that "the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). The binding state court order has already ruled against VDARE on the first and third elements, and VDARE's own admissions

**AA0558**

independently establish that the OAG's investigation had a legitimate basis.

**A.  The state court ruled that VDARE has not established a First Amendment injury and that the OAG's investigation was justified.**

**1.    VDARE did not establish a First Amendment injury.**

After reviewing VDARE's filings, the state court concluded that VDARE "has not established that the Subpoena would impair [VDARE's] own First Amendment rights." D.E. 15 at 10. The court observed that VDARE had "partially complied with the subpoena for months" and could not articulate how "providing a redaction log for its already-produced documents raises any First Amendment concerns or why continuing production would pose a threat to its existence." *Id.* at 11. The court also ruled that contractor identities, including writers for VDARE's website, are central to the OAG's investigation of potential self-dealing. *Id.* The court observed that the overlap between contributors and board members could pose "conflicts of interest" and call into question "board independence." *Id.* Accordingly, the court ordered disclosure of their identities "to determine whether further conflicts of interest may exist." *Id.* [3]

The court accepted the OAG's argument—also made here, *see* D.E. 12-1 at 15—that anonymity in this circumstance "is unprotected by the First Amendment" because it could "mask violations of the law." *Id.* (quoting *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010)). The court concluded that any remaining concerns could be addressed by the OAG's proposed confidentiality order. *Id.* at 12. These findings bind this Court, contradict VDARE's claim of First Amendment injury, and defeat its retaliation claim. *See, e.g.*, *Trump*, 2002 WL 1718951, at *18; *Exxon Mobil Corp.*, 316 F. Supp. 3d at 710; *Temple of Lost Sheep*, 930 F.2d at

---

[3] VDARE asserts that the OAG has taken inconsistent positions regarding whether it seeks the identities of paid, contributing writers. *See* D.E. 26 at 6. But that is based on a misinterpretation of our prior filing. To be clear, the OAG seeks those identities as part of its investigation into possible self-dealing but does not seek the identity of volunteer contributors. *See* D.E. 15 at 11.

184–85. VDARE's attempt to relitigate these questions, D.E. 26 at 14–15, should be rejected.

### 2. The OAG's investigation is justified.

The state court also conclusively decided that the OAG's investigation has a legitimate purpose, which defeats VDARE's retaliation claim. Analyzing the OAG's investigation, the court found that the OAG's subpoena focuses on subject matter areas within its jurisdiction, D.E. 15 at 9, and that the requests are tailored to "demand the type of material that will permit [the OAG] to determine whether [VDARE] complied with the law," including documents necessary to determine "whether there has been any diversion of charitable assets." *Id.* at 9-10. The court also noted that VDARE admitted "the critical facts that first triggered [the OAG's] scrutiny— Peter Brimelow, [VDARE's] founder and director, and his wife, Lydia Brimelow, also a director used and continue to use a $1.4 million charitable asset as their personal residence." *Id.* at 10-11. These findings, which this Court must accept under res judicata, conclude the inquiry. Once an investigation has been shown to be independently justified, "an inquiry into the underlying motive…need not be undertaken." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).[4]

### B. VDARE's own admissions defeat its retaliation claim.

Even if the state court's ruling were not binding (and it is), VDARE's concession that the OAG investigation is justified independently defeats its retaliation claim. VDARE repeatedly admits that the OAG has the authority to issue the subpoena at issue. D.E. 26 at 4 ("Precisely because VDARE respects the OAG's broad authority to conduct regulatory oversight as the

---

[4] After failing in state court, VDARE tries to litigate the underlying question of its conduct before this Court. See D.E. 26 at 18–20. VDARE's justifications are premature and beyond the scope of this motion. The investigation is at an early stage, and no claims have been asserted against VDARE. As the state court already found, however, VDARE's protestations do not inspire confidence. Lydia Brimelow signed the "lease" for the Brimelows' residence at the castle as both tenant and landlord—on behalf of her family and a for-profit corporation she controls. *See* D.E. 15 at 11. Rather than diminishing suspicions of self-dealing, those facts amplify them.

OAG sees fit, it was complying with its investigative subpoena"), 11 ("Recognizing the OAG's broad discretion to exercise regulatory oversight of charities registered in New York and issue investigative subpoenas...VDARE produced over 6,000 pages of documents"). And VDARE concedes that this particular investigation is justified. *Id.* at 17-18 ("VDARE did not dispute the OAG's discretion to conduct oversight of a charity's purchase of such a property [the Berkeley Springs Castle] and instead addressed the issue in its disclosures"). VDARE cannot admit the investigation is justified then claim that retaliatory animus is the investigation's but-for cause. *See Nieves*, 139 S. Ct. at 1722. Its retaliation claim should be dismissed on that basis alone.

## IV. All claims under state law and all claims for money damages must be dismissed for lack of jurisdiction.

As the OAG argued without response from VDARE, the Court does not have jurisdiction to reach VDARE's state law claims. *See, e.g.*, *Alleyne v. N.Y. State Educ. Dep't*, 691 F. Supp. 2d 322, 335 (N.D.N.Y. 2010) ("Sovereign immunity bars state constitutional claims against the state, its agencies, or against its employees in their official capacity, regardless of the relief sought."). But even if the Court did have jurisdiction to hear those claims, they would fail on the merits—as VDARE admits, the standard for a retaliation claim is the same under the state and federal constitutions. D.E. 26 at 8. Likewise, all claims for money damages are also barred by the Eleventh Amendment. *See, e.g.*, *Aron v. Becker*, 48 F. Supp. 3d 347, 366 (N.D.N.Y. 2014).

### CONCLUSION

For the reasons described above, the Court should grant the motion to dismiss.

Dated: March 8, 2023

LETITIA JAMES
Attorney General for the State of New York
*Attorney for State Defendants*
s/ James G. Sheehan
James G. Sheehan
Bureau Chief, Charities

9

**AA0561**



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF SOCIAL JUSTICE
CHARITIES BUREAU

212.416.8391
Yael.Fuchs@ag.ny.gov

March 14, 2023

**Via Electronic Filing**

Hon. Christian F. Hummel
James T. Foley U.S. Courthouse
445 Broadway, Room 441
Albany, New York 12207

        Re:    *VDARE Foundation, Inc.* v. *James*, No. 22-cv-1337

Dear Judge Hummel:

The Attorney General writes to apprise the Court of a decision from the New York Supreme Court, Appellate Division, relevant to issues raised by the Motion to Dismiss. The Attorney General has argued that a January 23, 2023 final decision by the State Supreme Court compelling subpoena production has res judicata affect barring VDARE's lawsuit challenging the validity of that same subpoena. *See* D.E. 27. Although VDARE has appealed the Supreme Court's decision, the Appellate Division denied its motion for a stay pending appeal, and the Supreme Court's order remains in full force and effect. Because the Appellate Division's ruling bears directly on the procedural history addressed in our Office's recent briefing to this Court, I enclose a copy of that decision for the Court's review.

        Respectfully submitted,

        */s/ Yael Fuchs*
        Assistant Attorney General

Encl.

cc:    Counsel of Record (via ECF)

FILED: APPELLATE DIVISION - 1ST DEPT 03/09/2023 10:12 AM
NYSCEF DOC. NO. 7 RECEIVED NYSCEF: 03/09/2023
2023-00672

# Supreme Court of the State of New York

## Appellate Division, First Judicial Department

Present – Hon.  Barbara R. Kapnick,                          Justice Presiding,
                Cynthia S. Kern
                Anil C. Singh
                Saliann Scarpulla
                John R. Higgitt,                             Justices.

---

| People of the State of New York, by Letitia | Motion No. | **2023-00691** |
| James, Attorney General of the State of New | Index No. | 453196/22 |
| York, | Case No. | 2023-00672 |
| Petitioner-Respondent, | | |

                         -against-

VDARE Foundation, Inc.,
                Respondent-Appellant.

---

An appeal having been taken to this Court from an order of the Supreme Court, New York County, entered on or about January 23, 2023,

And respondent-appellant having moved to stay enforcement of the aforesaid order pending the hearing and determination of the appeal taken therefrom,

Now, upon reading and filing the papers with respect to the motion, and due deliberation having been had thereon,

It is ordered that the motion is denied. The interim relief granted by order of a Justice of this Court, dated February 08, 2023 is hereby vacated.

ENTERED: March 09, 2023

Susanna Molina Rojas
Clerk of the Court

**AA0563**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

VDARE FOUNDATION, INC.

                                            Civ. Action No.  22-cv-1337 ( FJS/CFH)

                       Plaintiff,

           - against- **ORDER TO SHOW CAUSE**
**FOR A TEMPORARY**
**RESTRAINING ORDER**

LATICIA JAMES, in her official capacity as
the Attorney General of the State of New York

                       Defendant.
-----------------------------------------------------------------x

         Upon reading and filing of an application by Plaintiff VDARE FOUNDATION,

INC. to stay Defendant LATICIA James, in her official capacity as the Attorney General of the

State of New York, from enforcing the  Decision and Order of the Appellate Division, First

Department, dated March 9, 2023 and entered March 10, 2023, made by Affirmation of Andrew

J. Frisch, attorney for Plaintiff, dated March 20, 2023, and the exhibits thereto, and the

accompanying Memorandum of Law, dated March 2020, 2023, and upon the copy of the

complaint hereto annexed, it is

         ORDERED, that the above- named defendant show cause before, the Hon. Frederick

J. Scullin, Jr. of the Northern District of New York, at the Courthouse located at 100 South Clinton

Street 7th Floor Syracuse, NY 13261-7367 on _____, at _____o'clock in the  noon thereof, or as soon

thereafter as counsel may be heard, why an order should not be issued pursuant to Rule 65 of the

Federal Rules of Civil Procedure immediately temporarily restraining and enjoining the defendant

during the pendency of this action from enforcing the Decision and Order of the Appellate Division,

First Department, dated March 9, 2023 and entered on March 10, 2023; and it is further

<div align="center">

**AA0564**

</div>

ORDERED that, sufficient reason having been shown therefor, pending the hearing of plaintiff's application for a preliminary injunction, pursuant to Rule 65, Fed. R. Civ. P., the defendant is immediately temporarily restrained and enjoined from enforcing the Decision and Order of the Appellate Division, First Department, dated March 9, 2023 and entered on March 10, 2023; and it is further

ORDERED that service of a copy of this Order, and the papers upon which it was granted, upon Plaintiff, by electronic mail to Plaintiff's counsel, AAG Yael Fuchs, Office of the Attorney General, 28 Liberty Street, New York, New York 10005, at the email address Yael.Fuchs@ny.ag.gov and telephone number 212-416-8391 on or before _____ be deemed good and sufficient service; and it is further

ORDERED that opposition papers shall be served on Respondent by electronic mail to Respondent's counsel Andrew J. Frisch at the email address afrisch@andrewfrisch.com by 5:00 p.m. on _____, 2023, ____ business days prior to the date set forth above for the hearing on Plaintiff's motion for a preliminary injunction; and it is

ORDERED that any reply papers shall be served upon Plaintiff by electronic mail to. Defendant's counsel, AAG Yael Fuchs, Office of the Attorney General, 28 Liberty Street, New York, New York 10005, at the email address Yael.Fuchs@ny.ag.gov and telephone number 212-416-839, ____ business days prior to the date set forth above for the hearing on Plaintiff's motion for a preliminary injunction.

DATED:   New York, New York

ISSUED:  _____

_____
United States District Judge

**AA0565**

AA0566

; and it is furthe

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

VDARE FOUNDATION, INC.

     *Plaintiff,*

   - against -        Civil Action No. 22-cv-1337 (FJS/CFH)

LETITIA JAMES, in her official capacity    **DECLARATION**
as Attorney General of the State of New York,

     *Defendant.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

    Andrew J. Frisch hereby declares the following pursuant to 28 U.S.C. § 1746:

    1.  I am counsel of record in this case for VDARE FOUNDATION, INC. ("VDARE") and submit this Declaration in support of VDARE's order to show cause seeking a temporary injunction to stay the  Office of the Attorney General's (the "OAG") enforcement of the Appellate Division, First Department's Order, dated March 9, 2023 (Docket No.28), reinstating of Judge Kraus Order, dated January 23, 2023 (Docket No. 15) and requiring the immediate production of constitutionally protected information, pending this Court's resolution of the OAG's motion to dismiss, and if denied, until resolution of this case. I am also counsel of record for VDARE in *James v. VDARE Foundation, Inc.*, N.Y. County Index No. 453196/2022, a special proceeding initiated by the Attorney General in the Supreme Court of the State of New York, County of New York ("state court"), after VDARE initiated this federal case.

    2.  The document identified below is a true and accurate copy as described.

.

# AA0568

3.      The document is as follows:

Exhibit A      A memorandum of law submitted by the OAG in the Appellate Division,
               First Department  (Case No. 2023-00672; NYSCEF Docket No 5.)

4.      Notice of the Order to Show cause was provided to the OAG on March 20, 2023.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

*/s/ Andrew J. Frisch*
Andrew J. Frisch

Executed on March 20, 2023

EXHIBIT A

FILED: APPELLATE DIVISION – 1ST DEPT 02/22/2023 08:46 PM

NYSCEF DOC. NO. 5

2023–00672

RECEIVED NYSCEF: 02/22/2023

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION – FIRST DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,
by Letitia James, Attorney General
of the State of New York

Mot. No. 691

Case No. 2023-00672

*Petitioner-Respondent,*

Supreme Court
New York County
Index No. 453196/2022

v.

VDARE FOUNDATION, INC.,

*Respondent-Appellant.*

# MEMORANDUM OF LAW IN OPPOSITION TO
# APPLICATION FOR A STAY PENDING APPEAL

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Respondent
28 Liberty Street
New York, NY 10005
(212) 416-8656

ESTER MURDUKHAYEVA
*Deputy Solicitor General*
ANDREA W. TRENTO
*Assistant Solicitor General*
*of Counsel*

Dated: February 22, 2023

**AA0571**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................... iii

PRELIMINARY STATEMENT ...................................................................... 1

BACKGROUND ............................................................................................ 3

    A.   Statutory Background ................................................................. 3

    B.   Factual and Procedural Background ......................................... 5

        1.   VDARE's suspected violations of New York law .............. 5

        2.   VDARE's minimal and deficient responses to New York State Office of the Attorney General (OAG) subpoena ........................................................................ 9

        3.   VDARE's preemptive federal action ............................... 12

        4.   OAG's state-court proceeding .......................................... 13

ARGUMENT .............................................................................................. 16

    THIS COURT SHOULD DENY VDARE'S MOTION FOR A STAY PENDING APPEAL ................................................................................... 16

    A.   VDARE Is Unlikely to Succeed on the Merits of Its Appeal. .................................................................................. 17

        1.   Supreme Court properly denied VDARE's motion to dismiss or, in the alternative, to stay the subpoena-compliance proceeding ................................................... 17

        2.   Supreme Court properly granted OAG's motion to compel. ...................................................................... 22

i

**AA0572**

**Page**

B.  Equitable Factors Weigh against Staying Supreme Court's Order That VDARE Comply with Its Outstanding Subpoena Obligations. ...................................... 32

 1. VDARE will not be harmed—irreparably  or otherwise—by complying with the order. ....................... 33

 2. The relative hardships of the parties weigh in favor of denying VDARE's application. .................................... 36

CONCLUSION ........................................................................ 38

AA0573

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abrams v. New York Found. for the Homeless,*
    190 A.D.2d 578 (1st Dep't 1993)................................................23

*Ace Prop. & Cas. Ins. Co. v. Federal-Mogul Corp.,*
    55 A.D.3d 479 (1st Dep't 2008)..............................................19

*Americans for Prosperity Foundation v. Bonta,*
    141 S. Ct. 2373 (2021)..................................................30-32

*Anheuser-Busch, Inc. v. Abrams,*
    71 N.Y.2d 327 (1988)................................................5, 23

*Brown v. Socialist Workers '74 Campaign Comm. (Ohio),*
    459 U.S. 87 (1982)..................................................27-28

*Burford v. Sun Oil Co.,*
    319 U.S. 315 (1943)..................................................13

*Citizens United v. Schneiderman,*
    882 F.3d 374 (2d Cir. 2018)..........................................23

*Da Silva v. Musso,*
    76 N.Y.2d 436 (1990)............................................16-17, 36

*DeLury v. City of New York,*
    48 A.D.2d 405 (1st Dep't 1975)....................................16, 33

*Herbert v. City of New York,*
    126 A.D.2d 404 (1st Dep't 1987)......................................17

*Hudgens v. NLRB,*
    424 U.S. 507 (1976)..................................................28

*In re Dreier,*
    438 B.R. 449 (Bankr. S.D.N.Y. 2010)..................................21

**AA0574**

| Cases | Page(s) |
|---|---|

*John Doe No. 1 v. Reed,*
561 U.S. 186, 201 (2010) ................................................................... 27

*Kent Dev. Co. v. Liccione,*
37 N.Y. 2d 899 (1975) ........................................................................ 18

*L-3 Communications Corp. v. SafeNet, Inc.,*
45 A.D.3d 1 (1st Dep't 2007) ............................................................ 19

*Matter of American Dental Coop., Inc. v. Attorney-General of
State of N.Y.,*
127 A.D.2d 274 (1st Dep't 1987) ...................................................... 25

*Matter of Doe v. Kuriansky,*
91 A.D.2d 1068 (2d Dep't 1983) ........................................................ 4

*Matter of Evergreen Assn., Inc. v. Schneiderman,*
153 A.D.3d 87 (2d Dep't 2017) .................................................. 24, 31-32

*Matter of Giardina v. James,*
185 A.D.3d 451 (1st Dep't 2020) ...................................................... 22

*Matter of La Belle Creole Intl., S.A. v. Attorney-General of State of N.Y.,*
10 N.Y.2d 192 (1961) .......................................................................... 4

*Matter of Libre by Nexus, Inc. v. Underwood,*
181 A.D.3d 488 (1st Dep't 2020) ................................................ 23, 25-26

*Matter of Nicholson v. State Commn. on Jud. Conduct,*
50 N.Y.2d 597 (1980) ........................................................................ 22

*Matter of Roemer v. Cuomo,*
67 A.D.3d 1169 (3d Dep't 2009) ....................................................... 23

*Pirraglia v. Jofsen, Inc.,*
148 A.D.3d 648 (1st Dep't 2017) ...................................................... 17

*Rand v. Rand,*
201 A.D.2d 403 (1st Dep't 1994) ...................................................... 17

iv

**AA0575**

**Cases**                                                          **Page(s)**

*Syncora Guar. Inc. v. J.P. Morgan Sec. LLC,*
    110 A.D.3d 87 (1st Dep't 2013) ........................................................... 19

*Virag v. Hynes,*
    54 N.Y.2d 437 (1981) ........................................................................... 37

*Volokh v. James,*
    No. 22-cv-10195, 2023 WL 1991435 (S.D.N.Y. Feb. 14, 2023) ........... 35

*Walsh v. Goldman Sachs & Co.,*
    185 A.D.2d 748 (1st Dep't 1992) ........................................................... 18

*White Light Prods. v. On the Scene Prods.,*
    231 A.D.2d 90 (1st Dep't 1997) ....................................................... 19-20

*Wiseman v. American Motors Sales Corp.,*
    103 A.D.2d 230 (2d Dep't 1984) ........................................................... 26

**Constitution**

N.Y. Const. art. I, § 8 ............................................................................ 12

**Laws**

C.P.L.R. § 3211 ...................................................................................... 18

Estates, Powers and Trusts Law § 8-1.4 ................................................. 3

Executive Law
    art. 7-a ............................................................................................... 24
    § 63 ...................................................................................................... 4
    § 172 .................................................................................................... 6
    § 172-b .............................................................................................. 29
    § 172-e .............................................................................................. 29

General Business Law § 394-ccc ...................................................... 34-35

| **Laws** | **Page(s)** |
|---|---|

Not-for-Profit Corporation Law
§ 112.................................................................................. 4
§§ 509-511-a ................................................................... 24
§ 509 .................................................................................... 8
§ 510 .................................................................................... 8
§ 515 ................................................................................ 24
§ 715 ............................................................................ 8, 24
§ 715-a ........................................................................... 24

## Miscellaneous Authorities

Davies, Mark, et al., 8 *New York Practice Series, Civil Appellate Practice* § 9:4 (3d ed. May 2022 update) (Westlaw) ...................... 17, 36

The Editorial Board, *All About Nikki Haley's Donors*, Wall St. J. (Sept. 4, 2022), https://www.wsj.com/articles/all-about-nikki-haleys-donors-new-york-attorney-general-letitia-james-stand-for-america-11662065044 ........................................................ 29

Isenstadt, Alex, *Document Reveals Identity of Donors Who Secretly Funded Nikki Haley's Political Nonprofit*, POLITICO (Aug. 26, 2022), https://www.politico.com/news/2022/08/26/donors-secretly-funded-nikki-haleys-nonprofit-00053963 ............................................. 29

VDARE.com, https://vdare.com/donate ................................................... 37

**AA0577**

## PRELIMINARY STATEMENT

In this special proceeding to compel compliance with a subpoena duces tecum, the New York State Office of the Attorney General (OAG) has amply demonstrated that its subpoena to VDARE Foundation, Inc. is reasonably related to the State's strong interest in the regulation of charitable organizations for the public good. VDARE has stymied OAG's investigation at every turn—first by seeking numerous extensions of the compliance deadline, then by producing a trickle of documents with heavy and unexplained redactions, and finally by filing a preemptive lawsuit in federal district court seeking to enjoin OAG's investigation in its entirety and dallying in seeking relief in even that action. Supreme Court, New York County (Kraus, J.) properly granted OAG's motion to compel VDARE's compliance with the duly issued subpoena and denied VDARE's motion to dismiss or stay the subpoena-compliance proceeding pending resolution of its federal action. This Court should deny VDARE's request for the extraordinary relief of a stay of Supreme Court's order pending appeal.

*First*, VDARE has failed to show that it is likely to succeed on the merits of its appeal. VDARE's insistence that Supreme Court was required

**AA0578**

to defer to the "first-filed" federal case is wrong as a matter of law—both because the "first-filed" rule does not apply where the relief sought in the later-filed action (that is, compliance with an OAG investigative subpoena) is not available in the earlier-filed action, and because it is not controlling where the actions were filed near in time to one another or where one party files first preemptively after learning of the opposing party's intent to commence litigation. In any event, VDARE's assertion that OAG's investigation is motivated by harassment or retaliation is bereft of any evidence and is belied by the facial legitimacy of the subpoena.

*Second*, equitable factors also support denial of VDARE's application for stay pending appeal. VDARE has not put forward any evidence that it faces irreparable harm from the denial of its application; indeed, VDARE's copious litigation delays bely any allegation of harm. By contrast, a stay would prolong OAG's already-delayed investigation by months, to the detriment of the public interest in expeditious investigations and ensuring the compliance by organizations like VDARE with laws governing misuse of charitable assets.

2

**AA0579**

# BACKGROUND

## A.    Statutory Background

VDARE is a charitable non-profit corporation organized under the laws of the State of New York. Affirm. of Andrew J. Frisch in Supp. of Appl. for Stay & Interim Relief Pending Appeal (Frisch Affirm.) ¶ 4 (Feb. 6, 2023); *Id.*, Ex. A (Supreme Court Decision & Order on Mot. (Jan. 23, 2023)) at 1.[1] New York charitable organizations and their officers, directors, and trustees are subject to regulation by the State.

As relevant here, OAG is empowered to "investigate transactions and relationships of trustees for the purpose of determining whether or not property held for charitable purposes has been and is being properly administered," including by "subpoena" for the "production of any books or papers" and "examin[ation]" of "any . . . witness under oath." Estates, Powers and Trusts Law § 8-1.4(i); *see id.* § 8-1.4(a)(2) ("trustee" defined to include "any non-profit corporation organized under the laws of this state for charitable purposes").

---

[1] The Frisch Affirmation is NYSCEF Doc. No. 3 in this appellate proceeding. All other references to NYSCEF documents herein are to the electronic docket of the trial court. All lettered exhibit references are to the exhibits attached to the Frisch Affirmation.